Uzoma N. Nkwonta* (DC Bar No. 975323)
unkwonta@elias.law
Branden D. Lewiston* (DC Bar No. 252550)
blewiston@elias.law
Julianna D. Astarita* (DC Bar No. 90041368)
jastarita@elias.law
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135

Tyler L. Bishop (CA Bar No. 337546)
tbishop@elias.law
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (202) 948-1135

Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 786-3478
F: (213) 277-8989

*Counsel for Proposed Intervenor-Defendants Services, Immigrant Rights and Education Network and Mi Familia en Acción*

* *Pro hac vice application forthcoming*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA; SHIRLEY N. WEBER, in her official capacity as Secretary of State of California; and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,<br><br>Defendants. | Case No: 2:26-cv-12025<br><br>**MOTION TO INTERVENE OF SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK AND MI FAMILIA EN ACCIÓN**<br><br>Hearing Date: TBD* |

**NOTICE OF MOTION AND MOTION TO INTERVENE**

Services, Immigrant Rights and Education Network ("SIREN"), and Mi Familia en Acción ("MFA") (together, "Proposed Intervenors") respectfully request that this Court grant them leave to intervene as defendants in this case as of right under Federal Rule of Civil Procedure 24(a)(2). Alternatively, Proposed Intervenors request that the Court grant them permissive intervention under Rule 24(b).

In support of their Motion, Proposed Intervenors submit and incorporate the below Memorandum of Points and Authorities, declarations submitted by Proposed Intervenors (attached as Exhibits A and B), a Proposed Answer submitted pursuant to Rule 24(c) (attached as Exhibit C), the Declaration of Tyler L. Bishop (attached as Exhibit D), and a Proposed Order.

In view of the Department of Justice's stated intent to seek emergency relief, and the nature of its claim, which seeks to enjoin ongoing mail voting procedures, compliance with Local Civil Rule 7-3's seven-day waiting period is not practicable. Proposed Intervenors nonetheless contacted counsel for the parties in a good-faith effort to confer on their motion. *See* Bishop Decl. ¶ 3. Defendant Secretary of State Shirley Weber does not oppose the motion. *Id.* ¶ 4. Plaintiff was unavailable to confer prior to filing. *Id.* ¶ 5.

Dated: October 15, 2026

Respectfully submitted,

*/s/ Max Schoening*
Omar Qureshi (CA Bar No. 323493)
Max Schoening (CA Bar No. 324643)
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 786-3478
omar@qureshi.law
max@qureshi.law

Uzoma N. Nkwonta*
Branden D. Lewiston*
Julianna D. Astarita*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
F: (202) 968-4498
unkwonta@elias.law
blewiston@elias.law
jastarita@elias.law

Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (202) 948-1135
tbishop@elias.law

*Counsel for Proposed Intervenor-Defendants SIREN and MFA*

* *Pro hac vice application forthcoming*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ IV
INTRODUCTION ........ 1
BACKGROUND ........ 3
I. Federal law assigns election administration responsibilities to States, consistent with the Constitution's separation of powers. ........ 3
II. DOJ's prior efforts to meddle with California's voter-list practices have been rejected by courts repeatedly. ........ 4
III. DOJ's new lawsuit threatens disenfranchisement of lawful voters and chaos weeks before the November 2026 election. ........ 6
IV. Proposed Intervenors have strong interests in preventing DOJ's demands. ........ 9
LEGAL STANDARD ........ 11
ARGUMENT ........ 12
I. Proposed Intervenors are entitled to intervene as of right. ........ 12
A. This motion is timely. ........ 12
B. Proposed Intervenors' interests are threatened by this action. ........ 12
1. The requested relief threatens Proposed Intervenors' voter engagement efforts and deters the voters they serve. ........ 13
2. The requested relief would make it more difficult for Proposed Intervenors to carry out their missions. ........ 15
C. The existing parties do not adequately represent Proposed Intervenors' interests. ........ 16
II. The Court should alternatively grant permissive intervention. ........ 20
CONCLUSION ........ 21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*1789 Found. Inc. v. Fontes*,
No. CV-24-02987, 2025 WL 834919 (D. Ariz. Mar. 17, 2025) .................... 13, 16

*Arakaki v. Cayetano*,
324 F.3d 1078 (9th Cir. 2003) ............................................................ 11, 12, 18

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .................................................................... 4

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)............................................................................................ 3

*Barke v. Banks*,
No. 8:20-cv-358, 2020 WL 2315857 (C.D. Cal. May 7, 2020) .......................... 18

*Bellitto v. Snipes*,
No. 16-cv-61474, 2016 WL 5118568 (S.D. Fla. Sep. 21, 2016) .................. 13, 14

*Bellitto v. Snipes*,
935 F.3d. 1192 (11th Cir. 2019) ........................................................... 18, 19

*Berger v. N.C. State Conf. of the NAACP*,
597 U.S. 179 (2022)................................................................................ 3, 18, 20

*Callahan v. Brookdale Senior Living Cmtys., Inc.*,
42 F.4th 1013 (9th Cir. 2022) ........................................................................ 21

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
647 F.3d 893 (9th Cir. 2011) ............................................................... 17, 18

*Clark v. Putnam Cnty.*,
168 F.3d 458 (11th Cir. 1999) ...................................................................... 19

*Common Cause v. U.S. Dep't of Just.*,
No. 1:26-cv-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ......................... 5–7

*Foster v. Love*,
522 U.S. 67 (1997) ........ 3

*Freedom from Religion Found. v. Geithner*,
644 F.3d 836 (9th Cir. 2011) ........ 12

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) ........ 17

*GHP Mgmt. Corp. v. City of Los Angeles*,
339 F.R.D. 621 (C.D. Cal. 2021) ........ 17

*In re Exch. Union Co.*,
No. 24-mc-91645, 2025 WL 894652 (D. Mass. Mar. 24, 2025) ........ 21

*Issa v. Newsom*,
No. 2:20-cv-1044, 2020 WL 3074351 (E.D. Cal. June 10, 2020) ........ 12, 16

*Jud. Watch, Inc. v. Ill. State Bd. of Elections*,
No. 24 C 1867, 2024 WL 3454706 (N.D. Ill. July 18, 2024) ........ 13, 14, 16

*Kleissler v. U.S. Forest Serv.*,
157 F.3d 964 (3d Cir. 1998) ........ 17

*La Union del Pueblo Entero v. Abbott*,
29 F.4th 299 (5th Cir. 2022) ........ 16

*League of Women Voters of N.C. v. North Carolina*,
No. 1:13-cv-660, 2014 WL 12770081 (M.D.N.C. Jan 27, 2014) ........ 20

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
835 F. Supp. 3d 79 (D.D.C. 2026) ........ 8

*March for Our Lives Idaho v. McGrane*,
697 F. Supp. 3d 1029 (D. Idaho 2023) ........ 14

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ........ 4

*Mi Familia Vota v. Fontes*,
719 F. Supp. 3d 929 (D. Ariz. 2024) .................. 2, 10, 14, 16

*Paher v. Cegavske*,
No. 3:20-cv-243, 2020 WL 2042365 (D. Nev. Apr. 28, 2020) .................. 16

*Pub. Int. Legal Found., Inc. v. Winfrey*,
463 F. Supp. 3d. 795 (E.D. Mich. 2020) .................. 19, 20

*Republican Nat'l Comm. v. Aguilar*,
No. 2:24-cv-518, 2024 WL 3409860 (D. Nev. July 12, 2024) .................. 20

*San Jose Mercury News, Inc. v. U.S. Dist. Ct.*,
187 F.3d 1096 (9th Cir. 1999) .................. 12

*Sw. Ctr. for Biological Diversity v. Berg*,
268 F.3d 810 (9th Cir. 2001) .................. 11, 13, 16

*Trbovich v. United Mine Workers of Am.*,
404 U.S. 528 (1972) .................. 17, 18

*United Guar. Residential Ins. Co. v. Phila. Sav. Fund Soc'y*,
819 F.2d 473 (4th Cir. 1987) .................. 19

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .................. 5

*United States v. Benson*,
No. 1:25-CV-1148, 2025 WL 3520406 (W.D. Mich. Dec. 9, 2025) .................. 19

*United States v. Oregon*,
No. 6:25-cv-1666, 2025 WL 3496571 (D. Or. Dec. 5, 2025) .................. 15, 19

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .................. 2, 3, 5

*W. Expl. LLC v. U.S. Dep't of Interior*,
No. 3:15-cv-00491, 2016 WL 355122 (D. Nev. Jan. 28, 2016) .................. 17

*W. Watersheds Project v. Haaland*,
22 F.4th 828 (9th Cir. 2022) ........ 11, 12, 21

*Yniguez v. Arizona*,
939 F.2d 727 (9th Cir. 1991) ........ 14

**Constitution**

U.S. Const. art. I, § 4, cl. 1 ........ 3

**Statutes**

52 U.S.C. § 20507(c)(2)(A) ........ 1, 4

Cal. Elec. Code § 3000.5(a) ........ 9

**Rules**

Fed. R. Civ. P. 24 ........ 12, 20

**Other Authorities**

Jack Friedman & Wren Orey, *Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices*, MIT Election Lab (Oct. 1, 2026), https://electionlab.mit.edu/articles/evaluating-how-uscis-save-system-performs-practice ........ 8

Letter from Anonymous Whistleblower to Alex Padilla, U.S. Senator (Sep. 8, 2026) ........ 9

Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html ........ 7, 8

Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States Over Elections*, NBC News (July 17, 2026) ........ 19

Sarah N. Lynch, *Top U.S. DOJ Official Orders California to Review List of Possible Noncitizens Who Received Mail Ballots*, CBS News (Oct. 14, 2026), https://www.cbsnews.com/news/justice-department-california-noncitizens-mail-ballots/ ........ 7

7C *Wright & Miller's Federal Practice & Procedure* § 1909 (3d ed.) ........ 17

## INTRODUCTION

Less than three weeks before Election Day, and with ballots already in the hands of California voters, the U.S. Department of Justice ("DOJ") asks this Court to deny ballots to lawfully registered voters and set aside ballots already cast by others. The targeted voters—over 20,000 in total—were identified on a list derived through an error-prone matching process and delivered to local officials on a thumb drive, with a password on a sticky note, which DOJ gave officials only 48 hours to review before DOJ filed its lawsuit seeking to compel California to do its bidding.

No federal law authorizes DOJ's extraordinary demand, which would upend California's elections and would result in an unprecedented intrusion of the federal government into state-run election administration. The Constitution assigns States the authority to set and enforce voter qualifications and administer their elections, subject to certain safeguards enacted by Congress and designed to protect voters during federal elections. Among them, the National Voter Registration Act ("NVRA") bars systematic programs to remove ineligible voters from the rolls in the 90 days before an election, because that is when mistakes based on flawed data are most likely to disenfranchise eligible voters. 52 U.S.C. § 20507(c)(2)(A). DOJ's demand, which arrives well inside that window, seeks an end-run around that statutory protection and constitutional structure—all in pursuit of strong-arming California into aligning its election procedures with the preferences of the President. Put simply, DOJ seeks to enlist this Court in an effort to take over California's elections and decide who gets to have their votes count. DOJ's effort is lawless.

Proposed Intervenors—Services, Immigrant Rights and Education Network ("SIREN"), and Mi Familia en Acción ("MFA")—are nonprofit organizations that represent and serve California voters. They move to intervene as Defendants under Federal Rule of Civil Procedure 24 to protect their interests and the interests of the

members and communities they represent from DOJ's assault. DOJ's requested relief threatens to disenfranchise Proposed Intervenors' members and constituents, including naturalized citizens who are highly likely to get swept up in DOJ's error-prone citizenship verification campaign. It also threatens to undermine Proposed Intervenors' voter registration, voter education, and get-out-the-vote efforts because naturalized citizens and other eligible voters in communities Proposed Intervenors serve will likely be deterred from voting for fear of being misidentified as noncitizen voters and having their ballots ultimately discarded.

Proposed Intervenors are no strangers to combatting voter suppression, including from DOJ. MFA's sister organization—Mi Familia Vota—brought successful litigation challenging several discriminatory provisions of Arizona's voting laws that would have harmed naturalized citizens; the district court found the organization had standing to challenge those laws to protect its constituents and organizational mission. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 984–85 (D. Ariz. 2024), *aff'd in part, vacated in part,* 129 F.4th 691 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026). SIREN successfully intervened and prevailed in DOJ's lawsuit demanding California's unredacted voter files over purported concerns with ineligible voters. *United States v. Weber*, 816 F. Supp. 3d 1168, 1179 (C.D. Cal. 2026) ("*Weber*"), *appeal argued*, No. 26-1232 (9th Cir. May 19, 2026). SIREN also successfully intervened in *Wagner v. Weber*, a private lawsuit (to which DOJ now seeks to relate this action) seeking to compel voter purges under the NVRA. Minutes of Motion Hearing, *Wagner v. Weber*, No. 8:26-cv-1263-MCS (C.D. Cal. Sep. 28, 2026) ("*Wagner*"), ECF No. 35. In both cases, the courts recognized that Secretary Weber does not adequately represent the interests of private civic organizations: She is an election official who must "bear in mind broader public-policy implications," whereas Proposed Intervenors seek to vindicate their own

interests "full stop." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022). And on DOJ's compressed timeline, she and the other governmental defendants in this matter must weigh threats of federal retaliation if they do not compromise with DOJ. Proposed Intervenors face no such countervailing considerations and will defend their interests with zeal.

For these reasons and those set forth below, the Court should grant Proposed Intervenors' motion to intervene as of right under Rule 24(a)(2). Alternatively, the Court should grant permissive intervention under Rule 24(b).

## BACKGROUND

### I. Federal law assigns election administration responsibilities to States, consistent with the Constitution's separation of powers.

The Constitution's Elections Clause "invests the States with responsibility for the mechanics of congressional elections," subject only to Congress's power to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). Even then, Congress's power is strictly limited to preempting State laws on the "Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. Nothing in that limited grant of authority empowers the federal government to decide *who* gets to vote; the Constitution commits the power to set and enforce voter qualifications to the *States*. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16–17 (2013). This structure is deliberate: since the founding, the Elections Clause "has constitutionally prevented the centralization of election management in the Executive." *Weber*, 816 F. Supp. 3d at 1175.

Congress has enacted certain laws governing voter registration, but nothing in those laws empowers the federal government to create a list of registered voters whom it "believes" to be noncitizens and then demand that States deny them access to the ballot box. Compl. ¶ 45. To the contrary, the NVRA charges *States* with the "administration of voter registration for elections for Federal office." 52 U.S.C.

§ 20507(a). The whole premise of that regulatory scheme is that if a voter is registered at the time of an election, they get to cast a ballot and have that ballot count. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 711 (9th Cir. 2025) (rejecting "narrow view" that the NVRA governs only "voter registration—not rules for casting a ballot by mail" as "contrary to the text of the NVRA which declares the right 'to vote' is a fundamental right and establishes purposes beyond registration"), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).

The NVRA also imposes strict procedural safeguards on removing voters from the rolls, which DOJ seeks to circumvent here. Most notably, the NVRA requires States to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). The 90-day bar applies to removal programs targeting suspected noncitizens. *See Mi Familia Vota*, 129 F.4th at 715–17. Congress drew this line because the window before an election is when erroneous "maintenance" is most likely to disenfranchise entirely eligible voters, who might have little or no time to correct the error. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). DOJ's eleventh-hour demand here to have California refuse to send ballots to some voters and refuse to count ballots cast by others is a blatant attempt to make an end-run around this requirement.

## II. DOJ's prior efforts to meddle with California's voter-list practices have been rejected by courts repeatedly.

This lawsuit is the latest chapter in a now-18-months-long federal campaign to intrude upon States' election administration processes—a campaign courts have rejected at every turn. In March of 2025, the President directed the Attorney General to obtain States' voter information and "prioritize enforcement" against

States that do not cooperate. *Common Cause v. U.S. Dep't of Just.* No. 1:26-cv-1352, 2026 WL 3033772, at *4 (D.D.C. Oct. 9, 2026) (discussing Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)). DOJ then demanded unredacted voter lists from nearly every State, shared the data with the Department of Homeland Security ("DHS") to run it through the Systematic Alien Verification for Entitlements ("SAVE") database, and pressed States to remove voters flagged as potentially ineligible. *Id.* at *4–6.

California refused to hand over voters' sensitive data, and DOJ sued. *See* Complaint, *Weber*, No. 2:25-cv-9149 (C.D. Cal. Sep. 25, 2025), ECF No. 1. SIREN and other organizations intervened, and the court granted their motion to dismiss. *Weber*, 816 F. Supp. 3d at 1196. Every federal district court to address DOJ's similar demands for unredacted voter lists has dismissed DOJ's lawsuits. *See Common Cause*, 2026 WL 3033772, at *65 n.3 (collecting cases); *see also United States v. Benson*, 179 F.4th 470 (6th Cir.), *reh'g en banc denied*, 187 F.4th 462 (6th Cir. 2026).

Just last week, a federal court in D.C. went further and vacated the policy at the heart of DOJ's unlawful campaign. In *Common Cause*, the court held DOJ's "Voter List Maintenance Policy"—collecting state voter lists, running them through SAVE, and demanding that States remove the voters DOJ flagged—unlawful several times over. *Common Cause*, 2026 WL 3033772, at *1, *8. The court explained that "[b]ehind all the window dressing, the challenged policy represents the federal government's attempt to decide who gets to vote. But Congress has left that authority where our Constitution has always placed it: with the states." *Id.* at *1. The court also held DOJ's efforts were arbitrary and capricious because DOJ "entirely failed to consider the risk that its use of citizenship records" would lead to flawed demands to "remove U.S. citizens." *Id.* at *8. It emphasized that DOJ's efforts to target purported noncitizens have already resulted in the

"remov[al of] citizens from the voter rolls in their home states and risks disenfranchising many more." *Id.* at *2.

### III. DOJ's new lawsuit threatens disenfranchisement of lawful voters and chaos weeks before the November 2026 election.

On July 16, 2026, Secretary of Homeland Security Markwayne Mullin sent Secretary Weber a letter alleging that there may be "as many as 190,832" noncitizens registered to vote in California. Compl. Ex. A at 1 (July 16, 2026 Letter from Markwayne Mullin, Sec'y of Dep't of Homeland Sec.), ECF No. 1-1. Secretary Weber responded on July 23, requesting "[a] detailed description of the methodology utilized by DHS to identify these allegedly ineligible voters," including the "data sources, software, and matching criteria utilized in this analysis." Compl. Ex. B at 2 (July 23, 2026 Letter from Shirley N. Weber, Cal. Sec'y of State), ECF No. 1-2.

DOJ's only apparent response to that request for further information came on October 13—just three weeks before the November 3 general election, and after California had already begun mailing ballots to registered voters—in the form of a 48-hour ultimatum. *See* Compl. ¶ 47; Compl. Ex. C (Oct. 13, 2026 Letter from R. Trent McCotter, Acting Deputy Att'y Gen.), ECF No. 1-3. DOJ sent a letter stating that it delivered to Los Angeles County (but not, apparently, Secretary Weber) a "password-protected thumb drive" of individuals the federal government "believes are likely noncitizens" who were sent vote-by-mail ballots. Compl. Ex. C at 1. DOJ then demanded that election officials (1) refuse to send ballots to anyone on the list until their citizenship is confirmed; (2) "segregate[]" any ballots those voters return; and (3) not tabulate ballots already returned "until citizenship can be determined." *Id.* at 3. If California does not comply, the letter warned, DOJ "will have no choice but to seek emergency relief." *Id.* DOJ did not answer any of

Secretary Weber's questions regarding the methodology used to create the list or the sources of data used to create it.

DOJ sent a similar letter directly to the Los Angeles County Registrar. Compl. Ex. D (Oct. 13, 2026 Letter from R. Trent McCotter, Acting Deputy Att'y Gen.), ECF No. 1-4. The Registrar confirmed that his office received DOJ's letter but said it had not opened the accompanying USB drive, which came with a handwritten password, because doing so "would conflict with established data privacy and information security protocols."[1] He added that his office does not consider the drive a secure medium, and that DOJ's letter does not say how many voters are on the list or what information the records contain.[2]

Everything known about how the federal government generates its lists of purported "noncitizens" indicates that DOJ's list likely sweeps in eligible voters, particularly naturalized citizens. Just last week, a federal court stressed that DOJ has "failed to consider the risk that its use of citizenship records known to be unreliable would lead [it] to demand that states remove U.S. citizens from their voter rolls." *Common Cause*, 2026 WL 3033772, at *8. Earlier this year, DHS told Nevada that federal records showed the State may have nearly 16,000 noncitizens on its rolls—but when pressed, DHS then cut the number to 185, meaning over 15,000 citizens were falsely flagged as possible noncitizens.[3] Even then, Nevada election officials informed DHS that "[a]s for the 185 individuals, our records

---

[1] Sarah N. Lynch, *Top U.S. DOJ Official Orders California to Review List of Possible Noncitizens Who Received Mail Ballots*, CBS News (Oct. 14, 2026), https://www.cbsnews.com/news/justice-department-california-noncitizens-mail-ballots/.

[2] *See id.*

[3] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html.

indicate that they were citizens," and DHS provided no information to suggest otherwise.[4] Similar examples abound. An independent review in Travis County, Texas, found that 25% of voters alleged by the federal government to be "noncitizens" had already proven their citizenship. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 115 (D.D.C. 2026). A separate manual audit conducted by Utah found that, of 8,917 individuals flagged as "potential noncitizens" by the federal government, nearly all were citizens.[5]

The government's correspondence indicates that its data in California may be similarly inaccurate. Secretary Mullin's initial letter to Secretary Weber indicated that there could be "as many as 190,832 non-citizens" registered to vote, *see* Compl. Ex. A (Letter from Secretary Mullin); that number has been revised downward significantly, though it remains indeterminate. *Compare* Compl. ¶ 46 (identifying "nearly 20,000" suspected noncitizens registered to vote), *with* Compl. ¶ 47 (noting that the list provided to Defendants included "over 20,000 individuals" it believes are noncitizens).

Finally, a federal whistleblower has described deeply troubling processes that likely produced DOJ's list. According to a September disclosure, officers working for DHS's "Unlawful Voter Initiative" were given less than two hours of training, quotas of reviewing records for 40 voters a day (about 12 minutes each), and unreliable data that likely included naturalized citizens.[6] Officials described

---

[4] *See id.*

[5] Jack Friedman & Wren Orey, *Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices*, MIT Election Lab (Oct. 1, 2026), https://electionlab.mit.edu/articles/evaluating-how-uscis-save-system-performs-practice.

[6] *See* Letter from Anonymous Whistleblower to Alex Padilla, U.S. Senator (Sep. 8, 2026), *available at* https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf.

the data as compiled with "supplemental magic."[7] The disclosure also reports that officers were directed to search California's voter lookup system specifically using individuals' personal information.[8]

DOJ has now filed suit seeking extraordinary relief from this Court: an injunction enjoining California from sending to or tabulating mail ballots from registered voters on DOJ's list of suspected noncitizens. Compl. ¶ 63.

## IV. Proposed Intervenors have strong interests in preventing DOJ's demands.

Proposed Intervenors are dedicated to protecting the rights of California voters, many of whom are naturalized citizens most likely to be wrongly flagged by federal citizenship data. *See* Ex. A, Decl. of Huy Tran ("Tran Decl.") ¶¶ 4–6; Ex. B, Decl. of Angelica Razo ("Razo Decl.") ¶¶ 5–6, 9. Each organization works to register, educate, and turn out voters in communities historically excluded from the political process. Tran Decl. ¶¶ 4–5, 7; Razo Decl. ¶¶ 3–5. And each is in the middle of its get-out-the-vote program for an election in which ballots have already been sent out to voters. *See* Cal. Elec. Code § 3000.5(a).

If DOJ obtains the relief it seeks, members who are eligible citizens could have their ballots withheld, set aside, or left uncounted, with no notice of why they were flagged and no opportunity to clear their names before the results are certified. *See supra* Background § III. Proposed Intervenors cannot ignore that kind of last-minute disruption. They would have to pull staff and volunteers from planned get-out-the-vote work to identify affected constituents, help them prove their citizenship, and make sure their ballots are counted. Tran Decl. ¶ 11; Razo Decl. ¶ 13.

---

[7] *Id.*
[8] *Id.*

***SIREN.*** SIREN is an advocacy and direct-services organization that empowers immigrants and refugees through community education, organizing, policy advocacy, civic engagement, and legal services. Tran Decl. ¶¶ 3–4. It has roughly 120 members throughout California, and it serves a broader constituency of immigrants, refugees, and naturalized citizens. *Id.* ¶ 4. A core part of SIREN's work is helping recently naturalized citizens register and vote for the first time. *Id.* ¶ 6. Those voters face the greatest risk of being wrongly flagged as noncitizens, because federal records often fail to reflect naturalization. *Id.* ¶¶ 14–15; *supra* Background § III. Many already fear registering to vote will invite government scrutiny, and enforcement of a secret federal list of "likely noncitizens" whose ballots must be investigated and set aside would confirm those fears, undermining SIREN's mission. Tran Decl. ¶¶ 9, 14.

***Mi Familia en Acción.*** MFA is a national nonprofit civic engagement organization that works to build Latino political power by expanding the electorate through citizenship assistance, voter registration, voter education, and get-out-the-vote programs. Razo Decl. ¶ 3–4. MFA and its affiliate, Mi Familia Vota, have a long history of protecting the right to vote, including in litigation against the federal government and state governments to eliminate voting restrictions that place unlawful burdens on naturalized citizens. *See, e.g.*, *Mi Familia Vota*, 719 F. Supp. 3d 929.

MFA's work in California includes encouraging Latino voters and allied communities to participate in the electoral process. Razo Decl. ¶¶ 4–5. In the next few weeks before Election Day, MFA intends to engage with approximately 50,000 voters in California. *Id.* ¶ 7. As with SIREN, many of the individuals MFA serves are naturalized citizens, who are the voters most likely to appear on a list generated from outdated federal records. *Id.* ¶¶ 5–6. If DOJ's demand succeeds, MFA would have to divert staff and volunteers from voter turnout work in the final weeks of

the election to help those voters confirm their status and ensure their ballots are counted. *Id.* ¶¶ 10–11, 13. And DOJ's misguided and highly error-prone quest to identify purported noncitizen voters deters eligible citizens that MFA seeks to bring into the electorate. *Id.* ¶ 12.

## LEGAL STANDARD

A party seeking to intervene as of right must satisfy four requirements:

> (1) the applicant must timely move to intervene; (2) the applicant must have a significantly protectable interest relating to the property or transaction that is the subject of the action; (3) the applicant must be situated such that the disposition of the action may impair or impede the party's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties.

*Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003).

Rule 24(a)(2) "traditionally receives liberal construction in favor of applicants for intervention," *id.*, and the Ninth Circuit requires "interpret[ing] these requirements broadly in favor of intervention," guided by "practical considerations, not technical distinctions." *W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022) (quoting *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011)). Courts must "take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

"A motion for permissive intervention pursuant to Rule 24(b) is directed to the sound discretion of the district court." *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1100 (9th Cir. 1999). Only two factors must be satisfied where,

as here, the intervening party does not intend to assert additional "new claims" for relief: (1) the motion must be timely and (2) the applicant's claim or defense must have a question of law or fact in common with the main action. *Freedom from Religion Found. v. Geithner*, 644 F.3d 836, 841, 844 (9th Cir. 2011).[9]

## ARGUMENT

### I. Proposed Intervenors are entitled to intervene as of right.

#### A. This motion is timely.

Proposed Intervenors' motion is indisputably timely. To make this determination, courts consider the totality of the circumstances, including "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of [any] delay." *W. Watersheds Project*, 22 F.4th at 835–36. These factors are plainly satisfied as this motion comes merely hours after Plaintiff's filing. *See Issa v. Newsom*, No. 2:20-cv-1044, 2020 WL 3074351, at *2 (E.D. Cal. June 10, 2020) (concluding motion to intervene was timely when filed before any "substantive proceedings have occurred").

#### B. Proposed Intervenors' interests are threatened by this action.

Proposed Intervenors also have several "significantly protectable interest[s]" at stake in this suit, all of which are at risk of being "impair[ed] or impede[d]" by the "disposition of the action." *Arakaki*, 324 F.3d at 1083.

Each of Proposed Intervenors has a strong interest in ensuring that the members of the communities they serve can exercise their right to vote. Further, each of Proposed Intervenors has a distinct interest in preserving their own voter engagement efforts, which will be hampered by DOJ's attempts to prevent lawfully

[9] Rule 24(c) requires intervention motions to be "accompanied by a pleading." Fed. R. Civ. P. 24(c). Proposed Intervenors attach a proposed Answer to ensure compliance with Rule 24(c), *see* Ex. C, though they also reserve the right to move to dismiss under Rule 12(b) at the appropriate juncture.

registered voters—and naturalized citizens in particular—from receiving and voting mail ballots. The risk this suit poses to any of these interests supports intervention as of right. *See Berg*, 268 F.3d at 822 (emphasizing these elements are satisfied where a proposed intervenor is "substantially affected in a practical sense by the determination made in an action").

**1. The requested relief threatens Proposed Intervenors' voter engagement efforts and deters the voters they serve.**

Proposed Intervenors have an interest in ensuring that their members and constituents can participate in the upcoming election, free of unfounded threats or unlawful restrictions. Promoting voter turnout and civic engagement is at the core of each organization's mission. Tran Decl. ¶ 5; Razo Decl. ¶ 3. DOJ's attempt to force California to deny these voters access to mail ballots—or impose supplemental barriers to their participation in the voting process—based on erroneous data is antithetical to those interests.

Courts routinely grant intervention as of right to civic organizations like Proposed Intervenors that seek to protect their members and communities from potential disenfranchisement or unlawful interference with their right to vote, recognizing that they have "significant protectable organizational and associational interests in protecting their own constituents' voting rights." *1789 Found. Inc. v. Fontes*, No. CV-24-02987, 2025 WL 834919, at *3 (D. Ariz. Mar. 17, 2025); *see also Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, at *6 (N.D. Ill. July 18, 2024) (similar); *Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568, at *2 (S.D. Fla. Sep. 21, 2016) (similar). In *Judicial Watch*, for example, the court found that two organizations representing voters had "an associational interest in protecting their members from unlawful removal from the voter rolls should Plaintiffs succeed in obtaining their requested relief." 2024

WL 3454706, at *3. Likewise, in *Bellitto*, the court found that an organization representing tens of thousands of healthcare workers and retirees in Florida had a protectable interest in avoiding "the court ordered 'voter list maintenance' sought by Plaintiffs." 2016 WL 5118568, at *1–2. Here, DOJ seeks an order requiring California to refuse to send ballots to or tabulate ballots cast by lawfully registered voters—but the threat to Proposed Intervenors' members and constituents is the same as if DOJ sought to remove them from the rolls: either way, eligible voters would be denied the ability to cast a vote that counts.

In fact, harm to this particular interest—preserving the voting rights of members and constituents—has often been found to satisfy Article III's more onerous standing requirements. *E.g.*, *Mi Familia Vota*, 719 F. Supp. 3d at 983–88 (finding organizations had standing to protect members' voting rights); *March for Our Lives Idaho v. McGrane*, 697 F. Supp. 3d 1029, 1041–42 (D. Idaho 2023) (similar), *appeal argued*, 24-6376 (9th Cir. Sep. 19, 2025). That this interest meets the "more stringent" requirement of Article III "compels the conclusion that [Proposed Intervenors] have an adequate interest" for purposes of Rule 24. *Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991).

Proposed Intervenors also have an acute interest in this action because the relief DOJ seeks would deter the voters that Proposed Intervenors serve from participating in the political process. Naturalized citizens in particular already vote at much lower rates than other voters and are likely to be deterred from voting if DOJ prevails—either because they are concerned that exercising their constitutional right to vote will subject them and their families to false accusations and inappropriate scrutiny, or because they believe their votes may not count and so conclude voting is not worth it. Tran Decl. ¶ 15; Razo Decl. ¶ 12. This directly threatens Proposed Intervenors' mission-critical work of encouraging naturalized citizens and others to register to vote and then vote. Tran Decl. ¶¶ 11–12, 16; Razo

Decl. ¶¶ 5–6. This, too, supports intervention. *See United States v. Oregon*, No. 6:25-cv-1666, 2025 WL 3496571, at *1 (D. Or. Dec. 5, 2025) (finding protectable interest that supports intervention when organization alleged DOJ's requested relief would "deter qualified voters in marginalized communities from registering to vote in Oregon and engaging in the political process more broadly").

**2. The requested relief would make it more difficult for Proposed Intervenors to carry out their missions.**

Each of the Proposed Intervenors expends significant organizational resources to promote voter registration and voting among their members and communities. Razo Decl. ¶¶ 3–7; Tran Decl. ¶¶ 5–6. SIREN, for example, trains its members and other volunteers to support its GOTV efforts through direct canvassing; this year's training is tomorrow (October 16), and days of action are scheduled throughout the coming weeks. Tran Decl. ¶ 6. MFA similarly mobilizes voters through direct outreach and intends to engage with approximately 50,000 voters in California in the lead-up to the November election. Razo Decl. ¶ 7. The relief DOJ seeks would undercut these efforts, requiring Proposed Intervenors to divert time and resources towards staunching harm to these core activities, including with new and revised programs that account for the need to aid voters who are swept into DOJ's unlawful eleventh-hour demand, and provide support to new voters, including naturalized citizens, who are deterred by DOJ's continuous threats and accusations of unlawful voting. *See* Tran Decl. ¶ 15; Razo Decl. ¶ 12.

Courts have recognized that such threats to core organizational efforts constitute an impairment of a protectable interest under Rule 24. For example, the Fifth Circuit recognized impairment of a significant protectable interest where litigation "may change what" an organization "must do to prepare for upcoming elections." *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 307 (5th Cir. 2022) (reversing denial of intervention in election-related lawsuit). As there, Proposed

Intervenors here "will have to expend resources to educate their members on the shifting situation in the lead-up" to future elections if this suit is successful. *Id.* And the Ninth Circuit's case law confirms that Rule 24 facilitates intervention precisely to avoid such "practical . . . impair[ments]." *Berg*, 268 F.3d at 818–22; *see also 1789 Found.*, 2025 WL 834919, at *3–4 (granting intervention in part because of organizations' interest in "preserving their financial resources"); *Jud. Watch, Inc.*, 2024 WL 3454706, at *3 (finding labor unions had "organizational interest in avoiding adverse reallocation of resources to protect the voting rights of their members"); *Issa*, 2020 WL 3074351, at *3 (finding significant protectable interest in organizations "diverting their limited resources to educate their members on the election procedures"); *Paher v. Cegavske*, No. 3:20-cv-243, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020) (finding "significant protectable interest" in "organizational intervenors' efforts to promote the franchise"). Indeed, this too would satisfy even the more stringent requirement of Article III standing, and so necessarily supports finding a protectable interest in support of a Rule 24 motion. *See Mi Familia Vota*, 719 F. Supp. 3d at 985 (finding MFA's affiliate had standing to challenge Arizona voting law that would "frustrate[] Mi Familia Vota's mission and w[ould] require it to divert resources to counteract its effects").

### C. The existing parties do not adequately represent Proposed Intervenors' interests.

Proposed Intervenors cannot be assured their interests will be represented absent intervention. "[T]he requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests 'may be' inadequate," and therefore "the burden of making this showing is minimal." *W. Expl. LLC v. U.S. Dep't of Interior*, No. 3:15-cv-00491, 2016 WL 355122, at *3 (D. Nev. Jan. 28, 2016) (quoting *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983)) (emphasis added); *see also Trbovich v. United Mine Workers of Am.*, 404

U.S. 528, 538 n.10 (1972) (describing the burden of showing inadequate representation as "minimal"). Accordingly, courts are "liberal in finding" this requirement to be met because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C *Wright & Miller's Federal Practice & Procedure* § 1909 (3d ed.). And the Ninth Circuit "stress[es] that intervention of right does not require an absolute certainty . . . that existing parties will not adequately represent [an intervenor's] interests." *Citizens for Balanced Use*, 647 F.3d at 900. Proposed Intervenors readily surpass this low hurdle.

DOJ, of course, does not adequately represent Proposed Intervenors' interests—its push to upend California elections and disenfranchise voters poses the threat to Proposed Intervenors' interest that they seek to defend against. Nor can the government Defendants adequately represent Proposed Intervenors' interests. As public officials, their decisions are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998). Recognizing the competing interests faced by public officials, courts have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors," *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003)—even when they seek the same ultimate outcome in litigation. *See GHP Mgmt. Corp. v. City of Los Angeles*, 339 F.R.D. 621, 624 (C.D. Cal. 2021) (explaining courts "have permitted intervention on the government's side in recognition that the intervenors' interests are narrower than that of the government and therefore may not be adequately represented" (quoting *Arakaki*, 324 F.3d at 1087)); *Barke v. Banks*, No. 8:20-cv-358, 2020 WL 2315857, at *3 (C.D. Cal. May 7, 2020) (collecting cases); *see also, e.g., Citizens for Balanced Use*, 647 F.3d at 899 (similar).

In fact, the Supreme Court recently emphasized this point, explaining that public officials must "bear in mind broader public-policy implications," whereas private litigants—like Proposed Intervenors—seek to vindicate their own rights "full stop." *Berger*, 597 U.S. at 195–96 (citing *Trbovich*, 404 U.S. at 538–39). The Supreme Court thus instructed courts not to conduct the adequacy of representation analysis at too "high [a] level of abstraction," and reaffirmed that, even where the parties' interests "seem[] closely aligned," the burden to demonstrate inadequate representation remains "minimal" unless those interests are "identical." *Id.* at 196 (citation omitted). Nor may interests be deemed "identical" merely because they are "related." *Id.* (quoting *Trbovich*, 404 U.S. at 538–39). Rather, "[w]here 'the absentee's interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." *Id*. at 197 (quoting 7C *Wright & Miller's Federal Practice & Procedure* § 1909). In other words, even if the government Defendants also oppose the relief that DOJ seeks at a high level of abstraction, it does not follow that they share "identical" interests with Proposed Intervenors. *Id.* at 196–97.

Here, the interests of the government Defendants and Proposed Intervenors diverge widely; they are plainly not "identical." *Id.* Unlike Proposed Intervenors, the government Defendants are charged with "easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto v. Snipes*, 935 F.3d. 1192, 1198 (11th Cir. 2019). These competing goals "naturally create some tension." *Id.* In contrast, as other courts have recognized, organizations like Proposed Intervenors have "[t]he mission and interest" to pursue only one of these interests, *Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d. 795, 801 (E.D. Mich. 2020)—that is, to eliminate "barriers to registration and voting," *Bellitto*, 935 F.3d at 1198; *see also Oregon*, 2025 WL 3496571, at *2 (finding election officials "do not share" proposed

intervenors' interest in "increasing voter participation by marginalized communities"). As a result of these diverging interests, the government Defendants' representation of Proposed Intervenors cannot be presumed to be adequate. *See United Guar. Residential Ins. Co. v. Phila. Sav. Fund Soc'y*, 819 F.2d 473, 475 (4th Cir. 1987) (explaining that, under *Trbovich*, "when a party to an existing suit is obligated to serve two distinct interests, which, although related, are not identical, another with one of those interests should be entitled to intervene").

What's more, the government Defendants are "elected officials, and like all elected officials they have an interest in remaining politically popular and effective leaders," even if it means "compromising the proposed intervenors'" interests. *Clark v. Putnam Cnty.*, 168 F.3d 458, 462 (11th Cir. 1999) (citation modified). That concern is particularly strong here because the federal government has threatened to withhold grants, issue fines, and even pursue criminal prosecution against election officials, like the government Defendants here, if they do not meet the administration's demands—considerations which "may incentivize them to make compromises that Proposed Intervenors would not make."[10] *Oregon*, 2025 WL 3496571, at *2; *see also United States v. Benson*, No. 1:25-CV-1148, 2025 WL 3520406, at *6 (W.D. Mich. Dec. 9, 2025) (finding election officials' incentive to "comply with federal law" and "preserve comity with the federal government" demonstrates they do not adequately represent private intervenors). Proposed Intervenors, by contrast, will defend their interests with zeal, undeterred by the federal government's threats.

---

[10] Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States Over Elections*, NBC News (July 17, 2026), https://www.nbcnews.com/politics/elections/homeland-security-secretary-markwayne-mullin-threatens-states-election-rcna588002.

In sum, the government Defendants' competing obligations mean that they are unlikely to adequately represent Proposed Intervenors' unburdened interest in protecting and advancing the voting rights of their members and the communities they represent, "full stop." *Berger*, 597 U.S. at 195–96.

## II. The Court should alternatively grant permissive intervention.

In the alternative, the Court should exercise its discretion to grant permissive intervention. Proposed Intervenors assert a "defense that shares with the main action a common question of law or fact," and granting intervention would not "unduly delay or prejudice the adjudication" of the matter. Fed. R. Civ. P. 24(b)(1), (3). Proposed Intervenors have also moved promptly, *see supra* Argument § I.A, and agree to abide by any schedule set by the Court. And Proposed Intervenors' defense requires resolution of the same factual and legal issues raised in the underlying lawsuit. *See* Ex. C (Proposed Answer).

Courts regularly grant permissive intervention to civic organizations to ensure that a pro-voter perspective is offered—rather than only the views of a plaintiff who seeks to deny voters access to mail ballots, and government officials who are tasked with neutrally administering voting laws. *E.g.*, *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-518, 2024 WL 3409860, at *3 (D. Nev. July 12, 2024) (granting permissive intervention in NVRA case); *Winfrey*, 463 F. Supp. 3d at 799 (same); Order at 1, *Jud. Watch, Inc. v. Pennsylvania*, No. 1:20-cv-708 (M.D. Pa. Nov. 19, 2020), ECF No. 50 (same); Order at 2, *Daunt v. Benson*, No. 1:20-cv-522 (W.D. Mich. Sep. 28, 2020), ECF No. 30 (same); Order at 4–5, *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 5:16-cv-683 (E.D.N.C. Dec. 1, 2016), ECF No. 26 (same); *League of Women Voters of N.C. v. North Carolina*, No. 1:13-cv-660, 2014 WL 12770081, at *3 (M.D.N.C. Jan 27, 2014) (same as to individual voters).

The Ninth Circuit has also identified additional considerations the Court may consider in weighing permissive intervention requests. *See Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1022 (9th Cir. 2022). Those considerations—including Proposed Intervenors' interests, the inadequacy of the representation of those interests, and the intervenors' contribution to the factual and legal issues, *see id.*—buttress the case for intervention here. Proposed Intervenors have significant interests at stake, *see supra* Argument § I.B, and their involvement will center the rights of voters who are most likely to be impacted by DOJ's attempt to interfere with California's voting procedures. *See, e.g.*, *In re Exch. Union Co.*, No. 24-mc-91645, 2025 WL 894652, at *3 (D. Mass. Mar. 24, 2025) (granting permissive intervention to protect "privacy interest").

In sum, because Rule 24 is read "broadly in favor of intervention," *W. Watersheds Project*, 22 F.4th at 835, and because Proposed Intervenors' participation will assist rather than prejudice efficient development and resolution of this matter, the Court should grant permissive intervention in the event it does not grant intervention as of right.

## CONCLUSION

Proposed Intervenors respectfully request that this Court grant intervention as of right, or, in the alternative, grant permissive intervention.

Dated: October 15, 2026

Respectfully submitted,

*/s/ Max Schoening*
Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 786-3478

Uzoma N. Nkwonta* (DC Bar No. 975323)
Branden D. Lewiston* (DC Bar No. 252550)
Julianna D. Astarita* (DC Bar No. 90041368)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
F: (202) 968-4498
unkwonta@elias.law
blewiston@elias.law
jastarita@elias.law

Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

*Counsel for Proposed Intervenor-Defendants SIREN and MFA*

* *Pro hac vice application forthcoming*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Proposed Intervenor-Defendants SIREN and MFA certifies that this brief contains 6,342 words, which complies with the word limit of Local Rule 11-6.1.

Dated: October 15, 2026

*/s/ Max Schoening*
Max Schoening