TODD BLANCHE
Attorney General
R. TRENT MCCOTTER
Acting Deputy Attorney General
JOHN K. ADAMS
Associate Deputy Attorney General
ANDREW M. DARLINGTON
Counsel to the Assistant Attorney General
950 Pennsylvania Avenue, NW
Washington, D.C., 20530
Telephone: (202) 532-0100
Andrew.Darlington2@usdoj.gov

BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (Cal. Bar No. 272742)
Assistant United States Attorney
J. ROBERT RENNER (Cal. Bar No. 148587)
Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2464
E-mail: Julie.Hamill@usdoj.gov

Attorneys for Plaintiff
*United States of America*

**UNITED STATES DISTRICT COURT FOR THE**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>STATE OF CALIFORNIA, *et al.*,<br><br>Defendants. | No. 2:26-cv-12025<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>Hearing Information:<br><br>Honorable<br>United States District Judge |

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 4

I. Legal Background .......... 4

A. Federal Law .......... 4

B. California Law .......... 6

II. Factual Background .......... 8

A. USCIS and HSI's Process to Identify Likely Noncitizens on Voter Rolls in Federal Elections .......... 9

B. USCIS and HSI Identified Likely Noncitizens Registered to Vote in California, and the United States Notified Defendants of these Voters .......... 11

C. Defendants Refuse to Engage with the Federal Government, Prompting the United States to Sue to Prevent Unlawful Noncitizen Voting .......... 12

LEGAL STANDARD .......... 14

ARGUMENT .......... 15

I. The United States Has Standing and May Seek Equitable Relief .......... 15

II. The United States is Likely to Succeed on the Merits .......... 17

A. California Cannot Knowingly Facilitate Unlawful Voting in Violation of 18 U.S.C. § 611 and Should Be Enjoined from Presently Tabulating Votes as Applied to Likely Noncitizens Identified by the Federal Government .......... 17

B. California's Counterarguments Lack Merit .......... 23

III. The United States Faces Irreparable Harm Absent Preliminary Relief .......... 26

IV. The Balance of Equities and the Public Interest Weigh in the United States' Favor .......... 27

CONCLUSION .......... 28

# TABLE OF AUTHORITIES

**CASES**

*Abbott v. Perez*,
585 U.S. 579 (2018) ... 26

*Allen v. Milligan*,
608 U.S. 511 (2026) ... 21

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
107 F.4th 934 (9th Cir. 2024) ... 20

*Am. Trucking Associations, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ... 27

*Anderson v. United States*,
417 U.S. 211 (1974) ... 2, 3

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ... 27

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ... 5

*Arizona v. United States*,
567 U.S. 387 (2012) ... *passim*

*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022) ... 15

*Bluman v. FEC*,
800 F. Supp. 2d 281 (D.D.C. 2011) ... 6, 16

*Bluman v. FEC*,
565 U.S. 1104 (2012) ... 6

*Buckley v. Valeo*,
424 U.S. 1 (1976) ... 5

*Bush v. Gore*,
531 U.S. 98 (2000) ... 2

*Chavez-Perez v. Ashcroft*,

386 F.3d 1284 (9th Cir. 2004) ....................5

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ....................20

*Common Cause v. DOJ*,
No. 1:26-cv-01352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ....................14, 25

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ....................18, 19, 21

*Cruise Lines Int'l Ass'n, Inc. v. Suganuma*,
825 F. Supp. 3d 1170 (D. Haw. 2025) ....................15

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ....................14

*Daimler Truck N. Am. LLC v. California Air Res. Bd.*,
2025 WL 3049944 (E.D. Cal. Oct. 31, 2025) ....................19, 26

*Dep't of Homeland Sec. v. D.V.D.*,
145 S. Ct. 2153 (Mem.) ....................26

*Edye v. Robertson*,
112 U.S. 580 (1884) ....................6

*Ex parte Young*,
209 U.S. 123 (1908) ....................19, 20

*Fed. Election Comm'n v. Cruz*,
596 U.S. 289 (2022) ....................15

*Golden State Transit Corp. v. City of Los Angeles*,
475 U.S. 608 (1986) ....................19

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ....................5

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ....................5, 18

*Hollingsworth v. Perry*,
558 U.S. 183 (2010) ....................26

*In re Debs*,
158 U.S. 564 (1895) .......... 17

*KalshiEX LLC v. Johnson*,
830 F. Supp. 3d 907 (D. Ariz. Apr. 10, 2026) .......... 15

*Kansas v. Garcia*,
140 S. Ct. 791 (2020) .......... 18

*La Union del Pueblo Entero v. Abbott*,
604 F. Supp. 3d 512 (W.D. Tex. 2022) .......... 2, 15, 16

*Livadas v. Aubry*,
987 F.2d 552 (9th Cir. 1991) .......... 19

*Livadas v. Bradshaw*,
512 U.S. 107 (1994) .......... 19

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 26

*Mich. Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*,
467 U.S. 461 (1984) .......... 18, 22

*Musta v. Mendota Heights Dent*al Ctr.,
965 N.W.2d 312 (Minn. 2021) .......... 18

*Musta v. Mendota Heights Dent*al Ctr.,
142 S. Ct. 2834 (2022) .......... 18

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013) .......... 20

*NFIB v. Sebelius*,
567 U.S. 519 (2012) .......... 6

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 27

*Noem v. Doe*,
145 S. Ct. 1524 (Mem.) .......... 26

*Noem v. Nat'l TPS All.*,
145 S. Ct. 2728 (Mem.) .......... 26

*Norwood v. Harrison*,
413 U.S. 455 (1973) .......... 3, 18, 20, 21

*Peterson v. City of San Diego*,
34 Cal. 3d 225 (1983) .......... 6

*Puerto Rico v. Branstad*,
483 U.S. 219 (1987) .......... 19

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 21

*Safe Sts. All. v. Hickenlooper*,
859 F.3d 865 (10th Cir 2017) .......... 15

*Sanitary Dist. of Chi. v. United States*,
266 U.S. 405 (1925) .......... 17

*Savage v. Jones*,
225 U.S. 501 (1912) .......... 18

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 6

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 15

*Toll v. Moreno*,
458 U.S. 1 (1982) .......... 5, 19

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 26

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) .......... 16, 27

*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2012) .......... 26

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 27

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... 3, 15, 26, 27

*United States v. City of Jackson*,
318 F.2d 1 (5th Cir. 1963) .......... 2, 19

*United States v. Ekblad*,
732 F.2d 562 (7th Cir. 1984) .......... 16

*United States v. Idaho*,
623 F. Supp. 3d 1096 (D. Idaho 2022) .......... 16

*United States v. Knight*,
490 F.3d 1268 (11th Cir. 2007) .......... 4

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) .......... 2, 15, 16, 17

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001) .......... 27

*United States v. Raines*,
362 U.S. 17 (1960) .......... 6

*United States v. Texas*,
557 F.Supp.3d 810 (W.D. Tex. 2021) .......... 26

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .......... 15, 26

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) .......... 15

*Virginia Off. for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011) .......... 20

*Whole Woman's Health v. Jackson*,
2021 WL 5016707 (U.S. Oct. 27, 2021) .......... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 14

**CONSTITUTIONS**

Cal. Const. art. II .......... 24

U.S. Const. art. I .......... 5

U.S. Const. art. VI .......... 17

**STATUTES**

6 U.S.C. § 252 .......... 9

6 U.S.C. § 271 .......... 8

8 U.S.C. § 1182 .......... 8, 9

8 U.S.C. § 1227 .......... 8, 9

18 U.S.C. § 611 .......... *passim*

18 U.S.C. § 611(a) .......... *passim*

52 U.S.C. § 10307(a) .......... 13, 24

52 U.S.C. § 20501 .......... 7

52 U.S.C. § 20504 .......... 7

52 U.S.C. § 20507(c)(2) .......... 24

2016 Cal. Stat. ch. 832 .......... 7

2020 Cal. Stat. ch. 4 .......... 7

2021 Cal. Stat. ch. 312 .......... 7

Cal. Elec. Code § 2102 .......... 7

Cal. Elec. Code § 2103 .......... 7

Cal. Elec. Code § 2105 .......... 7

Cal. Elec. Code § 2106 .......... 7

Cal. Elec. Code § 2111 .......... 7

Cal. Elec. Code § 2150(a) .......... 7

Cal. Elec. Code § 2150(b) .......... 7

Cal. Elec. Code § 2188 .......... 11
Cal. Elec. Code § 2300(a) .......... 24
Cal. Elec. Code § 2300(a)(1)(A) .......... 24
Cal. Elec. Code § 3000.5 .......... 7, 20
Cal. Elec. Code § 3011 .......... 7
Cal. Elec. Code § 3011(a)(2) .......... 7
Cal. Elec. Code § 3011(a)(6) .......... 7
Cal. Elec. Code § 3019 .......... 7
Cal. Elec. Code § 3019(a)(2)(A) .......... 8
Cal. Elec. Code § 3019(a)(2)(B) .......... 8
Cal. Elec. Code § 3019(d)(1)(E)(5) .......... 8
Cal. Elec. Code § 4005 .......... 7
Cal. Elec. Code § 15307 .......... 28
Cal. Elec. Code § 15372 .......... 28

**REGULATIONS**

Cal. Code Regs. tit. 2 § 19073 .......... 7
Cal. Code Regs. tit. 2, § 20363 .......... 3, 23, 28
Cal. Code Regs. tit. 2, § 20960(c) .......... 8
Cal. Code Regs. tit. 2, § 20960(d) .......... 8
Cal. Code Regs. tit. 2, § 20960(e) .......... 8
Cal. Code Regs. tit. 2, § 20960(i) .......... 8
Cal. Code Regs. tit. 2, § 20960(j) .......... 8
Cal. Code Regs. tit. 2, § 20960(l) .......... 8

Cal. Code Regs. tit. 2, § 20990(c) (2022) .......... 7

**OTHER AUTHORITIES**

Pub. L. No. 104-208 .......... 4

Exec. Order, *Ensuring Citizenship Veriifcaton and Integrity in Federal Elections* § 5 (Mar. 31, 2026) .......... 22

## INTRODUCTION

Federal law prohibits noncitizen voting in federal elections. 18 U.S.C. § 611. In July 2026, the U.S. Department of Homeland Security (DHS) alerted the California Secretary of State (together with other Defendants, California) that a preliminary review of state records revealed numerous noncitizen registered voters. On October 13, after the Federal Government thoroughly analyzed that preliminary data, it identified over 20,000 individuals who it reasonably believes are noncitizen voters participating in the federal election. More precisely, two agencies housed within DHS that are charged with immigration enforcement—U.S. Citizenship and Immigration Services (USCIS) and Homeland Security Investigations (HSI)—deployed a longstanding multiagency and multilayered process to whittle down a preliminary list of over 175,000 potential noncitizen voters to a list of over 20,000 people who are "(1) registered to vote in California, (2) were sent a vote-by-mail ballot, and (3) are highly likely to be noncitizen aliens." Decl. of Nicolas Bartell ¶ 25; Decl. of Eric McLoughlin ¶ 25. The Federal Government gave that list to California to protect American citizens' votes while preventing unlawful votes. In response, California not just refused to act; it made clear that it is committed to treating ballots from those likely noncitizens equal to ballots from American citizens, prompting this suit and motion that seeks commonplace election relief when ballots are called into question.

This Court should grant the motion. Otherwise, there is a significant risk that American votes will be diluted. Just this morning, the United States charged dozens of noncitizens for election and immigration related crimes. *See* Press Release, Department of Justice *28 Foreign Nationals Arrested on Charges that they Illegally Registered and Voted* (October 19, 2026) (detailing 18 U.S.C. § 611 and other federal charges). Every single one of these individuals is on the list the Federal Government provided California. And the State is no stranger to voting-record irregularities. California has admitted to mishandling *tens of thousands* of voter records, including by registering numerous noncitizens to vote. *See* Mark Osborne, *1,500 noncitizens may have been registered to vote in California DMV*

*error*, ABC News (Oct. 9, 2018), *available a*t https://perma.cc/9RM4-THZX (California "admitted . . . a mistake caused as many as 1,500 noncitizens being registered to vote in the state" and had earlier identified some "23,000 Californians" who had their voter registration mishandled). The number of noncitizen voters California has admitted to registering (1,500) could change the outcome of an election. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98 (2000) (100s of votes); *California's 13th Congressional District, 2024*, Ballotpedia, *available at* https://perma.cc/QJ73-PR6N (187 votes). And even if that number were less, "'[t]he deposit of [fraudulent] ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial.'" *Anderson v. United State*s, 417 U.S. 211, 227 (1974). Under California's view, however, none of that matters, and it will proceed to tabulate the votes of potential noncitizens—including, it seems, those charged with an 18 U.S.C. § 611 crime. That view cannot withstand law or logic.

As an initial matter, this action follows a long line of cases in which the United States seeks and obtains injunctive relief when state actors violate federal law, especially in matters involving immigration and elections. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012) (affirming order that prevented Arizona from enforcing its immigration laws that violated the Supremacy Clause); *La Union del Pueblo Entero (LUPE) v. Abbott*, 604 F. Supp. 3d 512, 519–32 (W.D. Tex. 2022) (finding standing and granting relief for the United States to enforce the supremacy of federal law related to voting); *see also, e.g.*, *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024) (affirming order that prevented Missouri officials from violating the Supremacy Clause); *United States v. City of Jackson, Miss.*, 318 F.2d 1, 3–4 (5th Cir. 1963) (enjoining state officials from "encourag[ing] racial segregation" in violation of federal law). Consistent with this precedent, the United States has standing and may seek equitable relief to enforce the supremacy of federal law, as California itself has acknowledged, *infra* pp. 25–26.

On the merits, federal law makes it "unlawful for any alien to vote" in federal

elections, 18 U.S.C. § 611(a), and California election officials cannot knowingly facilitate violations of federal law when faced with credible evidence of noncitizen voting. *See Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Because California is knowingly facilitating violations of federal law, its actions conflict with the considered judgment that Congress expressed in 18 U.S.C. § 611 and present an obstacle to Congress's purposes and objectives in enacting the statute (and the Federal Government's law enforcement capacities). California's actions to count votes of likely noncitizens without verifying their citizenship—whether in collaboration with the Federal Government or otherwise—are therefore preempted, as applied, to the individuals identified by USCIS and HSI as highly likely to be noncitizens. *See Arizona*, 567 U.S. at 399, 405.

There is also no question that the United States suffers irreparable harm absent an injunction. "When a plaintiff seeks a preliminary injunction because of an alleged constitutional violation and shows it is likely to prevail on the merits, that showing will almost always demonstrate it is suffering irreparable harm as well." *United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026).

Finally, equity supports the United States. This action seeks to protect the rights of American voters, and injunctive relief will preserve the status quo by ensuring that only citizen votes are counted. On the other side, California expresses concern about administering the request to temporarily set aside ballots by likely noncitizen voters pending citizenship verification. But those anxieties cannot stand as an impediment to administering a fair election. In any event, California is well-equipped to handle the request, having laws on the books that facilitate the very relief sought here. *See, e.g.*, Cal. Code Regs. tit. 2, § 20363 (detailing how to resolve challenged ballots via segregation).

***

"Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson*, 417 U.S. at 227. The United States seeks to vindicate that right here and uphold

the supremacy of federal law. This Court should order California to set aside vote-by-mail ballots from likely noncitizens in the federal election—including any ballots cast by the individuals charged with 18 U.S.C. § 611 crimes this morning—until the voter's citizenship status can be determined. The United States respectfully requests that this Court grant this relief by **November 3, 2026,** before the end of voting in the 2026 federal election.

## BACKGROUND

### I. Legal Background

#### A. Federal Law

Since at least 1996, Congress has made it "unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner[.]" 18 U.S.C. § 611(a). A noncitizen may, however, vote in an election that otherwise includes federal candidates if (a) "the election is held partly for some other purpose[,]" (b) a state or local law allows noncitizens to vote, and (c) voting "is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices." *Id*. Congress passed this section as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *See* Pub. L. No. 104-208, div. C, title II, § 216(a), 110 Stat. 3009-572 (Sept. 30, 1996). A noncitizen who violates the voting ban may be fined or imprisoned. *See* 18 U.S.C. § 611(b); *United States v. Knight*, 490 F.3d 1268, 1271 (11th Cir. 2007) (finding 18 U.S.C. § 611 to be a general intent crime where the government needs only to "prove that the defendant knowingly engaged in the conduct prohibited" (citation omitted)).

Congress promulgated 18 U.S.C. § 611(a) under its plenary authority over immigration and its power to regulate federal elections under the Elections Clause. The Federal

Government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); s*ee also Chavez-Perez v. Ashcroft*, 386 F.3d 1284, 1292 (9th Cir. 2004) ("[f]ederal authority in the areas of immigration and naturalization is plenary"). This plenary authority "derives from various sources, including the Federal Government's power to establish a uniform Rule of Naturalization," "its power to regulate Commerce with foreign Nations," "and its broad authority over foreign affairs." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952); *accord Arizona*, 567 U.S. at 395 (recognizing that it is "fundamental that foreign countries" confer with "one national sovereign" on immigration issues). This naturally includes authority over the statuses of aliens and "regulation of the conduct of an alien before naturalization." *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Thus, "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.'" *Id.* Section 611(a) thus regulates the conduct of aliens vis-a-vis the Federal Government under its plenary authority over aliens.

In addition, the Elections Clause in Article I provides that "Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Otherwise, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Along with the Necessary and Proper Clause, the Elections Clause grants Congress the authority to regulate the manner of conducting federal elections, regardless of whether it can regulate the qualifications for voting. *See Arizona v. Inter Tribal Council of Arizona, Inc. (ITCA)*, 570 U.S. 1, 7-9, 16-17 (2013); *Buckley v. Valeo*, 424 U.S. 1, 62

(1976) (per curiam). Section 611(a) thus readily falls within those broad grants of authority, as it regulates the conduct of aliens within the sphere of federal elections and allows for the "maintenance of a republican form of government" by ensuring only citizens can vote in federal elections. *See Smiley* v. *Holm*, 285 U.S. 355, 366–67 (1932) ("In exercising [its Elections Clause] power, the Congress may supplement the[] state regulations . . . . It may impose additional penalties for the violations of the state laws."); *Burroughs* v. *United States*, 290 U.S. 534, 547 (1932) ("The power of Congress to protect the election of President and Vice President from corruption [is] clear."); *Bluman v. FEC*, 800 F. Supp. 2d 281, 283 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012) (upholding federal statute banning certain aliens from engaging in election-related expenditures, on the ground that "[t]he Supreme Court has long held that the government (federal, state, and local) may exclude foreign citizens from activities that are part of democratic self-government in the United States").

Either font of federal authority can independently support the validity and preemptive nature of 18 U.S.C. § 611(a). *See NFIB v. Sebelius*, 567 U.S. 519, 561 (2012) (upholding individual mandate as a tax even though it violated the Commerce Clause); *Edye v. Robertson*, 112 U.S. 580, 594-95 (1884) (even if head count payment violated Taxing Clause, it was a proper exercise of immigration authority). That is true even if there are some unconstitutional applications of the law. *See United States v. Raines*, 362 U.S. 17 (1960). But 18 U.S.C. § 611(a) constitutionally applies to situations where aliens are voting in federal elections even if they are authorized to do so under state law. Thus, 18 U.S.C. § 611(a) has preemptive effect like any other federal law, especially in the plenary realm of immigration regulation.

**B. California Law**

California has permitted voters to cast ballots by mail since 1922, *see Peterson v. City of San Diego*, 34 Cal. 3d 225, 228-29 (Cal. 1983), but it has dramatically extended its vote-by-mail access in recent years. Originally in an emergency response to the COVID-

19 pandemic, the California Legislature passed a bill requiring every county to implement an all-mailed-ballot election system for the 2020 general election. *See* 2020 Cal. Stat. ch. 4 (codified as amended at Cal. Elec. Code § 3000.5). After the election, the legislature made that system permanent. *See* 2021 Cal. Stat. ch. 312 (codified at Cal. Elec. Code § 3000.5). Under the current regime, state election officials are required to send unsolicited ballots to "every registered voter" in the State, no later than 29 days before "each election[.]" Cal. Elec. Code § 3000.5.

When registering to vote, proof of citizenship is not required, so long as the applicant self-attests to American citizenship under penalty of perjury. *See* 52 U.S.C. §§ 20501 & 20504; Cal. Elec. Code §§ 2111, 2150(a)–(b); Cal. Elec. Code §§ 2102, 2103, 2105, 2106. Although California verifies identifying information against government records, such verification establishes identity, not citizenship. *See* Cal. Code Regs. tit. 2, § 19073. All vote-by-mail ballot identification envelopes that are sent out contain "[a] warning plainly stamped or printed on it that voting twice constitutes a crime" but include no such similar warning for the crime of voting as a noncitizen in a federal election. *See* Cal. Elec. Code § 3011(a)(6); *see also generally id*. § 3011.

The California Legislature passed a law allowing counties to opt in to an all-mailed-ballot election. Counties can thus implement the State's permissive mail-in voting procedures, including a lax signature verification requirement. *See California's Voter's Choice Act*, 2016 Cal. Stat. ch. 832 (codified as amended at Cal. Elec. Code § 4005); *see also generally* Cal. Elec. Code § 3019. For a vote-by-mail ballot to count in an election, the voter must sign the ballot. Cal. Elec. Code § 3011(a)(2). California "shall [then] compare the signature" between the vote-by-mail ballot received and the voter's signature contained in its records to determine whether the voter is an eligible voter. *Id.* § 3019. California law requires election officials to "liberally construe[]" signature verification of vote-by-mail ballots "in the favor of the voter." Cal. Code Regs. tit. 2, § 20990(c) (2022).

In fact, "[a] presumption exists that the signature on the identification envelope,

signature verification statement, *unsigned* identification envelope statement, or provisional ballot envelope is the voter's signature and that the vote will be counted." Cal. Elec. Code § 3019(a)(2)(A) (emphasis added); *accord* Cal. Code Regs. tit. 2, § 20960(c). Exact signature matches are not required; signatures with similar characteristics suffice. Cal. Elec. Code, § 3019(a)(2)(B); *accord* Cal. Code Regs. tit. 2, § 20960(d)-(e). Only a signature possessing "multiple, significant, and obvious differing characteristics with all signatures in the voter's registration record will be subject to additional review by the elections official." *Id*. § 20960(i). Even then, if an initial reviewer identifies multiple, significant, and obvious differing characteristics, the vote will be rejected only if "two different elections officials unanimously find beyond a reasonable doubt that the signature differs in multiple, significant, and obvious respects from all signatures in the voter's registration record." *Id*. § 20960(j). What is more, a signature made using a mark, "such as an 'X' . . . is presumed valid" and should be counted. *Id*. § 20960(l). California's signature verification statement requires the voter to affirm that she or he is a registered voter and is a resident of the precinct in which they voted. But the verification statement omits affirmation of a voter's U.S. citizenship. *Id*. § 3019(d)(1)(E)(5).

## II. Factual Background

The United States Citizenship and Immigration Services (USCIS) is responsible for adjudicating immigrant visa and naturalization applications. *See* 6 U.S.C. § 271. Consistent with those responsibilities, USCIS maintains records and information on individuals who have applied to enter or reside permanently in the United States. *Id*. Those records include individuals' names, addresses, social security numbers, and numbers assigned to each applicant (alien numbers). USCIS also investigates allegations of illegal voting by noncitizens. *See* 8 U.S.C. §§ 1182, 1227.

The Fraud Detection and National Security Directorate (FDNS) is an agency within USCIS. FDNS "safeguards the integrity of the nation's lawful immigration system by leading USCIS' efforts to combat fraud, detect national security and public safety threats,

and maximize law enforcement and Intelligence Community partnerships." *FDNS Mission*, *available at* https://perma.cc/4SHH-GAQX. Its expertise and mission encompass noncitizen fraud in federal elections. *See* Bartell Decl. ¶ 13 ("As part of its charge to oversee lawful immigration, USCIS receives state voter rolls or information on state voter rolls from DHS to review for potential aliens who unlawfully registered to vote or who voted in a federal election."). Nicolas Bartell is the Associate Director of FDNS. *Id*. ¶ 2.

Homeland Security Investigations (HSI), which resides within Immigration and Customs Enforcement, serves as the primary investigative agency enforcing America's immigration laws. *See* 6 U.S.C. § 252. HSI maintains records and information on individuals who are being investigated for violations of the United States' immigration laws or regulations. *Id*. HSI regularly coordinates investigations with USCIS when noncitizens are alleged to have voted in federal elections. *See* 8 U.S.C. §§ 1182, 1227. As part of their regular investigative duties, USCIS, FDNS, and HSI collaborate to determine whether noncitizens vote in federal elections. Eric McLoughlin is the Assistant Director for the Cyber and Operational Technology section at HSI. *See* McLoughlin Decl. ¶ 1.

**A. USCIS and HSI's Process to Identify Likely Noncitizens on Voter Rolls in Federal Elections**

**1.** USCIS receives state voter rolls or information on state voter rolls to review for potential aliens who unlawfully registered to vote or who voted in a federal election. *See* Bartell Decl. ¶ 13. This data gathering process is distinct from the Systematic Alien Verification for Entitlements (SAVE) program. *Id.* ¶ 15. When presented with information on voter rolls from agencies like DHS, USCIS processes that information to identify registered voters who are likely aliens. *Id.* ¶ 14; *see also* McLoughlin Decl. ¶ 14.

USCIS begins its process by enhancing the voter data it receives through a reliable third-party data analytics and investigative platform. Bartell Decl. ¶ 14. The raw voting record data are combined with the enhanced data and then paired with an internal USCIS alien number to identify the same individual. *Id.* ¶ 16. USCIS then scores and ranks the

potential identity match to account for incomplete, outdated, or mismatched information. *Id.*

Following a preliminary identity match, USCIS screens potential matches against Department of State and Social Security Administration data to remove individuals who can be identified as United States citizens (or as deceased), and then it excludes those matches from further review. *Id.* ¶ 17. Afterwards, USCIS consolidates all match evidence and assigns a confidence level for each match. *Id.* ¶ 18. A high confidence match means the match between the voting record and USCIS alien record is "strong and consistent with multifield evidence supporting a strong identity link." *Id.* At that point, USCIS has completed its initial review.

Based on the results of that initial review, the FDNS investigators within USCIS *manually* review every match to confirm the identity match and determine which registered voters they believe are very likely to be aliens based on USCIS' citizenship data. *Id.* ¶ 19. Part of that investigation includes verifying whether the registered voter could have potentially derived citizenship based on history or through parentage. *Id.* Investigators also confirm the match with Department of State systems to identify if any documents (*e.g.*, passports) might not have been linked to USCIS systems, but which bear on the individual's citizenship status. *Id.* A second-level review of the match and citizenship status determination occurs after all of that process, as an additional safeguard. *Id.* After completion of the multilevel and additional-safeguard review, USCIS makes a final determination on which matches to send to HSI for further assessment. *Id.* ¶ 20.

**2.** Once USCIS and FDNS complete their analysis and send their work product, HSI performs an initial intake, which includes a quality review that identifies duplicate entries, incomplete records, missing identifiers, data quality issues, and the like. *See* McLoughlin Decl. ¶ 16. After that intake, HSI prioritizes the records for review and prepares the data for additional enrichment using approved analytic capabilities. *Id.*

HSI's enrichment process focuses on improving the completeness and consistency

of identification information and, where lawfully permitted, identifying additional unique identifiers that may assist in reliable matching of the voters to their immigration status. *Id.* ¶ 17. HSI's enrichment process can perform data matching across multiple authorized data sources and consolidate disparate records into a unified set of matching results. *Id.* The purpose of enrichment is to reduce the risk that voters are mistakenly associated with the wrong immigration status. *Id.* That process adds value by applying consistent quality controls and enrichment processes before voter records are disseminated as investigative referrals or routed for another authorized purpose. *Id.* ¶ 18. Then, after its investigation, HSI may ask USCIS to perform additional manual review of the relevant matches. *Id.* Once the HSI review is completed, each individual data profile is referred to the applicable HSI field office where it will be investigated for potential criminal violations. *Id.* ¶ 19.

**B. USCIS and HSI Identified Likely Noncitizens Registered to Vote in California, and the United States Notified Defendants of these Voters**

California's voter roster containing voter registration information is available for purchase. *See* Cal. Elec. Code § 2188. HSI "received what appeared to be the California voter roster for the general election of 2026." McLoughlin Decl. ¶ 20; *see also id*. ¶ 21. After assessing the credibility of the voter rolls, *id*. ¶ 20, HSI forwarded it to USCIS and FDNS on or around May 8, 2026, *see* Bartell Decl. ¶ 21. FDNS took that list and analyzed the data through the above-described process. *Id*. ¶ 22. That produced a "refined list of individuals who the [FDNS] believes are highly likely to be noncitizen aliens registered to vote in the 2026 federal election in California." *Id.* FDNS then sent that refined list to HSI. *Id.*

Once HSI received the list from FDNS, HSI further refined the data through the above-described HSI process and through federal law enforcement systems. McLoughlin Decl. ¶ 23. "That further refinement resulted in over 20,000 individuals remaining on the list." *Id.* HSI then facilitated the delivery of that final list to the Department of Justice, the U.S. Attorney's Office for the Central District of California, and the Los Angeles County

Registrar-Recorder / County Clerk (RR/CC) on October 13, 2026. *Id.* ¶ 24. The Department of Justice made the same list available to the California Secretary of State on the same day. *Id.*; *see also* Compl., Exs. C & D (delivering list to California).

The list of over 20,000 individuals delivered to California represents the floor of potential noncitizen California voters. *See* Bartell Decl. ¶ 23. USCIS, FDNS, and HSI continue to analyze additional potential noncitizen voter records through the above-mentioned multilevel review process. *Id.* For example, "USCIS has identified a separate batch of more than 17,000 voting records potentially tied to noncitizens after an initial review of voter rolls." *Id.* And based on USCIS' experience in this process, "most voters in [an] initially flagged population will end up being referred to HSI." *Id.* The review is ongoing as additional records are received on a rolling basis before the election date to ensure election integrity. *Id.* USCIS will supplement the record with additional information of likely noncitizen voting in the federal election. *Id.*

**C. Defendants Refuse to Engage with the Federal Government, Prompting the United States to Sue to Prevent Unlawful Noncitizen Voting**

In July 2026, U.S. Secretary of Homeland Security Mullin wrote to California Secretary of State Weber alerting her that a "[p]reliminary review" of California records revealed that there may be as many as 190,832 noncitizens registered to vote in California. Compl. Ex. A. "As an example," he stated, the Department of Homeland Security (DHS) "found 81,336 California registrants for whom the name, date of birth, address and Social Security number match a non-citizen in [DHS] files." *Id*. He then requested collaboration with California "to ensure the accuracy of [the] findings." *Id*.

Notwithstanding that California has registered numerous noncitizens to vote before, *supra* p. 1, Secretary Weber responded a week later to cast doubts about noncitizen voting in the State. Her response letter did not refute that noncitizens are registered to vote. Nor did she contest that they would receive vote-by-mail ballots if they registered to vote. Instead, she cast "serious doubts" about noncitizens registered to vote in California because

the State had refused to share its "statewide voter registration list with DHS or any other federal agency or official." Compl. Ex. B. She nonetheless asked for additional details to evaluate the claims.

The Federal Government provided those details last week. On October 13, the Federal Government hand delivered a list of over 20,000 individuals to RR/CC who it reasonably believes are noncitizens registered to participate in the federal election. *See* McLoughlin Decl. ¶¶ 23-24 and Ex. A; *accord* Bartell Dec. ¶¶ 24-25; Compl. ¶ 47. The Federal Government requested that California review the list within 48 hours to determine whether citizens are listed. Compl. Ex. D at 1. "For individuals whom [California] cannot independently confirm citizenship status," the Federal Government requested that California "instruct the appropriate elections official to segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined." *Id*. "This process," the Federal Government emphasized, "will protect American citizens' votes while preventing noncitizens from participating in the federal election in violation of federal law." *Id*. at 2. The Federal Government asked for a response to its modest request.

California responded two days later rejecting cooperation with the Federal Government and made clear it would not do anything to prevent noncitizen voting. *See* Exs. A & B. Responses acknowledged receipt of the list of over 20,000 individuals. *Id*. The RR/CC claimed that it was legally prohibited from preventing noncitizen voting—or even collaborating with the Federal Government on this issue—because "federal and state law support and require voter registration when eligibility requirements are met by attestation from an applicant." Ex. A at 2. The RR/CC did not explain why these laws would apply in the face of credible evidence demonstrating that the applicant is a noncitizen. *Id*. Next, the RR/CC stated that it could not remove ineligible voters from its voter rolls, but the Federal Government never requested that voters be removed from voter rolls. *Id*. at 3. Third, the RR/CC said that it could not "refuse to permit any person to vote who is entitled to vote." *Id*. (citing 52 U.S.C. § 10307(a)). Yet it did not explain why it believes the likely

noncitizens identified by the Federal Government would be entitled to vote in violation of 18 U.S.C. § 611. Finally, the RR/CC complained about "practical problems" due to its workload if it had to prevent noncitizen voting. *Id*. "Based on the foregoing," the RR/CC stated, it would not "comply with" the request to help prevent noncitizen voting. *Id*. at 4. The California Secretary of State iterated the same points. *See* Ex. B.[1]

Because California refused to even try to prevent noncitizen voting in violation of 18 U.S.C. § 611, despite being provided with a list of likely noncitizen voters by the Federal Government, the United States seeks narrow injunctive relief consistent with ordinary practices when a ballot is called into question. This Court should enjoin California from tabulating vote-by-mail ballots from likely noncitizens in the federal election until the voter's citizenship status can be determined. To do so, this Court should order California (1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote.

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party must establish that it is "likely to succeed on the merits," that it is "likely to suffer irreparable harm in the absence of preliminary relief," that "the balance of equities tips in [its] favor," and that "an injunction is in the public interest." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 841 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In

---

[1] Secretary Weber expressed "concern[]" that the Federal Government may be violating a court order preventing it from using data. Ex. B at 3 (citing *Common Cause v. DOJ*, No. 1:26-cv-01352-SLS (D.D.C.)). That concern is misplaced. In *Common Cause*, the court granted summary judgment and invalidated a purported "voter list maintenance policy" under which the Civil Rights Division requested States' unredacted voter rolls, compared those rolls against a federal database called Systematic Alien Verification for Entitlements, and asked States to remove ineligible voters. *Id*., Dkt. 51 at 9. The court's order, however, "[did] not prevent the federal government from taking *lawful* steps to support states' efforts to maintain accurate voter rolls." This case did not originate under that policy. Nor is this matter seeking voter removals. The accusation that the Federal Government violated a court order is thus meritless. *See also id*., Dkt. 57 at 13–14 (explaining the material factual and legal differences between the voter rolls efforts at issue in *Common Cause* and those at issue in the present litigation).

general, where the United States has demonstrated a likelihood of success on the merits of a Supremacy Clause claim, the other factors also favor a preliminary injunction. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *California*, 173 F.4th at 1068–69.

## ARGUMENT

### I. The United States Has Standing and May Seek Equitable Relief

**A.** Article III requires a plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When considering standing, courts must "accept as valid" the merits of the claim, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); *accord Missouri*, 114 F.4th at 985, meaning that this Court must analyze standing against the backdrop of California facilitating unlawful voting in violation of 18 U.S.C. § 611. For two reasons, "the [United States] has standing to sue to enjoin enforcement of preempted state" actions. *KalshiEX LLC v. Johnson*, 830 F. Supp. 3d 907, 910 (D. Ariz. Apr. 10, 2026) (collecting cases); *see also Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 898 (10th Cir 2017) ("The Supreme Court has reaffirmed time and again that the United States is empowered to enforce the supremacy of federal law against preempted State *action*, and that it may obtain an injunction to that effect.") (emphasis added).

First, "[i]t is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *Arizona v. United States*, 567 U.S. 387 (2012) (affirming order granting preliminary injunction because Arizona violated federal law); *Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022) (recognizing a "sovereign injury" to the United States). When state officials act in a way that "impugn[s] the United States' sovereignty, a personal injury to the United States arises." *LUPE*, 604 F. Supp. 3d at 527; *see also Cruise Lines Int'l Ass'n, Inc. v. Suganuma*,

825 F. Supp. 3d 1170, 1192 (D. Haw. 2025) (finding standing because "the Federal Government has an interest in enforcing its statutes and maintaining federal supremacy"). Courts thus hold that "the United States' sovereign interests are harmed when its laws are violated." *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022). That is especially true when a "domain of federal authority," such as immigration, is "undermined by impermissible state" action. *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

Here, the United States has sovereign authority to regulate alien voting in federal elections. *See Bluman*, 800 F. Supp. 2d at 283; *Arizona*, 567 U.S. at 394. Congress exercised that authority by criminalizing noncitizen voting in federal elections. 18 U.S.C. § 611. California impedes this authority by sending and tabulating vote-by-mail ballots to aliens it knows are likely to be noncitizens who are participating in the federal election. The clash between state officials knowingly allowing likely noncitizens to vote in a federal election and federal law prohibiting such voting is a "concrete harm to [the United States'] sovereignty" to regulate alien voting in federal elections. *LUPE*, 604 F. Supp. 3d at 526; *see also Arizona*, 567 U.S. at 406 (finding that state action "would interfere with the careful balance struck by Congress" in a preempted field). Such unlawful voting also dilutes lawful voting and unduly influences who runs the Federal Government—which is about as direct of an injury to the United States as one can imagine. Compl. ¶ 10.

Second, "[i]nterference with the federal government's interest in enforcing federal law is sufficient to establish" injury for purposes of standing. *Missouri*, 114 F.4th at 984–85; *accord United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) (finding "standing to seek relief from actual or threatened interference with the performance of its proper governmental functions"). The United States has alleged such interference: "by sending ballots to likely noncitizens despite the Federal Government notifying California of serious concerns," California has "made it nearly impossible for the United States to investigate and enforce federal law." Compl. ¶ 10. Moreover, by tabulating votes by likely

noncitizens, California has caused the United States to expend substantial resources, as not only alleged, *id*., but declared. *See* Bartell ¶ 22 (explaining the ongoing process to identify potential noncitizen voter records); McLoughlin Decl. ¶¶ 21–26; *see Missouri*, 114 F.4th at 984 (finding injury to the United States when Missouri caused it to expend resources).

These Article III injuries are traceable to the challenged conduct. And this Court can redress these harms by granting the requested relief. The United States has standing.

**B.** The United States may seek—and the Court may grant—equitable relief to stop unlawful state action. "While there is no implied right of action under the Supremacy Clause, there is an equitable tradition of suits to enjoin unconstitutional *actions* by state actors." *Missouri*, 114 F.4th at 986 (emphasis added). "Based on that equitable tradition, the United States has sued in other cases to enjoin a state law's implementation and enforcement or for other appropriate relief." *Id*. (collecting cases); *see also Arizona*, 567 U.S. 387 (affirming order granting preliminary injunction for state actions that violated the Supremacy Clause); *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 426 (1925) ("The Attorney General by virtue of his office may bring this proceeding and no statute is necessary to authorize the suit."); *In re Debs*, 158 U.S. 564, 584, 599 (1895) (similar). Thus—as California acknowledged—"the United States . . . [can] seek equitable relief to redress" violations of federal law. Br. of California, et al. as Amici Curiae, *Whole Woman's Health v. Jackson*, 2021 WL 5016707, at *6 (U.S. Oct. 27, 2021); *id*. at *7 ("[T]he United States has appropriately sought equitable relief to restore the very supremacy of our Constitution.").

## II. The United States is Likely to Succeed on the Merits

### A. California Cannot Knowingly Facilitate Unlawful Voting in Violation of 18 U.S.C. § 611 and Should Be Enjoined from Presently Tabulating Votes as Applied to Likely Noncitizens Identified by the Federal Government

**1.** Under the Supremacy Clause, the "Constitution, and the Laws of the United

States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399 ("The Supremacy Clause provides a clear rule that federal law" is supreme over state law). Federal preemption principles ensure the constitutional supremacy of federal law. Under those principles, contrary "state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912). And federal law can preempt state law "[e]ven without an express provision for preemption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). That includes where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 373 (citations omitted) (cleaned up), or otherwise "directly conflict[s]" with federal law, *Kansas v. Garcia*, 140 S. Ct. 791, 808 (2020) (Thomas, J., concurring). State action must "give way" when it conflicts with "a considered judgment" embodied in federal law. *Arizona*, 567 U.S. at 399, 405.

Such conflicts can arise in different ways and through different forms. One throughline, though, is that States cannot avoid preemption by facilitating a private party to violate federal law. "It is . . . axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood* , 413 U.S. at 465. For example, if a state purported to subsidize federal crimes, that would conflict with the considered judgment of Congress. *See, e.g.*, *Musta v. Mendota Heights Dental Ctr.*, 965 N.W.2d 312, 321-27 & n.11 (Minn. 2021) (federal law preempted a requirement that an employer subsidize the purchase of a federally prohibited drug), *cert denied*, 142 S. Ct. 2834 (Mem.) (2022).

When evaluating the obstacle that state action poses to federal aims, courts "examin[e] the federal statute as a whole and identify[] its purpose and intended effects[.]" *Crosby*, 530 U.S. at 373. To illustrate, when a State "authorizes [persons] to engage in conduct that the federal [law] forbids, it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Mich. Canners and Freezers*

*Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*, 467 U.S. 461, 478 (1984) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). At bottom, obstacle preemption exists wherever a state "undermines the intended purpose and natural effect" of a federal statute. *Crosby*, 530 U.S. at 373 (internal quotation marks omitted).

These preemption principles apply when state officials act in a manner that obstructs or conflicts with federal law. "It has long been a settled principle that federal courts may enjoin unconstitutional *action* by state officials." *Puerto Rico v. Branstad*, 483 U.S. 219, 228 (1987) (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Accordingly, whether state and local officials "act[] through . . . procedures rather than a court order or a general law . . . is irrelevant to [the] analysis." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 n.5 (1986). Preemption does not turn on the form of state action. It "turns on the actual content of [a state's] policy and its real effect on federal rights." *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994) (citing and adopting *Livadas v. Aubry*, 987 F.2d 552, 561 (9th Cir. 1991) (Kozinski, J., dissenting) ("The point is, the Commissioner is applying state law and his own policy in a way that impinges on protected federal rights.").

Courts have thus held that federal law preempts a wide range of conflicting state actions. Where state officials operating a state university had a "policy" of "preferential treatment" regarding "in-state status" that the Supreme Court deemed inconsistent with federal immigration law, that "policy" itself "violate[d] the Supremacy Clause." *Moreno*, 458 U.S. at 17. Preemption likewise applied when state officials acted to "encourag[e] racial segregation" in violation of the Equal Protection Clause. *United States v. City of Jackson*, 318 F.2d 1, 3–4 (5th Cir. 1963). Or when California itself sought to pursue civil litigation in state court to set emissions standards in violation of the Clean Air Act. *See Daimler Truck N. Am. LLC v. California Air Res. Bd.*, 2025 WL 3049944, at *17–*18 (E.D. Cal. Oct. 31, 2025). A "conflict in technique can be fully as disruptive to the system Congress enacted as [a] conflict in overt policy" written in a statute or regulation. *Arizona*,

567 U.S. at 406. After all, *Ex parte Young*, through which litigants there sought to enjoin unconstitutional state *action*, does not focus on the validity of state law; it focuses on whether "a state official who enforces that law 'comes into conflict with the superior authority of [the] Constitution.'" *Virginia Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (quoting *Ex parte Young*, 209 U.S. at 159-60).[2] That is the case here.

**2.** Federal law makes it "unlawful for any alien to vote" in federal elections. 18 U.S.C. § 611(a). Accordingly, California cannot "induce, encourage or promote"—let alone knowingly facilitate—noncitizen voting for a candidate who is running for a seat in the U.S. Senate or the U.S. House of Representatives when state election officials have notice of specific individuals who are likely to be noncitizens. *Norwood*, 413 U.S. at 465; *cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (applying *Norwood*'s "induce, encourage or promote" principle to scenario where a local government "had essentially become a '*passive participant*' in a system of racial exclusion" (emphasis added)); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013) (explaining that state actions "that require a private party to violate federal law are pre-empted").

**a.** Yet that is precisely what California is doing—such that its actions directly conflict with federal law. The Federal Government notified California months ago that many noncitizens may be registered to vote there. Despite knowing that California must send vote-by-mail ballots to every registered voter, Cal. Elec. Code § 3000.5, the State made no serious attempt to cooperate with the Federal Government or to otherwise determine whether noncitizens are registered to vote. *See* Compl., Ex. B. The Federal Government then provided California with a list of over 20,000 specific individuals who USCIS and HSI believe are likely noncitizens. *See* Compl. ¶ 47; *id*. Exs. C & D; McLoughlin Decl. ¶ 24 and Ex. A; Bartell Decl. ¶¶ 24–25. Yet despite knowing that California must count

[2] California believes its actions are authorized by state law. *See* Ex. B at 3 (claiming that preventing noncitizen voting here "violate[s] state law"). If that's correct, those state laws are preempted as applied to these facts. *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024) (explaining that an "as-applied challenge . . . attacks the application of a statute to a specific set of facts").

any vote-by-mail ballot that satisfies California's (largely illusory) signature verification requirements, the State refused to verify the citizenship of people included on the list—or take any action whatsoever to do so before tabulating those persons' votes. *See* Exs. A & B. California officials now know that over 20,000 California residents are highly likely to be noncitizens registered to vote. Bartell Decl. ¶ 25; McLoughlin Decl. ¶ 25. The officials even have immediate access to the names of those potential voters. But California is now poised to tabulate the votes of persons who they are aware have been identified as likely noncitizens. More than that, California apparently intends to tabulate vote-by-mail ballots received by noncitizens who the United States has charged with having already violated federal election and immigration laws. *See supra* p. 1.

Federal law preempts California's actions here. By facilitating violations of the statute, California's actions conflict with the "considered judgment" the statute expresses. *Arizona*, 567 U.S. at 399, 405. If California was just seeking to "induce, encourage or promote" violations of the statute, that would be enough to trigger federal preemption. *Norwood*, 413 U.S. at 465. But California is not just supporting conduct that federal law prohibits (such as when a state purports to subsidize illegal activity); it is directly facilitating violations of that federal law by ignoring likely noncitizen votes. It "is simply implausible that Congress would have" criminalized voting by noncitizens "if it had been willing to" let States "compromise [the] effectiveness" of that law by participating in its violation. *Crosby*, 530 U.S. at 376. And California's systematic defiance of federal law is all the more egregious because it undermines the federal rights of United States citizens to vote in an election in which only eligible voters participate. "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).[3]

[3] California may argue that *Purcell* prevents relief here, but that argument would lack merit because the United States is not seeking to enjoin "election rules on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026). Far from it, the United States is seeking relief to force California to *conform* to federal and state election rules concerning noncitizen voting. *See* 18 U.S.C. § 611. Such relief

**b.** California's actions also frustrate the objectives and purposes of 18 U.S.C. § 611(a). Congress's objectives and purposes are clear: only citizens vote in federal elections. Yet California is knowingly facilitating voting by likely noncitizens, and it is set to tabulate their votes without even attempting to verify their citizenship status when faced with credible evidence. If merely "authoriz[ing]" conduct that federal law prohibits can undermine "the full purposes and objectives of Congress[,]" *Michigan Canners*, 467 U.S. at 478, it follows that knowingly facilitating such conduct triggers obstacle preemption.

It's easy to see how California's actions pose an obstacle to the United States' ability to implement Congress's purposes and objectives by enforcing 18 U.S.C. § 611(a). The President has made clear that investigating and prosecuting violations of the statute are a major priority—including by expressly directing the Attorney General to "take all lawful steps to deter and address noncompliance with . . . 18 U.S.C. 611(a)." Exec. Order, *Ensuring Citizenship Verification and Integrity in Federal Elections* § 5 (Mar. 31, 2026). The Department of Justice has, in turn, charged numerous noncitizens accused of violating the statute—including just this morning for unlawful noncitizen voting in California. *See, e.g.*, *supra* p.1.[4]

---

would not cause confusion among voters or otherwise, because it concerns how to handle certain ballots once cast.

[4] *See also, e.g.*, Press Release, *Justice Department Announces Charges Involving 16 Aliens for Illegal Voting* (Oct. 16, 2026), https://www.justice.gov/opa/pr/justice-department-announces-charges-involving-16-aliens-illegal-voting; Press Release, *Department of Justice Indicts Ten Aliens for Voter Fraud in Minnesota* (Sept. 30, 2026), https://www.justice.gov/opa/pr/department-justice-indicts-ten-aliens-voter-fraud-minnesota; Press Release, *Justice Department Announces Charges Involving 16 Aliens for Election Crimes* (Oct. 12, 2026), https://www.justice.gov/opa/pr/justice-department-announces-charges-involving-16-individuals-election-crimes; Press Release, *Justice Department Announces Charges and Guilty Pleas Involving 12 Individuals for Election Crimes* (Sept. 28, 2026), https://www.justice.gov/opa/pr/justice-department-announces-charges-and-guilty-pleas-involving-12-individuals-election; Press Release, *Four Aliens Charged with Election Fraud* (Sept. 24, 2026), https://www.justice.gov/opa/pr/four-aliens-charged-election-fraud; Press Release, *Department of Justice Charges 16 Individuals for Illegal Voting and Related Election Crimes* (Sept. 18, 2026), https://www.justice.gov/opa/pr/department-justice-charges-16-individuals-illegal-voting-and-related-election-crimes; Press Release, *Six Charged in California, Kansas, Louisiana for Illegally Voting, Fraudulent Voter Registration, and Identity Fraud* (Sept. 14, 2026), https://www.justice.gov/opa/pr/six-charged-california-kansas-and-louisiana-illegally-voting-fraudulent-voter-registration.

By facilitating *tens of thousands* of votes from likely noncitizens, California is obstructing the United States' law enforcement efforts. It is not practicable or feasible for the Federal Government to prosecute thousands, let alone tens of thousands, of individuals that two federal investigative offices have identified as likely noncitizens. And while a State is not required to help the Federal Government investigate and prosecute crimes, facilitating the commission of such crimes obviously hampers such efforts. Indeed, the scale of the problem arising from California's facilitation of unlawful voting threatens to draw federal resources from, and thus impede federal efforts in, a wide range of law enforcement areas, *e.g.*, violent crime. Such a drain of resources presents yet another obstacle to the United States' law enforcement efforts.

Accordingly, California's facilitation of unlawful voting by sending vote-by-mail ballots to likely noncitizens and counting ballots that are returned—after knowing that noncitizens are likely registered to vote—is preempted as applied to the individuals the Federal Government has identified for California.

**B. California's Counterarguments Lack Merit**

Rather than refute that many likely noncitizens are set to have their votes counted unlawfully, California raised several arguments defending its conduct. *See* Exs. A & B. None has merit.

**1.** California officials have suggested that the Federal Government lacks "authority for directing a county's administration of ballots." *Id*. But the Federal Government is not seeking to "direct" anything. It is, rather, suing to stop an ongoing violation of federal law. And it seeks the narrowest relief possible to preserve the integrity of the election—the mere segregation of covered ballots to ensure that only eligible voters have their votes tabulated. In fact, California law contemplates this very form of relief. *See* Cal. Code Regs. tit. 2, § 20363 ("Resolution of challenged ballots shall take place in a segregated area within the recount location[.]").

That modest proposal in no way "suspend[s]" or "deni[es]" anyone's "voting

rights." *Contra* Ex. B at 2. If California verifies the citizenship of those whose ballots are segregated, California can and should tabulate their votes. No one who is legally allowed to vote would be impacted. And to the extent California law provides that mailed ballots "must be tabulated," Ex. B at 3, for the reasons discussed above, state officials' implementation of that law is plainly preempted to the extent officials know that ballots are likely from ineligible voters, *see also Id*. (referring to California's "right to cast a ballot" for a person who is "a *valid* registered voter" (quoting Cal. Elec. Code § 2300(a)(1)(A) (emphasis added)). Surely California does not believe that its state officials must count votes that are unlawfully cast—including the votes of the individuals indicted this morning.

**2.** California officials have asserted that their "safeguards" are "in full compliance with federal election law" because they require "voter registration applicants to attest to U.S. citizenship under oath," among other registration requirements. Ex. B at 2. That misses the point. Even if California is complying with certain general federal election laws, it now has credible evidence of unlawful voting. That a State requires voter-registration applicants to say they are citizens does not give the State carte blanche to facilitate unlawful voting by registered persons whom it knows are likely noncitizens. And to the extent California officials have invoked laws protecting the rights of "qualified voters," Ex. B at 2 (citing 52 U.S.C. § 10307(a)), who are "entitled to vote," Ex. A at 3 (quoting 52 U.S.C. § 10307(a)), the persons identified here are likely *not* qualified or entitled to vote. *See* 18 U.S.C. § 611(a); *see also* Cal. Const. art. II, § 2(a) and Cal. Elec. Code § 2300(a). Tabulating their votes anyway, without verification, would thus dilute the votes of those who *are* qualified and entitled to vote.

**3.** The California Secretary of State has invoked federal law prohibiting States from "systematically remov[ing] the names of ineligible voters from the official list of eligible voters'" within 90 days of an election. Ex. B at 2 (quoting 52 U.S.C. § 20507(c)(2)). But the Federal Government is not seeking changes to any registration list or alleging that

California violated the law by initially registering voters. This lawsuit is, rather, about tabulating votes that California now knows likely come from noncitizens. The Federal Government is seeking temporary ballot-handling procedures to ensure an accurate vote count pending citizenship verification. The relief sought does not require California to remove anyone from voter rolls, cancel qualified voters, or take any similar action.

And again, temporarily *segregating* ballots to ensure an accurate vote count does not impinge on anyone's voting, due process, or other rights. California officials' overheated rhetoric about "disenfranchise[ing] thousands of Californians" misapprehends what is actually at stake in this dispute. Ex. B at 3. For that reason and others explained above (at n.1), California's reliance on an injunction concerning the Federal Government's actions with respect to the "remov[al] [of] voters from [state voter] rolls" is inapt and inflammatory. *See Id*. (citing *Common Cause v. DOJ*, No. 1:26-cv-01352, 2026 WL 3033772, at *8 (D.D.C. Oct. 9, 2026)).

**4.** California officials have expressed doubt regarding the accuracy of the government's data. *See* Ex. B at 2. But the Federal Government has submitted detailed declarations explaining its process for compiling that data and why it is reliable. *See* Bartell Decl.; McLoughlin Decl. Those explanations are more than enough to overcome the officials' skepticism—particularly given that California has admitted to having many noncitizens on its voter rolls in the past. *See* Mark Osborne, *1,500 noncitizens may have been registered to vote in California DMV error*, ABC News (Oct. 9, 2018), *available at* https://perma.cc/9RM4-THZX (California "admitted . . . a mistake caused as many as 1,500 noncitizens being registered to vote in the state[,]" which the DMV discovered only when "a Canadian citizen . . . went to the Los Angeles Times to tell them about receiving a piece of mail from the DMV saying he was registered to vote.").

More than that, dozens of individuals named on the list the Federal Government gave to California have been charged with federal election-related crimes. Under these circumstances, common sense compels segregating these ballots to ensure that no

noncitizen votes are counted. Following segregation, California can and should verify citizenship status, at which point citizen votes *must be* tabulated. But noncitizen votes cannot be counted. After all, one vote cast by a noncitizen cancels one vote by an American.

In the end, California cannot muster any sufficient justification for its refusal to temporarily segregate ballots until citizenship is confirmed.

## III. The United States Faces Irreparable Harm Absent Preliminary Relief

For three reasons, the United States will suffer irreparable harm absent injunctive relief. First, irreparable harm necessarily results from the operation of preempted state action. *See California*, 173 F.4th at 1069 (granting injunction pending appeal because violation of Supremacy Clause was irreparable); *Valle del Sol v. Whiting*, 732 F.3d at 1029 (finding irreparable harm based on a Supremacy Clause violation); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2012) (same), *aff'd in part, rev'd on other grounds*, 567 U.S. 387 (2012). The United States also suffers a "per se irreparable harm" when state actions violate the Supremacy Clause. *United States v. Texas*, 557 F.Supp.3d 810, 821 (W.D. Tex. 2021) (collecting cases); *Daimler*, 2025 WL 3049944, at *17 (same).

Second, the "inability to enforce its duly enacted [law] clearly inflicts irreparable harm on" the United States. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also Maryland v. Kin*g, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (same). The Supreme Court has recently and repeatedly found that the Federal Government would be irreparably harmed if it could not enforce federal law. *See, e.g.*, *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (Mem.) (2025); *Noem v. Doe*, 145 S. Ct. 1524 (Mem.) (2025); *Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (Mem.) (2025); *see also Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) (must show irreparable harm to obtain a stay). Because California is frustrating the United States' ability to effectively enforce 18 U.S.C. § 611—which is a priority—the United States would suffer irreparably absent an injunction. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 859–60 (2025) (recognizing that the Federal Government "will suffer irreparable harm" if it is prevented from "enforcing its policies").

Finally, our constitutional system is irreparably injured when unlawful votes cancel out lawful votes. Unlawful voting undermines public faith in elections and the legitimacy of those who represent the public. And eroded trust in our democracy is irreparable.

**IV. The Balance of Equities and the Public Interest Weigh in the United States' Favor**

This action seeks to protect the interests of the United States, so the burdens that will result without injunctive relief are directly tied to the public benefits that will be protected if this Court issues the requested injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). That is all the more true given the longstanding "recognition that preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893–94 (9th Cir. 2019). Indeed, the Ninth Circuit has long held that "plaintiffs who "establish[ ] a likelihood that [a] policy violates the U.S. Constitution . . . have also established that both the public interest and the balance of the equities favor a preliminary injunction." *California*, 173 F.4th at 1069 (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)).

Moreover, injunctive relief will preserve the United States' sovereign authority. "Frustration of federal statutes and prerogatives are not in the public interest[.]" *Alabama*, 691 F.3d at 1301; *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496–98 (2001) (courts of equity must respect Congress's policy choices as set forth in a statute); *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009) (similar). Because the challenged conduct here frustrates the purpose of 18 U.S.C. § 611 to prevent noncitizen voting, allowing California to proceed would not be in the public interest. By contrast, an injunction will not burden California, as it does not have the authority to permit noncitizen voting. So an injunction would maintain that status quo.

On the other side, California has expressed concern about administering the United States' request to set aside vote-by-mail ballots cast by likely noncitizens. *See* Ex. B at 3. Those concerns cannot stand as an impediment to administering an election free from

unlawful voting. And California, having routinely administered elections since its founding in 1850, is well-equipped to implement the United States' requested relief. In fact, the very relief sought here—ballot segregation—is provided for in California's elections regulations. "Resolution of challenged ballots," California regulations state, "shall take place in a segregated area within the recount location[.]" Cal. Code Regs. tit. 2, § 20363. California has also known about noncitizen registration since July. *See* Compl. Ex. A.

And California has time to comply with the request. As it explained in its letter to the United States, it "will be fully engaged with ballot processing activities . . . until the end of November" before the State must officially certify "election results." Ex. B at 3 (citing Cal. Elec. Code §§ 15307, 15372); *see also Official Canvass – Vote Counting Process,* California Secretary of State, *available at* https://perma.cc/S4AE-JGVW (noting that California has 30 days, known as the canvass period, to verify results). Further, the United States has offered to assist California to confirm the citizenship of the persons identified by the Federal Government as likely noncitizen voters. *See* Compl., Ex. D at 2. In short, the circumscribed requested relief here would be neither unduly burdensome to California nor disruptive to the ongoing federal election because it concerns only what to do with ballots that are cast (and will not prevent the tabulation of ballots cast by eligible voters). The United States simply asks California to conduct the same process implemented every election cycle, with no additional changes or modifications to its rules.

The public interest and equities strongly tip in the United States' favor and outweigh the administrative costs of tabulating voters from likely noncitizens who received a vote-by-mail ballot from California. Americans benefit from an electoral process that prevents tabulation of illegal votes. California implements the requested injunctive relief every election. And the United States protects its sovereignty by enforcing Congress' prohibition against noncitizens voting.

**CONCLUSION**

For the foregoing reasons, this Court should enter an order requiring California (1)

to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot. The United States seeks this relief to prevent unlawful dilution of American citizens' votes and to protect the integrity of our elections. *See Anderson*, 417 U.S. at 227.

Dated: October 19, 2026

Respectfully submitted,

/s/ *Andrew M. Darlington*
ANDREW M. DARLINGTON
Counsel
*Attorney for the United States*

## CERTIFICATE OF SERVICE

I certify that on October 19, 2026, I served a copy of the foregoing pleading on all counsel of record by means of the CM/ECF electronic filing system.

*/s/ Andrew M. Darlington*
ANDREW M. DARLINGTON
Counsel
*Attorney for the United States*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the United States, certifies that this brief contains 10,110 words, which exceeds the requirements L.R. 11-6.1 while the United States awaits the Court's ruling on its pending Application to Exceed Word Limit.

*/s/ Andrew M. Darlington*
ANDREW M. DARLINGTON
Counsel
*Attorney for the United States*