ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
SETH E. GOLDSTEIN
Supervising Deputy Attorney General
ANNE P. BELLOWS (SBN 293722)
MICHAEL S. COHEN (SBN 339846)
LISA C. EHRLICH (SBN 270842)
ANDREW E. KUSHNER (SBN 316035)
CHRISTINA M. MCCALL (SBN 234139)
Deputy Attorneys General
1300 I Street, P.O. Box 944255
Sacramento, CA 95814
Telephone: (916) 210-6090
Fax: (916) 324-8835
E-mail: Michael.Cohen@doj.ca.gov
*Attorneys for Defendants State of California and California Secretary of State Shirley N. Weber, in her official capacity*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br>**v.**<br>**STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,**<br>Defendants. | Case No. 2:26-cv-12025<br>**STATE DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br>Date: Not Set<br>Time: Not Set<br>Courtroom: Not Set<br>Judge: Not Yet Assigned<br>Trial Date: Not Set<br>Action Filed: October 15, 2026 |

## TABLE OF CONTENTS

Page

Introduction ..... 1
Background ..... 1
I. Factual Background ..... 1
II. Legal Background ..... 3
Legal Standard ..... 7
Argument ..... 7
I. Plaintiff Lacks Standing ..... 7
II. Plaintiff's Claim Fails on the Merits ..... 10
A. Plaintiff Fails to Show That Any Aspect of California's Election Administration Unlawfully Impedes Federal Law Enforcement ..... 11
B. 18 U.S.C. § 611 Does Not Authorize the Relief Plaintiff Seeks ..... 17
C. Plaintiff's Requested Relief Is Unlawful ..... 19
III. The *Purcell* Principle and Equities Heavily Disfavor a Restraining Order ..... 23
Conclusion ..... 28

# TABLE OF AUTHORITIES

Page

**CASES**

*Abbott v. Perez*
585 U.S. 579 (2018) ........................................ 26

*Alexander v. Sandoval*
532 U.S. 275 (2001) ........................................ 17

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
458 U.S. 592 (1982) ........................................ 25

*Allen v. Milligan*
608 U.S. 511 (2026) ........................................ 23, 24

*Am. Encore v. Fontes*
152 F.4th 1097 (9th Cir. 2025) ........................................ 27

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*
178 F.4th 456 (9th Cir. 2026) ........................................ 7

*Andersen v. Celebrezze*
460 U.S. 780 (1983) ........................................ 21

*Arcia v. Fla. Sec'y of State*
772 F.3d 1335 (11th Cir. 2014) ........................................ 19, 20

*Ariz. Dem. Party v. Hobbs*
18 F.4th 1179 (9th Cir. 2021) ........................................ 21

*Arizona v. Inter Tribal Council of Ariz., Inc.*
570 U.S. 1 (2013) ........................................ 4, 12, 13

*Arizona v. United States*
567 U.S. 387 (2012) ........................................ 8, 13

*Arizona v. Yellen*
34 F.4th 841, 852-853 (9th Cir. 2022) ........................................ 8

*Armstrong v. Exceptional Child Center, Inc.*
575 U.S. 320 (2015) ........................................ 17

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Beck v. Prupis*
529 U.S. 494 (2000) .................................................... 18

*Bellitto v. Snipes*
935 F.3d 1192 (11th Cir. 2019) .................................................... 6

*Bolbol v. Rowell Ranch Rodeo, Inc.*
673 F. Supp. 3d 1099 (N.D. Cal. 2023) .................................................... 27

*Burdick v. Takushi*
504 U.S. 428 (1992) .................................................... 20, 21

*California Dem. Party v. Jones*
530 U.S. 567 (2000) .................................................... 22

*California v. United States Bureau of Alcohol Tobacco Firearms & Explosives*
188 F.4th 1160 (9th Cir. 2026) .................................................... 10

*Chamber of Commerce of U.S. v. Whiting*
563 U.S. 582 (2011) .................................................... 14, 16

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) .................................................... 10

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997) .................................................... 26

*Common Cause, et al. v. Department of Justice, et al.*
2026 WL 3033772 (D.D.C. Oct. 9, 2026) .................................................... 2

*Common Cause Indiana v. Lawson*
977 F.3d 663 (7th Cir. 2020) .................................................... 24

*ConocoPhillips Alaska, Inc. v. Alaska Oil and Gas Conservation Commission*
177 F.4th 964 (9th Cir. 2026) .................................................... 13

*Crawford v. Marion Cnty. Elec. Bd.*
553 U.S. 181 (2008) .................................................... 21

# TABLE OF AUTHORITIES
## (continued)


**Page**

*Cruise Lines International Association, Inc. v. Suganuma*
825 F. Supp. 3d 1170, 1192 (D. Haw. 2025) .......... 8

*Democratic Nat'l Comm. v. Wis. State Legislature*
592 U.S. 1039 (2020) .......... 23

*Election Integrity Project Cal., Inc. v. Weber*
113 F.4th 1072 (9th Cir. 2024) .......... 14, 17

*FDA v. Alliance For Hippocratic Med.*
602 U.S. 367 (2024) .......... 10

*Garcia v. Google, Inc.*
786 F.3d 733 (9th Cir. 2015) .......... 7

*Georgia v. Meadows*
88 F.4th 1331 (11th Cir. 2023) .......... 12

*Golden State Transit Corp. v. City of Los Angeles*
475 U.S. 608 (1986) .......... 11

*Gonzalez v. Arizona*
677 F.3d 383 (9th Cir. 2012) .......... 12

*I.N.S. v. Pangilinan*
486 U.S. 875 (1988) .......... 19

*In re Debs*
158 U.S. 564 (1895) .......... 18

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001) .......... 26

*L.A. Alliance for Hum. Rts. v. Cnty. of Los Angeles*
14 F.4th 947 (9th Cir. 2021) .......... 7

*La Union del Pueblo Entero v. Abbott* (*LUPE*)
604 F. Supp. 3d 512, 523 (W.D. Tex. 2022) .......... 8

*League of Women Voters v. Trump*
2026 WL 2620871 (D. Mass. Sept. 4, 2026) .......... 2

## TABLE OF AUTHORITIES
## (continued)

**Page**

*League of Women Voters of the U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016) .......... 28

*Lydo Enter's, Inc. v. City of Las Vegas*
745 F.2d 1211 (9th Cir. 1984) .......... 27

*Maryland v. King*
567 U.S. 1301 (2012) .......... 26

*MetroPCS California, LLC v. Picker*
970 F.3d 1106 (9th Cir. 2020) .......... 16

*Mi Familia Vota v. Fontes*
129 F.4th 691 (9th Cir. 2025) .......... 20

*Montana Medical Ass'n v. Knudsen*
119 F.4th 618 (9th Cir. 2024) .......... 13, 14

*Murphy v. Nat'l Collegiate Athletic Ass'n*
584 U.S. 453 (2018) .......... 11, 12, 15

*Nader v. Brewer*
531 F.3d 1028 (9th Cir. 2008) .......... 21, 22

*New Georgia Project v. Raffensperger*
976 F.3d 1278 (11th Cir. 2020) .......... 23

*New York v. United States*
505 U.S. 144 (1992) .......... 11, 14, 15

*Nken v. Holder*
556 U.S. 418 (2009) .......... 24

*Norwood v. Harrison*
413 U.S. 455 (1973) .......... 15, 16

*Norwood, City of Richmond v. J.A. Croson Co.*
488 U.S. 469 (1989) .......... 15, 16

*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*
181 F.4th 961 (9th Cir. 2026) .......... 24, 25

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Obama for Am. v. Husted*
697 F.3d 423 (6th Cir. 2012) ........ 28

*Printz v. United States*
521 U.S. 898 (1997) ........ 15

*Purcell v. Gonzalez*
549 U.S. 1 (2006) ........ 20, 23, 24, 26, 27

*Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*
944 F.2d 597 (9th Cir. 1991) ........ 26

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*
589 U.S. 423 (2020) ........ 23

*Reynolds v. Sims*
377 U.S. 553 (1964) ........ 20

*Sanitary Dist. of Chi. v. United States*
266 U.S. 405 (1925) ........ 18

*Ex parte Siebold*
100 U.S. 371 (1879) ........ 12

*Silvers v. Sony Pictures Ent., Inc.*
402 F.3d 881 (9th Cir. 2005) ........ 18

*Smiley v. Holm*
285 U.S. 355 (1932) ........ 4, 12

*Smith v. Helzer*
614 F. Supp. 3d 668 (D. Alaska 2022) ........ 27

*Soules v. Kauaians for Nukolii Campaign Comm.*
849 F.2d 1176 (9th Cir. 1988) ........ 27

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016) ........ 7

*Trump v. CASA, Inc.*
606 U.S. 831 (2025) ........ 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States Postal Serv. v. California*
2026 WL 2687160 (U.S. Sept. 14, 2026) .......... 2

*United States v. Alabama*
691 F.3d 1269 (11th Cir. 2012) .......... 8

*United States v. California*
__ F. Supp. 3d. __, 2026 WL 2970902 (C.D. Cal. Oct. 2, 2026) .......... 8, 9

*United States v. California*
824 F. Supp. 3d 1079 (C.D. Cal. 2026) .......... 7, 8, 10

*United States v. California*
921 F.3d 865 (9th Cir. 2019) .......... 14, 25

*United States v. Chelsea Cox*
2026 WL 2948729 (S.D. Fla. Oct. 1, 2026) .......... 11

*United States v. Comstock*
560 U.S. 126 (2010) .......... 17

*United States v. Idaho*
623 F. Supp. 3d 1096 (D. Idaho 2022) .......... 8

*United States v. Missouri*
114 F.4th 980 (8th Cir. 2024) .......... 8, 9

*United States v. Post*
297 F. Supp. 46 (W.D. La. 1969) .......... 5, 22

*United States v. Weber*
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 1

*Valle de Sol Inc. v. Whiting*
732 F.3d 1006 (9th Cir. 2013) .......... 25

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*
529 U.S. 765 (2000) .......... 8

*Voting Rights Coal. v. Wilson*
60 F.3d 1411 (9th Cir. 1995) .......... 15

## TABLE OF AUTHORITIES
## (continued)


**Page**

*Weinberger v. Romero-Barcelo*
456 U.S. 305 (1982) .......... 27

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......... 25, 27

*Xuyue Zhang v. Barr*
612 F. Supp. 3d 1005 (C.D. Cal. 2020) .......... 7

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I
§ 2, cl. 1 .......... 4
§ 4, cl. 1 .......... 4, 16

U.S. Const. art. II, § 1, cl. 2 .......... 4

U.S. Const. art. III .......... 7

U.S. Const. art. VI, cl. 2 .......... 15

U.S. Const. amend. XVII .......... 4

Cal. Const. art. II
§ 2 .......... 4
§ 2(a) .......... 4
§ 2.5 .......... 4

**STATUTES**

18 U.S.C.
§ 611 .......... *passim*

28 U.S.C.
§ 1292(b) .......... 8

# TABLE OF AUTHORITIES
## (continued)

**Page**

52 U.S.C.
§ 10307 ... 23
§ 10307(a) ... 5, 22
§§ 10308(a)-(d) ... 18
§ 10502 ... 16
§ 20301 ... 16
§ 20302 ... 16
§ 20503(a) ... 6
§ 20505(a)(1) ... 6
§ 20506(a)(6)(A) ... 6
§ 20507(a)(3) ... 6
§ 20507(a)(4) ... 6, 16
§ 20507(a)(5) ... 6
§ 20507(c)(2) ... 19, 20
§ 20507(c)(2)(A) ... 6
§ 20507(d)(1) ... 6
§ 20508(b)(2) ... 6, 16
§ 20510(a) ... 18
§ 20511 ... 18
§ 21083 ... 6
§ 21083(b)(4) ... 16

Cal. Elec. Code
§ 2000(a) ... 4
§ 2100 ... 4
§ 2101 ... 4, 6, 16
§ 2102(c) ... 4, 6, 16
§ 2111 ... 4, 6, 16
§ 2150(a)(1) ... 4, 6, 16
§ 2155 ... 6, 16
§ 2155.3 ... 6, 16
§§ 2200 *et seq.* ... 16

## TABLE OF AUTHORITIES
## (continued)

**Page**

§ 2201 .......... 6
§ 2201(a)(8) .......... 4, 26
§ 2201(c) .......... 4
§ 2213 .......... 4
§ 2220 .......... 6
§§ 2221-2227 .......... 6
§ 2262(a) .......... 6
§ 2264(a)(3) .......... 4, 16
§ 2264(b) .......... 4, 16
§ 2300(a)(1)(A) .......... 4
§ 3000.5 .......... 4, 16
§ 3003 .......... 4, 16
§ 3010 .......... 4, 16
§ 3010(a)(2) .......... 5
§§ 3011(a)(1)-(2) .......... 5
§ 3019 .......... 5
§ 3019(b) .......... 5
§ 3019(c) .......... 5
§ 3019(d)(4) .......... 5
§ 3019(e)(1) .......... 5
§ 3102 .......... 4, 16
§ 14240 .......... 4, 24
§ 14240(a)(3) .......... 26
§ 14247 .......... 26
§ 15101 .......... 5
§ 15102 .......... 5
§ 15105 .......... 4, 5, 24, 26
§ 15108 .......... 5
§ 15109 .......... 5
§§ 15600 *et seq.* .......... 24
§ 18100 .......... 4
§ 18500 .......... 4
§ 18543 .......... 4
§ 18560 .......... 4
§ 18561 .......... 4

Voting Rights Act § 11(a) .......... 5, 22

## TABLE OF AUTHORITIES
## (continued)

**Page**

**REGULATIONS**

Cal. Code Regs. tit. 2
§§ 19060-62 .......... 16
§ 19079 .......... 16
§§ 19080-81 .......... 16
§ 20070 .......... 16
§ 20075 .......... 16
§ 20076 .......... 16
§ 20282 .......... 5
§ 20363 .......... 5, 24
§ 20879 .......... 24

**OTHER AUTHORITIES**

11A Fed. Prac. & Proc. Civ. § 2942 & n. 73 (3d ed.) .......... 18

Lucas Waldron & Peter Elkind, *“Devoid of Any Factual Basis”: Again and Again, Judges Have Dismissed Trump's Voter Data Lawsuits*, ProPublica (Oct. 16, 2016) .......... 1

Nick Corasaniti, *From 16,000 to 185 to Zero: Trump’s Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026) .......... 2

## INTRODUCTION

With the November 3, 2026 General Election well underway, the United States demands that California's elections officials refuse to count votes cast by as many as 20,000 voters duly registered under state and federal law. This demand rests on mere suspicion, aroused by suspect data that the Department of Justice ("DOJ") failed to provide state officials. Instead, the California Secretary of State received a letter from DOJ demanding that she work to identify the citizenship of an unspecified list of individuals, or else direct elections officials to refuse to tabulate their ballots. This lawsuit followed less than 48 hours later.

At best, this litigation is a reckless political stunt. At worst, it threatens to disenfranchise thousands of Californians this election. Plaintiff's sole claim—that a federal criminal prohibition on *individual noncitizen voting* preempts large swaths of California's election administration—borders on the absurd. The relief Plaintiff seeks is as unlawful as it is untenable. And the stakes could not be higher; with thousands of ballots being cast every day across California, the election must proceed in accordance with the long-settled laws that govern its administration. The Court should deny Plaintiff's application.

## BACKGROUND

### I. Factual Background

In the run-up to the November 2026 election, the federal government has engaged in a comprehensive effort to interfere in state elections based on unsupported claims of voter fraud. The government has sued thirty states plus the District of Columbia to attempt to obtain unredacted voter rolls, and federal courts have rejected those efforts in *all* of the 26 cases to have reached a final decision (including in California).[1] The government has also sought to impose onerous new

[1] Lucas Waldron & Peter Elkind, *"Devoid of Any Factual Basis": Again and Again, Judges Have Dismissed Trump's Voter Data Lawsuits*, ProPublica (Oct. 16, 2016), https://projects.propublica.org/trump-doj-voter-data-lawsuits; *see also United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

rules on mail voting just weeks before the election—an effort that federal courts rejected at every level. *See League of Women Voters v. Trump*, 2026 WL 2620871 (D. Mass. Sept. 4, 2026); *United States Postal Serv. v. California*, 2026 WL 2687160 (U.S. Sept. 14, 2026). And the government has lobbed allegations of widespread voter fraud at the States, only for those allegations to crumble under scrutiny.[2] As one court recently noted, the federal government's citizenship records are "known to be unreliable." *Common Cause, et al. v. Department of Justice, et al.*, 2026 WL 3033772, at *8 (D.D.C. Oct. 9, 2026).

This case arises out of this campaign. On July 16, 2026, Department of Homeland Security ("DHS") Secretary Markwayne Mullin sent a letter to Secretary Weber alleging that approximately 190,000 voters registered in California "may be" noncitizens, with almost no further detail. ECF No. 1-1. Secretary Weber responded expressing "serious doubts about the reliability of [DHS's] data and accuracy of [DHS's] claims," and asking for a detailed description of the methodology utilized to identify the allegedly ineligible voters. ECF No. 1-2. In a subsequent email exchange, DHS requested a virtual meeting, and the Secretary's Office requested instead that information needed to effectively evaluate the claims be sent via email. Evans Decl. Exh. 1. To date, DHS has not provided evidence, documentation, or any other information to the Secretary's Office in support of its assertions that there "may be" noncitizens registered to vote in California. Evans Decl. ¶ 8.

Since August 2026, the Secretary's Office has received federal grand jury subpoenas for voter records for approximately 300 individuals and has provided, or is in the process of providing, responsive records to each of those subpoenas. Evans Decl. ¶ 7.

[2] *See, e.g.*, Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html.

On the afternoon of October 13, the U.S. Department of Justice ("DOJ") sent a letter to Secretary Weber informing her that DOJ provided a thumb drive to the Los Angeles County Registrar-Recorder/County Clerk containing "a list of names the Federal Government believes are likely noncitizens who were sent a . . . ballot" for the 2026 General Election.[3] ECF No. 1-3. DOJ demanded that Secretary Weber "review the list within 48 hours to determine whether any citizens are listed." *Id.* If her office could not "independently confirm citizenship" for any listed individuals, the letter demanded that she instruct elections officials to (1) segregate and not process or tabulate that individual's mail ballot "until their citizenship status can be determined" and (2) take immediate steps to prevent sending mail ballots to any listed individuals who have not already received them "until [the federal government] can confirm citizenship." *Id.*

On the morning of October 15, Secretary Weber responded rejecting DOJ's demands, explaining that "voting is well underway," that California fully complies with federal law, and that the requested procedures would be unlawful. Evans Decl. Exh. 2. She further explained that her office would "welcome the opportunity to review" any "proof that certain registered voters in California are ineligible." *Id.* at 3. That same morning, Plaintiff filed this suit.

## II. LEGAL BACKGROUND

The California Secretary of State, Dr. Shirley N. Weber, is the state's Chief Officer of Elections. Lean Decl. ¶ 5. California's 58 counties are primarily responsible for administering elections in the state. *Id.* ¶ 4. Each county is responsible for registering voters, maintaining voter rolls, issuing ballots to registered voters, and tabulating and certifying election results. *Id.*

---

[3] While Plaintiff has submitted a declaration asserting that a federal official "understand[s]" that the Secretary's Office was "provided that list on October 13," ECF No. 22-4 ("Bartell Decl.") ¶ 22, they are mistaken, Evans Decl. ¶ 8.

States hold primary responsibility for federal elections under the United States Constitution, including their "Times, Places and Manner," subject to laws enacted by Congress. U.S. Const. art. I, § 4, cl. 1; *see also id.* art. II, § 1, cl. 2. Unless Congress provides otherwise, States therefore have the authority "to provide a complete code for [federal] elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013) ("*ITCA*"). States also have sole authority to set voter qualifications, or "*who* may vote." *ITCA*, 570 U.S. at 16; *see also* U.S. Const. art. I, § 2, cl. 1; *id.* amend. XVII.

United States citizenship is one of several requirements to vote in California elections, and the State enforces this obligation in several ways. *See* Cal. Const. art. II, § 2(a); Cal. Elec. Code §§ 2100, 2101. California requires all voter registration applicants to attest to citizenship under oath, under penalty of perjury and by signature. Cal. Elec. Code §§ 2101, 2102(c), 2111, 2150(a)(1), 2264(a)(3), (b). Elections officials must cancel the registration of any voter "[u]pon proof that the person is . . . ineligible to vote," subject to procedural safeguards. Cal. Elec. Code §§ 2201(a)(8), (c), 2213. State law permits challenges to mail ballots related to "the voter's qualifications to vote," including citizenship. *Id.* §§ 14240, 15105, 15106. Finally, state law also penalizes numerous related offenses, including fraud in voter registration and voting, *id.* §§ 18100, 18500, 18560, and assisting ineligible voters to vote, *id.* § 18561. *See also id.* § 18543 (criminalizing fraudulent or spurious mass voter challenges for improper purposes).

For those who are eligible to vote, California's Constitution guarantees a right to vote and "have that vote counted." Cal. Const. art. II, §§ 2, 2.5. State law further affirms that Californians "have the right to cast a ballot if [they] are a valid registered voter." Cal. Elec. Code, § 2300(a)(1)(A); *see also id.* § 2000(a).

California sends each active registered voter a mail ballot. Cal. Elec. Code §§ 3000.5, 3003, 3010; *see also id.* § 3102. After voting their ballot, a voter places it in an envelope that is signed under penalty of perjury to establish the validity of

the vote. *Id.* §§ 3010(a)(2), 3011(a)(1)–(2). Once elections officials receive a mail ballot, they compare the signature on the ballot envelope to the signature on file for the voter. *Id.* § 3019. When the signatures compare and the ballot is otherwise valid (e.g., the voter has not already cast a ballot), the ballot is tabulated. *Id.* §§ 3019(b), 15101, 15109; Cal. Code Regs. tit. 2, §§ 20282. And if they do not compare (and the voter does not correct any signature deficiencies during the correction period), the ballot must be rejected. Cal. Elec. Code § 3019(c), (d)(4), (e)(1).

Each county establishes "special counting boards" to process and count mail ballots, which tabulate mail ballots as they are returned. Cal. Elec. Code §§ 15101, 15102. Special counting boards also adjudicate challenges to mail ballots in the same manner as other local officials on Election Day. *Id*. §§ 15105, 15108. Absent a successful challenge, all returned mail ballots that bear a valid signature must be counted. *Id*. §§ 3019, 15101, 15109; Cal. Code Regs. tit. 2, §§ 20282, 20363.

Congress exercised its Elections Clause authority to establish limited baseline requirements for federal elections, with which California law conforms. These requirements touch on the ability to cast a ballot, voter registration, voter roll maintenance, and certain mail voting procedures.

Congress enacted the Voting Rights Act of 1965 to safeguard the right to vote. In Section 11(a) of the Act, Congress provided that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under [the Act] or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." 52 U.S.C. § 10307(a). This provision prohibits public officials from denying any qualified person the right to vote. *United States v. Post*, 297 F. Supp. 46, 50 (W.D. La. 1969).

Congress enacted the National Voter Registration Act ("NVRA") in 1993 to reduce barriers to voter registration, protect the integrity of federal elections, and improve the accuracy of voter registration rolls. The NVRA expressly recognizes "method[s] of voter registration provided for under State law," and builds atop that

foundation by requiring certain additional methods be made available to those seeking "to register to vote in elections for Federal office." 52 U.S.C. § 20503(a). Under the NVRA, States must inform applicants of the applicable voter eligibility requirements and penalties associated with submitting false information on an application. *Id.* § 20507(a)(5). The NVRA requires States to accept and use particular forms for voter registration. *See id.* §§ 20505(a)(1), 20506(a)(6)(A). That form must include an attestation of the applicant, under penalty of perjury, that they meet every eligibility requirement to vote. *Id.* § 20508(b)(2). California implements that procedure. Cal. Elec. Code §§ 2101, 2102(c), 2111, 2150(a)(1), 2262(a).

The NVRA provides a framework for the removal of voters from voter rolls, ensuring that the process is fair and protects eligible voters. That framework addresses removals at the voter's request, or due to death, change of residence, or the voter becoming ineligible under state law "by reason of criminal conviction or mental incapacity." 52 U.S.C. §§ 20507(a)(3)–(4), (d)(1). The NVRA requires States to complete systematic removals from the official list of eligible voters no later than 90 days before a federal primary or general election. *Id.* § 20507(c)(2)(A). This window of time is known as the "quiet period." Overall, the NVRA requires only that States "conduct a general program that makes a reasonable effort to remove the names of voters who have become ineligible on account of death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019); *see also* 52 U.S.C. § 20507(a)(4). California has enacted a comprehensive list maintenance program to implement the NVRA's requirements. *See* Cal. Elec. Code §§ 2155, 2155.3, 2201, 2220, 2221–2227.

Congress enacted the Help America Vote Act ("HAVA") in 2002 to help upgrade the States' voting infrastructure. Among other things, HAVA set standards for applicants to verify their identity upon registration. *See* 52 U.S.C. § 21083.

**LEGAL STANDARD**

The same factors and considerations that govern issuance of a preliminary injunction control whether a temporary restraining order is proper. *See Xuyue Zhang v. Barr*, 612 F. Supp. 3d 1005, 1012 (C.D. Cal. 2020). A restraining order is "'an extraordinary remedy never awarded as of right.'" *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 178 F.4th 456, 465 (9th Cir. 2026) (citation omitted). A plaintiff is entitled to a restraining order "if it establishes a likelihood of success on the merits, irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest." *Id.* Mandatory injunctions such as the one Plaintiff seeks here are "'particularly disfavored'" and must be denied "'unless the facts and law clearly favor the moving party.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

**ARGUMENT**

**I. PLAINTIFF LACKS STANDING**

To obtain preliminary relief, a plaintiff "'must make a clear showing of each element of standing.'" *L.A. Alliance for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956–957 (9th Cir. 2021) (citation omitted). Here, Plaintiff cannot establish "injury in fact," one of the three elements of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Plaintiff asserts that it has suffered a "sovereign injury" based on an alleged conflict between 18 U.S.C. § 611, a misdemeanor criminal prohibition on individual noncitizen voting, and California's election administration activity. ECF No. 22-2 ("TRO") at 15. In *United States v. California*, however, a Central District court recently rejected the theory that "the mere *existence* of a preempted state law creates a sovereign injury to the federal government." 824 F. Supp. 3d 1079, 1083 (C.D. Cal. 2026) (emphasis in original). Here, Plaintiff's claim to standing is even weaker because Plaintiff does not identify any state law that conflicts with 18 U.S.C. § 611. Plaintiff instead alleges that it is the State's "action" that has caused

sovereign injury. TRO at 17.

Even if that were true, Plaintiff's cases do not demonstrate that an alleged Supremacy Clause violation alone establishes injury in fact. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000) is inapposite because "the Supremacy Clause does not itself conjure a substantive right" to "vindicate through suit." *See United States v. California*, 824 F. Supp. 3d at 1083 (discussing *Stevens*). *Arizona v. United States*, 567 U.S. 387 (2012) and *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) do not discuss standing at all. In *United States v. Missouri*, the state government "withdrew resources and manpower" previously dedicated to enforcing federal law. 114 F.4th 980, 984 (8th Cir. 2024). In *La Union del Pueblo Entero v. Abbott* (*LUPE*), the United States sued "pursuant to" two federal statutes specifically "authorizing suit." 604 F. Supp. 3d 512, 523 (W.D. Tex. 2022). In *Cruise Lines International Association, Inc. v. Suganuma*, the federal government also asserted concrete injury to its interest in maritime commerce. 825 F. Supp. 3d 1170, 1192 (D. Haw. 2025). Likewise, in *United States v. Idaho*, the government asserted concrete injury based on being denied "the benefits of its bargain" when the state reneged on its agreement to comply with federal law. 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022). Finally, *Arizona v. Yellen* does not discuss injury to the United States or standing in the Supremacy Clause context, instead holding that *Arizona* had standing because it was "coerced into accepting" unconstitutional funding conditions. 34 F.4th 841, 852–853 (9th Cir. 2022).

In *United States v. California*, the Court ultimately found standing based on inferences drawn from a complaint that California law "plausibly encroaches on" the federal government's "authority to enforce or administer" its egg products regulations. 2026 WL 2970902, at *3 (C.D. Cal. Oct. 2, 2026). The Court then certified its order for immediate interlocutory review under 28 U.S.C. § 1292(b), reasoning that the United States' "theory of constitutional standing in this matter is

atypical or unprecedented." *Id*. at *4.

The same theory cannot apply here. That theory depended on an inference that California's law interfered with Congress's intent to have uniform regulation of eggs nationwide by imposing additional requirements. But, contrary to Plaintiff's argument, California's alleged actions here do not "'interfere[] with the federal government's'" ability to enforce 18 U.S.C. § 611. TRO at 16 (citation omitted). Far from being "nearly impossible" for Plaintiff to enforce that statute, nothing California is alleged to have done impedes Plaintiff's ability to bring prosecutions under the law. *Id.* Indeed, on the same day the TRO was filed, the federal government announced that 28 alleged foreign nationals have been charged with federal crimes related to registering to vote and voting in federal elections.[4] RJN Exh. G. This development demonstrates that DOJ is not prevented from investigating and charging violations of 18 U.S.C. § 611.

The *United States v. California* court also recognized that its October 2026 order may have "overstretched inferences that reasonably can be extracted from" the operative complaint. 2026 WL 2970902 at *4. This Court should not "overstretch" here, where Plaintiff relies on an "unprecedented" theory of standing as a basis for seeking emergency relief in the form of outlandish measures that threaten thousands of Californians' right to vote.

Plaintiff also asserts a "direct" injury in the form of "expend[ing] resources" in the enforcement of federal law. TRO at 16–17. But it cites no authority that spending money to enforce a criminal prohibition provides standing to challenge state policies.[5] For good reason. Such a theory lacks a limiting principle; it would allow the United States to "abuse . . . the federal courts for political purposes" any

[4] These 28 defendants, plus Darwin Rivera-Flores (RJN Exh. B, H, and I), represent approximately .0001 percent of the registered voters (~23 million) in California.

[5] *Missouri* features no discussion of *federal* expenditures. Instead, the court discussed injury resulting from the *State* withdrawing resources that previously helped enforce federal law. 114 F.4th at 985. Plaintiff does not claim that California refuses to enforce the prohibition on noncitizen voting.

time it has the authority to enforce federal law, allowing the Executive Branch to "initiate a campaign of preemption suits under the aegis of its sovereignty to bring state law in line with its own political agenda." *United States v. California*, 824 F. Supp. 3d at 1085. "Standing doctrine provides a valuable safeguard" by demanding more than this circular concept of injury. *Id.*; *see also, e.g.*, *FDA v. Alliance For Hippocratic Med.*, 602 U.S. 367, 370 (2024) (an entity "that has not suffered concrete injury caused by a defendant's action cannot spend its way into standing").

Plaintiff also argues that it is harmed because, by sending out ballots, California "dilutes lawful voting and unduly influences who runs the Federal Government." TRO at 16. But "'[a]llegations of *possible* future injury'" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original and citation omitted). For noncitizen voting to affect who runs the government, a "highly attenuated chain of possibilities," *id.* at 410, would have to come to pass: that significant numbers of noncitizens are in fact registered to vote in California; those voters will vote in the 2026 General Election; *and* those votes will change the outcome of the election.

Plaintiff offers no evidence for any step of this causal chain. The record contains no evidence of widespread illegal voting. *See California v. United States Bureau of Alcohol Tobacco Firearms & Explosives*, 188 F.4th 1160, 1170 (9th Cir. 2026) (Courts do not "'endorse standing theories that rest on speculation about the decisions of independent actors . . . particularly speculation about future unlawful conduct.'") (citation omitted). Even if it did, Plaintiff offers no basis to conclude that this would change the outcome of any election and thus "who runs the Federal Government." TRO at 16.

## II. PLAINTIFF'S CLAIM FAILS ON THE MERITS

Plaintiff's claim fails on the merits multiple times over. Plaintiff has failed to show that 18 U.S.C. § 611 preempts any aspect of California's election

administration. In fact, Plaintiff is unable to seek a civil injunction based on this criminal statute at all. And, in any event, the relief Plaintiff seeks is unlawful.

### A. Plaintiff Fails to Show That Any Aspect of California's Election Administration Unlawfully Impedes Federal Law Enforcement

Plaintiff's sole claim rests on 18 U.S.C. § 611's misdemeanor criminal prohibition on individual noncitizen voting.[6] The statute does not purport to set forth any standards for election administration, much less prohibit States from delivering and tabulating ballots for duly registered voters or authorize federal agencies to intervene in election administration. *See New York v. United States*, 505 U.S. 144, 178 (1992) (distinguishing between "congressional regulation of individuals" and "congressional requirements that States regulate"). Nor have Defendants prevented DOJ from investigating and prosecuting violations of 18 U.S.C. § 611. *See* Request for Judicial Notice ("RJN"), Exh. A–H (documents showing DOJ recently charged dozens of noncitizens with election-related crimes). Plaintiff itself recognizes that "[t]he [DOJ] has . . . charged numerous noncitizens accused of violating the statute," including indictments and arrests on the morning of its filing. TRO at 22. And the Secretary's Office has provided or is providing documentation pertaining to these investigations in response to subpoenas. Evans Decl. ¶ 7.

Nevertheless, Plaintiff takes issue with Defendants' "actions," TRO at 19, which Plaintiff characterizes as "facilitating" allegedly unlawful voting, *id.* at 21.[7] This preemption claim is entirely without merit.

---

[6] Recently, the Southern District of Florida found 18 U.S.C. § 611 unconstitutional as applied to a defendant based on States' exclusive constitutional authority to set voter qualifications. *United States v. Chelsea Cox*, __ F. Supp. 3d. __, 2026 WL 2948729 (S.D. Fla. Oct. 1, 2026).

[7] Defendants contest that federal law can preempt "actions" consisting of inadequate assistance to federal law enforcement. Preemption "provides 'a rule of decision,'" establishing that "federal law is supreme in case of a conflict with state law." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (citation omitted). In some cases, federal law may preclude additional state restrictions. *See, e.g.*, *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 n.5, 615–

(continued…)

***Elections Clause Preemption.*** Plaintiff's preemption claim must be adjudicated under the Elections Clause. Where Congress has not exercised its Elections Clause authority to displace state election law, the States retain the "responsibility for the mechanics of congressional elections," *ITCA*, 570 U.S. at 9 (quotations omitted), including as to "registration, supervision of voting, protection of voters, [and] prevention of fraud and corrupt practices," *Smiley*, 285 U.S. at 366. Both the Ninth Circuit and the Supreme Court have recognized that it is the Elections Clause preemption framework, not that of the Supremacy Clause, that governs in cases concerning the rules for election administration. *See ITCA*, 570 U.S. at 13–15; *Gonzalez v. Arizona*, 677 F.3d 383, 392–393 (9th Cir. 2012), *aff'd sub nom. ITCA*, 570 U.S. 1. This is one such case, as Plaintiff contests and seeks relief from California's rules and conduct with respect to election administration. *See, e.g.*, ECF No. 1 ("Compl."), ¶ 62; TRO at 19, 20 n.2.

Under the Elections Clause preemption framework, congressional enactments displace state election law only "so far as [Congress] . . . exercise[s]" its authority "*and no farther*." *ITCA*, 570 U.S. at 9 (citation omitted and emphasis added); *see also Ex parte Siebold*, 100 U.S. 371, 384 (1879) (federal law preempts state election law only "so far as the conflict extends"). 18 U.S.C. § 611 plainly has no such preemptive effect, as it concerns individual noncitizen voters' criminal conduct in casting a vote and does not purport to set any rules governing election administration. Under these circumstances, it is the State's constitutional prerogative to maintain the rules about which Plaintiff complains. *See generally Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023) (recognizing that the federal Executive has no authority to "interfere[] with state election procedures based solely on [its] own initiative").

---

616 (1986) *cited in* TRO 19 (city's labor-related condition on taxi franchise was preempted). But preemption theory does not empower federal officials to enforce "a direct command to the States," *Murphy*, 584 U.S. at 480, nor to complain of state inaction on a favored policy issue.

Plaintiff's novel theory of preemption—that California's lawful rules for election administration (or "actions" implementing those rules) somehow "facilitate" conduct contrary to congressional intent—has no purchase under this framework. Plaintiff has not cited a single authority to the contrary. Because 18 U.S.C. § 611 does not displace election law and policy adopted pursuant to California's constitutional prerogative, Plaintiff's claim fails at the outset. If Plaintiff would like to change California's rules for election administration, the proper means of doing so is via congressional enactment—not Executive initiative.

***Supremacy Clause Preemption.*** Even if the standard Supremacy Clause framework applies, Plaintiff fails to show obstacle preemption. To establish obstacle preemption, Plaintiff must show that California's rules for election administration "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting 18 U.S.C. § 611. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citations and quotations omitted).

This is a high bar. "The Supreme Court has found obstacle preemption in only a small number of cases," and never under circumstances like these. *ConocoPhillips Alaska, Inc. v. Alaska Oil and Gas Conservation Comm'n*, 177 F.4th 964, 972 (9th Cir. 2026). And a "presumption against preemption" raises that bar even higher where "a statute regulates a field traditionally occupied by states." *Mont. Medical Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir. 2024). Under this presumption, courts "assume that a federal law does not preempt the state's police powers absent a clear and manifest purpose of Congress." *Id.*

Plaintiff cannot carry this burden. A presumption against preemption applies here because 18 U.S.C. § 611 plainly pertains to a field traditionally occupied by the State, by the Founders' design—i.e., regulating federal elections and determining voter qualifications. *See ITCA*, 570 U.S. at 8. And Plaintiff has not demonstrated that any aspect of California's election administration is an obstacle to enforcing 18 U.S.C. § 611 as Congress intended. Indeed, nothing in 18 U.S.C.

§ 611's misdemeanor prohibition on individual conduct of noncitizens who vote "demonstrate[s] *any* intent, let alone 'clear and manifest,' that Congress intended to supersede" State's authority over election administration. *United States v. California*, 921 F.3d 865, 886 (9th Cir. 2019) (finding no obstacle preemption with respect to various state laws pertaining to immigration enforcement).

Plaintiff's vague gesturing at Congress's intent to prevent noncitizen voting and the State's alleged inaction with respect to that crime are woefully insufficient. *See, e.g.*, TRO at 22–23. These assertions are far "too high a level of generality to support a finding of preemption," *Knudsen*, 119 F.4th at 629, and do nothing to establish that California "undermine[s] or disrupt[s] the activities of federal . . . authorities," *California*, 921 F.3d at 881. The Supreme Court has warned against the sort of "freewheeling judicial inquiry" on which Plaintiff invites the Court to embark, *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011), and the Ninth Circuit has cautioned against this sort of "judicial second-guessing" of election policies based upon allegations of vulnerability to fraud, *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1096 (9th Cir. 2024).

Regardless, Plaintiff's theory stretches the obstacle preemption doctrine beyond recognition. The core of Plaintiff's claim is this: "the State made no serious attempt to cooperate with the Federal Government or to otherwise determine whether noncitizens are registered to vote." TRO at 20. That is, since it is not "practicable or feasible for the United States" to undertake the scale of investigations that they would like "before the 2026 election concludes," Plaintiff demands that the State "work[] with the Federal Government to prevent" unlawful voting. Compl., ¶ 60; *see also id.* at ¶ 47. But "refusing to help is not the same as impeding," and is no basis for obstacle preemption. *California*, 921 F.3d at 888. In Plaintiff's words, "a State is not required to help the Federal Government investigate and prosecute crimes." TRO at 23.

Obstacle preemption does not, and constitutionally cannot, place such

affirmative requirements on States. *California*, 921 F.3d. at 888–889; *New York*, 505 U.S. at 188. Outside of the Elections Clause context, the federal government cannot order States either to take "affirmative action" or to impose "prohibitions." *Murphy*, 584 U.S. at 455; *see also New York*, 505 U.S. at 188 ("The Federal Government may not compel the States to enact or administer a federal regulatory program").[8] Nor can it "commandeer[]" States "to address particular problems," or "command States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). Yet compelled state assistance with enforcing a federal law is precisely what Plaintiff demands here. *See* Compl. ¶¶ 62, 64; TRO at 20, 28–29. Nothing in 18 U.S.C. § 611 gives Plaintiff that authority.

Plaintiff offers a few additional authorities, but none bolster its preemption claim. The first is the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2. TRO at 17–18. But the Supremacy Clause, if it applies here at all, is not an independent ground for preemption. *Murphy*, 584 U.S. at 477 (recognizing that preemption flows only from congressional enactment and that "pointing to the Supremacy Clause will not do").

Plaintiff also cites *Norwood v. Harrison*, 413 U.S. 455 (1973) and a case supposedly "applying" *Norwood*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989). TRO at 20. Both are inapt. *Norwood* concerned a claim that Mississippi violated the Equal Protection Clause by lending textbooks to private schools with racially discriminatory policies. 413 U.S. at 456–457. The Court concluded that the textbooks amounted to "tangible aid . . . giv[ing] support to such discrimination." *Id.* at 464–465. Here, no aspect of Defendants' lawful

---

[8] In contrast, Congress has power under the Elections Clause to "conscript state agencies to carry out voter registration for the election of Representatives and Senators," as Congress has chosen to do through the NVRA and a limited number of other federal election laws. *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). 18 U.S.C. § 611 is not among them.

administration of California elections can be deemed "tangible aid" to support noncitizen voting, nor to "induce, encourage, or promote" noncitizen voting. *Cf. Norwood*, 413 U.S. at 464–465. The quoted language from *City of Richmond* is even further afield. There, the Court simply cited *Norwood* for the proposition that a city was permitted to "take affirmative steps" to dismantle "a system of racial exclusion" in the construction industry. *City of Richmond*, 488 U.S. at 492. Neither case transforms Plaintiff's apparent disagreement with California's election rules and practices into a colorable preemption claim. Responsibility for policy choices related to election administration belongs to the States and Congress, not to DOJ. *See* U.S. Const., art. I, § 4, cl. 1.

Equally compromising for Plaintiff's position is the reality that California's policy choices are fully compliant with Congress's mandates governing election administration. For example, the NVRA and HAVA requires voter registration applicants to attest to voter eligibility under oath, including citizenship. 52 U.S.C. §§ 20508(b)(2), 21083(b)(4)(A)(i). California does, too. Cal. Elec. Code §§ 2101, 2102(c), 2111, 2150(a)(1), 2264(a)(3), (b). The NVRA also requires that States "conduct a general program that makes a reasonable effort to remove" specified ineligible voters, complete with a framework for removal. 52 U.S.C. § 20507(a)(4). California does this as well. *See, e.g.*, Cal Elec. Code §§ 2200 *et seq*.; Cal. Code Regs. tit. 2, §§ 19060–62, 19079–81, 20070, 20075, 20076. And Congress has mandated that States make mail voting available to certain voters and on certain terms. *See, e.g.*, 52 U.S.C. §§ 10502, 20302, 20301. California offers all voters this option. Cal. Elec. Code §§ 3001, 3003, 3010, 3102.

State law cannot impede federal law when it simply "trace[s]" it. *Whiting*, 563 U.S. at 602. Many aspects of California's election administration do just that, or else go "the extra mile" to empower voters where Congress has set minimum standards. *Id.* at 601; *see also MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1118 (9th Cir. 2020) ("'[T]he case for federal pre-emption is less persuasive when

coordinate state and federal efforts exist within a complementary administrative framework[ ] and in the pursuit of common purposes,'" (citations omitted)).

All told, Plaintiff comes up well short of showing that California's rules for election administration obstruct the execution of Congress's intent in enacting 18 U.S.C. § 611 under the Supremacy Clause, much less that any such obstruction surmounts the presumption against preemption applicable here.

Taken to its logical conclusion, Plaintiff's theory of preemption distorts the Constitution's Elections Clause and system of "limited" federal government beyond recognition. *United States v. Comstock*, 560 U.S. 126, 153 (2010) (Kennedy, J., concurring). If Plaintiff were correct, *any* state practice or inaction that Plaintiff speculates *could* facilitate violations of federal criminal law is likewise preempted—even those implicating the States' reserved authority over elections, where the "possibility of electoral fraud" or mistake "can never be *completely* eliminated." *Election Integrity Project Cal., Inc.*, 113 F.4th at 1096 (quotations omitted). That is not the law.

### B. 18 U.S.C. § 611 Does Not Authorize the Relief Plaintiff Seeks

In any event, Plaintiff lacks a cause of action to obtain the relief it seeks. It is axiomatic that a plaintiff may not sue without a cause of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Plaintiff does not identify any cause of action here, and recognizes that "there is no implied right of action under the Supremacy Clause." TRO at 17. Plaintiff attempts to sidestep this defect by arguing that there is an "equitable tradition of suits to enjoin unconstitutional actions by state actors." *Id*. (emphasis omitted). But such relief is only available "in a proper case." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). And Plaintiff makes no effort to show that the relief it seeks here is the sort of "equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025).

To the contrary, Plaintiff asks this Court to issue a civil injunction based on

alleged violations of 18 U.S.C. § 611, a criminal statute. "As a general rule," however, courts "are reluctant to issue injunctions against the commission of a crime." 11A Fed. Prac. & Proc. Civ. § 2942 & n. 73 (3d ed.). This rule rests upon "the adequacy of the criminal remedy to protect the plaintiff's interests." *Id*. The government may seek an injunction against potential crime when a specific statute authorizes such relief. *See, e.g.*, *Beck v. Prupis*, 529 U.S. 494, 496 n.1 (2000). But Congress has not authorized injunctive relief for 18 U.S.C. § 611. Congress has expressly authorized the Attorney General to seek injunctive relief to prevent certain alleged criminal violations of *other* election laws, *see* 52 U.S.C. §§ 10308(a)–(d), 20510(a), 20511, but 18 U.S.C. § 611 is not among them—an "omission[ ] [that] should be understood as exclusion[ ]." *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (citation omitted).

Plaintiff ignores this issue completely. In arguing that it may seek equitable relief here, TRO at 17, Plaintiff cites only a single decision where the government has obtained an injunction based on a criminal statute. *See In re Debs*, 158 U.S. 564 (1895). But *Debs* allowed an injunction against a rail-worker strike because the strike threatened "interstate commerce and the transportation of the mails," *id*. at 578, and the Supreme Court has described the case as allowing "the United States to remove obstructions to interstate . . . commerce"—an element absent here. *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1925).

Stranger still, Plaintiff does not seek to enjoin individuals alleged to violate 18 U.S.C. § 611, but California and its officials. If an injunction against the threatened violator of a criminal statute is disfavored, relief against a third party to prevent *someone else's* alleged criminal conduct is impossible. Plaintiff cites no authority to support this unprecedented use of the Court's equitable power.

### C. Plaintiff's Requested Relief Is Unlawful

Additionally, Plaintiff has no prospect of success on the merits because the injunctive relief it seeks is unlawful.[9] *I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988) (courts creating equitable remedies may not "'disregard statutory and constitutional requirements and provisions'" (citation omitted)). Plaintiff's demand is astounding. It seeks an injunction prohibiting California from *tabulating the ballots of registered voters* if federal agencies "identified" those voters as "likely noncitizens" until the completion of some unspecified process for verifying their citizenship. TRO at 28–29. This amounts to suspending voting rights for thousands of voters who are only *suspected* of being noncitizens, with absolutely no guarantee that their rights will be restored in time for their votes to be counted. This brazen request, if granted, would violate longstanding protections in federal statute and create an unconstitutional burden on affected citizens' voting rights. Plaintiff cannot succeed in obtaining illegal relief. Nor can Defendants be held liable for failing to accede to such unlawful demands.

***National Voting Registration Act.*** Most immediately, Plaintiff's requested injunction would violate the NVRA's "quiet period" before an election, which protects voters from erroneous removal from voter rolls. The NVRA requires States to "complete, not later than 90 days prior to the date of [a federal election], any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters," subject to exceptions not applicable here. 52 U.S.C. § 20507(c)(2). This rule reflects Congress's "cautious" approach to systematic removals, recognizing that "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). The quiet

[9] Nor can Plaintiff's request for declaratory relief salvage its prospects of success. To the extent Plaintiff's prayer for a declaration that Defendants' "actions" here are "preempted" is even comprehensible, *see* Compl. ¶ 62, it fails the basic test of legal validity, *see supra*, II.A.

period also protects elections officials' time during the busy months leading up to an election and provides certainty about the list of registered voters.

Plaintiff demands that elections officials treat thousands of voters as ineligible until proven otherwise—in substance and effect, requiring officials to remove voters' names "from the official lists of eligible voters." *See* 52 U.S.C. § 20507(c)(2). Linguistic games cannot reconcile this demand with the NVRA's plain language. *See id.*

Ninth Circuit precedent squarely prohibits the removal of voters from the voter rolls during the "quiet period" based on database matching programs designed to identify noncitizens, as opposed to individualized information. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 715–717 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026); *see also Arcia*, 772 F.3d at 1344 ("us[ing] a mass computerized data-matching process to compare the voter rolls with other state and federal databases" qualified as prohibited "systematic" removals). In fact, DOJ's *own guidance* provides that the quiet period prohibition "applies to list maintenance programs based on third-party challenges derived from any large, computerized data-matching process." RJN Exh. A. Plaintiff's list of 20,000 "likely noncitizens," TRO at 20, derives from just this kind of database matching program and is therefore an impermissible basis for removing voters from "the official lists of eligible voters."

***Constitutional violation.*** The U.S. Constitution "protects the right of all qualified citizens to vote, in state as well as in federal elections," and "to have their votes counted." *Reynolds v. Sims*, 377 U.S. 553, 554 (1964). "'[V]oting is of the most fundamental significance under our constitutional structure,'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted), necessary to the lawful renewal of government. These interests merit "careful consideration"—particularly when an election is already underway, raising the risk that judicial relief could adversely affect the election. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

To determine whether an election procedure unconstitutionally trespasses on the right to vote or deprives that right without due process, courts apply the *Anderson-Burdick* test. *See Burdick*, 504 U.S. at 434; *Ariz. Dem. Party v. Hobbs*, 18 F.4th 1179, 1194–95 (9th Cir. 2021) (due process and other constitutional challenges to deprivations of the right to vote are analyzed under *Anderson-Burdick*). This test weighs “the character and magnitude of the asserted injury” to voting rights against “the precise interests put forward by the [government] as justifications for the burden imposed,” considering “the extent to which those interests make it necessary to burden the [voters’] rights.” *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). A “regulation that imposes a severe burden is subject to strict scrutiny.” *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).

This balancing test forecloses Plaintiff’s requested injunction. The burden Plaintiff seeks to impose on duly registered voters is severe. Unlike cases where courts have upheld routine, procedural rules designed to manage registration or balloting, *see, e.g.*, *Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 202–203 (2008) (requirement to present photo ID when voting in person); *Arizona Dem. Party*, 18 F.4th at 1181 (election day deadline for curing signatures), Plaintiff demands that California sequester and refuse to tabulate ballots cast by duly registered voters outside of any statutory procedure and in the absence of any individualized evidence. Such an order would unquestionably have a devastating disenfranchising effect.[10] Plaintiff does not set out a standard by which citizenship can be “verif[ied],” *see* TRO at 28–29, and concedes that it “is not practicable or feasible for the United States” to carry out that confirmation process “before the 2026 election concludes.” Compl. ¶ 60. With fewer relevant resources and amid an

[10] Additionally, the disenfranchising harms will fall solely on naturalized citizens, as Plaintiff’s methodology relies on alien numbers from immigration records. Bartell Decl. ¶¶ 16, 18. Election procedures that “‘place[] a particular burden on an identifiable segment’ of voters are more likely to raise constitutional concerns.” *Arizona Dem. Party*, 18 F.4th at 1190 (quoting *Anderson*, 460 U.S. at 792).

election, California cannot possibly carry out such an investigation, either. *See* Lean Decl. ¶ 14–15. Implementing Plaintiff's requested relief would therefore strip voting rights from thousands of potential voters in an ongoing election.

To sustain a procedure imposing a severe burden on voting rights, a court must determine that the rule passes strict scrutiny, or is "narrowly tailored to serve a compelling state interest." *Nader*, 531 F.3d at 1035. Even assuming that enforcing a misdemeanor criminal statute is a compelling interest, the requested injunction is not necessary to advance that interest. Nothing prevents Plaintiff from enforcing 18 U.S.C. § 611 by bringing charges where it has sufficient evidence. *California Dem. Party v. Jones*, 530 U.S. 567, 584–585 (2000) (narrow tailoring not satisfied where another, less burdensome option would accomplish the same ends). California does not stand in its way. To the contrary, in recent months, the Secretary has responded to, or is in the process of responding to, numerous federal grand jury subpoenas for voter data and records, Evans Decl. ¶ 7, and DOJ has just recently proven capable of enforcing 18 U.S.C. § 611 in California, RJN Exh. G.

Nor is the requested injunction narrowly tailored. It is immensely overbroad in suspending voting rights for thousands of potential voters whom Plaintiff only "reasonably believes," TRO at 1, to be "likely noncitizens," *id. passim*. Plaintiff substantiates its claim with little more than a general description of its process for analyzing data, without individualized evidence of even one noncitizen voter. *Id.* at 9–12. With that, Plaintiff asks this Court to deem thousands of people ineligible to vote until proven otherwise. This abjectly fails the narrow tailoring requirement.

***Voting Rights Act.*** Plaintiff's requested injunction would also violate section 11(a) of Voting Rights Act: "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is . . . qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." 52 U.S.C. § 10307(a). This provision straightforwardly "prohibits public officials from denying any qualified person the right to vote." *United States v. Post*, 297 F. Supp. 46, 50 (W.D. La.

1969). Here, Plaintiff seeks an order requiring elections officials to "refuse to tabulate, count, and report" votes cast by thousands of duly registered voters on the mere possibility that some of them may be ineligible. *But see* 52 U.S.C. § 10307. That is precisely the sort of willful refusal to tabulate duly cast votes that the Voting Rights Act squarely prohibits. *See id.*

***State law.*** Finally, the requested relief is unlawful because it would violate many state laws. *See infra*, Section III. Unless federal law preempts state law (which 18 U.S.C. § 611 does not), ordering the relief Plaintiff seeks would require state officials to ignore state law. No authority supports such a dramatic result.

## III. THE *PURCELL* PRINCIPLE AND EQUITIES HEAVILY DISFAVOR A RESTRAINING ORDER

Plaintiff's relief is barred by the well-established *Purcell* principle. That principle provides that "lower federal courts should not 'alter the election rules'" of a State "on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026); *see also Purcell v. Gonzalez*, 549 U.S. 1 (2006).

Plaintiff argues *Purcell* does not apply because, in Plaintiff's telling, it only seeks to maintain existing election rules, and its sought-after relief can cause "no confusion among voters or otherwise" because "it concerns how to handle certain ballots once cast." TRO at 21–22 n.3. Plaintiff's representations are difficult to square with this litigation and the law.

First of all, Courts routinely apply *Purcell* to deny injunctive relief related to "how to handle ballots once cast," TRO at 21–22 n.3. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.* (2020) 589 U.S. 423, 425 (applying *Purcell* in overturning a district court order allowing ballots cast by mail and postmarked after election day to be tabulated); *Democratic Nat'l Comm. v. Wis. State Legislature*, 592 U.S. 1039, 1043–44 (2020) (discussing *Purcell* and the impropriety of a district court injunction changing the treatment of cast ballots under state law six weeks before election day) (Kavanaugh, J., concurring); *New Georgia Project v.*

*Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) (applying *Purcell* in reversing district court injunction concerning the treatment of cast ballots "in the middle" of election with "absentee ballots already printed and mailed"); *Common Cause Indiana v. Lawson*, 977 F.3d 663, 665 (7th Cir. 2020) (same).

Plaintiff is also wrong to the extent it implies that the requested relief is consistent with California law. *See, e.g.*, TRO at 3, 14, 21–22 n.3, 28. State law sets forth a detailed and exclusive process for contesting voter eligibility, no aspect of which contemplates separating ballots upon receipt in response to third-party demands. *See, e.g.*, Cal. Elec. Code §§ 14240 (challenges to voter eligibility), 15105 (allowing challenges to mail ballots on the same grounds as challenges at polling places "prior to the opening of the identification envelope of the challenged voter"), 15106 (establishing a burden of "extraordinary proof of the validity of the challenge at the time the challenge is made"); Cal Reg. tit. 2, § 20879 (describing challenges to mail ballots). Plaintiff cites only Cal. Code Regs. tit. 2, § 20363 to argue that the relief sought here—widespread, pre-tabulation ballot segregation—"is provided for in California's regulations." *See, e.g.*, TRO at 3, 28. But this provision applies to ballots challenged during a formal "recount," governed by Cal. Elec. Code §§ 15600 *et seq.* Plaintiff clearly has not invoked this process, which entails wholly different administrative considerations. The requested relief would undoubtedly "alter the election rules" while the election is ongoing, contrary to the *Purcell* principle. *Allen*, 608 U.S. at 514.

The equities and the public interest also strongly disfavor Plaintiff's application. These factors "merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

***First***, the public interest here follows the merits because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981 (9th Cir. 2026). "It is clear that it would not be equitable or in the public's interest to allow the [United

States] to violate the requirements of federal law." *Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (citation modified). As discussed in detail above, *see supra*, II.C, there is no basis in federal or state law for the remedy Plaintiff requests here, which itself would violate both state and federal law. Such an injunction is clearly counter to the public interest.

Plaintiff argues that the public interest favors an injunction because Plaintiff suffers irreparable harm simply from "the operation of preempted state action." TRO at 26. Plaintiff cannot rely on "general pronouncements that a Supremacy Clause violation alone causes sufficient harm" to tip the balance in its favor. *United States v. California*, 921 F.3d 865, 894 (9th Cir. 2019); *see id*. at 893–894. Plaintiff also argues that it suffers irreparable harm because California prevents it from "enforc[ing] federal law." TRO at 26. Not so, as amply demonstrated above. *See supra*, II.A; RJN Exh. B–G; *Novedades Y Servicios, Inc.*, 181 F.4th at 981 (no harm to government where it failed to explain why it could not "combat emergent threats through other investigatory and prosecutorial tools"). And even crediting Plaintiff's claims of irreparable harm, TRO at 26, a court must still "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, they weigh strongly against any injunction that would upend election administration and disenfranchise voters in an ongoing election.

***Second***, an injunction would disserve the public interest because it would create serious and irreparable sovereign and administrative harms for the State and Secretary of State. These outweigh Plaintiff's alleged harms. Acting on its constitutional prerogative, the State has adopted laws governing the conduct of elections based on its assessment of the best means to safeguard the integrity of the electoral process. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) ("[C]reat[ing] and enforc[ing] a legal code" part of States' "sovereign power"); *Purcell*, 549 U.S. at 4 (States have "compelling

interest in preserving the integrity of [their] election process[es]”). The State necessarily “suffers irreparable injury whenever an enactment of its people or their representatives is enjoined.” *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Here, Plaintiff asks the Court to enjoin California from fully implementing its laws governing the mailing, processing, and tabulation of voted ballots. *See* TRO at 27. Plaintiff argues that the injunction it requests “would maintain the status quo”, *id.*, but the relief sought is impossible to reconcile with state law governing ballot tabulation and voter challenges.[11] *See supra*, II.C. The request upends California state election law, and “[i]njuries where “sovereign interests and public policies [are] at stake” are irreparable. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

Plaintiff’s demands would impose a heavy burden on the Secretary of State and county elections officials as they administer the General Election. *See* Lean Decl. ¶¶ 13–14. They would divert critical resources away from implementing state laws intended to facilitate and protect elections. *Id.*; *see also Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018) (“[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.”). An injunction here would also lead to public confusion, privacy concerns, and, inevitably, the loss of public trust and reputational harms to the State and its elections officials—harm that is irreparable. Lean Decl. ¶ 16; *Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (“[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.”).

***Third***, Plaintiff itself exacerbated these harms through its own delay, giving rise to an emergency of its own making. *See, e.g.*, *Bolbol v. Rowell Ranch Rodeo,*

[11] Plaintiff’s recent criminal charges against alleged noncitizen voters in California suggest that it has individualized evidence that those individuals are noncitizens. Nothing prevents Plaintiff from working through existing procedures to challenge ballots cast by those persons, if any, through established statutory channels. *See* Cal. Elec. Code §§ 15105, 14240(a)(3), 14247; *see also id.* § 2201(a)(8).

*Inc.*, 673 F. Supp. 3d 1099, 1101 (N.D. Cal. 2023) (plaintiffs who "sit on their rights only to spring an application for a temporary restraining order on their opponents at the eleventh hour" may not obtain emergency relief). Plaintiff has provided no explanation for its decision to press this initiative just days before the General Election, even though they apparently possessed this information months ago. Bartell Decl. ¶ 21 (FDNS received a copy of the California voter rolls from HSI on May 8, 2026). Courts have been justifiably "wary" of this sort of "sandbagging" when it comes to failure to seek pre-election relief, and the same principle weighs against emergency relief here. *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180–81 (9th Cir. 1988); *see also Lydo Enter's, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1212 (9th Cir. 1984) ("delay" is "a factor to be considered in weighing the propriety of relief"); *Smith v. Helzer*, 614 F. Supp. 3d 668, 691 (D. Alaska 2022), *aff'd* (9th Cir. 2024) 95 F.4th 1207 (finding delay weighed against preliminary relief in election matter).

***Fourth***, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (*quoting Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The Ninth Circuit has recognized that "[t]here is no doubt that the right to vote is a legally protected interest and voter disenfranchisement is a concrete and particularized injury." *Am. Encore v. Fontes*, 152 F.4th 1097, 1111 (9th Cir. 2025). Plaintiff has demanded that validly cast ballots be sequestered until citizenship is confirmed, without specifying what confirmation is sufficient or any plan to conduct further investigation to accomplish it. TRO at 28; Lean Decl. ¶ 15. The risk—if not certainty—of disenfranchisement is plain. The public has a strong interest in preventing the irreparable harm of disenfranchisement and late-stage disruptions to election administration. *See, e.g.*, *Purcell*, 549 U.S. at 4–5 (observing that the public has a "strong interest in exercising the fundamental political right to vote" and discouraging courts from altering election rules close to elections (quotation

omitted)); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 14 (D.C. Cir. 2016) (recognizing "the strong public interest in ensuring that unlawful agency decisionmaking does not strip citizens of the right to vote"). Instead, the public interest "favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).

## CONCLUSION

For the foregoing reasons, and considering the urgent need for clarity during an ongoing election, California respectfully requests that the Court deny Plaintiff's application for a temporary restraining order forthwith.

Dated: October 20, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
SETH E. GOLDSTEIN
Supervising Deputy Attorney General
ANNE P. BELLOWS
LISA C. EHRLICH
ANDREW E. KUSHNER
CHRISTINA M. MCCALL
Deputy Attorneys General

/s/ *Michael S. Cohen*

MICHAEL S. COHEN
Deputy Attorney General
*Attorneys for Defendants State of California and California Secretary of State Shirley N. Weber, in her official capacity*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the State of California and California Secretary of State Shirley N. Weber, certifies that this brief contains 9,835 words, which exceeds the requirements of L.R. 11-6.1 while State Defendants await the Court's ruling on their pending Application For Leave to Exceed Word Limit.

Dated: October 20, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California

/s/ *Michael S. Cohen*

MICHAEL S. COHEN
Deputy Attorney General
*Attorneys for Defendants State of California and California Secretary of State Shirley N. Weber, in her official capacity*