DAWYN R. HARRISON, COUNTY COUNSEL
PETER BOLLINGER, ASST. COUNTY COUNSEL (SBN 241752)
EVA CHU, SNR. DEP. COUNTY COUNSEL (SBN 235356)
ADAM BAUMGARTEN, SNR. DEP. COUNTY COUNSEL (SBN 292095)
648 KENNETH HAHN HALL OF ADMINISTRATION
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-0809
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM (SBN 241068)
ABIGAIL URQUHART (SBN 310547)
ALEX SCANDROLI (SBN 345278)
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

Attorneys for Defendant
DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

*Additional Counsel Listed on Following Page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

Defendants.

Case No. 2:26-cv-12025

**OPPOSITION OF DEFENDANT DEAN C. LOGAN, IN HIS OFFICIAL CAPACITY AS THE COUNTY OF LOS ANGELES REGISTRAR-RECORDER/COUNTY CLERK, TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**

*[Filed concurrently with Declarations of Christopher Pelham, Aman Bhullar, and Monica Flores]*

**PUBLIC RIGHTS PROJECT**
Joshua Karsh (*pro hac vice forthcoming*)*
Toby R. Merrill (*pro hac vice forthcoming*)**
Kyra Sikora (*pro hac vice forthcoming*)
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
joshua.karsh@publicrightsproject.org
toby.merrill@publicrightsproject.org
kyra.sikora@publicrightsproject.org

** Licensed in Illinois and Washington, D.C. Not licensed to practice law in California.*

***Licensed in Massachusetts and New York. Not licensed to practice law in California.*

Attorneys for Defendant
DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 8
II. RELEVANT BACKGROUND ........ 10
A. The County's Election Procedures ........ 10
B. DHS' July 2026 Letter To The Secretary Of State ........ 13
C. DOJ's October 2026 Ultimatum To The County And The County's Response ........ 13
D. The Executive's Description Of The October List And The Additional Review It Seeks ........ 15
E. Comparing The Executive's List To Current County Records Shows Indicia Of Unreliability ........ 17
F. Implementing The Executive's Ballot Hold Segregation Is Not Feasible Without Disrupting The Ongoing Election ........ 17
III. LEGAL STANDARD ........ 21
IV. THE COURT SHOULD DENY THE *EX PARTE* APPLICATION ........ 21
A. The Executive Has Not Shown A Likelihood Of Success On The Merits Of Its Preemption Claim ........ 21
1. The Executive has not shown a concrete injury traceable to the County. 22
2. California's election procedures do not conflict with Section 611. ........ 23
3. California's election procedures are not obstacle-preempted merely because they do not accommodate the Executive's preferred investigative timeline. ........ 24
4. The Constitution and Congress' election statutes leave no room for the Executive to prescribe new ballot-processing requirements on its own authority. ........ 25
5. The Complaint's allegations do not establish that the County knowingly facilitates unlawful voting. ........ 26
6. Even a valid preemption claim would not entitle the Executive to relief that violates independent federal voting protections and due process. ........ 27
B. The Executive Has Not Established Likely Irreparable Harm ........ 29
1. The Executive has not shown that, absent an injunction, unlawful votes will be cast and counted. ........ 29
2. The Executive's delay undermines both its claim of emergency and the feasibility of its proposed remedy ........ 30
C. The Equities, The Public Interest, and *Purcell* Weigh Against Changing Ballot Procedures During An Ongoing Election ........ 31
1. The proposed injunction would divert essential election resources and risk disenfranchising eligible voters. ........ 31
2. Purcell weighs against introducing a new citizenship-clearance rule after voting has begun. ........ 32
3. An open-ended hold risks disenfranchisement without a demonstrated proportionate benefit. ........ 33
V. THE EXECUTIVE'S REQUESTED RELIEF IS ALSO DEFECTIVE BECAUSE IT IS NOT PRECISELY DEFINED FOR IMPLEMENTATION BY THE COUNTY ........ 33

VI. CONCLUSION ........................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. United States*,
417 U.S. 211 (1974) .......... 33

*Arizona v. Inter Tribal Council of Arizona, Inc.l*,
570 U.S. 1 (2013) .......... 25

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 24

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) .......... 23

*Coalition for Humane Rights, et al. v. U.S. Dep't of Homeland Security, et al.*,
No. 1:26-cv-03072 (D.D.C.) .......... 20

*Common Cause v. U.S. Dep't of Just.*,
No. 1:26-cv-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) .......... 25, 26, 29, 30

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 24

*Democracy N.C. v. N.C. State Bd. of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) .......... 28

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) .......... 21

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 23, 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 22

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 28

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, No. 25-1017 (U.S. June 29, 2026) .......... 27, 29

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 22

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
762 F.2d 1374 (9th Cir. 1985) .......... 31

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) (per curiam) .......... 31, 32

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
762 F. Supp. 1354 (D. Ariz. 1990) ........ 28

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
589 U.S. 423 (2020) (per curiam) ........ 32

*Rosemond v. United States*,
572 U.S. 65 (2014) ........ 27

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ........ 21

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) ........ 26

*United States v. California*,
No. 2:25-cv-06230-MCS-AGR, ECF No. 77 (C.D. Cal.) ........ 22, 24

*United States v. Classic*,
313 U.S. 299 (1941) ........ 33

*United States v. Cox*,
No. 0:25-cr-60249-DSL, 2026 Wl 2948729 (S.D. Fla. Oct. 1, 2026) ........ 26

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) ........ 22

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........ 25

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 21, 22, 29

*Wyeth v. Levine*,
555 U.S. 555 (2009) ........ 24

**Rules and Statutes**

18 U.S.C. § 2 ........ 27

18 U.S.C. § 611 ........ 16, 21, 22, 23, 24, 25, 26, 29, 33

18 U.S.C. § 611(a) ........ 22, 23

52 U.S.C. § 10307(a) ........ 28

52 U.S.C. §§ 20505(a)(1), 20507(b)(1), (c)(2) ........ 13

52 U.S.C. §§ 20505(a)(1), 20508(b) ........ 25

52 U.S.C. § 20507(b)(1) ........ 28

52 U.S.C. § 20507(b)(1), (c)(2)(A) ........ 25

52 U.S.C. § 20507(c)(2)(A) ........ 27

52 U.S.C. § 20508(b)(2) ........ 10

52 U.S.C. §§ 20510(a), 21111 .......... 25
52 U.S.C. § 21081(a)(1)(C) .......... 11
Cal. Elec. Code § 2101 .......... 23
Cal. Elec. Code §§ 2111, 2201(a)(8), 18100 .......... 23
Cal. Elec. Code § 2201(a)(8) .......... 12
Cal. Elec. Code § 3000.5 .......... 10
Cal. Elec. Code § 15372 .......... 33
Elections Code § 2111 .......... 10
Fed. R. Civ. P. 65(d)(1) .......... 34

**Other Authorities**

Cal. Const. art. II, § 2 .......... 23
Cal. Const., art. II, § 7 .......... 11, 32, 34
U.S. Const. art. I, § 4, cl. 1 .......... 25
U.S. Const. art. II, § 3 .......... 26

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Voting is already underway in Los Angeles County. Ballots have been mailed, returned, and processed, and election officials are working toward fixed deadlines for counting and certification. Plaintiff United States of America, through the Department of Justice (together, "the Executive"), now asks this Court to interrupt that work and enjoin the withholding of 20,000 registered California voters' ballots pending investigation based solely on an unreliable voter roll maintenance list (the "October List").

The Executive portrays that intervention as modest and its list as the product of a thorough investigation. Neither characterization survives scrutiny. The Executive's own declarations describe a bulk data match that began with a voter roster more than a year old, obtained from an unidentified source, supplemented through an unnamed commercial platform, and compared against federal databases. (McLoughlin Decl. ¶¶ 20–21; Bartell Decl. ¶ 16-17.) The Executive's own declarant concedes that the resulting data may be "incomplete, outdated, or mismatched." (Bartell Decl. ¶ 16.) The Complaint describes the October List as the starting point for further work, not a determination of ineligibility. (Compl. ¶¶ 38–43.) And that work, the Executive concedes, cannot be finished before the election ends. (*Id.* ¶ 60.)

A review of the October List shows the consequences of treating suspicions as a basis for withholding or segregating ballots. Of the more than 20,000 records on the Executive's list, 7,035 bear County addresses. (Declaration of Aman Bhullar ("Bhullar Dec.") ¶ 25.) That total includes duplicates, cancelled registrations, and a high percentage of U.S. born-persons. (Declaration of Monica Flores ("Flores Dec.") ¶ 45.) Federal agencies' database "matching" cannot be equated with imminent unlawful votes. Other States' experience confirms why such matches require investigation and individualized proof. Some States use the Department of Homeland Security's ("DHS") Systematic Alien Verification for

Entitlements ("SAVE") program to compare voter information against federal citizenship and immigration records. The Executive says it compiled California's list independently of SAVE, (Compl. ¶ 33 n.1), but its process draws on overlapping federal records and raises the same central concern: a database's failure to confirm citizenship may reflect nothing more than incomplete or stale information. In Texas, for example, further review established that 578 of the 2,724 people SAVE initially identified as potential noncitizens, more than one in five, were citizens.[1] In Utah, manual review of 10,718 records that database checks had left unresolved confirmed citizenship for 5,659, more than half, while identifying 27 confirmed and 25 probable noncitizens; another 5,007 remained unresolved.[2]

The Executive's timing magnifies that risk. It began work on the October List in May 2026 and notified the California Secretary of State of its concerns in July, though it provided no evidence or methodology to support those concerns. Then the Executive waited until voting was underway to deliver the October List, and demanded action in less than 48 hours. Its proposed order would carry that compressed timetable into an ongoing election without supplying a workable process for resolving disputed matches, a meaningful opportunity for affected voters to respond, or any assurance that eligible voters' ballots will be released in time to count. A ballot hold is no modest precaution when the Executive cannot say how or when it will end.

The County of Los Angeles can evaluate credible evidence through lawful procedures, and the Executive remains free to investigate and prosecute actual offenses. Neither requires an emergency order placing thousands of registered voters' ballots on hold while federal officials investigate indefinitely. The Executive has not shown that federal law authorizes that disruption, that reliable evidence makes it necessary, or that eligible voters will be protected from its consequences. The Court should deny the Executive's *Ex Parte* Application for a

[1] (Declaration of Christopher Pelham ("Pelham Dec.") ¶ 2; Ex. A.)
[2] (*Id.* ¶ 3; Ex. B.)

Temporary Restraining Order (the "Application").

## II. RELEVANT BACKGROUND

### A. The County's Election Procedures

Defendant Dean C. Logan is sued in his officially capacity as the Los Angeles County Registrar-Recorder/County Clerk (the "County"). (Compl. ¶ 16.) The County's administration of the November 3, 2026 General Election is the largest and most complex in the nation, servicing 88 cities, 55 general and special districts, and 140 unincorporated areas. (Flores Dec. ¶ 5.) The County serves approximately 5.9 million registered voters, with 5,000 voting precincts for countywide elections. (*Id.*)

In California, voter rolls are maintained by the California Secretary of State. (*Id.* ¶ 6.) The California voter registration system is called VoteCal. (*Id.*) The Los Angeles County Database Voter Information Management System is called ("DIMS"). (*Id.*) The DIMS database and VoteCal databases interact with each other in order to facilitate the maintenance of up-to-date voter rolls for the County. (*Id.*) The County is not responsible for the voter rolls outside of the County, nor does it have access to statewide data. (*Id.*)

For voter registration, under Elections Code § 2111, a person "may prove he or she is a citizen by his or her certification under penalty of perjury on the affidavit of registration." (*Id.* ¶ 7; *see also* 52 U.S.C. § 20508(b)(2) (federal mail voter registration form must include "an attestation that the applicant meets each such requirement," including citizenship, and "require[] the signature of the applicant, under penalty of perjury").) Consistent with California and federal law, for registration, the County relies on the under oath representation for proof of an individual's citizenship, no additional verification is required. (*Id.*)

California law requires the County to mail a vote-by-mail ("VBM") ballot to every active registered voter 29 days before the election on October 5, 2026. (*Id.* ¶ 18; *see also* Cal. Elec. Code § 3000.5.) All VBM ballots require voter and signature verification before the vote can be counted. (Flores Dec. ¶ 20.) This

process includes a comparison of signatures on envelopes to the signatures on file. (*Id.*) If a signature is missing or does not compare to the signature on file, state law requires county elections officials to reach out to voters to verify their signature to ensure that their ballot can be counted. (*Id.*)

The County is currently conducting and preparing for the November 2026 General Election. (*Id.* ¶ 21.) The County has mailed approximately 5.6 million VBM ballots to County registered voters, and there are 567 active contests in the General Election. (*Id.* ¶ 22.) As of October 13, 2026, the date the County received the October List, there were no ballots waiting to be mailed. (*Id.*) The County has put its 420 VBM ballot drop boxes for the General Election into operations and also began its VBM ballot processing operations on October 5, 2026. (*Id.* ¶ 23.) VBM ballots are currently being returned to the County's office by mail and scheduled VBM ballot drop box retrievals. (*Id.*)

Since the County began its VBM ballot processing operations on October 11, 2026, the County has processed more than 331,000 VBM ballots to date and anticipates much higher volumes of VBM ballots to be received as Election Day approaches (*Id.*) Regardless of voting method, voting is fully anonymous—even to the County itself, in compliance with California and federal law. (*Id.* ¶ 17; *see also* Cal. Const., art. II, § 7; 52 U.S.C. § 21081(a)(1)(C) (Help America Vote Act ("HAVA")). Once a vote-by-mail ballot has been removed from its return envelope, or an in-person ballot has been cast, there is no way to associate the voter with that ballot. (*Id.*)

The County will be operating a total of 646 vote centers, 123 of which will be eleven day vote centers to open starting on October 24, 2026, and 523 of which will be four day vote centers to open on October 31, 2026. (*Id.* ¶ 24.) The County is currently in the process of preparing for the opening of these 640 vote centers, which include training and assigning election workers to the vote centers, setting up call centers and other information technology resources to support the election, as well as the logistical operations of ensuring voting equipment and supplies will

be appropriately and securely transported to and set up at each vote center. (Flores Dec. ¶)

From the opening of vote centers on October 24, 2026 and up through Election Day, the County will be diverting the majority of its staff and resources towards supporting the conduct of the General Election. (*Id.* ¶¶ 26-27.) After 8 p.m. on Election Day, the County will be required to redirect staff and resources toward tabulating votes, completing the official canvass, and certifying election results to the Secretary of State within 30 days. (*Id.* ¶ 28.)

County officials must begin reporting results to the Secretary of State no more than two hours after they begin tallying votes after the polls close. (*Id.* ¶ 29.) County officials then continue to report results periodically throughout Election Night until all vote totals have been reported. (*Id.*) County officials are required to conduct a public 1% manual tally of the ballots tabulated by the County's voting system in order to verify the accuracy of the automated count. (*Id.* ¶ 32.) The final County results must be submitted by December 3, 2026 to the Secretary of State, who in turn, must certify the count by December 11, 2026. (*Id.* ¶ 33.)

The County has never attempted a "temporary ballot segregation", nor received a request from a federal agency to do so. (*Id.* ¶¶ 12, 35.) The County has no authority under state or federal law to withhold or set aside the ballot of a registered voter on the basis of a third party's assertion that the voter may not be a citizen. (*Id.* ¶ 3.) In every instance in which the County has acted on information bearing on a registrant's citizenship, the information originated with the registrant himself or herself. (*Id.* ¶ 11.) In those situations the County does not cancel or refuse the registration. (*Id.*) The County writes to the registrant, identifies the registrant's own statement or omission, and asks the registrant to confirm his or her eligibility. (*Id.*)

California law permits cancellation upon proof of ineligibility. Cal. Elec. Code § 2201(a)(8). Federal law also governs registration and list maintenance. The

National Voter Registration Act ("NVRA") requires acceptance and use of the Federal Form and prescribes safeguards for list maintenance, including a 90-day "quiet period" on systematic removal programs. 52 U.S.C. §§ 20505(a)(1), 20507(b)(1), (c)(2). HAVA requires a statewide computerized registration list and coordination with the NVRA's removal requirements. *Id.* § 21083(a)(1)–(4). The 90-day "quiet period" for the November 3 election began August 5, 2026.

### B. DHS' July 2026 Letter To The Secretary Of State

On July 16, 2026, DHS Secretary Markwayne Mullin wrote to Secretary of State Shirley N. Weber asserting that a "[p]reliminary review" of California's publicly available voter data revealed "there may be as many as 190,832 non-citizens registered to vote in California." (Compl. Ex. A.) On July 23, 2026, Secretary Weber responded that she had "serious doubts about the reliability of [DHS's] data," noting that her office had never shared the statewide voter registration list with DHS, and requested a "detailed description of the methodology utilized by DHS to identify these allegedly ineligible voters, including . . . all data sources, software, and matching criteria," and whether artificial intelligence was used. (Compl. Ex. B.) Secretary Weber also advised that her office would comply with the NVRA's prohibition on systematic cancellation of registrations within 90 days of a federal election—a period that began on August 5, 2026. (*Id.*) DHS did not provide the requested methodology or otherwise respond to Secretary Weber.

### C. DOJ's October 2026 Ultimatum To The County And The County's Response

On October 13, 2026, DOJ hand-delivered a letter to Mr. Logan (the "October 13 Letter") enclosing a password-protected thumb drive that contained "a list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election" (*i.e.*, the October List). (Compl. Ex. C.) The October 13 Letter asked the County to (i) review the list within 48 hours; (ii) for anyone whose citizenship the

County cannot independently confirm, instruct elections officials to segregate—not cancel—the VBM ballot; (iii) withhold ballots not yet sent; and (iv) not verify signatures on or tabulate returned ballots "until citizenship can be determined." (*Id.*)

On October 14, 2026—the day after receiving the October 13 Letter and before the Executive's deadline—Mr. Logan issued a public statement confirming that the County had received the October 13 Letter "21 days prior to Election Day" and was "reviewing the information in coordination with the California Secretary of State and Attorney General to determine the next appropriate steps." (Pelham Dec. ¶ 4; Ex. C.) The County noted that the October 13 Letter did "not specify the number of individuals involved or describe the information contained in the records," and that under federal and state law "any action to remove a voter from eligibility must be based on verifiable information, not assertions of unconfirmed data matching." (*Id.*)

The next day, October 15, 2026, at approximately 8:48 a.m.—before the Executive's deadline—the County sent the Executive a written response (the "County Response"). (Pelham Dec. ¶ 5; Ex. D.) In doing so, the County noted that a preliminary review of the October List showed that it was not specific to Los Angeles County and contained addresses throughout California. (*Id.*) The County further noted that the Executive provided no information on how the list of "likely noncitizens" was compiled or on what evidentiary basis it suspected that the listed individuals were noncitizen registrants. (*Id.*) Further, although the October 13 Letter asked the County to "independently confirm citizenship status," the Executive provided no process or information enabling the County to do so. (*Id.*) In addition to noting that the Executive's requests would violate California and federal law, the County observed that it was impossible to review the more than 20,000 individuals on the October List in the less than 28 hours the Executive afforded. (*Id.*)

Within minutes after the 9:00 a.m. deadline passed, the Executive filed this

action claiming the County "failed" to conduct its review by the deadline and mischaracterized the County's response as "a total lack of commitment to work with the Federal Government." (Compl. ¶ 4.) The Complaint omits the County Response to the October 13 Letter entirely. The Application repeats that mischaracterization, asserting that the County "made clear it would not do anything to prevent noncitizen voting." (Appl. at 13.) But the County said no such thing: it provided a well-reasoned and legally sound explanation for why it could not segregate ballots. (Pelham Dec. ¶ D; Ex. 5.)

On October 16, 2026—the day after filing suit—DOJ sent a letter responding to the County's objections (the "October 16 Letter"). (Pelham Dec. ¶ 6, Ex. E.) The October 16 Letter confirms, rather than answers, the deficiencies the County identified. That is, the Executive simply concludes, without offering any additional information, that it sent "credible evidence that certain ballots may be unlawful to count." (*Id.*) The Executive did not explain how a single list of more than 20,000 names generated by bulk database matching constitutes individualized evidence. (*Id.)* Nor did the Executive attempt to address the County's concerns that segregation would violate, among other laws, the NRVA and result in votes not being counted. The October 16 Letter closes by warning the County's position risks "significant federal scrutiny and legal exposure" and suggesting that declining to set aside ballots could amount to "aiding or abetting a federal offense." (*Id.*) Far from fostering cooperation, the Executive responded with a threat of prosecution directed at the County's chief election official.

### D. <u>The Executive's Description Of The October List And The Additional Review It Seek</u>

The Complaint describes a process of comparing voter information with immigration records, supplementing incomplete information through third-party software, assigning confidence levels, and conducting additional checks. (Compl. ¶¶ 34–43.) The October List is purportedly ranked by high confidence by reference to the strength of the identity link between voter information and federal

records. (*Id.* ¶ 34.) The list then passes to additional investigators for further work. (*Id.* ¶¶ 38–43.)

The declarations supporting the Application add that the underlying voter data in the October List reflected August 2025 records that came from an unidentified source. (McLoughlin Decl. ¶¶ 20–21.) The matching for the list used an unnamed commercial platform and the Executive acknowledges the data that could be incomplete, outdated, or mismatched, despite checks against federal citizenship and immigration records. (Bartell Decl. ¶¶ 16–18.) The Executive is careful to describe this process as "independent of SAVE", (Compl. ¶ 37 n.1; Bartell Decl. ¶ 15.), yet its data inputs and methodology is strikingly similar to SAVE.

The Executive's declarants describe their citizenship conclusions with different degrees of certainty. (*Compare* McLoughlin Decl. ¶¶ 24–25, *with* Bartell Decl. ¶ 25.) Neither provides a validated error rate for the process. The Executive acknowledges approximately 189 records with data discrepancies and describes another batch of more than 17,000 voting records under review for rolling supplementation before Election Day. (Bartell Decl. ¶ 23 & n.1; McLoughlin Decl. ¶ 25 n.1.)

The Complaint asserts one claim: that California's mailing and counting procedures, as applied to persons on the October List, obstruct 18 U.S.C. § 611. (Compl. ¶¶ 50–61.) It requests withholding ballots until citizenship is verified beyond the registration attestation. (*Id.* ¶¶ 6, 63.) The proposed order would require confirmation for each listed voter who returns a ballot and would not permit reliance solely on the registration-related attestation. (ECF No. 22-8 at 6–7.)

The Executive acknowledges that it cannot practicably investigate thousands or tens of thousands of listed individuals before the election concludes. (Compl. ¶ 60.) It nevertheless asks that 20,000 ballots be segregated indefinitely while citizenship is determined. (*Id.* ¶¶ 6, 63.) The proposed order identifies no

adequate notice-and-response procedure, adjudication standard, or deadline assuring resolution before the applicable counting deadlines. (ECF No. 22-8 at 6–7.) The Application also announces charges against 28 listed persons. (Appl. at 1.)

**E. <u>Comparing The Executive's List To Current County Records Shows Indicia Of Unreliability</u>**

The County identified 7,035 records bearing County addresses and compared a sample of that data with County voter records. (Bhullar Dec. ¶ 25.) That sampling showed the following:

- 42.9% of the sampled voters were canceled; 42.4% are active voters; and 4.6% are inactive voters. (*Id.* ¶ 24.)
- 86 of the sampled individuals had ballots mailed, whereas, the ballots for the other 112 were not sent because of canceled or inactive status. (*Id.*)
- 71.2% of the sampled individuals have never voted. (*Id.*)
- 25.8% of the sampled voters record a place of birth in the United States, a strong indicator of citizenship status. (Flores Dec. ¶ 46.)

These figures describe the composition of the records, not the citizenship of individual registrants. When comparing this data with the Executive's efforts to implement voter roll maintenance in other jurisdictions through SAVE, (*see supra* § I), there is no basis to support the Executive's supposition that the October List constitutes credible evidence of noncitizen voting.[3]

**F. <u>Implementing The Executive's Ballot Hold Segregation Is Not Feasible Without Disrupting The Ongoing Election</u>**

The Executive concedes that "it is not practicable or feasible for the United States to investigate before the 2026 election concludes thousands, let alone tens of thousands, of individuals" on its list. (Compl. ¶ 60.) There are several practical

[3] Other jurisdictions that have shown SAVE data to be too unreliable in identifying noncitizens include Nevada and North Carolina. (Pelham Dec. ¶¶ 7-8.) Nevada is particularly instructive. In July 2026, DHS told Nevada that "as many as" 15,903 noncitizens were registered there. (*Id.* ¶ 7; Ex. F) In an August 2026 meeting, a USCIS official acknowledged that the figure was "preliminary" and had not received "a full manual review of each one," and DHS revised the number of confirmed noncitizens to 185. (*Id.*) Nevada then reviewed those 185 registrants and reported to DHS: "[O]ur records indicate that they were citizens. You have provided nothing of substance to suggest otherwise." (*Id.*)

realities that makes ballot segregation pending investigation virtually impossible without risking wide-spread system disruption and voter disenfranchisement.

*First*, all VBM ballots were sent out by October 10, 2026. (Flores Dec. ¶ 36.) It is not possible to segregate unreturned ballots at this stage because they have already been printed and mailed. (*Id.*) Second, insofar as any person on the October List has returned their VBM ballot, that individual has already voted and the County has processed that vote. (*Id.*) This is because, once the signature on a VBM ballot envelope is verified, the ballot is removed from its identification envelope and, to anonymize the vote, commingled with other ballots for tabulation. (*Id.*)

*Second*, even as to return envelopes that have not yet been processed, the County could not carry out what the Executive requests without redirecting key staff from the administration of the election, delaying the certification of the election, risking the disenfranchisement of eligible voters, and creating uncertainty in the election results, for the following reasons. (*Id.* ¶ 37.)

- The October List does not contain the unique identifiers that the County voter file (DIMS) uses. Any attempt to associate a name on the October List with a registration record depends on approximate matching of names, dates of birth, and addresses. (*Id.* ¶ 38.)
- The October List includes multiple dates of birth in different formats, and often, these different columns include different dates of birth. It also includes the entire address in a single cell, which is not how the data is stored in DIMS. Indeed, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, Sara Jones-Smith vs. Sara Jones Smith). Precise data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement. (Flores Dec ¶ 38.)

- Any review of approximate matches would have to be performed manually, with multiple checks, by the County's most experienced voter-records staff. Those are the same staff who are responsible for signature verification and VBM processing during the election period, and the review would have to be completed before the counting and certification deadlines described above. (*Id.* ¶ 40.)
- The County's voting system and ballot-processing workflow have no function for setting aside the ballots of registered voters. Creating one during an election would require changes to systems and procedures that have already been tested and finalized for this election, the development and documentation of a new process, and the training of staff on it, all while the work described above is required to be completed on the statutory schedule. (*Id.* ¶ 41.)
- While the Executive describes a multi-agency investigative process that led to the October List, it provides none of the supporting evidence from that investigation to aid the County's review. (*Id.* ¶ 45.) The October List assigns no "high," "medium," or "low" confidence rating to any record, despite the Complaint's description of a tiered confidence process, and the Executive discloses no basis for any individual's inclusion.[4] (*Id.*)

*Third*, segregation of the VBM ballots for 20,000 voters would have a catastrophic impact on the IT infrastructure that enables the County to administer the election. (Bhullar Dec. ¶ 3.) For this reason, to protect the stability and security of the County's election systems, the County implements a tiered election freeze, already in effect for the November Election, which limits changes to the systems and infrastructure that support the election. (*Id.* ¶ 6.) The VBM segregation request would require system updates to multiple, separate software programs and

[4] A September 2026 whistleblower reported that USCIS officers working on DHS' "Unlawful Voter Initiative" received less than two hours of training, were assigned quotas of 40 voter reviews per day (about 12 minutes each), worked from data described as unreliable, and were directed to search California's voter lookup system using individuals' personal information. (Pelham Dec. ¶ 9; Ex. H.) This lack of training and incentive structure calls into question the reliability of the October List.

hardware devices. (*Id.* ¶ 11.) The affected software and hardware include, but are not limited to, DIMS, BlueCrest Vantage sorters, and Electronic Pollbooks ("ePollbooks"). (*Id.*) There are a number of harmful impacts on these systems summarized in the Bhullar Dec., but of particular relevance to the Executive's segregation request, the County would be required to place a flag on these voters within DIMS to segregate. (*Id.*) No such flag currently exists, so a new flag would need to be developed and tested by the DIMS manufacturer.

It is impossible, however, to do this type of programmatic change without shutting down the DIMS system in the midst of an active election cycle. (*Id.*) Even if we were able to safely conduct this programmatic change, the potential impact of attempting a change to DIMS in this environment is unknown, and the possible consequences range from small to large. (*Id.* ¶ 17.) On the larger scale, because DIMS houses all voter information and is the centralized software and data on which all other systems rely, a breakdown at this level could jeopardize the County's compliance with federal and state mandated deadlines. (*Id.*)

Based on the foregoing, one of the County's top official with responsibility for administering the November Election states unequivocally that, if the County were forced to comply with the Executive's demands, "it would be virtually impossible to timely certify the election results in compliance with state law." (Flores Dec. ¶ 3.) In either case, the County "is not equipped to verify voter citizenship because it does not independently house citizenship-related information beyond the voter attestation" and has no access to federal citizenship data. (*Id.* ¶ 43.) Even if the County had a basis to fully investigate citizenship, the registrant would be entitled under state and federal law to notice and an opportunity to respond before any ballot was rejected, and no such process could be completed between now and the certification deadlines described above.[5]

[5] For the Court's reference, in *Coalition for Humane Rights, et al. v. U.S. Dep't of Homeland Security, et al.*, No. 1:26-cv-03072 (D.D.C.), plaintiffs filed an "Emergency Application for Temporary Restraining Order and Preliminary Injunction" based on the same communications by the government, and list of allegedly ineligible California voters, that are at issue in this case. The district court in that case has set a deadline of October 30, 2026 for plaintiff's reply brief, suggesting a decision sometime after that.

(Flores Dec. ¶ 48.)

## III. LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Id.* at 20. The standard for a temporary restraining order is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). When the government is a party, the third and fourth factors merge. *Drakes Bay Oyster*, 747 F.3d 1073, 1092 (9th Cir. 2014)

The relief sought here is mandatory: it would compel State and County election officials to take affirmative steps—segregating ballots and conducting a new citizenship-verification process—that alter, rather than preserve, the status quo. Mandatory injunctions are "particularly disfavored" and should not issue "unless the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The Executive's contention that its injunction would "preserve the status quo", (Appl. at 3, 27), inverts the inquiry. The status quo is the County's administration of an election under existing law, in which registered voters' ballots are verified and counted. An order requiring the County to withhold and segregate ballots and create a new citizenship-verification regime is the opposite.

## IV. THE COURT SHOULD DENY THE *EX PARTE* APPLICATION

### A. The Executive Has Not Shown A Likelihood Of Success On The Merits Of Its Preemption Claim

The Complaint asserts a single claim: that California's procedures for mailing and counting ballots, as applied to persons on the October List, are preempted because they obstruct 18 U.S.C. § 611. (Compl. ¶¶ 50–62.) To obtain

a temporary restraining order on that claim, the Executive must make a clear showing that it is likely to establish standing and likely to succeed on the merits. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Winter*, 555 U.S. at 22. It can show neither. Because standing is a threshold question that must be resolved before the merits, the County addresses it first.

1. <u>The Executive has not shown a concrete injury traceable to the County.</u>

The Executive bears the burden of establishing injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). But alleging that California's procedures "are preempted and thus violate the Supremacy Clause," (Compl. ¶ 62), does not itself establish a concrete injury. Another judge of this District rejected that proposition in a preemption suit the United States brought against California, finding "no binding authority holding that the mere existence of a preempted state law creates a sovereign injury to the federal government." *United States v. California*, No. 2:25-cv-06230-MCS-AGR, ECF No. 77 at 5 (C.D. Cal.) ("*Egg Case*"). In addition, Section 611 is a criminal prohibition directed at "any alien" who votes. 18 U.S.C. § 611(a). California cannot violate it.

The narrower theory the *Egg Case* court later accepted on amended pleadings—that state action may injure the United States by "impeding the operations or functions of the federal government"—does not help the Executive here. *Egg Case*, *ECF* No. 77 at 7 (citing *United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024)); *id.*, ECF No. 103 at 5–6, 8 (describing that theory as "atypical or unprecedented" and certifying the question for interlocutory appeal), appeal pending, No. 26-6754 (9th Cir.). The cases recognizing that theory involved state or local measures that directly obstructed federal operations. In *King County*, a county order barred airport service providers from servicing federal immigration charter flights, forcing the flights elsewhere at added cost. 122 F.4th at 750–52. In *United States v. City of Arcata*, municipal ordinances

barred military recruiters from contacting minors. 629 F.3d 986, 989–90 (9th Cir. 2010). Here, unlike these cases, the County's procedures impose not comparable restriction. They prohibit no federal investigation or prosecution. The only obstacle the Executive identifies is that it cannot finish investigating before Election Day, (Compl. ¶ 60), a problem traceable to its own timing and data, not to anything the County has done. The Executive's own enforcement confirms the point. It announced charges against 28 listed individuals the morning it filed the Application. (Appl. at 1.) Individualized federal enforcement is proceeding, and nothing in California law stands in its way.

2. California's election procedures do not conflict with Section 611.

Preemption must rest on a conflict either with "the Constitution itself or a valid statute enacted by Congress," *Kansas v. Garcia*, 589 U.S. 191, 202 (2020), not merely a disagreement over how an election should be administered. Further, obstacle *preemption* imposes a "high threshold"; it does not license "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011). There is neither conflict nor tension here.

Like federal law, California law prohibits noncitizens from voting. Cal. Const. art. II, § 2; Cal. Elec. Code § 2101. California requires every registrant to attest to *citizenship* under penalty of perjury, makes false registration a crime, and permits cancellation on proof of ineligibility. Cal. Elec. Code §§ 2111, 2201(a)(8), 18100. When the County receives credible evidence that a registrant may not be a citizen, it notifies the registrant and acts on the response. (Flores Dec. ¶ 11.) California's procedures thus neither make an attestation conclusive nor shield anyone from investigation.

Section 611, for its part, prohibits aliens from voting in federal elections. 18 U.S.C. § 611(a). It does not require registrars to segregate ballots based on federal referrals, to independently confirm the citizenship of every flagged

registrant, or to withhold counting until federal officials are satisfied. The Executive identifies no congressionally prescribed verification procedure that California has displaced or the County has refused to follow. The obstacle-preemption cases it invokes involved state laws that authorized what federal law forbids or penalized what federal law protects. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373–77 (2000); *Arizona v. United States*, 567 U.S. 387, 400–07 (2012). California's law authorizes nothing Section 611 forbids.

3. <u>California's election procedures are not obstacle-preempted merely because they do not accommodate the Executive's preferred investigative timeline.</u>

The Executive's real complaint concerns timing and method: Defendants will not suspend their ordinary procedures while federal officials investigate people they suspect may be noncitizens. (Compl. ¶¶ 59–61.) But the Supremacy Clause makes federal law supreme, not federal agencies' preferred methods of enforcing it. "[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Garcia*, 589 U.S. at 212. Executive preferences and demand letters are not "Laws" under the Supremacy Clause. *Id.* at 202; *see Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (declining to defer to agency's view that state law obstructed federal objectives).

The Ninth Circuit has rejected a materially similar theory. In *United States v. California*, the United States argued that state laws limiting cooperation with federal immigration enforcement were obstacle-preempted. 921 F.3d 865, 888–91 (9th Cir. 2019). There, the court held that a State's refusal to assist federal enforcement does not obstruct it, and that federal expectations of state cooperation are not federal requirements. *Id.* So too here. The October 13 Letter asked the County to do what no statute requires. (Compl. Ex. C.) The County's declining to do so is not obstruction, and the Executive's inability to complete its own investigation in time, (Compl. ¶ 60), is not a conflict between state and federal law.

4. The Constitution and Congress' election statutes leave no room for the Executive to prescribe new ballot-processing requirements on its own authority.

Under the Elections Clause, the States prescribe the "Times, Places and Manner" of congressional elections unless Congress "make[s] or alter[s]" those regulations. U.S. Const. art. I, § 4, cl. 1. And that power belongs to Congress, not the Executive. *United States v. Weber,* 816 F. Supp. 3d 1168, 1175 (C.D. Cal. 2026). (noting that the Elections Clause "has constitutionally prevented the centralization of election management in the Executive").

Congress has legislated extensively on the procedures the Executive seeks to displace. The NVRA requires States to accept and use the Federal Form, which establishes citizenship by attestation, and a State may not demand more of Federal Form applicants as a condition of registration. 52 U.S.C. §§ 20505(a)(1), 20508(b); *Arizona v. Inter Tribal Council of Arizona, Inc.l*, 570 U.S. 1, 15–20 (2013). The NVRA also requires list maintenance to be "uniform" and "nondiscriminatory" and bars systematic removal programs within 90 days of a federal election. 52 U.S.C. § 20507(b)(1), (c)(2)(A). HAVA assigns the statewide registration list to state officials. *Id.* § 21083(a). Congress thus addressed both sides of election integrity: removing ineligible registrants and protecting eligible voters from erroneous exclusion. The Executive's proposed order, which would require citizenship verification beyond the attestation for a federally selected group of voters, mid-election, on the strength of a bulk data match, cuts against Congress's choices. (ECF No. 22-8 at 6–7.

DOJ has an important role in the system Congress designed. Congress authorized the Attorney General to sue to enforce the NVRA and HAVA. 52 U.S.C. §§ 20510(a), 21111. But the Complaint asserts no violation of either statute. It asserts preemption under Section 611. (Compl. ¶¶ 50–62.) As *Common Cause* explained, DOJ's "enforcement role is limited to ensuring that states comply with their statutory obligations," and if DOJ "wants to enforce HAVA and

the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes." *Common Cause v. U.S. Dep't of Just.*, No. 1:26-cv-1352, 2026 WL 3033772, at *25 (D.D.C. Oct. 9, 2026) (quoting *United States v. Bellows*, 834 F. Supp. 3d 113, 126 (D. Me. 2026)). The Executive's duty is to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3: the obligations Congress enacted, not new ones of the Executive's own design. A criminal prohibition directed at individual voters cannot be read as an implied grant of authority to impose an emergency ballot-withholding regime that bypasses the safeguards Congress separately adopted.

The Executive's reading would also raise a serious constitutional question. At least one court has held that Section 611 regulates voter qualifications, which the Elections Clause does not authorize Congress to set. *United States v. Cox*, No. 0:25-cr-60249-DSL, 2026 Wl 2948729 (S.D. Fla. Oct. 1, 2026). The Court need not decide that question. But reading Section 611 to let the Executive override how a State determines whether its registrants meet those qualifications would deepen the problem, one the Court does not need to reach.

5. <u>The Complaint's allegations do not establish that the County knowingly facilitates unlawful voting.</u>

The Executive's alternative framing, that California knowingly facilitates unlawful voting, depends on treating unverified suspicions as established facts. (Compl. ¶ 59.) The Complaint alleges only that noncitizens "might be registered." (*Id.*) And it describes the October List as the start of further investigative work, not a determination of any registered voter's ineligibility. (*Id.* ¶¶ 38–43.) And it concedes it cannot finish its investigations before the election ends. (*Id.* ¶ 60.) No state official can knowingly facilitate a crime on the basis of a list its sender says still needs investigating. Knowledge that an allegation has been made is not knowledge that it is true.

*Norwood v. Harrison* does not eliminate the need to establish underlying unlawful conduct. *Norwood* held that a State may not lend free textbooks to

students attending private schools with racially discriminatory admissions policies, even under a long-standing program open to all private-school students. 413 U.S. 455, 463–68 (1973). The constitutional defect was tangible state aid to schools that *in fact* discriminated. *Norwood* did not hold that officials facilitate unlawful conduct merely by continuing to apply established procedures after receiving an unresolved allegation. To the contrary, the Court declined to presume that every participating private school discriminated and contemplated an individualized determination of which schools did, for example through a certification process. *Id.* at 470–71.

Nor does the Executive's invocation of aiding and abetting, (Compl. ¶ 19), supply the missing link. Accomplice liability requires affirmative assistance and intent to facilitate the offense. 18 U.S.C. § 2; *Rosemond v. United States*, 572 U.S. 65, 71, 76 (2014). Continuing ordinary ballot processing while insisting on reliable evidence and lawful procedures does not establish criminal intent.

6. Even a valid preemption claim would not entitle the Executive to relief that violates independent federal voting protections and due process.

Even a valid preemption claim would not authorize an order inconsistent with other federal statutes or the Constitution, several of them applicable here.

*First*, the NVRA bars systematic programs to remove ineligible voters within 90 days of a federal election. 52 U.S.C. § 20507(c)(2)(A). That period began August 5, 2026. The Ninth Circuit has applied that restriction to systematic noncitizen-removal programs and held that mailing individual notices after database comparison does not transform such a program into an individualized inquiry. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 716–17 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, No. 25-1017 (U.S. June 29, 2026). The Executive seeks segregation rather than cancellation, and Section 20507(c)(2)(A) speaks of removal. The County recognizes that distinction. But withholding a registered voter's otherwise valid ballot until an

open-ended review ends, three weeks before Election Day, works the same exclusion. The Quiet Period's protection should not be evaded by changing the label.[6]

*Second*, the Voting Rights Act forbids any person acting under color of law from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the vote of a person who is "entitled to vote" or "otherwise qualified to vote." 52 U.S.C. § 10307(a). Registered voters whose ineligibility has not been established remain qualified. An order holding their ballots past the certification deadline would constitute a failure or refusal to tabulate, count, and report their vote.

*Third*, procedural due process requires attention to the fundamental interest involved, the risk of erroneous exclusion, the value of safeguards, and the Executive's interests. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, the list contains disputed matches; the proposed order specifies no adequate notice, response process, adjudication standard, or deadline; and a mistaken exclusion may become irreversible when the canvass closes. Those circumstances require a meaningful opportunity to correct an error before an eligible voter loses the opportunity to have the ballot counted. *See Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990)..

*Finally*, federal law requires voter-list maintenance to be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). It also requires officials assessing a voter's qualifications to use the same standards, practices, and procedures used for other voters in the same county already found qualified. *Id*. § 10101(a)(2)(A). Here, the Executive would segregate ballots based on immigration-related records

[6] The Executive's demand that California take action against the voters on the October List cannot be reconciled with DOJ's own published guidance on list maintenance under Section 8 of the NVRA. (Pelham Dec. ¶ 10; Ex. I.) That guidance identifies three "[e]xamples of list maintenance activities that may violate the NVRA": (1) "comparing voter files to outdated or inaccurate records or databases", (2) "taking action that erroneously affects a particular class of voters (such as newly naturalized citizens)", or (3) "matching records based solely on first name, last name, and date of birth." (*Id.*) The guidance emphasizes the Quiet Period applies to "list maintenance programs based on third-party challenges derived from any large, computerized data-matching process." (*Id.*) The October List, and the relief the Executive seeks based on it, fits each of the foregoing examples.

that may show only that a voter was once a noncitizen or that current citizenship could not be confirmed. That approach risks subjecting naturalized citizens to additional scrutiny because of their immigration history, even though they have the same right to vote as citizens born in the United States. That resembles the problem *Mi Familia Vota* identified: additional scrutiny for voters with immigration numbers that otherwise similarly situated voters did not face. 129 F.4th at 714-15, 720.

Thus, even if Section 611 displaced some aspect of California law, it would not displace the federal protections that forbid the order the Government seeks.

**B. <u>The Executive Has Not Established Likely Irreparable Harm</u>**

1. <u>The Executive has not shown that, absent an injunction, unlawful votes will be cast and counted.</u>

Irreparable harm must be likely, not merely possible. It must rest on evidence, not speculation. *Winter*, 555 U.S. at 22. The Executive's theory of harm is that persons on its October List will cast unlawful ballots that will be counted. To support preliminary relief, it must show that the listed records correspond to identifiable people who are presently noncitizens, remain registered, and are likely to cast ballots in this election. Its list establishes none of those things. Neither do its declarations.

The unreliability of mass-generated voter roll maintenance lists, like the October List, in establishing noncitizen status has recently been adjudicated by a number of federal courts. *Common Cause v. DOJ* found that "SAVE's ability to verify citizenship—and particularly the citizenship of acquired or naturalized citizens—is limited." 2026 WL 3033772, at *33 (D.C.C. Oct. 9, 2026) The record in *Common Cause* showed that SSA, whose data feeds SAVE, acknowledged that (1) its citizenship information "merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA," (2) that "SSA's records do not provide definitive information about an individual's citizenship status," and (3) that "approximately 1/4 of those records do not have an indication

of citizenship present." *Id.* SSA's Inspector General found that seven percent of people SSA classified as noncitizens were in fact citizens—approximately 3.3 million people. *Id.* And USCIS itself acknowledged that modified "SAVE [program] may only be able to verify acquired U.S. citizen[s] in certain situations." *Id.* Given that record, *Common Cause* found that implementing SAVE to remove registered voters "present[ed] an obvious risk that U.S. citizens will be wrongfully removed from voter rolls," adding that "that risk is not hypothetical." *Id.* at *26, *33. Indeed, two individual plaintiffs in *Common Cause*—an acquired citizen and a naturalized citizen—had their registrations cancelled because of erroneous SAVE results. *Id.* at *33. Like *Common Cause*, the Executive cannot show imminent risk of noncitizen voting here based on the inherently unreliable October List.[7]

Nor has the Executive established likely irreparable harm to its enforcement interests. The County's procedures prohibit no federal investigation or prosecution, and the Executive concedes it "actively investigates and prosecutes" unlawful voting. (Compl. ¶ 69.) Those tools remain available during and after election. The Government's announcement that it has charged 28 listed individuals, proves the point: individualized enforcement is proceeding. (Application at 1.) But evidence concerning those 28 people says nothing about the accuracy of the thousands of other entries, which remain hunches. Evidence supporting 28 prosecutions cannot justify an injunction reaching thousands of ballots.

2. <u>The Executive's delay undermines both its claim of emergency and the feasibility of its proposed remedy.</u>

The Executive dates the start of its analysis of California voters to May 8, 2026. (Application at 11.) DHS raised its concerns with the State in July 2026, and the State promptly asked for the methodology behind them. (Compl. Ex. A.)

[7] *League of Women Voters v. U.S. Dep't of Homeland Sec.* similarly found that the federal voter roll maintenance lists were known to the federal government to be unreliable. 835 F. Supp. 3d 79 (D.D.C. 2026).

The Executive never supplied it. Instead, it waited until VBM ballots had been mailed and returned ballots were being processed, delivered the October List on October 13, and demanded action in less than 48 hours. (Compl. Ex. C.) The Executive's unexplained delay "implies a lack of urgency and irreparable harm," *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985), and that principle applies with special force where the Executive's delay is what produced the claimed harm.

The five-month timeline undercuts the Executive's claim that the requested relief cannot await a meaningful opportunity to test its evidence and its proposed remedy. And its own delay has compounded the operational problems that make its proposed remedy unworkable. Having taken months to compile its list, the Executive cannot fairly demand that the County verify it in days, during an election, without access to the federal records on which it rests. The Executive concedes that it cannot complete thousands of individualized investigations before the election concludes. (Compl. ¶ 60.)

### C. The Equities, The Public Interest, and *Purcell* Weigh Against Changing Ballot Procedures During An Ongoing Election

#### 1. The proposed injunction would divert essential election resources and risk disenfranchising eligible voters.

The County's election is already in progress. (Flores Dec. ¶¶ 21-23.) The County serves approximately 5.9 million registered voters, has mailed approximately 5.9 million ballots, and has already processed more than 331,000 returned ballots. (Flores Decl. ¶¶ 5, 21-22.) The staff qualified to match and review records are the same staff who verify signatures and process ballots. (*Id.* ¶ 21.) The County does not have sufficient resources, nor legal basis, to segregate VBM ballots once received and meet the certification deadlines. (*Id.* ¶ 37, 42.) The Executive has offered no workable plan for completing the required matching, notice, and adjudication within the canvass period.

Ballot secrecy imposes another limit. Once a returned ballot is verified and

separated from its envelope, it cannot be associated with the voter who cast it. Cal. Const. art. II, § 7; (Flores Dec. ¶ 16.) An order reaching only ballots not yet separated from their envelopes would treat voters differently depending on how far their ballots had progressed through processing, without resolving anyone's citizenship. Even for ballots that remain identifiable by voter, the County cannot make a conclusive citizenship determination from the information the Executive has provided. It has no direct access to the federal records on which the list rests, and the Executive has supplied no defined process for obtaining them. (Flores Dec. ¶ 43.) An order requiring the County to resolve citizenship questions without that would leave ballots on hold with no means of releasing them.

2. *Purcell* weighs against introducing a new citizenship-clearance rule after voting has begun.

"Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion," and that risk grows "[a]s an election draws closer." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). For that reason, federal courts "should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam).

The Executive says it seeks only to enforce existing noncitizen-voting rules and to adjust how certain ballots are handled. (Application 25-26.) But the longstanding citizenship qualification is not the change the County challenges. The change is a new condition on counting a registered voter's ballot: under the Executive's proposed order, a listed registrant's otherwise valid ballot could not be counted until officials affirmatively confirm citizenship beyond the registration attestation, through a process the order does not define. (*Id.*) That changes election administration mid-election, for a federally selected group of voters, after many have already voted under the existing rules. Calling it enforcement does not eliminate its operational consequences. And the Executive's planned "rolling" additions to the list, citation, mean that neither the County nor affected voters

would know the final scope of the required review even as implementation proceeded.

3. <u>An open-ended hold risks disenfranchisement without a demonstrated proportionate benefit.</u>

The right to vote includes the right to have a lawful ballot counted. *United States v. Classic*, 313 U.S. 299, 315 (1941). The County must prepare and submit its certified statement of results by December 3, 2026. Cal. Elec. Code § 15372. Yet the Executive has supplied no supported timetable for notifying listed voters, receiving their responses, adjudicating disputed eligibility, and processing the ballots of those found eligible. The proposed order sets no deadline for resolving those questions and releasing eligible voters' ballots. Describing the hold as temporary does not establish that it will end in time for those ballots to count. A voter whose ballot goes uncounted because they never learned why it was held, or learned too late to respond, loses the vote as surely as one turned away at the polls. On this record, an open-ended hold poses a substantial risk of disenfranchising eligible voters without any demonstrated, proportionate benefit. The public's interest in excluding unlawful votes does not justify an undefined process that threatens to exclude lawful votes.[8]

## V. THE EXECUTIVE'S REQUESTED RELIEF IS ALSO DEFECTIVE BECAUSE IT IS NOT PRECISELY DEFINED FOR IMPLEMENTATION BY THE COUNTY

The Executive's requested remedy does not specify exactly what Mr. Logan, in his capacity as Los Angeles County's Registrar-Recorder/County Clerk, should do. Neither a statewide list nor a generalized direction to verify citizenship is sufficiently tailored and limited to Mr. Logan.

[8] The Executive's vote-dilution argument does not change the balance. *Anderson v. United States*, 417 U.S. 211, 227 (1974), on which the Executive relies (Appl. at 2–3), involved a criminal conviction for casting fraudulent ballot. This is an after-the-fact, individualized prosecution of the very kind Section 611 contemplates and the County does not obstruct. *Anderson* does not stand for eligible voters' ballots being withheld wholesale on suspicion to facilitate voter fraud investigation. Disenfranchising a lawful voter does not protect lawful votes from dilution.

*First*, relief against Mr. Logan must stop at the County line. Mr. Logan is sued in his official capacity as Los Angeles County's Registrar-Recorder/County Clerk. His office administers elections in the County. It does not administer elections in California's other counties or supervise their registrars. The presence of the State and Secretary of State as co-defendants does not enlarge his jurisdiction. An order directed him to him therefore cannot reach beyond the records with a County address.

*Second*, relief must reach only identifiable County voters as to whom the Executive has made an individualized showing.. The County's review shows that much of the County-address portion *of* the list cannot support any hold at all: the records contain cancelled registrations, many matches contain no County registrant, and fewer than half of the remaining records are associated with a mailed ballot. (Bhullar Dec. ¶ 24.) The Executive has not identified any unique, active County registrant, shown that the registrant was issued a ballot, or presented any individualized evidence on which it relies for that person. No order can reach ballots already separated from their envelopes and commingled, which cannot lawfully be identified. Cal. Const. art. II, § 7; (Flores Dec. ¶ 35.) And the Executive's planned "rolling" additions, (Bartell Dec. ¶ 23), may not expand any order without further leave of Court.

*Third*, any order must be specific. Fed. R. Civ. P. 65(d)(1). An order that tells the County to withhold ballots "until citizenship is determined" without saying how, by whom, or by when is neither *specific* nor workable. Among other problems, the Executive's requested order does not include any provision for:

1. written notice to each affected voter stating the basis for the hold ("segregating" their ballot);
2. a meaningful opportunity to respond;
3. the evidence that will suffice to establish citizenship, which must include the voter's own documentation;

4. who decides disputed cases, and the Executive's obligation to supply any federal records on which it relies, since the County has no access to them, (Flores Dec. ¶ 42);
5. a deadline for decision that leaves time to count released ballots before the County's December 3 certification (*Id.* ¶¶ 32-33); and
6. a default rule that any ballot not shown to be ineligible by that deadline to have been cast by an ineligible voter is counted.

## VI. CONCLUSION

For the foregoing reasons, the County respectfully requests the Court deny the Application.

Dated: October 20, 2026

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI

By:____________________
CHRISTOPHER PELHAM
Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

Dated: October 20, 2026

**PUBLIC RIGHTS PROJECT**
JOSHUA KARSH (*pro hac vice forthcoming*)
TOBY R. MERRILL (*pro hac vice forthcoming*)
KYRA SIKORA (*pro hac vice forthcoming*)

By: */s/ Joshua Karsh*
JOSHUA KARSH
Attorneys For Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

The undersigned, counsel of record for Defendant Dean C. Logan, certifies that this brief contains 9,459 words in accordance with Defendant's unopposed application to submit an oversized brief, not to exceed 10,500 words.

ALEX SCANDROLI
October 20, 2026