DAWYN R. HARRISON, COUNTY COUNSEL
PETER BOLLINGER, ASST. COUNTY COUNSEL (SBN 241752)
EVA CHU, SNR. DEP. COUNTY COUNSEL (SBN 235356)
ADAM BAUMGARTEN, SNR. DEP. COUNTY COUNSEL (SBN 292095)
648 KENNETH HAHN HALL OF ADMINISTRATION
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-0809
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM (SBN 241068)
ABIGAIL URQUHART (SBN 310547)
ALEX SCANDROLI (SBN 345278)
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

Attorneys for Defendant
DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

*Additional Counsel Listed on Following Page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

Defendants.

Case No. 2:26-cv-12025

**DECLARATION OF CHRISTOPHER PELHAM IN SUPPORT OF OPPOSITION OF DEAN C. LOGAN, IN HIS OFFICIAL CAPACITY AS THE COUNTY OF LOS ANGELES REGISTRAR-RECORDER/COUNTY CLERK, TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Date Action Filed: October 15, 2026



DOCUMENT PREPARED ON RECYCLED PAPER

**PUBLIC RIGHTS PROJECT**
Joshua Karsh (*pro hac vice forthcoming*)
Toby R. Merrill (*pro hac vice forthcoming*)
Kyra Sikora (*pro hac vice forthcoming*)
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
joshua.karsh@publicrightsproject.org
toby.merrill@publicrightsproject.org
kyra.sikora@publicrightsproject.org

**DECLARATION OF CHRISTOPHER PELHAM**

I, Christopher K. Pelham, declare as follows:

1. I am an attorney licensed to practice before this Court, and I am a Partner at the law firm of Norton Rose Fulbright US LLP, counsel of record for Defendant Dean C. Logan, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk (the "County"). I have personal knowledge of the facts stated herein, and could and would testify competently thereto if sworn as a witness. I submit this declaration in support of the County's Opposition to Plaintiff United States of America's *Ex Parte* Application or Temporary Restraining Order.

2. Attached hereto as **Exhibit A** is a true and correct copy of an article published by the Bipartisan Policy Center titled "Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices" (October 5, 2026), available at https://bipartisanpolicy.org/article/evaluating-how-the-uscis-save-system-performs-in-practice-evidence-from-election-offices/, which I accessed on October 19, 2026.

3. Attached hereto as **Exhibit B** is a true and correct copy of an article published by the Bipartisan Policy Center titled "Four Things to Know about Noncitizen Voting" (updated July 22, 2026), available at https://bipartisanpolicy.org/article/four-things-to-know-about-noncitizen-voting/, which I accessed on October 19, 2026.

4. Attached hereto as **Exhibit C is** a true and correct copy of Dean Logan's public statement on the County's receipt of the Government's letter dated October 13, 2026. The statement is titled "Statement from Dean Logan Regarding U.S. Department of Justice Correspondence," published on the County of Los Angeles website on October 14, 2026, and available at https://lacounty.gov/2026/10/14/statement-from-dean-logan-regarding-u-s-department-of-justice-correspondence/, which I accessed on October 19, 2026.

5. Attached hereto as **Exhibit D** is a true and correct copy of the



DOCUMENT PREPARED ON RECYCLED PAPER

County's written response sent to the Government on October 15, 2026, at approximately 8:48 a.m., prior to the Government's deadline.

6. Attached hereto as **Exhibit E** is a true and correct copy of a letter from the Government dated October 16, 2026 responding to the County's October 15, 2026 response.

7. Attached hereto as **Exhibit F** is a true and correct copy of an article published by the New York Times, titled "From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle" available at https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html, which I accessed on October 19, 2026.

8. Attached hereto as **Exhibit G** is a true and correct copy of a press release by the North Carolina State Board of Elections, titled "NCSBE to Send Letter to Potential Non-Citizens on Voter Rolls," available at https://www.ncsbe.gov/news/press-releases/2026/10/13/ncsbe-send-letter-potential-non-citizens-voter-rolls, which I accessed on October 19, 2026.

9. Attached hereto as **Exhibit H** is a true and correct copy of a letter dated September 13, 2026, from U.S. Senators Alex Padilla and Charles E. Schumer to DHS Secretary Markwayne Mullin and USCIS Director Joseph B. Edlow, available at https://www.padilla.senate.gov/wp-content/uploads/09.17.26-DHS-OIG-investigation-request-letter-re-USCIS-whistleblower.pdf, which I accessed on October 19, 2026. The letter describes a whistleblower disclosure alleging that DHS and USCIS diverted personnel to an "Unlawful Voter Initiative" where they received less than two hours of training, were assigned quotas of 40 voter reviews per day (about 12 minutes each), worked from data described as unreliable, and were directed to search California's voter lookup system using individuals' personal information.

10. Attached hereto as **Exhibit I** is a true and correct copy of guidance published by the U.S. Department of Justice, Civil Rights Division, titled "NVRA



DOCUMENT PREPARED ON RECYCLED PAPER

List Maintenance Guidance" (September 2024), available at https://www.justice.gov/crt/nvra-list-maintenance-guidance, which I accessed on October 19, 2026.

11. Counsel for the County held a videoconference with counsel for Plaintiff and counsel for co-defendant the State of California on October 19, 2026, to discuss multiple matters relevant to the newly filed case. With respect to the Application that Plaintiff filed, which included a request for leave to file an oversized brief, the parties discussed agreeing to stipulate, or not to oppose, Defendants filing an oversized opposition brief in response. Following that conference, counsel for Plaintiff confirmed by email to the proposed word limit of 10,500 for the opposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 20th day of October, 2026, at Los Angeles, California.

CHRISTOPHER PELHAM

# EXHIBIT A

Bipartisan Policy Center

ARTICLE

# Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices

**October 5, 2026** Jack Friedman Wren Orey

IN BRIEF

- **Many election offices began using SAVE, a citizenship verification tool operated by U.S. Citizenship and Immigration Services, to assess voters' citizenship status in 2025, but its accuracy and the administrative burden it creates remain largely unstudied.**
- **Noncitizen voting is already illegal in every state and extremely rare, and while SAVE can help identify voters erroneously registered, confirming that someone is not a citizen is difficult to do conclusively and requires significant manual effort.**
- **In Utah's May 2026 audit of 2,069,640 voter records, only 52 confirmed or probable noncitizens were identified—just 0.0025% of records reviewed.**
- **In Texas, a review of Department of Public Safety records confirmed citizenship for 578, or 21%, of the 2,724 voters SAVE initially flagged as potential noncitizens.**

*This article describes progress on an ongoing research project funded by the MIT Election Data and Science Lab (MEDSL). The article was first published on MEDSL's website.*

## Introduction

In May 2026, Utah reported the results of a "citizenship audit" of its voter registration rolls that it conducted in April. Of more than 2 million voter records analyzed, just 27 were found to be noncitizens, with another 25 likely noncitizens. The audit's findings are noteworthy because they confirm what previous studies have consistently shown: that noncitizen voting, which is already illegal in every state for federal elections, is extremely rare. But the findings are notable for another reason too: they were made possible by a resource—the Systematic Alien Verification for Entitlements (SAVE) service, a program run by the U.S. Citizenship and Immigration Services (USCIS)—that was only recently made available to election officials.

After USCIS made a series of changes to SAVE last year, election offices in states across the country began adopting the tool with the purpose of identifying and removing noncitizens from voter registration lists (and preventing noncitizens from registering to vote in the first place). Until a federal court's ruling in *League of Women Voters v. U.S. Department of Homeland Security* in June 2026, which temporarily blocked the 2025 SAVE expansions (a September 25, 2026 Supreme Court ruling allowed them to resume), many states were using SAVE results to inform decisions about who can register—and who stays registered—to vote. These decisions were affecting millions of voters and potential voters. Yet little is known about how accurate SAVE is, or the administrative burden that it created for officials. Our research project is an attempt to fill that gap.

## What is SAVE?

SAVE is an online service operated by USCIS that lets government agencies verify a person's immigration or citizenship status. It was originally created in 1987 for benefits-granting agencies, such as those providing unemployment insurance or health care, to establish applicants' eligibility.

Prior to 2025, election officials could, in theory, use SAVE to verify the citizenship status of voters. But in practice, they rarely did so. The following limitations rendered SAVE an

impracticable voter registration and list maintenance tool.

- Non-federal agencies like election offices were charged usage fees for each query.
- Queries could only be made on one individual at a time.
- Each query required a DHS-issued immigration identifier, which election offices rarely possess.
- SAVE did not query Social Security Administration databases so did not return information on U.S.-born citizens.

But in 2025, USCIS made a series of changes to the SAVE program that made it a more viable resource for election officials:

- Usage fees for non-federal agencies were lifted.
- A bulk upload feature was added, enabling queries on thousands of records at a time.
- Social Security Administration and State Department databases were made available to SAVE queries.
- Queries were permitted using Social Security numbers (and SSN4), including those of U.S.-born citizens.

When these changes came online, election offices in many states quickly signed up to partner with USCIS to process voter records through SAVE. As of November 3, 2025, 26 states had established (or were in the process of establishing) memoranda of agreement for SAVE voter verification. As of this writing, 101 election offices across 29 states are registered, via a memorandum of agreement, with SAVE for voter registration and/or list maintenance. USCIS reported that state voting agencies had submitted more than 46 million voter verification queries as of October 2025.

In a matter of months, election officials went from using SAVE only on rare occasions to submitting large swaths of their voter registration records.

## Research Questions

The widespread usage of SAVE for voter verification is unprecedented; in a sense, a live experiment is being conducted. But the results haven't yet been systematically analyzed, as we are trying to do. We have four primary research questions.

**1. How accurate is the system?** The tendency of SAVE to generate false positives—voters flagged as (potential) noncitizens who are in fact citizens—is a well-documented problem. For instance, officials in Texas have described flagged voters who, upon investigation, were found to have already documented their citizenship to the state years earlier. We are asking which kinds of voters tend to be flagged; how often it turns out that flagged voters have already provided proof of citizenship; and, where no such proof has been recorded, how many voters supply it when asked.

**2. What makes the system return a usable answer?** SAVE does not respond only with "citizen" or "noncitizen." It frequently returns an inconclusive result, which means that election staff must manually investigate further. We are examining whether a conclusive response is more likely if, for example, a full nine-digit Social Security number is provided rather than an SSN4.

**3. Under what conditions do voters respond to outreach?** When voters are flagged by SAVE as potential noncitizens, election offices typically send them a mailed notice requesting proof of citizenship. The outcome (whether the voter's registration is ultimately cancelled) often depends on whether and how the person replies. We are trying to determine how often people respond to the notices, what those responses look like, how many provide proof of citizenship, and whether the length of the deadline affects response rates. An office cannot determine who is flagged by SAVE, but it does determine how they notify voters, how much time they give voters, and how to respond to voter action or inaction.

**4. What administrative burden does the process impose?** Submitting lists to SAVE and managing the ensuing process uses election official time and expenses. Our project aims to document the administrative burden that the SAVE citizenship verification process imposes on election officials, and to identify potential ways to minimize that burden.

## Methods and Initial Findings

To answer these questions, we seek to use already-public data, issue public records requests for more data, and hold interviews with election officials.

We have submitted public records requests to 24 jurisdictions across six states that hold agreements with USCIS to use SAVE for voter registration and/or voter list maintenance: Florida, Georgia, Kansas, Missouri, Texas, and Utah.

Our requests seek three categories of records:

- **Query-level material**. The lists of voters an office submitted to SAVE and the responses it received, with personal identifying information redacted.
- **Case-investigation material.** Written policies and procedures, the template notices mailed to flagged voters, tracking of who responded and how each case was resolved, and records of any registrations cancelled.
- **Aggregate statistics.** Counts of voters by SAVE response category, resolution counts, and outreach outcomes.

We have received records from several jurisdictions to date, and a number of records requests remain outstanding. While it is too early to draw conclusions, the records we have received suggest at least one consistent trend: voters flagged by SAVE as potential noncitizens are often removed from voter lists without a definitive determination about citizenship. In one county, for example, 55 of 84 flagged voters were removed, not because they were confirmed noncitizens, but because they did not respond to the mailed notice that the county sends to flagged voters.

To supplement what we learn from these requests, we are also analyzing publicly available reports from states participating in SAVE. Two are especially instructive.

- Utah's lieutenant governor published a citizenship verification audit (discussed above) in May 2026 covering 2,069,640 voter records. Data from the Utah Driver License Division (DLD) confirmed citizenship for 96% of these records. The lieutenant governor's office then used SAVE to review 71,256 of the records DLD data could not confirm. Of those, 8,917 could not be confirmed as citizens, and a manual review of those cases identified 27 confirmed noncitizens and 25 probable ones. Together these 52 confirmed/probable noncitizens represent 0.0025% of the total 2,069,640 records reviewed.
- In Texas, the secretary of state's office processed their entire voter registration list through SAVE, which identified 2,724 potential noncitizens. On September 15, 2026, the

secretary of state's office reported that a review of Department of Public Safety (DPS) records confirmed citizenship for 578 (21%) of the initial 2,724 flagged voters (citizenship was established for 504 of these 578 records after passport data, previously missing from SAVE, was added). That leaves 2,146 registered voters flagged as potential noncitizens, or 0.01% of Texas' more than 18 million registered voters.

Several tentative conclusions follow from these reports. First, SAVE can help election officials to verify the citizenship status of many—perhaps most—voters. Second, it also works well as an informal audit of registration records, helping to identify individuals erroneously added to voter lists. These are typically people who indicated they were noncitizens on the relevant (usually paper) form, and were inadvertently registered to vote through no fault of their own. Third, however, proving that someone is *not* a citizen is difficult to do conclusively, and requires significant manual effort. Fourth, how well SAVE functions depends on coordination and data-sharing across state agencies. Typically, citizenship information is spread across multiple agencies; in Texas and Utah, DPS and DLD, respectively, possessed citizenship records that the election office had not previously consulted.

## What Comes Next

Several of our records requests remain open, and we will analyze them as they arrive, alongside the records we have already received. We are also continuing interviews with election officials and reviewing whatever additional information states make public. Through this combination of records, interviews, and public reporting, we hope to produce evidence about how SAVE is and is not working for election offices, and to help answer some of the important questions raised by election officials' expanded use of SAVE.



Bipartisan Policy Center

**Advancing bipartisan solutions that improve lives and build a stronger America.**

**© 2026 Bipartisan Policy Center**

https://bipartisanpolicy.org/article/evaluating-how-the-uscis-save-system-performs-in-practice-evidence-from-election-offices/

# EXHIBIT B

Bipartisan Policy Center

ARTICLE

# Four Things to Know about Noncitizen Voting

**July 22, 2026** Wren Orey Jack Friedman Theresa Cardinal Brown Theo Menon Feyisayo Oyolola

*Updated July 22, 2026*

In recent years, heightened scrutiny has targeted the integrity of election processes, particularly regarding noncitizen participation in U.S. elections. We address here four frequently asked questions concerning noncitizen voting in American elections:

**01** Can noncitizens vote?

**02** Have there been documented cases of noncitizen voting?

**03** How do election offices verify voters' citizenship status?

**04** What are the penalties for voting as a noncitizen?

## Can noncitizens vote?

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 explicitly prohibits noncitizens from voting in federal elections. It is not legal in any state for a noncitizen to cast a ballot in an election for federal office. While federal law does not

prohibit noncitizens from casting a ballot in state or local elections, no state currently allows noncitizens to vote in statewide elections. Municipalities in three states—California, Maryland, and Vermont—and Washington, DC allow noncitizens to vote in certain local elections.[1]

- San Francisco allows resident noncitizen parents and guardians to vote in school board elections.
- Oakland passed a ballot measure in 2022 also giving noncitizen parents and legal guardians the ability to vote in school board elections. The measure is still pending implementation.
- Several municipalities in Maryland and Vermont permit noncitizens to vote in municipal elections.
- Washington, DC, began allowing noncitizen residents to vote in non-federal elections in 2022.

Election offices in communities that allow noncitizens to vote in local elections maintain processes to ensure that a registered noncitizen voter cannot vote for state or federal races. Maryland's cities, for example, maintain separate ballots for municipal elections. This ensures that noncitizens cannot receive a ballot for state or federal contests.

## Have there been documented cases of noncitizens voting?

Illegal voting, including by noncitizens, is routinely investigated and prosecuted by the appropriate authorities, and there is no evidence that noncitizen voting has ever been significant enough to impact an election's outcome.

When investigating noncitizen voting, it is important to distinguish between voter registration and casting a ballot. Noncitizen registration is already rare, and noncitizen voting is even less common.

Recent public debate has focused heavily on audits of voter registration lists, as these audits sometimes flag individuals who appear to be registered as noncitizens. In many cases,

however, further review shows the individual is in fact a citizen, and they were only flagged due to clerical errors or outdated records. For example:

- **Ohio** Secretary of State Frank LaRose flagged 521 cases of potential noncitizen voting between 2019 and September 2023. But an *Ohio Capital Journal* review found just one case in which a noncitizen was ultimately charged with voter fraud. The review noted that this was due to a combination of accidental registration and a lag in how the department of motor vehicles updates an individual's citizenship status after naturalization.

- **Utah** performed a citizenship review of its entire voter registration list from April 2025–May 2026. After a time-intensive, multi-step review of more than 2 million registered voters, they identified only 27 confirmed instances of noncitizen registration.[2]

- **Georgia**: In October 2024, Georgia Secretary of State Brad Raffensperger announced that a citizenship audit of 8.2 million registered voters identified 20 noncitizens who had registered to vote. Of those 20 individuals, just nine had cast ballots in prior elections, most before Georgia implemented enhanced citizenship verification through the Department of Driver Services in 2012. The cases were referred to local prosecutors for investigation.

Nationwide, records from a federal citizenship verification tool show that just 0.04% of voter verification cases are returned as noncitizens.

## Federal data shows that very few voter verification cases are returned as noncitizens

This chart shows the distribution of USCIS Systematic Alien Verification for Entitlements program responses for voter verification cases as of August 2025.

U.S. Citizen

96.31%

Non-definitive response (unable to locate record; more information or verification required)

3.12%

Deceased

0.53%

Non-U.S. Citizen

0.04%

Source: ACLU, Bower v. Social Security Administration, USCIS FOIA Response 10 of 14

In the rare instances in which noncitizens have been registered to vote—or have voted—the fault usually lies in administrative error. For example:

- **Oregon**: Oregon officials in 2024 revealed that a clerical error caused 1,940 individuals to be added to the voter rolls, an unknown number of whom may have been noncitizens. Due to a poorly designed computer program, Department of Motor Vehicle workers mistakenly affirmed that these individuals had provided proof of citizenship when, in fact, they had not. Although it is possible that some portion of these 1,940 individuals were noncitizens, many were later found to be citizens. Nevertheless, given that only 44 of the 1,940 later voted, the clerical error could not have affected the outcome of any elections in a state that, in 2024, cast more than 2.3 million ballots.

- **Texas**: Recently disclosed internal communications between former Texas Secretary of State Jane Nelson and U.S. Citizenship and Immigration Services reveal that the state mistakenly registered noncitizens to vote, even though these individuals had acknowledged their noncitizen status on a voter registration application.

- **New Jersey**: On July 21, 2026, New Jersey Governor Mikie Sherrill announced that a software glitch in the state's Motor Vehicle System caused approximately 6,600 ineligible noncitizens to be registered to vote, even though those individuals reported that they were not citizens during the registration transaction. The governor acknowledged that roughly 400 of these individuals cast ballots. However, there is no evidence to date that these votes altered the outcome of any races in New Jersey—a state that, in 2024, recorded over 4 million cast ballots.

While federal law prohibits voting by noncitizens in federal elections, prosecution typically requires demonstrating that the individual knowingly violated federal law. Therefore, the cases outlined above—of ineligible noncitizens being registered to vote through no fault of their own, and often without even their knowledge—are best addressed through administrative improvements. Such improvements, which can be found in a prior BPC report, include investing in modern motor vehicle department and state election office technology and infrastructure; strengthening coordination and data-sharing between motor vehicle departments and voter registration officials; and expanding back-end verification processes, which use existing government data to verify the citizenship statuses of registered voters.

## How do election offices verify voters' citizenship status?

*The National Voter Registration Act of 1993* requires that individuals registering to vote anywhere in the United States attest under penalty of perjury that they are a U.S. citizen.

Depending on the state, election offices then employ a combination of other tools to further verify status:

01 **Review of documents that an individual used to obtain a state-issued ID or driver's license.** In states using this model, the motor vehicle department shares the types of documents a voter used to obtain an ID with the state or local election office. Those documents, such as a birth certificate or passport, can often confirm a voter's citizenship. When they don't, the election office can do additional investigation.[3]

02 **Use of federal data to verify citizenship.** 23 states have an agreement with the U.S. Citizenship and Immigration Services SAVE System to verify voters' citizenship status.

03 **Use of local and state data to verify citizenship.** Election officials in some states also consult jury list dismissals when the reason for dismissal is a lack of citizenship status.

*For more on citizenship verification best practices, read BPC's report, Modernizing Voter List Maintenance: An Evidence-Based Framework for Access and Integrity.*

## What are penalties for voting as a noncitizen? Does voting by a noncitizen affect their immigration status?

There are significant penalties for registering or voting as a noncitizen. Illegally voting in a federal election can result in a fine and up to one year in federal prison, and noncitizens found guilty of this crime may also face deportation and revocation of their legal status under immigration law. Falsely claiming U.S. citizenship for the purpose of registering to vote may also result in deportation or denial of future immigration status, even if no voting occurs.

The enormity of these penalties means that deterrence is an important factor in ensuring compliance with laws that prohibit noncitizens from voting in federal elections. The risk of deportation, jail time, and fines often deter intentional efforts by noncitizens to register and vote.

---

## Footnotes

1. New York City enacted a law allowing noncitizens to vote in local elections in 2021, but it was ruled unconstitutional by a state judge in 2022. ⤴

2. On May 27, 2026, the Utah Lieutenant Governor's office further explained that in addition to the 27 confirmed instances of noncitizen registration, "there are 5,007 registrants whose citizenship status we were unable to confirm, many of whom registered to vote years before driver license or Social Security numbers were required. This week, these individuals will receive notice of the new citizenship requirements in state law. To be eligible to vote in upcoming state and local races, they will need to show proof of citizenship to their county clerks, otherwise they will receive a federal-only ballot." Those individuals registered prior to the Help America Vote Act of 2002 and are very likely U.S. citizens. The office continued to note that they "also identified 25 registered voters who are probable noncitizens. These individuals will have 30 days to provide proof of citizenship before being removed from voter rolls by their respective county clerks." ⤴

3. Real ID's require proof of lawful presence and not citizenship (meaning noncitizens with lawful presence, such as permanent residents, can get a Real ID). However, by requiring proof of such lawful status, departments of motor vehicles often have documentation on file indicating what someone's status is. ⤴



Celebrating 250 years of Americans working together to meet shared challenges.

Bipartisan Policy Center

**Advancing bipartisan solutions that improve lives and build a stronger America.**

**© 2026 Bipartisan Policy Center**

https://bipartisanpolicy.org/article/four-things-to-know-about-noncitizen-voting/

# EXHIBIT C

(213) 974-1234 GENERAL INFO

lacounty.gov

LOS ANGELES COUNTY
REGISTRAR-RECORDER/COUNTY CLERK

DEAN C. LOGAN
Registrar-Recorder/County Clerk

**October 14, 2026**

**Contact:**
Media Info [mailto:mediainfo@rrcc.lacounty.gov] : (213) 462-1422

# Statement from Dean Logan Regarding U.S. Department of Justice Correspondence

**LOS ANGELES** – Los Angeles County Registrar-Recorder/County Clerk (RR/CC) Dean C. Logan issued the following statement regarding correspondence received from the U.S. Department of Justice concerning voter eligibility and citizenship:

*"Our office received correspondence and information from the U.S. Department of Justice the afternoon of October 13, 2026 (21 days prior to Election Day) concerning assertions related to voter eligibility and citizenship. We are reviewing the information in coordination with the California Secretary of State and Attorney General to determine the next appropriate steps.*

*The letter included a USB drive purportedly containing the referenced records, along with a handwritten note providing a password. We have not accessed the drive because doing so would conflict with established data privacy and information security protocols. We do not consider the device a secure medium. Additionally, the letter does not specify the number of individuals involved or describe the information contained in the records.*

*Maintaining accurate voter registration records is a fundamental responsibility of our office. Federal and state laws are clear on how voter eligibility is established – and any action to remove a voter from eligibility must be based on verifiable information, not assertions of unconfirmed data matching.*

*With the 2026 General Election underway, we remain focused on administering a safe, secure, accurate, and transparent election. We will continue following established legal requirements and verification procedures while protecting the rights of every eligible voter."*

A copy of the October 13, 2026, letter from the U.S. Department of Justice, along with the accompanying handwritten note, is available below.

Link: https://rrcc.box.com/s/jwladrl77dwd9ud2hexcw2yeuvm1gnic [https://rrcc.box.com/s/jwladrl77dwd9ud2hexcw2yeuvm1gnic?utm_content=&utm_medium=email&utm_name=&utm_source=gov

# EXHIBIT D

OFFICE OF THE
COUNTY
COUNSEL

**County of Los Angeles**

Dawyn R. Harrison
County Counsel

October 15, 2026

VIA E-MAIL

R. Trent McCotter
Acting Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
election@hq.dhs.gov

**Re: DOJ Demand Letter Dated October 13, 2026**

Dear Mr. McCotter:

This acknowledges Los Angeles County Registrar-Recorder/County Clerk Dean C. Logan's ("RR/CC") receipt of the U.S. Department of Justice's ("DOJ") letter dated October 13, 2026, hand delivered to the RR/CC's office in Norwalk at approximately 2:55 p.m. PST. The letter was accompanied by a USB flash drive and contains a sticky note with a handwritten password on the last page. The following day, on October 14, 2026 at approximately 2:00 p.m. PST, Al Rossi, Acting Assistant Special Agent in Charge for Homeland Security Investigations, emailed the same letter and a list in Excel format, with the same password provided for the USB flash drive.

Your letter requests that the RR/CC access the USB flash drive or Excel list using the provided password to review "a list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election" and "determine whether any citizens are listed." Your letter also requests a response within 48 hours as well as by 9:00 am PST on October 15, 2026, which would be less than 48 hours after receipt of the letter. Your letter further requests that, in the middle of an election cycle and without any identified authority, the County withhold ballots for certain individuals on the list until "we confirm their citizenship status," or take other actions without any commitment to finalizing that process prior to the legal close of the voting period.



648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713

TEL 213.974.1811
TDD 213.633.0901
pbollinger@counsel.lacounty.gov

Based on a cursory review of the Excel list DOJ provided, this appears to be a list that contains sensitive and personal identifiable information of 20,000+ individuals with associated addresses across the State of California, and not a distinct list associated with and specific to Los Angeles County ("County"). The RR/CC is unclear why a list with records not associated with Los Angeles County was transmitted to the RR/CC, as it only maintains records for County voters and notes that the letter reads as if it is directed to the California Secretary of State rather than the RR/CC.

For the reasons addressed below, the RR/CC is legally prohibited from taking the actions requested in the letter and is, therefore, unable to comply with the requests. As a preliminary concern, we note the letter does not provide any information on how the Government compiled the list of "likely noncitizens" or on what evidentiary basis the Government has reason to suspect that those listed are registered voters who *may* be noncitizens. Further, the letter asks the RR/CC to "independently confirm citizenship status," yet provides no process or information for the RR/CC to do so, and, again, contains records that are not associated with Los Angeles County.

In your letter, DOJ cited no statutory or legal authority for directing a county's administration of ballots. The opposite is true: DOJ is asking RR/CC to engage in an unlawful course of conduct. RR/CC makes the following legal objections to the DOJ's requests.

First, as you may know, federal and state law support and require voter registration when eligibility requirements are met by attestation from an applicant. 52 U.S.C. § 20501 et seq., § 20504; Cal. Elec. Code §§ 2102, 2103, 2105, 2106. For voting purposes, a person may prove they are a citizen by their certification under penalty of perjury on the affidavit of registration. Cal. Elec. Code § 2111. Such attestation shall be deemed evidence of citizenship for voting purposes only. Cal. Elec. Code § 2114. As such, RR/CC is required to register voters when eligibility requirements are met by the voter's own attestation and associated identification information that is verified through the California statewide voter registration database maintained and regulated by the California Secretary of State, in addition to a number of other voter eligibility criteria reviewed and managed by other agencies. RR/CC, therefore, does not, nor is the RR/CC authorized to, independently investigate an applicant's citizenship status. Any investigation regarding a registered voter's eligibility must be based on individualized evidence that would be referred to and handled by other enforcement and investigative agencies such as the California Secretary of State or the California Attorney General.

Second, under the National Voter Registration Act, federal law imposes a 90-day "quiet period" to safeguard against systematic removals of ineligible voters ahead of a federal election. 52 U.S.C. § 20507(c)(2)(A). That 90-day window started on August 5, 2026.

Third, under 52 U.S.C. § 10307(a), "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote . . . or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." Notice of unverified and uncorroborated allegations of voter ineligibility does not authorize the RR/CC to not comply with this statute.

For these reasons, DOJ's requests to the RR/CC would violate the law. Indeed, a failure to register voters as required by federal and state law can subject the RR/CC to civil enforcement and a private right of action. 52 U.S.C. § 20510; Cal. Elec. Code § 2142.

In addition to these legal objections, there are also several practical reasons why DOJ's requests cannot be complied with. The November 2026 General Election is well underway. Registered voters across the County have been mailed vote-by-mail ballots as required by state law, which your letter acknowledges, and the RR/CC has been processing vote-by-mail ballots since October 5, 2026. In-person voting is also underway at the RR/CC and will expand to more than 640 vote centers across the County starting on October 24, 2026 and continue until 8:00 p.m. on Election Day. In the weeks following the election and until the end of November, the RR/CC will be fully engaged with ballot processing activities, conducting the official canvass, the one-percent manual tally and post-election audit, and certifying election results. Notably, state law requires county elections officials to finish counting all regular incoming ballots on or before the 13th day following the election and certification of election results must occur within 30 days. Cal. Elec. Code §§ 15307, 15372. Thus, this is an extremely critical period for the RR/CC's administration of the November 2026 General Election.

Based on the foregoing, the RR/CC is unable to comply with DOJ's requests. Aside from the questionable circumstances surrounding how the letter and statewide list were transmitted to the RR/CC and the impossibility of reviewing and responding to a list of 20,000+ individuals with addresses throughout California in less than 28 hours, we are not authorized to, or are prohibited from, taking the actions requested in your letter under both federal and state law. The actions described would disenfranchise those in question without due process.

Very truly yours,

DAWYN R. HARRISON
County Counsel

By Peter Bollinger
PETER M. BOLLINGER
Assistant County Counsel
Government Services Division

PMB

c: Al Rossi, Acting Assistant Special Agent in Charge, Homeland Security Investigations.

# EXHIBIT E

**U.S. Department of Justice**

950 Pennsylvania Ave, NW
Washington, DC 20530

(202) 514-2000

October 16, 2026

Peter M. Bollinger
Assistant County Counsel
Los Angeles County Counsel's Office

Re: Response to October 15, 2026 Letter

Mr. Bollinger:

The Department of Justice has reviewed your October 15 letter responding to the federal investigative materials provided to the Los Angeles County Registrar-Recorder/County Clerk ("County ROV"). I write to address several legally untenable assertions and to make unmistakably clear the legal implications for violating 18 U.S.C. § 611.

Your letter asserts that the County ROV is "legally prohibited" from taking even minimal steps—such as temporarily segregating ballots—after receiving credible federal evidence identifying tens of thousands of individuals suspected to be noncitizens. That position is incorrect as a matter of federal law and places officials in both the California Secretary of State ("SOS") and County ROV offices at risk of knowingly facilitating violations of federal criminal statutes.

On October 13, the Department hand delivered a password-protected dataset identifying more than 20,000 individuals who federal agencies reasonably believe are likely noncitizens registered to vote in California. This list was developed through a multilayered, multiagency investigative methodology that relied upon internal immigration records, data matching, supervisory verification procedures, and more.

The legal consequences for either facilitating or ignoring a federal crime are significant. Noncitizen voting in a federal election is a federal crime—and knowingly facilitating such conduct is equally unlawful. Under 18 U.S.C. § 611(a), noncitizens are prohibited from voting in any election involving federal offices. Under 18 U.S.C. § 2, anyone who aids, abets, counsels, induces, or procures the commission of a federal offense is equally liable. If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime. Your assertion that ballots must be counted simply because California's registration system relies on self-attestation does not relieve election officials of their obligations under federal law ***when they are on actual notice of noncitizen voting.*** Nor can state procedures supersede federal criminal statutes.

Your argument that the County is "not authorized" to pause or segregate ballots because California relies on attestation-based registration is immaterial. Section 611 does not excuse unlawful voting simply because a State employs a permissive registration method. The Department has not asked the County to adjudicate immigration status; it has asked the County to temporarily set aside ballots from individuals whose eligibility is credibly in question—a standard election-administration practices implement nationwide.

Likewise, your reliance on the National Voter Registration Act's ("NVRA's") "quiet period" is misplaced. The NVRA's 90-day limitation applies only to systematic list-maintenance programs—not to targeted, individualized evidence of unlawful voting identified by federal law enforcement. The Department has not requested a purge, cancellation of registrations, or any programmatic action. We requested only temporary ballot segregation pending citizenship verification. Invoking the NVRA to justify counting ballots unlawfully cast is both legally incorrect and operationally irresponsible.

Additionally, the administrative burdens, timing constraints, or the fact that the investigative list includes individuals residing outside Los Angeles County do not permit the County to knowingly tabulate ballots that federal law prohibits. Once the United States provides credible evidence that certain ballots may be unlawful to count, election officials may not disregard that information because it is inconvenient to process. Administrative difficulty is not a defense to violating federal law or aiding or abetting a federal offense.

The Department strongly urges the County and the SOS to reconsider their positions before taking actions that risk significant federal scrutiny and legal exposure.

Sincerely,

/s/

Trent McCotter
Acting Deputy Attorney General
United States Department of Justice

cc: Shirley N. Weber, Ph.D, California Secretary of State
Dean C. Logan, Los Angeles County Registrar-Recorder/County Clerk

# EXHIBIT F

# *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle.*

It was the Trump administration's latest stumble in its effort to find proof of widespread noncitizen voting, despite decades of evidence that it is extremely rare.

Listen · 7:25 min



**By Nick Corasaniti**

Sept. 24, 2026

See more of our coverage in your search results.

**Add The New York Times on Google ↗**

When the Department of Homeland Security sent Nevada a list of 185 names last month that it claimed identified noncitizens who had been improperly allowed to register to vote, state election officials got to work.

On Tuesday, the state sent a strongly worded rebuke to the federal government: Every single person on the list was a lawful citizen.

"As for the 185 individuals, our records indicate that they were citizens," Greg D. Ott, a deputy attorney general in Nevada, wrote, according to a copy of a letter sent to Department of Homeland Security officials obtained through open records requests. "You have provided nothing of substance to suggest otherwise."

Mr. Ott also stated that D.H.S. officials had still not provided enough data for election officials to investigate their claims. Nor have they turned over the list of nearly 16,000 individuals they claim may be noncitizens.

… records do not support DHS's claims, and DHS has still not provided evidence to change that," Francisco Aguilar, the Democratic secretary of state in Nevada, said in a statement. "Instead, DHS officials continue their attempts to intimidate election officials into compliance and deter voters with huge claims of fraud with no evidence. Repeating unsupported claims does not make them true."

It was the Trump administration's latest stumble in a broad campaign to find proof of widespread noncitizen voting in American elections, despite decades of evidence that it is extremely rare.

The Department of Homeland Security said in a statement that Nevada's characterization was "false" and "the list of 185 were simply a subset of individuals that had gone through a rigorous manual review process" at the time of the last meeting between the two agencies.

The back and forth began in July, when President Trump and Markwayne Mullin, the homeland security secretary, said they had identified more than 270,000 noncitizens on voter rolls in just four states: Nevada, California, New Jersey and Pennsylvania.

Both men stated the claims as fact, yet letters sent to election officials in the four states in the days that followed indicated that the numbers may have been inflated. Each letter qualified Mr. Trump's concrete assertions with the phrase "there may be as many as." None offered actual proof of noncitizens on voter rolls.

In Nevada's case, Mr. Mullin initially claimed that there were as many as 15,903 noncitizens on the voter rolls. But in a meeting between Nevada election officials and the Department of Homeland Security last month, department leaders admitted that their initial claim was unsubstantiated. That prompted some pointed questions from Nevada election officials, according to a video recording of the virtual meeting.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

what you're saying is the 15,000 number has not been vetted?" asked C. Murphy Hebert, the chief deputy in the Nevada secretary of state's office.

"I probably wouldn't use the sentence, 'It hasn't been vetted,'" replied Kimberley Vogt, an official with Homeland Security. "Because definitely we've done something with it to get down to 15,000. So I wouldn't say that. But it hasn't had a full manual review of each one."

Following the meeting, Ms. Vogt sent a clarifying email to Nevada officials. "I also wanted to be sure I clarified that we did not reduce the 15,903 to 185," she wrote. "We've manually reviewed some of the 15,903 and confirmed 185 are not U.S. Citizens."

Now, Nevada officials are saying even that 185 number is wrong. They also took issue with a letter D.H.S. sent them in early September, in which the agency reiterated its initial claims about nearly 16,000 noncitizens on the rolls and pressured state officials to review each case in a letter to Nevada officials in early September.

"Each one of the 15,903 individuals identified should be carefully reviewed by your state to determine eligibility for voting in a federal election," read a letter from the Department of Homeland Security sent on September 9.

But Nevada election officials said in their letter that D.H.S. "has never provided Nevada with a list of 15,903 individuals." Instead, they said, the department sent them a smaller batch of roughly 6,000 individuals, identified only by what Homeland Security called a voter case number.

"D.H.S. still has not provided any additional verifiable information for the individuals it suggests are noncitizens," they wrote.

The Department of Homeland Security said in a statement that the 6,218 individuals had "the highest number of matching attributes" to a potential noncitizen in their records, and that the smaller tranche of voters "was at the request of Nevada. They wanted to start with a subset less than the 15,903 registrants DHS originally identified."

Nevada officials disputed that claim, and records reviewed by the Times did not show Nevada making that request.

Mr. Ott also said the use of so-called voter case numbers, which Nevada officials took to mean voter registration numbers, was imprecise.

Using only "voter case numbers" without any other information such as a name, date of birth, address, or another verifiable data point, could lead to the identification of multiple individuals, Mr. Ott said. This is because Nevada recently transitioned to a statewide voter-registration system that was previously run by counties. So an individual may have been assigned one number by a county in the past and a different number under the new statewide system.

"The number also doesn't tell us whether an individual was born in the United States, naturalized, derived citizenship through a parent, or holds any particular immigration status," Mr. Ott wrote. "A number that matches a voter record thus establishes only that a number exists in, or once existed in, a voter registration system."

Mr. Trump's demand for evidence of fraud has prompted multiple governmental efforts. The New York Times this month reported that hundreds of agents with Homeland Security had been temporarily pulled from their duties investigating international crimes and terrorism for a roughly three-week intensive search noncitizens on voter rolls. The methodology was criticized by Democrats as faulty and potentially illegal, and the Virginia attorney general wrote a letter demanding more information.

**Nick Corasaniti** is a Times reporter covering national politics, with a focus on voting and elections.

# EXHIBIT G

An official website of the State of North Carolina How you know

NORTH CAROLINA STATE BOARD OF ELECTIONS

**TUESDAY, OCTOBER 13, 2026**

# NCSBE to Send Letter to Potential Non-Citizens on Voter Rolls

The North Carolina State Board of Elections will send letters this week to 1,392 registered voters identified as potential non-U.S. citizens through the federal Systematic Alien Verification for Entitlements (SAVE) database.

Share to: (/#facebook) (/#email) (/#linkedin) (/#x) (/#bluesky)

RALEIGH, NC

The North Carolina State Board of Elections will send letters this week to 1,392 registered voters identified as potential non-U.S. citizens through the federal Systematic Alien Verification for Entitlements (SAVE) database. SAVE is a federal database used by government agencies to verify immigration and citizenship status.

The findings represent approximately 0.02% of North Carolina's 7.9 million registered voters.

The letters will provide registrants with instructions on how to voluntarily request removal from the voter rolls if they were registered in error or provide information verifying their U.S. citizenship. See a copy of the letter (https://s3.amazonaws.com/dl.ncsbe.gov/Legal/SAVE/Ltr%20Identified%20Voter_v1_20261008.

“Maintaining accurate voter rolls and ensuring that only U.S. citizens participate in our elections are fundamental duties of the State Board,” said Sam Hayes, executive director of the State Board of Elections. “While these registrations represent a small percentage of our voter rolls, one ineligible registrant is still one too many. We have a duty to enforce the law while protecting the rights of every eligible legitimate voter.”

Earlier this year, the Department of Homeland Security identified nearly 1,600 potential non-citizens on the voter rolls. However, further comparisons with the SAVE database, combined with additional reviews by the State Board and checks against state DMV records, have reduced that number.

In July, the State Board announced that it would review potentially ineligible registrations before initiating any removal proceedings. The mailing represents the next step in that process.

On September 25, the U.S. Supreme Court issued a ruling allowing continued use of the SAVE database for voter list maintenance purposes while litigation proceeds. The State Board will continue utilizing available federal citizenship verification tools consistent with applicable law.

## Verification and Review Process

Inclusion on the SAVE database does not necessarily mean an individual is ineligible to vote. Citizenship information may be incomplete or outdated, particularly for individuals who have become naturalized U.S. citizens. This is why the State Board conducts a review of available records when receiving data back from the SAVE database.

Once data is returned from SAVE, the State Board conducts additional reviews. This includes checking voter records to see if a registrant previously showed a U.S. passport when voting or provided citizenship documents to the N.C. Division of Motor Vehicles.

When available records do not establish citizenship, the registrant will be asked to provide corrected or updated information before any removal proceedings are initiated.

## Protecting Eligible Voters

No voter will be automatically removed from the voter rolls based solely on information obtained through SAVE. Any removal proceedings must comply with applicable state and federal laws, including requirements for notice and due process.

Individuals who receive a letter and believe they have been identified in error should follow the instructions provided and contact the State Board to resolve any discrepancy

Receiving a letter does not cancel an individual's voter registration or automatically prevent an otherwise eligible voter from participating in the November 3 general election. Any voter

challenge or determination of ineligibility must follow the procedures established under North Carolina and federal law.

## Public Information and Transparency

The State Board will provide information about the review process while protecting individual registrants' information and the integrity of any ongoing investigations or eligibility reviews.

The State Board will continue to review citizenship information, resolve discrepancies, and maintain accurate voter registration records ahead of the election.

For additional information about the SAVE verification process and voter list maintenance, visit Maintaining Accurate Voter Rolls (https://www.ncsbe.gov/about-elections/maintaining-accurate-voter-rolls).

### Related Topics:

- Laws/litigation (/press-release-terms/lawslitigation)
- Required by law (/press-release-terms/required-law)

## CONTACT

**Jason Tyson**

ncsbe.comms@ncsbe.gov (mailto:ncsbe.comms@ncsbe.gov)

# EXHIBIT H

# United States Senate

WASHINGTON, DC 20510

September 13, 2026

The Honorable Markwayne Mullin
Secretary
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528

The Honorable Joseph B. Edlow
Director
U.S. Citizenship and Immigration Services
5900 Capital Gateway Drive
Camp Springs, MD 20529

Dear Secretary Mullin and Director Edlow:

On September 8, 2026, Senator Alex Padilla received a protected whistleblower disclosure (the "Disclosure") that reveals serious allegations of illegal and inappropriate activities within the Department of Homeland Security's ("DHS" or "the Department") U.S. Citizenship and Immigration Services ("USCIS") Fraud Detection and National Security Directorate ("FDNS").

According to the attached Disclosure, the Department and USCIS leadership have abruptly diverted FDNS personnel to an "Unlawful Voter Initiative" using highly questionable data and methods to identify purported unlawful voters. DHS materials admit these investigations will include naturalized U.S. citizens, some of whom will have federal law enforcement records created against them. FDNS employees are expressing concern that they are being directed to take actions that are against the law and Department policy, which will harm Americans. The whistleblower's Disclosure includes compelling evidence of wrongdoing and abuse of power by agency leadership including:

(1) USCIS personnel have been directed to access sensitive voter information in violation of state laws prohibiting unauthorized access to individual voter records potentially thousands of times;[1]

(2) USCIS personnel are under significant pressure from headquarters to enter federal TECS[2] records against individuals that are likely to be false in many cases, potentially harming thousands of people in likely violation of federal privacy requirements;[3]

(3) With minimal training, agency leadership is imposing reckless quotas that demand USCIS personnel investigate 40 subjects per day, a rate of roughly 12 minutes per subject, to complete this rushed investigation by September 12;[4] and,

(4) USCIS personnel are being tasked with unreliable DHS voter data of dubious origins, that is compiled with "supplemental magic", which they are required to accept as accurate.[5]

---

[1] Disclosure Letter to Senator Padilla from Anonymous Whistleblower re: Department of Homeland Security and U.S. Citizenship and Immigration Services Direction to Identify "Unlawful Voters", (Sept. 8, 2026), 1.

[2] "TECS" is a system where "users are able to input, access, or maintain law enforcement, inspection, intelligence-gathering, and operational records." *See* DHS/CBP/PIA-021 TECS System: Platform, available at: https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform

[3] Disclosure Letter, 1.

[4] *Id.* at 2.

[5] *Id.* at 3.

On Friday, August 21, 2026, USCIS FDNS personnel were instructed to drop everything and watch one training video. By the following Tuesday, August 25, they were directed to begin reviewing data provided by DHS to FDNS to hunt for "unlawful voters." Hundreds of employees have been diverted to chasing the Administration's unfounded claims of significant noncitizen voting. This sudden surge indicates that the Department's top priority is now manufacturing evidence for election conspiracy theories, rather than FDNS's fraud detection and national security mission.

It is notable that these activities come as federal courts have unanimously rejected the Administration's attempts to coerce states to share their citizens' voter data.[6] The Disclosure shows how DHS is deploying federal law enforcement resources to go around those judicial rulings and gather state voter information by any means, regardless of state laws. Further, the Administration's continued claims of election fraud signal its intent to use this unreliable evidence of "unlawful voters" in ways that can disenfranchise eligible voters, disrupt state and local election administration, and subject election officials to additional unwarranted threats of prosecution.[7]

1. **Illegal Access to State Voter Records Using PII**

The whistleblower's Disclosure shows this initiative appears to involve thousands of violations of state laws protecting voter data against unauthorized access. Several states, including Virginia, require a specific attestation that one is authorized to access the voter's information, under penalty of law.[8] However, the Department and USCIS are directing assigned personnel to make false claims, using Personally Identifiable Information (PII) from DHS data, on state government websites by affirming that they are the voter or have been authorized by the voter to obtain the desired state voter data. This appears to be a clear-cut violation of state laws regarding access to individual voter information and raises serious questions about federal privacy laws and data policies as well.

As documented by the Disclosure, federal employees are being directed to misrepresent themselves based on questionable guidance from USCIS's Office of Chief Counsel ("OCC"). This guidance stated that FDNS officers may conduct such searches on these websites as "open-source research for 'adjudicative or investigative' purposes," seemingly disregarding certain states' laws. This guidance also conflicts with 5 U.S.C. §552a(a)(7), which defines "routine use" "with respect to the disclosure of a record" as "the use of such record for a purpose which is compatible with the purpose for which it was collected." Further, statements made by Department leadership that personnel would not be "personally liable" for conducting these searches indicates a known concern about the legality of these actions.

2. **Creation of Erroneous Federal Law Enforcement Records**

The Disclosure also outlines the serious consequences for individuals whose information is being reviewed through this initiative. FDNS officers were instructed to create records known as "TECS records" for individuals who have been determined to be "unlawful voters" despite questions from

---

[6] Avery Lotz, *DOJ's voter roll crusade hits a courthouse wall,* Axios (Aug. 5, 2026), https://www.axios.com/2026/08/05/trump-doj-voter-roll-lawsuits-fail
[7] Assistant Attorney General Dhillon Letter to All States' Chief Election Officials Threatening Prosecution, Example Letter to Michigan Secretary of State Benson (July 7, 2026), available at: https://www.documentcloud.org/documents/28425163-20260707-doj-letter-and-memo-voter-eligibility/
[8] Disclosure Letter, 1.

officers regarding the source and accuracy of voting and immigration history information to make these determinations. TECS records are law enforcement records maintained by U.S. Customs and Border Protection (CBP) that carry significant downstream impacts on individuals, including naturalized U.S. citizens.

Now, tens of thousands of individuals are being investigated by FDNS officers through this initiative without their knowledge or ability to correct erroneous data. The Department's own training information acknowledges there will be serious flaws in the data, even stating "there will be U.S. citizens in this population."[9] At a time when immigration enforcement is significantly increasing at airports, U.S. citizens or other lawfully present noncitizens could be referred to secondary inspections by CBP personnel at ports of entry upon return to the United States from legally authorized travel abroad due to a TECS record based on questionable sources. While USCIS' materials caution about the possibility of unreliable data, personnel are nevertheless directed to generate records regardless of whether they believe that the DHS-provided data is correct, which can trigger referrals to Homeland Security Investigations (HSI).

### 3. Minimal Training and Reckless Quotas Leading to Criminal Investigations

As revealed in the Disclosure, staff were given just one session of training as part of this initiative – consisting only of a video that lasted approximately 1 hour and 45 minutes. Less than 3 business days later, assigned staff were expected to begin reviewing data, with quotas of 5 subjects per hour, or 40 per day over 8 hours. Not only is such a breakneck pace likely to cause fatigue amongst these staff, but it equates to approximately 12 minutes per subject – a completely inadequate timeline for investigating and reconciling multiple Alien Registration Numbers mistakenly or inadvertently issued to an individual, increasing the likelihood of error. Individual cases identified by this initiative can then be taken up by HSI for further action, including criminal investigations.

### 4. Questionable Source Data Compiled With "Supplemental Magic"

The Disclosure establishes a glaring lack of transparency around the source data provided by the Department for these investigations. The official training video states that the data was compiled with "supplemental magic." The video also establishes that both headquarters and USCIS personnel understand the shortcomings of both the state voter data and the federal immigration and citizenship data, including individuals with multiple alien numbers, but personnel are required to accept the data even when they believe it to be inaccurate. This use of "supplemental magic" on this data set to create records to be used against citizens shows a shocking disregard for the federal privacy and data laws enacted to protect the American people.

The Department has already shown repeated disregard for the Privacy Act and other laws and policies limiting federal agencies' collection, use, and sharing of individuals' records.[10] The Disclosure shows that some of the data being used to check against state voter rolls comes from the SAVE program. The

---

[9] *Appendix,* 25.

[10] *League of Women Voters v. Department of Homeland Security,* No. 25-cv-3501, Order Denying Federal Defendants' Motion for Stay Pending Appeal (D.D.C. July 8, 2026), *aff'd*, Order Denying Federal Defendants' Motion for Stay (D.C. Cir., Sept. 4, 2026).

modified use of SAVE is now barred by a federal court injunction, raising questions about whether the Department is following that court order.[11]

**Continuation of Administration's Baseless Claims of Election Fraud**

These activities are especially alarming just weeks before the 2026 midterm elections. They also must be seen in the context of the repeated, unverified claims by President Trump of widespread noncitizen voter fraud, including those made during his July 16, 2026, prime-time address from the White House. Over the past several weeks, *CNN*, *The New York Times*, *The Washington Post*, and *ProPublica* and other outlets have reported on the intense White House pressure on DHS and other agencies to back up the President's baseless claims of widespread election fraud.[12] Now, the Administration appears likely to use the "unlawful voters" supposedly identified with "supplemental magic" in ways that disenfranchise eligible voters and threaten state and local election officials before, during and after Election Day 2026.

In light of this Disclosure, DHS and USCIS must (1) be transparent about what they intend to do with the unreliable records they are generating; (2) immediately stop this initiative and related activities; and (3) remove any TECS or other law enforcement or administrative records generated from it. In addition to taking immediate corrective action, please provide answers to the attached questions no later than September 21, 2026.

Thank you for your prompt attention to this important matter.

Sincerely,

Alex Padilla
United States Senator
Ranking Member, Committee on Rules and Administration;
Ranking Member, Judiciary Subcommittee on Border Security and Immigration

Charles E. Schumer
United States Senator
Senate Democratic Leader

---

[11] Disclosure Letter, 3; *Appendix,* 18.

[12] Peter Elkind, et. al., *Inside Trump's Failed Hunt for Noncitizen Voters,* ProPublica (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations; Alvarez, et. al., *Exclusive: DHS plans to launch voter fraud investigation surge Tuesday*, CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations; Nick Corasaniti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, New York Times (Sept. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/trump-election-voter-fraud.html; Ted Hesson, *Immigration Officers Are Being Diverted to Trump's Voter Fraud Effort,* Washington Post (Aug. 25, 2026), https://www.washingtonpost.com/immigration/2026/08/25/immigration-officers-are-being-diverted-trumps-voter-fraud-effort/.

cc: Chairman Mitch McConnell, Senate Committee on Rules and Administration
Chairman Chuck Grassley, Senate Committee on the Judiciary
Ranking Member Dick Durbin, Senate Committee on the Judiciary

**Questions for DHS and USCIS Regarding the Whistleblower Disclosure from Ranking Member Alex Padilla and Leader Chuck Schumer**

1) How does DHS or any of its agencies plan to use the information generated by the USCIS "Unlawful Voter Initiative" (USCIS Initiative)? Has DHS or any of its agencies provided any information generated from the USCIS Initiative to HSI, the FBI, or any U.S. Attorneys' Offices? Has DHS or any of its agencies provided such information to any state or local election office for purposes of determining voter eligibility or does it intend to do so before or after November 3, 2026?

2) How many DHS employees, broken down by component agency and title, have been devoted to the USCIS Initiative, HSI "criminal voter fraud surge initiative," or any other initiative concerning alleged noncitizen voter registration or voting since January 20, 2025?

3) What assessment have DHS and USCIS conducted of the operational consequences of these reassignments on other missions, including fraud reviews and national security screenings? What work has DHS and USCIS chosen to pause or forego in order to reassign resources to the "Unlawful Voter Initiative"?

4) Which senior DHS or White House officials ordered, approved and oversee each election-related DHS initiative, including the HSI "criminal voter fraud surge initiative" and USCIS FDNS diversion?

5) What factual or statistical analyses did DHS conduct to determine that the prevalence of suspected voting by noncitizens warranted the personnel and resources assigned to these efforts? Please provide any analyses and explain how DHS determined that a surge immediately before Election Day 2026 was necessary and appropriate.

6) How is DHS obtaining voter data from states which have not voluntarily submitted it to the Department? Which office(s) at DHS headquarters or component agency is responsible for collecting and maintaining these records?

7) Provide all legal analysis for the USCIS Initiative, including any analysis of the Department's legal authority to access information on state voter websites, and specifically the direction for FDNS officers to enter false attestations or access state voter information websites identified for the use of voters or their authorized representatives.

    a) Did DHS or USCIS notify states that they intended to use these websites for this purpose?
    b) Does DHS or USCIS keep records of the numbers of false attestations by officers accessing state voter data by claiming to be a voter or their authorized representative?
    c) Has any officer who has access such websites ever truthfully identified themselves, and if so, under what circumstances?

8) Which federal, state or nongovernmental databases or other information sources are DHS employees using or accessing to identify, verify, or check for noncitizens on state voter rolls?

9) Did DHS or USCIS analyze whether any new or modified SORN, "routine use" justification, Privacy Impact Assessment, computer-matching/information sharing agreement, or other public notice or agreements were required before beginning these operations?

   a. Identify every Privacy Threshold Analysis, SORN, "routine use" justification, Privacy Impact Assessment, memorandum of understanding or agreement, data-use/information sharing agreement, legal opinion, Privacy Office review, state law or any other legal or compliance document applicable to these activities and explain how the Department has ensured compliance. Please provide a copy of each of the above that were completed for the USCIS Initiative, the HSI "criminal voter fraud surge initiative," or any other initiative concerning alleged noncitizen voter registration or voting since January 20, 2025.

   b. If this disclosure of information was determined to be "routine use" as defined at 5 U.S.C. §552a(a)(7), please provide the reasoning that informed this conclusion. If not, please provide the basis under 5 U.S.C. §552a or any other federal privacy law that DHS and USCIS are subject to that justified the disclosure of this information and the reasoning that informed that justification.

10) What does the Department and USCIS mean in its use of the term "supplemental magic" in the training provided to FDNS officers? Please define the term and provide information about where the data FDNS staff were given to further their research originated from.

   a. How did the Department create its list of individuals to be investigated?
   b. What factors were considered when determining whether an individual merited review by USCIS?
   c. How many individuals were referred to USCIS for review under the USCIS Initiative?
   d. How many individuals have been reviewed by FDNS? How many individuals had TECS records created?

11) What training did DHS employees receive before initiating these voter efforts, including training concerning legal guardrails and limitations of DHS databases, state voter registration systems and the applicable restrictions on their use? Please provide a full copy of any training and guidance materials provided to officers and their supervisors on August 21, 2026, and any subsequent materials provided since the start of the USCIS Initiative.

12) What recourse do naturalized citizens and other noncitizens reviewed under this USCIS Initiative have to address an erroneous TECS record?

13) Please preserve and provide all guidance, policies, training materials, training videos, presentations, manuals, and other records regarding the USCIS "Unlawful Voter Initiative," the HSI "criminal voter fraud surge initiative," and related DHS activities to identify noncitizen voters on state voter rolls.

Democracy Defenders Fund

**September 8, 2026**

The Honorable Alex Padilla
Ranking Member, Committee on Rules and Administration
U.S. Senate Committee on Rules and Administration
331 Hart Senate Office Building
Washington, D.C., 20510

**Re: Systemic Pattern of Potential Illegal Conduct and Data Falsification at DHS's "Unlawful Voter Initiative" — Anonymous Whistleblower Disclosure**

Senator Padilla:

Democracy Defenders Fund represents an anonymous federal whistleblower (hereinafter "Whistleblower" or "client") with direct knowledge of potential repeated illegality in connection with the U.S. Citizenship and Immigration Services-Fraud Detection and National Security Directorate Headquarters (USCIS-FDNS HQ) Unlawful Voter Initiative. The Whistleblower has reason to believe that, with the knowledge and at the direction of leadership at headquarters, the Unlawful Voter Initiative has potentially already committed thousands of violations of state law in an effort to improperly access individuals' voter records. The Whistleblower is similarly aware of detailed evidence of pressure to falsify federal records and believes that may have occurred on a large scale, potentially in violation of federal law. The details supporting our client's reports are set forth in the Appendix to this letter.

Our client reports that leadership of the Unlawful Voter Initiative are requiring DHS employees to utilize Personally Identifiable Information (PII), accessed through DHS internal data, to access state voter registration websites. The employees may be required to use the PII to make false attestations that they are the voter or are acting with the voter's express authorization, in order to access these individual voters' records. Such false representations would likely violate relevant state law. *See, e.g.*, Va. Code § 18.2-152.3. DHS has previously tried to obtain the unredacted voter files of nearly every State. *See* Nick Corasaniti & Alan Feuer, *Justice Department Issues Subpoenas for Voter Data in Nevada*, N.Y. Times (Sept. 4, 2026), https://tinyurl.com/yhdsjsn6. Because those demands violate the statutory and constitutional election framework, Democratic and Republican election officials have refused to comply. In response, DOJ has filed at least 31 lawsuits against those states and the District of Columbia to obtain the voter data. Melissa Quinn, *The Trump Administration has filed 31 lawsuits seeking states' voter data. Here's where they stand.*, CBS News (Aug. 17, 2026), https://tinyurl.com/3rvna3ut. DOJ has not been successful in a single case so far. The DHS Initiative appears to be an illegal alternative to DOJ's unlawful efforts.

Democracy Defenders Fund

The Whistleblower reports that given the nature of the Initiative, the pressures put on officers, and the instructions given by headquarters, it is likely the case that no officer who has sought to access information on a state website has been truthful about his or her identity. The Unlawful Voter Initiative includes all 50 states and is targeted at up to hundreds of thousands of individuals. The officers received their first and only training on Friday, August 21, and were considered ready to begin the Initiative on Tuesday, August 25. They are required to review and determine if the PII belongs to an "unlawful voter," and each officer was given a quota of at least five subjects to be reviewed per hour and 40 subjects per day, with USCIS-FDNS-HQ leadership tracking their output—giving officers only twelve minutes to determine if a subject is a U.S. citizen, if they should be considered an "unlawful voter," and enter a record against them (called a "TECS" record).[1] The Whistleblower understands that the goal is to complete this stage of the initiative by September 12.

When the Whistleblower and others expressed concerns about the legality of this conduct to USCIS-FDNS HQ, the response was that individual officers would not be personally liable for conducting the searches when they are done as part of their official duties and properly documented. No explanation was offered as to why officers would not be legally liable. That statement implies awareness that the activity is illegal and nevertheless requires DHS officials to continue improperly accessing state voter records. Only one substantive response was provided to the concerns raised by the Whistleblower and others, namely that these searches are permissible as open-source research for "adjudicative or investigative" purposes. However, that appears inconsistent with the guidance listed in DHS's Rules of Behavior required for accessing other, less sensitive information, such as social media posts; and also the USCIS Rules of Behavior, in which employees agree that they "will not attempt to access systems [they are] not authorized to access" and "will not attempt to bypass access control measures." No attempt was made to explain these discrepancies, leading the Whistleblower and others to believe that DHS leadership may be knowingly requiring them to break the law and DHS policies.

Furthermore, the Whistleblower reports widespread doubts among officers working on the Initiative about the accuracy of the source data DHS is providing to its employees, through USCIS-FDNS HQ, as part of the Unlawful Voter Initiative. The data DHS provides often consists of unverified voter registration and/or voting dates and is known to conflict with data found in other sources. Indeed, the inaccuracies of this DHS data are widely known and acknowledged by DHS itself. The State Citizenship Lists DHS is putting together, pursuant to the President's Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in*

[1] "TECS" is officially an acronym with no definition. It originally stood for Treasury Enforcement Communication System. https://www.aila.org/library/cbp-memo-muster-on-tecs-name-change.

Democracy Defenders Fund

*Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026), must be compiled from "citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." 2026 Elections EO, § 2(a). Yet both SSA and DHS have both acknowledged systematic data gaps and unreliability in the underlying data set for purposes with respect to determining voter eligibility and citizenship. *See e.g.,* Letter from Nancy Morales Gonzalez, Assoc. Gen. Couns., SSA, to Jon Sherman, Litig. Dir. & Senior Couns., Fair Elections Ctr., Re: Application for Records and Testimony of a Social Security Administration (SSA) Employee in a Federal Civil Case 2 (Jul. 13, 2023), https://perma.cc/KS2N-U2US.[2]

Moreover, the internal data often does not include the sources of the information, and USCIS-FDNS HQ does not and will not elaborate on the specific sources and dates of data it provides to the officers conducting reviews. When officers expressed their misgivings about the unreliability of the data to leadership, they were told they were required to create the TECS law enforcement records of unlawful registration and/or voting irrespective of their concerns. Although the training acknowledges that the voter data set contains inconsistent information, officers were told to assume that the data provided by DHS to USCIS-FDNS HQ was accurate enough to determine whether an individual may have voted or registered to vote by a specific date.

At one point in the training video, there was an express recognition of these flaws. The video tells DHS employees that certain information that is not included in the source data will be "brought in through supplemental magic." Magic is not a recognized form of record keeping under state or federal law.

As a result, our client reports that TECS law enforcement records are regularly created against individuals based solely on DHS data that is unverified, inconsistent with other information, and/or is unexplained to the officers working on the Initiative. Our client also reports that TECS law enforcement records have been created against U.S. citizens. Such records can have ramifications for individuals far beyond the voting context. TECS law enforcement records can be used against them in ***any*** interaction they may have with the federal government, such as crossing the border during travel or seeking a benefit.

---

[2] *See also* DHS, Privacy Threshold Analysis for the SAVE Program 17, 34, 38–39 (approved Jul. 17, 2025), https://perma.cc/9AXY-WCLU (DHS knew that there were "shortfalls in data accuracy" for SAVE, and warned that SAVE "may share inaccurate information with registered agencies"); DHS, DHS Ref. No. DHS/USCIS/PIA-006(d), Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program 19 (Oct. 31, 2025), https://perma.cc/G92U-LYPM; USCIS, Voter Registration and Voter List Maintenance Fact Sheet (Aug. 27, 2025), https://perma.cc/Q5F7-YBCA ("if an individual with acquired citizenship has not received a Certificate of Citizenship from USCIS (e.g., some foreign-born children of U.S. citizens) or is not designated as a U.S. citizen in SSA records, SAVE may not be able to confirm that individual's U.S. citizenship").

Democracy Defenders Fund

Our client wants it known that they believe the responsibility for this potentially illegal activity lies solely with USCIS-FDNS HQ. The Whistleblower believes that their colleagues below that level, up to and including regional leadership, are likely also victims of an abuse of power. Our client wants it known that they would not have had the courage to come forward if not for them speaking up internally, many before our client did. They are outstanding public servants and do not deserve to be vilified for being placed in an impossible situation by headquarters.

Our client, a lawful anonymous whistleblower, feels it is their duty to come forward and reveal potentially unlawful conduct related to the "Unlawful Voter Initiative." Our client is understandably extremely concerned about retaliation by Administration officials should their identity become known. As such, we ask that reasonable steps be taken to maintain their anonymity throughout the whistleblowing process. The Whistleblower makes this disclosure out of concern that law enforcement records used against individuals, including U.S. citizens, are being created through potentially unlawful means and based upon unreliable information. That is a dangerous abuse of the power of the federal government. We respectfully submit this disclosure for inquiry and investigation. Our client welcomes referral of the matter to any other oversight bodies with relevant authority and jurisdiction.

Sincerely,

/s/ Norman L. Eisen
Norman L. Eisen
Executive Chair
Democracy Defenders Fund
[redacted]

/s/ Stephen A. Jonas
Stephen A. Jonas
Chief Counsel & Director, Rapid Response Legal
Democracy Defenders Fund
[redacted]

Democracy Defenders Fund

## Appendix — Anonymous Whistleblower Disclosure

This document reflects the Whistleblower's personal knowledge and assessment. Given the size of the Initiative and the speed being demanded of officials, USCIS-FDNS HQ has put extraordinary pressure on employees despite the legal risk involved. Our client has an extreme fear of retaliation, but they feel an obligation to speak up about the misconduct and gross mismanagement they have witnessed.

### 1. "UNLAWFUL VOTER INITIATIVE"

On Friday, 08/21/2026, FDNS IOs received instructions to stop everything being worked on and immediately watch a 1 hour 45 minute training video provided by USCIS-FDNS HQ. The video, referenced throughout this statement, is the only formal training provided by USCIS-FDNS HQ for the Unlawful Voter Initiative surge. It was also the first time officers may have heard of the Initiative that they would be mandatorily assigned, to effective immediately. USCIS-FDNS HQ also provided a link to an internal FDNS website listing all 50 states and provided links to each state's official state voter registration website, along with some other guides, links, and a PowerPoint presentation.

Three days later, on 8/24/2026, FDNS completed a reorganization that brought IOs throughout the country under more direct control of headquarters. The Unlawful Voter Initiative appears to be the very first action taken by headquarters using the newly reorganized FDNS.

By Tuesday, 8/25/2026, officers were considered trained and ready to begin reviewing data provided by DHS to the officers through USCIS-FDNS HQ. This data contains the personal information of tens or hundreds of thousands of individuals throughout all 50 states, including US citizens. Officers are supposed to review and determine if the information belongs to an "unlawful voter" and were given a quota of at least five subjects to be reviewed per hour. If the officer determines the subject to be an unlawful voter, they are to create a TECS record against them so that they may be subjected to additional scrutiny. Our client understands that the goal is to complete this stage of the Initiative by 9/12/2026.

**Details:** Evidence supporting this statement is provided below. This is not all of the evidence that exists, but it is what the Whistleblower feels can be provided at this time without revealing their identity. Much of the evidence discussed in this statement is sourced to the mandatory training video, along with a transcript that was provided with the video. The creation of the transcript appears to have been automated and there are minor transcription errors with some words, but the transcript accurately reflects what was said in the training video. We have only redacted information that could potentially be used to identify an individual officer as there is extreme fear within FDNS of retaliation for discussing this activity. We are only including details from the transcript that we believe to be indicative of violations of law, gross

Democracy Defenders Fund

mismanagement, and/or abuse of authority.

## 2. ACCESSING STATE VOTER REGISTRATION WEBSITES USING DECEPTIVE INFORMATION

Image 1 shows the mandatory training video provided by USCIS-FDNS HQ, with the URL in the bottom left of the screenshot being the link to the internal FDNS website for this initiative. The transcript for the training video was provided on the right side of the screen with timestamps for the video—which will be referenced throughout this statement:




Image 1 – FDNS Unlawful Voter Surge Training Video

Training Video Transcript:

14:00
But the part that I really want to emphasize for purposes of this surge, it's a lot, but there's information in a table at the bottom part of this sight and it go, it lists every single state available.

14:14
So we have in the column on the far left is obviously the state.

14:22
The next is that link in the state.

14:26
It's a hyperlink to go to their state voter registration or voter site.

Image 2 (below) shows the main page for the Initiative that was referenced in the video. The first state voter registration website that is linked to (Alabama) is shown at the bottom of the screenshot and is also used as an example in the training video (Image 3 and Image 4).



Image 2 - FDNS Unlawful Voter Initiative Internal Website with Link to Alabama State Voter Registration Website

Democracy Defenders Fund




Image 3 - FDNS Unlawful Voter Initiative Internal Website Visible in Training Video (Alabama)

Training Video Transcript:

> 14:56
> So I have Alabama up on the screen.
> 14:58
> If you are assigned to cases, Alabama cases, and you want to search their state registration site, you would need the first name, the last name, and the date of birth of the person as it was entered at their registration.

Democracy Defenders Fund




Image 4 – Alabama Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

As can be seen from both the transcript of the training video and the screenshot of the Alabama Voter Registration website, in order to access the voter information and obtain the voter's information as instructed by the training, an officer must input the name and DOB of the voter as if it were that voter ("confirm *your* registration status….").

Images 5 and 6 (below) show the link to Virginia on the FDNS initiative website. The fact that an attestation is required for Virginia and some other states is highlighted on the FDNS initiative website with ("Attestation"). The link to Virginia's Department of Elections website is visible in the bottom left corner from moving the on-screen cursor over the "Virginia" hyperlink.



Image 5 - FDNS Unlawful Voter Initiative Internal Website Showing Virginia with “(Attestation)” Highlighted



| | | | |
|---|---|---|---|
| Virginia (VA) | First Name; Last Name; Date of Birth; Last 4 of SSN; Locality (Attestation) | Data Source(s): IRIS<br>First Name: Yes<br>Middle Name: No<br>Last Name: Yes<br>Date of Birth: Yes<br>Year of Birth: No<br>Country of Birth: Yes<br>A#: Yes<br>SSN: Yes<br>Address: No<br>Phone #: No<br>Registration Date: No<br>Election Date: No<br>Email: No | |

Image 6 - Close-Up of Virginia State Voter Registration Website Link with “(Attestation)” Highlighted

Image 7 (below) shows the Virginia Department of Elections website linked on the FDNS initiative website. Note that in order to conduct a search on this site, the officer is required to make an attestation certifying and affirming that they are the voter or acting with their express authorization. It also makes clear that it is unlawful to access the information of any other voter.

Democracy Defenders Fund




Image 7 – Virginia State Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website.

What follows is the full text of attestation on Virginia website:

> "I certify and affirm that the information provided to access my voter registration is my own or l am expressly authorized by the voter to access this information. I understand that it is unlawful to access the record of any other voter, punishable as computer fraud under Va. Code § 18.2-152.3."

The two other states in the Initiative internal website with highlighted attestation requirements are Florida and Massachusetts (Image 8, Image 9, Image 10, and Image 11 below).




Image 8 – FDNS Unlawful Voter Initiative Internal Website Showing Florida with "(Attestation)" Highlighted.




Image 9 - Florida State Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

The website makes clear that "This website is intended for use by a registered voter to determine his or her voter registration and voting status."




Image 10 - FDNS Unlawful Voter Initiative Internal Website Showing Massachusetts with "(Attestation)" Highlighted




Image 11 - Massachusetts Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

The website states that "This webpage is intended for use by the individual voter to determine their voter registration status."

Democracy Defenders Fund

While other states may not have an explicit attestation requirement, the wording and nature of their websites make it clear that their use is intended for the registered voter only. California is another example.




Image 12 - FDNS Unlawful Voter Initiative Internal Website Showing Link to California State Voter Registration Website

Democracy Defenders Fund




Image 13 - California State Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

As stated on the website: “To find your record, you will need to enter some personal information. Close your browser when you are done to protect your personal information.” It goes on to say: “In order to find an exact match, your voter registration record must have either a California driver license or identification card (DL/ID) number, or the last four digits of your social security number. For best results, please enter both your DL/ID and last four digits of your social security number.”

In light of these instructions about access to the state websites, officers expressed concerns that accessing registered voter information on these websites may be illegal as officers are essentially misrepresenting themselves as the potential registered voter (with or without a specific attestation).

There is a statement on the FDNS initiative website that “OCC advises that it is permissible for Immigration Services Officers and Immigration Officers to use these state voter websites for purposes of confirming voter registration status as it pertains to an alien’s eligibility for an immigration benefit.” A similar statement is also found in the PowerPoint presentation provided for this initiative (Image 14 below).



Image 14 - FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 12

However, this broad statement appears to conflict with the state law cited in the Virginia state voter registration site's attestation and likely other state laws requiring truthful information when accessing the state’s websites. Moreover, it does not clarify the legal authority used to access state voter registration websites despite this clear and obvious conflict.

As noted, not all state websites call for attestations or possibly even identification as a voter to access information. But because of the nature and pressures put on officers participating in the Initiative and the instructions given by USCIS-FDNS HQ, it is likely the case that no officer who has sought to access information on a state website has been truthful about his or her identity.

The training video said that OCC “advised that it is perfectly OK for IS OS, for adjudicators and for FDNSIOS to use those websites [the “state websites on the ECN site”] to search records,” and provided the links to those sites. (41:53).

Despite this conclusory statement in the training video, requests were made in the last week of August to leadership for details on the legal justification and authority for seemingly violating state law and making false attestations. The response was twofold:

- OCC advised that this type of review is permissible as open-source research when conducted for purposes related to adjudicative or investigative responsibilities.

- IOs and Immigration Services Officers (ISOs) are not personally liable for conducting these searches when done as part of their official duties and properly documented.

Notably, the statement "IOs and ISOs are not personally liable for conducting these searches when done as part of their official duties and properly documented" does not provide adequate legal justification or any authority for conducting these searches. Part of an officer's basic training includes a detailed overview of the legal basis for their authority, so it is not at all improper for an officer to ask for the specific laws that they are relying on to exercise it. However, this statement suggests that there may be legal implications for accessing these websites, but that the officers themselves are simply not personally liable. This leads us to believe that USCIS-FDNS HQ is aware that the activity may be illegal, and yet they are still requiring officers to engage in this illegal activity with promises of personal liability protection.

Stating that these searches are permissible as open-source research for "adjudicative or investigative" purposes relating to voting is a change from the earlier justification that the searches pertain to "an alien's eligibility for an immigration benefit."

This also appears to be inconsistent with USCIS and DHS guidance. The USCIS Rules of Behavior (which uses the same language as found in "Information Technology System Security Program, Sensitive Systems Attachment G Rules of Behavior") states that every USCIS employee must acknowledge and abide by a System Access section that specifically says, "I will not attempt to access systems I am not authorized to access." The next section (Passwords and Other Access Control Measures) specifies "I will not attempt to bypass access control measures." Accessing those state websites is therefore a fundamental violation of the most basic rules of behavior that all employees must acknowledge.

Furthermore, it is also inconsistent with the DHS Rules of Behavior required for accessing other, less sensitive information such as social media posts. For example, page 8 of the publicly available Privacy Policy for Operational Use of Social Media Instruction 110-01-001 states that employees should "Respect individuals' privacy settings and access only information that is publicly available unless the individual whose information the employee seeks to access has given consent to access it." It is inexplicable for private social media information to be afforded more protection than an individual's voter registration information and voting record, especially when sensitive PII is necessary to access the voter information without the individual's knowledge or consent and with the officer falsely attesting to be the registered voter.

## 3. SOURCE, ACCURACY, AND SCOPE OF PII DATA PROVIDED BY DHS TO USCIS-FDNS HQ

Democracy Defenders Fund

There are multiple steps to the Unlawful Voter Initiative: 1) verifying that the data provided by DHS to USCIS-FDNS-HQ matches USCIS holdings; 2) making a determination as to whether or not the identified individual is a U.S. citizen and voted/registered to vote ("lawfully" or "unlawfully" based on when their U.S. citizenship was acquired); and 3) creating a record in TECS to alert any government agency with access to TECS (including HSI) that the subject was identified as a potential unlawful voter.

Training Video Transcript:

> 0:38
> In a nutshell, you're going to review information, specifically voter data and determine if it is a match to USCIS subject data, USCIS holdings, and ultimately if it is, is that person an unlawful voter or not?
> —
> 1:07
> And then ultimately for unlawful voters, you will be creating a TECS record.




Image 15 - FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 8

There are, however, widely known problems with the accuracy of the data provided by DHS to USCIS-FDNS HQ, which manifest in the second and third steps described above. As already documented earlier in this statement, officers are being directed to verify voter registration dates

and voting dates provided by DHS using state voter registration websites. Aside from the legal issues already discussed, officers have noted that sometimes the information provided by DHS to USCIS-FDNS HQ contradicts results from the state voter registration websites; a state voter registration website may show that there is no match to an individual, while the data provided to officers by USCIS-FDNS HQ lists specific voter registration dates and a date on which the subject may have first voted. With such a direct contradiction, knowing the specific source and date of the information is necessary to determine reliability before taking any action.

USCIS-FDNS HQ does not and will not elaborate on the specific sources and dates of data it provides to the officers conducting the review. In the training video and when directly questioned, generalized or canned statements are provided. The problem is further compounded by the fact that explicit instructions were given that the data provided by DHS to USCIS-FDNS HQ should be assumed to be accurate enough to determine that an individual may have voted or registered to vote by a specific date. Yet the training repeatedly points to the inconsistencies in the data, noting that sometimes the voter registration date is provided in the initial data set and sometimes it is not.

Training Video Transcript:

> 7:15
> You might also not have a registration date, but you would find that through other other research and we'll go over some of that in in just a minute.

The training leaves it up to the officer to check whether the person may have voted, again acknowledging that the data is inconsistent:

> 7:50
> So based on what you have available and information you find, did they vote yes or no?
> 7:55
> And if they did vote, you want to enter the earliest election date in the next field.
> 8:02
> Again, this might be a data point provided to you from the source data, and in some cases it might not be.
> 8:10
> You might have only a registration date provided in the source data.
> 8:15
> And when you go on to do some additional research, for example, looking up the subject in a state voter website, you might find an election in addition to a registration date provided in the data.
> 8:33
> Or vice versa, we might get an election date.

The training acknowledges that there is a confusing collection of data from many different sources as well as differences across the states. The training video compares Connecticut to Illinois, as an example. While Connecticut's records provide both the voter's registration date and their earliest election date, Illinois provides only the voter registration date and no election date whatsoever. (16:25-17:20).

The training video transcript then states that the information is coming from multiple sources, and acknowledges incongruities between the systems and the states, and between the states themselves:

> 17:43
> So accurate [*sic*: "Accurint" - see below] and clear [see below] both have voter records available.
> 17:47
> Some states are in both systems, some states are in one or the other, some states are in neither.
> 17:53
> So just know that in addition to the data points provided with your assignment, you also will have an opportunity to look up voter records
> in accurate and clear.
> 18:03
> I would say if like here for Arizona, Arizona isn't in accurate or clear.
> 18:10
> So you probably don't have to waste your time even looking because it's just not a record that is there at this time.

(Note that "accurate" refers to the commercial database Accurint, with the pronunciation similar enough to cause an error in the likely-automated transcription. "Clear" refers to the commercial database Thomson Reuters CLEAR.)

In some states, the only source for voter registration dates or voting dates besides the state voter registration website is DHS data. This is plainly visible on the internal Unlawful Voter Initiative website, with the rightmost column indicating where state voter registration data may also be found besides the state voter registration website (e.g., commercial databases like Accurint or Clear). For example, the training video states that the Social Security number included in the aforementioned Connecticut data comes from Accurint. (16:12). In the case of California, however, there is no such other source (Image 16 and Image 17):

Democracy Defenders Fund

| State | Required to Search Info | Data Provided to FDNS | [illegible] |
|---|---|---|---|
| Alabama (AL) | First Name; Last Name; Date of Birth | [illegible] | [illegible] |
| Alaska (AK) | [illegible] | | [illegible] |
| Arizona (AZ) | [illegible] | [illegible] | |
| Arkansas (AR) | First Name; Last Name; Date of Birth | [illegible] | [illegible] |
| California (CA) | [illegible] | [illegible] | |

Image 16 – FDNS Unlawful Voter Initiative Internal Website Showing Column Headers, Available Data Sources

| | | | |
|---|---|---|---|
| California (CA) | First Name; Last Name; Date of Birth; California Driver's License/Identification Card or Last 4 of SSN | Data Source(s): DHS<br>First Name: Yes<br>Middle Name: Yes<br>Last Name: Yes<br>Date of Birth: Yes<br>Year of Birth: No<br>Country of Birth: Yes<br>A#: No<br>SSN: No from source; Yes from Accurint<br>Address: Yes<br>Phone #: Yes<br>Registration Date: Yes<br>Election Date: Yes (all elections)<br>Email: Yes | |

Image 17 - Close-up of California State Voter Registration Website Link

For California, there is no way to verify the voter registration dates or voting dates in the data provided by DHS without accessing the California state voter registration website, which may not be legal and has been stated by officers to often be inaccessible due to technical errors. Officers are specifically told to rely on the data DHS provided for California and use the voter registration dates and voting dates provided in that data to indicate that the subject may be an unlawful voter and create a TECS record. Throughout the training video, officers are told to do their own research and make their own determinations as to whether an individual may have unlawfully voted or registered to vote. In practice, the officers' determinations must hold the DHS-provided voter registration dates and voting dates to be accurate despite any reasonable concerns or evidence to the contrary.

Training Video Transcript:

18:28

I just want to, I want to really stress how important the source data is.

Democracy Defenders Fund

18:32
So like [REDACTED] mentioning in the third column, the data provided to FDNS.
18:36
So the data sources, it has IRIS.
18:38
If it says IRIS, that means it was received via save.
18:42
If it says DOJDHS or is there an ICE, [REDACTED], that might be an ICE too.
18:47
All of those values, that’s just the, that’s just the agency that passed us the public voter file.
18:54
So these are all still public voter files.
18:56
The data source.
18:56
It doesn't mean that the initial source was DHS.
18:58
It means that that’s how we received the file.
19:00
So, this public voter file for California was passed to us by the department.
19:05
So like that's how we received it.
—
21:56
To illustrate the point, this will be populated with 10s of thousands of actual cases in the very near future.
22:06
And this is what you will access.
22:09
So this is what it will look like.
22:12
And for those of you who just click on the link, there’s just going to be 10s of thousands of records here.
—
26:29
All of these things come in the source data if it’s available, if it’s blank, you know, or if the ECN site says for example the date of birth did was not something provided and you see a date of birth here, then that is possible that was brought in as a supplemental effort through FDNS enhancements.

26:52
So if the ECN site says no date of birth and you see a date of birth that did not come from the source data, that would be applicable to any of these fields that could potentially come in the source data.
27:07
So the reason we have it broken up here, we have a full date of birth and then we have a month and year, and we have a year of birth is because some states provide only a year of birth.
27:18
It'll be a first name, middle name, a last name, and a year of birth only.
27:23
So that's why you'll see so many variations of the date of birth.
27:29
The voter address, some states do provide a voter address that they entered at the time of registration.
—
29:20
We do not get A numbers in source data not so we that is something that's going to be brought in through ***supplemental magic***. (emphasis added).

There may be no better description of the DHS source data, or at least the lack of visibility afforded to us in how it was compiled, than "supplemental magic." In the end, this "supplemental magic" is being relied upon to enter TECS records against people, including U.S. citizens, despite known issues with the source data.

As the Training Video Transcript states:

4:00
Be aware of what is, what information was provided by the source compared to what information you have available, and you're ultimately going to compare those two things and determine is this a subject match?
4:14
Is the voter a match to DHS systems?
—
5:54
We pull in the A number based on USCIS holdings, but in some instances you'll see people have multiple A numbers or for one reason or another, maybe there's an error in the data.
—
8:56
So if the subject, if you determine that the subject is an unlawful voter and you need to

enter a text record, in those instances for all unlawful voters, we're going to be entering text records.

(Note that "text records" in the transcript refer to "TECS records," with the pronunciation similar enough to cause an error in the likely-automated transcription.)

The Whistleblower emphasized that verifying data provided by DHS through USCIS-FDNS HQ is not an objectionable requirement. If the data for an individual is found to be accurate, lawfully using available systems and resources to determine if an alien did in fact vote or register to vote would also not be an objectionable requirement (at least not rising to the level of abuse of authority and/or gross mismanagement). Creating a TECS record on an individual (which is the responsibility of and attributable to an individual officer) would also not be an objectionable requirement, assuming the officer is reasonably certain that the data upon which the record relies is accurate enough that a TECS record is merited. However, it is clear to our client and other DHS employees that the data they are being forced to rely upon is not reliable.

Officers have expressed concerns about the requirement to enter TECS records that would not otherwise be created without the voter registration date and/or voting dates provided in the DHS source data. When explicitly asked if officers could complete the assignment without creating TECS records that rely solely on the DHS source data for voter registration and/or voting dates, officers were told "no" by FDNS leadership. This will have a significant impact on certain states, e.g. California, where voter registration and voting dates were often provided only in the DHS data because of inaccessibility or inconsistency with the California state voter registration website data and the absence of sources such as Accurint or Clear. The result is that a significant number of TECS records, potentially thousands or tens of thousands, will be created against California residents based on data that an officer may have good reason to believe is unreliable or inaccurate without corroboration.

This requires the officer to create a record in TECS under their own name that they may believe to be inaccurate or false due to reasonable reliability concerns with the DHS data. The Whistleblower, given their extensive experience serving in government, believes this rises to the level of gross mismanagement and abuse of authority by USCIS-FDNS HQ, as many of these records are likely being created by officers based on a fear of reprisal and discipline as opposed to confidence in their assessment of the data. From what our client has directly observed in the completed assignments, it appears more California residents than not that were included in the DHS source data have had TECS records created against them. From what our client has directly observed, multiple officers have specifically noted in their comments that the only accessible source for a voter registration date or voting date was the DHS data. Additional accuracy issues with the source data are also described throughout the video, including regarding US citizens which will be expanded on in the next section.

Democracy Defenders Fund

For example, the training video discussed the implications of multiple alien numbers ("A numbers") and Social Security numbers associated with a person:

> 29:32
> And then we have if there's multiple [A] numbers, perhaps consolidated a numbers, multiple related to subjects for whatever reason, you see that in the set column, the [A] number set and it just shows the primary versus what is possibly, you know, multiple [A] numbers for the same person that will help you drive your research.
> 29:55
> This social is the next column.
> 29:57
> If that is available in the data, it will be brought in.
> 30:02
> Generally, you will have this provided it is not provided in the source data generally, but it could be, it perhaps will be in the future, but it is *or* brought in from supplemental, you know, from supplementing the data.
> 30:17
> So you'll likely have a value there when you get these cases.
> 30:22
> And I'll just, sorry, I'll just add that [REDACTED] touched on this, but it's very likely that a lot of these assignments will have multiple and alien numbers and multiple Social Security numbers, right?
> —
> 30:49
> So there's a lot of different criteria here.
> 30:50
> When there are multiple alien number sets in that next column, there could be multiple alien numbers that both relate to the voter or there could be multiple alien numbers that relate to completely different people.
> 31:02
> And what we do is this is a sign because one of those alien numbers might be a non citizen.
> 31:07
> So it's important to check both alien numbers and see whether they relate back to your voter.
> 31:11
> And the same goes for the social.
> 31:13
> When you're reviewing cases, you will see you you will see a lot of cases that have multiple Social Security numbers as well.

31:19
So, you know, they might not both relate to the same person.

And later in the video, the trainer says:

54:45
Social Security numbers, last thing before we move on, they may not be accurate.
54:50
Do not rely solely on the Social Security information.

## 4. U.S. CITIZENS

Officers are required to use the PII of confirmed U.S. citizens in order to access state voter registration websites without their knowledge or consent. This is done to find evidence that a naturalized US citizen may have registered to vote or voted prior to naturalization. If the "supplemental magic" associates someone with an alien number, even if it is outdated because that individual has long since become a citizen, and the reviewing officer confirms there is a match between the subject and the alien number in USCIS databases, they will use the known U.S. citizen's PII in an attempt to find evidence that they registered to vote or voted prior to naturalization. The only way for a U.S. citizen to escape this scrutiny is for the officer to determine that there is not a subject match. It is irrelevant if a subject naturalized decades ago, has no current applications with USCIS, or even if they're deceased. All that matters is that the DHS source data indicates that they are a subject with an alien number that registered to vote or voted.

As the Training Video Transcript states:

10:19
So we have public voter files that people that voted in these states, that raw data includes a lot of U.S.
10:24
citizens.
10:24
So what we did is we took the voters and we tried to match them up against USCIS holdings.
10:30
And then once we match them up against USCIS holdings, we tried to identify whether that CSUSCIS holding is a current citizen.
10:39
But what I'll say is the two biggest determinations that you're going to make is 1, whether the person is a match, right?

Democracy Defenders Fund

10:45
So whether the voter is a match to the USCIS holding and two, whether that USCIS holding is a current alien or whether they're current USCS holding as a citizen.
—
19:16
So the two big elements to our review is 1, reviewing to see whether it's a subject match and two, and we'll stress this throughout the presentation.
19:24
And two, reviewing to see whether the person is [a US] citizen.
19:28
If you're reviewing the voter and you determine that the alien number that's brought in through USCIS holdings is not a subject match to the voter, then you are not, you know, you, you won't be reviewing citizenship, you'll be focusing on just the subject match.
—
19:56
So, you know, review the, the, the, the information you're reviewing is the voter source data and not the USCS holdings that we bring in.
20:03
*So* even if that [A] number is an alien, you wouldn't be marking that it's not a citizen because it doesn't correspond to the voter source data, which is always the most important data.
—
32:14
So starting with subject match, you will fill that in and when you sorry, it's not it's not working at the moment, but you will have a yes or no option
here to select.
32:30
If you select yes, you will continue through the form.
32:33
If you do not have a subject match, you will select no and then you can move.
32:41
You can move to the comments, which is the very last field and just say why it was not a subject match and move on to your next assignment.
32:53
USC.
32:54
This is how the subject match will work as well.
32:57
So it's a yes or no.
32:59

> So if you have a subject match, you now move to the are they [a US] citizen, yes or no?
> 33:06
> If yes, you know you look at when that occurred pre or post restoring election and make that determination.

Again, FDNS requires that the DHS-provided voter registration date and/or voting date in the source data must be considered accurate. An officer would therefore be required to create a TECS record against a known U.S. citizen if the voter registration date and/or voting date provided in the DHS data predates their confirmed naturalization date, even if an officer reasonably believes that the DHS source data is not reliable enough to justify creating a TECS record. In other words, the current process is knowingly sweeping known US citizens in as potentially "unlawful voters."

## 5. ADDITIONAL CONSIDERATIONS




Image 18-FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 15

USCIS-FDNS HQ also acknowledges that there are U.S. citizens included in this data and references using Social Security Administration and Department of State data for assessing possible U.S. citizens. They also specifically state that U.S. citizens with petitioning spouses can have their Social Security Numbers inaccurately linked to their alien spouses. Officers, however, were instructed that the petitioning U.S. citizen spouses were "likely entitled to vote."

Democracy Defenders Fund

Training Video Transcript:

36:30

OK, I'm just going to, I'm going to state a couple of things really quick.

36:34

So first, there will be U.S.

36:37

citizens in this population.

36:39

So we've done the best we can.

36:41

We're going to talk about, you know, how we, the review process at the end, but like, unfortunately, we're relying on the data we have available.

36:48

We have taken it and bet and done batch, batch queries against Social Security Administration and Department of State for US passports.

36:55

But the way that, the way that the systems work, it's not perfect.

37:00

So during your reviews, you will identify U.S.

37:02

citizens.

37:03

So I just want to throw that out there.

37:04

My apologies.

37:05

You know, thank you.

37:06

We're, we're still, we're just doing the best we can.

—

55:41

One thing we've seen is that sometimes USC petitioning spouses, their socials are linked to their alien spouse.

55:53

So one thing to keep in mind is that as you search the social and and for example, PCIS, it might be returned to like an alien that I'm for sure the alien spouse.

56:03

But in reality, the social belongs to the petitioning spouse, who is the US citizen who was likely entitled to vote.

56:10
So that's just something to keep in mind.

As USCIS-FDNS HQ has acknowledged, it can be very difficult to determine if a subject is a U.S. citizen or not. They may be natural-born citizens and have no interactions with the federal government that can be easily queried (passports, cross-border travel, etc.), or they may have derived citizenship automatically even if they are not considered natural born. There is no single, clear data source to confirm that a subject is a U.S. citizen. In many cases, the only proof of U.S. citizenship for a person may be held in local or county birth records.

The last approximately 50 minutes of the hour-and-45-minute training video is specifically about derivative citizenship and complex scenarios, mentioned here to illustrate the potential complexity and difficulty in determining if someone is a U.S. citizen.

Here’s one example from the Training Video Transcript:

54:20
And if they obtain their permanent residence as a minor look, you know, consider the derivative elements of that.
54:29
I’m not going to go into that right more because right now because the whole, you know, next section is on the Child Citizenship Act and we're going to go over the derivative part of this a bit.
—
56:35
But one thing we have found that the most complicated part or the most challenging part, these are pretty straightforward reviews.
56:43
And but the challenging, the most challenging ones we have seen are when they relate to people who have potentially derive citizenship.

Below is a case example that was discussed in the video.

Democracy Defenders Fund




Image 19 - FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 34

Training Video Transcript:

1:23:53
And for our last example, this particular one is an instance when we talked about having multiple alien numbers or Social Security numbers associated in the systems.
1:24:08
What we were looking at for the particular this particular provided data was the voter name and the voter data was not a complete or exact match.
1:24:21
The DOB information provided only included a year.
1:24:26
[REDACTED] talked about in some instances you may have month and year, full date of birth and some of the other provided data it may only be the year.
1:24:35
This particular example, the year was also off by one year in terms of the partial name hit.
1:24:44
So first name was a match, last name was a match.
1:24:47
There was a little bit of a difference in terms of the formatting.
1:24:51

It was as if the surname had been combined together, but there also was a middle initial provided that middle initial could not be associated to the individual in our systems.
1:25:04
And then the other piece that we're looking at within the data is the address provided.
1:25:09
So the voter information, voter roll provided address when you're looking at our systems, is that an address that has been used on another USCIS
filing.
1:25:22
Can we, if not within our systems, can we associate that that that address to the individual using one of our commercial databases?
1:25:32
Clear, accurate, those are all things that as you're reviewing, you'll be sort of looking at in this instance that could not be associated when *you* do a little bit further dive into the two Social Security numbers provided.
1:25:49
One of those Social Security numbers in clear in this particular instance was associated to one individual.
1:25:58
The other Social Security number was actually and clear then associated to the actual voter.
1:26:06
It did require a little bit more of a deep dive in that we, you know, taking a closer look at the other Social Security number provided searches then showed an ACRQ record for [a US] passport issuance.
1:26:22
The other individual had naturalized it was prior to that voting date.
1:26:27
This one just allowed us to then determine, you know, it wasn't a match.
1:26:31
But because of the close similarities, the cross of the two Social Security numbers, the name, it required just a little bit more searching of that other Social Security number to determine if it was a match, if the individual voted and also, you know, were they a citizen prior to voting.
1:26:53
So these examples you'll see sort of common in terms of maybe being associated to more than one alien number, Social Security number.

Officers are expected to complete at *minimum* 40 subject reviews a day, or 5-6 per hour for 8 hours. This means that officers are expected to take no more than 12 minutes to determine if a

subject is a U.S. citizen or not, determine if they are to be considered an "unlawful voter," and enter a TECS record against them before moving on to the next subject. Officers are reminded that FDNS leadership is tracking their output and will question why they are not meeting quotas.

**CLOSING STATEMENT**

Anyone reading this account from our client could find themselves (or elements of their identity) linked in the DHS data through "supplemental magic." If so, will a federal officer use their identity to access their private voter records? Will the officer decide their identity to be that of a U.S. citizen and "lawful voter" within the allotted 12 minutes? Or will they be labeled an "unlawful voter" before the officer proceeds to the next person to meet their quota?

These are critical questions that our client believes must be presented to the American public.

# EXHIBIT I

# NVRA List Maintenance Guidance

## Voter Registration List Maintenance: Guidance under Section 8 of the National Voter Registration Act, 52 U.S.C. § 20507

Published September 2024

Federal law imposes important limits on the rules and procedures States may adopt regarding their voter registration lists. The National Voter Registration Act of 1993 (also known as the "NVRA" or "motor voter law"), for one, sets forth certain voter registration requirements for federal elections. Section 8 of the NVRA, 52 U.S.C. § 20507, addresses the administration of voter registration by States and requires procedures to maintain accurate and current voter registration lists. These requirements govern, among other issues:

- The date by which valid voter registration applications must be accepted and eligible persons registered,
- Changes in a registrant's address information,
- Limits on removal of names from the voter registration list, and
- Administration of a uniform, nondiscriminatory voter registration list maintenance program that complies with the Voting Rights Act (VRA").[footnote 1]

This guidance addresses one aspect of maintaining a voter registration list: when and how jurisdictions may remove voters from their voter lists. This guidance does not impose legal obligations and is not intended to be comprehensive. Rather, it is intended only to aid jurisdictions as they comply with existing obligations under Section 8 in three areas:

- List Maintenance
- Restrictions on List Maintenance
- Special Rules for Changes of Address

# List Maintenance

Section 8(a)(4) of the NVRA sets forth steps that States must follow concerning general voter registration list maintenance programs that make a reasonable effort to remove from the voter rolls people who are ineligible by reason of death or change in residence to a location outside the jurisdiction. A State's voter registration list maintenance program must comply with procedures in the NVRA.

To conduct a general program that makes a reasonable effort to remove voters who are ineligible due to a change in residence, States can follow the "safe harbor" procedure in Section 8(c)(1) of the NVRA. That procedure allows use of change-of-address information supplied by the United States Postal Service through its National Change of Address program (NCOA) to identify registrants who may have changed residences. Once a State has identified such individuals, it may take one of two actions:

1. If the NCOA information indicates that the person has moved to a different residence in the same registrar's jurisdiction, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid, pre-addressed return form the registrant can use to verify or correct the address information; or
2. If the NCOA information indicates that the registrant has moved to a residence outside the registrar's jurisdiction, the registrar may remove the registrant from the voter rolls after satisfying all requirements of the Section 8(d) notice process described below.

States do not have to use the NCOA process. They have discretion under the NVRA in designing their general program, subject to the limitations described below.

# Restrictions on List Maintenance

The NVRA also limits whether, when, and how a State can remove a person's name from the rolls. States can remove the name of a person from the voter registration rolls when the registrant requests it, and, if State law so provides, for mental incapacity or criminal conviction. States can also remove ineligible persons from the voter rolls because the person has died or changed their residence to a place outside the jurisdiction. Finally, States can remove people who were ineligible or improperly registered in the first instance.

## Removal at the Request of the Registrant

A "removal at the request of the registrant" under the NVRA requires first-hand action by a registrant: (1) asking to remove their name from the voting registration list; (2) completing and returning a notice card indicating an address change outside the jurisdiction; or (3) submitting a new application registering to vote a second time in a new jurisdiction and providing information

regarding the registrant's prior voter registration address on the new application, which the State can treat as a request to cancel or transfer their prior registration.

**Information submitted by a third party does not constitute a "removal at the request of the registrant."** When a registrant provides notice of a new address within the same jurisdiction, or registers to vote a second time at a new address within the same jurisdiction, the State should update the original registration, rather than cancel it.

## Discrimination, Intimidation, Threats, and Coercion

Under Section 8(b) of the NVRA, a State's list maintenance program must be uniform, nondiscriminatory, and consistent with the VRA. Section 2 of the VRA, 52 U.S.C. § 10301, prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in a language minority group. Section 11(b) of the VRA, 52 U.S.C. § 10307(b), also prohibits any conduct that attempts to, or actually would, intimidate, threaten, or coerce a reasonable voter.

Examples of list maintenance activities that may violate the NVRA include comparing voter files to outdated or inaccurate records or databases, taking action that erroneously affects a particular class of voters (such as newly naturalized citizens), or matching records based solely on first name, last name, and date of birth. **The prohibitions of the NVRA extend to any list maintenance activity based on third-party submissions.**

## The 90-Day Quiet Period Before Federal Elections

The NVRA limits when States can conduct a general list maintenance program. Under Section 8(c)(2), **States must complete any program that systematically removes the names of ineligible voters from the official list of eligible voters no later than 90 days before a primary election or general election for federal office.** In other words, once an election for federal office is less than 90 days away, processing and removals based on systematic list maintenance must cease. And, if a State's federal primary election occurs less than 90 days before a federal general election, the State must complete any systematic-removal program based on change of address for the federal election cycle no later than 90 days prior to the federal primary election: no further systemic activity may take place between the primary and general elections.

This 90-day deadline applies to State list maintenance verification activities such as general mailings and door-to-door canvasses. **This deadline also applies to list maintenance programs based on third-party challenges derived from any large, computerized data-matching process.** However, the 90-day deadline does not preclude removal of a registrant's name at the request of that registrant, removal due to the death of the registrant, or removal due to a criminal conviction or mental incapacity of the registrant as provided by State law, nor does the deadline preclude the correction of a registrant's information. 52 U.S.C. § 20507(c)(2)(B).

# Special Rules for Changes of Address

Section 8(b) of the NVRA prohibits removing registrants from the voter registration list solely because of a failure to vote. However, States may **initiate** the process of determining whether a voter has changed residence to outside of the jurisdiction based on information showing that a voter has not voted in elections nor communicated with a registrar over an extended period.

Section 8(d) of the NVRA prescribes additional rules for a State seeking to remove a person from the voting rolls based on a change of residence, regardless of the voters' participation in prior elections. Specifically, a State may remove a person from the voter registration list due to a change in residence *only* in one of two circumstances: upon (1) the person's written confirmation of a change in residence to a place outside the jurisdiction, or (2) completion of the notice-and-waiting process described in Section 8(d)(2).

Confirmation in writing means confirmation by the voter, such as a notice card completed and returned by the voter. **A third-party submission — such as a submission of another individual's information via an online portal or a challenge based solely on public database information — is *not* confirmation by the registrant of a change of address.** In the absence of a written confirmation from a registrant of a change of address outside the jurisdiction, Section 8(d) of the NVRA sets forth a process for removing a person based on a change of residence. 52 U.S.C. § 20507(d)(2). This process requires sending a forwardable notice, in the form of a postage-prepaid and pre-addressed return card, on which the person may state their current address. The notice must include the language required by Section 8(d)(2) of the NVRA. If the registrant did not change their residence, or changed residence but remained in the registrar's jurisdiction, the notice must advise that:

1. The registrant should complete and return the card no later than the voter registration deadline for the next election;
2. If the card is not returned, the registrant may need to affirm or confirm their address before being permitted to vote in a federal election from the date of the notice to the day after the second general election for Federal office that occurs after the date of the notice; and
3. If the registrant does not vote in an election during that period, the registrant's name will be removed from the list of eligible voters.

*Id.* § 20507(d)(2)(A). If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, the notice must provide information concerning how the registrant can continue to be eligible to vote. *Id.* § 20507(d)(2)(B).

Any political subdivision covered by Section 203 of the VRA, 52 U.S.C. § 10503, must provide such notices in the language of the applicable minority group as well as in English, unless the language of the applicable minority group is oral or unwritten (or in the case of Alaska natives and American Indians, if the predominant language is historically unwritten). *See id.* § 10503(c).

The jurisdiction may designate the registrant as inactive if the registrant fails to return the card by the voter registration deadline for the next election after the notice is sent.

The jurisdiction may remove the registrant from the voter rolls after sending the notice *only* in one of two circumstances. First, if the registrant confirms in writing, such as by completing and returning the notice card, that the registrant has changed residence to a place outside the jurisdiction, then the registrant can be removed from the list immediately. Second, if the registrant fails to respond to the notice and fails to vote or to appear to vote in an election from the date the notice is sent to the day after the second federal general election after the notice is sent, then the registrant can be removed from the list after that second federal general election.

Section 8(f) of the NVRA establishes that if a voter changes address to another address within the registrar's same jurisdiction, the registrar must update the voter's registration to reflect the new address, and the voter may not be removed based on this change, except as otherwise provided in Section 8(d). A "registrar's jurisdiction" in this context means (1) an incorporated city, town, borough, or other form of municipality; or (2) a geographic area larger than a municipality or a geographic area of consolidated municipalities, if voter registration is maintained by such larger units of government.

For more information, please consult the Department's NVRA Questions and Answers at https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.

[footnote 1] The NVRA applies to 44 States and the District of Columbia. Six States (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming) are exempt from the NVRA because, on and after August 1, 1994, they either had no voter-registration requirements or had election-day voter registration at polling places with respect to elections for federal office. Likewise, the territories are not covered by the NVRA (Puerto Rico, Guam, Virgin Islands, American Samoa). While the NVRA applies to elections for federal office, most States have extended its procedures to all elections.

*Updated September 18, 2024*

950 Pennsylvania Avenue NW

Office of the Assistant Attorney General,

Main

Washington DC 20530

Civil Rights Division

202-514-3847

TTY/TDD: 711