Aseem Mulji (SBN 330354)
amulji@campaignlegalcenter.org
Anna Baldwin* (DC Bar No. 998713)
abaldwin@campaignlegalcenter.org
Sejal Jhaveri* (DC Bar No. 90043488)
sjhaveri@campaignlegalcenter.org
Daniel S. Lenz* (WI Bar No. 1082058)
dlenz@campaignlegalcenter.org
David Kronig* (DC Bar No. 1030649)
dkronig@campaignlegalcenter.org
William Hancock* (DC Bar No. 90002204)
whancock@campaignlegalcenter.org
Heather Szilagyi* (DC Bar No. 90006787)
hszilagyi@campaignlegalcenter.org
Robyn K. Bitner* (DC Bar No. 1617036)
rbitner@campaignlegalcenter.org
**CAMPAIGN LEGAL CENTER**
1333 New Hampshire Ave. NW, Ste. 300
Washington, DC 20036
(202) 736-2200

Norman L. Eisen* (DC Bar No. 435051)
norman@democracydefenders.org
Tianna Mays* (DC Bar No. 21597)
tianna@democracydefenders.org
Pooja Chaudhuri** (SBN 314847)
pooja@democracydefenders.org
Jacki Anderson* (DC Bar No. 1531821)
jacki@democracydefenders.org
Beauregard Patterson* (WI Bar No. 1102842)
beauregard@democracrydefenders.org
Jacob Kovacs-Goodman* (DC Bar No. 90032363)
jacob@democracydefenders.org
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Ave. SE #15180
Washington, DC 20003
(202) 601-8678

*Additional counsel on next page*

Kristen M. Clarke* (DC Bar No. 973885)
kclarke@naacpnet.org
Anthony P. Ashton* (MD Bar No. 25220)
aashton@naacpnet.org
Olivia N. Sedwick* (DC Bar No. 1600928)
osedwick@naacpnet.org
**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
4805 Mt. Hope Drive
Baltimore, MD 21215
(410) 580-5777

Jonah Lalas (SBN 286755)
jlalas@altber.com
**ALTSHULER BERZON LLP**
350 W. Colorado Blvd.
Pasadena, CA 91105
(323) 963-8693

Stacey M. Leyton (SBN 203827)
sleyton@altber.com
Danielle Leonard (SBN 218201)
dleonard@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

*Counsel for Proposed Intervenor-Defendants*
*League of United Latin American Citizens;*
*NAACP; NAACP California/Hawaii State Conference;*
*NAACP Los Angeles Branch*

**Pro hac vice application forthcoming*
***Admission application forthcoming*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>STATE OF CALIFORNIA; SHIRLEY WEBER, in her official capacity as the Secretary of State of California; and DEAN LOGAN, in his official capacity as Los Angeles County Registrar-Recorder,<br>*Defendants*. | Case No. 2:26-cv-12025<br><br>**LEAGUE OF UNITED LATIN AMERICAN CITIZENS; NAACP; NAACP CALIFORNIA/HAWAII STATE CONFERENCE; AND NAACP LOS ANGELES BRANCH'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE UNITED STATES'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>Date: Not Set<br>Time: Not Set<br>Courtroom: Not Yet Assigned<br>Judge: Not Yet Assigned |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ vi

INTRODUCTION ........ 1

BACKGROUND ........ 1

- A. Federal Overreach in Election Administration ........ 1
- B. California's Election Procedures ........ 2
- C. The Federal Government's Correspondence with California Election Officials ........ 3
- D. Proceedings in this Court ........ 5

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

- I. The Federal Government has no chance of success on the merits ........ 7
  - A. USDOJ has no cause of action, standing, or procedural basis for civil relief. ........ 7
  - B. Section 611's individual criminal prohibition does not preempt California's election administration laws or permit injunctive relief that violates the National Voter Registration Act and Help America Vote Act. ........ 11
  - C. The Federal Government's demand is contrary to federal voter protections. ........ 15
- II. The Federal Government cannot show irreparable harm. ........ 16
  - A. The Federal Government has not provided any credible evidence that the list it provided to California includes noncitizens. ........ 17

B. The Federal Government's allegations of noncitizen voting have repeatedly been found unreliable. .......... 20
III. The balance of equities requires denial of the Federal Government's Motion. .......... 21
IV. The public interest requires denial of the Federal Government's Motion. .......... 22
CONCLUSION .......... 23
CERTIFICATE OF COMPLIANCE .......... 26

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Aldabe v. Aldabe*, 616 F.2d 1089 (9th Cir. 1980) ........ 9

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........ 16, 17

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ........ 11

*Arizona v. United States*, 567 U.S. 387 (2012) ........ 11

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ........ 7

*Ass'n of Community Organizations for Reform Now v. Edgar*, 56 F.3d 791 (7th Cir. 1995) ........ 1

*Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016) ........ 22

*Botany Worsted Mills v. United States*, 278 U.S. 282 (1929) ........ 9

*Burdick v. Takushi*, 504 U.S. 428 (1992) ........ 23

*Bush v. Gore*, 531 U.S. 98 (2000) ........ 16

*California v. Sierra Club*, 451 U.S. 287 (1981) ........ 9, 10

*Castillo v. Barr*, 449 F. Supp. 3d 915 (C.D. Cal. 2020) ........ 6

*Common Cause v. United States Department of Justice*, No. CV 26-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ........ 2, 21

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ........ 11

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024) ........ 14

*Federal Trade Commission v. Consumer Defense, LLC*, 926 F.3d 1208 (9th Cir. 2019) ........ 6

*Federal Trade Commission v. Lead Express, Inc.*, No. 2:20-cv-840, 2020 WL 2615685 (D. Nev. May 19, 2020) ........ 6

*Foster v. Love*, 522 U.S. 67 (1997) ........ 11

*Frazier v. Callicutt*, 383 F. Supp. 15 (N.D. Miss. 1974) ........ 16

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) .... 1
*La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022) .... 8
*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) .... 22
*League of United Latin American Citizens v. Executive Office of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025) (*LULAC I*) .... 2
*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .... 1, 22
*Merrill v. Milligan*, 142 S. Ct. 879 (2022) .... 22
*Mi Familia Vota v. Fontes*, 111 F.4th 976 (9th Cir. 2024) .... 21
*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) .... 14, 16
*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981) .... 10
*Moore v. Harper*, 600 U.S. 1 (2023) .... 12, 13
*Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) .... 10
*Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) .... 13
*National Wildlife Federation v. National Marine Fisheries Service*, 886 F.3d 803 (9th Cir. 2018) .... 16
*Norwood v. Harrison*, 413 U.S. 455 (1973) .... 10
*Novedades Y Servicios, Inc. v. Fin. Crimes Enforcement Network*, 181 F.4th 961 (9th Cir. 2026) .... 23
*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) .... 22
*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005) .... 22
*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*, 996 F.3d 257 (4th Cir. 2021) .... 21
*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .... 22

*Republican National Committee v. Democratic National Committee*, 589 U.S. 423 (2020) .......... 21
*Saffar v. Jenkins*, No. 2:23-cv-04544, 2023 WL 5505980 (C.D. Cal. July 18, 2023) .......... 15
*Shivelhood v. Davis*, 336 F. Supp. 1111 (D. Vt. 1971) .......... 16
*Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) .......... 10
*United States v. Hobbs*, No. C25-6078-KKE, 2026 WL 2833713 (W.D. Wash. Sep. 22, 2026) .......... 2
*United States v. Jalas*, 409 F.2d 358 (7th Cir. 1969) .......... 8
*United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026) .......... 14
*United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024) .......... 8
*United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 18,21
*Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026) .......... 2
*Watson v. Republican National Committee*, 609 U.S. 672 (2026) .......... 9, 11, 12
*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .......... 7
*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .......... 6, 7, 20

**Statutes**

8 U.S.C. § 1227(6)(A) .......... 9
18 U.S.C. § 611(a) .......... 10
18 U.S.C. § 1963 .......... 9
18 U.S.C. § 1964(a)-(b) .......... 9
52 U.S.C. § 10101(a)(2)(A) .......... 15
52 U.S.C. § 10101(e) .......... 9
52 U.S.C. § 10302 .......... 9
52 U.S.C. § 10307(a) .......... 16

52 U.S.C. § 10308(d) .......... 7
52 U.S.C. § 10504 .......... 7
52 U.S.C. § 20307(a) .......... 7
52 U.S.C. § 20507(a)(4) .......... 13, 14
52 U.S.C. § 20507(c)-(d) .......... 13
52 U.S.C. § 20507(c)(2)(A) .......... 14
52 U.S.C. § 20508(b)(2) .......... 2
52 U.S.C. § 20508(b)(2)(A)-(B) .......... 12
52 U.S.C. § 20509 .......... 13
52 U.S.C. § 20510(d) .......... 7
52 U.S.C. § 21083(a)(1)(A) .......... 13-14
52 U.S.C. § 21083(a)(2) .......... 13-14
52 U.S.C. § 21083(a)(2)(A)(i) .......... 14
52 U.S.C. § 21083(b)(4)(A)(i) .......... 12
52 U.S.C. § 21085 .......... 13-14
52 U.S.C. § 21111 .......... 7

**Constitutional Provisions**

Cal. Const. art. II, § 2 .......... 2
U.S. Const. art. I, § 4 .......... 8
U.S. Const. art. I, § 4, cl. 1 .......... 11
U.S. Const. art. I, § 8, cl. 4 .......... 12
U.S. Const. art. VI, cl. 2 .......... 11

**Codes**

Cal. Code Regs. tit. 2, § 20879 .......... 3
Cal. Elec. Code § 2000 .......... 2
Cal. Elec. Code § 2101 .......... 12

Cal. Elec. Code § 2111 .......... 2, 12
Cal. Elec. Code § 2119(a) .......... 2
Cal. Elec. Code § 2150 .......... 2
Cal. Elec. Code § 2150(a)(1) .......... 12
Cal. Elec. Code § 2194(b)(1) .......... 4
Cal. Elec. Code § 2200 *et seq*. .......... 2
Cal. Elec. Code § 2201(a)(8) .......... 2
Cal. Elec. Code § 2213 .......... 3
Cal. Elec. Code § 3000.5 .......... 3
Cal. Elec. Code § 3001 .......... 3
Cal. Elec. Code § 3003 .......... 3
Cal. Elec. Code § 3011 .......... 3
Cal. Elec. Code § 3019 .......... 3
Cal. Elec. Code § 3019(d) .......... 3
Cal. Elec. Code § 3020 .......... 3
Cal. Elec. Code § 15101 .......... 3
Cal. Elec. Code § 15105 .......... 3
Cal. Elec. Code § 15106 .......... 3
Cal. Gov't Code § 7924.000(b)-(c) .......... 4

**Other Authorities**

Department of Homeland Security, Privacy Threshold Analysis for the SAVE Program (approved Sep. 11, 2025), https://perma.cc/A44N-4729 .......... 21
Letter from Senator Padilla & Senator Schumer, to DHS Leadership (Sep. 13, 2026), https://perma.cc/22SY-U5T6 .......... 21

News Release, Los Angeles County Registrar-Recorder/County Clerk, Statement from Dean Logan Regarding U.S. Department of Justice Correspondence (Oct. 14, 2026), https://perma.cc/N6RA-VD8V ........ 5

Press Release, California Secretary of State, California Secretary of State Shirley N. Weber, Ph.D., Issues Statement in Response to U.S. Department of Justice Letter (Oct. 14, 2026), https://perma.cc/77RK-AT33 ........ 5

Press Release, Department of Homeland Security, DHS Secretary Markwayne Mullin Sends Letters to Secretaries of State Warning About Non-Citizens on Voter Rolls (July 17, 2026), https://perma.cc/C5KH-B83G ........ 20

Sam Levin & Sam Levine, *DoJ charges 28 green card holders in California over alleged voter fraud*, The Guardian (Oct. 19, 2026), https://perma.cc/96P6-DUVN ........ 15

Sam Levine, *Nearly 200 people wrongly identified on Nevada's voter rolls as non-citizens*, The Guardian (Sep. 25, 2026), https://perma.cc/9VUK-LWWP ........ 20

Tierney Sneed, *Trump admin files 'long shot' lawsuit after California wouldn't open a thumb drive of alleged non-citizens*, CNN (Oct. 15, 2026), https://www.cnn.com/2026/10/15/politics/trump-doj-sues-california-non-citizens-voting ........ 20

## INTRODUCTION

Nineteen days before Election Day, the United States Department of Justice (USDOJ) filed suit to indefinitely prevent the counting of more than 20,000 ballots from registered California voters until their citizenship has been verified to USDOJ's satisfaction, trying to inject chaos into an ongoing election. But neither the Federal Government's immigration authority nor its extremely limited elections authority grant it the power to use a federal criminal statute governing the conduct of individual voters—18 U.S.C. § 611—to seek injunctive remedies against California's elections officials. Moreover, the Federal Government's requested relief would create "a substantial risk that citizens will be disenfranchised in the present federal election cycle," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and would violate federal civil rights laws. The Federal Government's preemption theory boils down to a claim that the executive has the power to command any action it sees fit—and sue to enforce that command—so long as it can somehow link it to the purpose of a federal statute. That theory ignores not only our federal structure of government but also Congress's to shape *how* it accomplishes its purposes. The Federal Government has no chance of success on the merits, no evidence of irreparable harm, no ability to overcome the balance of equities tipping strongly in voters' favor, and no public interest in the commission of unlawful government action. The Court should deny the extraordinary request for any temporary restraining order or preliminary relief.

## BACKGROUND

### A. Federal Overreach in Election Administration

Article I, Section 4 of the Constitution vests primary responsibility for administering elections to the states. *Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012); *Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995).

Congress may also regulate the conduct of federal elections, but the Constitution does not grant "any authority over federal election administration to the President or the Executive Branch." *Washington v. Trump*, 814 F. Supp. 3d 1173, 1214 (W.D. Wash. 2026). That the executive branch would have the power to regulate elections "does not appear to have crossed the Framers' minds." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025) (*LULAC I*). Courts have overwhelmingly rejected the Federal Government's recent efforts to exceed its authority. *See, e.g.*, *Common Cause v. U.S. Dep't of Just.*, No. CV 26-1352, 2026 WL 3033772, at *36 (D.D.C. Oct. 9, 2026) (vacating USDOJ's policy of obtaining and sharing voter lists); *United States v. Hobbs*, No. C25-6078-KKE, 2026 WL 2833713, at *1 n.3 (W.D. Wash. Sep. 22, 2026) (listing cases in which courts have dismissed USDOJ's efforts to compel states to produce unredacted voter lists). This latest attempt to compel California to violate state and federal law is part of that pattern.

**B. California's Election Procedures**

The California Constitution establishes three qualifications for voter eligibility: adult age, California residency, and U.S. citizenship. *See* Cal. Const. art. II, § 2. To vote, a person must meet those qualifications and register. Cal. Elec. Code § 2000. The registration deadline is fourteen days before the relevant election. *Id.* § 2119(a). To register, voters must submit an affidavit signed under penalty of perjury. *Id.* § 2150. Attesting to U.S. citizenship under penalty of perjury is proof of citizenship. *Id.* § 2111. No further verification is required under federal law. *See* 52 U.S.C. § 20508(b)(2) (requirements for a mail voter registration form). California also has a defined framework of list maintenance procedures. *See generally* Cal. Elec. Code § 2200 *et seq.* Elections officials are required to cancel voters' registrations if they subsequently receive "proof that the person is otherwise ineligible." *Id.* § 2201(a)(8). And there are

judicial procedures to compel officials to cancel the registration of an ineligible voter. *Id.* § 2213.

All registered California voters are entitled to vote by mail. Cal. Elec. Code § 3003. Elections officials begin sending mail ballots 29 days prior to Election Day. *Id.* §§ 3000.5, 3001. To cast that ballot, voters must complete a declaration on the identification envelope of their ballot affirming, under penalty of perjury, that they reside in the precinct where they are voting and are the voter whose name appears on the envelope. *Id.* § 3011. A mail ballot is timely returned if it is received by election officials on Election Day or if it was verifiably sent by Election Day and received by elections officials within seven days of Election Day. *Id.* § 3020.

Elections officials may begin counting mail ballots as early as 29 days prior to Election Day. Cal. Elec. Code § 15101. Once a mail ballot is received, officials must ensure that the signature on the identification envelope matches a signature in the registration file. *Id.* § 3019. During this processing, observers and precinct officials may challenge the voter's eligibility or other issues with their mail ballot. *Id.* § 15105; *see also* Cal. Code Regs. tit. 2, § 20879. These challenges are subject to a burden of "extraordinary proof." Cal. Elec. Code § 15106. If no challenges are sustained and the signature on the envelope compares to a voter's registration file, the mail ballot is placed in a ballot container for counting. *Id.* § 3019(d).

### C. The Federal Government's Correspondence with California Election Officials

On July 16, 2026, the Secretary of the Department of Homeland Security (DHS), Markwayne Mullin, sent a letter to Shirley N. Weber, the California Secretary of State. Compl. ¶ 3, ECF No. 1; Ex. A, ECF No. 1-1. Secretary Mullin's letter claimed that "results of a recent analysis of California's publicly available voter registration database

information" indicated that there "there *may be* as many as 190,832 non-citizens registered to vote in California." Ex. A (emphasis added). The letter continued, "[a]s an example, we found 81,336 California registrants for whom the name, date of birth, address[,] and Social Security number match a non-citizen in our files."[1] *Id.* Secretary Mullin did not explain DHS's methodology or sources for its comparison. *Id.*

Secretary Weber responded on July 23, 2026, explaining that "California's election officials work every day to maintain accurate voter rolls and ensure that only eligible voters are registered" and highlighting "serious doubts" about DHS's data. Compl. ¶ 3; Ex. B, ECF No. 1-2. Secretary Weber noted that Secretary Mullin's letter "provide[d] no detail whatsoever that my office can use to evaluate the veracity of your allegations" and requested more information. *Id.* Secretary Weber also referenced the National Voter Registration Act's (NVRA) 90-day moratorium on systematic removals. *Id.*

The Federal Government failed to respond until October 13, 2026, when USDOJ sent a letter to Secretary Weber informing her that DOJ provided a thumb drive to the Los Angeles County Registrar-Recorder/County Clerk containing a list of "over 20,000" individuals whom the U.S. Citizenship and Immigration Services (USCIS) and Homeland Security Investigations (HSI) "believe are noncitizens registered to participate in the federal election in California." Compl. ¶ 47; Ex. C, ECF No. 1-3. USDOJ demanded that she review the thumb drive (which they had not provided to the State) "within 48 hours to determine whether any citizens are listed." Compl. ¶ 47; Ex. D, ECF No. 1-4. USDOJ demanded that, for "individuals whom you cannot

[1] The Federal Government does not explain how DHS can compare Social Security numbers (SSNs), which are confidential under California law. Cal. Elec. Code § 2194(b)(1); Cal. Gov't Code § 7924.000(b)-(c); *but see* Decl. of Nicolas Bartell ¶ 16, ECF No. 22-4 (Bartell Decl.) (indicating USCIS receives voter information with SSNs).

independently confirm citizenship status," Secretary Weber segregate any vote-by-mail ballots already received or "take all immediate and reasonable steps to not provide a ballot to those individuals until we confirm their citizenship status" and confirm the same by contacting DHS by noon EST on October 15. Ex. D. The Los Angeles County Registrar-Recorder/County Clerk Dean C. Logan publicly announced that he had received those records, "along with a handwritten note providing a password," but was not able to access them due to "established data privacy and information security protocols."[2] Secretary Weber responded that USDOJ and DHS's methodology was still unclear and that "California has robust state law requirements that only U.S. citizens can register to vote."[3]

On October 16, 2026, USDOJ sent a letter to the Los Angeles County Counsel's Office, threatening local election officials with potential criminal charges as "aiders and abettors" for "knowingly tabulat[ing] ballots cast by individuals identified by federal agencies as noncitizens." App. A at 1. It asserted that 18 U.S.C. § 611(a), which makes it a federal crime for noncitizens to vote, "does not excuse unlawful voting simply because a State employs a permissive registration method." *Id.* at 2. USDOJ ended its letter stating that the County's actions risked "significant federal scrutiny and legal exposure." *Id.*

### D. Proceedings in this Court

On October 15, 2026, USDOJ sued. The Complaint has only one claim, alleging that California's refusal "to independently verify the citizenship of people included on"

---

[2] News Release, L.A. Cnty. Registrar-Recorder/Cnty. Clerk, Statement from Dean Logan Regarding U.S. Department of Justice Correspondence (Oct. 14, 2026), https://perma.cc/N6RA-VD8V.

[3] Press Release, Cal. Sec'y of State, California Secretary of State Shirley N. Weber, Ph.D., Issues Statement in Response to U.S. Department of Justice Letter (Oct. 14, 2026), https://perma.cc/77RK-AT33.

the October 13, 2026 list violates the Supremacy Clause of the U.S. Constitution, particularly 18 U.S.C. § 611(a), which it alleges preempts counting those votes without additional verification. Compl. ¶¶ 50-61. Although USDOJ filed its Complaint nineteen days before the election, it waited four more days to file its *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue and Memorandum in Support (Motion), ECF Nos. 22-1, 22-2. The Motion requests that by November 3 (Election Day), this Court order California to: (1) "set aside vote-by-mail ballots" from voters on the list; and (2) "verify their citizenship status before tabulating" such ballots. Motion at 4, 29. Also on October 19, USDOJ announced that it had charged 28 individuals with "election and immigration related crimes." Motion at 1. USDOJ claimed that each individual is on the list provided to California and Los Angeles County. *Id.* These charges stand in contrast to the United States's assertion that Defendants' refusal to accede to their demands "ha[s] made it nearly impossible for the United States to investigate and enforce federal law." Compl. ¶ 10.

## LEGAL STANDARD

The Federal Government is subject to the same exacting standard as any other party seeking preliminary relief, absent a specific statute to the contrary. *Cf.* Motion at 15; *see Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1212-13 (9th Cir. 2019); *Fed. Trade Comm'n v. Lead Express, Inc.*, No. 2:20-cv-840, 2020 WL 2615685, at *2 (D. Nev. May 19, 2020). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party is entitled to a preliminary injunction[4] only if they establish that they are "likely

[4] Courts in this District apply the same test for a temporary restraining order. *See, e.g.*, *Castillo v. Barr*, 449 F. Supp. 3d 915, 920-21 (C.D. Cal. 2020).

to succeed on the merits"; "likely to suffer irreparable harm in the absence of preliminary relief"; "the balance of equities tips in [their] favor"; and "an injunction is in the public interest." *Id.* at 20. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

## ARGUMENT

### I. The Federal Government has no chance of success on the merits.

#### A. USDOJ has no cause of action, standing, or procedural basis for civil relief.

USDOJ's claim suffers from procedural defects that preclude any possibility of success on the merits. To start, the Supremacy Clause does not provide a cause of action for USDOJ to seek injunctive relief. As Justice Scalia explained, the Clause "creates a rule of decision," "instruct[ing] courts what to do when state and federal law clash," but "does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015). Absent a cause of action, the United States cannot proceed on a claim in equity based solely on the Supremacy Clause. *Id.* at 327-28. USDOJ has no congressionally authorized right of action allowing it to file a civil suit seeking any equitable remedy in this context, much less the extraordinary one sought here. The United States may file civil actions to enforce federal voting rights seeking injunctive relief only when Congress provides an explicit public right of action. *See* 52 U.S.C. §§ 10308(d) (Voting Rights Act (VRA)), 10504 (VRA Amendments of 1970), 20307(a) (Uniformed and Overseas Citizens Absentee Voting Act), 20510(d) (NVRA); 21111 (Help America Vote Act (HAVA)). Congress has provided public rights of action in other statutes because, unless Congress speaks, the Elections Clause leaves the administration of federal elections to the states, empowering only Congress to "alter"

state election practices. U.S. Const. art. I, § 4. Congress has not given the United States a right of action to seek injunctive relief pursuant to the only statute it purports to enforce here: 18 U.S.C. § 611.

USDOJ also lacks Article III standing because the United States has not suffered an injury. USDOJ's two theories of standing—sovereign injury and resource strain—do not establish an injury akin to those shown in other federal preemption cases. The United States only suffers "a concrete harm to its sovereignty" when the object of its laws violates them. *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 526 (W.D. Tex. 2022). But Section 611 does not regulate California; it prohibits individual noncitizens from voting in federal elections. Further, USDOJ's suggestion that California could take actions that make federal law enforcement easier does not establish an Article III injury. California is not obligated to minimize federal resources spent to enforce federal criminal law. Instead, the case USDOJ relies upon only established that a state's decision to affirmatively withdraw resources that it previously committed to federal law enforcement efforts constitutes an injury. *United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024) (finding standing where state "withdr[e]w from joint task forces with federal law enforcement" and ceased prior "information sharing" with federal officers). Here, the Federal Government has identified no comparable impairment.

Finally, a federal criminal statute does not give USDOJ a basis for injunctive relief. USDOJ's claim is based on an extraordinary theory that it may enforce 18 U.S.C. § 611 by coercing a state into taking certain action. *See, e.g.*, *United States v. Jalas*, 409 F.2d 358, 360 (7th Cir. 1969) (explaining federal courts generally lack authority to issue injunctions against the commission of a crime subject to narrow exceptions). But the Federal Government cannot repackage the prohibitions and penalties included in a

criminal statute to obtain injunctive relief that Congress did not authorize. *See Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 689 (2026) ("No statute pursues a single policy at all costs.").

This Court should reject this attempt to re-write a narrow criminal law punishing individual wrongdoing to encompass extraordinary civil relief, selected at the discretion of USDOJ, like segregating or nullifying whole swaths of challenged ballots during an election. Compl. ¶¶ 62-63; *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode."). Section 611 has no civil enforcement mechanism. "The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra Club*, 451 U.S. 287, 297 (1981); *see also Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

Where Congress authorizes the executive to pursue civil and criminal remedies, it has done so clearly. For example, the Racketeer Influenced and Corrupt Organizations Act provides both for criminal penalties, 18 U.S.C. § 1963, and civil relief, including divestiture, restrictions on future activities, and dissolving enterprises, *id.* § 1964(a)-(b). Similarly, where Congress provided for injunctive relief in other voting-related statutes to preserve the right to vote, it included that language in the statute. *See, e.g.*, 52 U.S.C. § 10101(e) (comprehensive enforcement scheme under the Civil Rights Act (CRA)); *id.* § 10302 (enforcement of the VRA). It also provided for specific relief regarding list-maintenance. *See infra* Section I.B. A separate statute imposes immigration sanctions on a noncitizen who has "voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation." 8 U.S.C. § 1227(6)(A). "In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Middlesex Cnty.*

*Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981); *see also Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). There is no indication that Congress sought to authorize injunctive relief under this criminal statute.

USDOJ acknowledges as much, stating that it "actively investigates and prosecutes incidents of unlawful voting," while complaining that "it is not practicable or feasible" for it to investigate everyone on its list. Compl. ¶ 60. Yet the Motion still highlights USDOJ's efforts to prosecute alleged noncitizen voters, making clear that it retains the power and ability to enforce actual violations of Section 611. The alleged burden or inconvenience of enforcing the statutes that Congress enacted is no license allowing this Court to create a new remedy. *Sierra Club*, 451 U.S. at 297.

Section 611 likewise imposes no specific obligations on state or county election officials. *See* 18 U.S.C. § 611(a). Where Congress has criminalized certain conduct for private individuals, courts should not presume that it also intended to regulate a host of states' or counties' election administration activities. *Morse v. Republican Party of Va.*, 517 U.S. 186, 250 (1996) (Kennedy, J., dissenting) ("Congress knows the difference between regulating States and other actors."). To avoid this clear deficiency, USDOJ overreads *Norwood v. Harrison*, 413 U.S. 455 (1973) to suggest that liability may attach to a state through the criminal conduct of private individuals. But *Norwood* involved a Mississippi statute that actively supported racially discriminatory schools by providing textbooks to those schools, even though the state could not have run such schools itself. *Id.* at 463-65. By contrast, USDOJ cannot allege California is circumventing any rule since Section 611 plainly does not require California to adopt any particular method of citizenship verification. More importantly, California is fulfilling, not shirking, its

constitutional responsibilities to administer its elections through its established procedures. *See* U.S. Const. art. I, § 4, cl. 1.

**B. Section 611's individual criminal prohibition does not preempt California's election administration laws or permit injunctive relief that violates the National Voter Registration Act and Help America Vote Act.**

The Federal Government's preemption claim also fails on its substantive merits while simultaneously seeking relief that would violate other federal statutes designed to protect the right to vote.

The Supremacy Clause mandates the preemption of a state statute to the extent it conflicts with federal law. *See* U.S. Const. art. VI, cl. 2. State law conflicts with federal law when: (1) it is impossible to comply with both state and federal law; or (2) "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (citation modified). California law bars noncitizens from voting in federal elections; so too does federal law.

As the Supreme Court recently reiterated in a case about preemption for federal elections, "Congress's power to regulate elections 'supercede[s]' state law 'so far as it is exercised, and no farther.'" *Watson*, 609 U.S. at 697 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1879)). "Because the power the Elections Clause confers is none other than the power to [preempt], the reasonable assumption is that the statutory text accurately communicates the scope of Congress's [preemptive] intent." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013). States have primary authority to run elections, which Congress alone can preempt through legislative enactment. Where an

actual conflict between a Congressional enactment and state election law exists, "the latter, so far as the conflict extends, ceases to be operative," *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *Ex parte Siebold*, 100 U.S. at 384 (1880)). The Federal Government's broad authority "over the subject of immigration," *Arizona v. United States*, 567 U.S. 387, 394 (2012), that derives from the Article I power to establish a uniform Rule of Naturalization, U.S. Const. art. I, § 8, cl. 4, does not change that analysis. USDOJ's reliance on *Arizona* is thus inapt. That case addressed field preemption, which involves "a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401. But USDOJ's claim is that the Defendant jurisdictions are not doing *enough* to prevent alleged non-citizen voting, not that federal law prevents them from doing anything at all.

In addition, the power to supersede state election law "was not lodged" in the federal executive or judicial branches. *Watson*, 609 U.S. at 697. Those branches "cannot add to the words Congress chose." *Id.* The only federal statutory requirement imposed on state officials with respect to citizenship verification is to use a form at registration where the voter must attest, under penalty of perjury, that he or she is a citizen. 52 U.S.C. §§ 20508(b)(2)(A)-(B), 21083(b)(4)(A)(i). California does that. Cal. Elec. Code §§ 2101, 2111, 2150(a)(1). There is no conflict.

What the Federal Government seeks has nothing to do with preemption, but is an attempt to impose new obligations on state officials that Congress has never enacted and that would unjustifiably burden Californians' right to vote. Unless Congress provides otherwise, state law governs how state officials engage in "supervision of voting, . . . prevention of fraud and corrupt practices, counting of votes, [and the] duties

of inspectors and canvassers." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (citation omitted).

USDOJ's obstacle preemption arguments are likewise misplaced. Under its boundless theory, one criminal prohibition directed to individual illegal voting empowers the executive branch to oversee and impose extra-statutory duties on state voting officials merely because, in its view, state actors are not doing enough to "prevent" third parties from violating federal criminal law. *See* Motion at 13. This theory suffers from two fatal flaws. It ignores Congress's established framework for regulating voter eligibility, which includes a series of on-point statutory provisions rather than a single criminal misdemeanor. It also misconstrues California's inaction as erecting an obstacle. But there is no such thing as "inaction" or omission-based preemption under the Supremacy Clause and the executive branch may not unilaterally force states to take action to enforce federal law. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 463 (2018).

In fact, Congress established a clear policy around voter eligibility through the NVRA and HAVA, which delegate responsibility for voter list maintenance, voter verification, and vote processing to the states. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists" for deaths and changes in residence; specifies when and how states may (and may not) remove voters from the rolls; and compels states to designate a chief election official responsible for these tasks. 52 U.S.C. §§ 20507(a)(4), 20507(c)-(d), 20509. HAVA obligates chief election officials to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list" and directs that "[t]he specific choices on the methods of complying . . . shall be left to the discretion of the State[s]." 52 U.S.C.

§§ 21083(a)(1)(A), 21083(a)(2), 21085. With respect to enforcement of list maintenance requirements, USDOJ is limited to challenging a state's general *program* prescribed by those statutes. *See id.* §§ 20507(a)(4) (NVRA), 21083(a)(2)(A)(i) (HAVA). "Congress did not confer a general auditing power to . . . [US]DOJ over state election officials" in the NVRA or HAVA to supersede states' list maintenance efforts. *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *5 (C.D. Ill. July 31, 2026) (citation omitted).

Congress limited the executive's role in enforcing these statutes, so it would flout Congressional intent to allow USDOJ to use 18 U.S.C. § 611 as a backdoor for its preferred list maintenance procedures. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) ("Where two laws are merely complementary . . . our duty lies not in preferring one over another but in giving effect to both."). The Federal Government's arguments would rewrite these statutes by permitting USDOJ or DHS, not the states, to conduct list maintenance, while simultaneously ignoring the guardrails that Congress established, including the NVRA's 90-day moratorium. 52 U.S.C. § 20507(c)(2)(A).

USDOJ attempts to conjure a distinction between segregating (and ultimately discarding) ballots and conducting list maintenance. Motion at 24-26. Semantics aside, USDOJ seeks to dictate what state election officials must do to assess the eligibility of alleged noncitizen voters to determine whether their ballots will count by using the systematic process that the NVRA prohibits this close to Election Day. *See generally* Motion at 9-11 (describing USCIS system); *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 711 (9th Cir. 2025) (NVRA does not allow states to "place individuals' names on the voting rolls but then preclude those who do not provide [documentary

proof of citizenship] from casting vote-by-mail ballots in federal elections"), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).

USDOJ is not entitled to run to court, waving a list of dubious reliability—that the Deputy Attorney General publicly admits may contain U.S. citizens[5]—to demand that state officials take steps that the Federal Government would prefer. It certainly cannot do so once voting is already underway and in disregard of those state and county officials' actual obligations under state and federal law while threatening criminal prosecution and injunctive orders from this Court.[6] Those actions are lawless attempts to circumvent the Constitution's protections against centralizing power in the executive branch and degradation of the right to vote.

**C. The Federal Government's demand is contrary to federal voter protections.**

The demand that California segregate and withhold tabulation of certain voters' ballots for some vague citizenship verification process violates several legal requirements for the uniform treatment of voters and their ballots.

First, it violates the CRA's prohibition against applying different standards, policies, or practices to determine the qualifications of voters within the same jurisdiction. 52 U.S.C. § 10101(a)(2)(A). It would subject purported noncitizens on the Federal Government's list to different ballot handling, ballot tabulation, and voter qualification procedures different than the rest of the electorate in those voters'

---

[5] Sam Levin & Sam Levine, *DoJ charges 28 green card holders in California over alleged voter fraud*, The Guardian (Oct. 19, 2026), https://perma.cc/96P6-DUVN ("There may be some names on there who, it turns out, ultimately are citizens.").

[6] Congress has determined how any actual issues with voter lists should be resolved. The existence of that "alternative remedial structure" counsels against creating a new one. *Saffar v. Jenkins*, No. 2:23-cv-04544, 2023 WL 5505980, at *5 (C.D. Cal. July 18, 2023).

respective counties. *See, e.g.*, *Frazier v. Callicutt*, 383 F. Supp. 15, 19 (N.D. Miss. 1974) (finding CRA violation where different procedures were applied to registrants with prior addresses from campus or outside the county). Applying differential treatment to a "subset of the electorate" violates the CRA's uniformity provision. *Mi Familia Vota*, 129 F.4th at 723-24. It "invites county [officials] to pose a barrier to [voting] for any disfavored individual." *Id.* at 723. The CRA does not permit such ad hoc alteration of vote tabulation or voter qualification procedures. *See Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971).

Second, this improvised mandate to segregate and withhold tabulation of some ballots violates Section 11(a) of the VRA. 52 U.S.C. § 10307(a) ("No person acting under color of law shall . . . refuse to tabulate, count, and report" an eligible voter's ballot).

Third, the requested relief runs afoul of the NVRA's 90-day moratorium on systematic cancellation programs because it would effectively treat those voters as if they had been removed from the rolls by preventing their ballots from being tabulated. *See supra* Section I.B.

Fourth, it violates the Fourteenth Amendment's requirement of equal treatment in election administration. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam); *see also infra* Section IV (requested relief would be contrary to the constitutional right to vote).

**II. The Federal Government cannot show irreparable harm.**

"Irreparable harm requires a showing that the harm 'is *likely* in the absence of the injunction,'" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quoting *Winter*, 555 U.S. at 22), "not just possible," *All. for the Wild*

*Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). USDOJ offers no evidence that any harm is even remotely probable, much less likely.

**A. The Federal Government has not provided any credible evidence that the list it provided to California includes noncitizens.**

USDOJ's claim of irreparable harm rests on the premise that noncitizens will vote in the upcoming election, but it offers no substantive evidence that there are more than 20,000 potential noncitizens on California's voter roll. The type of matching the Federal Government describes is likely to result in errors. *See* Ex. A ¶¶ 13-15, Expert Decl. of Kassra Oskooii (Oskooii Decl.). And neither the Complaint nor the declarations attached to the Motion provide more than vague generalizations about USCIS's and HSI's processes, depriving Defendants, Proposed Intervenor-Defendants, and this Court of the level of detail necessary to evaluate their accuracy.

First, the type of matching described is not reliable. Oskooii Decl. ¶ 17. Using multiple fields employing "combinations or sets of variables such as names, addresses, dates of birth, and gender" multiple fields can lower the error rate, but "differences in how and when information is collected, recorded, and maintained across databases create additional obstacles." *Id.* ¶ 18. Indeed, "[e]ven carefully implemented matching procedures can leave uncertainty about whether linked records belong to the same person." *Id.* ¶ 19. Matching state voter files to federal administrative databases "introduces further challenges because of differences in the extent or volume of information, formatting, and record maintenance." *Id.* ¶ 21. Research on voter files shows that matching voter data to federal databases without unique identifiers "can pose significant challenges and lead to faulty conclusions." *Id.*

Second, the description of USCIS's and HSI's "multilevel process . . . falls far short of the information needed to independently assess the reliability of its

conclusions." *Id.* ¶ 26. As detailed by Proposed Intervenor-Defendants' expert, each step of the process "requir[es] a determination that records refer to the same individual" and each step "introduc[es] the possibility of a false positive." *Id.* ¶ 26.

At the outset, HSI and USCIS cannot even confirm that their starting data was California's current voter roll, stating that HSI "received *what appeared to be* the California voter roster . . . *as of August 2025*." Decl. of Eric McLoughlin ¶¶ 20-21, ECF No. 22-3 (McLoughlin Decl.) (emphasis added). Each step of the described process thereafter is replete with uncertainty. For instance, USCIS's initial steps are to "enhance[] . . . voter data through a reliable third-party data analytics and investigative platform" and then pair that data "with an internal USCIS alien number that *may* be the same individual." Decl. of Nicolas Bartell ¶ 16, ECF No. 22-4 (Bartell Decl.) (emphasis added). USCIS fails to identify which third-party platform it used or any information that could be used to assess whether it is "reliable," which is "critical because information attributed to the wrong voter at this stage can adversely impact" the accuracy of subsequent stages. Oskooii Decl. ¶ 35. The Federal Government claims that "voting records USCIS receives contain information about the listed individual" including SSN, Bartell Decl. ¶ 16; *see also* McLoughlin Decl. ¶ 15, but the publicly available California voter file does not contain SSNs, so it is unclear how USCIS or HSI obtained that data, how many names on the list were matched using SSNs, or whether the SSN data they used is reliable. *See* Oskooii Decl. ¶¶ 35-38.[7] Moreover, the United States's declarations fail to disclose "the specific fields from voter records that

[7] The Federal Government has sought to compel California to produce its unredacted voter roll, but its case was dismissed. *See United States v. Weber*, 816 F. Supp. 3d 1168, 1196 (C.D. Cal. 2026). The materials filed with the Court all but admit that the Federal Government received what it claims is a California voter registration list from some third-party entity. Motion at 11; Oskooii Decl. ¶¶ 33, 35, 37.

were compared, whether comparisons required exact agreement or allowed variations, or the specific criteria and thresholds used to classify matches as 'high confidence.'" *Id.* ¶ 26. Thus, a "high confidence" match is a "meaningless qualitative classification rather than an empirically established level of accuracy." *Id.*

Each described step is equally vague. After assigning the confidence level, USCIS investigators conduct an undefined "manual review" of the matches and a further undefined "second-level review of the match" before turning the data over to HSI. Bartell Decl. ¶¶ 19, 20. HSI intakes the data, conducts a purported "quality review that consists of identifying duplicate entries, incomplete records, inconsistent formatting, missing identifiers, and other data quality issues" and then "prepares the data for additional enrichment using approved analytic capabilities." McLoughlin Decl. ¶ 16. Nowhere does HSI acknowledge the depth or scope of quality issues with USCIS's data, how many of those issues they resolve, or what happens with those it cannot resolve. Nor does it provide any information about its "enrichment process" besides a circular claim that it "adds value . . . before voter records are disseminated as investigative referrals or routed for another authorized purpose." *Id.* ¶ 18. As such, "it is difficult to determine whether this enrichment process" serves to correct errors or compounds them by "introduc[ing] further opportunities for error." Oskooii Decl. ¶ 30.

Even if USCIS and HSI could be taken at their word that their matching process is accurate, they miss a crucial connecting step. Establishing an identity match alone does not establish an individual's citizenship status. *Id.* ¶ 22. At no point does the Federal Government explain the criteria used to resolve "incomplete or conflicting citizenship information" or "how current any of the underlying records are." *Id.* ¶ 14. The declarations also fail to disclose "how many voter records entered the process, how many generated initial matches, or how many were excluded at each subsequent stage

such as the alien-number linkage, citizenship review, second-level review, and HSI assessment." *Id.* ¶ 29.

Absent sufficient detail, this Court cannot assess the veracity of the Federal Government's claims that it has accurately identified more than 20,000 noncitizen voters on California's voter roll.

**B. The Federal Government's allegations of noncitizen voting have repeatedly been found unreliable.**

The flaws with the Federal Government's process are real. In July, at the same time DHS sent a letter to California alleging it had identified as many as 190,832 noncitizens on the state's voter roll, the agency sent similar letters to New Jersey, Nevada, and Pennsylvania.[8] In Nevada, DHS initially identified up to 15,903 non-citizen registered voters as the supposedly "high-confidence" matches, but later reduced that number to 6,218, and then to 185 after conducting its purported manual review.[9] Nevada officials later confirmed that, according to state records, all 185 registered voters are citizens.[10] The Federal Government's California list has already gone from 190,832 to approximately 20,000 without explanation; this is not the showing on which findings of irreparable harm are made. *Winter*, 555 U.S. at 22.

Both DHS's Systematic Alien Verification for Entitlements (SAVE) system and other similar matching methods are demonstrably unreliable. Just days ago, a court held

[8] Press Release, DHS, DHS Secretary Markwayne Mullin Sends Letters to Secretaries of State Warning About Non-Citizens on Voter Rolls (July 17, 2026), https://perma.cc/C5KH-B83G.

[9] Tierney Sneed, *Trump admin files 'long shot' lawsuit after California wouldn't open a thumb drive of alleged non-citizens*, CNN (Oct. 15, 2026), https://www.cnn.com/2026/10/15/politics/trump-doj-sues-california-non-citizens-voting.

[10] Sam Levine, *Nearly 200 people wrongly identified on Nevada's voter rolls as non-citizens*, The Guardian (Sep. 25, 2026), https://perma.cc/9VUK-LWWP.

that USDOJ's efforts to "demand that states *remove* United States citizens from their rolls" was unlawful in part because the Federal Government had "downplay[ed] the risk of voter disenfranchisement—despite knowingly relying on an inaccurate database to check voter eligibility." *Common Cause*, 2026 WL 3033772, at *1-2. Other federal courts have similarly found that such noncitizen lists are inaccurate,[11] which is unsurprising given the limitations of the available datasets. Oskooii Decl. ¶ 28. And the Federal Government has acknowledged as much. *See* DHS, Privacy Threshold Analysis for the SAVE Program, at 17 (approved Sep. 11, 2025), https://perma.cc/A44N-4729 (acknowledging "[s]hortfalls in data accuracy in the [SAVE] system could cause incomplete or false results"). This problem extends beyond SAVE. *See* Letter from Senator Padilla & Senator Schumer, to DHS Leadership (Sep. 13, 2026), https://perma.cc/22SY-U5T6 (describing a whistleblower disclosure that DHS and USCIS have been "using highly questionable data and methods to identify purported unlawful voters"); *see also supra* Section II.A. The Federal Government has thus failed to carry its burden of showing that it is likely to suffer any irreparable harm because it has made no showing that there are noncitizens on California's voter roll.

**III. The balance of equities requires denial of the Federal Government's Motion.**

Under the *Purcell* principle, "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). *Purcell* prevents "the uncertainty engendered by judicial disruptions to the status quo in the midst of elections [that] can and often will cause eligible voters to remain away from the polls." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 985 (9th Cir.

---

[11] *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021); *Weber*, 816 F. Supp. 3d at 1185 n.22, 1196.

2024). It aims to ensure that "[w]hen an election is close at hand, the rules of the road [are] clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring) (mem.). Here, the timing, scale, and lawlessness of the intrusion tips the balance of equities strongly against USDOJ. An injunction would "reach[] beyond the parties, carrying with it a potential for public consequences." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016). The requested relief would impact the fundamental right of approximately 20,000 Californians, some of whom may be LULAC and NAACP members, in the midst of the election. *Purcell*, 549 U.S. at 4. The impact of any injunction would also create impossible eleventh-hour administrative burdens for California's election officials—requiring them to verify thousands of registered voters' citizenship status—while voting is already under way. *Merrill*, 142 S. Ct. at 880 (noting that running state-wide elections is "extraordinarily complicated and difficult," poses "significant logistical challenges," and requires "enormous advance[d] preparations by state and local officials") (Kavanaugh, J., concurring). If this Court grants preliminary relief, thousands of citizens stand to "be disenfranchised in the present federal election cycle." *Newby*, 838 F.3d at 12.

**IV. The public interest requires denial of the Federal Government's Motion.**

The public's "deep interest in fair elections" and protecting the fundamental right to vote also weigh heavily against preliminary relief. *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th Cir. 2012); *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) (noting public interest strongly favors protecting voting rights and "permitting as many qualified voters to vote as possible"). "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

Conversely, "there is . . . no public interest in the perpetuation of unlawful [government] action." *Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981 (9th Cir. 2026) (citing *Newby*, 838 F.3d at 12). Because the Federal Government seeks to prevent the tabulation of tens of thousands of votes, based on no substantive evidence and an extraordinary and novel legal theory, *see supra* Sections I-II, the public interest tips sharply against the requested injunction.

The fundamental rights of U.S. citizens are not extra weight to discard in service of political expediency. Nothing about USDOJ waiting until voting has *already started* to publicly demand adherence to an impossible and illegal set of commands and to threaten election officials with prosecution is likely to bolster the integrity of ongoing elections. It is nearly certain to trample on the constitutional rights of U.S. citizens. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (holding severe burdens on right to vote must be justified by compelling state interest).

## CONCLUSION

For the reasons stated, this Court should deny the Federal Government's Application for an *Ex Parte* Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

Dated: October 20, 2026

Respectfully submitted,

<u>*/s/ Aseem Mulji*</u>

Norman L. Eisen* (DC Bar No. 435051)
norman@democracydefenders.org
Tianna Mays* (DC Bar No. 21597)
tianna@democracydefenders.org
Pooja Chaudhuri** (SBN 314847)
pooja@democracydefenders.org
Jacki Anderson* (DC Bar No. 1531821)
jacki@democracydefenders.org

Aseem Mulji (SBN 330354)
amulji@campaignlegalcenter.org
Anna Baldwin* (DC Bar No. 998713)
abaldwin@campaignlegalcenter.org
Sejal Jhaveri* (DC Bar No. 90043488)
sjhaveri@campaignlegalcenter.org

Beauregard Patterson* (WI Bar No. 1102842)
beauregard@democracydefenders.org
Jacob Kovacs-Goodman* (DC Bar No. 90032363)
jacob@democracydefenders.org
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Ave. SE #15180
Washington, DC 20003
(202) 601-8678

Kristen M. Clarke* (DC Bar No. 973885)
kclarke@naacpnet.org
Anthony P. Ashton* (MD Bar No. 25220)
aashton@naacpnet.org
Olivia N. Sedwick* (DC Bar No. 1600928)
osedwick@naacpnet.org
**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
4805 Mt. Hope Drive
Baltimore, MD 21215
(410) 580-5777

Daniel S. Lenz* (WI Bar No. 1082058)
dlenz@campaignlegalcenter.org
David Kronig* (DC Bar No. 1030649)
dkronig@campaignlegalcenter.org
William Hancock* (DC Bar No. 90002204)
whancock@campaignlegalcenter.org
Heather Szilagyi* (DC Bar No. 90006787)
hszilagyi@campaignlegalcenter.org
Robyn K. Bitner* (DC Bar No. 1617036)
rbitner@campaignlegalcenter.org
**CAMPAIGN LEGAL CENTER**
1333 New Hampshire Ave. NW, Ste. 300
Washington, DC 20036
(202) 736-2200

Jonah Lalas (SBN 286755)
jlalas@altber.com
**ALTSHULER BERZON LLP**
350 W. Colorado Blvd.
Pasadena, CA 91105
(323) 963-8693

Stacey M. Leyton (SBN 203827)
sleyton@altber.com
Danielle Leonard (SBN 218201)
dleonard@altber.com
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

**Pro hac vice application forthcoming*
***Admission application forthcoming*

*Counsel for Proposed Intervenor-Defendants League of United Latin American Citizens; NAACP; NAACP California/Hawaii State Conference; NAACP Los Angeles Branch*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record, for Proposed Intervenor-Defendants League of United Latin American Citizens; NAACP; NAACP California/Hawaii State Conference; and NAACP Los Angeles Branch certifies that this brief contains 6,945 words, which complies with the word limit of Local Rule 11-6.1.

Dated: October 20, 2026

/s/ *Aseem Mulji*
Aseem Mulji

# Appendix A

**U.S. Department of Justice**

950 Pennsylvania Ave, NW
Washington, DC 20530

(202) 514-2000

October 16, 2026

Peter M. Bollinger
Assistant County Counsel
Los Angeles County Counsel's Office

Re: Response to October 15, 2026 Letter

Mr. Bollinger:

The Department of Justice has reviewed your October 15 letter responding to the federal investigative materials provided to the Los Angeles County Registrar-Recorder/County Clerk ("County ROV"). I write to address several legally untenable assertions and to make unmistakably clear the legal implications for violating 18 U.S.C. § 611.

Your letter asserts that the County ROV is "legally prohibited" from taking even minimal steps—such as temporarily segregating ballots—after receiving credible federal evidence identifying tens of thousands of individuals suspected to be noncitizens. That position is incorrect as a matter of federal law and places officials in both the California Secretary of State ("SOS") and County ROV offices at risk of knowingly facilitating violations of federal criminal statutes.

On October 13, the Department hand delivered a password-protected dataset identifying more than 20,000 individuals who federal agencies reasonably believe are likely noncitizens registered to vote in California. This list was developed through a multilayered, multiagency investigative methodology that relied upon internal immigration records, data matching, supervisory verification procedures, and more.

The legal consequences for either facilitating or ignoring a federal crime are significant. Noncitizen voting in a federal election is a federal crime—and knowingly facilitating such conduct is equally unlawful. Under 18 U.S.C. § 611(a), noncitizens are prohibited from voting in any election involving federal offices. Under 18 U.S.C. § 2, anyone who aids, abets, counsels, induces, or procures the commission of a federal offense is equally liable. If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime. Your assertion that ballots must be counted simply because California's registration system relies on self-attestation does not relieve election officials of their obligations under federal law ***when they are on actual notice of noncitizen voting.*** Nor can state procedures supersede federal criminal statutes.

Your argument that the County is "not authorized" to pause or segregate ballots because California relies on attestation-based registration is immaterial. Section 611 does not excuse unlawful voting simply because a State employs a permissive registration method. The Department has not asked the County to adjudicate immigration status; it has asked the County to temporarily set aside ballots from individuals whose eligibility is credibly in question—a standard election-administration practice implemented nationwide.

Likewise, your reliance on the National Voter Registration Act's ("NVRA's") "quiet period" is misplaced. The NVRA's 90-day limitation applies only to systematic list-maintenance programs—not to targeted, individualized evidence of unlawful voting identified by federal law enforcement. The Department has not requested a purge, cancellation of registrations, or any programmatic action. We requested only temporary ballot segregation pending citizenship verification. Invoking the NVRA to justify counting ballots unlawfully cast is both legally incorrect and operationally irresponsible.

Additionally, the administrative burdens, timing constraints, or the fact that the investigative list includes individuals residing outside Los Angeles County do not permit the County to knowingly tabulate ballots that federal law prohibits. Once the United States provides credible evidence that certain ballots may be unlawful to count, election officials may not disregard that information because it is inconvenient to process. Administrative difficulty is not a defense to violating federal law or aiding or abetting a federal offense.

The Department strongly urges the County and the SOS to reconsider their positions before taking actions that risk significant federal scrutiny and legal exposure.

Sincerely,

/s/ ____________________
Trent McCotter
Acting Deputy Attorney General
United States Department of Justice

cc: Shirley N. Weber, Ph.D, California Secretary of State
Dean C. Logan, Los Angeles County Registrar-Recorder/County Clerk