# EXHIBIT A

**Expert Report of Kassra A.R. Oskooii**

## A. Background and Qualifications

1. I, Kassra A.R. Oskooii, am over 18 years of age and am competent to testify.

2. I received my Ph.D. in Political Science, specializing in American politics, minority and race politics, and political methodology, from the University of Washington in Seattle, Washington in 2016. Prior to that, I received my master's degree in political science at the University of Washington and received a political methodology field certificate from the Center for Statistics and the Social Sciences in 2013. I received my Bachelor of Arts in Political Science in 2008 at the University of Washington with minors in Human Rights and Law, Societies, and Justice.

3. I am a tenured Professor in the Department of Political Science and International Relations at the University of Delaware ("UD"), having joined the faculty in 2016. I am also an affiliated faculty member at UD's Data Science Institute, Master of Science in Data Science, Center for Political Communication, and Center for the Study of Diversity. My research and teaching focuses on American political behavior, political methodology, political psychology, political representation, voting rights, and redistricting.

4. My research has been published in leading peer-reviewed social science journals, including *Sociological Methods and Research, Political Behavior, Public Opinion Quarterly, Political Psychology, Advances in Political Psychology, British Journal of Political Science, Political Research Quarterly, Electoral Studies, Perspectives on Politics, Urban Affairs Review, State Politics and Policy Quarterly*, and *Journal of Public Policy*. I have also published research on ecological inference ("EI") methods used in racially polarized voting ("RPV") analyses, including one article in the top-ranked *Sociological Methods and Research* journal. In addition, I contributed to the development of *eiCompare* and *eiExpand*, two open-source R packages used by social scientists, statisticians, and legal experts to quantify racially polarized voting using ecological inference methods. These packages allow researchers to use aggregate election and demographic data from the U.S.

Census, the American Community Survey, or voter files to quantify racial and ethnic voting patterns. *eiCompare* has been cited in numerous academic articles and court filings.

5. Throughout my academic career, I have taught courses on a range of topics related to voting behavior and redistricting. This includes instruction on the collection of demographic, electoral, and public opinion data and analysis of such data.

6. I have served as an expert witness in various redistricting and voting rights cases involving the collection and analysis of complex data sets. In my work as an expert witness, I have utilized demographic data derived from voter files, the U.S. Decennial Census, and American Community Survey ("ACS") to conduct RPV analyses and electoral performance analyses, to develop demonstrative/illustrative and remedial plans, and to evaluate electoral plans as related to compliance with the Voting Rights Acts ("VRA") and traditional and state-specific redistricting principles.

7. I have submitted expert reports in more than a dozen cases related to redistricting and voting rights, including *Palmer v. Hobbs*, No. 3:22-cv-05035-RSL (W.D. Wash. filed Dec. 1, 2023), Dkt. No. 245-1 [Testified], *League of Women Voters of Utah v. Utah State Legislature*, No. 220901712/2022 (Utah 3rd Dist. Ct.) [Testified], *Alabama State Conference of the NAACP v. Allen*, No. 2:21-cv-1531-AMM (N.D. Ala. June 20, 2024), Dkt. No. 164-17 [Deposed & Testified], *Coca v. Dodge City*, No. 6:22-cv-1274 (D. Kan. July 10, 2024) [Deposed and Testified], *Dickinson Bay Area Branch NAACP v. Galveston County*, No. 3:22-cv-117-JVB (S.D. Tex. 2023) [Deposed & Testified], *Baltimore County Branch of the NAACP v. Baltimore County*, No. 1:21-cv-03232-LKG (D. Md. 2022), *Common Cause Florida v. Lee*, No. 4:22-cv-00109-AW-MAF (N.D. Fla. 2022), *Common Cause Florida v. Byrd*, No. 4:22-cv-00109-AW-MAF (N.D. Fla. filed May 19, 2023), Dkt. No. 156-6 [Deposed], *Reyes v. Chilton*, No. 4:21-cv-05075-MKD (E.D. Wash. filed Jan. 5, 2023), Dkt. No. 79-2 [Deposed], *Finn v. Cobb County Board of Elections and Registration*, No. 1:22-cv-02300-ELR (N.D. Ga. filed Aug. 25, 2023), Dkt. No. 162, *Caroline County Branch of the NAACP v. Town of Federalsburg*, No. 1:23-cv-00484-SAG (D. Md. filed Mar. 9, 2023), Dkt. No. 8-6, *Wicomico County Branch of the NAACP v. Wicomico County*,

No. 1:23-cv-03325-MJM (D. Md. filed July 12, 2024), Dkt. No. 53-7, *New York Communities for Change v. County of Nassau*, No. 602316/2024 (N.Y.S.) [Deposed & Testified], *NC NAACP v. Berger*, No. 23-cv-1104 (M.D.N.C. 2023) [Deposed & Testified], *Lopez v. County of Stanislaus*, No. 2:25-cv-01175 (E.D. Cal. Filed Apr. 22, 2025), and *Sherman v. Hargett*, No. 3:26-cv-00616 (M.D. Tenn. 2026), Dkt. No. 20-2.

8. My academic research, teaching, and expert analysis involves working with and analyzing large data sets, including combining datasets from multiple sources for analysis. This expertise involves extensive analysis of state voter files, including the merging of voter information with other datasets, such as Census data.

9. More information about my qualifications and expert witness and consulting background, including all my publications over the past ten years, can be found on my Curriculum Vitae, appended to this declaration as **Appendix A**.

10. I am being compensated by the Proposed Intervenor-Defendants at a rate of $550 an hour for my work in this matter. My compensation is not in any way contingent on the content of my opinions or the outcome of this matter.

## B. Scope of work

11. Counsel for the League of United Latin American Citizens, NAACP, NAACP California/Hawaii State Conference, and NAACP Los Angeles Branch, as Defendant-Intervenors in *United States v. California*, have engaged me to form expert opinions on the methodology and impacts of the process used by the Department of Homeland Security to identify approximately 20,000 possible noncitizens on California's voting rolls.

12. I formed my opinions based on my scholarly expertise and the description of the process that USCIS/HSI used as set out in litigation papers filed by the United States in this case. Counsel provided me with the United States' Complaint in this case and the exhibits to the Complaint, which are the letters from the Secretary of Homeland Security to the California Secretary of State (Exhibit A), California Secretary of State to the Secretary of Homeland

Security (Exhibit B), Acting Deputy Attorney General to the California Secretary of State (Exhibit C), and Acting Deputy Attorney General to the Los Angeles County Recorder-Registrar (Exhibit D). In addition, counsel provided me with the U.S. Department of Justice's memorandum in support of a temporary restraining order, the declarations in support of that motion from Eric McLoughlin and Nicolas Bartell, and the exhibits in support of the motion. I relied on this information to form my opinions.

## C. Summary of Opinions

13. Matching voter registration records to administrative databases presents substantial challenges that can lead to citizens being incorrectly identified as noncitizens. When databases lack a common unique identifier, matching depends on personal characteristics that may be shared by different individuals, recorded inconsistently, incomplete, or outdated. Using multiple identifiers can improve matching, but it does not eliminate the risk of mistaken identity. Moreover, correctly matching individuals between voter registration records and administrative databases does not establish that the citizenship information contained within federal databases is complete or current. Reliable citizenship determinations therefore require both accurate identity matching and an accurate assessment of citizenship status at the relevant time.

14. DHS's disclosures do not provide sufficient information to independently assess the reliability of its conclusion that approximately 20,000 California registrants are "likely" noncitizens. Although the agency describes multiple stages of matching and review, it does not disclose the specific matching rules, the specific criteria for its confidence thresholds, any detailed information about the third-party platform and their procedures, or underlying data needed to evaluate those procedures. It also leaves unexplained important connections between voter records and information compiled by third-party software, such as how and in what ways the third-party platform linked names to Social Security numbers not available on the California public voter file. Furthermore, the descriptions do not report any false positive error rates, any validation results, or audit findings that would establish the accuracy of these links. Consequently, the designation of "high confidence" appears to be merely a qualitative classification rather than an empirically derived designation. The

information shared with me likewise does not explain how incomplete or conflicting citizenship information is resolved, does not explain how current any of the underlying records are, or report what additional evidence or decision criteria were considered as part of the manual reviews.

15. These omissions and lack of transparency prevent an independent assessment of how the final figure was produced and whether the stated steps adequately addressed erroneous identity matches or citizenship determinations. In my opinion, the disclosed information does not establish that DHS's estimate is a reliable count of noncitizens registered to vote in California.

## D. Challenges in Matching Voter Records to Administrative Data

16. Social scientists have found that matching[1] voter registration records with other administrative databases[2] presents numerous challenges that can undermine confidence that records identified as a match actually refer to the same individual (Enamorado, Fifield, and Imai, 2019). These challenges are particularly consequential when matches are used to draw conclusions about a registered voter's citizenship status. A false positive occurs when records belonging to different individuals are incorrectly matched across databases and are identified as the same individual.[3] In the context of attempting to identify the citizenship status of voters, a false positive can cause a citizen to be incorrectly identified as a noncitizen because the voter's record has been linked to someone else's immigration or other administrative record.

17. Without a common unique identifier present in all datasets being matched that can unambiguously link records from different data sources, such a Social Security Number ("SSN"), matching attempts generally rely on combinations or sets of variables such as names, addresses, dates of birth, and gender (Ansolabehere and Hersh, 2017; Enamorado,

[1] Other terms commonly used are "linking" or "merging" records.

[2] A database typically refers to a collection of information (data or records) stored electronically.

[3] A false negative occurs when records belonging to the same individual are not linked.

Fifield, and Imai, 2019). None of these fields on their own, however, are sufficient to distinguish one person from another. Even with multiple variables, matching across datasets is very difficult because many people share a birthdate, common surnames can appear thousands of times, and even combinations of first and last names may identify numerous individuals (Ansolabehere and Hersh 2017; McDonald and Levitt 2008). For instance, there are 2000 people named Maria Garcia in the state of Texas (Ansolabehere and Hersh 2017).

18. Using multiple fields can help distinguish records, but differences in how and when information is collected, recorded, and maintained across databases create additional obstacles. Fields may be missing (e.g., not contain address information), incomplete (e.g., one database may contain a full address while another contains only a ZIP code or partial address), outdated (e.g., contain old addresses), in different formats (e.g., in one dataset birthdates can be recorded in month-day-year format while in another in day-month-year format). Names may differ because of marriage, nicknames, preferred names, alternative spellings, or typographical errors. Agency staff can introduce additional errors during data entry, such missing a numeric or character value or typing the wrong value altogether. Reconciling these differences requires standardizing records across databases maintained by agencies with different administrative purposes and data-management practices and goals (Ansolabehere and Hersh 2017; Morse 2023). And this standardization needs to come *before* attempting to merge different datasets, as illustrated by social scientists such as Ansolabehere and Hersh (2017).

19. Even carefully implemented matching procedures can leave uncertainty about whether linked records belong to the same person, particularly when identifying information in incomplete, inaccurate, or shared by multiple individuals (Enamorado, Fifield, and Imai, 2019).[4] Ansolabehere and Hersh (2017) evaluated the percentage of people in one database

[4] Deterministic record linkage methods use predetermined rules, such as requiring agreement on three out of four variables across datasets, to decide whether records in different databases refer to the same person. Probabilistic methods instead weigh agreements and disagreements across available variables to estimate the likelihood that two records refer to the same person. It is not entirely clear from the complaint and declarations whether the government (and third-party platform) is using a deterministic or probabilistic matching method. In any case, neither approach is

appearing in another database using names, addresses, dates of birth, and gender against Social Security numbers in Texas. They found that approximately 2 percent of the linked records are classified as false positive, meaning that supposedly matched records did not actually belong to the same individual.[5] Applied to a voter file the size of California's, roughly 23 million registrants, an error rate of this size would mean about 400,000 voters could be linked to someone else's record.

20. Research on matching records within and across voter files reinforces these concerns. Goel et al. (2020) examine the difficulty of distinguishing actual double voting from cases in which different individuals share identifying characteristics or records contain clerical errors. Because public voter files omit Social Security numbers, first name, last name, and date of birth are often the only variables available across states.[6] Yet different people can, more often than expected, share the same name and birthdate (McDonald and Levitt, 2008)[7], and even the availability of the last four digits of SSN does not necessarily help in determining whether two registrations belong to the same individual (Goel et al. 2020).

21. These difficulties arise when comparing records collected for *similar* purposes (i.e., maintaining voter lists). The difficulties are magnified when matching is attempted between records collected for *different* purposes. Matching state voter files to federal administrative databases introduces further challenges because of differences in the extent or volume of information, formatting, and record maintenance. As Kim et al. (2023, 9)

---

error-free, as both can incorrectly link records belonging to different people or fail to link records belonging to the same person.

[5] Because Ansolabehere and Hersh (2017) had reliable access to full SSN, they were able to use this information to then calculate the rate of false positives relative to their matching approach. However, when a common unique identifier is not available across records, deterministic methods are unable to quantify uncertainty and typically rely on arbitrary thresholds to determine the degree of their matching accuracy (Enamorado, Fifield, and Imai, 2019).

[6] This poses a problem for the verification of citizenship, as U.S. Citizenship and Immigration Services' Voter Registration and Voter List Maintenance Fact Sheet states that to submit a case under Systematic Alien Verification for Entitlements (SAVE) tool, individual's first and last name, date of birth, and one or more government-issued enumerators, such as an A-number or SSN, is required. (https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet)

[7] For example, McDonal and Levitt (2008) illustrate that the probability of at least two people sharing the same birthdate is above 99 percent with a dataset of 460 random individuals.

observe, “voter files often are linked to administrative data using fields that are not ideally suited for robust matching,” leading to false positives in which a substantial number of individuals could end up sharing the same linking variables although they are not the same person. As such, even in more favorable circumstances where there is an attempt to match individuals across voter files rather than linking administrative data from various federal agencies to state voter files, matching without unique identifiers that may exist across databases can pose significant challenges and lead to faulty conclusions (also see Morse 2023).

22. Finally, and perhaps more importantly, correctly linking two records does not establish that the citizenship information in the administrative record is complete, accurate, or current. An administrative record may accurately identify an individual but fail to reflect a subsequent naturalization. Thus, even a match based on a unique identifier such as an SSN does not, by itself, establish that the person is currently a noncitizen. Evaluating citizenship through administrative matching therefore requires two separate determinations: whether the records belong to the same individual and whether the linked information accurately reflects that individual’s current citizenship status. Resolving the first question, which is quite challenging and can be plagued with errors, does not resolve the second.

## E. DHS’s Identification of Potential Noncitizens Appears Speculative and Lacks Transparency

23. On July 16, 2026, the U.S. Department of Homeland Security (DHS) informed California’s Secretary of State that its “records revealed that there may be as many as 190,0832 non-citizens registered to vote in California” (Exhibit A). The letter presented this finding as preliminary, asking the state to collaborate to “ensure the accuracy” of the results. Yet it did not identify the underlying data sources, describe the matching methodology, or specify the software used to link California voters to administrative records containing citizenship information. The letter indicated only that voters’ names, dates of birth, and Social Security numbers may have been used as matching criteria. It did not explain how DHS obtained or

associated Social Security numbers with individual voter records, given that the California public voter file does not contain such information (Exhibit B).

24. The complaint subsequently alleged that U.S. Citizenship and Immigration Services ("USCIS") believes that "more than 20,000" registered voters were "likely noncitizens" (Compl. ¶ 45). The apparent change from the figure in the July letter raises questions about how the agency identified potential noncitizens, evaluated its initial matches, and arrived at its subsequent estimate. Those questions are particularly important in light of instances in which officials have repeatedly incorrectly identified citizens as noncitizens, such as in Texas.[8] More recently, DHS asserted that nearly 16,000 people on Nevada's voter rolls might be noncitizens but later provided state officials with a list of only 185 individuals it identified as noncitizens after its manual review.[9] Nevada subsequently reported that its records showed all 185 were citizens and that DHS had provided no substantive evidence to the contrary. These examples underscore the need for a transparent and detailed account of both how records were matched and how citizenship statuses were determined, information necessary to evaluate the reliability of DHS's conclusions in California.

25. Absent information showing that the process used here differs from the error-prone processes used elsewhere by the Government—including very recently—there is no reason to have confidence in the accuracy of these assessments. For example, a separate DHS process, use of its overhauled Systematic Alien Verification for Entitlements ("SAVE") program to analyze state voting rolls, has repeatedly resulted in false identification of U.S. citizens as non-citizens when used in Texas and Arizona, among other states.[10]

---

[8] Jen Fifield et al., *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/PR4Q-67NR.

[9] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html.

[10] Press Release, USCIS, USCIS Enhances Voter Verification Systems (Nov. 3, 2025), https://perma.cc/9LN5-SEDU ("USCIS Enhances Voter Verification Systems"); Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU; Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025), https://perma.cc/HN98-8N2Q; Sasha Hupka, "The SAVE system isn't reliable, but it still might be useful," Votebeat, (Aug. 22, 206), https://www.votebeat.org/arizona/2026/08/22/yavapai-county-save-tool-noncitizen-voters-michelle-burchill.

26. While the agency's description outlines a multilevel process, its description falls far short of the information needed to independently assess the reliability of its conclusion that approximately 20,000 California registrants are "likely" noncitizens. For instance, it does not disclose all the specific fields from voter records that were compared, whether comparisons required exact agreement or allowed variations, or the specific criteria and thresholds used to classify matches as "high confidence." Although it describes a "high-confidence" match as a strong and consistent identity link supported by multiple identifiers, it does not specify which combinations of identifiers satisfy that standard. Nor does it identify the third-party software or platform that was relied upon, the sources or currency of the information compiled by that software, or the method used to assign confidence levels. One critical question is how Social Security numbers were associated with individual voter records, given that the publicly accessible version of the California voter file does not contain such information. The subsequent connection between an "enriched" voter record and a particular alien number is similarly vague. These are distinct linkage steps, each requiring a determination that records refer to the same individual and each introducing the possibility of a false positive if records belonging to different people are incorrectly joined. Yet the description reports no error rates, validation against a reliable benchmark, or audit results through which the accuracy of those links could be assessed. As such, "high confidence" is a meaningless qualitative classification rather than an empirically established level of accuracy.[11]

27. Based on the information provided by the agency, there are also likely myriad problems with the reliability of the underlying data matched through this process. Public reporting describes a June 1 HSI report that Heather Honey, a DHS official, obtained 48.4 million voting records through "independent sources of information." Gabe Cohen, ICE Reviewed

---

[11] A recent whistleblower disclosure, which alleges that DHS and USCIS have been "using highly questionable data methods to identify purported unlawful voters" is further reason not to take the assertion of "high confidence," made without explaining any of the relevant underlying details, at face values. *See* Letter from Senator Padilla and Senator Schumer to DHS leadership (Sept. 13, 2026), https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf

Tens of Millions of Voter Records Looking for Noncitizen Voters, Record Show, CNN (Oct. 7, 2026), https://www.wmur.com/article/ice-viewed-millions-voter-records-noncitizen-voters/74063981?utm. No information about these independent sources has been provided. The government's papers also indicate that the voter file did not come directly from the state but through some other unspecified source. The McLoughlin declaration still does not identify the source of the voter file nor confirm its accuracy or currentness. In fact, it indicates only that McLoughlin "believe[s]" the voter file is accurate "as of August 2025," meaning it is *more than a year old* (McLoughlin Decl. ¶ 21).

28. The available information is also unclear regarding the completeness and currency of the underlying citizenship information. For example, it does not disclose the dates or update schedules of the records used, making it difficult to assess whether they support a determination of *current* noncitizenship. As noted before, the reliability of the final classification depends on two separate determinations: whether the records were correctly linked to the registered voter and whether the linked information was sufficiently complete, current, and conclusive to establish that individual's noncitizenship status. The available information does not provide a basis for measuring the accuracy of either the identity linking steps or the resulting citizenship classifications. There appears to be no known public source of complete and current citizenship data held by the federal government.[12]

29. The agency likewise omits the information necessary to trace how it arrived at the approximately 20,000 voter number. It does not report how many voter records entered the process, how many generated initial matches, or how many were excluded at each subsequent stage such as the alien-number linkage, citizenship review, second-level review, and HSI assessment. Although the account states that USCIS forwards high-confidence referrals, this appears to me to be an arbitrary designation, as it does not explain how those categories are handled or whether any records are reclassified.

[12] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH (quoting head of USCIS verification division who acknowledges that DHS cannot always locate up-to-date citizenship information for persons not born in the U.S.).

30. HSI's use of analytical tools to "rectify" mismatches and "shore up" data deficiencies introduces another issue. A discrepancy can reflect an error or outdated information, but it can also indicate that records belong to different people. Without reliable methods to distinguish those possibilities, it is difficult to determine whether this enrichment process corrects erroneous links and supplies independently corroborated information, or whether it instead introduces further opportunities for error.

31. These details matter when a matching process is used to identify a comparatively small population within a statewide voter file. Taking the approximately 23 million registrants as the relevant denominator, 20,000 represents less than one-tenth of one percent of the total voter file. Even a small rate of false positive across the records examined could therefore account for the approximately 20,000 individuals flagged as noncitizen registered voters.

## F. Additional Information Provided by Mr. McLoughlin and Mr. Bartell Does Not Establish the Reliability of the Data Matching and Citizenship Classifications

32. The additional descriptions of the process or workflow outlined by McLoughlin and Bartell do not lessen the principal methodological concerns I identified above.

33. McLoughlin's declaration does not even express certainty about the version of California's voter rolls that USCIS and HSI used to conduct their matching. He states, "Our office received what appeared to be the California voter roster for the general election of 2026. . . . I believe that the voter file provided to HSI accurately reflects the actual voter rolls in California . . . as of August 2025" (McLoughlin Decl. ¶¶ 20-21). This suggests both that HSI is not entirely confident of the provenance of the file it received, and that even if the version of the voter file HSI received was accurate at the time, it may be more than one year old.

34. Furthermore, the process described involves several stages, such as supplementing voter records with information from an unidentified third-party platform through an unidentified

process, linking those expanded records to USCIS holdings, reviewing citizenship information, and conducting further analysis within HSI. Each stage requires decisions about whether the information belongs to the same individual and what that information establishes. Describing these stages does not, by itself, demonstrate that the decisions were correct or methodologically sound. In fact, these additional accounts provide no error rates or independently verified validation results to empirically establish the accuracy of the final classifications.

35. The initial use of an unidentified third-party data analytics platform introduces an identity linkage step that one can only describe as a black box. McLoughlin states that FDNS combines information from the voter file with information from a "reliable" platform to learn more about each individual (McLoughlin Decl. ¶ 15). However, the description does not identify the platform, the underlying data sources, the fields used to connect its information to voter records, or the criteria or methods for accepting such connections. There is also no evidence to support the characterization of the platform as "reliable." These details, or lack thereof, are critical because information attributed to the wrong voter at this stage can adversely impact data matching efforts at subsequent stages, which will then adversely impact the ultimate citizenship classification.

36. Statements such as confidence increasing as more identifiers agree, McLoughlin Decl. ¶ 15, likewise do not establish the accuracy of the matching procedure. Agreement between datasets on different fields does not necessarily provide equivalent evidence of that it is the same individual. Agreement on a common name, for example, is less distinguishing than agreement on variables such as Social Security numbers. A scoring procedure therefore requires more than a count of the number of fields that match; it requires a determination of the weight to assign each type of field that matches.

37. Furthermore, the inclusion of Social Security numbers (SSNs) among the possible matching fields does not lessen my concerns. As discussed above, the publicly accessible version of the California voter file does not contain SSNs. Their use therefore requires an explanation of how an SSN was associated with each voter. McLoughlin and Bartell do not

identify the source of those associations, the procedure used to establish them, or the number of accepted matches supported by verified SSNs rather than other identifying information. An agreement on an SSN obtained through an erroneous initial link could actually *reinforce* a mistaken identification rather than correct it. As such, the relevant question is not simply whether an SSN appears in the expanded or enriched record, but whether that number has been reliably established as belonging to the correct registered voter.

38. Other information shared identifies safeguards for assessing citizenship, but it does not establish how reliably USCIS and HSI distinguished citizens from noncitizens. Bartell states that FDNS investigators manually review identity matches, consider whether individuals derived citizenship through their parents or otherwise acquired citizenship, consult State Department systems for relevant documents such as passports, and conduct a second-level review. These are relevant checks, but they also reveal that citizenship documents may not have been accurately linked or that USCIS systems lack the relevant citizenship evidence. Furthermore, the account does not explain how complete or current the additional searches are, how investigators dealt with missing or conflicting information, or what evidence they consider sufficient to classify someone as "very likely" to be a noncitizen.

39. The quality review conducted after FDNS transfers its work product to HSI raises a separate concern about the preparation of the data used in the earlier analysis. McLoughlin states that HSI reviews the transferred data for duplicate entries, incomplete records, inconsistent formatting, and missing identifiers. However, these basic data cleaning and standardization steps should have *preceded* the initial data linkage efforts. The description suggests that these checks were conducted only *after* records from multiple databases had already been linked. This suggests that the initial links may have relied on messy, incomplete, inconsistently formatted, or otherwise deficient data, which casts serious doubts about the reliability of the resulting matches and the ultimate citizenship conclusions drawn from them.

40. HSI's subsequent "enrichment" and refinement descriptions of the records remain similarly unspecified (McLoughlin Decl. ¶¶ 16-18). McLoughlin states that these procedures improve identity and address information, identify additional identifiers where permitted, and consolidate records from multiple authorized sources. Once again, the account does not identify which additional sources and fields were used in the California analysis, how newly obtained information was attributed to particular voters, or how conflicting records were handled.

41. Finally, USCIS's acknowledgment that approximately 189 records on the list sent to California on October 13, 2026, contained "minor data discrepancies" raises serious concerns about the accuracy of the described multi-level process. These discrepancies were identified *after* the records had apparently passed or been vetted through various matching, enrichment, manual review, and second-level review procedures by two separate agencies and that supposedly supported "high confidence" identifications. The presence of these discrepancies on the final list demonstrates that the entire process is likely error prone and casts real doubt on how thoroughly the list was checked and whether similar or more consequential problems remain undetected among the other records.

## G. <u>Conclusion</u>

42. My work in this matter is ongoing, and I reserve the right to modify, update, or supplement my report, particularly as additional information is made available to me.

43. Pursuant to 28 U.S.C. § 1746, I, Kassra A.R. Oskooii, declare under penalty of perjury that the foregoing is true and correct.

Executed by:

Dr. Kassra A.R. Oskooii

Dated: October 20, 2026

**Work Cited:**


Ansolabehere, S., & Hersh, E. D. (2017). ADGN: An algorithm for record linkage using address, date of birth, gender, and name. *Statistics and Public Policy*, *4*(1), 1-10.

Enamorado, T., Fifield, B., & Imai, K. (2019). Using a probabilistic model to assist merging of large-scale administrative records. *American Political Science Review*, *113*(2), 353-371.

Goel, S., Meredith, M., Morse, M., Rothschild, D., & Shirani-Mehr, H. (2020). One person, one vote: Estimating the prevalence of double voting in US presidential elections. *American Political Science Review*, *114*(2), 456-469.

Kim, S-Y., Meredith, M., Morse, M., & Pettigrew, S. (2023). The future of voter registration: Access, accuracy, and cost. MIT Election Data and Science Lab. https://electionlab.mit.edu/sites/default/files/2023-10/voter-registration.pdf

McDonald, M. P., & Levitt, J. (2008). Seeing double voting: An extension of the birthday problem. *Election Law Journal: Rules, Politics, and Policy*, *7*(2), 111-122.

Morse, M. (2023). Democracy's Bureaucracy: The Complicated Case of Voter Registration Lists. *BUL Rev.*, *103*, 2123.

# Appendix A

**Kassra A.R. Oskooii**

**Contact Information**

University of Delaware
Political Science & International Relations
403 Smith Hall, 18 Amstel Ave
Newark, DE 19716

(302) 831-2355
oskooiik@udel.edu
kassrao@gmail.com
www.kassraoskooii.com

**Academic Appointments**

**University of Delaware**

Political Science & International Relations

| | |
|---|---|
| Professor | 2026-Present |
| Associate Professor | 2021-2026 |
| Assistant Professor | 2016-2021 |

*Current Faculty Affiliations*:

| | |
|---|---|
| Data Science Institute (DSI) | 2023-Present |
| Master of Science in Data Science (MSDS) | 2023-Present |
| Center for Political Communication (CPC) | 2016-Present |
| Center for the Study of Diversity (CSD) | 2016-Present |

**Education**

**University of Washington** — Ph.D., 2016

Department of Political Science

General Fields: American Politics & Political Methodology
Specialized Field: Minority and Race Politics

**University of Washington** — M.A., 2013

Department of Political Science

Center for Statistics & the Social Sciences (CSSS)
Political Methodology Field Certificate (2013)

**University of Washington** — B.A., 2008

Major: Political Science
Minors: Human Rights and Law, Societies, & Justice

**Peer-Reviewed Journal Publications**

"Bureaucratic Bias or Voter-Side Factors? Testing Competing Explanations for Racial Gaps in Vote-By-Mail Ballot Signature Rejections." 2026. ***Political Research Quarterly***, 79(1): 62-77. w/ Herndon and Rios.

"Neighboring Groups and Political Attacks." 2025. ***Political Research Quarterly***, 78(4): 1474-1490. w/ Besco, Garcia-Rios, Lagodny, Lajevardi, and Tolley.

"Anti-Muslim Policy Preferences and Boundaries of American Identity Across Partisanship." 2024. ***Journal of Public Policy***, 44(3): 573-591. w/ Lajevardi, N.

"In the Shadow of September 11: The Roots and Ramifications of Anti-Muslim Attitudes in the United States." 2024. ***Advances in Political Psychology***, 45(S1): 87-118. w/ Lajevardi, N., Saleem, M., and Docherty, M.

"Social Mobility Through Immigrant Resentment: Explaining Latinx Support for Restrictive Immigration Policies and Anti-Immigrant Candidates." 2024. ***Public Opinion Quarterly***, 88(1): 51-78. w/ Hickel, F., and Collingwood, L.

"The Participatory Implications of Racialized Policy Feedback." 2023. ***Perspectives on Politics***, 21(3): 932-950. w/ Garcia-Rios, S., Lajevardi, N. and Walker, H.

"Undermining Sanctuary? When Local and National Partisan Cues Diverge." 2023. ***Urban Affairs Review***, 59(1): 133-169. w/ Collingwood, L. & Martinez, G.

"Fight Not Flight: The Effects of Explicit Racism on Minority Political Engagement." 2022. ***Electoral Studies***, 80: 102515. w/ Besco, R., Garcia-Rios, S., Lagodny, J., Lajevardi, N., & Tolley, E.

"Hate, Amplified? Social Media News Consumption and Anti-Muslim Policy Support." 2022. ***Journal of Public Policy***, 42: 656-683. w/ Lajevardi, N. and Walker, H. (FirstView)

"Estimating Candidate Support in Voting Rights Act Cases: Comparing Iterative EI and EI-RxC Methods." 2022. ***Sociological Methods and Research***, 51(1): 271-304. w/ Barreto, M., Collingwood & Garcia-Rios, S.

"Beyond Generalized Ethnocentrism: Islam-Specific Beliefs and Prejudice toward Muslim Americans." 2021. ***Politics, Groups, and Identities***, 9(3): 538-565. w/ Dana, K. & Barreto, M.

"Opinion Shift and Stability: The Information Environment and Long-Lasting Opposition to Trump's Muslim Ban." 2021. ***Political Behavior***, 43: 301–337. w/Lajevardi, N. & Collingwood, L.

Covered in: *The Washington Post (Monkey Cage)*

"The Role of Identity Prioritization: Why Some Latinx Support Restrictionist Immigration Policies and Candidates." 2020. ***Public Opinion Quarterly***, 84: 860–891. w/ Hickel, F., Alamillo, R. & Collingwood, L.

"Perceived Discrimination and Political Behavior." 2020. ***British Journal of Political Science***, 50(3): 867-892.

"The Paradox Between Integration and Perceived Discrimination Among American Muslims." 2020. ***Political Psychology***, 41(3): 587-606. w/ Lajevardi, N., Walker, H. & Westfall, A.

*Winner of the 2019 American Political Science Association Race, Ethnicity, and Politics Section Best Paper Award.*

"Veiled Politics: Experiences with Discrimination among Muslim Americans." 2019. ***Politics and Religion***, 12(2): 629-677. w/ Dana, K., Lajevardi, N., & Walker, H.

"Partisan Attitudes toward Sanctuary Cities: The Asymmetrical Effects of Political Knowledge." 2018. ***Politics and Policy***, 46 (6): 951-984. w/ Dreier, S. & Collingwood, L.

"A Change of Heart? Why Individual-Level Public Opinion Shifted against Trump's Muslim Ban." 2018. ***Political Behavior***, 40: 1035-1072. w/ Collingwood, L. & Lajevardi, N.

Covered in: *The Washington Post (Monkey Cage), Vox, ThinkProgress, NPR, Al Jazeera, Middle East Eye, Psychology Today, & Social Psych Online*

"Old-Fashioned Racism, Contemporary Islamophobia, and the Political Isolation of Muslim Americans in the Age of Trump." 2018. ***Journal of Race, Ethnicity, and Politics***, 3(1): 112-152. w/ Lajevardi, N.

"The Politics of Choice Reconsidered: Partisanship, Ideology, and Minority Politics in Washington's Charter School Initiative." 2018. ***State Politics and Policy Quarterly***, 18(1): 61-92. w/ Collingwood, L. & Jochim, A.

"Muslims in Great Britain: The Impact of Mosque Attendance on Political Behaviour and Civic Engagement." 2018. ***Journal of Ethnic and Migration Studies***, 44(9): 1479-1505. w/ Dana, K.

"eiCompare: Comparing Ecological Inference Estimates across EI and EI: RxC." 2016. ***R Journal***, 8(2): 92-101. w/ Collingwood, L., Barreto, M. & Garcia-Rios, S.

"How Discrimination Impacts Sociopolitical Behavior: A Multidimensional Perspective." 2016. ***Political Psychology***, 37(5): 613-640.

"Mosques as American Institutions: Mosque Attendance, Religiosity and Integration into the Political System among American Muslims." 2011. ***Religions***, 2(4): 504-524. w/ Dana, K. & Barreto, M.

**Book Chapters / Encyclopedic Entries**

"Discrimination." 2025. In ***IPSA Companion to Political Science: A Practical Introduction to the 200 Most Important Concepts*** edited by Audrey Gagnon, Stephen Sawyer, and Daniel Stockemer.

"Discrimination." 2023. In ***Edward Elgar Encyclopedia of Political Sociology*** edited by Maria Grasso and Marco Giugni. 33:131-133.

"Race and Racism in U.S. Campaigns." 2020. In ***Oxford Handbook on Electoral Persuasion*** edited by Liz Suhay, Bernie Grofman, and Alex Trechsel. 15:278–295. w/ Christopher Parker, Christopher Towler, and Loren Collingwood.

**Book Reviews**

"Understanding Muslim Political Life in America: Contested Citizenship in the Twenty-First Century." Edited by Brian R. Calfano and Nazita Lajevardi. Philadelphia: Temple University Press, 2019. 248p. ***Perspectives on Politics***.

**Public Writing**

"Biden reverses Trump's 'Muslim Ban.' Americans support the decision." ***The Washington Post*** *(Monkey Cage)* (27 January, 2021). w/ Lajevardi, N. and Collingwood, L.

"Targeted: Veiled Women Experience Significantly More Discrimination in the U.S." ***Religion in Public*** (21 January, 2020). w/ Dana, K., Lajevardi, N., and Walker, H.

"Here's what the Democrats need to do to get the DREAM Act through Congress." ***LSE American Politics and Policy Blog*** (29 January, 2018). Also covered by Newsweek U.S. Edition. w/ Walker, H. and Garcia-Rios, S.

"Why Individual-Level Opinion Rapidly Shifted Against Trump's 'Muslim Ban' Executive Order." ***Religion in Public*** (17 January, 2018). w/ Collingwood, L. and Lajevardi, N.

"Allies in name only? Latino-only leadership on DACA may trigger implicit racial biases among White liberals." ***LSE American Politics and Policy Blog*** (28 September, 2017). w/ Garcia-Rios, S. and Walker, H.

"Protests against Trump's immigration executive order may have helped shift public opinion against it" ***LSE American Politics and Policy Blog*** (12 February, 2017). w/ Collingwood, L. and Lajevardi, N.

**Grants, Fellowships, & Awards**

| | |
|---|---|
| Champion of Experiential Learning Award, UD CAS | (2025) |
| Most Valuable Professor Award, UD Athletics | (2025) |
| Nominee of UD's Excellence in Teaching Award | (2023) |
| UD Provost Teaching Fellow | (2022-2025) |
| APSA Race, Ethnicity, and Politics Best Paper Award w/ N. Lajevardi, H. Walker and A. Westfall | (2019) |
| AAPOR Student-Faculty Diversity Pipeline Award | (2019) |
| CTAL Instructional Improvement Grant: Engaging Diversity in Political Science w/ Kara Ellerby ($11,000) | (2018) |

| | |
|---|---|
| POSCIR Seed Research Grant ($1,500) | (2018) |
| DEL General University Research Grant ($7,500) | (2017) |
| UW Political Science Research Fellowship (est. $13,000) | (2016) |
| Dissertation Improvement Research Grant, UCLA ($3000) | (2015) |
| Dean Recognition for Exceptional Pedagogical Contribution, UW | (2014) |
| Best Graduate Paper in PoliSci (w/Hannah Walker), UW | (2014) |
| UW Center for Democracy & VRA Research Fellowship ($5,000) | (2014) |
| UW Center for Democracy & VRA Research Fellowship ($5,000) | (2013) |
| Center for Statistics and the Social Sciences Grant ($1,000) | (2013) |
| UW WISER Research Grant ($2500) | (2011-14) |
| UW WISER Survey Research Fellowship ($20,000) | (2011-14) |
| Grad. Opportunities & Minority Achievement Fellowship ($4,000) | (2010-11) |
| Donald R. Matthews Graduate Fellowship ($40,000) | (2010-11) |
| Jody Deering Nyguist Award for Excellence in Public Speaking | (2008) |

**Research Center / Academic Affiliations**

| | |
|---|---|
| Data Science Institute (DSI), UD | (2023 - ) |
| Master of Science in Data Science (MSDS), UD | (2023 - ) |
| Center for Political Communication, UD | (2016 - ) |
| Center for the Study of Diversity, UD | (2016 - ) |
| Race, Justice, Policy Research Initiative, UD | (2017-20) |
| UW Center for Democracy and Voting Rights Research | (2013-14) |
| Washington Institute for the Study of Race & Ethnicity (WISER) | (2010-16) |
| Center for Social Science and Statistics (CSSS), UW | (2010-16) |
| Washington Survey Research Center (WASRC) | (2010-15) |

**Teaching Experience**

**University of Delaware** (2016 - )
- POSC 150: Intro to American Politics (x14)
- POSC 230: Intro to Politics and Social Justice (x2)
- POSC 413: Minority Politics, Representation, and Voting Rights (x4)
- POSC 867: Race, Ethnicity, and Politics (Graduate Seminar) (x3)
- POSC 807: American Political Behavior (Graduate Seminar) (x3)
- POSC 867: Parties, Elections, and Polarization (Graduate Seminar) (x1)

**University of Washington** (2011-2016)
- POLS 202: Intro to American Politics (x2)
- POLS 357: Minority Representation and the Voting Rights Act (x1)
- POLS 205: Political Science as a Social Science (TA)
- POLS 317: US Race and Ethnic Politics (TA)
- POLS 353: US Congress (TA)
- POLS 503: Advanced Research Design and Analysis (TA)
- LAW E 558: Voting Rights Research and the Law (TA)

**Select External Invited Talks/Panels**

"Bureaucratic Bias or Voter-Side Factors?' Testing Competing Explanations for Racial Gaps in Vote-By-Mail Ballot Signature Rejections." ***Georgetown University***. Talk sponsored by the Department of Government. February 20, 2026.

"Bridging the Boundary Gap: Understanding Methods, Trade-offs, and Best Practices of Assigning Census Blocks to Precincts." ***University of California Los Angeles***. Virtual talk sponsored by the Voting Rights Project. October 30, 2025.

"Pernicious Prejudice: Scholarly Approaches to Antisemitism and Islamophobia." ***Harvard University***. Panel Cosponsored by the Edmond & Lily Safra Center for Ethics, Center for Jewish Studies, Center for Middle Eastern Studies, Center for American Political Studies, and FAS Civil Discourse Initiative. May 1, 2024.

"Diversity and the State of Democratic Citizenship." Featured invited roundtable sponsored by the ***Center for the Study of Democratic Citizenship***. April 23, 2021.

"Shocks to the System: Capturing Opinion Shift and Stability Toward Trump's Muslim Ban." Keynote Speaker at the Democracy and Diversity Triannual Conference at the ***Center for the Study of Democratic Citizenship*** in Montreal, Canada. April 24-25, 2020. [Cancelled Due to COVID-19]

"The New American Electorate." Panelist. ***Princeton University***. Event sponsored by the Center for the Study of Democratic Politics. April 3, 2020. [Cancelled Due to COVID-19]

"Neighboring Identities: Psychological and Political Reactions to Generalized and Particularized Anti-Immigrant Appeals." w/Sergio Garcia-Rios. ***University of Toronto***. Talk Sponsored by the Department of Political Science. March 6, 2020.

"History, Institutions, and Theory Research Coordination Network on Racial and Ethnic Politics." Panelist. ***University of Pennsylvania***. Event sponsored by the American Political Science Association's Special Projects Fund and the Center for the Study of Ethnicity, Race and Immigration at Penn. February 28-29, 2020.

"Using Observational and Experimental Data to Examine the Sociopolitical Consequences of Perceived Discrimination." ***Rutgers University***. Talk sponsored by the Emerging Trends Lecture Series & the Center for the Experimental Study of Politics and Psychology. April 27, 2018.

"A Change of Heart? Using Panel Designs to Establish Causality with Real Events." w/Loren Collingwood. ***Princeton University***. Talk sponsored by the Center for the Study of Democratic Politics. April 26, 2018.

"Using Observational and Experimental Data to Examine the Sociopolitical Consequences of Perceived Discrimination." ***University of California Los Angeles***. Talk sponsored by the Race, Ethnicity and Politics Workshop.

March 5, 2018.

"Muslim-American Attitudes, Sociopolitical Behavior, and Identity." Panelist/Section Presenter. ***University of California Los Angeles***. Event sponsored by the Luskin School of Public Affairs & the National Science Foundation. December 15, 2017.

"Muslim-American Political Behavior." Panelist/Section Presenter. ***Menlo College***. Event sponsored by Menlo College & the National Science Foundation. December 16, 2016.

**Select Internal/Public Invited Talks/Panels**

"American Presidency and Political Power." Talk sponsored by the YALI Mandela Washington Fellows Program at the University of Delaware. June 21, 2024.

"How Democratic is the U.S. Constitution, and to What Extent did the Founding Fathers Oppose Majority Rule?" Speaker. University Day Public Lecture. March 18, 2023.

"Executive Power and the U.S. Democracy." Talk sponsored by the YALI Mandela Washington Fellows Program at the University of Delaware. July 13, 2023.

"Executive Power and the U.S. Democracy." Talk sponsored by the YALI Mandela Washington Fellows Program at the University of Delaware. July 2022.

"Race, Ethnicity, and Gender in the 2020 Election." Speaker. Panel sponsored by the University of Delaware POSCIR. December 14, 2020.

"Building Community: Scholarship and Connection among Faculty of Color." Speaker. Panel sponsored by the Center for the Study of Diversity (CSD) at the University of Delaware. February 24, 2020.

"Executive Power and the U.S. Democracy." Talk sponsored by the 2019 YALI Mandela Washington Fellows Program at the University of Delaware. July 2, 2019.

"Opinion Shift and Stability: Long-Lasting Opposition toward Trump's Muslim Ban." Talk sponsored by the Department of Sociology and Criminal Justice Colloquium Speaker Series at the University of Delaware. April 24, 2019.

"Old-Fashioned Racism and the Roots of Contemporary Islamophobia." Talk sponsored by the Center for the Study of Diversity (CSD) Colloquium Speaker Series at the University of Delaware. December 6, 2018.

"Understanding Executive Power in the United States." Talk sponsored by

the 2018 YALI Mandela Washington Fellows Program at the University of Delaware. July 2, 2018.

"The Inclusion and Exclusion of Minority Groups in the United States." Talk sponsored by the 2017 YALI Mandela Washington Fellows Program at the University of Delaware. July 11, 2017.

"Inclusion and Exclusion: Perceptions of Discrimination in the Workplace." Diversity Summit Presenter. Talk sponsored by the Office of Equity and Inclusion at the University of Delaware. June 20, 2017.

"What Happens Now Part II? A Forum to Discuss Bigotry & Closed Borders in the Trump Era." Speaker. Panel sponsored by the Department of Women and Gender Studies, Sociology and Criminal Justice, Political Science and International Relations, & the College of Arts and Sciences at the University of Delaware. February 13, 2017.

"Forum on the Travel Ban Executive Order." Speaker. Panel sponsored by the University of Delaware Provost Office. February 7, 2017.

"What Happens Now Part I? Fear, Diversity, and Inclusion in Post-U.S. Election." Speaker. Panel sponsored by Women and Gender Studies, Sociology and Criminal Justice, Political Science and International Relations, History, & the College of Arts and Sciences at the University of Delaware. November 30, 2016.

"Race, Religion, and Gender." Election Central Panelist. Event sponsored by the Center for Political Communication at the University of Delaware. November 8, 2016.

**Select Conference Papers**

2024

"Motivated Misperceptions and Public Opinion about Abortion" Paper Presentation (Lead, Dr. Cassese) at the Annual American Political Science Association Conference (APSA)

2021

"Partisan Winners and Losers: Testing Alternative Frames of Congressional Election Results Among White and Latino Voters." Online Paper Presentation at the Annual American Political Science Association Conference (APSA).

"Kissing Up and Kicking Down: How Immigrant Resentment Impacts Latinx Support for Donald Trump and Restrictive Immigration Policies." Online Paper Presentation at the Annual American Political Science Association Conference (APSA).

"How do Political Attacks Affect Racial and Ethnic Self-Identities?" Online Paper Presentation at the Annual Midwest Political Science Association Conference (MPSA).

"Kissing Up and Kicking Down: How Immigrant Resentment Impacts Latinx Support for Donald Trump and Restrictive Immigration Policies." Online Paper Presentation at the Annual Midwest Political Science Association Conference (MPSA).

2019

"The Significance of Politicized Group Identities: Re-examining the Relationship between Contact with Punitive Political Institutions and Political Participation." Paper Presentation at the Annual American Political Science Association Conference (APSA) in Washington DC.

"Threat or Reassurance? Framing Midterm results among Latinos and Whites." Paper Presentation at the Annual American Political Science Association Conference (APSA) in Washington DC.

"When American Identity Trumps Latinx Identity: Explaining Support for Restrictive Immigration Policies." Paper Presentation at the Annual American Political Science Association Conference (APSA) in Washington DC.

"Anti-Minority Politics and Political Participation: Evidence from Four Countries." Paper Presentation at the Annual American Political Science Association Conference (APSA) in Washington DC.

2018

"Assessing the Link between Interactions with Punitive Political Institutions and Political Behavior." Paper Presentation at the 2018 Symposium on the Politics of Immigration, Race, and Ethnicity (SPIRE) Meeting in Philadelphia, PA (University of Pennsylvania).

"Are Integrated Muslim Americans More Likely to Perceive Discrimination?" Paper Presentation at the Annual American Political Science Association Conference (APSA) in Boston, MA.

"Opinion Shift and Stability: Enduring Individual-Level Opposition to Trump's Muslim Ban." Paper Presentation at the Annual American Political Science Association Conference (APSA) in Boston, MA.

"Assessing the Link between Interactions with Punitive Political Institutions and Political Behavior." Paper Presentation at the 2018 Collaborative Multiracial Post-Election Study (CMPS) Meeting in Los Angeles, CA (UCLA).

2017

"A Change of Heart? Why Individual-Level Public Opinion Shifted against Trump's Muslim Ban." Paper Presentation at the Annual American Political

Science Association Conference (APSA) in San Francisco, CA.

"Veiled Politics: Experiences with Discrimination among American Muslims." Paper Presentation at the Annual American Political Science Association Conference (APSA) in San Francisco, CA.

"The Racial Shield as Racism Exoneration: Explaining White Racist Support for Conservative Minority Candidates." Paper Presentation at the Annual Western Political Science Association Conference (WPSA) in Vancouver BC, Canada.

2016

"Assessing the Mechanism Linking Discrimination to Democratic Engagement." Paper Presentation at the Annual American Political Science Association Conference (APSA) in Philadelphia, PA.

"Estimating Candidate Support: Comparing EI and EI-RxC." Paper Presentation at the Annual Midwest Political Science Association Conference (MPSA) in Chicago, Illinois.

**Student Supervision**

Natalie Standridge, Long Paper & Dissertation Committee Member (POSC)
Sadie Ellington, Dissertation Committee Member (POSC)
Enes Aksu, Dissertation Committee Member (POSC)
Enes Tuzgen, Dissertation Committee Member (POSC)
Olga Gerasimenko, Dissertation Committee Member (POSC)
Furkan Karakayan, Dissertation Committee Member (POSC)
Richard Takyi Amoah, Dissertation Committee Member (ECON)
Sheila Afrakomah, Dissertation Committee Member (ECON)
Ahmet Ates, Dissertation Committee Member (POSC)
Charles Mays, Long Paper and Dissertation Chair (POSC)
Ian Mumma, Long Paper Committee Member (POSC)
Clark Shanahan, Long Paper Committee Member (POSC)
Fahmida Zaman, Research Assistant Supervisor (POSC)
Lola Bessis, Independent Research Supervisor (POSC)

Rachel Spruill, Undergraduate Honors Thesis Chair
Satvika Kadiyala, Undergraduate Summer Scholars Advisor
Jessica Sack, Undergraduate Honors Thesis Chair
Jordan Spencer, Undergraduate Faculty Mentor for the McNair Program
Lauren Turenchalk, Undergraduate Research Supervisor

**Professional Service**

**Editorial Board Member**
*Politics and Religion* (6/2018 - 12/2021)

**Select Discipline Service**

American Political Science Association (APSA) REP Section Executive Council (2025-2027)

American Political Science Association (APSA) REP Section Conference Chair (2021-2022)

Western Political Science Association (WPSA) Task Force on Equity, Inclusion, and Access in the Discipline (2020-2021)

American Political Science Association (APSA) REP Best Paper Award Committee Member (2020)

**Select University Service**

College of Arts & Sciences Senator (2025)
Community Engagement Scholars Faculty Review Board Member (Winter/Spring 2022)
Summer Educational and Cultural Experience Program (SECEP) Lecturer of Politics and Justice in the United States. (July 27 - August 20, 2019)

**Select Department Service Roles**

Director of Graduate Admissions & Funding
Director of Undergraduate Internships
Executive and Advisory Committee Member
Member of Hiring Committees
Faculty Review Committee Member
Graduate Placement Committee Chair
Academic Program Review Steering Committee Member
Academic Program Review Response Committee Member
Undergraduate Advising (Standard Annual Load)
Diversity, Equity, and Inclusion Committee Member
New Minor Development Committee Member
Social Science Sponsored Research Committee Member

**Manuscript Reviewer/Referee**

*American Journal of Political Science, American Political Science Review, American Politics Research, British Journal of Political Science, Belgian Federal office for Science Policy, Behavioral Sciences of Terrorism and Political Aggression, Cambridge University Press, Electoral Studies, European Journal of Political Research, European Political Science Review, International Journal of Public Opinion, Journal of Elections, Public Opinion & Parties, Journal of Ethnic and Migration Studies, Journal of Public Policy, Journal of Politics, Journal of Race, Ethnicity and Politics, Journal of Women, Politics & Policy, Migration Studies, Perspectives on Politics, Political Behavior, Politics, Groups, and Identities, Political Psychology, Political Research Quarterly, Politics and Religion, Political Studies Review, PS: Political Science & Politics, Public Opinion Quarterly, Social Science Quarterly, Time-Sharing Experiments for the Social Sciences*

**Conference Coordination**

Politics of Race, Immigration, and Ethnicity Consortium (PRIEC) at the University of Delaware. (2020)

Politics of Race, Immigration, and Ethnicity Consortium (PRIEC) at the University of Washington. (2013)

Latinos and the Voting Rights Act. Center for Democracy and Voting Rights Research at the University of Washington Law School. (2013)

Islam in the Public Sphere Conference. Washington Institute for the Study of Race & Ethnicity (WISER). (2011)

**Select Expert Consulting Experience**

*State of Maryland Attorney General's Office*; 2021 MD Redistricting

*Baltimore County Branch of the NAACP v. Baltimore County, Maryland*, No. 1:21-cv-03232-LKG (D. Md. 2022)

*Common Cause Florida v. Lee*, 4:22-cv-109-AW-MAF (N.D. Fla 2022)

*Common Cause Florida v. Byrd*, No. 4:22-cv-00109-AW-MAF (N.D. Fla. 2023) [Deposed]

*Dickinson Bay Area NAACP Branch v. Galveston County, Texas*, No. 3:22-cv-117-JVB (S.D. Tex. 2023) [Deposed & Testified]

*Reyes v. Chilton*, 4:21-cv-05075-MKD (E.D. Wash. 2021) [Deposed]

*Roswell Independent School District (RISD)*; 2022 Redistricting

*Caroline County Branch of the NAACP v. Town of Federalsburg*, Civ. Action No. 23-SAG-00484 (D.Md. 2023)

*Finn v. Cobb County Board of Elections and Registration*, No. 1:22-cv-02300-ELR (N.D. Ga. 2023)

*Coca v. City of Dodge City, et al.* Case no. 6:22-cv-01274 (D Kan. 2024) [Deposed & Testified]

*Soto Palmer v. Hobbs*, No. 3:22-cv-05035-RSL (W.D. Wash. 2023) [Testified]

*Stone v. Allen*, No. 2-21-cv-1531 (N.D. Ala. 2024) [Deposed & Testified]

*Wicomico County Branch of the NAACP et al v. Wicomico County, MD*, Civ. Action No. 23-MJM-03325 (D. Md. 2024)

*New York Communities for Change et al v. County of Nassau, NY*, No. 602316/2024 (N.Y.S.) [Deposed & Testified]

*NC NAACP et al v. Berger et al*, No. 23-cv-1104 (M.D. NC. 2023) [Deposed & Testified]

*League of Women Voters of Utah, et al. v. Utah State Legislature, et al.*, No. 220901712/2022 (Utah 3rd Dist. Ct.) [Testified]

*Amber Sherman, et al. v. Tre Hargett, et al.*, No. 3:26-cv-00616 (M.D. Tenn. 2026)

*Lopez v. County of Stanislaus*, No. 2:25-cv-01175 (E.D. Cal. Filed Apr. 22, 2025)

**Previous Research Positions**

**Senior Researcher, Washington Poll** 2010-2014
*Public Opinion Survey Design, Programming, and Analysis.*

**Researcher, Center for Democracy & Voting Rights Research** 2013-2014
*Racially Polarized Voting (RPV) Analysis of jurisdictions in states such as: California, Florida, Texas, and Washington.*

**Investigator, Washington State Charter School Initiative** 2013
*Precinct and school district level data collection and analysis of the I-1240 Vote for S360 Polling Firm and Melinda & Gates Foundation.*

**Skills & Additional Information**

**Software**: R, Python (Basic), , LaTeX, esri, DRA2020
**Languages**: Farsi (Persian)–Native Speaker
**R Packages**: eiCompare (contributor), eiExpand (contributor)