# Exhibit A

Uzoma N. Nkwonta* (DC Bar No. 975323)
unkwonta@elias.law
Branden D. Lewiston* (DC Bar No. 252550)
blewiston@elias.law
Julianna D. Astarita* (DC Bar No. 90041368)
jastarita@elias.law
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135

Tyler L. Bishop (CA Bar No. 337546)
tbishop@elias.law
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (202) 948-1135

Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 786-3478
F: (213) 277-8989

*Counsel for Proposed Intervenor-Defendants Services, Immigrant Rights and Education Network and Mi Familia en Acción*

* *Pro hac vice application pending*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF CALIFORNIA; SHIRLEY N. WEBER, in her official capacity as Secretary of State of California; and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

Defendants.

Case No: 2:26-cv-12025-DOC-(ADSx)

**SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK AND MI FAMILIA EN ACCIÓN'S [PROPOSED] OPPOSITION TO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Hearing Date and Details: TBD

Action Filed: October 15, 2026

Judge: Hon. David O. Carter

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii
INTRODUCTION ........ 1
BACKGROUND ........ 2
LEGAL STANDARD ........ 5
ARGUMENT ........ 6
I. DOJ is not likely to succeed on the merits. ........ 6
  A. The United States has no cause of action in equity to enforce 18 U.S.C. § 611, a criminal statute. ........ 6
  B. Federal law does not preempt California's procedures for mailing ballots to or tabulating ballots from registered voters. ........ 10
  C. Federal statutes bar DOJ's relief. ........ 13
II. The remaining factors weigh strongly against preliminary relief. ........ 18
  A. DOJ has not shown any likely harm, much less irreparable harm, in the absence of relief. ........ 19
  B. Registered voters will suffer irreparable harm under DOJ's relief, and the public interest weighs against it. ........ 20
  C. DOJ's delay—and *Purcell*—weigh strongly against relief. ........ 21
CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Acosta v. Trans Union, LLC*,
243 F.R.D. 377 (C.D. Cal. 2007) .......... 13

*All. for the Wild Rockies v. Pena*,
865 F.3d 1211 (9th Cir. 2017) .......... 19

*Allen v. Milligan*,
608 U.S. 511 (2026) .......... 21

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) .......... *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 6, 7, 9

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*,
33 F.4th 1107 (9th Cir. 2022) .......... 10

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
56 F.3d 791 (7th Cir. 1995) .......... 15

*Assurance Wireless USA, L.P. v. Reynolds*,
100 F.4th 1024 (9th Cir. 2024) .......... 10, 11

*Carney v. Adams*,
592 U.S. 53 (2020) .......... 19

*Common Cause v. DOJ*,
No. 1:26-cv-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) .......... 3

*Frazier v. Callicutt*,
383 F. Supp. 15 (N.D. Miss. 1974) .......... 17

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) .......... 6

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007) .......... 19

*INS v. Pangilinan*,
486 U.S. 875 (1988) .......... 13

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .......... 20

*League of Women Voters v. DHS*,
835 F. Supp. 3d 79 (D.D.C. 2026) .......... 4

*Louisiana v. United States*,
380 U.S. 145 (1965) .......... 17

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .......... 20

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) .......... 21

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) .......... *passim*

*N.H. Youth Movement v. Scanlan*,
No. 26-1740, 2026 WL 2620381 (1st Cir. Sep. 4, 2026) .......... 21

*Norwood v. Harrison*,
413 U.S. 455 (1973) .......... 8, 9

*Penn Mut. Life Ins. Co. v. City of Austin*,
168 U.S. 685 (1898) .......... 21

*People Not Politicians v. Onder*,
No. 26A388, 2026 WL 2883222 (U.S. Sep. 25, 2026) .......... 21, 22

*Price v. Diab*,
181 F.4th 955 (9th Cir. 2026) .......... 22

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 21, 22

*RNC v. Mi Familia Vota*,
145 S. Ct. 108 (Aug. 22, 2024) .......... 12

*RNC v. Mi Familia Vota*,
146 S. Ct. 2799 (June 29, 2026) .......... 12

*Shivelhood v. Davis*,
336 F. Supp. 1111 (D. Vt. 1971) .... 17

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
240 F.3d 832 (9th Cir. 2001) .... 6

*United States v. California*,
824 F. Supp. 3d 1079 (C.D. Cal. 2026) .... 8, 19

*United States v. California*,
No. 2:25-cv-06230-MCS, 2026 WL 2970902 (C.D. Cal. Oct. 2, 2026) .... 19

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .... 11

*United States v. City of Philadelphia*,
644 F.2d 187 (3d Cir. 1980) .... 7, 8

*United States v. Cox*,
No. 0:25-cr-60249, 2026 WL 2948729 (S.D. Fla. Oct. 1, 2026) .... 13

*United States v. Jalas*,
409 F.2d 358 (7th Cir. 1969) .... 7

*United States v. Mattson*,
600 F.2d 1295 (9th Cir. 1979) .... 7, 8

*United States v. Metcalf*,
156 F.4th 871 (9th Cir. 2025) .... 13

*United States v. Solomon*,
563 F.2d 1121 (4th Cir. 1977) .... 7

*Watson v. RNC*,
609 U.S. 672 (2026) .... 1, 11, 12

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .... 5, 6

*Yong v. INS*,
208 F.3d 1116 (9th Cir. 2000) .... 12

**Statutes**

U.S. Const. art. I, § 4, cl. 1 .......... 1

18 U.S.C. § 611 .......... 6, 10

34 U.S.C. § 12601 .......... 8

42 U.S.C. § 1997a .......... 8

52 U.S.C. § 10101 .......... 8, 18

52 U.S.C. § 10307 .......... 16

52 U.S.C. § 10308 .......... 8

52 U.S.C. § 20505 .......... 14

52 U.S.C. § 20507 .......... 14

52 U.S.C. § 20508 .......... 12

52 U.S.C. § 20510 .......... 8

52 U.S.C. § 21083 .......... 12

52 U.S.C. § 21111 .......... 8

Cal. Elec. Code § 2101 .......... 10

Cal. Elec. Code § 2200 .......... 16

Cal. Elec. Code § 2201 .......... 17

Cal. Elec. Code § 18560 .......... 10

**Other Authorities**

Jack Friedman & Wren Orey, *Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices*, MIT Election Lab (Oct. 1, 2026), https://perma.cc/9JEX-B44C .......... 4

Jasper Ward, *Trump Threatens California Officials with Imprisonment Over Stance on Mail Ballots*, Reuters (Oct. 16, 2026), https://perma.cc/KVY7-5WCT .......... 5

Katherine Schaeffer, *One in Ten Eligible Voters in the United States Are Naturalized Citizens*, Pew Rsch. Ctr. (Sep. 19, 2019), https://perma.cc/2G59-7XB7 ........ 20

Letter from Anonymous Whistleblower to U.S. Senator Alex Padilla at 12, 39 (Sep. 8, 2026), available at https://perma.cc/P9DF-8FSZ3 ........ 5

Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html ........ 4

The Federalist No. 46 (James Madison) (Clinton Rossiter ed., 1961) ........ 1

The Federalist No. 51 (James Madison) (Clinton Rossiter ed., 1961) ........ 2

## INTRODUCTION

This lawsuit marks a dark hour in American history. Abandoning its historical role of defending voting rights, the U.S. Department of Justice demands that California refuse to count ballots from more than 20,000 registered voters whose names appear on a list of purported noncitizens, created by the federal government through a process that has been riddled with well-documented errors. Indeed, when the federal government sent a similar list—generated through the same process—to Nevada's Secretary of State in July, state officials responded that their records indicated that every voter on this purported noncitizen list was in fact a citizen. Here too, the Los Angeles County Clerk's preliminary sample review has raised serious questions about the veracity of DOJ's claims, as more than 25% percent of the voters in that sample listed their birthplace as the United States.

Remarkably, DOJ itself acknowledges that its list may be incorrect and that the individuals it identifies may be citizens. It does not claim that the people on its haphazard list are in fact noncitizens but rather attempts to enlist California officials to check its work, all while denying voters the opportunity to vote a mail ballot or have their ballot counted. Worse still, this chaotic and unprecedented demand comes while voting in the election is already well underway.

Fortunately, the Framers designed our constitutional system to restrain such "ambitious encroachments" of a power-hungry federal executive. The Federalist No. 46, at 298 (James Madison) (Clinton Rossiter ed., 1961). The Constitution assigns to the states the authority to set the "Times, Places and Manner" of holding federal elections, subject only to laws enacted by Congress that preempt state decisions. U.S. Const. art. I, § 4, cl. 1. That power to preempt extends only "so far as it is exercised, and no farther." *Watson v. RNC*, 609 U.S. 672, 697 (2026). And states alone are tasked with setting and evaluating voter qualifications for federal elections. *See Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1, 17 (2013)

("Prescribing voting qualifications … 'forms no part of the power to be conferred upon the national government'" (quoting The Federalist No. 60, at 371 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). "This allocation of authority sprang from the Framers' aversion to concentrated power." *Id.*; *see also* The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961) (explaining the division of powers between the states and federal governments erects a "double security" to secure "the rights of the people").

This Court should reject DOJ's attempt to dismantle the protections our Framers constructed. No law authorizes DOJ to bring this suit, and no law preempts California from counting the ballots of registered voters who have never been shown to be ineligible—in fact, numerous federal laws *prohibit* just what DOJ seeks to do here. And the irreparable harm threatened by DOJ's extraordinary request cannot be overstated: DOJ asks that the Court require California to *deny* eligible voters' mail ballots, force them to scramble at the eleventh hour to defend their eligibility, and even disenfranchise them outright simply because their name appears on an unreliable and unconfirmed list of purported noncitizens drawn from an error-prone database-matching process. It is well established that a federal court may not rewrite a state's election laws when an election is already underway and when doing so would throw that election into chaos.

DOJ's request for a temporary restraining order and preliminary injunction should be denied.

## BACKGROUND[1]

At the direction of the President, DOJ and the Department of Homeland Security ("DHS") have launched an unprecedented crusade to interfere with the

---

[1] The relevant background is further detailed in Proposed Intervenors' motion to intervene and the existing Defendants' filings. *See generally* ECF 11, 31, 32.

states' election administration. *See Common Cause v. DOJ*, No. 1:26-cv-1352, 2026 WL 3033772, at *4 (D.D.C. Oct. 9, 2026) (discussing Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)). This lawsuit arises out of the government's most recent salvo.

On July 16, DHS Secretary Markwayne Mullin sent a letter to California Secretary of State Shirley Weber alleging that approximately 190,000 registered California voters "**may be**" noncitizens." Compl. Ex. A., ECF 1-1 (emphasis added). Secretary Weber requested information on the sources of data and the methodology used to compile the list, including the "software[] and matching criteria utilized in this analysis." Compl. Ex. B at 1, ECF 1-2.

The United States ignored the Secretary for several months, until October 13, when voting in California was already underway. TRO Ex. A at 1, ECF 22-7. Then, DOJ provided a thumb drive to the Los Angeles County Registrar-Recorder/County Clerk ("Los Angeles County Clerk") containing a list of over 20,000 names "the Federal Government believes are likely noncitizens who were sent a … ballot" for the 2026 General Election. Compl. ¶ 4, ECF 1. DOJ demanded that, within just 48 hours, the Los Angeles County Clerk and the Secretary agree not to send mail ballots to any voter on the list and to segregate and not tabulate the mail ballots of individuals on the list unless their citizenship could be verified. Compl. Ex. C, ECF 1-3. Secretary Weber and the Los Angeles County Clerk did not acquiesce to this extraordinary and unprecedented demand.

There is no reason to credit DOJ's 20,000 noncitizens figure. Even DOJ itself has stopped short of endorsing it as fact: the best it can allege is that the voters on its list "might be" noncitizens. Compl. ¶ 59. And the correspondence that led up to this point alone casts doubt on the reliability of DOJ's list. Secretary Mullin's initial letter to Secretary Weber indicated that there could be "as many as 190,832 non-citizens" registered to vote. *See* Compl. Ex. A (emphasis removed). With little

explanation, the figure has now plummeted to around 20,000. *See* Compl. ¶ 47. Initial analysis by the Los Angeles County Clerk confirms DOJ's list is riddled with errors: 25.8% of voters in a sample analyzed by the Clerk listed their birthplace as the United States, 42.9% already had their registrations canceled, and another 4.6% had registrations listed as inactive. *See* LA Opp'n to TRO 17, ECF 32-1.

At this point, this comes as no surprise: in recent months the federal government has repeatedly attempted to identify noncitizens on voter rolls, and each time it has largely identified naturalized citizens instead, with eye-popping error rates. Earlier this year, for instance, DHS told Nevada that federal records showed the state may have nearly 16,000 noncitizens on its rolls but later cut the number to just 185 purported noncitizens.[2] Nevada responded that its records showed that *all* were, in fact, eligible voters, and DHS offered no evidence to the contrary.[3] Similar examples abound. A manual audit conducted by Utah found that, of 8,917 individuals flagged as "potential noncitizens" by the federal government, nearly all were citizens.[4] And an independent review in Travis County, Texas, found that 25% of voters alleged by the federal government to be "noncitizens" had *already* proven their citizenship. *League of Women Voters v. DHS*, 835 F. Supp. 3d 79, 115 (D.D.C. 2026). A federal whistleblower report reveals why these mistakes are so common. According to a September disclosure, officers working for DHS's "Unlawful Voter Initiative" were given less than two hours of training, quotas of reviewing records

---

[2] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html.

[3] *Id.*

[4] Jack Friedman & Wren Orey, *Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices*, MIT Election Lab (Oct. 1, 2026), https://perma.cc/9JEX-B44C.

for 40 voters a day (about 12 minutes each), and unreliable data that likely included naturalized citizens.[5] The whistleblower explained that officials used "supplemental magic" to obtain alien numbers for the individuals they claim to have identified on the voter rolls, and warned that "potentially thousands or tens of thousands" of California residents will be considered unlawful voters "based on data that an officer may have good reason to believe is unreliable or inaccurate without corroboration."[6]

Undeterred by the patent unreliability of its list of purported noncitizens, DOJ filed this suit on October 15, 2026. It seeks extraordinary relief: an order requiring California to segregate and refuse to tabulate mail ballots from individuals on DOJ's list until their citizenship status can be "verified"—a term that DOJ never defines and for which there is no established process—in the days before the November 3 election. Compl. ¶ 63. Proposed Intervenors moved to intervene as defendants the same day. Mot. Intervene, ECF 11. DOJ's ex parte request for a temporary restraining order and preliminary injunction followed four days later. ECF 22-1. DOJ—and President Trump—have also threatened to imprison California election officials if they do not comply.[7]

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain preliminary relief, a plaintiff must show (i) "he is likely to succeed on the merits," (ii) "he is likely to suffer irreparable harm in the absence of preliminary relief," (iii) "the balance of

---

[5] *See* Letter from Anonymous Whistleblower to U.S. Senator Alex Padilla at 12, 39 (Sep. 8, 2026), *available at* https://perma.cc/P9DF-8FSZ3.

[6] *Id.* at 30-31.

[7] Jasper Ward, *Trump Threatens California Officials with Imprisonment Over Stance on Mail Ballots*, Reuters (Oct. 16, 2026), https://perma.cc/KVY7-5WCT.

equities tips in his favor," and (iv) "an injunction is in the public interest." *Id*. The showing required for a temporary restraining order is "substantially identical" as that for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

## ARGUMENT

### I. DOJ is not likely to succeed on the merits.

DOJ's lawsuit and its unprecedented demands extend far beyond the federal government's constitutionally assigned role, and it seeks relief that would violate federal law several times over. And since DOJ requests a "mandatory injunction" that alters rather than preserves the status quo, the Court must deny the motion "unless the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quotation omitted). DOJ falls well short of that high bar.

#### A. The United States has no cause of action in equity to enforce 18 U.S.C. § 611, a criminal statute.

DOJ's sole cause of action alleges a violation of the Supremacy Clause, even as DOJ concedes that "there is no implied right of action under the Supremacy Clause." TRO Mem. 17, ECF 22-2 (citation omitted). Because the Supremacy Clause "is not the 'source of any federal rights,' and certainly does not create a cause of action," DOJ's claim is "subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25, 327 (2015) (citation omitted).

Recognizing the limitations of its Supremacy Clause claim, DOJ attempts to invoke the so-called "equitable tradition of suits to enjoin unconstitutional actions by state actors" and the Attorney General's asserted inherent authority to sue. TRO Mem. 15-17; *see* Compl. ¶ 8. But this suit falls far outside that tradition, and DOJ cannot enforce the criminal prohibition in 18 U.S.C. § 611—which addresses the

conduct of noncitizens—through a freestanding suit in equity against California's election officials. *See, e.g.*, *United States v. City of Philadelphia*, 644 F.2d 187, 190-99 (3d Cir. 1980) (holding DOJ lacked equitable cause of action to enjoin city officials from violating civil rights through discriminatory policing, despite DOJ invoking criminal statutes barring deprivation of civil rights); *United States v. Jalas*, 409 F.2d 358, 360 (7th Cir. 1969) (holding DOJ lacked equitable cause of action to enjoin official from running for union election, despite DOJ invoking criminal statute barring union officers from accepting stock from employer to influence his decisions, which the official previously violated); *United States v. Mattson*, 600 F.2d 1295, 1297-1300 & n.1 (9th Cir. 1979) (holding DOJ lacked equitable cause of action to enjoin state officials to address unsanitary and unsafe facilities housing institutionalized citizens, despite DOJ invoking the constitutional rights of the individuals and a criminal statute barring deprivation of constitutional rights); *United States v. Solomon*, 563 F.2d 1121, 1124 (4th Cir. 1977) (similar). This conclusion flows from the "general rule prohibiting issuance of an injunction against the commission of a crime." *Jalas*, 409 F.2d at 360.

There is no basis for a different result here. To start, the criminal statute DOJ purports to derive its authority from (§ 611) does not regulate the conduct of election officials at all. It makes it "unlawful for any alien to vote." 18 U.S.C. § 611(a). And Congress specified how § 611 is enforced: through *criminal* prosecutions of individuals. 18 U.S.C. § 611(b). "The 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Armstrong*, 575 U.S. at 328 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). DOJ is, by its own admission, using that tool for enforcement right now—its own brief touts indictments of alleged noncitizen voters, emphasizing the President's directive to "address noncompliance with . . . 18 U.S.C. 611(a)." TRO Mem. 1, 22 (alteration in original). Yet DOJ points to nothing in § 611 suggesting that Congress meant to go

beyond such procedures and also authorize a *civil* suit in equity against state officials.

Further still, where Congress intended for DOJ to have a cause of action to sue state officials concerning voter list maintenance, it said so explicitly. *See* 52 U.S.C. § 20510(a) (National Voter Registration Act); *see also id.* § 21111 (Help America Vote Act). Congress has also authorized DOJ to bring civil suits for injunctive relief in other contexts. *E.g.*, 52 U.S.C. §§ 10101(c), 10308(d); 34 U.S.C. § 12601(b); 42 U.S.C. § 1997a. It chose not to do so here.

Nor does DOJ's reference to its own purported inherent authority move the needle. TRO Mem. 17. The Ninth Circuit has expressly held that DOJ cannot sue state officials to vindicate federal interests without specific "statutory authority" except in limited circumstances that DOJ does not claim are applicable here—and limits on its ability to sue "cannot be evaded by an assertion of nonstatutory authority." *Mattson*, 600 F.2d at 1298, 1300; *see City of Philadelphia*, 644 F.2d at 201 (citing *Mattson*, 600 F.2d 1295; *Solomon*, 563 F.2d at 1124).[8]

In fact, DOJ has not identified a single court that has interpreted a federal criminal prohibition to invest the federal government with such broad power over the details of state administration of state laws. DOJ attempts to justify this power grab by pointing to *Norwood v. Harrison*, 413 U.S. 455 (1973), which DOJ cites for the proposition that California "cannot induce, encourage, promote, or knowingly facilitate noncitizen voting" in a federal election. Compl. ¶ 56. The case is inapposite and it does not even apply on DOJ's own terms. DOJ never alleges that California

[8] *Mattson* notes DOJ has been permitted to sue in equity without statutory authorization only in a narrow category of cases involving "a property interest, interference with national security or a burden on interstate commerce." 600 F.2d at 1298-99; *see United States v. California* ("*California Eggs I*"), 824 F. Supp. 3d 1079, 1084 (C.D. Cal. 2026) (same). None of those apply here.

has "induce[d], encourage[d], or promote[d]" noncitizen voting, Compl. ¶ 56; rather, it claims that the Los Angeles County Clerk did not immediately (within 48 hours) comply with DOJ's demands to stop sending mail ballots to—and segregate ballots received from—voters on a list of possible noncitizens compiled by the federal government, Compl. ¶ 4. And while DOJ suggests *Norwood* shows that California cannot "knowingly facilitate" noncitizen voting, Compl. ¶ 56, that phrase is DOJ's own creation; it appears nowhere in *Norwood*, which held that a Mississippi program to support racially segregated private schools violated the Fourteenth Amendment's equal-protection guarantee, just as it would if a state or locality ran a segregated school directly, 413 U.S. at 467. Further, DOJ itself admits that it does not *know*—just "believes"—that the voters on the list it sent to California are noncitizens, Compl. ¶ 4, so any suggestion that California is "knowingly facilitating" noncitizen voting under these circumstances is contradicted by DOJ's own allegations.

DOJ effectively asks this Court to bypass Congress's judgment and transform § 611 from a criminal prohibition applicable to individual aliens into a mechanism for usurping state officials' ability to determine whether a registered voter is eligible to cast a ballot, making the ballots of 20,000 voters presumptively invalid "until those individuals' citizenship status can be verified." Compl. ¶ 63; TRO Mem. 14 (further requesting order requiring California to "independently—or in collaboration with the Federal Government—verify their citizenship status"). Federal law does not authorize these demands, and granting such relief would require the Court to supervise a slapdash citizenship-verification regime—precisely the kind of "judicially unadministrable" task Congress would *not* silently leave to courts of equity. *Armstrong*, 575 U.S. at 328.

### B. Federal law does not preempt California's procedures for mailing ballots to or tabulating ballots from registered voters.

DOJ's sole claim is that federal law preempts California from mailing ballots to or tabulating mail ballots from registered voters whom DOJ suspects "might be" noncitizens. Compl. ¶¶ 50-61. But it rests that claim entirely on 18 U.S.C. § 611, a criminal statute that, as noted, says nothing about state election administration. DOJ's preemption theory is meritless. No federal law requires California to segregate and not count ballots from registered voters merely because of the federal government's unconfirmed—and, here, it is already evident, broadly misplaced—suspicions.

Preemption comes in three flavors—express, field, and conflict—none of which supports DOJ's claim. *See Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). The "text" of § 611 does not "explicitly manifest[] Congress's intent to displace state law," *id*. at 1031-32, so express preemption does not apply. DOJ does not claim otherwise. And since election administration is principally the realm of the states, field preemption also cannot apply. *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1114 (9th Cir. 2022) (explaining field preemption occurs only when Congress determines an entire "field … must be regulated by its exclusive governance" rather than state law). Accordingly, DOJ must hang its hat on conflict preemption, which arises when it is "impossible for a private party to comply with both state and federal law." *Assurance Wireless*, 100 F.4th at 1032.

But DOJ fails to show any such conflict between federal and California law. California law, like federal law, bars noncitizens from voting in federal elections. Cal. Elec. Code §§ 2101(a), 18560(a); 18 U.S.C. § 611. That is fatal to DOJ's preemption claim because "private part[ies]" can easily abide by "both state and

federal law." *Assurance Wireless*, 100 F.4th at 1032. If someone is a noncitizen, they cannot vote; if they are a citizen (and meet other requirements), they can.

Undeterred, DOJ claims that 18 U.S.C. § 611 preempts California laws requiring mail-in ballots to be sent to registered voters and providing for those ballots to be counted if they comply with California's signature-matching requirements, at least insofar as those laws apply to voters on DOJ's list of suspected noncitizens. Compl. ¶¶ 59-60. DOJ fundamentally misunderstands both § 611 and preemption doctrine. Section 611 is a *criminal* prohibition that makes it unlawful for an "alien" to vote; it says *nothing* about a *state's* obligations with respect to election administration. *See also supra* Argument § I.A. And since Congress's power to preempt state election laws extends "so far as it is exercised, and no farther," *Watson*, 609 U.S. at 697, that conspicuous silence means § 611 cannot preempt the California laws at issue here.

Nor can DOJ establish preemption by claiming California's failure to abide by its commands frustrates federal enforcement efforts. *See* TRO Mem. 22 (claiming obstacle preemption). The Ninth Circuit has squarely rejected the application of preemption when state officials refuse to assist the federal government. *See United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019). As the court put it, "refusing to help is not the same as impeding." *Id.* (citation omitted). And even if that refusal to help "obstructs federal immigration enforcement," it is *still* not enough to show preemption and require state and local officials to act at the federal government's beck and call—any contrary result would run "directly afoul of the Tenth Amendment and the anticommandeering rule." *Id.*

Other federal laws buttress the conclusion that § 611 does not preempt a state's voting laws whenever DOJ alleges a noncitizen may be registered to vote in the state. The Constitution "empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them." *ITCA*, 570 U.S. at 16. Rather, "prescribing

voting qualifications" is the realm of the states. *Id.* at 17. Against that backdrop, the only affirmative requirement federal law imposes on states with respect to assessing prospective voters' citizenship is to require voters to attest under penalty of perjury that they are citizens at the time of registration. 52 U.S.C. §§ 20508(b)(2), 21083(b)(4)(A)(i). DOJ never contends Defendants failed to comply with that requirement. Yet it now seeks to require them to engage in some unspecified additional steps to "confirm" the citizenship of registered voters before allowing them access to the franchise. Compl. Ex. C at 1. Not only does no federal law authorize DOJ to unilaterally impose this additional requirement on state election officials, but the NVRA in fact *preempts* it. *ITCA*, 570 U.S. at 15 (as to federal registration forms); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 710-11 (9th Cir. 2025) (holding the NVRA preempts Arizona from requiring documentary proof of citizenship to vote by mail), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).[9] If DOJ believes that requiring additional confirmation of citizenship would be wise, the appropriate audience for its suggestion is Congress, not the courts. *See Watson*, 609 U.S. at 695 ("[P]olicy arguments are properly directed to legislatures, not courts.").

Though it should be clear enough already that § 611 does not support DOJ's claim, the doctrine of constitutional avoidance supplies another reason why the Court should not read § 611 to preempt the state mail-voting laws at issue here. DOJ neglected to mention that, earlier this month, a federal court declared § 611

---

[9] The Supreme Court stayed an aspect of the *Mi Familia Vota* decision not at issue here. *See RNC v. Mi Familia Vota*, 145 S. Ct. 108 (Aug. 22, 2024). It later granted *certiorari* on that unrelated aspect of the decision, and on the 90-day provision issue, with argument scheduled in December. *See RNC v. Mi Familia Vota*, 146 S. Ct. 2799 (June 29, 2026). It has not granted *certiorari* on the other two portions of the decision discussed in this brief. All portions of *Mi Familia Vota* remain established precedent in the Ninth Circuit. *See Yong v. INS*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000).

unconstitutional. *United States v. Cox*, No. 0:25-cr-60249, 2026 WL 2948729 (S.D. Fla. Oct. 1, 2026). Surveying constitutional text and history, *Cox* concluded that "Congress may only 'regulate *how* federal elections are held, but not *who* may vote in them.'" *Id.* at *8 (quoting *ITCA*, 570 U.S. at 16). The court thus held that § 611's prohibition on noncitizens voting in federal elections improperly intrudes into states' exclusive authority over voter qualifications. *Id.* at *11-12. That constitutional concern would be supercharged if, as DOJ contends, § 611 not only sets a voter qualification for federal elections but *also* authorizes DOJ to issue eleventh-hour diktats to segregate and not count ballots. Such a result would turn our constitutional structure—in which "States alone" have the "general power to set voter qualifications in federal elections"—on its head. *Id.* at *9; *see United States v. Metcalf*, 156 F.4th 871, 882 (9th Cir. 2025) ("[C]ourts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality." (citation omitted)).

### C. Federal statutes bar DOJ's relief.

DOJ's request should also be denied because numerous federal laws—including the NVRA, the Voting Rights Act, and the Civil Rights Act—foreclose the relief DOJ seeks, and courts may not "issue injunctions that authorize or direct people to violate valid federal statutes." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 395 (C.D. Cal. 2007) (citation omitted); *see also INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("[C]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law" (citation omitted)).

**NVRA.** The relief DOJ demands would cause California to violate the NVRA several times over.

*First*, DOJ's demand that voters on its list have their mail ballots set aside until their citizenship is "confirmed," Compl. ¶ 4, conflicts with the NVRA's requirement that states "accept and use the [federal voter-registration form] for the registration of voters in elections for Federal office." 52 U.S.C. § 20505(a)(1). That means California must "accept the Federal Form as a *complete and sufficient* registration application." *ITCA*, 570 U.S. at 9 (emphasis added). As the Ninth Circuit held last year, requiring voters who registered using the federal form to provide evidence of citizenship in order to vote by mail conflicts with this requirement—it would require voters "seeking to cast their ballots by mail to provide *more* information than what the federal form requires." *Mi Familia Vota*, 129 F.4th at 710 (emphasis added). Accordingly, DOJ's demand that voters on its list take some additional step to confirm their citizenship "to vote by mail conflicts with ... the NVRA and ... cannot stand." *Id.*

*Second*, the NVRA requires that States "complete, not later than 90 days prior to [an election] for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). This 90-day quiet period squarely applies here. The November 3 election is only 13 days away. The provision applies to programs targeting suspected noncitizens. *See Mi Familia Vota*, 129 F.4th at 715-16. And since DOJ admits that it generated the list of voters through a process that relied on database-matching, Compl. ¶ 35, the program it contemplates is "systematic," *Mi Familia Vota*, 129 F.4th at 716 (holding "mass computerized data-matching process" constitutes "systematic" removal program) (citation omitted).[10] The NVRA thus bars the relief DOJ seeks.

---

[10] It is no answer that DOJ may contemplate officials conducting individualized investigations of the voters on its list—at most, that would occur "only *after* the

Nor should the Court adopt DOJ's suggestion that the 90-day provision does not apply because DOJ did not specifically request that voters be *removed* from the rolls. The Ninth Circuit has rebuffed similar attempts to skirt the NVRA's protections, rejecting the "narrow view" that the NVRA governs only "voter registration—not rules for casting a ballot by mail"—as "contrary to the text of the NVRA[,] which declares the right 'to vote' is a fundamental right and establishes purposes beyond registration." *Mi Familia Vota*, 129 F.4th at 711. Registration is not an end in itself; it exists only so that people can cast a ballot that will be counted. In other words, because "[r]egistration is indivisible from election," one cannot create an end-run around the NVRA "by separating registration from voting." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995). If the NVRA could be so easily circumvented, its protections would "ceas[e] to perform any meaningful function." *ITCA*, 570 U.S. at 13.

*Third*, the relief DOJ demands violates Section 8(b) of the NVRA, which requires that "any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office ... shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1). The Ninth Circuit recently held that requiring registered voters who government officials "have 'reason to believe' are not citizens" to comply with citizenship checks or to provide documentary proof of citizenship would be "non-uniform" and "discriminatory in effect because it is 'likely that the properly registered citizens

---

systematic comparison," and the Ninth Circuit has held that the 90-day provision applies to any removal program that is not "*prompted* by an individualized investigation." *Mi Familia Vota*, 129 F.4th at 717 (second emphasis added). Besides, it is highly unlikely individualized investigations of 20,000 registered voters are feasible in the few days remaining before the November election. *See* LA Opp'n to TRO 17-21.

who would be required to respond and provide documentation would be' naturalized citizens." *Mi Familia Vota*, 129 F.4th at 714 (quoting *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012)). It so concluded in part because Arizona's process of identifying suspected noncitizens "require[d] an immigration number," which U.S.-born American citizens do not have. *Id.* So too here: the process used to create DOJ's list of over 20,000 purported noncitizens involved "pair[ing]" individuals on California's public voter list "with an internal USCIS alien number." Bartell Decl. ¶¶ 16, 18, ECF 22-4. Since natural-born citizens do not have USCIS alien numbers, DOJ's citizenship checks will apply only to "naturalized citizens and non-citizens," and are thus likely to have a discriminatory impact on naturalized citizens. *Mi Familia Vota*, 129 F.4th at 714. That violates NVRA Section 8(b). *Id.*

**Voting Rights Act.** DOJ's requested relief would also violate the Voting Rights Act, which provides that

> No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

52 U.S.C. § 10307(a). DOJ's demands run headlong into this prohibition. It asks the Court to enjoin California election officials from "tabulating" ballots cast by voters on DOJ's list. Compl. ¶ 63. Those voters are presumptively qualified to vote because they are registered to vote in California. State law provides that registration is "permanent for all purposes" "unless and until" the registration is canceled. *See* Cal. Elec. Code § 2200. And registrations may not be canceled based on mere allegations; an election official must have "proof" someone is ineligible to remove them from the rolls. *Id.* § 2201(a)(8). DOJ admits it has no such proof. *E.g.*, Compl. ¶ 59 (stating voters on the list "might be" noncitizens). If registration means anything, it must at a minimum require election officials to honor someone's status as a registered voter

unless and until the voter's registration is canceled through the procedures the law prescribes. The Voting Rights Act would be a dead letter if its protections could be sidestepped merely because someone alleged, without proof, that a registered voter might be ineligible. It thus requires California to count the ballots of the voters on DOJ's list, unless the voter's registration is lawfully canceled according to the procedures set forth in the law.

**Civil Rights Act.** DOJ also seeks relief that runs afoul of the different standards, practices, or procedures provision ("DSPP Provision") of the Civil Rights Act, which provides that,

> [N]o person acting under color of law shall . . . in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

52 U.S.C. § 10101(a)(2)(A).

Imposing new citizenship checks on—or segregating the ballots of—individuals on DOJ's list is a clear violation of the DSPP Provision. Courts have repeatedly held the provision bars imposing special procedures on a subset of voters. *See, e.g.*, *Frazier v. Callicutt*, 383 F. Supp. 15, 18-19 (N.D. Miss. 1974) (holding denial of registration to Black students whose record listed a previous out-of-county address violated provision where county accepted registrations of nearly all non-Black students whose registrations listed a previous out-of-county address); *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971) (holding "[a]ny questionnaire [concerning domicile]" must be "equally relevant to all applicants and not designed only to apply to student applicants"); *see also Louisiana v. United States*, 380 U.S. 145, 154-55 (1965) (approving district court's order that a "uniform,

objective, standardized 'citizenship test'" be applied to "all or none" of the voters in a parish). Most notably, the Ninth Circuit held in *Mi Familia Vota* that an Arizona law requiring county officials to conduct citizenship checks through a federal database on registered voters they had "reason to believe" were not citizens violated the DSPP Provision. 129 F.4th at 723. The court explained that the law imposed different procedures on naturalized citizens than U.S.-born citizens, because the database "contains no information on U.S.-born citizens" and its use "solely impacts naturalized citizens." *Id.* (citation modified).

DOJ's request to investigate citizenship status before tabulating mail ballots, TRO Mem. 29, is an effort to "determin[e] whether any individual is qualified under State law or laws to vote in any election." 52 U.S.C. § 10101(a)(2)(A). And it would require the application of a "standard, practice, or procedure" in the form of a citizenship verification check that is "different from the standards, practices, or procedures applied under such law ... to other individuals within the same county, parish, or similar political subdivision." *Id.* As explained, voters on DOJ's list are more likely to be naturalized U.S. citizens, and therefore to have non-U.S. national origins, than voters not on the list—just like the voters to whom the Arizona law applied. DOJ's relief would therefore force California to apply different standards to different subsets of citizens—standards that would differ not only from those applied to all U.S-born citizens, but also from those applied to *any* voter who is *not* on the list.

## II. The remaining factors weigh strongly against preliminary relief.

Even if DOJ could show a likelihood of success, its failure to establish *any* of the remaining factors also suffices to deny its motion for preliminary relief. *See All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1223 (9th Cir. 2017) ("[A] party seeking a preliminary injunction must satisfy all four factors.").

### A. DOJ has not shown any likely harm, much less irreparable harm, in the absence of relief.

To start, DOJ has not shown that the United States would likely suffer irreparable harm absent the relief it requests. *See, e.g.*, *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm."). DOJ offers three theories—a *per se* injury from a Supremacy Clause violation, impairment of its ability to enforce federal law, and erosion of public faith in elections, TRO Mem. 26-27—but none survives the barest of scrutiny.

*First*, DOJ cannot show an injury to its purported sovereign interests because it has not shown that Defendants are in violation of federal law. *See* Argument § I.B. And even if it had, the "mere existence" of an unlawful state act—without more—cannot harm the government's sovereign interests. *California Eggs I*, 824 F. Supp. 3d at 1083 (discussing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).[11]

*Second*, the cases DOJ cites involve a sovereign barred from enforcing its own laws. TRO Mem. 26 (citing *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)). Those cut against DOJ here. No one, of course, has barred *DOJ* from enforcing federal laws, yet DOJ proposes to bar *California* from following its own laws. Nor can DOJ manufacture a resources-based harm from the cost of its own list-building program, which DOJ admits began months before anyone in California mailed a ballot. TRO Mem. 11.

*Third*, any alleged dilution of citizens' votes or public confidence is not a harm to the United States. It is "an abstract general interest common to all members of the public." *Carney v. Adams*, 592 U.S. 53, 59 (2020) (citation modified). And, in any

[11] *See also United States v. California*, No. 2:25-cv-06230-MCS, 2026 WL 2970902, at *3-4 (C.D. Cal. Oct. 2, 2026) (holding DOJ stated injury-in-fact only upon allegations that conflicts between *enforcement* of state regulations and federal law frustrated federal interests, and certifying question for appellate review).

event, this harm is purely speculative. As explained in the next section, it is far more likely that eligible citizens will be deprived of their right to vote—and public confidence will be shaken—if DOJ prevails than if it loses.

### B. Registered voters will suffer irreparable harm under DOJ's relief, and the public interest weighs against it.

If DOJ succeeds, eligible voters are all but certain to have their ballots segregated and not counted, causing them irreparable harm. We know this is likely to happen because every time the federal government has attempted to identify lists of noncitizens on voter rolls through database matching, the error rates have been eye-popping. *See supra* Background (describing the federal government's misidentification of eligible voters as noncitizens). That is particularly likely here because California has the highest rate of naturalized citizens as a percent of the voting population in the country, 21%.[12]

DOJ's demand risks disenfranchising naturalized citizens and other lawful voters on its list. There is no established process to "verify" the citizenship of 20,000 registered voters on the eve of an election, and doing so is almost certainly infeasible to accomplish in time. *See supra* Argument § I.C. Any deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). And the deprivation of the right to vote is "real and completely irreparable" because "once the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). For similar reasons, the public interest weighs against DOJ's relief, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002.

---

[12] Katherine Schaeffer, *One in Ten Eligible Voters in the United States Are Naturalized Citizens*, Pew Rsch. Ctr. (Sep. 19, 2019), https://perma.cc/2G59-7XB7.

### C. DOJ's delay—and *Purcell*—weigh strongly against relief.

DOJ makes no effort to explain why it filed its ex parte request only 15 days before Election Day, when voting in California was already underway. This timing weighs heavily against DOJ. Indeed, the Supreme Court has "repeatedly cautioned that lower federal courts should not alter the election rules on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (citation modified); *see generally Purcell v. Gonzalez*, 549 U.S. 1 (2006).

DOJ asks this Court to do just that: it seeks to require California to interrupt its elections, refuse to send ballots to certain voters, and to segregate and not tabulate ballots already cast by others. TRO Mem. 3-4; Proposed Order Granting TRO 6-7, ECF 22-8. *Purcell* bars such late-breaking intervention. In fact, *Purcell* "applies with even greater force here," because "[t]he election is not merely upcoming; it has already started." *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sep. 25, 2026).

DOJ's delay is particularly galling because it first alleged that California had noncitizens on its rolls in July but then went radio-silent for months when California asked reasonable follow-up questions. *See* Compl. Exs. A-C. This unexplained, protracted delay is yet another reason why the equities foreclose DOJ's relief. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (explaining *Purcell* cannot be overcome when party "delayed bringing the complaint to court"); *accord Penn Mut. Life Ins. Co. v. City of Austin*, 168 U.S. 685, 697 (1898) ("No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith, and reasonable diligence." (citation omitted)). DOJ's delay also "vitiates much of the force of [its] allegations of irreparable harm." *N.H. Youth Movement v. Scanlan*, No. 26-1740, 2026 WL 2620381, at *1 (1st Cir. Sep. 4, 2026) (citation omitted)).

DOJ's preemptive attempt to address *Purcell* only reveals how squarely the doctrine applies here. DOJ says *Purcell* does not apply because DOJ does not seek to "enjoin 'election rules on the eve of an election'"—a statement it makes, without any apparent sense of irony, in a motion for a preliminary injunction of California's election rules filed 15 days before Election Day. TRO Mem. 21 n.3 (citation omitted); *see* Compl. ¶ 63 (requesting a "preliminary and permanent injunction" preventing California from "tabulating" ballots). Nor can DOJ distinguish *Purcell* by claiming it merely desires to "conform" election practices to the law. TRO Mem. 21 n.3. That is the literal definition of injunctive relief: "[A]n injunction forces the defendant to conform its behavior to the law." *Price v. Diab*, 181 F.4th 955, 959 (9th Cir. 2026). DOJ's claim to legal high ground is no answer to *Purcell's* prohibition on "late-breaking" injunctions. *People Not Politicians*, 2026 WL 2883222, at *2. DOJ's relief would also undoubtedly cause "confusion," *Purcell*, 549 U.S. at 5, because eligible voters on its list will be left scrambling to figure out if they can vote by mail—or at all—and what they have to do to ensure their ballots count. Indeed, *no* voter can be sure that they have not been wrongly identified as a noncitizen. That is the exact type of "electoral chaos" *Purcell* guards against. *People Not Politicians*, 2026 WL 2883222.

## CONCLUSION

DOJ's requests for a TRO and preliminary injunction should be denied.

Dated: October 21, 2026

Respectfully submitted,

*/s/ Tyler L. Bishop*

Uzoma N. Nkwonta*
(DC Bar No. 975323)
Branden D. Lewiston*
(DC Bar No. 252550)
Julianna D. Astarita*
(DC Bar No. 90041368)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
F: (202) 968-4498
unkwonta@elias.law
blewiston@elias.law
jastarita@elias.law

Tyler L. Bishop (CA Bar No. 337546)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

Omar Qureshi (CA Bar No. 323493)
omar@qureshi.law
Max Schoening (CA Bar No. 324643)
max@qureshi.law
**QURESHI LAW PC**
700 Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 786-3478

*Counsel for Proposed Intervenor-Defendants SIREN and MFA*

* *Pro hac vice application pending*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Proposed Intervenor-Defendants SIREN and MFA certifies that this brief contains 6,990 words, which complies with the word limit of Local Rule 11-6.1.

Dated: October 21, 2026

*/s/ Tyler L. Bishop*
Tyler L. Bishop