DAWYN R. HARRISON, COUNTY COUNSEL
PETER BOLLINGER, ASST. COUNTY COUNSEL (SBN 241752)
EVA CHU, SNR. DEP. COUNTY COUNSEL (SBN 235356)
ADAM BAUMGARTEN, SNR. DEP. COUNTY COUNSEL (SBN 292095)
648 KENNETH HAHN HALL OF ADMINISTRATION
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-0809
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM (SBN 241068)
ABIGAIL URQUHART (SBN 310547)
ALEX SCANDROLI (SBN 345278)
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

Attorneys for Defendant
DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

*Additional Counsel Listed on Following Page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,<br><br>Defendants. | Case No. 2:26-cv-12025<br><br>**DEFENDANT DEAN C. LOGAN, IN HIS OFFICIAL CAPACITY AS THE COUNTY OF LOS ANGELES REGISTRAR-RECORDER/COUNTY CLERK'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF UNITED STATES OF AMERICA'S COMPLAINT**<br><br>Date Action Filed: October 15, 2026<br>Hearing Date:<br>December 7, 2026<br>*Ex Parte* Requested Hearing:<br>October 30, 2026<br>Time: 8:30 a.m. |

**PUBLIC RIGHTS PROJECT**
Joshua Karsh (*pro hac vice forthcoming*)*
Toby R. Merrill (*pro hac vice forthcoming*)**
Kyra Sikora
Sharanya Mohan (*request for admission pending*)
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
joshua.karsh@publicrightsproject.org
toby.merrill@publicrightsproject.org
kyra.sikora@publicrightsproject.org
sai.mohan@publicrightsproject.org

* *Licensed in Illinois and Washington, D.C. Not licensed to practice law in California.*

***Licensed in Massachusetts and New York. Not licensed to practice law in California.*

Attorneys for Defendant
DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

**TO THE PARTIES PLAINTIFF AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 30, 2026, at 08:30 A.M., or as soon thereafter as the matter may be heard, in Courtroom 10A of the United States District Court for the Central District of California, located at Ronald Reagan Federal Building and United States District Court, 411 West 4th Street, Santa Ana, California 92701, Defendant Dean C. Logan, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk (the "County"), will and hereby does move the Court for an order dismissing the Complaint for Declaratory and Injunctive Relief (ECF No. 1) (the "Complaint") filed by Plaintiff United States of America (the "Executive") as against the County.[1]

This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(1), on the ground that the Executive lacks Article III standing, and pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that the Complaint's sole claim for relief—a Supremacy Clause claim alleging that California's lawful conduct in implementing its election procedures and refusing to follow the Executive's unlawful demands somehow violates 18 U.S.C. § 611 "as applied" to the County—fails to state a claim upon which relief can be granted. Because these defects cannot be cured by amendment, dismissal should be without leave to amend.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Christopher Pelham, the pleadings and papers on file in this action—including the County's Opposition to Plaintiff's Ex Parte Application for Temporary Restraining Order (ECF No. 32-1) and supporting Declarations filed therewith (ECF Nos. 32-2, 32-3, 32-4), which are incorporated herein by reference—and

[1] Filed concurrently with this Motion is Defendant Dean C. Logan's opposed ex parte application to specially set a briefing schedule and advance the hearing on the Motion to October 30, 2026. (See Dkt. 57.) The State Defendants joined in that application. (Dkt. 61.) As explained therein, exigent circumstances call for a ruling on the matters presented in this Motion before the November 3, 2026 General Election.

such further evidence and argument as may be presented at or before the hearing.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 19, 2026. The parties are at an impasse on the grounds for the motion and briefing schedule.

Dated: October 21, 2026

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI

By:____________________________
CHRISTOPHER PELHAM
Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

Dated: October 21, 2026

**PUBLIC RIGHTS PROJECT**
JOSHUA KARSH (*pro hac vice forthcoming*)
TOBY R. MERRILL (*pro hac vice forthcoming*)
KYRA SIKORA
SHARANYA MOHAN (*request for admission pending*)

By: *\/s/ Joshua Karsh*
JOSHUA KARSH
Attorneys For Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 11

A. The County's Election Procedures ..... 11

B. DHS's July 2026 Letter to the Secretary of State ..... 14

C. DOJ's October 2026 Ultimatum to the County and the County's Response ..... 14

D. The Complaint ..... 17

1. The Executive's Description Of The October List And The Additional Review It Seeks ..... 18

2. Comparing The Executive's List To Current County Records Shows Indicia Of Unreliability ..... 19

II. LEGAL STANDARDS ..... 20

III. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(B)(1) ..... 21

A. The Complaint Alleges No Actual or Certainly Impending Injury ..... 21

1. A Bare Assertion of Sovereign Injury from Preemption Is Insufficient. ..... 22

2. The Complaint Does Not Plead That the County Has Impeded Any Federal Operation or Function. ..... 23

3. The Executive Cannot Manufacture Standing By Pleading Self-Inflicted Harm. ..... 23

4. Vote Dilution Is a Speculative, Generalized Grievance ..... 24

5. The Asserted Injuries are Not Fairly Traceable to the County ..... 24

6. The Requested Relief Would Not Redress the Alleged Injury ..... 26

B. The Claim Is Not Ripe, and the Alleged Injury Rests on a Speculative Chain of Contingencies ..... 27

C. The Declaratory Judgment Act and 28 U.S.C. § 1345 Do Not Cure These Defects ..... 29

IV. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6) ..... 29

A. The Complaint Fails to State a Preemption Claim ..... 29

B. Preemption Requires a Conflict with Federal Law, Not with Federal Enforcement Preferences, and No Such Conflict Exists Here ..... 30

C. Section 611 Does Not Displace California's Rules for Administering This Election ..... 32

D. Declining to Help Federal Investigators Is Not Obstruction, and Section 611 Imposes No Duty on County Officials to Assist ..... 34

E. The Complaint's "Knowing Facilitation" Theory Fails as a Matter of Law and Is Refuted by the Complaint's Own Allegations ..... 35

1. Norwood Supplies No Preemption Rule ..... 35

2. Norwood Undercuts the Remedy the Executive Seeks ..... 36

3. The Complaint Does Not Plausibly Allege Knowledge ..... 36

F. Even if the Complaint Stated a Claim, the Court Could Not Grant the Relief the Executive Seeks ..... 38

G. The Complaint Does Not Allege That Any Listed Voter in Los Angeles County Has Cast a Ballot, and Relief Against Mr. Logan Could Reach No One Else ..... 40

V. CONCLUSION ..... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .......... 28, 39

*Arizona Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) .......... 31

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 25, 35

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 22

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 20, 29, 37

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1988) .......... 20

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) .......... 41

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 20, 37

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) .......... 24, 38, 39

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) .......... 21, 24, 27

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 31, 32

*Democracy N.C. v. N.C. State Bd. of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) .......... 40

*Election Integrity Project Cal., Inc. v. Weber*,
113 F.4th 1072 (9th Cir. 2024) .......... 24, 33

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 24

*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 24

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 31, 32, 36

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .......... 20

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) .......... 19

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .......... 33

*La Union del Pueblo Entero v. Abbott*,
604 F. Supp. 3d 512 (W.D. Tex. 2022) .......... 22

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
835 F. Supp. 3d 79 (D.D.C. 2026) .......... 28

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) .......... 20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 20, 21, 24, 25

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 40

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) .......... 20

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) .......... 28, 39, 41

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 22, 30, 31

*Norwood v. Harrison*,
413 U.S. 455 (1973) .......... 36, 37

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*,
485 U.S. 495 (1988) .......... 31

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
762 F. Supp. 1354 (D. Ariz. 1990) .......... 40

*Rosemond v. United States*,
572 U.S. 65 (2014) .......... 38

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) .......... 20, 28

*Ex parte Siebold*,
100 U.S. 371 (1879) .......... 35

*Skelly Oil Co. v. Phillips Petroleum Co.*,
339 U.S. 667 (1950) .......... 29

*Texas v. United States*,
523 U.S. 296 (1998) .......... 27

*Thomas v. Anchorage Equal Rts. Comm'n*,
220 F.3d 1134 (9th Cir. 2000) (en banc) .......... 27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 24

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .......... 22

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 22, 35

*United States v. Cox*,
No. 0:25-cr-60249-DSL, 2026 WL 2948729 (S.D. Fla. Oct. 1, 2026) .......... 34

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) .......... 22, 23

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) .......... 22

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
529 U.S. 765 (2000) .......... 22

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) (plurality opinion) .......... 31

*Watison v. Carter*,
668 F.3d 1108 (9th Cir. 2012) .......... 20

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) .......... 41

**Rules and Statutes**

18 U.S.C. § 2 .......... 37, 38

18 U.S.C. § 611
.......... 18, 22, 24, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37

18 U.S.C. § 611(a) .......... 17, 32, 33, 35, 36

18 U.S.C. § 611(b) .......... 28

28 U.S.C. § 1345 .......... 29

28 U.S.C. §§ 2201, and 2202 .......... 29

52 U.S.C. § 10307(a) .......... 26, 27, 39, 40

52 U.S.C. §§ 10308(d), 20510(a), 21111 .......... 28

52 U.S.C. §§ 20505(a)(1), 20507(b)(1), (c)(2)(A), 20508(b)(2) ..... 13, 25-6, 33-4, 38-40

52 U.S.C. §§ 20505, 20507(c)(2) .......... 13

52 U.S.C. §§ 20505(a)(1), 20508(b)(2) .......... 25, 33

52 U.S.C. § 20507(b)(1) .......... 40

52 U.S.C. § 20507(b)(1), (c)(2)(A) .... 26
52 U.S.C. § 20507(c)(2)(A) .... 39
52 U.S.C. § 20508(b)(2) .... 11, 17
52 U.S.C. §§ 20510(a), 21111 .... 34
52 U.S.C. § 20702 .... 22
52 U.S.C. § 21081(a)(1)(C) (Help America Vote Act ) .... 12, 27
Cal. Code Regs. tit. 2, §§ 20960, 20990–20991 .... 17, 38
Cal. Elec. Code §§ 2101 .... 31
Cal. Elec. Code § 2111 .... 11, 17, 37
Cal. Elec. Code § 2201(a)(8) .... 13
Cal. Elec. Code § 2300 .... 12
Cal. Elec. Code § 3000.5, and .... 12, 17, 38
Cal. Elec. Code §§ 3011, 3019 .... 17, 38
Cal. Elec. Code §§ 3001, 4005(a)(8)(A) .... 12
Cal. Elec. Code § 3017(a)(3) .... 41
Cal. Elec. Code §§ 15307, 15372, 15501(b) .... 13
Civil Rights Act .... 40
Congress, the Voting Rights Act .... 22
Declaratory Judgment Act .... 29
HAVA .... 13, 22, 33, 34, 38
Immigration and Nationality Act .... 31
National Voter Registration Act .... 13
NVRA .... 16, 22, 33, 34, 38, 39
Voting Rights Act .... 39

**Other Authorities**

§ 2942 Availability of Injunctive Relief—In General, 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.) .... 29
Cal. Const., art. II, § 2 .... 31
Cal. Const., art. II, § 7 .... 12, 26, 27
U.S. Const. art. I, § 4, cl. 1 .... 33

U.S. Const. art. II, § 3 ........................................................................ 34
US. Const. Art. III......................................................................... 27-33

# **MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Los Angeles County is administering the November 3, 2026 General Election the same way it administers every election: according to applicable laws, regulations, and practices – that includes applicable federal law California law, California Code of Regulations and a clear aim—to ensure that every eligible voter has access to voting, that the election is conducted securely with integrity, and that every valid ballot submitted is counted an included in the certified returns. The County has not changed. The Federal Government's posture has. Weeks before Election Day, the United States asks this Court to intrude on the administration of an election. But the Constitution assigns the administration of elections to the States and their localities, and the federal government may enter that domain only where Congress has authorized it and only where it has suffered a cognizable injury. Neither is true here. The Complaint should be dismissed.

### A. The County's Election Procedures

Defendant Dean C. Logan is sued in his official capacity. (Compl. ¶ 16.) The County's administration of the November 3, 2026 General Election is the largest and most complex local election operation in the nation, serving 88 cities, 55 general and special districts, 140 unincorporated areas, and 19 languages. (Declaration of Monica Flores in Support of the County's Opposition, ECF No. 32-4 ¶ 5.) The County serves approximately 5.9 million registered voters, with 5,000 voting precincts for countywide elections. (*Id.*)

To register to vote, under state law, a person "may prove he or she is a citizen by his or her certification under penalty of perjury on the affidavit of registration." (Cal. Elec. Code § 2111; *see also* 52 U.S.C. § 20508(b)(2) (federal mail voter registration form must include "an attestation that the applicant meets each such requirement," including citizenship, and "require[] the signature of the applicant, under penalty of perjury").) Consistent with California and federal law

for registration, the County must rely on the under-oath representation for proof of an individual's citizenship and each registration must be cleared through the statewide voter registration database administered by the Secretary of State; no additional verification is required. (ECF No. 32-4 ¶ 8.)

California law requires the County to mail a vote-by-mail ("VBM") ballot to every active registered voter 29 days before the election—here, by October 5, 2026. (Cal. Elec. Code §§ 3000.5(a), 3001, 4005(a)(8)(A).) All VBM ballots require voter and signature verification before the vote can be counted. (ECF No. 32-4 ¶ 21.) This process includes a comparison of signatures on envelopes to the signatures on the voter registration file. (*Id.*) If a signature is missing or does not compare to the signature on file, state law requires county election officials to reach out to voters to confirm that they sent in the associated ballot, and if so, to verify their signature to ensure that their ballot can be counted. (*Id.*)

The County is currently conducting the November 2026 General Election. (*Id.* ¶ 22.) The County has mailed approximately 5.9 million VBM ballots to County registered voters, and there are 491 active contests in the General Election. (*Id.* ¶ 23.) As of October 13, 2026, the date the County received the Executive's list of purported noncitizen registrants (the "October List"), there were no ballots waiting to be mailed other than replacement ballots. (*Id.*) The County has put more than 420 VBM ballot drop boxes for the General Election into operation and also began its VBM ballot processing operations on October 5, 2026. (*Id.* ¶ 24.) VBM ballots are currently being returned to the County's office by mail and scheduled VBM ballot drop box retrievals. (*Id.*)

Since the County began its VBM ballot processing operations on October 11, 2026, the County has processed more than 331,000 VBM ballots to date and anticipates much higher volumes of VBM ballots to be received as Election Day approaches. (*Id.*) Regardless of voting method, voters are entitled to cast a secret ballot, and voting is fully anonymous—even to the County itself, in compliance with California and federal law. (Cal. Const., art. II, § 7; Cal. Elec. Code § 2300;

52 U.S.C. § 21081(a)(1)(C) (Help America Vote Act ("HAVA")).) Once a VBM ballot has been removed from its return envelope, or an in-person ballot has been cast, there is no way to associate the voter with that ballot. (ECF No. 32-4 ¶ 18.)

County officials must begin reporting results to the Secretary of State no more than two hours after they begin tallying votes after the polls close. (*Id.* ¶ 30.) County officials then continue to report results periodically throughout Election Night until all vote totals have been reported. (*Id.*) County officials are required to conduct a public 1% post-election manual tally audit of the ballots tabulated by the County's voting system in order to verify the accuracy of the automated count. (*Id.* ¶ 33.) The final County results must be submitted by December 3, 2026 to the Secretary of State, who in turn, must certify the count by December 11, 2026. (Cal. Elec. Code §§ 15307, 15372, 15501(b); ECF No. 32-4 ¶ 34.) Los Angeles County has publicly noticed its intent to certify County returns on November 27, 2026.

The County has never attempted a "temporary ballot segregation," such as what the Executive demands here, nor received a request from a federal agency to do so. (ECF No. 32-4 ¶¶ 36, 45.) The County has no authority under state or federal law to withhold or set aside the ballot of a registered voter on the basis of a third party's assertion that the voter may not be a citizen, nor to cancel a voter's registration on that basis. (*Id.* ¶ 3, 15.) The limited exceptions permitting cancellation involve notifications that a voter is deceased, notification of felony incarceration, or a specific court order of incompetence for purposes of voting — none of which apply here. (*Id.* ¶ 15.) Depending on the nature of the information received, the County has limited authority to inactivate a registration and issue a confirmation notice seeking clarifying information. (*Id.*)

California law permits cancellation upon proof of ineligibility. Cal. Elec. Code § 2201(a)(8). Federal law also governs registration and list maintenance. The National Voter Registration Act ("NVRA") requires acceptance and use of the Federal Form for voter registration and prescribes safeguards for list

maintenance, including a 90-day "quiet period" before any federal election, prohibiting systematic removal of voters during this time. 52 U.S.C. §§ 20505(a)(1), 20507(c)(2). In other words, federal law prohibits mass re-examination of voter rolls between August 5, 2026 and Election Day. HAVA requires a statewide computerized registration list and coordination with the NVRA's removal requirements. *Id.* § 21083(a)(1)–(4).

### B. DHS's July 2026 Letter to the Secretary of State

On July 16, 2026, Department of Homeland Security ("DHS") Secretary Markwayne Mullin wrote to Secretary of State Shirley N. Weber asserting that a "[p]reliminary review" of California's publicly available voter data revealed "there may be as many as 190,832 non-citizens registered to vote in California." (Compl. Ex. A.) On July 23, 2026, Secretary Weber responded that she had "serious doubts about the reliability of [DHS's] data," noting that her office had never shared the statewide voter registration list with DHS, and requested a "detailed description of the methodology utilized by DHS to identify these allegedly ineligible voters, including . . . all data sources, software, and matching criteria," and whether artificial intelligence was used. (Compl. Ex. B.) Secretary Weber also advised that her office would comply with the NVRA's prohibition on systematic cancellation of registrations within 90 days of a federal election—a period that began on August 5, 2026. (*Id.*) DHS did not provide the requested methodology, any list of such alleged records, or otherwise respond to Secretary Weber.

### C. DOJ's October 2026 Ultimatum to the County and the County's Response

On October 13, 2026, the Department of Justice ("DOJ") hand-delivered a letter to a County office, addressed to Mr. Logan (the "October 13 Letter"), enclosing a password-protected thumb drive that contained "a list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election" (*i.e.*, the

October List). (Compl. Ex. C.) The October 13 Letter contains extraordinary demands: that the County (i) review the list within 48 hours; (ii) for anyone whose citizenship the County cannot independently confirm, (a) instruct election officials to "segregate—not cancel—those individuals' [VBM] ballots until their citizenship can be determined," (b) if those individuals "have not yet been sent a [VBM] ballot, take all immediate and reasonable steps to not provide a ballot to those individuals until we confirm their citizenship status," and (c) if their VBM ballot has been returned, "instruct the appropriate elections official not to verify the signature and/or tabulate the ballot until citizenship can be determined." (*Id.*)

On October 14, 2026—the day after receiving the October 13 Letter and before the Executive's deadline—Mr. Logan issued a public statement confirming that the County had received the October 13 Letter "21 days prior to Election Day" and was "reviewing the information in coordination with the California Secretary of State and Attorney General to determine the next appropriate steps." (Declaration of Christopher Pelham in Support of the County's Opposition, ECF No. 32-2 ¶ 4; Ex. C.) The County noted that the October 13 Letter did "not specify the number of individuals involved or describe the information contained in the records," and that under federal and state law "any action to remove a voter from eligibility must be based on verifiable information, not assertions of unconfirmed data matching." (*Id.*)

The next day, October 15, 2026, at approximately 8:48 a.m.—before the Executive's deadline—the County sent the Executive a written response (the "County Response"). (ECF No. 32-2 ¶ 5; Ex. D.) In doing so, the County noted that a preliminary review of the October List showed that it was not specific to Los Angeles County and contained addresses throughout California. (*Id.*) The County further noted that the Executive provided no information on how the list of "likely noncitizens" was compiled or on what evidentiary basis it suspected that the listed individuals were noncitizen registrants. (*Id.*) Further, although the October 13 Letter asked the County to "independently confirm citizenship status,"

the Executive provided no process or information enabling the County to do so. (*Id.*) In addition to noting that the Executive's requests would violate California and federal law, the County observed that it was impossible to review the more than 20,000 individuals on the October List in the less than 48 hours the Executive afforded or at all for records not associated with individuals or addresses outside of Los Angeles County. (*Id.*)

Minutes after the 9:00 a.m. deadline passed, the Executive filed this action claiming the County "failed" to conduct its review by the deadline and mischaracterized the County's response as "a total lack of commitment to work with the Federal Government." (Compl. ¶ 4.) The Complaint omits the County Response to the October 13 Letter entirely. The Executive's Ex Parte Application for Temporary Restraining Order (the "Application") repeats that mischaracterization, asserting that the County "made clear it would not do anything to prevent noncitizen voting." (Appl. at 13.) But the County said no such thing: it provided a well-reasoned and legally sound explanation for why it could not segregate ballots. (ECF No. 32-2 ¶ 5; Ex. D.)

On October 16, 2026—the day after filing suit—DOJ sent a letter responding to the County's objections (the "October 16 Letter"). (ECF No. 32-2 ¶ 6, Ex. E.) The October 16 Letter confirms, rather than answers, the deficiencies the County identified. The Executive simply concludes that it sent "credible evidence that certain ballots may be unlawful to count." (*Id.*) It did not. The Executive did not explain how a single list of more than 20,000 names generated by bulk database-matching constitutes individualized evidence. (*Id.*) Nor did the Executive attempt to address the County's concerns that segregation would violate the NVRA among other laws, and result in votes not being counted. In fact, since its October 13 Letter, the Executive has provided no additional guidance to the County about how an individualized citizenship analysis should be conducted by either side, how either side can afford satisfactory due process to a suspected noncitizen voter before refusing to certify their vote, or how the County can still

satisfy election timelines in the course of that analysis.

The October 16 Letter closes with bald threats to individual County officials. It warns that the County's position risks "significant federal scrutiny and legal exposure" and suggests that declining to set aside ballots could amount to "aiding or abetting a federal offense." (*Id.*)

**D. <u>The Complaint</u>**

The Complaint primarily focuses on the California Secretary of State and has few allegations specifically against Mr. Logan in his official capacity or Los Angeles County. In fact, the sole two allegations against Mr. Logan specifically are that "Defendant Dean C. Logan is the County of Los Angeles Registrar-Recorder / County Clerk. In that role, he is responsible for registering voters, maintaining voter files, and administering federal elections" and that he issued a press release. (Compl. ¶¶ 4, 16.) The sole specific allegation mentioning Los Angeles County is that the October List includes "many addresses listed in Los Angeles County." (*Id.* ¶ 46.) Notably, while the October List includes addresses for individuals located throughout California, the Complaint does not allege that the County has any authority over the administration of elections in any other county.

The Complaint alleges that federal law makes it "unlawful for any alien to vote" in a federal election, 18 U.S.C. § 611(a), and that a noncitizen who violates that prohibition "may be fined or imprisoned." (Compl. ¶¶ 17–19.) It further alleges that California law requires election officials to mail a VBM ballot to "every registered voter" no later than 29 days before each election, Cal. Elec. Code § 3000.5, and to verify the signature on each returned VBM ballot envelope before counting it. (Compl. ¶¶ 22–23, 26–29 (citing Cal. Elec. Code §§ 3011, 3019; Cal. Code Regs. tit. 2, §§ 20960, 20990–20991).) The Complaint does not dispute that consistent with California and federal law, a registrant proves citizenship by certifying it under penalty of perjury on the affidavit of registration. Cal. Elec. Code § 2111; *see* 52 U.S.C. § 20508(b)(2). Rather, it

alleges California and the County are required to take additional steps with respect to the October List voters.

1. *The Executive's Description Of The October List And The Additional Review It Seeks*

To create the October List, the Complaint describes a process of comparing un-sourced voter information with immigration records, supplementing incomplete information through third-party software, assigning confidence levels, and conducting additional checks. (Compl. ¶¶ 34–43.) It is purportedly ranked by confidence by reference to the strength of the identity link between voter information and federal records. (*Id.* ¶ 34.) The list then passes to additional investigators for further work. (*Id.* ¶¶ 38–43.)

The Complaint asserts one claim: that California's mailing and counting procedures, as applied to persons on the October List, obstruct 18 U.S.C. § 611 in violation of the Supremacy Clause. (*Id.* ¶¶ 50–61.) It requests withholding ballots until citizenship is verified beyond the registration attestation. (*Id.* ¶¶ 6, 63.) The proposed order would require confirmation for each listed voter who returns a ballot and would not permit reliance solely on the registration-related attestation. (ECF No. 22-8 at 6–7.)

The Executive acknowledges that it cannot practicably investigate thousands or tens of thousands of listed individuals before the election concludes. (Compl. ¶ 60.) It nevertheless asks that the County and State indefinitely segregate returned ballots associated with its unconfirmed list of around 20,000 records while citizenship is determined. (*Id.* ¶¶ 6, 63.) The proposed order identifies associated authority for the requested actions, no adequate notice-and-response procedure for accused voters, any standard for adjudicating citizenship, or any deadlines or guidance to assure resolution before the applicable counting deadlines. (ECF No. 22-8 at 6–7.) Meanwhile, prosecution efforts continue and, following the filing of the Complaint, the Executive announced criminal charges against 28 listed persons. (Appl. at 1.)

2. *Comparing The Executive's List To Current County Records Shows Indicia Of Unreliability*

The County identified 7,035 records bearing County addresses on the October List and compared a sample of two hundred of the individuals listed with County voter records. (Declaration of Aman Bhullar in Support of the County's Opposition, ECF No. 32-3 ¶ 25.) That sampling showed the following:

- 42.9% of the list sampled had canceled voter registration records in the County's system; 42.4% of the list samples had active records, i.e., that the record has cleared verification through the statewide database and has met all legal requirements for voter registration; and 14.6% are considered inactive records, meaning there is an issue in the record that has been flagged such as the mail being undeliverable, not responding to a confirmation notice, or not voting. (*Id.* ¶ 24.)
- 86 of the sample listed individuals who had ballots mailed to them in the November 2026 General Election; all 112 individuals where ballots were not mailed to them had either canceled or inactive records. (*Id.*)
- 71.2% of the list sampled had never voted in the past elections. (*Id.*)
- Among the records for which birthplace information was meaningfully reported, 38.9% indicated that they were born in the United States. (*Id.*)

These figures describe the composition of the records, not the citizenship of individual registrants. When comparing this data with the Executive's efforts to implement voter roll maintenance in other jurisdictions through the Systematic Alien Verification for Entitlements ("SAVE") program, there is no basis to support the Executive's supposition that the October List constitutes credible evidence of noncitizen voting.[2]

[2] Other jurisdictions that have shown SAVE data to be too unreliable in identifying noncitizens include Nevada and North Carolina. (ECF No. 32-2 ¶¶ 7-8.) Nevada is particularly instructive. In July 2026, DHS told Nevada that "as many as" 15,903 noncitizens were registered there. (*Id.* ¶ 7; Ex. F.) In an August 2026 meeting, a DHS official acknowledged that the figure was preliminary and had not received "a full manual review of each one." (*Id.*) DHS later revised the number of confirmed noncitizens to 185. (*Id.*) Nevada then reviewed those 185 registrants and reported to DHS: "[O]ur records indicate that they were citizens. You have provided nothing of substance to suggest otherwise." (*Id.*)

## II. LEGAL STANDARDS

*Rule 12(b)(1).* Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The plaintiff bears the burden of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A Rule 12(b)(1) challenge may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the movant asserts that the allegations of the complaint are insufficient on their face to invoke federal jurisdiction. *Id.* In a factual attack, the court may review evidence beyond the complaint and need not presume the truthfulness of the plaintiff's allegations. *Id.*; *see also Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014). The County's motion presents both.

*Rule 12(b)(6).* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* The Court may take judicial notice of matters of public record and may consider documents incorporated by reference into the complaint without converting the motion into one for summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). When a complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory, dismissal is appropriate. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008); *see also Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Where amendment would be futile, dismissal without leave to amend is proper. *See Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012).

## III. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(B)(1)

The Executive invokes a federal interest that no one disputes: noncitizens may not vote in federal elections. California law says the same thing. But an interest in enforcing the law is not an injury, and a federal prohibition does not dispense with Article III. The Executive, like any other plaintiff, must identify a concrete injury, actual or imminent, fairly traceable to the County's conduct and likely to be redressed by the requested relief. *Lujan*, 504 U.S. at 560–61. The Complaint identifies none.

The Executive's theory rests on a chain of possibilities: that registered voters identified through federal database matching are noncitizens; that some will cast ballots; that the County will count those ballots; and that doing so will impair a federal interest. (Compl. ¶¶ 58–60.) But the Complaint does not allege that any identified voter has cast an unlawful ballot, much less that the County has counted one. (*See* Compl. ¶¶ 62–63.) Nor does it identify any federal investigation or prosecution that the County has obstructed; what the Executive principally alleges is that federal authorities cannot complete their own investigations before the election concludes. (Compl. ¶ 60.) That is not an injury attributable to the County.

### A. The Complaint Alleges No Actual or Certainly Impending Injury

Article III requires an injury that is concrete and particularized and actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. When a plaintiff seeks prospective relief against anticipated conduct, the threatened injury must be "certainly impending," or there must be a substantial risk that it will occur. *Clapper v. Amnesty International USA*, 568 U.S. 398, 409, 414 n.5 (2013). A speculative chain of future events will not suffice. *Id*. at 410–14.

The Complaint identifies no concrete, particularized injury to the Executive. It offers four theories: an abstract sovereign interest in preemption

(Compl. ¶ 9), an alleged impediment to federal enforcement (*id.* ¶ 60), a self-inflicted drain on federal resources (*id.* ¶ 10), and dilution of citizens' votes (*id.* ¶¶ 6, 10). None satisfies Article III.

1. *A Bare Assertion of Sovereign Injury from Preemption Is Insufficient.*

The Complaint's standing theory rests almost entirely on a single assertion: that the Executive has "standing to vindicate its sovereign interests, including its legally protected interest in enforcing federal law, such as 18 U.S.C. § 611." (Compl. ¶ 9.) That falls short of the bar for standing. Alleging that California's procedures "are preempted and thus violate the Supremacy Clause" (*id.* ¶ 62) does not establish a concrete injury. The Supremacy Clause "provides 'a rule of decision'"; it is not a source of federal rights. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015). At most, sovereign injury arises where state action "imped[es] the operations or functions of the federal government." *United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024). A County that follows state and federal election law, but declines to take unlawful action to assist the federal government with its own enforcement priorities, impedes nothing. *See United States v. California*, 921 F.3d 865, 888-89 (9th Cir. 2019) ("[R]efusing to help [the federal government] is not the same as impeding."); *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) (rejecting argument that local officials' actions trying to comply with NVRA and HAVA mandates to update and maintain voter rolls interfered with enforcement of criminal prohibition on altering records under 52 U.S.C. § 20702).[3]

---

The Complaint's authorities are not to the contrary. *Arizona v. United States*, 567 U.S. 387, 401-07 (2012), involved state statutes creating state immigration crimes in a field of exclusive federal concern, and the Court did not address standing. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), concerned whether a qui tam relator may sue for the government's proprietary injury from false claims. *United States v. Missouri*, 114 F.4th 980, 983 (8th Cir. 2024), involved the State's explicit refusal to comply with actual statutes passed by Congress (among other acts) surrounding gun control. *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 527-28 (W.D. Tex. 2022), involved the State's explicit violation of another statute passed by Congress, the Voting Rights Act. None

2. *The Complaint Does Not Plead That the County Has Impeded Any Federal Operation or Function*.

Any sovereign injury that could support standing here would require that the County has impeded the operation of a federal function, and the Complaint does not plead that it has. Courts have recognized this theory only where local measures directly obstructed federal operations. In *King County*, a county order barred airport service providers from servicing federal immigration charter flights, forcing the flights elsewhere at added cost. 122 F.4th at 750–52. In *United States v. City of Arcata*, municipal ordinances barred military recruiters from contacting minors. 629 F.3d at 989–90. The Complaint alleges nothing comparable. It identifies no law or County policy that prohibits, regulates, or burdens any federal investigation or prosecution. To the contrary, it concedes that the Executive "actively investigates and prosecutes incidents of unlawful voting." (Compl. ¶ 60.) And the Executive's own announcements, of which the Court may take judicial notice, confirm that it is doing exactly that in California.[4] *See* ECF No. 31-4, Ex. G (Oct. 19, 2026 press release announcing arrests of 11 foreign nationals in California and charges against 17 more).

What the Executive alleges instead is that completing its investigations of thousands of suspected noncitizens before the election ends is not "practicable or feasible." (Compl. ¶ 60.) The County's refusal and lack of authority to undertake the additional verification the Executive requested does not prevent federal officials from investigating anyone.

3. *The Executive Cannot Manufacture Standing By Pleading Self-Inflicted Harm*.

The Complaint next asserts that, by sending ballots to persons on its list, Defendants "have made it nearly impossible for the United States to investigate and enforce federal law," imposing "a substantial drain on federal resources."

---

involved a federal criminal statute directed at private individuals. None found standing based on a State's refusal to adopt procedures that no federal statute requires.

[4] The County has cooperated through subpoena response.

(Compl. ¶ 10.) But the Complaint itself pleads that California law required those ballots to be mailed, and that they were mailed before the Executive delivered its list. (*Id.* ¶¶ 23, 44, 47.) The Executive spent months compiling a list of unconfirmed data and delivered it to the County after ballots were mailed. The Executive cannot charge the resulting difficulty to the County. A party "cannot manufacture standing merely by inflicting harm on [itself]." *Clapper*, 568 U.S. at 416. Nor can it "spend its way into standing." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

4. *Vote Dilution Is a Speculative, Generalized Grievance.*

The Complaint's remaining assertions are that unlawful votes "dilute the votes of citizens" and "undermine[] public faith in federal elections." (Compl. ¶ 10.) Those are not concrete and particularized injuries to the Executive. Vote dilution is an injury to individual voters, *Gill v. Whitford*, 585 U.S. 48, 65-68 (2018), and the Executive does not vote.

The Ninth Circuit likewise cautioned against "judicial second-guessing" of state election administration based on vulnerability to fraud that "can never be completely eliminated." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1096 (9th Cir. 2024). And any dilution theory depends on a "highly attenuated chain of possibilities," that listed registrants are in fact noncitizens, that they will vote, that their votes will be counted, and that those votes will alter an outcome. *Clapper*, 568 U.S. at 410.

5. *The Asserted Injuries are Not Fairly Traceable to the County*

Even if the Executive had alleged an injury, nothing in the Complaint traces it to the County. Traceability requires a causal connection between the injury and "the challenged action of the defendant," not "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations omitted). It fails where the causal chain rests on "speculation about the decisions of independent actors," *Clapper*, 568 U.S. at 414, or on harm the plaintiff inflicted on itself, *id.* at 416. And a plaintiff must establish standing as to each

defendant and each form of relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross.").

*First*, any unlawful vote would result from the independent criminal act of a noncitizen, the very conduct Section 611 prohibits, not from any act of the County. (Compl. ¶¶ 17–19.) That is "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. Every act the Complaint attributes to the County is what California law requires and federal law permits: mailing ballots to active registrants, relying on sworn attestations of citizenship, verifying signatures, and tabulating ballots. 52 U.S.C. §§ 20505(a)(1), 20508(b)(2); Cal. Elec. Code §§ 2111, 3000.5, 3019; *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15–20 (2013); (Compl. ¶¶ 23, 44, 48). The Complaint does not allege that the County exercised any independent discretion as to the persons on the October List. Nor does it allege that state law permits the County to withhold a registered voter's ballot on the strength of a third party's assertion.

*Second*, the only "obstacle" the Complaint identifies is the Executive's inability to finish investigating its list before Election Day. (Compl. ¶ 60.) That obstacle is of the Executive's own making. By its own account, the Executive began compiling the October List in May 2026, waited until July to raise its concerns with the Secretary of State, never provided the methodology the Secretary requested, and then waited until ballots had been mailed and were being processed to deliver the list to the County on October 13—with a 48-hour deadline. (Compl. ¶¶ 4, 44, 47 & Exs. A–C.) The Complaint does not explain how the County caused that difficulty. Nor does it identify any federal law requiring the County to complete those investigations on the Executive's timetable. The obstacle it describes is a calendar, not the County.

*Third*, the Complaint's theory of causation is that the County will count ballots "without verifying the voter's citizenship." (Compl. ¶ 59.) But the Registrar has no power to make the determination whose absence the Executive

blames for its injury. His office cannot investigate citizenship beyond the registrant's sworn attestation. (ECF No. 32-4 ¶¶ 8, 44.) It has no guidelines, no access to federal citizenship databases, and no statutory or regulatory authority to adjudicate whether a registered voter is a citizen. (*Id.* ¶¶ 6, 44–46.) Federal and state law affirmatively forbid what the Executive asks of him: the NVRA's uniformity and Quiet Period requirements, 52 U.S.C. § 20507(b)(1), (c)(2)(A); the Voting Rights Act's prohibition on refusing to count a qualified voter's ballot, *id.* § 10307(a); and California's guarantee of ballot secrecy, Cal. Const., art. II, § 7. An official cannot cause an injury by failing to do what the law gives him no power to do and in fact prohibits. Whatever injury the Executive claims flows from the absence of a federal citizenship determination, not from any act or omission of the Registrar.

6. *The Requested Relief Would Not Redress the Alleged Injury*

The requested injunction would not remedy the asserted injury: that federal investigators cannot determine the citizenship of thousands of suspected noncitizens before the election concludes. (Compl. ¶ 60.) It would not help federal authorities complete a single investigation, remove any obstacle to prosecution, or restore any federal power the County has impaired. It would instead require the County to withhold the ballots of registered voters until their citizenship could be independently verified (Compl. ¶ 63)—shifting the cost of the Executive's uncertainty from federal investigators to the County and to the affected voters, including citizens whose eligibility no one has actually determined to be in doubt. Article III requires more.

The relief sought would also require Mr. Logan to act beyond his office's authority and contrary to the federal and state laws identified above. (*See* ECF No. 32-1 at 27–29.) Relief a court cannot order cannot satisfy redressability.

Nor could any order against the County reach (1) ballots already verified, separated from their envelopes, and commingled, which cannot be associated with any voter, Cal. Const., art. II, § 7; 52 U.S.C. § 21081(a)(1)(C); (ECF No.

32-4 ¶¶ 18, 36-38); or (2) any record bearing an address outside Los Angeles County, over which the County has no authority (Compl. ¶ 16; ECF No. 32-4 ¶ 6). At a minimum, then, the Executive lacks standing to seek relief against the County as to the roughly two-thirds of the October List not bearing County addresses. (ECF No. 32-3 ¶ 25.)

### B. <u>**The Claim Is Not Ripe, and the Alleged Injury Rests on a Speculative Chain of Contingencies**</u>

The Complaint asks the Court to act now against an injury that depends on events that have not occurred and that the Executive itself cannot say will occur. Ripeness, which in its constitutional dimension "coincides squarely with standing's injury in fact prong," bars claims that rest "upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138–39 (9th Cir. 2000) (en banc); *Texas v. United States*, 523 U.S. 296, 300 (1998). A threatened injury must be "certainly impending" or present a "substantial risk"; "[a]llegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409, 414 n.5; *Tex. Voters All.*, 495 F. Supp. 3d at 451–52.

The Executive's theory depends on a chain of contingencies as explained above. The Complaint pleads none of these links. It alleges only that noncitizens "might be registered" (Compl. ¶ 59), describes the listed persons as "likely" noncitizens (*id.* ¶¶ 4, 47) and the list as the input to "further investigation" (*id.* ¶¶ 38–43), and it concedes that investigation cannot be completed before the election ends (*id.* ¶ 60).

The County's review of the list confirms how speculative that chain is, which is consistent with how other federal courts have treated bulk database matching.[5] Only 7,035 of the more than 20,000 records bear County addresses,

[5] Federal courts have repeatedly found that bulk database matching of the kind underlying the October List is too unreliable to establish that any individual registrant is a noncitizen. The District of Columbia found that "SAVE's ability to verify citizenship—and particularly the citizenship of acquired or naturalized citizens—is limited," that the Social Security Administration's citizenship data "merely represents a snapshot," and that reliance on that data "present[s] an obvious risk that U.S. citizens will be wrongfully removed from voter

and a sample of those records reflects many canceled and inactive registrations, individuals who have never voted, and reported U.S. places of birth. *See supra* § I.D.2; (ECF No. 32-3 ¶¶ 24–25; ECF No. 32-4 ¶ 46). The list contains duplicates and lacks the unique identifiers the County uses, so any match to a County registration is approximate. (ECF No. 32-4 ¶¶ 37-38, 44-48.) The Executive's declarants concede the underlying data may be "incomplete, outdated, or mismatched." (ECF No. 22-4 ¶ 16.) On a factual attack, the Court need not accept the Complaint's conclusory assertion that the list identifies noncitizen voters. *Safe Air*, 373 F.3d at 1039.

The structure of Section 611 confirms the point. Congress enforces Section 611 the way it enforces most criminal prohibitions: through after-the-fact prosecution of the individual who votes unlawfully. 18 U.S.C. § 611(b). It provided no civil action to enforce Section 611, and certainly none against the officials who administer elections. Where Congress wanted DOJ to sue civilly over federal elections, it said so. 52 U.S.C. §§ 10308(d), 20510(a), 21111; *see Common Cause*, 2026 WL 3033772, at *25. And courts are "reluctant to issue injunctions against the commission of a crime" because the criminal remedy ordinarily protects the government's interest. § 2942 Availability of Injunctive Relief—In General, 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.). Where the Executive had evidence of noncitizen status, it used the remedy Congress provided: it prosecuted 28 individuals. (Appl. at 1.) That it asks instead to hold everyone else's ballots "until citizenship can be determined" (Compl. Ex. D) confirms that the harm it posits is hypothetical.

---

rolls"—a risk that "is not hypothetical." *Common Cause*, 2026 WL 3033772, at *26, *33. Another court found that the federal government had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 95 (D.D.C. 2026). And the Ninth Circuit has held that a "mass computerized data-matching process to compare the voter rolls with other state and federal databases" is "likely [to] cause inaccurate removals." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 716–17 (9th Cir. 2025) (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014)), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, No. 25-1017 (U.S. June 29, 2026).

### C. <u>The Declaratory Judgment Act and 28 U.S.C. § 1345 Do Not Cure These Defects</u>

Nor do the Complaint's jurisdictional statutes, 28 U.S.C. §§ 1345, 2201, and 2202, help. (Compl. ¶¶ 7–8.) Section 1345 confers statutory jurisdiction over suits by the United States; it does not relieve the United States of Article III's case-or-controversy requirement. And the Declaratory Judgment Act is procedural only; it neither expands federal jurisdiction nor supplies a cause of action. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950).

## IV. <u>THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(B)(6)</u>

Even if the Executive could clear the threshold of Article III, its Complaint would fail at the next step. To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. The Executive's lone claim does not come close. It invokes preemption, but it identifies no state law that conflicts with federal law. It invokes Section 611, but that statute prohibits noncitizens from voting; it says nothing about how county officials mail, verify, or count ballots. And it invokes the Supremacy Clause, but what it really seeks to make supreme is not an Act of Congress but the Executive's own preferred enforcement timetable.

### A. <u>The Complaint Fails to State a Preemption Claim</u>

The Complaint pleads a single claim. It alleges that the County and the State have sent VBM ballots to registered voters whom federal agencies have identified as "likely noncitizens," and that they "ultimately" expect to count those ballots. (Compl. ¶¶ 5, 59, 61–62.) The Executive alleges these "actions" are preempted by 18 U.S.C. § 611, which makes it a crime for noncitizens to vote in federal elections. (*Id.* ¶¶ 5, 59, 61-62.) On the Complaint's theory, Defendants "frustrate the very purpose and effect" of Section 611 by declining to "agree to work with the Federal Government to verify citizenship status before tabulating those voters' votes." (*Id.* ¶¶ 58–59.) Those "actions," the Complaint

says, make it "not practicable or feasible for the Executive to investigate" thousands of individuals it suspects of being unqualified voters "before the 2026 election concludes." (*Id.* ¶¶ 59–60.)

These allegations do not plead a preemption claim. The Executive identifies no conflict between state and federal law, and its attempt to reframe the County's noncooperation as obstruction and facilitation of unlawful voting finds no support in the law. (Compl. ¶¶ 58–60.)

### B. Preemption Requires a Conflict with Federal Law, Not with Federal Enforcement Preferences, and No Such Conflict Exists Here

Preemption serves one purpose: it "provides a rule of decision" when state and federal law conflict. *Murphy*, 584 U.S. at 477. The necessary predicate is a conflict between federal law and a state-law requirement. *Id.*; *see Kansas v. Garcia*, 589 U.S. 191, 202 (2020) ("There is no federal preemption *in vacuo* . . . .") (quoting *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). No conflict, no preemption.

Nor can preemption rest on some "brooding federal interest" untethered to a federal legal requirement. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion). Federal law may preempt state restrictions imposed through executive or administrative action, not just legislation. *See Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 971 (9th Cir. 2017) (holding that a governor's executive order and resulting agency policy, not a statute, "encroache[d] on the exclusive federal authority to create immigration classifications and so is displaced by the [Immigration and Nationality Act]"). But that is not this case. The Executive identifies no state-law requirement that conflicts with Section 611. (Compl. ¶¶ 58–60.) Instead, it asks the Court to treat the County's refusal to undertake additional citizenship verification at the Executive's request as preempted—even though Section 611 regulates individual voters, not the election officials who administer elections. (*Id.* ¶¶ 17–19, 58–60.)

California law does not authorize noncitizens to vote; it forbids them to do so. Cal. Const., art. II, § 2. The California Constitution limits the franchise to citizens. *Id*. State statutes require registrants to attest to citizenship under penalty of perjury, criminalize fraudulent registration, and require cancellation of a registration upon legally sufficient proof of noncitizenship. Cal. Elec. Code §§ 2101, 2111, 2201(a)(8), 18100. The hypothetical law authorizing noncitizen voting included in the Executive's allegations (Compl. ¶ 55) is not California's election law.

The Executive alleges obstacle preemption, which, to be sure, does not require a state law expressly authorizing prohibited conduct or making simultaneous compliance impossible. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). It can reach state rules that frustrate the operation of a federal statutory scheme. *Id*. But the inquiry stays tied to the scheme Congress enacted. Section 611, the sole statutory basis for the Executive's preemption claim, makes it "unlawful for any alien to vote" in a federal election, subject to specified exceptions. 18 U.S.C. § 611(a); (Compl. ¶¶ 17–20). It prescribes no rules for mailing, verifying, or counting ballots, imposes no citizenship-verification duty on county registrars, and creates no federal clearance procedure. Congress did not condition ballot processing on completion of federal investigations or require election officials to preserve the Executive's ability to isolate every ballot cast by a voter whose citizenship federal authorities may question.

Nor does the Complaint identify any interference with a congressionally prescribed enforcement mechanism. It alleges no state prohibition on federal investigation, no refusal to obey federal process, and no immunity from prosecution. Indeed, it concedes that the Executive "actively investigates and prosecutes" unlawful voting. (Compl. ¶ 60.) Its asserted obstacle is that federal officials cannot finish investigating thousands of suspected noncitizens before the election concludes. (*Id.* ¶¶ 58–60.) That explains why the Executive wants

the County to suspend ordinary ballot processing, not how that processing frustrates the operation of Section 611. Treating the absence of additional state assistance as a conflict would allow federal investigators to change election rules whenever they announce that their investigations remain unfinished.

The Supreme Court has rejected that understanding of preemption: "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Garcia*, 589 U.S. at 212. Section 611 is federal law. The proposed hold-until-cleared procedure is the Executive's proposed means of enforcing it. The former does not give the latter statutory force. Because the Complaint identifies no conflict between California's election procedures and Section 611, its sole claim fails.

**C.** Section 611 Does Not Displace California's Rules for Administering This Election

Section 611(a) prohibits voting by an alien in an election for specified federal offices, subject to its exceptions. Subsection (b) provides criminal penalties. That is all. Neither provision directs election officials to investigate a federal list, segregate listed voters' ballots, or withhold those ballots until citizenship is independently verified—the very authority and relief the Executive seeks here. Those requirements appear nowhere in Section 611, or in any other law Congress has enacted.

That gap matters. The Executive "literally has no power to act" except as authorized by the Constitution or by Congress. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Neither the Constitution nor Congress has given the Executive authority for any of the steps it asks this Court to compel: requiring County registrars to segregate ballots and to implement a new citizenship-verification process.

Under the Elections Clause, the States prescribe the "Times, Places and Manner" of congressional elections unless Congress "make[s] or alter[s]" those regulations. U.S. Const. art. I, § 4, cl. 1. That power belongs to Congress, not the

Executive. *See Weber*, 816 F. Supp. 3d at 1175 (noting that the Elections Clause "has constitutionally prevented the centralization of election management in the Executive"). Congress has legislated extensively on the procedures the Executive seeks to displace here. The NVRA requires States to accept and use the Federal Form, which includes a citizenship attestation under penalty of perjury. 52 U.S.C. §§ 20505(a)(1), 20508(b)(2). HAVA requires a citizenship question on the mail registration form and assigns responsibility for the statewide registration list to state officials. *Id.* § 21083(a)(1), (b)(4)(A)(i). The NVRA also regulates list maintenance and limits systematic removals before federal elections. *Id.* § 20507(b)(1), (c)(2). Those provisions reflect congressional choices about both identifying ineligible registrants and protecting eligible voters against erroneous exclusion. Congress did not delegate any of those roles to the Executive.

Congress has delegated to the Executive an important role in election regulation. For example, it has authorized the Attorney General to sue to enforce the NVRA and HAVA. 52 U.S.C. §§ 20510(a), 21111. But the Complaint asserts no violation of either statute. And under the Constitution, the Executive's duty is to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, enforcing the obligations Congress enacted, not new ones the Executive invents or prefers. And Section 611, a criminal prohibition directed at individual aliens who voted, cannot be read as an implied grant of authority to impose an emergency ballot withholding regime that bypasses the safeguards Congress separately adopted in legislation addressing both citizenship attestation and voter roll maintenance.[6]

---

[6] The Executive's reading would also raise a serious constitutional question. At least one court has held that Section 611 regulates voter qualifications, which the Elections Clause does not authorize Congress to set. *United States v. Cox*, No. 0:25-cr-60249-DSL, 2026 WL 2948729, at *1 (S.D. Fla. Oct. 1, 2026). The Court need not decide that question. But reading Section 611 to let the Executive override how a State determines whether its registrants meet those qualifications would only deepen the problem.

**D. <u>Declining to Help Federal Investigators Is Not Obstruction, and Section 611 Imposes No Duty on County Officials to Assist</u>**

Stripped to its essentials, the Complaint's theory is that the State and County obstruct federal law whenever they decline to help federal investigators. The Complaint alleges that Defendants "declined to work with" federal agencies and would not "independently verify" citizenship on the Executive's say-so, and that this frustrated federal enforcement. (Compl. ¶¶ 47, 57–60.) That is a grievance about cooperation, not a conflict with federal law. The Ninth Circuit has already drawn that line. In *California*, the United States argued that state laws limiting assistance to federal immigration enforcement were obstacle-preempted because they made the federal task harder. 921 F.3d at 888. The court rejected the argument in terms that preclude this case: "refusing to help is not the same as impeding." *Id.*; *see id.* at 888–91. The Executive itself concedes that "a State is not required to help the Federal Government investigate and prosecute crimes" (Appl. at 23), yet that is exactly what it seeks to compel here by injunction.

The Executive may respond that mailing and counting ballots are affirmative acts, not mere lack of cooperation. The distinction does not hold. *California* also involved the State's affirmative conduct: state and local officials kept releasing people from their custody without giving the advance notice or arranging the transfers that federal immigration authorities wanted. *California*, 921 F.3d at 887–89. The question was never whether the State was doing something. It was whether the State was interfering with federal enforcement or simply carrying on its own functions without lending federal officials a hand. This case is even easier. The County is doing what California law requires and federal law permits: mailing ballots to registered voters and processing them in accordance with applicable state laws, regulations, and procedures. The Executive now asks this Court to halt that work unless County officials adopt a new referral-and-clearance process of the Executive's design.

Nothing in Section 611 requires the County to do what the Executive is asking. The statute makes it a crime for a noncitizen to vote in a federal election. It regulates the conduct of individual voters, not the officials who administer elections. 18 U.S.C. § 611(a). It says nothing about federal referrals, ballot holds, or citizenship clearance. Relabeling noncooperation as "facilitation" does not write those duties into it.[7]

To be clear, the County does not claim broad immunity from federal election law. Its point is narrower: the Constitution assigns the power to regulate federal elections to Congress, and Congress has not exercised it here. An executive demand letter is not an Act of Congress. Attaching a preemption label to the Executive's demands does not change that. "The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Garcia*, 589 U.S. at 212.

**E. <u>The Complaint's "Knowing Facilitation" Theory Fails as a Matter of Law and Is Refuted by the Complaint's Own Allegations</u>**

Unable to identify a conflicting state law, the Complaint recasts the County's ordinary election procedures as "knowingly facilitat[ing] unlawful voting." (Compl. ¶¶ 56, 59–61.) For that theory it leans on a single case, *Norwood v. Harrison*, 413 U.S. 455 (1973), which reasoned that a State "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Id.* at 465; (Compl. ¶¶ 5, 56). The theory fails three times over.

1. *Norwood Supplies No Preemption Rule*

*Norwood* was an equal-protection case. Mississippi lent free textbooks to students at private schools with racially discriminatory admissions policies.

---

[7] The result is no different under the Elections Clause, which the Complaint also invokes. Congress may supersede state election procedures, but only "so far as [Congress] . . . exercise[s]" that authority "and no farther." *Inter Tribal Council*, 570 U.S. at 9 (citation omitted); *see also Ex parte Siebold*, 100 U.S. 371, 384 (1879). Congress did not exercise that authority in Section 611 to prescribe ballot-verification or counting procedures.

*Norwood,* 413 U.S. at 458. The Court held that this tangible aid supported discrimination the State itself could not practice. *Id*. at 463–68. The principle depends on a constitutional prohibition that binds the State. Section 611 binds no State. It forbids noncitizens to vote. 18 U.S.C. § 611(a). A State cannot "induce" others to do what it is "forbidden to accomplish" when federal law forbids the State nothing. The Complaint cites no case turning *Norwood* into a preemption doctrine, and the County is aware of none.

2. *Norwood Undercuts the Remedy the Executive Seeks*

Even on its own terms, *Norwood* did not presume that every participating school discriminated. It contemplated an individualized determination of whether a given school discriminated, for example, through a certification process. *Id*. at 470–71. California already requires individualized certification. Each registrant attests to citizenship under penalty of perjury, and election officials act on credible, individualized information of ineligibility. Cal. Elec. Code §§ 2111, 2150(a)(1), 2201(a)(8). The Executive asks for the opposite of what *Norwood* required: a blanket hold on thousands of ballots, based on a bulk list, with no individualized determination at all. (Compl. ¶¶ 6, 63.)

3. *The Complaint Does Not Plausibly Allege Knowledge*

The Complaint's own allegations defeat the premise that the County "knows" that persons on the October List are noncitizens. It alleges only that the State "knows that noncitizens *might* be registered to vote." (Compl. ¶ 59 (emphasis added).) It describes the listed individuals as "likely" noncitizens. (*Id.* ¶¶ 4, 45, 58.) It explains that USCIS refers its list to HSI "for further investigation," and that HSI in turn sends it to "criminal investigators in the field for further investigative steps." (*Id.* ¶¶ 38–43.) And it concedes that the investigation cannot be completed before the election concludes. (*Id.* ¶ 60.) By its author's own account, then, the list is where an investigation begins, not where it ends. It cannot confer knowledge that any listed person is ineligible.

Knowing that an accusation has been made is not knowing that it is true.[8] The Complaint's assertion that the County acts "knowingly" is therefore "a legal conclusion couched as a factual allegation," which the Court need not accept. *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.

The Complaint's passing reference to aiding and abetting does not fill the gap. (Compl. ¶ 19.) Section 2 of Title 18 establishes criminal accomplice liability; it creates no independent civil cause of action. Nor is there a general presumption that civil liability extends to aiders and abettors. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). In any event, the Complaint does not allege conduct satisfying § 2. Accomplice liability under 18 U.S.C. § 2 requires an affirmative act in furthering the offense, undertaken with intent to facilitate it and advance knowledge of the circumstances constituting the offense. *Rosemond v. United States*, 572 U.S. 65, 71, 76–77 (2014). The Complaint alleges neither intentional assistance nor the requisite knowledge.

The County's alleged conduct consists of administering elections under generally applicable federal and state law, including the NVRA, HAVA, and California's procedures for mailing, verifying, and counting ballots. *See supra* § IV.C; Cal. Elec. Code §§ 3000.5, 3011, 3019; Cal. Code Regs. tit. 2, §§ 20960, 20990–20991. The Complaint identifies no departure from those neutral procedures undertaken with the intent to facilitate unlawful voting. Nor does it allege that any County official intends for a noncitizen to vote or knows that any particular voter has committed or will commit an offense. Notice that federal agencies suspect certain registered voters are noncitizens is not knowledge that those voters are ineligible, much less intent to facilitate unlawful voting.

---

[8] The Executive's announcement that it has charged 28 people on its list (Appl. at 1) does not help it. The charges appear nowhere in the Complaint, and a criminal charge is an accusation, not proof that anyone is a noncitizen or has voted. Nor do 28 charges, about one-seventh of one percent of the list, say anything about the other 20,000 names. Above all, the charges show that federal enforcement is proceeding exactly as Section 611 contemplates, against individual voters, with nothing the County has done standing in its way.

### F. Even if the Complaint Stated a Claim, the Court Could Not Grant the Relief the Executive Seeks

Even if the Complaint stated a claim, the injunction it seeks would require County officials to violate federal law. That alone warrants dismissal of the request for injunctive relief. A decree commanding violations of federal and constitutional law cannot serve the public interest, and the Executive's proposed decree would require four of them.

*First*, the NVRA requires States to complete "any program the purpose of which is to systematically remove the names of ineligible voters" no later than 90 days before a federal election. 52 U.S.C. § 20507(c)(2)(A). That window closed on August 5, 2026. The Eleventh Circuit has applied the bar to systematic programs aimed at noncitizens. *Arcia*, 772 F.3d at 1344–48. The Ninth Circuit has done the same—and has held that sending individual notices after a database comparison does not convert a systematic cancellation of registrations, which, under the NVRA, may not be conducted within 90-days of an election, into an "individualized" removal program, one of the NVRA's enumerated exceptions.. *Mi Familia Vota*, 129 F.4th at 716–17. The program the Executive proposes is systematic by design: a bulk list, generated by database matching, applied wholesale on the eve of the election. It would not formally strike names from the rolls. But setting aside the ballots of registered voters until an open-ended federal review ends, less than two weeks before Election Day, accomplishes the same exclusion the 90-day bar exists to prevent. Congress drew that line to keep error-prone, last-minute purges from disenfranchising eligible voters. A ballot hold that achieves the same result under a different name does not escape it.

*Second*, the Voting Rights Act forbids any person acting under color of law to "willfully fail or refuse to tabulate, count, and report" the vote of any person "entitled to vote" or "otherwise qualified to vote." 52 U.S.C. § 10307(a). The Executive does not claim that every person on the October List is a noncitizen. It describes them only as "likely" noncitizens. (Compl. ¶¶ 4, 45, 58.)

A blanket hold would therefore necessarily withhold the ballots of qualified citizens, and County officials would have to refuse, knowingly, to count those votes before certification. The Court should not order officials to do what Section 10307(a) prohibits.

*Third*, the order would deprive eligible voters of the right to have their ballots counted without the process the Constitution requires. Due process calls for weighing the private interest at stake, the risk of erroneous deprivation, the value of additional safeguards, and the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Every factor cuts against the proposed order. The interest is the fundamental right to vote. The list contains disputed matches, so the risk of error is substantial. The proposed order provides no notice, no means of response, no standard for decision, and no deadline. And once the canvass closes, a mistaken exclusion may be impossible to undo. Courts have required a meaningful opportunity to cure before an eligible voter's ballot is rejected. *See Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). A decree that dispenses with those safeguards is not one this Court should enter.

*Fourth*, federal law requires that voter-list maintenance be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). The Civil Rights Act separately bars officials who are assessing a voter's qualifications from applying standards, practices, or procedures different from those applied to other voters in the same county already found qualified to vote. *Id.* § 10101(a)(2)(A). The Executive's proposed hold would single out voters based on immigration-related records that may show only that a person was once a noncitizen, or that current citizenship could not be confirmed. It is likely that naturalized citizens would bear scrutiny that native-born citizens do not, solely because of their immigration history, even though both have the same right to vote. The Ninth Circuit found that kind

of differential scrutiny unlawful. *Mi Familia Vota*, 129 F.4th at 714–15.[9]

### G. **The Complaint Does Not Allege That Any Listed Voter in Los Angeles County Has Cast a Ballot, and Relief Against Mr. Logan Could Reach No One Else**

Moreover, Mr. Logan's authority ends at the county line. He administers elections in Los Angeles County. (*See* Compl. ¶ 16.) He has no power to mail, hold, or count ballots anywhere else. *See* Cal. Elec. Code § 3017(a)(3) (requiring a county election official to forward to the issuing county any ballot dropped off or voted in another county). The Complaint does not allege how many listed individuals are registered in Los Angeles County, or that any one of them has requested or returned a ballot there. And courts enjoin officials, not laws; an injunction runs only to the conduct of the official before the court. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). An official-capacity defendant can be ordered to do only what his office empowers him to do. *See Baughcum v. Jackson*, 92 F.4th 1024, 1033 (11th Cir. 2024) (holding plaintiffs' claims against the Commissioner were not redressable because the Commissioner "was not responsible for issuing licenses, nor could he issue them to the plaintiffs if ordered," as licensing authority lay with the probate judges). Mr. Logan therefore cannot be compelled by injunction to act on the ballots of the approximately 13,000 listed individuals registered outside Los Angeles County.

## V. **CONCLUSION**

Election integrity is measured by making sure every lawful vote counts, guided by established law and untainted by intimidation and threats. The Executive's Complaint erodes that integrity by sowing doubt across the electorate and seeking to disrupt the core civic functions of County election workers. This Court is the essential check against this overreach, and with ballots already being cast, an order dismissing the Executive's preemption claim

[9] The Executive's request that VBM ballets be held and not counted, but not in-person ballots, is also contrary to the application of uniform and nondiscriminatory standards.

as unlawful will confirm that election officials can complete their work and eligible voters are not dissuaded. For these reasons, the County respectfully requests the Court dismiss the Complaint with prejudice, for no amount of amendment can cure the defects.

Dated: October 21, 2026

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI

By:________________________
CHRISTOPHER PELHAM
Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

Dated: October 21, 2026

**PUBLIC RIGHTS PROJECT**
JOSHUA KARSH (*pro hac vice forthcoming*)
TOBY R. MERRILL (*pro hac vice forthcoming*)
KYRA SIKORA
SHARANYA MOHAN (*request for admission pending*)

By: */s/ Joshua Karsh*
JOSHUA KARSH
Attorneys For Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

The undersigned, counsel of record for Defendant Dean C. Logan, certifies that this brief contains 10,349 words, which complies with the word limit of L.R. 11-6.1 or the Court's order permitting up to 10,500 words.

ABIGAIL URQUHART
October 21, 2026