TODD BLANCHE
Attorney General
R. TRENT MCCOTTER
Acting Deputy Attorney General
JOHN K. ADAMS
Associate Deputy Attorney General
ANDREW M. DARLINGTON (Fl. Bar No. 10188895)
Counsel to the Assistant Attorney General
950 Pennsylvania Avenue, NW
Washington, D.C., 20530
Telephone: (202) 532-0100
Andrew.Darlington2@usdoj.gov

BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (Cal. Bar No. 272742)
Assistant United States Attorney
J. ROBERT RENNER (Cal. Bar No. 148587)
Assistant United States Attorney
300 N. Los Angeles St., Ste. 7516
Los Angeles, California 90012
Telephone: (213) 894-2464
E-mail: Julie.Hamill@usdoj.gov

Attorneys for Plaintiff
*United States of America*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, *et al.*,<br><br>Defendants. | Case No. 2:26-cv-12025<br><br>**UNITED STATES' MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION FOR INJUNCTION PENDING APPEAL**<br><br>Hon. David O. Carter<br>United States District Judge |

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 9

A. The Federal Government is likely to prevail on the merits. ........ 9

B. The other injunction factors strongly favor the government. ........ 14

CONCLUSION ........ 16

## TABLE OF AUTHORITIES

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025) ........ 9

*Abbott v. Perez*,
585 U.S. 579 (2018) ........ 15

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ........ 15

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ........ 15

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ........ 11

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ........ 9, 10, 13

*Daimler Truck N. Am. LLC v. California Air Res. Bd.*,
2025 WL 3049944 (E.D. Cal. Oct. 31, 2025) ........ 11, 15

*Feldman v. Arizona Sec'y of State's Off.*,
843 F.3d 366 (9th Cir. 2016) ........ 9

*Golden State Transit Corp. v. City of Los Angeles*,
475 U.S. 608 (1986) ........ 10

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ........ 10

*Kansas v. Garcia*,
140 S. Ct. 791 (2020) ........ 9

*Livadas v. Aubry*,
987 F.2d 552 (9th Cir. 1991) ........ 11

*Livadas v. Bradshaw*,
512 U.S. 107 (1994) ........ 11

*Maryland v. King*,
567 U.S. 1301 (2012) ........ 15

*Mich. Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*,
467 U.S. 461 (1984) ........ 10, 13

*Musta v. Mendota Heights Dental Ctr.*,
965 N.W.2d 312 (Minn. 2021) ........ 10

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013) ........ 12

*NetChoice v. Bonta*,
761 F. Supp. 3d 1232 (N.D. Cal. 2025) ........ 2

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,
491 U.S. 350 (1989) ........ 14

*Puerto Rico v. Branstad*,
483 U.S. 219 (1987) ........ 10

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ........ 13

*Savage v. Jones*,
225 U.S. 501 (1912) ........ 9

*Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ........ 15

*United States v. City of Jackson*,
318 F.2d 1 (5th Cir. 1963) ........ 11

*United States v. Texas*,
557 F.Supp.3d 810 (W.D. Tex. 2021) ........ 15

*Virginia Off. for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011) ........ 11

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 9

**STATUTES**

6 U.S.C. § 271 ........ 3

18 U.S.C. § 611 ........ 8, 11, 13, 16

52 U.S.C. § 10307(a) ........ 8

Cal. Elec. Code § 2188 ........ 5

Cal. Elec. Code § 3000.5 ........ 12

6 U.S.C. § 252 ........ 3

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 62(d), the United States moves for an injunction pending appeal of this Court's constructive denial of the United States' emergency application for preliminary injunctive relief. *See* Fed. R. Civ. P. 62(d); *see A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) ("A district court's inaction in the face of extreme urgency and a high risk of 'serious, perhaps irreparable,' consequences may have the effect of refusing an injunction" and concluding that inaction for "14 hours and 28 minutes . . . had the practical effect of refusing an injunction." (citations omitted)).

The United States has appealed this Court's effective denial of its application for an injunction requiring Defendants to (1) set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot. *See* ECF Nos. 22, 62. The requested injunction is warranted because the United States is likely to succeed on appeal, and an injunction would prevent further irreparable harm to the United States and the general public while the United States' appeal proceeds.

The United States brings this application on an *ex parte* basis because every minute of processing that occurs without segregating the ballots of suspected non-eligible voters causes untraceable disenfranchisement and dilution of the votes of United States citizens. Once illegally cast ballots are counted and commingled with lawful votes, the resulting harm is impossible to remedy. The urgency is heightened because of the fundamental right to vote and to have one's lawful vote counted without dilution.

Defendant Dean Logan admits in his opposition to the United States' application for temporary restraining order, "[s]ince the County began its [Vote By Mail ("VBM")] ballot processing operations on October 11, 2026, **the County has processed more than 331,000 VBM ballots to date** and anticipates much higher volumes of VBM ballots to be received as Election Day approaches (citation omitted). Regardless of voting method,

voting is fully anonymous—even to the County itself, in compliance with California and federal law. (citation omitted). **Once a vote-by-mail ballot has been removed from its return envelope, or an in-person ballot has been cast, there is no way to associate the voter with that ballot.** (citation omitted)." (Emphasis added). ECF No. 32-1, p. 11.

Assistant Registrar-Recorder Monica Flores admits in her declaration that "[t]he [Los Angeles County] **Registrar is not equipped or authorized to verify voter citizenship** because it does not independently house citizenship-related information beyond the voter attestation as identified in federal and state law (such as, among other things, immigration records, travel records, naturalization records, etc.) and certainly is not equipped to do so within the election period." (Emphasis added). ECF No. 32-4 at 15.

Once an unlawful vote is processed, it cannot be undone if it is later discovered that the voter was ineligible. *See* Dkt 32-1.

In the alternative, the United States requests that the Court follow the approach recently taken in similar circumstances in *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1236 (N.D. Cal. 2025), granting a temporary injunction of up to thirty days, or until the Ninth Circuit rules on the United States' forthcoming emergency motion for an injunction pending appeal, whichever is sooner. Absent judicial intervention, lawful votes of United States citizens are permanently diluted. Accordingly, the United States respectfully requests a ruling on this motion as soon as possible and no later than noon PT on October 23, 2026.

## BACKGROUND

This case concerns Defendants State of California, Shirley N. Weber, in her Official Capacity as the California Secretary of State, and Dean C. Logan, in his Official Capacity as the County of Los Angeles Registrar-Recorder/County Clerk ("Defendants" or "California") refusal to segregate the ballots of tens of thousands of individuals identified by the Federal Government as highly likely to be ineligible to vote.

**1.** The Federal Government includes several agencies and sub-agencies with authority to evaluate individuals' citizenship. The United States Citizenship and Immigration

Services (USCIS) is responsible for adjudicating immigrant visa and naturalization applications. *See* 6 U.S.C. § 271. The Fraud Detection and National Security Directorate (FDNS) is an agency within USCIS that "safeguards the integrity of the nation's lawful immigration system by leading USCIS' efforts to combat fraud, detect national security and public safety threats, and maximize law enforcement and Intelligence Community partnerships." *FDNS Mission*, *available at* https://perma.cc/4SHH-GAQX. Its expertise and mission encompass noncitizen fraud in federal elections. *See* Bartell Decl. ¶ 13, ECF No. 62-2. Homeland Security Investigations (HSI), which resides within Immigration and Customs Enforcement, serves as the primary investigative agency enforcing America's immigration laws and maintains records and information on individuals who are being investigated for violations of the United States' immigration laws or regulations. *See* 6 U.S.C. § 252.

USCIS receives state voter rolls or information on state voter rolls to review for potential aliens who unlawfully registered to vote or who voted in a federal election. *See* Bartell Decl. ¶ 13, ECF No. 62-2. This data gathering process is distinct from the Systematic Alien Verification for Entitlements (SAVE) program. *Id.* ¶ 15. When presented with information on voter rolls from agencies like DHS, USCIS processes that information to identify registered voters who are likely aliens. *Id.* ¶ 14; *see also* McLoughlin Decl. ¶ 14, ECF No. 62-3.

USCIS begins its process by enhancing the voter data it receives through a reliable third-party data analytics and investigative platform. Bartell Decl. ¶ 14, ECF No. 62-2. The raw voting record data are combined with the enhanced data and then paired with an internal USCIS alien number to identify the same individual. *Id.* ¶ 16. USCIS then scores and ranks the potential identity match to account for incomplete, outdated, or mismatched information. *Id.*

Following a preliminary identity match, USCIS screens potential matches against Department of State and Social Security Administration data to remove individuals who

can be identified as United States citizens (or as deceased), and then it excludes those matches from further review. *Id.* ¶ 17. Afterwards, USCIS consolidates all match evidence and assigns a confidence level for each match. *Id.* ¶ 18. A high confidence match means the match between the voting record and USCIS alien record is "strong and consistent with multifield evidence supporting a strong identity link." *Id.* At that point, USCIS has completed its initial review.

Based on the results of that initial review, the FDNS investigators within USCIS *manually* review every match to confirm the identity match and determine which registered voters they believe are very likely to be aliens based on USCIS' citizenship data. *Id.* ¶ 19. Part of that investigation includes verifying whether the registered voter could have potentially derived citizenship based on history or through parentage. *Id.* Investigators also confirm the match with Department of State systems to identify if any documents (*e.g.*, passports) might not have been linked to USCIS systems, but which bear on the individual's citizenship status. *Id.* A second-level review of the match and citizenship status determination occurs after all of that process, as an additional safeguard. *Id.* After completion of the multilevel and additional-safeguard review, USCIS makes a final determination on which matches to send to HSI for further assessment. *Id.* ¶ 20.

Once USCIS and FDNS complete their analysis and send their work product, HSI performs an initial intake, which includes a quality review that identifies duplicate entries, incomplete records, missing identifiers, data quality issues, and the like. *See* McLoughlin Decl. ¶ 16, ECF No. 62-3. After that intake, HSI prioritizes the records for review and prepares the data for additional enrichment using approved analytic capabilities. *Id.*

HSI's enrichment process focuses on improving the completeness and consistency of identification information and, where lawfully permitted, identifying additional unique identifiers that may assist in reliable matching of the voters to their immigration status. *Id.* ¶ 17. HSI's enrichment process can perform data matching across multiple authorized data sources and consolidate disparate records into a unified set of matching results. *Id.* The

purpose of enrichment is to reduce the risk that voters are mistakenly associated with the wrong immigration status. *Id.* That process adds value by applying consistent quality controls and enrichment processes before voter records are disseminated as investigative referrals or routed for another authorized purpose. *Id.* ¶ 18. Then, after its investigation, HSI may ask USCIS to perform additional manual review of the relevant matches. *Id.* Once the HSI review is completed, each individual data profile is referred to the applicable HSI field office where it will be investigated for potential criminal violations. *Id.* ¶ 19.

California's voter roster containing voter registration information is available for purchase. *See* Cal. Elec. Code § 2188. HSI "received what appeared to be the California voter roster for the general election of 2026." McLoughlin Decl. ¶ 20, ECF No. 62-3; *see also id*. ¶ 21. After assessing the credibility of the voter roster, *id*. ¶ 20, HSI forwarded it to USCIS and FDNS on or around May 8, 2026, *see* Bartell Decl. ¶ 21, ECF No. 62-2. FDNS took that list and analyzed the data through the above-described process. *Id*. ¶ 22. That produced a "refined list of individuals who the [FDNS] believes are highly likely to be noncitizen aliens registered to vote in the 2026 federal election in California." *Id.* FDNS then sent that refined list to HSI. *Id.*

Once HSI received the list from FDNS, HSI further refined the data through the above-described HSI process and through federal law enforcement systems. McLoughlin Decl. ¶ 23, ECF No. 62-3. "That further refinement resulted in over 20,000 individuals remaining on the list." *Id.* HSI then facilitated the delivery of that final list to the Department of Justice, the U.S. Attorney's Office for the Central District of California, and the Los Angeles County Registrar-Recorder / County Clerk (RR/CC) on October 13, 2026. *Id.* ¶ 24. The Department of Justice made the same list available to the California Secretary of State on the same day. *Id.*; *see also* Compl., ECF No. 1, Exs. C & D (delivering list to California).

The list of over 20,000 individuals delivered to California represents the floor of potential noncitizen California voters. *See* Bartell Decl. ¶ 23, ECF No. 62-2. USCIS,

FDNS, and HSI continue to analyze additional potential noncitizen voter records through the above-mentioned multilevel review process. *Id.* For example, "USCIS has identified a separate batch of more than 17,000 voting records potentially tied to noncitizens after an initial review of voter rolls." *Id.* And based on USCIS' experience in this process, "most voters in [an] initially flagged population will end up being referred to HSI." *Id.* The review is ongoing as additional records are received on a rolling basis before the election date to ensure election integrity. *Id.* USCIS will supplement the record with additional information of likely noncitizen voting in the federal election. *Id.*[1]

**2.** In July 2026, U.S. Secretary of Homeland Security Mullin wrote to California Secretary of State Weber alerting her that a "[p]reliminary review" of California records revealed that there may be as many as 190,832 noncitizens registered to vote in California. Compl. Ex. A, ECF No. 1-1. "As an example," he stated, the Department of Homeland Security (DHS) "found 81,336 California registrants for whom the name, date of birth, address and Social Security number match a non-citizen in [DHS] files." *Id*. He then requested collaboration with California "to ensure the accuracy of [the] findings." *Id*.

Notwithstanding that California has registered numerous noncitizens to vote before, Secretary Weber responded a week later to cast doubts about noncitizen voting in the State. *See* Mark Osborne, *1,500 noncitizens may have been registered to vote in California DMV error*, ABC News (Oct. 9, 2018), *available a*t https://perma.cc/9RM4-THZX (California "admitted . . . a mistake caused as many as 1,500 noncitizens being registered to vote in the state" and had earlier identified some "23,000 Californians" who had their voter registration mishandled). Her response letter did not refute that noncitizens are registered to vote. Nor did she contest that they would receive vote-by-mail ballots if they registered to

[1] California has claimed that the list is unreliable based on an unspecified "sampling" of the data. ECF No. 32-1 at 17. Counsel for the United States wrote to counsel for Defendants asking for more information about this analysis and specific individuals who they claim are inaccurately identified as likely noncitizens. Counsel for the United States has not received a response as of the time of this filing.

vote. Instead, she cast "serious doubts" about noncitizens registered to vote in California because the State had refused to share its "statewide voter registration list with DHS or any other federal agency or official." Compl. Ex. B, ECF No. 1-2. She nonetheless asked for additional details to evaluate the claims.

The Federal Government provided those details over one week ago. On October 13, the Federal Government hand delivered a list of over 20,000 individuals to RR/CC who it reasonably believes are noncitizens registered to participate in the federal election. *See* McLoughlin Decl. ¶¶ 23-24 and Ex. A, ECF No. 62-3; *accord* Bartell Dec. ¶¶ 24-25, ECF No. 62-2; Compl. ¶ 47, ECF No. 1. The Federal Government requested that California review the list within 48 hours to determine whether citizens are listed. Compl. Ex. D, ECF No. 1-4 at 1. "For individuals whom [California] cannot independently confirm citizenship status," the Federal Government requested that California "instruct the appropriate elections official to segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined." *Id*. "This process," the Federal Government emphasized, "will protect American citizens' votes while preventing noncitizens from participating in the federal election in violation of federal law." *Id*. at 2. The Federal Government asked for a response to its modest request.

California responded two days later rejecting cooperation with the Federal Government and made clear it would not do anything to prevent noncitizen voting. *See* Compl. Exs. A & B, ECF Nos. 1-1 & 1-2. Responses acknowledged receipt of the list of over 20,000 individuals. *Id*. The RR/CC claimed that it was legally prohibited from preventing noncitizen voting—or even collaborating with the Federal Government on this issue—because "federal and state law support and require voter registration when eligibility requirements are met by attestation from an applicant." Compl. Ex. A, ECF No. 1-1 at 2. The RR/CC did not explain why these laws would apply in the face of credible evidence demonstrating that the applicant is a noncitizen. *Id*. Next, the RR/CC stated that it could not remove ineligible voters from its voter rolls, but the Federal Government never

requested that voters be removed from voter rolls. *Id*. at 3. Third, the RR/CC said that it could not "refuse to permit any person to vote who is entitled to vote." *Id*. (citing 52 U.S.C. § 10307(a)). Yet it did not explain why it believes the likely noncitizens identified by the Federal Government would be entitled to vote in violation of 18 U.S.C. § 611. Finally, the RR/CC complained about "practical problems" due to its workload if it had to prevent noncitizen voting. *Id*. "Based on the foregoing," the RR/CC stated, it would not "comply with" the request to help prevent noncitizen voting. *Id*. at 4. The California Secretary of State iterated the same points. *See* Compl. Ex. B., ECF No. 1-2.

Because California refused to even try to prevent noncitizen voting in violation of 18 U.S.C. § 611, despite being provided with a list of likely noncitizen voters by the Federal Government, the United States seeks narrow injunctive relief consistent with ordinary practices when a ballot is called into question. This Court should enjoin California from tabulating vote-by-mail ballots from likely noncitizens in the federal election until the voter's citizenship status can be determined. To do so, this Court should order California (1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote.

**3.** The United States filed its Complaint on October 15, 2026. ECF No. 1. That morning, the Federal Government announced that it was charging numerous noncitizens in California with violating 18 U.S.C. § 611. *See* ECF No. 61-2 & n.4 (collecting press releases). That same day, the United States moved for an *ex parte* application to exceed the page limitations and for a temporary restraining order and order to show cause why a preliminary injunction should not issue. ECF No. 22. The case was originally assigned to Judge Holcomb, who entered a standing order on October 20. ECF No. 34 & 44. The next day, the case was transferred to Judge Carter. ECF No. 46. The United States re-filed their application for preliminary injunctive relief upon the district court granting leave to exceed pages, ECF Nos. 53, 62. The district court has set a hearing for October 27. ECF No. 64.

Because Defendants have already been and are presently counting potentially noncitizen ballots, the United States requested expedited ruling on the temporary restraining order by noon October 22. ECF No. 67 at 3. As of filing, the district court has failed to rule on the motion and therefore constructively denied Federal Government's motion. *See, e.g.*, *A.A.R.P. v. Trump*, 605 U.S. 91, 92 (2025).

**ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). All of those factors support the United States and warrant injunctive relief here.

**A. The Federal Government is likely to prevail on the merits.**

**1.** Under the Supremacy Clause, the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2; *Arizona v. United States*, 567 U.S. 387, 399 (2012) ("The Supremacy Clause provides a clear rule that federal law" is supreme over state law). Federal preemption principles ensure the constitutional supremacy of federal law. Under those principles, contrary "state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912). And federal law can preempt state law "[e]ven without an express provision for preemption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). That includes where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 373 (citations omitted) (cleaned up), or otherwise "directly conflict[s]" with federal law, *Kansas v. Garcia*, 140 S. Ct. 791, 808 (2020) (Thomas, J.,

concurring). State action must "give way" when it conflicts with "a considered judgment" embodied in federal law. *Arizona*, 567 U.S. at 399, 405.

States cannot avoid preemption by facilitating a private party to violate federal law. It is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 465. For example, if a state purported to subsidize federal crimes, that would conflict with the considered judgment of Congress. *See, e.g.*, *Musta v. Mendota Heights Dental Ctr.*, 965 N.W.2d 312, 321-27 & n.11 (Minn. 2021) (federal law preempted a requirement that an employer subsidize the purchase of a federally prohibited drug), *cert denied*, 142 S. Ct. 2834 (Mem.) (2022).

When evaluating the obstacle that state action poses to federal aims, courts "examin[e] the federal statute as a whole and identify[] its purpose and intended effects[.]" *Crosby*, 530 U.S. at 373. To illustrate, when a State "authorizes [persons] to engage in conduct that the federal [law] forbids, it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Mich. Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*, 467 U.S. 461, 478 (1984) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). At bottom, obstacle preemption exists wherever a state "undermines the intended purpose and natural effect" of a federal statute. *Crosby*, 530 U.S. at 373 (internal quotation marks omitted).

These preemption principles apply when state officials act in a manner that obstructs or conflicts with federal law. "It has long been a settled principle that federal courts may enjoin unconstitutional *action* by state officials." *Puerto Rico v. Branstad*, 483 U.S. 219, 228 (1987) (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Accordingly, whether state and local officials "act[] through . . . procedures rather than a court order or a general law . . . is irrelevant to [the] analysis." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 n.5 (1986). Preemption does not turn on the form of state action. It "turns on the actual content of [a state's] policy and its real effect on federal

rights." *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994) (citing and adopting *Livadas v. Aubry*, 987 F.2d 552, 561 (9th Cir. 1991) (Kozinski, J., dissenting) ("The point is, the Commissioner is applying state law and his own policy in a way that impinges on protected federal rights.")).

Courts have thus held that federal law preempts a wide range of conflicting state actions. Where state officials operating a state university had a "policy" of "preferential treatment" regarding "in-state status" that the Supreme Court deemed inconsistent with federal immigration law, that "policy" itself "violate[d] the Supremacy Clause." *Moreno*, 458 U.S. at 17. Preemption likewise applied when state officials acted to "encourag[e] racial segregation" in violation of the Equal Protection Clause. *United States v. City of Jackson*, 318 F.2d 1, 3–4 (5th Cir. 1963). Or when California itself sought to pursue civil litigation in state court to set emissions standards in violation of the Clean Air Act. *See Daimler Truck N. Am. LLC v. California Air Res. Bd.*, 2025 WL 3049944, at *17–*18 (E.D. Cal. Oct. 31, 2025). A "conflict in technique can be fully as disruptive to the system Congress enacted as [a] conflict in overt policy" written in a statute or regulation. *Arizona*, 567 U.S. at 406. After all, *Ex parte Young*, through which litigants there sought to enjoin unconstitutional state *action*, does not focus on the validity of state law; it focuses on whether "a state official who enforces that law 'comes into conflict with the superior authority of [the] Constitution.'" *Virginia Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (quoting *Ex parte Young*, 209 U.S. at 159-60). That is the case here.

**a.** Federal law makes it "unlawful for any alien to vote" in federal elections. 18 U.S.C. § 611(a). Accordingly, California cannot "induce, encourage or promote"—let alone knowingly facilitate—noncitizen voting for a candidate who is running for a seat in the U.S. Senate or the U.S. House of Representatives when state election officials have notice of specific individuals who are likely to be noncitizens. *Norwood*, 413 U.S. at 465; *cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (applying *Norwood*'s "induce, encourage or promote" principle to scenario where a local government "had

essentially become a '*passive participant*' in a system of racial exclusion" (emphasis added)); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013) (explaining that state actions "that require a private party to violate federal law are pre-empted").

Yet that is precisely what California is doing. Its actions therefore directly conflict with Federal law. The Federal Government notified California months ago that many noncitizens may be registered to vote there. Despite knowing that California must send vote-by-mail ballots to every registered voter, Cal. Elec. Code § 3000.5, the State made no serious attempt to cooperate with the Federal Government or to otherwise determine whether noncitizens are registered to vote. *See* Compl., Ex. B, ECF No. 1-2. Such prior efforts stand in sharp contrast to California's efforts since the start of this litigation that show it has the ability to cooperate with the Federal Government to prevent unlawful voting. *See* ECF No. 32-1 at 17 (conducting analysis of likely noncitizen voters).

The Federal Government then provided California with a list of over 20,000 specific individuals who USCIS and HSI believe are likely noncitizens. *See* Compl. ¶ 47, ECF No. 1; *id*. Exs. C & D, ECF Nos. 1-3 & 1-4; McLoughlin Decl. ¶ 24 and Ex. A, ECF No. 62-3; Bartell Decl. ¶¶ 24–25, ECF No. 62-2. Yet despite knowing that California must count any vote-by-mail ballot that satisfies California's (largely illusory) signature verification requirements, the State refused to verify the citizenship of people included on the list—or take any action whatsoever to do so before tabulating those persons' votes. *See* Exs. A & B, ECF No. 62-5. California officials now know that over 20,000 California residents are highly likely to be noncitizens registered to vote. Bartell Decl. ¶ 25, ECF No. 62-2; McLoughlin Decl. ¶ 25, ECF No. 62-3. The officials even have immediate access to the names of those potential voters. But California is now poised to tabulate the votes of persons who they are aware have been identified as likely noncitizens. More than that, California apparently intends to tabulate vote-by-mail ballots received by noncitizens who the United States has charged with having already violated federal election and immigration laws.

Federal law preempts California's actions here. By facilitating violations of the statute, California's actions conflict with the "considered judgment" the statute expresses. *Arizona*, 567 U.S. at 399, 405. If California was just seeking to "induce, encourage or promote" violations of the statute, that would be enough to trigger federal preemption. *Norwood*, 413 U.S. at 465. But California is not just supporting conduct that Federal law prohibits (such as when a state purports to subsidize illegal activity); it is directly facilitating violations of that Federal law by knowingly ignoring likely noncitizen votes. It "is simply implausible that Congress would have" criminalized voting by noncitizens "if it had been willing to" let States "compromise [the] effectiveness" of that law by participating in its violation. *Crosby*, 530 U.S. at 376. And California's systematic defiance of Federal law is all the more egregious because it undermines the Federal rights of United States citizens to vote in an election in which only eligible voters participate. "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

**b.** California's actions also frustrate the objectives and purposes of 18 U.S.C. § 611(a). Congress's objectives and purposes are clear: only citizens vote in federal elections. Yet California is knowingly facilitating voting by likely noncitizens, and it is set to tabulate their votes without even attempting to verify their citizenship status when faced with credible evidence. If merely "authoriz[ing]" conduct that federal law prohibits can undermine "the full purposes and objectives of Congress[,]" *Michigan Canners*, 467 U.S. at 478, it follows that knowingly facilitating such conduct triggers obstacle preemption.

California's actions pose an obstacle to the United States' ability to implement Congress's purposes and objectives by enforcing 18 U.S.C. § 611(a). The President has made clear that investigating and prosecuting violations of the statute are a major priority—including by expressly directing the Attorney General to "take all lawful steps to deter and address noncompliance with . . . 18 U.S.C. 611(a)." Exec. Order, *Ensuring Citizenship Verification and Integrity in Federal Elections* § 5 (Mar. 31, 2026). The Department of

Justice has, in turn, charged numerous noncitizens accused of violating the statute—including charging numerous California residents the same day the United States filed their complaint.

By facilitating *tens of thousands* of votes from likely noncitizens, California is obstructing the United States' law enforcement efforts. It is not practicable or feasible for the Federal Government to prosecute thousands, let alone tens of thousands, of individuals that two federal investigative offices have identified as likely noncitizens. And while a State is not required to help the Federal Government investigate and prosecute crimes, facilitating the commission of such crimes obviously hampers such efforts. Indeed, the scale of the problem arising from California's facilitation of unlawful voting threatens to draw federal resources from, and thus impede federal efforts in, a wide range of law enforcement areas, *e.g.*, violent crime. Such a drain of resources presents yet another obstacle to the United States' law enforcement efforts.

Accordingly, California's facilitation of unlawful voting by sending vote-by-mail ballots to likely noncitizens and counting ballots that are returned—after knowing that these noncitizens are likely registered to vote—is preempted as applied to the individuals the Federal Government has identified for California.

**B. The other injunction factors strongly favor the government.**

The United States is likely to succeed on the merits and suffer irreparable harm. Critically, the public interest and balance of the equities overwhelmingly support an injunction requiring Defendants to segregate ballots of individuals known to the Federal Government and Defendants to be highly likely to be ineligible to vote. Such an extraordinary remedy is necessary to preserve the status quo, protect the integrity of our elections, and prevent potentially tens of thousands of violations of Federal criminal law.

Irreparable harm necessarily results from the enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366–67 (1989) (irreparable injury may be established "by a showing that the challenged

state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted)); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm based on Supremacy Clause violation); *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) ("It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury. If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation."). This follows from the simple fact that the United States suffers a "per se irreparable harm" when state actions violate the Supremacy Clause. *United States v. Texas*, 557 F.Supp.3d 810, 821 (W.D. Tex. 2021) (collecting cases); *Daimler*, 2025 WL 3049944, at *17 (same). Indeed, the Supreme Court has repeatedly recognized that the "inability to enforce its duly enacted [law] clearly inflicts irreparable harm on" the United States. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also Maryland v. Kin*g, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (same).

The harm here is also quintessentially irreparable because California's mishandling of ballots cannot be undone. Under California law, election officials open ballots and then separate for all time the ballot from the envelope. Once this occurs, it cannot be undone. There is no further way for officials to track or trace ballots cast by individuals later determined to be ineligible to vote. Nor is there any way for Federal law enforcement to trace these as part of criminal investigations. As we write, California election officials are already tabulating votes. The only way to preserve the eroding status quo is for an injunction pending appeal to require segregating the ballots Federal officials have identified as associated with ineligible voters. Otherwise, what is done can never be undone.

The balance of equities and the public interest likewise favor the United States. Because the challenged laws are invalid under the Supremacy Clause, they are not in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009) (public interest represented by "the Constitution's declaration that federal law

is to be supreme"). Indeed, it is emphatically contrary to the public interest to allow ineligible voters to have their votes cast and tabulated in a Federal election. This dilutes the votes of lawful voters. It directly affects which individuals will serve in Federal offices. It also facilitates violation of criminal law. 18 U.S.C. s 611. In particular, the failure to at least segregate ballots of the identified individuals forever impairs the ability of election officials to understand the effect of their votes on the election. It also significantly inhibits Federal law enforcement investigations into whether the identified individuals did in fact violate Federal law by voting a Federal election. Any comparable burden on Defendants associated with segregating ballots is de minimis in comparison. Segregating ballots is a targeted remedy, and is something Defendants already do with provisional ballots. The public interest and balance of the equities strongly support enjoining Defendants to segregate ballots of individuals identified as ineligible to vote.

**CONCLUSION**

The Court should grant an immediate injunction pending appeal.

Dated: October 22, 2026 Respectfully submitted,

*/s/ Julie A. Hamill*
Julie A. Hamill
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on October 22, 2026, I served a copy of the foregoing pleading on all counsel of record by means of the CM/ECF electronic filing system.

*/s/ Julie A. Hamill*
Julie A. Hamill
Assistant United States Attorney

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the United States, certifies that this brief contains 5,501 words, which complies with the requirements of L.R. 11-6.1.

*/s/ Julie A. Hamill*
Julie A. Hamill
Assistant United States Attorney