Sean F. Bigley – CA Bar No. 300851
sfbigley@ajsocal.org
Binwant Kahlon – CA Bar No. 366721
bkahlon@ajsocal.org
Catherine Y. Hwang – CA Bar No. 340136
chwang@ajsocal.org
**ASIAN AMERICANS ADVANCING JUSTICE SOUTHERN CALIFORNIA**
1145 Wilshire Blvd.
Los Angeles, CA 90017
Tel: (213) 241-0286

Jon Sherman – DC Bar No. 998271*
jsherman@fairelectionscenter.org
Nina G. Beck – WI Bar No. 1079460*
nbeck@fairelectionscenter.org
Zoe M. Ginsberg – MD Bar No. 2411071003*
zginsberg@fairelectionscenter.org
**FAIR ELECTIONS CENTER**
1629 K Street NW, Ste. 300
Washington, DC 20006
Tel: (202) 331-0114

* *Pro Hac Vice forthcoming*

Attorneys for Proposed Amicus Curiae

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | Case No. 2:26-cv-12025<br><br>**PROPOSED BRIEF OF AMICUS CURIAE ASIAN AMERICANS ADVANCING JUSTICE SOUTHERN CALIFORNIA IN SUPPORT OF DEFENDANTS AND INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Hearing Date: Tuesday, October 27, 2026<br>Time: 1:00 p.m. |

| | |
|---|---|
| | Judge: Hon. David O. Carter<br>Magistrate Judge: Hon. Autumn D. Spaeth |

## CORPORATE DISCLOSURE STATEMENT

Proposed amicus curiae Asian Americans Advancing Justice Southern California ("AJSOCAL") states that it does not have any parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in proposed amicus curiae.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .................................................... iii

STATEMENT OF INTEREST ........................................................................ 1

I. INTRODUCTION ........................................................................................ 2

II. ARGUMENT ............................................................................................... 4

A. The federal government's actions and requested relief seek to single out foreign-born voters and impose a citizenship verification and/or proof requirement only upon them. ........................................................................ 4

B. Federal law governing voter qualification determinations prohibits DHS's citizenship investigation procedure and the United States's requested relief. ....... 9

1. The federal government's attempt to impose an extralegal citizenship investigation regime on California clearly violates the Civil Rights Act of 1964. ........................................................................ 9

2. The United States's likely counterarguments are meritless. ........................13

C. The federal government's attempt to impose a discriminatory citizenship investigation regime in California is a 21st century reboot of laws found unconstitutional over a hundred years ago........................................................14

III. CONCLUSION ...........................................................................................18

CERTIFICATE OF COMPLIANCE.................................................................19

# TABLE OF AUTHORITIES

**Cases** **Page**

*Attorney General v. City of Detroit*
78 Mich. 545 (1889) ....................................................................15

*Boustani v. Blackwell*
460 F. Supp. 2d 822 (N.D. Ohio 2006)....................................................16, 17

*Cal. Nurses Ass'n v. Mullin*
No. 26-cv-10680 (N.D. Cal. Oct. 21, 2026) ...............................................5, 8

*Common Cause v. U.S. Dep't of Just.*
No. CV 26-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ................................ 3

*Kineen v. Wells*
144 Mass. 497 (1887)....................................................................15

*Knauer v. United States*
328 U.S. 654 (1946)....................................................................16

*League of Women Voters v. U.S. Dep't of Homeland Sec.*
835 F. Supp. 3d 79 (D.D.C. 2026) .......................................................5, 7

*League of Women Voters v. U.S. Dep't of Homeland Sec.*
No. 26-5243, 2026 WL 2643439 (D.C. Cir. Sep. 4, 2026) ................................10, 11

*Mi Familia Vota v. Fontes*
129 F.4th 691 (9th Cir. 2025)................................................ 4, 5, 9, 10, 11, 12

*Osborn v. Bank of the United States*
22 U.S. 738 (1824)....................................................................16

*Republican Nat'l Comm. v. Mi Familia Vota*
146 S. Ct. 2799 (2026) ..................................................................4, 9, 10

*Schneider v. Rusk*
377 U.S. 163 (1964)....................................................................3, 16

*State ex rel. Williams v. Moorhead*
96 Neb. 559, 148 N.W. 552 (1914) .......................................................16

*U.S. Student Ass'n Found. v. Land*
585 F. Supp. 2d 925 (E.D. Mich. 2008)....................12
*United States v. Weber*
816 F. Supp. 3d 1168 (C.D. Cal. 2026)....................3, 13
*VAYLA New Orleans v. Schedler*
No. 16-cv-305-BAJ-RLB (M.D. La. May 4, 2016)....................17

**Statutes**

8 U.S.C. §1481....................5
18 U.S.C. § 611....................13
42 U.S.C. § 1320b-7(d)(5)(A)....................10
52 U.S.C. § 10101(a)(2)(A)....................4, 9, 11, 12, 13, 14, 17
Ariz. Rev. Stat. § 16-165(I)....................10
Cal. Elec. Code § 2101....................13
Cal. Elec. Code § 2102(c)....................13
Cal. Elec. Code § 2111....................13
Cal. Elec. Code § 2150(a)(1)....................13
Cal. Elec. Code § 2264(a)(3)....................13
Cal. Elec. Code § 2264(b)....................13
La. Rev. Stat. Ann. § 18:105(B)....................17
Ohio R.C. § 3505.20(A)(2)....................17
Ohio R.C. § 3505.20(A)(3)....................17
Ohio R.C. § 3505.20(A)(4)....................17

**Other Authorities**

110 Cong. Rec. 1,695 (Feb. 3, 1964)....................9
Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 84 (2000)....................14, 15
Gréta Bedekovics and Sydney Bryant, *The SAVE Act Would Disenfranchise Millions of Citizens*, Ctr. For Am. Progress (last updated Jan. 26, 2026),

https://www.americanprogress.org/article/the-save-act-would-disenfranchise-millions-of-citizens/ ........ 6

Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://perma.cc/KS2N-U2US ........ 6

Make Elections Great Again Act, H.R. 7300, 119th Cong. §§ 112, 113 (2026)........ 2

Notice of Modified System of Records, 85 Fed. Reg. 31798 (May 27, 2020) ........ 6, 7

Safeguard American Voter Eligibility Act or the SAVE America Act, H.R. 7296, 119th Cong. § 2 (2026) ........ 2

## STATEMENT OF INTEREST

Asian Americans Advancing Justice Southern California ("AJSOCAL") is the nation's largest civil rights and legal services organization for Asian American, Native Hawaiian, and Pacific Islander ("AANHPI") communities. AJSOCAL serves more than 15,000 people and partner organizations each year; provides free legal services for immigrants, workers, tenants, and survivors; pursues impact litigation; and advocates for policy change. AJSOCAL's services are open to all. Since 1983, AJSOCAL has represented clients in the areas of immigration, language rights, workers' rights, voting rights, family law, housing, and hate crimes, among others.

Fostering civic engagement and the exercise of voting rights amongst AANHPI citizens in Southern California have been central parts of AJSOCAL's mission for more than thirty years. AJSOCAL's civic engagement work began because AANHPI communities in Southern California had grown in number without gaining a corresponding political voice. Since then, AJSOCAL's work has included naturalization and citizenship services, redistricting advocacy, impact litigation, Get Out The Vote work, and voter protection. AJSOCAL carries out that work in coalition with Common Cause, Asian Americans Advancing Justice–AAJC, the Asian American Legal Defense and Education Fund, and community organizations across California. Its poll monitoring and legal observer program places trained volunteers at vote centers in both Los Angeles and Orange counties to document language-access and accessibility barriers, and AJSOCAL uses those observations to make recommendations to county election officials. To prepare for the November 3, 2026 general election, AJSOCAL has trained community partners as election legal observers and is conducting voter education in eleven languages. Through its Demographic Research Project, AJSOCAL and its predecessor organization, the Asian Pacific American Legal Center, have published A Community of Contrasts since at least 2013, presenting disaggregated data on as many as 42 Asian and 32

Native Hawaiian and Pacific Islander groups so that local governments and community organizations can see the communities they serve.

AJSOCAL's practice sits where immigration records and voting rights meet. Its immigration attorneys represent clients across the life of an immigration file: survivors seeking protection under the Violence Against Women Act and U visas before they hold lawful permanent residence, and people who have lost that status and face removal or detention, whom AJSOCAL defends in removal proceedings and through habeas petitions in this District. That practice gives AJSOCAL direct knowledge of how immigration records are created, how long they persist, and how often they fail to reflect a person's later change in status. In that work, a client's claim to have derived citizenship through a parent can be dispositive, and often no certificate from U.S. Citizenship and Immigration Services documents it. Records of that kind are the ones the federal government used to build the list at issue here.

AJSOCAL has a direct interest in ensuring that naturalized and derived citizens are not subjected to citizenship checks that other qualified voters never face, and that their ballots are counted on the same terms as everyone else's. The relief the United States seeks would single out those voters because of their immigration records. AJSOCAL submits this brief to explain why federal law forbids that result.

## I. INTRODUCTION

The federal government's misguided crusade to identify, at all costs, a vanishingly small number of non-citizens on the voter rolls continues. Plan A failed: Congress repeatedly rejected bills that would have imposed a nationwide proof of citizenship requirement for voter registration and citizenship checks using DHS's Systematic Alien Verification for Entitlements ("SAVE") system.[1] Federal courts

[1] *See* Safeguard American Voter Eligibility Act or the SAVE America Act, H.R. 7296, 119th Cong. § 2 (2026); Make Elections Great Again Act, H.R. 7300, 119th Cong. §§ 112, 113 (2026).

rejected Plan B: obtaining all registered voters' Social Security Numbers in order to query the stale, unreliable citizenship data in SAVE. *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *see also Common Cause v. U.S. Dep't of Just.*, No. CV 26-1352, 2026 WL 3033772, at *1 (D.D.C. Oct. 9, 2026) (charging federal government with "knowingly relying on an inaccurate database to check voter eligibility"). Now, the government has resorted to Plan C: trying to match publicly available voter file data, without SSNs, to DHS records in order to isolate and investigate naturalized and derived U.S. citizens, whose ballots it wants segregated until their citizenship is confirmed. This last-ditch plan is also running aground on law and reality.

By DHS's own description, the federal government's purported citizenship investigation procedure and the relief it wants this Court to impose target foreign-born U.S. citizens on the voter rolls and subject them to practices and procedures not visited upon their U.S.-born counterparts. Though federal constitutional and statutory requirements mandate equal treatment, the United States's discriminatory methodology and proposed relief impermissibly treat the registration of foreign-born voters as inherently suspect. *Cf. Schneider v. Rusk*, 377 U.S. 163, 165 (1964) ("[T]he rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive."). U.S.-born Californians, by contrast, have not been so targeted or required to clear a citizenship check, though DHS's shambolic methodology seems to have ensnared some anyway.[2] In striving to single out naturalized and derived U.S. citizens on California's voter rolls and requesting the application of different standards, practices, and procedures to them, federal officials are advocating for an extraordinary and extralegal citizenship investigation procedure

---

[2] An undetermined number of U.S.-born citizens have been flagged by this procedure as well, but their inclusion appears to have been inadvertent and due to error-riddled data and methods. *See* Bhullar Decl. ¶ 24, ECF No. 32-3.

that would violate the Civil Rights Act of 1964 ("CRA"), 52 U.S.C. § 10101(a)(2)(A). Just last year, the Ninth Circuit held that a citizenship check system that only applies to foreign-born, registered voters and subjects them to differential treatment violates 52 U.S.C. § 10101(a)(2)(A), which requires registrars to follow the same standards, practices, and procedures in determining the qualifications of any and all voters. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 722–24 (9th Cir. 2025), *cert. granted on other grounds sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026). This precedent forecloses the government's requested relief.

The United States's claim is a thinly camouflaged attempt to impose documentary proof of citizenship and/or other citizenship investigation procedures on foreign-born voters. Sadly, this is not unprecedented in our country's history. During a wave of xenophobia in the 19th century, state legislatures enacted a raft of discriminatory voter qualification rules and procedures aimed at restricting naturalized citizens' participation, only to see most struck down as unconstitutional around the turn of the 20th century. What is unprecedented, however, is the federal government's effort to resurrect these discriminatory and long-discredited relics.

## II. ARGUMENT

### A. The federal government's actions and requested relief seek to single out foreign-born voters and impose a citizenship verification and/or proof requirement only upon them.

As described in its officials' declarations, DHS's methodology uses immigration-related, numeric identifiers that it issues ("DHS numeric identifiers") to limit the universe of voters who it believes should be subject to a citizenship verification and/or proof requirement. All foreign-born individuals on the rolls will have been assigned a DHS numeric identifier like an Alien Registration Number ("A-Number"). DHS numeric identifiers are assigned to foreign-born individuals, not

U.S.-born citizens, who only interact with DHS in certain narrow circumstances.[3] Here, DHS is seeking to match California voters against these numeric identifiers because it wants to scrutinize and verify the citizenship of individuals who have naturalized or derived citizenship. While this process relies on a methodology and data that is so error-prone that some U.S.-born individuals are also being ensnared, Bhullar Decl. ¶ 24, ECF No. 32-3, DHS officials clearly improvised this system to subject foreign-born voters to a citizenship verification and/or proof requirement and have not sought to impose any corresponding requirement for U.S.-born individuals.[4]

Initially, USCIS receives information from voter rolls and works to create a list of foreign-born individuals in order to scrutinize their citizenship status. Bartell Decl. ¶ 16, ECF No. 22-4. For states like California, which have not provided their unredacted voter files to the federal government, DHS relies on "unreliable commercial versions of voter roll data." *Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680, slip op. at 2 (N.D. Cal. Oct. 21, 2026). After a state voter file is acquired, it is sent to the Fraud Detection and National Security Directorate ("FDNS") at DHS. McLoughlin Decl. ¶ 14, ECF No. 22-3. FDNS combines the raw voter file with data from unnamed third-party sources not disclosed to the Court and then seeks to match individuals in the voter file with a DHS numeric identifier such as an A-Number. *See* Bartell Decl. ¶ 16, ECF No. 22-4. This process purports to "determine if the person

[3] *See League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 102 (D.D.C. 2026) ("[T]he old SAVE did not previously have access to the records of natural-born citizens unless those individuals had some other interaction with DHS, *e.g.*, as a sponsor of a non-citizen.").

[4] For example, reliance on DHS numeric identifiers prevents DHS from confirming the citizenship of individuals born in the United States who may no longer be citizens. 8 U.S.C. §1481; *see Mi Familia Vota*, 129 F.4th at 761–62 (Bumatay, J., dissenting) (noting agreement with majority to affirm part of injunction because citizenship checks relying on A-numbers subject naturalized citizens to a different practice or procedure than a native-born registrant who "renounced his citizenship").

on the list has data in USCIS immigration holdings." McLoughlin Decl. ¶ 14, ECF No. 22-3; *see also id.* ¶ 15 ("FDNS then compares the enhanced voter file data to USCIS holdings to score the extent to which the individual profile matches an individual within DHS holdings."). Critically, DHS and USCIS do not maintain citizenship information on individuals born in the United States. *See* Notice of Modified System of Records, 85 Fed. Reg. 31798, 31801 (May 27, 2020); *see also* Compl. ¶ 30 ("Consistent with those responsibilities, USCIS maintains records and information on *individuals who have applied to enter or reside permanently in the United States*. Those records include individuals' names, addresses, social security numbers, and numbers assigned to each applicant (*alien numbers*).") (emphasis added) (citation omitted). Plaintiffs thus do not seek to investigate individuals who *lack* a DHS numeric identifier, and they do not seek injunctive relief to compel the verification and/or proof of their citizenship.

However, individuals who *have* been matched with a DHS numeric identifier are subjected to several rounds of review and verification. USCIS compares individuals with these identifiers against data held by the Department of State ("DOS") and the Social Security Administration ("SSA") to remove foreign-born individuals who can be identified as United States citizens or as deceased. Bartell Decl. ¶¶ 17, 19, ECF No. 22-4. SSA does not have an obligation to maintain updated citizenship records for individuals with DHS numeric identifiers,[5] and DOS's passport database lacks information for the nearly half of the population that lacks a U.S. passport.[6] As a result, many foreign-born individuals who naturalized after their

---

[5] Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://perma.cc/KS2N-U2US.

[6] Gréta Bedekovics and Sydney Bryant, *The SAVE Act Would Disenfranchise Millions of Citizens*, Ctr. For Am. Progress (last updated Jan. 26, 2026), https://www.americanprogress.org/article/the-save-act-would-disenfranchise-millions-of-citizens/ (estimating 53.1 percent of the national population possess a

last interaction with either agency may be subjected to further review and verification following FDNS's analysis. After FDNS compiles an initial list of potential non-citizens on the voter rolls, it assigns a confidence level for the accuracy of each match. *Id.* ¶ 18. FDNS then manually reviews these purported matches to determine whether these individuals are "likely" to lack United States citizenship. *Id.* ¶ 19.

After completion of this review, USCIS forwards that list to Homeland Security Investigations ("HSI"), another component of DHS. Compl. ¶ 39. HSI reviews the list by conducting additional matching across data sources and identifying additional unique identifiers where possible. McLoughlin Decl. ¶¶ 16–18, ECF No. 22-3. HSI then transmits data profiles to HSI field offices, where individuals are investigated for potential criminal violations. *Id.* ¶ 19. Crucially, FDNS and HSI are only reviewing and seeking citizenship verification of individuals whom USCIS officials believed it had accurately matched against a DHS numeric identifier. Individuals who have naturalized or who hold derived citizenship are taken off the list of potential non-citizen voters only after undergoing this process. Bartell Decl. ¶ 19, ECF No. 22-4; McLoughlin Decl. ¶ 15, ECF No. 22-3.

By contrast, there is no process by which USCIS purports to investigate and verify the citizenship of individuals without DHS numeric identifiers. Nor could they. USCIS accesses citizenship information for U.S.-born individuals by only one mechanism: the SAVE system. Prior to its 2025 expansion, SAVE queried all records held by DHS regarding an individual's interaction with DHS but could not be used to verify the citizenship status of individuals who lack DHS numeric identifiers. *See* Notice of Modified System of Records, 85 Fed. Reg. 31798, 31799 (May 27, 2020). It was not until DHS incorporated SSA citizenship data into SAVE that DHS was able to query this data for individuals born in the United States. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 102 (D.D.C. 2026), *stayed on*

---

valid U.S. passport).

*other grounds*, 609 U.S. ---, 2026 WL 2879700 (Sep. 25, 2026) ("[T]he old SAVE did not previously have access to the records of natural-born citizens unless those individuals had some other interaction with DHS."). Critically, the United States represents that its process for identifying suspected non-citizens here is distinct from SAVE, *see* Bartlett Decl. ¶ 15, ECF No. 22-4, which underscores that its process is intended only to scrutinize foreign-born individuals who may well be naturalized or derived citizens.

This methodology is designed to target foreign-born individuals, requiring the investigation and verification of individuals who have interacted with DHS. However, absent SSNs, the federal government cannot investigate the citizenship status of registered California voters who cannot be matched to a DHS numeric identifier, and crucially, it is not seeking to have California do so either. Though vague and short on details, the requested citizenship verification procedure the United States requests would only be imposed on registered California voters who could be matched against a DHS numeric identifier by federal officials—*i.e.* only foreign-born voters. While the list of suspected non-citizens provided to Defendants did include an undetermined number of U.S.-born individuals, Bhullar Decl. ¶ 24, those false positives are not the result of a process that applies a standard procedure to investigate all individuals on California's voter rolls. Rather, they are, as USCIS has conceded in other cases, the natural result of an error-ridden, overinclusive process that determines citizenship based on "[s]imilar names, incomplete records, outdated citizenship information, clerical errors, and other circumstances" and ultimately lacks both transparency and accuracy. *See Cal. Nurses Ass'n*, slip op. at 3 (describing voter eligibility matching policy which mirrors methodology described by declarants Bartell and McLoughlin).[7]

[7] The presence of U.S.-born citizens on the list is mysterious given the government's described methodology, though this is likely attributable to a deeply flawed matching protocol that has likely caused officials, among other things, to confuse naturalized or derived citizens with their U.S.-born, household members with the same names,

Despite these errors, given federal officials' descriptions, the government's process was clearly designed to investigate foreign-born individuals assigned DHS numeric identifiers and then force verification and/or proof of their citizenship.

**B. Federal law governing voter qualification determinations prohibits DHS's citizenship investigation procedure and the United States's requested relief.**

**1. The federal government's attempt to impose an extralegal citizenship investigation regime on California clearly violates the Civil Rights Act of 1964.**

The 1964 Civil Rights Act's Different Standards, Practices, and Procedures Provision ("the DSPP Provision") requires equal treatment in determining voter qualifications:

> No person acting under color of law shall in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

52 U.S.C. § 10101(a)(2)(A). Congress enacted this subsection to "require[] the application of uniform practices in determining whether an individual is qualified to vote." 110 Cong. Rec. 1,695 (Feb. 3, 1964).

The Ninth Circuit recently construed this provision in the consolidated litigation against various citizenship investigation procedures the Arizona Legislature enacted for voter registration applicants and existing registered voters alike. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 722–24 (9th Cir. 2025), *cert. granted on other*

---

minus a different suffix.

*grounds sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).[8] Section 10101(a)(2)(A), the DSPP Provision, had been invoked to challenge an Arizona statute that required county recorders to investigate the citizenship status of any registered voter it had "reason to believe" was not a U.S. citizen. *Mi Familia Vota*, 129 F.4th at 705 (citing Ariz. Rev. Stat. § 16-165(I)). And the specified method to investigate the citizenship status of registered voters was DHS's SAVE system. *Id.* at 705–06.

As referenced above, at the time the Ninth Circuit ruled in *Mi Familia Vota*, the SAVE system (1) only contained data on naturalized and derived U.S. citizens and (2) could only be queried with a DHS numeric identifier such as an A-Number. The D.C. Circuit recently summarized pre-2025 SAVE as follows:

> For nearly four decades, SAVE principally searched DHS's own immigration records. An agency generally submitted a request about a specific individual using a DHS identifier for the person, such as an alien registration number. SAVE returned citizenship or immigration-status information, and the requesting agency made any ultimate eligibility determination. *See* 42 U.S.C. § 1320b-7(d)(5)(A); Gov't Mot. 3–4. The system ordinarily could not verify the citizenship of a person born in the U.S. (about whom DHS would have no immigration records), it could not be searched using a Social Security number (SSN), and it could not accept bulk queries encompassing multiple persons. Gov't Mot. 4–5.

---

[8] The U.S. Supreme Court granted certiorari on two questions that do not implicate the argument advanced here. *Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (June 29, 2026).

*League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 26-5243, 2026 WL 2643439, at *2 (D.C. Cir. Sep. 4, 2026). With rare exception, SAVE did not contain data on U.S.-born citizens.[9]

In *Mi Familia Vota*, the fact that the designated system for conducting citizenship checks under the challenged Arizona law could only query data for naturalized and derived citizens, but never for U.S.-born citizens, was dispositive. 129 F.4th at 723. As the Ninth Circuit panel explained, "county recorders can only conduct SAVE checks on naturalized citizens and non-citizens because running a citizenship check through SAVE requires an immigration number" and, therefore, Arizona's "reason to believe" provision would "not apply to U.S.-born citizens." *Id*. "Because SAVE contains no information on U.S.-born citizens" and "a query cannot start without an immigration number," which U.S.-born citizens do not have, the panel affirmed the district court's finding "that the 'reason to believe' provision 'solely' impacts naturalized citizens and cannot be used if the subject of the inquiry is a U.S.-born citizen." *Id*. Applying the DSPP Provision's clear text, it concluded that:

> Because the "reason to believe" provision "determine[s] whether any individual is qualified under State law . . . to vote in any election" and "appl[ies] a[ ] standard, practice, or procedure" for naturalized citizens "different from the standards, practices, or procedures applied under

[9] Subsequently, in May 2025, DHS modified the SAVE system so that it could be queried using a full or partial SSN and return citizenship-status results from SSA records, as well as DHS records and so that user agencies could upload voter registration records in bulk. *League of Women Voters*, 2026 WL 2643439, at *2. The United States has not obtained SSNs for all California voters. Otherwise, it would simply bulk-upload data on all registered California voters to the modified SAVE system to conduct these citizenship checks, rather than using the convoluted, multi-stage, and error-riddled process it has described. *See* Bartell Decl. ¶¶ 14–20, ECF No. 22-4; McLoughlin Decl. ¶¶ 13–19, ECF No. 22-3.

> such law" to U.S.-born citizens, the "reason to believe" provision violates the DSPP Provision.

*Id.* (quoting 52 U.S.C. § 10101(a)(2)(A)).

To be sure, the Ninth Circuit reaffirmed that government officials "can investigate the citizenship status of registered voters to ensure that only qualified individuals are registered to vote." *Id.* They must review the citizenship status of *all* registered voters, not just a subset it views as suspect: "[T]he 'reason to believe' provision [would have] subject[ed] only naturalized citizens to database checks" and therefore "violate[d] the DSPP Provision." *Id.* at 724; *see also U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 949–50 (E.D. Mich. 2008) (noting that DSPP Provision "requires that if Michigan wishes to impose unique procedural requirements on the basis of a registrant's original voter ID being returned as undeliverable, it must impose those requirements on *everyone* whose original ID is returned as undeliverable") (alteration in original).

*Mi Familia Vota v. Fontes* mirrors the case now before this Court and forecloses what the federal government is pursuing. By the government's own admission, federal officials are singling out foreign-born voters on California's voter rolls, only investigating their citizenship status, and then want this Court to impose a citizenship verification and/or proof regime only as to them, not U.S.-born voters. From the first step onward, this citizenship investigation procedure separates out registered California voters who can be paired with a DHS numeric identifier and then only engages in further data-matching and citizenship-status investigation with respect to this subset of voters. *See* Section A. Furthermore, the injunctive relief that the United States requests is inextricably connected to DHS's investigation and would have California election officials verify and/or obtain proof of citizenship from *only* the voters federal officials have flagged.

In this way, as in *Mi Familia Vota*, DHS has "limit[ed]" its methods "to a subset of the electorate: persons with immigration numbers," instead of utilizing "a method

that could be applied to both naturalized and U.S.-born citizens." 129 F.4th at 723. The United States seeks to impose on California election officials "standards, practices, [and] procedures" related to "determining whether any individual is qualified under State law or laws to vote in any election" that are "different from the standards, practices, or procedures applied" to U.S.-born citizens already deemed qualified to vote by county election officials. 52 U.S.C. § 10101(a)(2)(A). This extralegal, non-statutory citizenship investigation procedure does not contemplate investigating and verifying the citizenship status of all registered California voters to ensure they are qualified to vote. Instead, it impugns the validity of foreign-born voters' qualifications—in particular, the veracity of their sworn attestation to U.S. citizenship on a voter registration form. *See* Cal. Elec. Code §§ 2101, 2102(c), 2111, 2150(a)(1), 2264(a)(3), 2264(b). And then, rewriting state and federal election laws, the United States would have California and federal officials work in concert to test that new and discriminatory presumption or, presumably, demand the voter supply documentary proof of citizenship. Applying these different standards, different practices, and different procedures to foreign-born voters in California is forbidden by the CRA's DSPP Provision. 52 U.S.C. § 10101(a)(2)(A).

**2. The United States's likely counterarguments are meritless.**

The United States may counter that 52 U.S.C. § 10101(a)(2)(A) does not govern the investigatory choices made in the normal course of criminal law enforcement. However, this Court need not decide whether the CRA's DSPP Provision can be applied when the Department of Justice acts purely in pursuit of 18 U.S.C. § 611 cases, because the United States has manifestly filed this *civil* action seeking to impose citizenship investigation procedures on California that are not found anywhere in the state's election code or federal law. By trying to force California election officials into adopting these new and discriminatory voter qualification procedures, it has brought its citizenship investigation methodology and the requested injunctive relief—which would only impact voters federal officials have

already flagged as suspected non-citizens—squarely within the ambit of Section 10101(a)(2)(A).

Additionally, that the government pursued other methods to investigate the citizenship of *all* registered California voters is of no moment. Those efforts were either found unlawful in their own right, *see Weber*, 816 F. Supp. 3d at 1181–95, or repeatedly found insufficient support in Congress. *See supra* note 1. That is all irrelevant to the requirement of equal treatment in voter-qualification determinations set forth in 52 U.S.C. § 10101(a)(2)(A).

**C. The federal government's attempt to impose a discriminatory citizenship investigation regime in California is a 21st century reboot of laws found unconstitutional over a hundred years ago.**

The government's actions hearken back to an earlier era, in which naturalized voters were targeted with discriminatory requirements aiming to deny immigrants political power. The origins of such laws lie with the 19th Century's anti-immigrant Know-Nothing movement, which rose to prominence in the mid-1850s. *See* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 84 (2000). Despite embracing immigrant labor, native-born citizens "who objected to immigrant participation in politics" argued "recently arrived immigrants, even citizens" were "insufficiently tutored in American values and the workings of American democracy. . . ." *Id.* at 83. "Charges that immigrants corrupted elections by voting illegally and selling their votes were commonplace, as were stories of politically motivated mass naturalizations in the days before elections." *Id*. The goal of this nativism "was political: they feared that immigrants . . . wielded too much electoral power and would use it to subvert American values and institutions." *Id*. at 84. To that end, the Know-Nothings "advocated [for] significant changes in state voting laws, including registration systems, literacy tests, and in the absence of a change in naturalization laws, a twenty-one- or fourteen-year postnaturalization residence period before a foreign-born male could vote." *Id*.

Debates over immigrant suffrage continued to rage throughout the late 19th century and into the early 20th century. At least nineteen states enacted proof of naturalization requirements—discriminatory proof of citizenship laws that did not apply to U.S.-born citizens—and extended residency and waiting periods before naturalized citizens could vote. *Id*. at 86, 138–39, Table A.12. Perhaps most notably, Massachusetts initially imposed a two-year waiting period before naturalized citizens could vote. *Id*. at 86–87. Although the two-year waiting period was repealed during the Civil War, *id*. at 87, Massachusetts replaced it with a 30-day waiting period for naturalized citizens in 1885. *Id*., Table A.12. Massachusetts and Maine "also passed laws requiring immigrants to present their naturalization papers to local officials three months before elections." *Id*. at 86. Likewise, in New York and California, immigrants had to wait 90 days after naturalization before voting. *Id*. at 139.

The tides began to turn when several state supreme courts struck down documentary proof of citizenship requirements that only applied to naturalized U.S. citizens registering to vote and similar discriminatory measures. In *Kineen v. Wells*, the Supreme Judicial Court of Massachusetts struck down the 30-day waiting period, holding that it was not a "reasonable" regulation of electoral procedures. 144 Mass. 497, 503 (1887). The court stated unequivocally: "No argument in favor of the constitutionality of the section can be founded upon any peculiarity in the situation of naturalized citizens, which renders an inquiry in regard to their qualifications different from similar inquiries when applied to all other citizens." *Id*.

Similarly, in *Attorney General v. City of Detroit*, the Supreme Court of Michigan struck down the state's discriminatory law, requiring only naturalized voters to show documentary proof of citizenship. 78 Mich. 545, 547, 561–64 (1889). In striking down the Michigan statute, the court reasoned:

> This distinction between native-born and naturalized electors is an unfair one, and . . . entirely unnecessary in order to prevent fraud. . . . A law that treats these men as men whose oaths cannot be taken in their

> own interest, while it permits a native-born citizen to prove his standing as a voter by his own testimony, cannot receive my sanction, as I believe such a requirement to be not only unjust, but unconstitutional, *unless applied to all*.

*Id*. at 562 (emphasis added).

Likewise, in *State ex rel. Williams v. Moorhead*, the Supreme Court of Nebraska struck down a requirement that naturalized citizens provide documentary proof of their naturalization to rebut a challenge to their voter registration, noting that thousands of otherwise qualified voters do not possess their naturalization papers. 96 Neb. 559, 148 N.W. 552, 555–57 (1914). Instead, the court held that it was sufficient for a naturalized citizen to furnish an affidavit. *Id*. at 556. In rejecting the state's argument that documentary proof was necessary to prevent voter fraud, the court stated that it was "unable to see how" affidavits "will open the door to fraud where a naturalized citizen is attempting to register, any more than it would if one claiming to be native born were making application." *Id*. at 557.

Discriminatory proof-of-citizenship requirements and other restrictions that applied only to naturalized voters were largely eradicated around the turn of the 20th century. However, the modern era has seen attempts to reverse this progress, even as the U.S. Supreme Court has underscored that naturalized citizens are full-fledged U.S. citizens, who immediately upon naturalization enjoy the same rights and privileges as their U.S.-born counterparts. *Schneider*, 377 U.S. at 166 (upon naturalization, a naturalized citizen "becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the constitution, on the footing of a native") (quoting *Osborn v. Bank of the United States*, 22 U.S. 738, 827 (1824)); *Knauer v. United States*, 328 U.S. 654, 658 (1946) ("Citizenship obtained through naturalization is not a second-class citizenship.").

Just twenty years ago, the Ohio Legislature passed a law requiring naturalized citizens, before voting, to produce a copy of their naturalization certificate for

inspection as part of a challenge process and declare under oath that they are the same person named in the certificate. *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 823 (N.D. Ohio 2006). There was no corresponding requirement for U.S.-born citizens. Naturalized citizens challenged this requirement as a violation of the Equal Protection Clause, and the district court agreed:

> Because amended R.C. § 3505.20(A)(2), (3), (4) . . . imposes an undue burden on the fundamental right to vote of naturalized citizens in Ohio; since the statute, as amended, subjects naturalized citizens to disparate treatment in violation of the Fourteenth Amendment of the United States Constitution; and since the implementation of the law offends constitutional sensibilities by categorizing naturalized individuals as "second-class citizens," . . . , this Court finds amended R.C. 3505.20(A)(2), (3), and (4), *et seq.* unconstitutional.

*Id*. at 827.

And ten years ago, a vestige of these 19th century anti-immigrant voting restrictions was still being quietly enforced by Louisiana's parish registrars. Only in response to federal litigation did the state legislature finally repeal a 142-year-old discriminatory requirement that required only naturalized citizens to produce documentary proof of citizenship. *See* Compl., *VAYLA New Orleans v. Schedler*, No. 16-cv-305-BAJ-RLB (M.D. La. May 4, 2016), ECF No. 1 (alleging La. Rev. Stat. Ann. § 18:105(B) discriminates against naturalized citizens by subjecting them to heightened voter registration requirements in violation of equal protection and 52 U.S.C. § 10101(a)(2)(A)). Not only did this obviously discriminatory law survive well into the 21st century, but Louisiana actively enforced it. Whenever any voter registration applicant identified a foreign place of birth on their form, the parish registrar would send a notice to the naturalized applicant, insisting that they present documentary proof of citizenship or see their application rejected. Crucially though, rather than defend this indefensible practice in 2016, the Legislature acted quickly to

repeal the unconstitutional statute just one month after plaintiffs sued. Notice of Voluntary Dismissal, *VAYLA*, ECF No. 26 (June 7, 2016) (dismissing case as moot).

* * *

Situating the federal government's extraordinary request in this history of discrimination against foreign-born Americans underscores the extreme and retrogressive nature of what the United States seeks in this litigation. But it also paints a stark picture of just how unprecedented it is for federal authorities—who typically protect the voting rights of all—to be launching this kind of assault on naturalized and derived citizens' voting rights.

## III. CONCLUSION

For all of the foregoing reasons, AJSOCAL, as proposed amicus curiae, files this brief in support of Defendants and Proposed Intervenor-Defendants.

DATED: October 23, 2026

Respectfully submitted,

*/s/ Sean F. Bigley*
Sean F. Bigley
Binwant Kahlon
Catherine Y. Hwang
**Asian Americans Advancing Justice Southern California**

Jon Sherman*
Nina G. Beck*
Zoe M. Ginsberg*
**Fair Elections Center**

**Pro hac vice forthcoming*

Attorneys for Proposed Amicus Curiae Asian Americans Advancing Justice Southern California

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for proposed amicus curiae Asian Americans Advancing Justice Southern California, certifies that this brief contains 6326 words, which complies with the word limit of L.R. 11-6.1.

Dated: October 23, 2026

*<u>/s/ Sean F. Bigley</u>*
Sean F. Bigley, CA Bar No. 300851