DAWYN R. HARRISON, COUNTY COUNSEL
PETER BOLLINGER, ASST. COUNTY COUNSEL (SBN 241752)
EVA CHU, SNR DEP. COUNTY COUNSEL (SBN 235356)
ADAM H. BAUMGARTEN SNR. DEP. COUNTY COUNSEL(SBN 292095)
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-0809
pbollinger@counsel.lacounty.gov
EChu@counsel.lacounty.gov
Abaumgarten@counsel.lacounty.gov

CHRISTOPHER K. PELHAM (SBN 241068)
ABIGAIL G. URQUHART (SBN 310547)
ALEX J. SCANDROLI (SBN 345278)
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

Attorneys for Defendant
DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

*Additional Counsel Listed on Following Page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,<br><br>Defendants. | Case No. 2:26-cv-12025<br><br>**DEFENDANT DEAN C. LOGAN'S COMBINED OPPOSITION TO PLAINTIFF'S EX PARTE MOTION FOR INJUNCTION PENDING APPEAL AND SUPPLEMENTAL OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Date Action Filed: 10/15/2026 |

**PUBLIC RIGHTS PROJECT**
Joshua Karsh (*pro hac vice pending*)
Toby R. Merrill (*pro hac vice pending*)
Sharanya Mohan (CA Bar No. 350675)
Christine E. Bass (CA Bar No. 334002)
Kyra Sikora (CA Bar No. 345896)
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
joshua.karsh@publicrightsproject.org
toby.merrill@publicrightsproject.org
sai.mohan@publicrightsproject.org
christine.bass@publicrightsproject.org
kyra.sikora@publicrightsproject.org

** Licensed in Illinois and Washington, D.C. Not licensed to practice law in California.*
***Licensed in Massachusetts and New York. Not licensed to practice law in California.*

Attorneys for Defendant
DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1
II. BACKGROUND ..... 4
III. ARGUMENT ..... 6
A. The Executive has no basis for an injunction pending appeal from a ruling this Court has not made. ..... 6
B. The Executive is unlikely to succeed on the merits of either of its motions. ..... 8
C. The Executive has not established irreparable harm. ..... 10
D. The equities and public interest decisively oppose the requested injunction. ..... 11
E. The proposed interim injunction fails for the same reasons. ..... 12
IV. CONCLUSION ..... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025) ........ 6

*Carson v. American Brands, Inc.*,
450 U.S. 79 (1981) ........ 6

*Feldman v. Arizona Secretary of State's Office*,
843 F.3d 366 (9th Cir. 2016) ........ 8

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ........ 8

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ........ 11

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........ 9

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ........ 9

*Mission Power Engineering Co. v. Continental* Casualty *Co.*,
883 F. Supp. 488 (C.D. Cal. 1995) ........ 7

*Nascimento v. Dummer*,
508 F.3d 905 (9th Cir. 2007) ........ 7

*NetChoice v. Bonta*,
761 F. Supp. 3d 1232 (N.D. Cal. 2025) ........ 12

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*,
762 F.2d 1374 (9th Cir. 1985) ........ 8, 11

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ........ 3, 11

*Religious Technology Center v. Scott*,
869 F.2d 1306 (9th Cir. 1989) ........ 7

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 8, 10

**Rules and Statutes**

18 U.S.C. § 611 — a ........ 2

52 U.S.C. § 10101(a)(2)(A) ........ 11

52 U.S.C. § 10307(a) ........ 9

DOCUMENT PREPARED ON RECYCLED PAPER

52 U.S.C. §§ 20504(c)(2)(C), 20508(b)(2) .......... 5

52 U.S.C. § 20507(i)(1) .......... 10

52 U.S.C. §§ 20507(b)(1), 10101(a)(2)(A) .......... 9

52 U.S.C. § 20507(c)(2)(A) .......... 3, 8

Cal. Elec. Code §§ 2111, 3000 *et seq.*, 3011, 3014, 3015, 3016.5, 3017, 3019, 3020, 3021.5 .......... 5

National Voter Registration Act .......... 8

Voting Rights Act .......... 9

**Other Authorities**

Cal. Const. art. II, § 7 .......... 5, 7

The Supremacy Clause .......... 2

## I. INTRODUCTION

Plaintiff United States of America, acting through the Department of Justice (together, "the Executive"), asks this Court to intervene in an ongoing state and federal election in one of the Nation's largest jurisdictions on the strength of nothing more than suspicion. The right to vote is the foundation of our democracy, and the officials who count those votes are its custodians. Defendant Dean C. Logan, the Los Angeles County Registrar-Recorder/County Clerk (the "County"), leads an agency of election workers who are doing exactly that work, for their community, under the shadow of criminal threat. The injunction the Executive seeks would make that work impossible. It has no basis in federal law. It ignores the realities of election administration. And it asks for something no court can order, because no election official can perform it. Full stop.

Voting is already underway in Los Angeles County. Ballots have been mailed, returned, and processed, ready to be tabulated after 8 p.m. on election night, and election officials are working toward fixed deadlines for tabulation, canvassing, and certification. The Executive asks this Court to interrupt that work. It seeks an order directing the County to segregate and withhold the returned ballots of registered voters whom federal investigators suspect may be noncitizens, based solely on an unreliable list of more than 20,000 entries generated through bulk database matching (the "October List"). The Executive's own declarant concedes that the resulting data may be "incomplete, outdated, or mismatched." (Decl. of Nicolas Bartell ISO U.S. Ex Parte Appl. for TRO, ECF No. 22-4 ¶ 16.) Yet it asks the Court to withhold the ballots of those on the list, to preserve the possibility of excluding those ballots if an investigation the Executive concedes it cannot finish before the election ends eventually substantiates its suspicions. No federal law authorizes that interference. With this brief, the County opposes the Executive's

new ex parte motion for injunction pending appeal,[1] (Notice of Pl.'s Ex Parte Mot. for Inj. Pending Appeal, ECF No. 76), and supplements its earlier opposition (Opp'n of Def. Dean C. Logan to Pl.'s Ex Parte Appl. for TRO, ECF No. 32-1) to the pending TRO and preliminary-injunction application.

*First*, there is nothing to enjoin "pending appeal." This Court has not denied the pending TRO application. This case was reassigned on October 21. Later that day the Court scheduled a hearing on the Executive's preliminary injunction application for October 27. The Executive instead unilaterally declared its own deadline for a ruling, appealed when that deadline passed, and now demands an injunction pending that appeal. A court that schedules an expedited hearing has not constructively refused relief merely because the movant demands a faster decision.

*Second*, the Executive is unlikely to succeed on the merits. Its lone claim is that 18 U.S.C. § 611 — a criminal statute that forbids noncitizens to vote — preempts the County's ordinary processing of ballots. But Section 611 regulates voters, not elections officials. It says nothing about how ballots are mailed, verified, or counted, and nothing about holding ballots while federal investigators work through a list. The Supremacy Clause makes supreme the laws Congress has enacted, not the Executive's preferred enforcement timetable. And the County's adherence to existing law neither authorizes unlawful voting nor obstructs federal prosecution: the Executive remains free to investigate and prosecute anyone who votes unlawfully, and it is doing just that. Refusing to comply or cooperate with an unlawful request is not the same as impeding citizenship investigations.

*Third*, the Executive has shown no irreparable harm. It has not established that the voters whose ballots it seeks to withhold are ineligible, let alone that any has cast an unlawful ballot. And nothing about ordinary ballot processing impairs federal enforcement: the County keeps records of who is registered and who voted,

[1] In opposing the requested injunction, the County incorporates its opposition to the request for temporary restraining order (ECF No. 32-1.)

and federal officials remain free to use them to investigate and prosecute. The Executive's real complaint is that once a ballot leaves its envelope, it can no longer be traced back to the voter. That is not obstruction. That is the right to ballot secrecy, safeguarded by, and consistent with, California's constitutional and statutory requirements. Congress has never required election officials to preserve the Executive's ability to pull particular ballots while it pursues its suspicions.[2] Instead, it has prohibited systematic list maintenance in the period immediately preceding a federal election. 52 U.S.C. § 20507(c)(2)(A).

Any urgency, moreover, is self-inflicted. Federal agencies had the voter data by May 8, 2026, yet the Executive waited until October 13 — after the County had already begun processing ballots — to deliver its list with a 48-hour ultimatum. (U.S.' Mem. in Supp. of Pl.'s Ex Parte Mot. for Inj. Pending Appeal, ECF No. 76-1 at 5, 7.) Having failed to finish its investigation before voting began, the Executive now asks voters and election officials to bear the cost of its delay and risk voter disenfranchisement resulting from incomplete, unverified, or inaccurate data.

*Fourth*, the equities and the public interest weigh decisively against an eleventh-hour, mandatory order that the County ***cannot*** perform. The logistical hurdles to compliance cannot be overstated and it would seriously jeopardize the ability to comply with mandatory certification compliance, among other deadlines. It would also cloud the ballots of every voter matched to the Executive's list — presumptively eligible registrants, including naturalized citizens whose earlier immigration records make them especially prone to false matches — without notice or any opportunity to be heard. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006),

[2] Even the DOJ's *own* guidelines don't support this proposition: "the Department should not engage in overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Doing otherwise runs the risk of chilling legitimate voting and campaign activities and of interjecting the investigation itself into ongoing campaigns and the adjudication of any ensuing election contest," 9-85.300 Non-interference In Elections When Conducting Federal Criminal Investigations Involving Ballot Fraud, 2022 WL 20355953, at *1

counsels against exactly this kind of late federal-court intervention in the mechanics of an ongoing election. Both applications, including the alternative request for a 30-day injunction, should be denied.

## II. BACKGROUND

Federal investigators began reviewing California voter data months before this lawsuit. Homeland Security Investigations received what it described as an apparent California voter roster and forwarded it to USCIS on or around May 8, 2026. (ECF No. 76-1 at 5.) In July, the Secretary of Homeland Security advised the California Secretary of State of preliminary concerns about possible noncitizen registrants and requested collaboration to verify the findings. (*Id.* at 6.) The Secretary of State responded a week later and requested supporting information, which the Executive declined to provide unless the State agreed to participate in or use its flawed database. (*Id.* at 6-7.)

The Executive did not deliver its list until October 14[3] — well after its initial engagement with the Secretary of State and after the County began processing returned vote-by-mail ballots. (*Id.* at 1, 5.) The accompanying letter demanded that election officials review more than 20,000 entries within 48 hours — an impossible timeline — and segregate the vote-by-mail ballots of individuals whose citizenship could not independently be confirmed. (*Id.* at 7; ECF No. 32-2, Ex. D.) Notably, the 48-hour demand included no explanation of the methodology the Executive used to determine whether an individual is a noncitizen.

As the Executive concedes, the list is not determinative of any voter's eligibility or citizenship status. The Executive describes a process beginning with a voter roster of uncertain provenance, supplemented by an unidentified third-party data-analytics and investigative platform, comparisons with immigration records, confidence scoring, and further investigation. (Declaration of Eric McLoughlin ISO

[3] The Executive initially provided a thumb drive which purportedly included the list, but use of thumb drives is not consistent with County cybersecurity policies.

Pl.'s Ex Parte Appl. for TRO and OSC re Prelim. Inj., ECF No. 62-3 ¶¶ 16–24; Declaration of Nic Bartell ISO Pl.'s Ex Parte Appl. for TRO and OSC re Prelim. Inj., ECF No. 62-2 ¶¶ 14–23.) The Executive acknowledges the need to account for incomplete, outdated, or mismatched information. (ECF No. 76-1 at 3-5.) Its investigators characterize the resulting entries as persons believed "highly likely" to be noncitizens, not persons adjudicated ineligible to vote. (ECF No. 62-2 ¶ 22.) Further investigation remains underway. (*Id.* ¶ 23.)

The County has challenged the list's reliability. (ECF No. 32-1 at 17.) The Executive has not shown that any particular entry identifies a person who is currently ineligible, much less that such a person has voted in this election.

Federal and California law require registrants to attest to citizenship, and returned vote-by-mail ballots are subject to established procedures, including signature verification procedures. *See* 52 U.S.C. §§ 20504(c)(2)(C), 20508(b)(2); Cal. Elec. Code §§ 2111, 3000 *et seq.*, 3011, 3014, 3015, 3016.5, 3017, 3019, 3020, 3021.5. The County does not possess the records needed to conduct the investigation the Executive demands, including but not limited to, federal immigration or naturalization records. (Declaration of Monica Flores in Support of the County's Opposition, ECF No. 32-4 ¶ 15.) Moreover, unlike the Department of Justice, the County is not an investigative body with authority to seek and match information in response to assertions or allegations about eligibility. It must process registrations and ballots uniformly in compliance with applicable state and federal law. Once a ballot is removed from its identifying envelope, it cannot be traced to the voter consistent with California law. (ECF No. 32-1 at 11; Cal. Const. art. II, § 7.)

Moreover, the County diligently investigated the logistical realities of compliance and was unable to find a feasible path forward. There are technological hurdles, training hurdles, and physical hurdles. There are 5.9 million eligible voters in Los Angeles County. Every single person who decides to vote casts a physical

ballot. The Executive seems to believe that compliance would be the same as picking up mail from the kitchen counter—but that is not so. This is an incredibly complex system involving thousands of workers and changes of this magnitude simply cannot be effectively completed overnight without jeopardizing the effectiveness of the system as a whole.

The Executive filed suit on October 15 and sought emergency relief. (Compl.) The case was reassigned to this Court on October 21, and within the day, the Court scheduled a hearing for October 27. (ECF Nos. 46, 64.) The Executive then requested a ruling by noon October 22. (United States' Request for Expedited Ruling, ECF No. 67 at 2.) When none issued, it filed a notice of appeal and the present motion, requesting another ruling by noon on October 23. (ECF 76-1 at 2.)

## III. <u>ARGUMENT</u>

### A. <u>The Executive has no basis for an injunction pending appeal from a ruling this Court has not made.</u>

Rule 62(d) authorizes an injunction pending appeal from an order granting or refusing injunctive relief. But this Court has entered no such order. (Fed. R. Civ P. 62(d).) It has scheduled an expedited hearing on the Executive's application. (ECF No. 64.)

The Executive invokes *A.A.R.P. v. Trump*, 605 U.S. 91 (2025), which recognized that judicial inaction can, in extraordinary circumstances, have the practical effect of refusing an injunction. There, detainees faced imminent removal from the country before their claims could be adjudicated. The Court recognized the need for intervention to prevent consequences that could not effectively be challenged later. *Id.* at 94; see *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981).

This case is manifestly different. The Executive has had months to investigate, has produced no reliable determination that an identified voter is ineligible, and seeks to impose novel procedures during an election already

underway. Those procedures would not only burden the voters on its list, but all voters in the County and State. The County serves approximately 5.9 million registered voters and has already processed hundreds of thousands of returned ballots; the staff who would have to match and review the Executive's records are the same staff who verify signatures and process every other voter's ballot. (ECF No. 32-1 at 31.) Segregating the ballots of 20,000 voters would also require changes to multiple software systems during the County's election freeze, risking a catastrophic impact on the infrastructure that runs the entire election. (*Id.* at 18–19.) And the order the Executive seeks is not merely burdensome; it is logistically impossible. Every vote-by-mail ballot has already been printed and mailed. (*Id.* at 18.) Once a returned ballot's signature is verified, the ballot is separated from its envelope and commingled with others, and cannot lawfully be traced to the voter. (*Id.* at 18, 31–32; Cal. Const. art. II, § 7.) The County also has no access to the federal records needed to resolve anyone's citizenship, so ballots placed on hold could be held indefinitely, which would prevent the County from processing and tabulating ballots for certification at the County level, and ultimately delay certification of statewide results. (ECF No. 32-1 at 32.) The Court's decision to hold a hearing six days after reassignment is not a refusal to act; it is the measured response demanded by such a sweeping and unworkable request.

Nor may the Executive create appellate jurisdiction by announcing when the Court must rule. Even an express ruling denying a temporary restraining order ordinarily is not immediately appealable. *Religious Technology Center v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989). And an appeal from a plainly nonappealable order does not divest the district court of jurisdiction. *Nascimento v. Dummer*, 508 F.3d 905, 908 (9th Cir. 2007). The Court should proceed with its scheduled hearing.

The ex parte posture is independently unwarranted. Such relief requires a showing that the movant did not create the urgency necessitating extraordinary procedure. *Mission Power Engineering Co. v. Continental* Casualty *Co.*, 883 F.

Supp. 488, 492 (C.D. Cal. 1995). The Executive cannot make that showing. It began reviewing the voter information in May, delivered its findings after ballot processing began, demanded action within 48 hours, and then insisted upon successive judicial deadlines. (ECF 76–1 at 5-6; ECF No. 67 at 2.) That chronology is not a reason to dispense with ordinary procedures for considering an injunction. Delay of this magnitude also undermines a claim of irreparable urgency. *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

**B. The Executive is unlikely to succeed on the merits of either of its motions.**

Both emergency applications require a showing of likely success, irreparable harm, favorable equities, and consistency with the public interest. *Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016); *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The Executive seeks more than preservation of the status quo. It seeks a mandatory order imposing new responsibilities on the County during an ongoing election. Such injunctions are "particularly disfavored" and should not be issued unless the facts and law clearly favor the moving party. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

The Executive cannot satisfy even the ordinary standard. The Executive's preemption claim rests on Section 611, which imposes no duty on state election officials to investigate suspected violations or segregate ballots while federal investigators do so. (ECF No. 32-1 at 23-24.) And the County's procedures interfere with no federal enforcement mechanism. They prohibit no investigation, refuse no lawful federal process, and confer no immunity from prosecution. (*Id.* at 24-26.)

Worse, the order the Executive seeks would require the County to violate federal law. Start with the National Voter Registration Act. Congress barred States from conducting any program "the purpose of which is to systematically remove the names of ineligible voters" within 90 days of a federal election. 52 U.S.C. §

Document Prepared on Recycled Paper

20507(c)(2)(A). That quiet period began August 5, 2026. (ECF No. 32-1 at 27.) Congress drew that line for good reason: database-matching programs run on the eve of an election are prone to error, and eligible voters swept up in them have no time to discover the mistake and correct it before they lose their vote. The Ninth Circuit has applied the bar to systematic noncitizen-removal programs and held that a database comparison is not transformed into an individualized inquiry merely because notices go out afterward. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 716–17 (9th Cir. 2025). The Executive's program is systematic by design: a bulk list, generated by database matching, applied wholesale weeks before Election Day. It would not formally strike names from the rolls. But setting aside registered voters' ballots until an open-ended federal review ends accomplishes the same exclusion the quiet period exists to prevent. A purge does not escape the statute by being called a ballot hold.

The quiet period is not the only obstacle. The Voting Rights Act forbids any person acting under color of law to "willfully fail or refuse to tabulate, count, and report" the vote of a person "entitled to vote." 52 U.S.C. § 10307(a). The Executive describes the voters on its list only as "likely" noncitizens; it does not claim that all are ineligible. (ECF No. 68 at 38.) A blanket hold would therefore withhold the ballots of qualified citizens, and County officials would be refusing, knowingly, to count them. Federal law also requires that list maintenance be "uniform" and "nondiscriminatory," and bars officials from applying different standards to some voters than to others already found qualified. 52 U.S.C. §§ 20507(b)(1), 10101(a)(2)(A). An order singling out voters based on immigration records would fall hardest on naturalized citizens. And an order withholding ballots with no notice, no opportunity to respond, no standard for decision, and no deadline would deny eligible voters the process the Constitution requires. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); (ECF No. 32-1 at 28–29.) A preemption claim cannot succeed by demanding that the County break federal law to avoid an imagined conflict with it.

### C. The Executive has not established irreparable harm.

The Executive's newly expanded arguments trying to establish irreparable harm are unavailing. First, it argues that, once a ballot is separated from its identifying envelope, it cannot later be identified and excluded from the count if the voter is found ineligible. (ECF No. 76-1 at 19.) That is a consequence of the legally mandated secret ballot, not an obstruction of federal law enforcement. The County maintains voter-registration and participation records, which by law must be made available for public inspection, that federal officials can use to investigate who voted and whether anyone voted unlawfully. 52 U.S.C. § 20507(i)(1). What the Executive seeks to preserve is something else: the possibility of identifying and excluding particular ballots if its unfinished investigation eventually substantiates its suspicions. (Compl. ¶¶ 6, 63.) Congress has imposed no such requirement. Nor has the Executive established that the thousands of voters whose ballots it seeks to withhold are ineligible to vote. Its claimed harm remains speculative. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008).

Second, the Executive also invokes dilution of lawful votes. (ECF 76-1 at 1–2, 16.) But vote dilution is an asserted injury to voters, not to the United States, which casts no ballot. Although Congress may authorize the United States to sue to protect voting rights, the Executive identifies no such authorization for the vote-dilution theory it advances here. It cannot establish irreparable injury merely by invoking an alleged injury to voters. It also ignores the rights of the voters whose ballots the Executive seeks to indefinitely hold along with the general public, who has a right to have its elections timely completed.

Finally, the Executive's own delay undermines its claim of urgency. Federal agencies had underlying voter data in May, yet the Executive did not deliver its list to the County until October 14, after ballot processing began. (ECF No. 76-1 at 5.) The Executive waited more than three months after first raising this issue to seek

emergency relief, and that delay undercuts its claim of urgency now. *See Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

**D. <u>The equities and public interest decisively oppose the requested injunction.</u>**

The injunction would disrupt an ongoing election and jeopardize the votes of eligible citizens. The County has already processed hundreds of thousands of ballots, with substantially greater volumes expected as it gets closer and closer to Election Day. (ECF No. 32-1 at 11.) The order would require officials to identify and segregate ballots based on an unverified federal list, then undertake citizenship determinations the County is neither equipped nor authorized to perform. (ECF 32-4 ¶ 44.)

Eligible voters mistakenly included on the list would have their ballots withheld without notice or an opportunity to contest the determination. (ECF No. 32-4 ¶ 49.) That risk is especially serious for naturalized citizens whose immigration records may not reflect their current status. The resulting burdens implicate both the right to vote and federal protections against nonuniform eligibility procedures. See *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); 52 U.S.C. § 10101(a)(2)(A).

The Executive's reliance on *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006), is misplaced. The Executive cites *Purcell* for the proposition that "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." (*See* ECF No. 76-1 at 13.) But that statement in *Purcell* was made in the context of the State's compelling interest in preventing voter fraud generally, not in the context of a federal agency's own after-the-fact review of an existing voter list after an election is already underway. *Purcell*, 549 U.S. at 4. *Purcell* and its progeny caution against changing election procedures close to Election Day,

Document Prepared on Recycled Paper

because such orders risk voter confusion and can themselves increase the very disenfranchisement the Executive invokes. *Id.* at 4–5. The requested injunction would do just that, after voting has already begun. The public interest in preventing unlawful voting does not justify disrupting election administration and withholding potentially lawful ballots based on unproven suspicions, particularly when federal investigation and prosecution remain available. The equities favor denying relief.

**E. The proposed interim injunction fails for the same reasons.**

The Executive alternatively seeks an injunction lasting up to 30 days or until the Ninth Circuit rules on its emergency motion, whichever is sooner. (ECF 76-1 at 2.) It cites *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1236 (N.D. Cal. 2025), for authority to grant temporary relief preserving appellate review.

But the temporary nature of relief does not justify an injunction that changes rather than preserves the status quo. Unless the Ninth Circuit ruled sooner, an order issued now and lasting 30 days would extend to November 22, beyond Election Day. Even an injunction of only a few days would require the County to undertake the very segregation-and-verification process at issue, disrupt ongoing operations, impose immediate burdens on registered voters, and jeopardize the County's ability to meet required deadlines. (ECF No. 32-4 ¶¶ 38, 41.)

The Executive's alternative therefore suffers from precisely the same substantive and equitable defects as its principal request. Calling the interference temporary does not make it harmless.

## IV. CONCLUSION

The Executive may investigate and prosecute unlawful voting. But neither Section 611 nor any other federal statute identified in its motion authorizes it to compel local election officials to interrupt lawful ballot processing because a federal investigation remains unfinished. This would violate both federal and state law. The Executive has shown neither likely success nor irreparable harm, and the consequences of its proposed intervention would fall on the County and registered

voters.

The Court should deny the motion in full, including the alternative request for a temporary injunction, and proceed with the October 27 hearing as scheduled.

Dated: October 23, 2026 **NORTON ROSE FULBRIGHT US LLP**

By: */s/ Abigail Urquhart*
CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI

*Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk*

Dated: October 23, 2026 **PUBLIC RIGHTS PROJECT**

By: */s/ Joshua Karsh*
JOSHUA KARSH (*pro hac vice pending*)
TOBY R. MERRILL (*pro hac vice pending*)
SHARANYA MOHAN(CA Bar No. 350675)
CHRISTINE E. BASS (CA Bar No. 345896)
KYRA SIKORA (CA BAR NO. 345896)

*Attorney for Defendant Dean C. Logan, in his official capacity as the County of Los Angeles Registrar- Recorder/County clerk.*

** Licensed in Illinois and Washington, D.C. not licensed to practice law in California.*

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

The undersigned, counsel of record for Defendant Dean C. Logan, certifies that this brief contains 3980 words in compliance with L.R. 11-6.2

*/s Abigail Urquhart*
ABIGAIL URQUHART