Lanny A. Breuer (PHV Forthcoming)
Thomas Perrin Cooke (PHV Forthcoming)
Samuel T. Ackerman (PHV Forthcoming)
Joshua M. Schenk (PHV Forthcoming)
Basundhara Mukherjee (PHV Forthcoming)
Evan Chiacchiaro (PHV Forthcoming)
lbreuer@cov.com
pcooke@cov.com
sackerman@cov.com
jschenk@cov.com
bmukherjee@cov.com
echiacchiaro@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

Jane Petersen Bentrott (SBN 323562)
jane.bentrott@protectdemocracy.org
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington DC 20006
Tel: (202) 579-4582

*Counsel for Amicus Curiae*

Maryam Jazini Dorcheh (PHV Forthcoming)
onoureldin@commoncause.org
mjazini@commoncause.org
COMMON CAUSE
805 15th Street NW, Suite 800
Washington, DC 20005

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

United States of America,

Plaintiff,

v.

STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

Defendants.

Civil Case No.: 2:26-cv-12025

**BRIEF FOR COMMON CAUSE AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS**

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1
II. ARGUMENT .......... 3
A. The Department Cannot Commandeer State Election Officials to Assist in the Enforcement of Federal Criminal Law .......... 5
B. Where Congress Has Legislated on Election Administration, It Has Done So Carefully—and It Has Never Granted Authority to DOJ to Direct States to Set Aside Votes Cast by Individual Voters. .......... 8
1. HAVA .......... 9
2. NVRA .......... 11
3. Courts Have Repeatedly Affirmed that the Department Lacks Authority to Direct Purges of State Voter Lists .......... 13
C. Granting the Government's Requested Relief Would Ignore Federal Privacy Law .......... 15
III. CONCLUSION .......... 20
For the foregoing reasons, this Court should deny the Department's Ex Parte Application for a Preliminary Injunction and grant defendants' Motion to Dismiss .......... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .......... 12

*Bush v. Gore*,
531 U.S. 98 (2000) .......... 9

*Common Cause v. DOJ*,
No. 26-cv-01352 (D.D.C. Oct. 23, 2026) .......... 17

*Common Cause v. U.S. Dep't of Just.*,
No. 1:26-cv-01352-SLS, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) .......... *passim*

*Democratic Nat'l Comm. v. Wis. State Legislature*,
592 U.S. 1039 (2020) .......... 20

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026) .......... 12

*EPIC v. USCIS*,
No. 26-cv-03457 (D. Md. Oct. 2, 2026) .......... 17

*Foster v. Love*,
522 U.S. 67 (1997) .......... 5

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... 5, 6

*League of Women Voters of Mass. v. Missouri*,
No. 26-1944, 2026 WL 2629723 (1st Cir. Sept. 4, 2026) .......... 6

*League of Women Voters of Mass. v. Trump*,
837 F. Supp. 3d 283 (D. Mass. 2026) .......... 6

*Maydak v. United States*,
363 F.3d 512 (D.C. Cir. 2004) .......... 19

*Munro v. Socialist Workers Party*,
479 U.S. 189 (1986) .......... 5

*New York v. United States*,
505 U.S. 144 (1992) .......... 7

*Palm Beach Cnty. Canvassing Bd. v. Harris*,
772 So. 2d 1220 (Fla. 2000), *rev'd sub nom. Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70 (2000) .......... 9

*Printz v. United States*,
521 U.S. 898 (1997) .......... 7

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 20

*Reschenthaler v. Schmidt*,
776 F. Supp. 3d 280 (M.D. Pa. 2024) .......... 20

*Romeu v. Cohen*,
265 F.3d 118 (2d Cir. 2001) .......... 7

*Roudebush v. Hartke*,
405 U.S. 15 (1972) .......... 5

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) .......... 5

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) .......... 15

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026), *aff'd*, 179 F.4th 470 (6th Cir. 2026) .......... 14

*United States v. California*,
No. 2:26-cv-12025 (C.D. Cal. Oct. 15, 2026), ECF No. 1 .......... 2, 3

*United States v. Henderson*,
No. 2:26-cv-00166, slip op. (D. Utah Oct. 23, 2026) .......... 1

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) .......... 15

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) .......... 14

*United States v. Raffensperger*,
No. 1:26-cv-00485-VMC, 2026 WL 3002013 (N.D. Ga. Sept. 30, 2026)..................... 1

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ..............................................................*passim*

**Statutes**

5 U.S.C. § 552a(a)(5) ....................................................................................... 16

5 U.S.C. § 552a(a)(7), (b)(3)............................................................................... 17

5 U.S.C. §§ 552a(e)(5), (e)(6)............................................................................ 18

5 U.S.C. § 552a(e)(7) ....................................................................................... 19

8 U.S.C. § 1373 .................................................................................................. 17

18 U.S.C. § 611(a) ............................................................................................. 2

18 U.S.C. § 611(a)–(c) ....................................................................................... 7

44 U.S.C. § 3502(3) ........................................................................................... 17

44 U.S.C. § 3518(c)(2)....................................................................................... 17

52 U.S.C. § 20501(b) ......................................................................................... 11

52 U.S.C. §§ 20507, 21083.................................................................................. 3

52 U.S.C. § 20507(a)(1)..................................................................................... 12

52 U.S.C. § 20507(g) ......................................................................................... 13

52 U.S.C. § 20510(a) ......................................................................................... 12

52 U.S.C. § 21083(a)(1)(A) ............................................................................... 10

52 U.S.C. §§ 21083(a)(4)(A), 21085 ................................................................. 11

**Other Authorities**

Andrew Blankstein et al., *DOJ Demands that California Counties Help Identify Noncitizen Voters*, NBC News (Oct. 24, 2026, at 1:13 A.M.), , https://www.nbcnews.com/politics/2026-election/doj-demands-california-counties-help-identify-noncitizen-voters-rcna605356.................................. 2

H.R. Rep. No. 107-329, pt. 1 (2001) .......................................................................... 10

Miles Parks & Jude Joffe-Block, *Some on DOJ's 20,000 'Likely' Noncitizen List in California Appear to Be U.S.-Born*, NPR (Oct. 20, 2026), https://www.npr.org/2026/10/20/nx-s1-6009873/california-doj-voter-rolls-noncitizens .......................................................................................... 18, 19

*President Trump Address to the Nation on Election Security (transcript)*, Univ. of Va. Miller Ctr. (July 16, 2026), https://millercenter.org/the-presidency/presidential-speeches/july-16-2026-address-nation-election-security ............................................................................................................. 4

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae Common Cause states that it is a nonprofit organization, that it has no parent corporation, and that it issues no stock.

## INTEREST OF AMICUS CURIAE

Common Cause is a nonpartisan, grassroots organization dedicated to fair elections and to making government at every level more democratic and more accountable to the people it serves. Founded by John Gardner in 1970 as a "citizens' lobby,"

Common Cause has more than 1 million members nationwide and local organizations in 22 states and the District of Columbia, including California, and has spent decades registering voters, encouraging participation, and advocating for policies that make voting more accessible.

Common Cause has a direct and particular interest in this case. It was the lead plaintiff in *Common Cause v. U.S. Department of Justice*, No. 1:26-cv-01352-SLS, 2026 WL 3033772 (D.D.C. Oct. 9, 2026), in which the court held that the Department of Justice's Civil Rights Division exceeded its statutory authority through a program that collected state voter rolls, cross-checked them against federal citizenship data, and urged States to remove voters the Department identified as potential noncitizens, and vacated that program. 2026 WL 3033772, at *1, *36. Common Cause submits this brief to explain how the U.S. Constitution and federal statutes governing voter eligibility and list maintenance allocate authority between the States and the federal government, and why the relief sought here would subvert that carefully considered allocation.

## I. INTRODUCTION

Since 2025, the federal government has waged a nationwide campaign to seize States' unredacted voter registration lists, run the sensitive personal data included in those lists through federal databases, and pressure States to purge the voters it identifies as potential noncitizens. *See Common Cause v. U.S. Dep't of Just.*, No. 1:26-cv-01352-SLS, 2026 WL 3033772 (D.D.C. Oct. 9, 2026). Most States—including California—refused. The Department of Justice ("DOJ" or "the Department") then tried to compel production of the sought-after voter registration data in roughly 30 States. Every federal court to decide the question, including this Court, has rejected the Department's demand: no federal statute authorizes bulk, unredacted disclosure of statewide voter registration databases to the Department. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1174 (C.D. Cal. 2026) (finding DOJ's requests "unprecedented and illegal").[1] One court went further, vacating DOJ's policy of "attempt[ing] to decide who gets to vote," because "Congress has left that authority where our Constitution has always placed it: with the states." *Common Cause*, 2026 WL 3033772, at *1.

[1] Twenty-seven federal district courts have dismissed those actions, and one circuit court has affirmed dismissal. Mem. Op. at 10 n. 3, *Common Cause*, ECF No. 51 (D.D.C. Oct. 9, 2026); *United States v. Henderson*, No. 2:26-cv-00166, slip op. at 19–20 (D. Utah Oct. 23, 2026); *United States v. Raffensperger*, No. 1:26-cv-00485-VMC, 2026 WL 3002013, at *6–9 (N.D. Ga. Sept. 30, 2026).

Having failed to obtain the States' records, the Department now seeks to make its own list do the work Congress never authorized. Through a process it continues to shroud in secrecy, it stitched together internal federal databases into a self-made list of purported "noncitizens" and, three weeks before a general election—after California had already mailed ballots—demanded that State and Los Angeles County officials disenfranchise more than 20,000 voters by federal fiat within 48 hours.[2] Specifically, the Department ordered officials to set aside any ballots returned by voters it claimed it could not immediately verify as citizens, and to cease sending ballots to any of the identified voters who had not yet received one.

When California declined to comply with the Department's demands, the United States filed this suit, alleging that California's refusal to verify voters' citizenship is preempted by the federal statute prohibiting noncitizens from voting in federal elections, 18 U.S.C. § 611(a). Compl. at 13–14, *United States v. California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 15, 2026), ECF No. 1. The United States asks the Court to declare that California's noncompliance with its demand is preempted by federal law, to enjoin

---

[2] On October 23, 2026, after this suit was filed, the Department sent similar letters to the remaining 57 counties in California. The letters demand county officials identify whether certain individuals are citizens and segregate their ballots if officials cannot confirm their citizenship, and threatened the officials with legal consequences if they do not comply. *See* Andrew Blankstein et al., *DOJ Demands that California Counties Help Identify Noncitizen Voters*, NBC News (Oct. 24, 2026, at 1:13 A.M.), https://www.nbcnews.com/politics/2026-election/doj-demands-california-counties-help-identify-noncitizen-voters-rcna605356.

California from counting mail ballots submitted by the purported noncitizens, and award the United States attorney's fees. *Id.* at 14.

Neither Section 611 nor any other federal law supports that demand. Congress built a framework for election administration—through the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"), among other laws—that assigns States the responsibility to register voters, maintain their rolls, and determine individual voter eligibility, subject to carefully drawn safeguards. *See* 52 U.S.C. §§ 20507, 21083. That framework does not empower the federal government to compile its own eligibility lists and direct state officials to set aside ballots based on those lists. Nor does a criminal prohibition on noncitizen voting silently displace that structure or commandeer state assistance in federal investigations.

California moved to dismiss on October 21, 2026. Mot. to Dismiss, *California*, ECF No. 65. The next day, the United States noticed an appeal to the Ninth Circuit and filed an emergency *ex parte* application for injunctive relief pending appeal, which California opposed. Notice of Appeal, *California*, ECF No. 74; Ex Parte Appl., *California*, ECF No. 76; Opp'n to Mot. for Inj., *California*, ECF No. 79.

## II. ARGUMENT

The Department asks this Court to order California to segregate and not count more than 20,000 ballots on the eve of a federal election. Nothing in the Elections Clause, the Tenth Amendment, or federal election law permits that unprecedented attempt to commandeer state election administrative authority and risk disenfranchising voters by

federal fiat. The Constitution and Congress have deliberately vested the primary responsibility for election administration with the States. Neither the constitutional structure nor any federal statute tolerates federal usurpation of that authority or federal intervention in voter eligibility determinations. That these demands come at the eleventh hour, with no more factual support than the executive branch's say-so, underscores the dangerous and unlawful nature of the federal government's attempted usurpation. And that danger is further heightened when viewing this latest federal escapade through the lens of the Administration's relentless efforts to spin a false narrative that our elections are unsecure and beset by a deluge of non-citizen voting. *See, e.g.*, *President Trump Address to the Nation on Election Security (transcript)*, Univ. of Va. Miller Ctr. (July 16, 2026), https://millercenter.org/the-presidency/presidential-speeches/july-16-2026-address-nation-election-security (claiming that a DHS review of state voter rolls and public records identified approximately 278,000 noncitizens registered to vote in federal elections, and asserting that the number would be higher because some States had refused to share voter files).

Lacking authority in federal election administration laws and the Constitution, the Department attempts to rest this entire suit on a novel preemption theory built on a standalone criminal statute. That theory fails three times over. If DOJ's unprecedented gambit is permitted, it would commandeer state officials to enforce federal law. It would upend the decentralized system of election administration that the Elections Clause and Congress established. And it would violate the federal government's own privacy laws.

### A. The Department Cannot Commandeer State Election Officials to Assist in the Enforcement of Federal Criminal Law.

At the outset, the Department's demand would unlawfully commandeer California to aid in the enforcement of federal criminal law, in contravention of the constitutional balance between the States and the federal government in election administration and the Tenth Amendment. The Elections Clause of the Constitution vests primary election administration authority in the States, while granting Congress "the power to override state regulations by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33 (1995)). Under that authority, States are empowered to regulate, among other things, voter registration, recounts, *Roudebush v. Hartke*, 405 U.S. 15 (1972), and the form and content of ballots, *see Munro v. Socialist Workers Party*, 479 U.S. 189 (1986). The "Constitution assigns no direct role to the President in either domain" of election administration. *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 42 (D.D.C. 2025).

This constitutional design is no mistake. Recognizing the impossibility of a single regulation "which would have been always applicable to every probable change in the situation of the country," the Framers resolved "that a discretionary power over elections ought to exist somewhere." The Federalist No. 59 (A. Hamilton). The Framers "submitted the regulation of elections for the federal government, in the first instance," to the States, where such regulation would "be both more convenient and more satisfactory." *Id.* But

they "reserved to [Congress] a right to interpose" regulations of its own where the need arose. *Id.* This diffusion of power would "preserve and restore to the people their equal and sacred rights of election" against "the influence of ambitious or popular characters, or in times of popular commotion, and when faction and party spirit run high." *The Massachusetts Convention: Convention Debates* (Jan. 16, 1788), *reprinted in* 6 *Ratification of the Constitution by the States: Massachusetts* 1217–18 (J. Kaminski et al. eds., 2000). Stated simply, "[t]he executive branch has no authority to regulate elections." *League of Women Voters of Mass. v. Trump*, 837 F. Supp. 3d 283, 298 (D. Mass. 2026) (citing U.S. Const. art. I, § 4, cl. 1; *id.*, art. II.), *appeal dismissed sub nom. League of Women Voters of Mass. v. Missouri*, No. 26-1944, 2026 WL 2629723 (1st Cir. Sept. 4, 2026).

States are vested with election administration authority by default. And where Congress has legislated in the field of election administration, it has not carved out a role for the federal government in policing the eligibility of individual voters on state voter lists. As such, the government's theory of preemption, which relies on a single federal criminal statute proscribing noncitizen voting, fails because there is no California state law that remotely conflicts with or stands as an obstacle to that federal provision. The Department admits as much, hypothesizing that there would be such a conflict "*[i]f* California passed a law that allowed noncitizens to vote for a candidate" running in federal elections." Compl. ¶ 55 (emphasis added).

With no legitimate basis to assert either explicit federal authority to direct California to disenfranchise individual voters, or any actual conflict between state and federal law, the Department instead proceeds on the faulty assumption that California must actively "work with the Federal Government to determine whether noncitizens are registered to vote" to enable federal enforcement of federal criminal law. *Id.* ¶ 57. But the Court's Tenth Amendment precedents make pellucid that "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers…to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also New York v. United States*, 505 U.S. 144, 188 (1992). California does not have a free-floating obligation to aid the federal government in federal law enforcement. *See Romeu v. Cohen*, 265 F.3d 118, 133 (2d Cir. 2001) (Walker, J., concurring) (stating there is no difference between federal "mandate" on how "states officials" administer "federal elections" and "other constitutionally infirm federal mandates commandeering the states"). Indeed, even where the federal government has exercised its authority to regulate federal elections, Congress has repeatedly sought to retain the primacy of state administration with minimum federal election standards, in accordance with both the Elections Clause and Tenth Amendment.

And, in any event, Section 611 plays little role in the architecture of federal election administration. It makes it unlawful for "any alien to vote" in an election held in whole or in part for federal office, provides a criminal penalty, and sets out an exception keyed to the voter's parentage, residence before age 16, and reasonable belief in citizenship. 18

U.S.C. § 611(a)–(c). The statute is directed to individual conduct and individual liability. Even if Section 611 could be read to displace some degree of state election administration authority—which it could not— Section 611 does not direct state election officials to do anything, let alone give the federal government power to commandeer them to set aside ballots based on unauthorized federal database checking.

**B. Where Congress Has Legislated on Election Administration, It Has Done So Carefully—and It Has Never Granted Authority to DOJ to Direct States to Set Aside Votes Cast by Individual Voters.**

While federal law enables post-election enforcement of certain election crimes and the imposition of baseline list maintenance standards, it does not—and could not—authorize the Department to commandeer election administration officials in California. A criminal law provision that is enforced against individual voters is an especially thin reed when understood alongside the relevant authorities of federal election law, in particular, HAVA and the NVRA.

Those provisions reflect the careful balance Congress has struck in setting forth minimum national election administrative standards while maintaining the primacy of States in the actual implementation of those standards and administration of elections themselves. That statutory allocation matters because the Department asks the Court to impose a federal ballot remedy that neither statute makes available to the federal government. Indeed, both the text and the history of HAVA and the NVRA demonstrate that the Department's sought-after remedy is fundamentally inconsistent with the limited

federal role Congress chose. "Consistent with our constitutional structure, the NVRA and HAVA place *states* at the helm of maintaining their voter rolls," while DOJ's role is limited to ensuring that States comply with the duties Congress imposed. *Common Cause* 2026 WL 3033772, at *25 (emphasis added). That is why courts have repeatedly rejected the Department's efforts to interfere in the maintenance of state voter roles and election administration, including in *Common Cause*, in which the district court vacated the Department's Voter List Maintenance Policy writ large.

**1. HAVA**

Congress enacted HAVA following the infamous ballot administration issues during the 2000 presidential election. That election hinged on the results in Florida, where "several . . . county canvassing boards determined that the manual recounts conducted indicated an error in the vote tabulation." *Palm Beach Cnty. Canvassing Bd. v. Harris*, 772 So. 2d 1220, 1225 (Fla. 2000), *rev'd sub nom. Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70 (2000). Those outcome-determinative errors demonstrated "that punchcard balloting machines can produce an unfortunate number of ballots which are not punched in a clean, complete way by the voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000).

Following the Florida recount turmoil, Congress enacted HAVA to address demonstrated weaknesses in state election administration by, *inter alia*, setting forth minimum election administration standards and providing States with voluntary election

assistance. In so doing, Congress took pains to ensure that primary election administration authority continued to reside with the States.

As relevant here, HAVA's minimum standards require States to develop, "a single, uniform, official, centralized, interactive computerized statewide voter registration list" with the "name and registration information of every legally registered voter in the State," 52 U.S.C. § 21083(a)(1)(A); "to ensure that voter registration records in the State are accurate and are updated regularly[;]" to establish "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters," *id.* § 21083(a)(4)(B); and to "make[] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," *id.* § 21083(a)(4)(A). But HAVA leaves the primary responsibility for its implementation with States, making clear that "[t]he specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." *Id.* § 21085.

The legislative drafters of HAVA were well aware of the policies animating the constitutional default that places primary election administration authority with the States. Echoing the Framers, Congress explained that HAVA maintains "[t]he dispersal of responsibility for election administration," which "has made it impossible for a single centrally controlled authority to thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 32 (2001). As Congress recognized, "[t]his leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country." *Id.* The drafters of HAVA thus reaffirmed as a principal concern precisely that

which the Department pursues in this action—centralized federal control of election administration.

In enacting HAVA, Congress intentionally left States with the authority to implement baseline federal standards. By way of enforcement, Congress required only that States make a "reasonable effort" to remove registrants who are ineligible to vote, while entrusting States to choose the methods of compliance. 52 U.S.C. §§ 21083(a)(4)(A), 21085. Section 611, by contrast, does not regulate States' administration of elections at all; it is a criminal statute prohibiting noncitizens from voting in federal elections. It therefore provides no basis for upsetting the careful federal-state balance Congress expressly established in HAVA.

**2. NVRA**

Like HAVA, the NVRA imposes federal requirements on state election administrators without displacing States' role in conducting elections and making individual ballot eligibility determinations. Congress enacted the NVRA to increase registration by eligible citizens in federal elections, enhance their participation, protect electoral integrity, and ensure that accurate and current voter registration rolls are maintained. 52 U.S.C. § 20501(b). As relevant here, the NVRA requires each State, in administering voter registration for federal elections, to register eligible applicants who submit valid forms on time, notify applicants of the disposition of their applications, and limit removals from the official list to specified grounds. *Id.* § 20507(a)(1)–(3). Congress

did not include list maintenance at the Executive Branch's request—let alone the mandatory ballot sequestration—as an enumerated state duty. 52 U.S.C. § 20507(a)(1).

The statute also requires each State to conduct a general program that makes a reasonable effort to remove ineligible voters by reason of death or change of residence, and it requires list-maintenance programs to be uniform, nondiscriminatory, and not based on failure to vote. *Id.* § 20507(a)(4), (b). Systematic removal programs must be completed at least 90 days before a federal election, subject to statutory exceptions inapplicable here. *Id*. § 20507(c)(2)(A). The 90-day quiet period, which began on August 5, 2026, prohibits the use of "a mass computerized data-matching process to compare voter rolls with . . . federal databases" to remove voters on the eve of an election and underscores Congress's concern with sweeping eligibility interventions when there is little time to correct mistakes.[3] *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014); *see also DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700, at *3 (U.S. Sept. 25, 2026) (noting that NVRA's 90-day "moratorium" will prohibit mass removals of voters using the federal SAVE program).

---

[3] Under the NVRA, the Attorney General may bring a civil action for declaratory or injunctive relief necessary to carry out the Act's specified requirements. 52 U.S.C. § 20510(a). There is no historical precedent for DOJ attempting to take over election administration and threatening disenfranchisement of eligible citizens as it has here. *Common Cause*, 2026 WL 3033772, at *1-2.

The NVRA also shows how Congress writes a voter-specific federal-to-state notice channel when it so intends. Its provisions governing notice of federal felony convictions, for example, specify the federal official, the state recipient, the information to be transmitted, and a correction mechanism if the conviction is overturned. 52 U.S.C. § 20507(g). That carefully designed intergovernmental coordination confirms that Congress is explicit when it intends to facilitate federal-state data sharing relevant to elections, and that Congress left administration with the State in accordance with the constitutional default. The NVRA creates no comparable channel for federal agencies' citizenship assessments.

Taken together, HAVA and the NVRA mark the outer bounds of the federal role Congress chose in the field of federal election administration. They impose minimum standards, require state-maintained systems, and provide DOJ with specific, limited mechanisms by which to coordinate with States to identify potentially ineligible voters. They do not transfer voter-specific eligibility determinations from California to federal agencies.

#### 3. Courts Have Repeatedly Affirmed that the Department Lacks Authority to Direct Purges of State Voter Lists.

Amid the Department's unprecedented attempts to commandeer state election administration under the baseless pretext of widespread illegal voter participation of non-citizens, Courts have repeatedly affirmed that this statutory framework leaves the

Department with only limited mechanisms to coordinate with States to identify potentially ineligible voters.

In the context of the Department's unlawful nationwide campaign to collect state voter files and conduct database checks for voter eligibility, and demand the removal of purportedly ineligible voters, the *Common Cause* court held unambiguously that "no statute justifies the Civil Rights Division's unprecedented Voter List Maintenance Policy." 2026 WL 3033772, at *26. Indeed, numerous federal courts have recently held that neither the NVRA nor HAVA confers authority on the Department to demand that States produce their voter lists to the federal government. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *aff'd*, 179 F.4th 470 (6th Cir. 2026). To conclude otherwise "would turn these voter-protection laws on their head." *Common Cause*, 2026 WL 3033772, at *22; *see also Weber*, 816 F. Supp. 3d at 1176 ("There cannot be unbridled consolidation of all elections power in the Executive without action from Congress and public debate"); *United States v. Oregon*, 828 F. Supp. 3d 1092, 1104 (D. Or. 2026) (Congress never gave DOJ "such expansive and unfettered authority to invade citizens' right to keep their sensitive information private"). The *Common Cause* court explained that those statutes place States "at the helm of maintaining their voter rolls," provide DOJ only "pre-suit investigation and enforcement mechanisms," give the Attorney General no "special access" to state voter-registration lists, and do not allow the Department to "loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list."

*Common Cause*, 2026 WL 3033772, at *25 (quoting *United States v. Bellows*, 834 F. Supp. 3d 113, 126 (D. Me. 2026)). If HAVA and the NVRA do not authorize DOJ to direct removals, they do not authorize DOJ to direct California to suspend ordinary ballot processing and withhold tabulation based on a federal list. The Department may prosecute unlawful voting, seek records on a statutorily adequate written basis, and bring the program-level civil actions Congress authorized under HAVA and the NVRA. What it cannot do is convert an unverified federal eligibility list into a mandate that States segregate and not tabulate particular voters' ballots without any statutory authorization.

While federal law enables post-election enforcement of certain election crimes and the imposition of baseline list maintenance standards, it decidedly does not, and could not, authorize the Department to commandeer election administration in California and order the potential disenfranchisement of thousands of voters. As courts have unanimously held, the Constitutional and statutory frameworks governing election administration do not permit the federal government's unprecedented attempts to interfere with the States' electoral processes and risk disenfranchising thousands of voters.

### C. Granting the Government's Requested Relief Would Ignore Federal Privacy Law.

Just as Congress assigned States a discrete role in administering elections, it established a framework to protect the personal data the federal government holds. And "[a] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497

(2001). The Department asks this Court to order state officials to act on federal agency records—compiled and disclosed without the privacy safeguards Congress attached to them—to disenfranchise tens of thousands of Californians. This Court refused a similar invitation in *Weber*, holding that the Privacy Act barred the Department's demand for California's voter records because the records reflected protected political expression, no exception applied, and the Department identified no adequate System of Records Notice. 816 F. Supp. 3d at 1192-94. The Act's protections apply with even greater force here, where the Department has built the list itself and now asks the Court to put its equitable power behind it. The requested relief would implicate three of the Act's core safeguards, further militating against a grant of equitable relief.

The Privacy Act responds to concerns over the Executive "accumulating and centralizing Americans' personal information," and requires agencies to follow defined procedures before "maintaining, collecting, using or disseminating records." *Weber*, 816 F. Supp. 3d at 1192-93 (citing 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f)). The Department's collection of California's entire voter roll and the resulting list, *see* Compl. ¶¶ 33-39, is a "system of records" covered under the Privacy Act: records "retrieved by the name of the individual or by some identifying number," 5 U.S.C. § 552a(a)(5); *see Weber*, 816 F. Supp. 3d at 1193; *Common Cause*, 2026 WL 3033772, at *28-29. USCIS built it by linking each voter match "with an alien number in its system" to produce "a table of individuals." Compl. ¶¶ 30, 36. "At bottom, the Defendants seem to think that they can collect data on every registered voter in [California] without complying with procedural

protections that Congress deemed necessary." *Common Cause*, 2026 WL 3033772, at *29. As this Court held in *Weber* and the *Common Cause* court agreed, that is plainly incorrect.[4]

***First,*** the Act limits when agencies may disclose records retrieved by an individual's name or other identifier, including the voter registration and citizenship status data at issue here. *Common Cause*, 2026 WL 3033772, at *29. The Department asks the Court to convert the Government's illegal collection and disclosure of sensitive data to non-agency state officials into a mandatory injunction, requiring them to "set aside" listed ballots and verify citizenship "beyond relying on unverified statements of citizenship necessary to registering." Compl. ¶ 6; ECF No. 76-1 at 1, 8. That is not an order to "preserve the status quo." Dkt. 76-1 at 14; *see* ECF No. 79 at 3-4.[5] And no exception permits that disclosure. The "routine use" exception permits disclosure only "for a purpose which is compatible with the purpose for which it was collected," 5 U.S.C. § 552a(a)(7), (b)(3), and the law-enforcement exception requires a written request "specifying the particular portion

---

[4] The Government's actions here—including those of DHS and its components—are not excused from the Privacy Act based on 8 U.S.C. § 1373. *See* Opp. to Mot. to Stay at 22-27, ECF 59, *Common Cause v. DOJ*, No. 26-cv-01352 (D.D.C. Oct. 23, 2026) (discussing DOJ); *see also* Supp. Mem. at 4-18, ECF 51, *EPIC v. USCIS*, No. 26-cv-03457 (D. Md. Oct. 2, 2026) (discussing DHS).

[5] The Paperwork Reduction Act governs information collections "undertaken with reference to a category of individuals or entities," 44 U.S.C. § 3518(c)(2), and the *Common Cause* court held that a Department program imposing identical reporting requirements on the States was such a collection, *Common Cause* Op. 73-76. To the extent the Department has sent comparable requests to ten or more jurisdictions, *see* 44 U.S.C. § 3502(3), those requests may be subject to the Act's notice-and-comment requirements

desired," *id.* § 552a(b)(7). The D.D.C. court applied both limits in *Common Cause*, holding that wholesale disclosure of entire voter rolls fell outside the routine uses the Department invoked and that a request for all such records did not satisfy the "particular portion" requirement. *Common Cause* 2026 WL 3033772, at *31-32.

***Second,*** the Privacy Act imposes record-accuracy requirements. *Id.* at *32-33. Records used in "making any determination about any individual" must be accurate and complete enough "to assure fairness to the individual," and before disseminating records "to any person other than an agency," the agency must make "reasonable efforts" to ensure their accuracy. 5 U.S.C. §§ 552a(e)(5), (e)(6).

Withholding a listed person's ballot is a determination about that individual if ever there was one. Compl. ¶¶ 6, 63. Yet the complaint concedes that the voter data USCIS receives "typically do[es] not contain complete information," that gaps are filled with unidentified "third-party software," and that lower-confidence matches "reflect incomplete, outdated, or mismatched data." *Id.* ¶ 35. The Department, as the party seeking extraordinary relief, has not shown that the required "reasonable efforts" were made.

Underscoring that problem, a United States Principal Deputy Associate Attorney General has acknowledged that the Government's records may be inaccurate, stating, "There may be some names on there who it turns out ultimately are citizens. We're not perfect." Miles Parks & Jude Joffe-Block, *Some on DOJ's 20,000 'Likely' Noncitizen List in California Appear to Be U.S.-Born*, NPR (Oct. 20, 2026), https://www.npr.org/2026/10/20/nx-s1-6009873/california-doj-voter-rolls-noncitizens.

Unsurprisingly, preliminary results confirm that many of the individuals on the Government's list of supposed noncitizens have records that "indicate that they were born in the United States, which is strong evidence of citizenship." *Id.* The Privacy Act shows the Court cannot sanction the Government's reckless actions. "This is particularly true given what is at stake," since the "consequences are not hypothetical." *Common Cause*, 2026 WL 3033772, at *33.

***Third,*** the Act bars agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment" absent an exception such as an "authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Voter registration is such protected expression. *Weber*, 816 F. Supp. 3d at 1193. And the law-enforcement exception demands more than "generic investigative" purposes. *Common Cause*, 2026 WL 3033772, at *34 (quoting *Maydak v. United States*, 363 F.3d 512, 517 (D.C. Cir. 2004)). Here, USCIS ran California's entire voter roster through its matching process without any individualized suspicion, Compl. ¶¶ 33-34, *California,* ECF No. 1; ECF No. 76-1 at 5, and routed the results to field agents for criminal and "administrative immigration charges," Compl. ¶¶ 40-43, *California*, ECF No. 76-1—the very repurposing of voter data that concerned this Court in *Weber*, 816 F. Supp. 3d at 1185, 1194. Nor has the Department identified a System of Records Notice giving voters specific notice of this use. *See id.* at 1193-94. At a minimum, equity should not convert the output of these practices into a binding command over the ballots of more than 20,000 voters in the final days of an election. The Department seeks mandatory relief, not an order to "preserve the status quo."

ECF No. 76-1 at 14; *see* ECF No. 79 at 3–4. And courts have refused materially identical requests on the eve of an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006); *Reschenthaler v. Schmidt*, 776 F. Supp. 3d 280, 290–92 (M.D. Pa. 2024) (rejecting request to "segregate ballots for potential exclusion and to impose new verification procedures" as "a nonstarter"); *Democratic Nat'l Comm. v. Wis. State Legislature*, 592 U.S. 1039, 1043-44 (2020) (Kavanaugh, J., concurring). For the reasons identified above, this Court should do the same here.

## III. CONCLUSION

For the foregoing reasons, this Court should deny the Department's Ex Parte Application for a Preliminary Injunction and grant defendants' Motion to Dismiss.

Dated: October 24, 2026

By: */s/ Jane Petersen Bentrott*

Jane Petersen Bentrott (SBN 323562)
jane.bentrott@protectdemocracy.org
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington DC 20006
Tel: (202) 579-4582

*Counsel for Amicus Curiae*

Maryam Jazini Dorcheh (PHV Forthcoming)
onoureldin@commoncause.org
mjazini@commoncause.org
COMMON CAUSE
805 15th Street NW, Suite 800
Washington, DC 20005

Lanny A. Breuer (PHV Forthcoming)
Thomas Perrin Cooke (PHV Forthcoming)
Samuel T. Ackerman (PHV Forthcoming)
Joshua M. Schenk (PHV Forthcoming)
Basundhara Mukherjee (PHV Forthcoming)
Evan Chiacchiaro (PHV Forthcoming)
lbreuer@cov.com
pcooke@cov.com
sackerman@cov.com
jschenk@cov.com
bmukherjee@cov.com
echiacchiaro@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Common Cause, certifies that this brief contains 5171 words, which complies with the word limit of L.R. 11-6.1.

Dated: October 24, 2026 By: */s/ Jane Petersen Bentrott*

Jane Petersen Bentrott (SBN 323562)
jane.bentrott@protectdemocracy.org
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington DC 20006
Tel: (202) 579-4582

*Counsel for Common Cause*