TODD BLANCHE
Attorney General
R. TRENT MCCOTTER
Acting Deputy Attorney General
JOHN K. ADAMS
Associate Deputy Attorney General
ANDREW M. DARLINGTON (Fl. Bar No. 1018895)
Counsel to the Assistant Attorney General
950 Pennsylvania Avenue, NW
Washington, D.C., 20530
Telephone: (202) 532-0100
Andrew.Darlington2@usdoj.gov

BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (Cal. Bar No. 272742)
Assistant United States Attorney
J. ROBERT RENNER (Cal. Bar No. 148587)
Assistant United States Attorney
300 N. Los Angeles St., Ste. 7516
Los Angeles, California 90012
Telephone: (213) 894-2464
E-mail: Julie.Hamill@usdoj.gov

Attorneys for Plaintiff
*United States of America*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF CALIFORNIA, *et al.*,

Defendants.

Case No. 2:26-cv-12025-DOC-ADS

**UNITED STATES' REPLY IN SUPPORT OF THE *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND THE ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Date: October 27, 2026
Time: 1:00 PM PST
Courtroom: 1
Action Filed: October 15, 2026

Hon. David O. Carter
United States District Judge

## I. INTRODUCTION

California's opposition briefs confirm that this Court should grant the motion.[1] Diverging from their position in their Notice of Related Cases, Dkt. 10, 20, California recognizes that "this lawsuit is not about maintenance of voter rolls" that otherwise might implicate other federal statutes, U*nited States v. State of California, et al., No.* 26-7070 (9th Cir. 2026), App. Dkt. 32.1 p. 12, but is instead devoted to the common election remedy of segregating ballots from voters who are highly likely to be ineligible based on credible evidence. California also shows that it can accommodate this limited ballot-segregation remedy, *e.g.*, by explaining how its laws permit challenges to voter eligibility and ballot segregation. *See, e.g.*, App. Dkt. 30.1 pp. 4–5, 20. And granting the motion maintains the status quo by preventing tabulation of unlawful votes while protecting lawful votes.

California also does not refute that it will tabulate ballots from individuals charged with federal voting crimes or that it has registered upwards of 1,500 noncitizens to vote in federal elections before. App. Dkt. 5.1 p. 9. The number of noncitizen voters California has admitted to registering (1,500) could change the outcome of an election. *See* Dkt. 22-2 pp. 1–2. And regardless, counting any vote from a noncitizen—even just those individuals charged with federal crimes last week—"dilutes the influence of honest votes in an election." *Anderson v. United State*s, 417 U.S. 211, 227 (1974). To prevent unlawful dilution of American votes, this Court should follow a long line of precedent in which the United States seeks and obtains injunctive relief when state actors violate federal law, especially in matters involving immigration and elections. *See, e.g.*, *Arizona*

[1] In light of the appeal pending before the Ninth Circuit, *United States v. California*, *et al.*, No. 26-7070, this Court lacks jurisdiction over issues pertaining to the United States' request for emergency relief. However, in order to preserve all rights and out of an abundance of caution, the United States files this reply in support of its application. The United States reserves all arguments made in the Ninth Circuit. Citations to the Ninth Circuit docket use "App. Dkt." throughout this brief.

*v. United States*, 567 U.S. 387 (2012); *La Union del Pueblo Entero (LUPE) v. Abbott*, 604 F. Supp. 3d 512, 519–32 (W.D. Tex. 2022). This Court should immediately grant this motion.

## II. ARGUMENT

### A. The Federal Government Has Standing and May Seek Equitable Relief

**1.** Courts must "accept as valid" the merits of the claim when considering standing, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); *United States v. Missouri,* 114 F.4th 980, 985 (8th Cir. 2024), meaning that this Court must analyze standing against the backdrop of a State facilitating unlawful voting and diluting American votes. *See* Dkt. 1, ¶¶ 9–10. The United States plainly has standing to enforce its criminal and immigration laws and to protect American voters from unlawful dilution. *See* Dkt. 22-2 at 15–17; *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 898 (10th Cir 2017) ("The Supreme Court has reaffirmed time and again that the United States is empowered to enforce the supremacy of federal law against preempted State action, and that it may obtain an injunction to that effect.") (collecting cases).

The stray district court opinions (and transcripts of oral argument) cited by California are irreconcilable with binding precedent. *United States v. California*, 824 F. Supp. 3d 1079 (C.D. Cal. 2026), fails to meaningfully engage *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), and *Arizona v. United States*, 567 U.S. 387 (2012), which both recognize an injury to the United States arising from violations of its laws. *United States v. Michigan*, 2026 WL 3088394 (W.D. Mich.), supports the Federal Government, as it recognized standing when a State "impose[s] significant and counterproductive burdens on federal agencies charged with enforcing the national immigration scheme," *id*. at *4 (quoting *Arizona*). That is what is alleged here. *See* Dkt. 1, ¶ 10.

The allegations here are not only plausible but are supported by a history of California mishandling voter rolls and subsequent facts showing noncitizen voting. App. Dkt. 6, p. 9.

**2.** California argues that the Federal Government lacks a cause of action in this case. However, "[w]hile there is no implied right of action under the Supremacy Clause, there is an equitable tradition of suits to enjoin unconstitutional actions by state actors." *Missouri*, 114 F.4th at 986. "Based on that equitable tradition, the United States has sued in other cases . . . for other appropriate relief." *Id*. (collecting cases); *accord Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ; *Roman v. Wolf*, 977 F.3d 935, 942 (9th Cir. 2020) (per curiam) (citation omitted).

Relying on a case about a *remedy* (universal injunctions), not a *cause of action*, California argues that the Federal Government may not claim equity because history does not support a request for a court order that would disrupt state election laws. Dkt. 31-1, p. 17 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 832 (2025)). *CASA* is inapposite because the Federal Government does not seek a universal injunction. On the contrary, the Federal Government seeks a narrowly tailored remedy to segregate ballots of only those individuals identified to be likely noncitizens.

## III. The United States is Likely to Succeed on the Merits of Its As-Applied Challenge

The Federal Government has shown why it is likely to succeed on the merits of this narrow as-applied challenge, Dkt. 62-1, pp. 17-23.

**A. *Preemption.*** California argues that there can be no conflict preemption because state law also prohibits noncitizens from voting. Dkt. 32-1, p. 23. But preemption applies even where federal and state laws share the same purpose. *See, e.g.*, *Arizona*, 567 U.S. at 402–03 (state law preempted that criminalized same conduct as federal law); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ; *Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 463 (1984) (similar). In any event, even if state law as written is consistent with federal law, California's actions are not. *See* App. Dkt. 5.1, pp. 25–27. The United States has provided California with particularized information of highly likely ineligible voters whose votes would conflict with federal law. *Id*. at 27–32.

California then suggests that there is no obstacle preemption, but this ignores that 18 U.S.C. § 611 is an exercise of Congress's plenary power to regulate the conduct of aliens in America. And counting votes from noncitizens impedes the congressional ban on noncitizen voting. California contends that a generally applicable criminal statute cannot displace state election laws without a clear statement. Dkt. 31-1, pp. 13, 14. But as explained in *Arizona v. Inter Tribal Council of Arizona, Inc.*, "[t]he assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to 'make or alter' state election regulations." 570 U.S. 1, 14 (2013) (quoting U.S. Const. art. I, § 4, cl. 1); *see also Foster v. Love*, 522 U.S. 67, 69 (1997) . Even if a clear statement rule applied, 18 U.S.C. § 611 amply clears the bar as it is specifically directed at elections involving federal offices.

California next argues that 18 U.S.C. § 611 regulates voters but not officials. Dkt. 31-1 at 17. But "[i]t is . . . axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). California seems to suggest that its actions here fall short of the encouragement that *Norwood* and other preemption cases require. *See* Dkt. 31-1 at 15-16 (arguing that mailing ballots to registered voters isn't tangible aid). But it never explains how refusing to verify the citizenship of votes cast by likely noncitizens is anything other than facilitating a violation of the federal ban on noncitizen voting. Under these facts, federal law forbids counting votes from people on the list the Federal Government provided without independently verifying citizenship. It is no answer for California to bury its head in the sand.

California ends with a textual argument that 18 U.S.C. § 611 incorporates state voter-qualification decisions. But California omits an important limitation: that noncitizens may participate in state or local elections when no federal candidate is on the ballot.

**B. *Authority for Requested Relief.*** Apart from arguing no cause of action, California invokes various theories for why the Federal Government lacks authority to

request the relief here under 18 U.S.C. § 611. *See* Dkts. 31-1 at 19, 32-2 at 33. California is wrong.

For starters, the Federal Government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394; *see also Chavez-Perez v. Ashcroft*, 386 F.3d 1284, 1292 (9th Cir. 2004) ("[f]ederal authority in the areas of immigration and naturalization is plenary"). This plenary authority "derives from various sources, including the Federal Government's power to establish a uniform Rule of Naturalization," "its power to regulate Commerce with foreign Nations," "and its broad authority over foreign affairs." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). Separately, the Elections Clause grants Congress the authority to regulate the manner of conducting federal elections, regardless of whether it can regulate the qualifications for voting. *See* U.S. Const. art. I, § 8, cl. 18; *id.* § 4, cl. 1; *Arizona*, 570 U.S. at 7-9, 16–17; *Buckley v. Valeo*, 424 U.S. 1, 62 (1976) (per curiam). These provisions, individually or collectively, support the constitutionality of 18 U.S.C. § 611.

The Federal Government also may seek equitable relief to prevent violations of 18 U.S.C. § 611. *See supra* § I; Dkt. 62-1, pp. 15-16. In arguing otherwise, California makes a "mistake" to "suppose that for the determination of equities and equitable rights [courts] must look only to the statutes of Congress." *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 339 (1906). "The principles of equity exist independently of, and anterior to, all congressional legislation." *Id.*; *United States v. Texas*, 566 F. Supp. 3d 605, 651 (W.D. Tex. 2021) ("[E]quitable remedies need not be rooted in an act of Congress."). California's contrary rule—that the Federal Government must have an independent statutory authority that parallels its requested relief—would gut preemption and is contrary to well-settled principles. *See, e.g.*, App. Dkt. 5.1, pp. 25–26 (collecting cases).

Further, California makes a commandeering argument, Dkt. 31-1, p. 15, but the United States is not requesting an order for state officers to execute federal law, *see Printz v. United States*, 521 U.S. 898, 935 (1997). Nor is the United States asking

California to pass a law, adopt a federal policy, or independently enforce 18 U.S.C. § 611. By contrast, the relief requests that California perform a ministerial task—segregate ballots—until citizenship can be confirmed, with or without the help from the Federal Government. *See* Dkt. 62-1 28-29.

Finally, California argues that the Federal Government lacks authority because state law exclusively governs elections. Yet federal law superseding state law is a feature of the Supremacy Clause, not a bug. "[T]he Supreme Court has [also] stated that otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 862 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992). "To hold otherwise would fail to take account of the obligations of local governments, under the Supremacy Clause, to fulfill the requirements that the Constitution imposes on them." *Missouri v. Jenkins*, 495 U.S. 33, 57 (1990).

**C. *Federal Voting Laws*.** As California fully recognizes, "this lawsuit is not about maintenance of voter rolls." App. Dkt. 30.1, p. 12. In nonetheless suggesting that the relief here would violate three independent federal voting protections, California misapprehends this case. Dkt. 31-1 at 19-23.

First, the requested relief would not contravene NVRA's prohibition on systematic removals of registered voters in the 90 days leading up to an election. 52 U.S.C. § 20507(c)(2). As recognized in *Mi Familia Vota v. Fontes*, that provision only bans "systematic cancellation programs"—but not "individualized removals." 129 F.4th 691, 717 (9th Cir. 2025); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2014).

Consistent with this precedent, the Federal Government has furnished California with a particularized list of individuals highly likely to be ineligible to vote—including those criminally charged. *See* Dkt. 62-1, pp. 1, 11. The NVRA "does not preclude States from 'deny[ing] registration based on information in their possession establishing the applicant's ineligibility.'" *Arizona v. Inter Tribal Council, Inc.*, 570 U.S. 1, 15 (2013)

(quoting amicus brief); *cf. Beals v. Virginia Coalition for Immigrant Rights*, No. 24A407 (U.S. Oct. 30, 2024) . Nor does the NVRA prevent removing *ineligible* voters. *See Bell v. Marinko*, 367 F.3d 588, 591-92 (6th Cir. 2004). In all events, the United States does not seek to "remove the names" of anyone "from the official lists of eligible voters," only to segregate select ballots. 52 U.S.C. § 20507(c)(2).

Second, the relief would not violate the Voting Rights Act's command that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is . . . *qualified* to vote" 52 U.S.C. § 10307(a) (emphasis added). Quite the opposite, the Federal Government seeks to ensure California is not permitting *unqualified* votes. In fact, tabulating unqualified votes necessarily infringes on lawful votes. *See Anderson*, 417 U.S. at 227. California's contrary interpretation is overbroad. Nothing in the VRA transforms voter registration into an irrebuttable determination of eligibility; nor does it prohibit segregating ballots, which has been described as a "targeted remedy." *Republican Party of Pennsylvania v. Boockvar*, 592 U.S. 1068, 1070-71 (2020) (Alito, J., in chambers). Federal (and state) law expressly contemplates ballot segregation and provides for provisional ballots in certain circumstances. 52 U.S.C. § 21082. A request for similar relief therefore cannot violate a federal statute.

Third, segregating ballots would not violate any constitutional protection. California cites *Burdick v. Takushi*, but that case merely established a balancing framework, which tilts in favor of the Federal Government. 504 U.S. 428, 434 (1992). The Federal Government plainly "has a valid interest in," among other things, "deterring … voter fraud" and promoting "public confidence in the integrity of the electrical process." *Crawford v. Marion Cnty. Election B*553 U.S. 181, 191, 197 (2008). The limited remedy of segregating ballots pending further investigation is narrowly tailored to protect lawful voters from dilution.

**IV. The Other Factors Favor the Federal Government**

As the Federal Government explained, it will suffer irreparable harm absent injunctive relief and the equities support granting the motion. *See* Dkt. 62-1, pp. 26-27.

California is wrong to argue otherwise.

**A. *Irreparable harm*.** California says that the "'mere existence' of an allegedly preempted state law" is insufficient to cause irreparable harm. Dkt. 31-1 at 7. That argument conflicts with precedent. *See* Dkt. 62-1 at 26-27.

California goes on to cast doubt about the list of individuals who are highly likely to be noncitizens participating in the federal election, including by citing an "anonymous" whistleblower. Dkt. 32-2, Ex. H. But senior government officials swore under oath that they reasonably believe the list, which is the work of a multiagency and multilayered process, includes only those individuals who are "(1) registered to vote in California, (2) were sent a vote-by-mail ballot, and (3) are highly likely to be noncitizen aliens." Dkt. 62-1, p. 9 (citing declarations). Indeed, the Federal Government has criminally charged individuals on that list for unlawful voting. *Id*. at 1. California downplays this evidence by putting forth its own preliminary analysis that claims to reveal inaccuracies on the list. Dkt. 32-1 at 17. Although California has not shared its methodology with the Federal Government, even assuming that California is right, that means it is still tabulating *thousands*—if not over 10,000—unlawful votes. Those numbers are far too great for this Court to ignore. In all events, the Federal Government has tried from day one to work with California. *See* Dkt. 1, Exs. C & D.[2]

**B. *Equities*.** This action seeks to protect the interests of the United States, so the burdens that will result without injunctive relief are directly tied to the public benefits that will be protected from the requested injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Because the Federal Government has an absolute interest in upholding election integrity and protecting American voters, *see Anderson*, 417 U.S. at 227, the equities support granting the motion. California responds with *Purcell* and administrative burdens, but those concerns cannot stand as an impediment to

[2] California also cites a letter to Nevada, but the data and methodologies used to identify likely noncitizens in that letter are distinct from the refined processes used to support this lawsuit. *See* App. Dkt. 30.1, pp. 22–23.

administering an election free from unlawful voting.

Beginning with *Purcell*, California again misapprehends the nature of this case. *See* Dkt. 31-1 at 23. The "*Purcell* principle" prevents "the uncertainty engendered by judicial disruptions to the status quo in the midst of elections [that] can and often will cause *eligible* voters to remain away from the polls." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 985 (9th Cir. 2024) (emphasis added). Yet the individuals identified by the Federal Government are likely *ineligible* noncitizen voters who have already cast their ballot.

Nor does the request—ballot segregation—change the rules of an election. Noncitizens are not permitted to vote in federal elections under either federal or state law. Granting the relief here would thus uphold the status quo. *Purcell*, which ordinarily applies to rule changes in voter maps or voter requirements, is simply not implicated by this suit. *See, e.g.*, *People Not Politicians v. Onder*, 509 U.S. ---, 2026 WL 2883222 (Sept. 25, 2026) (per curiam); *Merrill v. Milligan*, 142 S. Ct. 879, 879–82 (2022) (Kavanaugh, J., concurring); *Mi Familia Vota*, 111 F.4th at 985 (similar).

Turning to administrative burdens, California claims that the Federal Government is asking for an entirely new set of requirements for processing and tabulating ballots that are impossible to satisfy, but that isn't true. Dkt. 31-1 at 26. The relief requested is entirely consistent with California law—and routine election relief that California likely will execute in this election. *See id.* at 20–21 (identifying vote-by-mail challenges procedures and recount procedures that require segregation).

For example, Cal. Code Regs. tit. 2, § 20363 details how to resolve challenged ballots via segregation. California does not deny that this process could be used in support of the requested relief here. Instead, it says that this provision applies during a "formal 'recount.'" Dkt. 31-1, p. 24. But that is a legalistic distinction without an equitable difference. The point is that California has a procedure in place to provide the ballot-segregation remedy. Moreover, California acknowledges that "[e]lections officials must also cancel the registration of any voter upon proof that the person is ineligible to

vote." *Id*. at 4 (citing Cal. Code Regs. tit. 2, §§ 2201(a)(8), (c), 2213). Such provisions show that California can identify "ineligible" voters and deal with the aftermath. The Federal Government is also available to assist with any burden California may experience during this process. The Federal Government has consistently offered its help to California to protect the integrity of our elections. The offer still stands.

**V. CONCLUSION**

This Court should grant the motion.

DATED: October 25, 2026

Respectfully submitted,

*/s/ Julie A. Hamill*
Julie A. Hamill
Assistant United States Attorney

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for the United States certifies that this brief contains 3174 words, which complies with the word limit of L.R. 11-6.1.

DATED: October 25, 2026

Respectfully submitted,

*/s/ Julie A. Hamill*
Julie A. Hamill
Assistant United States Attorney