BRADLEY A. BENBROOK (SBN 177786)
BENBROOK LAW GROUP, PC
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
Telephone: (916) 447-4900

JAMES UTHMEIER
*Attorney General*
DAVID M.S. DEWHIRST* (FBN 1076928)
*Solicitor General*
HUNTER R. PRATT* (FBN 1018395)
*Deputy Solicitor General*
JOHN SCOGGIN* (FBN 1058864)
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
*Counsel for Proposed Amicus Curiae State of Florida*

**Pro Hac Vice forthcoming*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVIDSION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | Case No.: 2:26-cv-12025-DOC-ADS<br><br>**[PROPOSED] BRIEF OF AMICI CURIAE STATE OF FLORIDA AND TEN OTHER STATES IN SUPPORT OF THE UNITED STATES**<br><br>Re: Application at ECF 62<br><br>Date: October 27, 2026<br>Time: 1:00 p.m.<br>Courtroom One<br>Hon. David O. Carter |

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE .......... 2
BACKGROUND .......... 3
SUMMARY OF ARGUMENT .......... 4
ARGUMENT .......... 5
I. Florida's experience shows the importance of preventing noncitizen voting, and the United States is seeking to do the same .......... 6
II. The United States seeks lawful, familiar, and ordinary safeguards against noncitizen voting. .......... 9
CONCLUSION .......... 13

## INTEREST OF AMICI CURIAE

Florida, Alabama, Arkansas, Iowa, Kansas, Montana, Nebraska, South Carolina, South Dakota, Texas, and West Virginia submit this brief in support of the United States' *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "application"). ECF 62. *Amici* States administer elections, investigate noncitizen voting, and protect their citizens' lawful votes. Their experience demonstrates how officials can preserve voting rights while resolving credible citizenship questions.

Florida leads the country in administering and securing elections. Governor DeSantis has emphasized Florida's "zero tolerance for voter fraud."[1] Attorney General Uthmeier has likewise stated that "Florida will not allow anyone to steal the vote of Americans at the ballot box." *Id.* Those commitments reflect the States' compelling interest in "protecting their elections." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021).

A noncitizen's vote dilutes the strength of legitimate voters and undermines public confidence in the integrity of elections. *Amici* States thus have a direct interest in preventing that dilution from occurring within the borders of their sister states. Noncitizen votes cast in one State can distort federal election results, magnify that State's influence in selecting national officeholders, and harm States that faithfully enforce the citizenship requirement. The resulting composition of Congress affects every State and its citizens. The Constitution permits substantial differences among state election laws and procedures. But Congress's prohibition on noncitizen voting in federal elections supplies a common rule that every State must respect. There should be no daylight between the States in faithfully administering that prohibition. *See* 18 U.S.C. § 611(a).

---

[1] Press Release, Fla. Off. of the Att'y Gen., *Attorney General James Uthmeier Announces Arrests, Charges Against 20 Defendants in Statewide Election Integrity Operation* (Sept. 24, 2026), https://perma.cc/XHQ9-YZ9F.

Florida has prosecuted noncitizen voting, led multistate litigation for access to federal citizenship information, and preserved disputed ballots pending eligibility determinations. Those are the ordinary responsibilities of election administration. When a State refuses to address credible evidence of noncitizen voting, federal enforcement should be viewed as an ordinary response.

**BACKGROUND**

The United States sued California, Secretary of State Shirley N. Weber, and Los Angeles County Registrar-Recorder/County Clerk Dean C. Logan. DE1. The United States alleges that California's administration of vote-by-mail ballots conflicts with the federal prohibition on noncitizen voting. It seeks declaratory and injunctive relief preventing tabulation of the identified individuals' mail ballots until their citizenship can be verified. *Id.* at 12–14.

The dispute followed months of federal efforts to address noncitizen registration. In July, the Department of Homeland Security alerted California to potential noncitizen registrations. After further investigation, federal officials delivered a list of more than 20,000 likely noncitizen registrants on October 13 and asked California officials to verify citizenship and segregate affected mail ballots. ECF 62-1 at 19–23. U.S. Citizenship and Immigration Services and Homeland Security Investigations manually reviewed the underlying records to develop the list. *Id.* at 20–22. Just last week, the United States announced charges against 28 noncitizens who appeared on that list.[2]

The United States filed its application, which California and Logan opposed. Defendants also moved to dismiss. ECF 22-2; ECF 31-1; ECF 32-1; ECF 62; ECF 65-1; ECF 68. On October 21, the Court set argument for October 27 at 1:00 p.m. ECF 64.

[2] Press Release, U.S. Dep't of Just., *Justice Department Charges 28 Foreign Nationals in California for Election Crimes* (Oct. 19, 2026), https://perma.cc/98MQ-47UD.

## SUMMARY OF ARGUMENT

Only citizens may vote in federal elections. Enforcing that condition protects the power of the franchise. Congress made noncitizen voting a federal crime, 18 U.S.C. § 611, and the Supreme Court has repeatedly recognized the importance of preventing vote dilution caused by illegal voting, *Anderson v. United States*, 417 U.S. 211, 226–27 (1974). Accordingly, the injunctive relief the United States requests is neither "unlawful," DE31-1 at 31, as California claims, nor unusual. The United States notified California months ago of the serious risk of noncitizen voting. ECF 1, Ex. A. Yet California did nothing to address the threat.

By contrast, Florida proactively safeguards the integrity of its elections. In 2025, state and federal authorities prosecuted five noncitizen-voting cases against six individuals.[3] One defendant, a citizen of the United Kingdom, pleaded guilty to six felony counts for illegally voting in *six elections*.[4] In September 2026, Florida announced charges against another 16 noncitizens accused of falsely claiming citizenship to register and then voting; federal citizenship records helped investigators establish their status.[5] The state has another 41 active criminal investigations, and it has removed approximately 4,800 noncitizens from Florida's voter rolls in the last year. Without that enforcement, citizens' votes would have been diluted. Even a State with robust safeguards like Florida must regularly identify unlawful voting, investigate it, and act.

California's continued processing of vote-by-mail ballots cast by likely noncitizens, despite specific information identifying them and an opportunity to verify citizenship, facilitates conduct Congress prohibited. *See* 18 U.S.C. § 611(a). So the

---

[3] Fla. Dep't of State, Off. of Election Crimes & Sec., *Annual Report to Governor and Legislature* at 2–4 (2026), https://perma.cc/W9CZ-AVTR.

[4] *Id.* at 2.

[5] Press Release, U.S. Citizenship & Immigr. Servs., *USCIS Assists Florida Investigation Leading to Charges for Unlawful Voting* (Sept. 29, 2026), https://perma.cc/AT8B-Z45X.

United States' application seeks an ordinary safeguard against that harm: have California set aside the identified vote-by-mail ballots and verify citizenship before tabulation. ECF 62-1 at 38–39. The United States is likely to succeed on the merits of its request for declaratory and injunctive relief, and it will likely face irreparable harm absent an injunction.

All the application asks California to do is separate and preserve contested ballots. We know that's possible because Florida, California, and other states already do it. On one hand, holding a ballot while resolving eligibility preserves the ability to count it. On the other hand, counting first and investigating later is like trying to un-ring a bell—and California has admitted as much. *See* ECF 65-1 at 32 (describing the process of separating the ballot and envelope); ECF 32-1 at 18 (after verification "the ballot is removed from its identification envelope and, to anonymize the vote, commingled with other ballots for tabulation"). This also tips the equities and public interest in favor of the United States. The requested relief harms no legal voter—any disputed ballot can still be counted later. The only true cost is the modest administrative cost of physically separating the ballots. And the risk of irreversible voter dilution surely outweighs that minor cost.

The requested relief allows the Court to protect the election while the parties resolve the underlying issues. The Court should grant it.

## ARGUMENT

To obtain a preliminary injunction, the United States must clearly show that it is likely to succeed on the merits, likely to suffer irreparable harm absent preliminary relief, that the balance of equities favors relief, and that an injunction serves the public interest. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)). Likelihood of success is the most important factor. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Because governmental actors oppose the requested relief, the balance-of-equities and public-interest inquiries merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Florida's experience underscores the irreparable harm threatened by noncitizen voting and the public's interest in stopping it. The United States is entitled to equitable relief because the requested safeguards enforce an existing federal prohibition through ordinary, practical election procedures—procedures just like those enshrined in Florida law.

## I. Florida's experience shows the importance of preventing noncitizen voting, and the United States is seeking to do the same.

The Supreme Court recognizes that preventing election fraud serves a compelling governmental interest. *Brnovich*, 594 U.S. at 685. That interest protects the franchise itself: the right to vote can be impaired by dilution just as effectively as by outright denial. *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Fraudulent votes dilute lawful votes and can change the outcome of a close election. *Brnovich*, 594 U.S. at 672. The harm also extends beyond the count. Fraud undermines confidence in government and discourages participation in the democratic process. *Doe v. Reed*, 561 U.S. 186, 197 (2010). Enforcing laws against unlawful voting protects both the weight of lawful votes and public confidence in elections.

Florida's enforcement experience demonstrates the need for those safeguards. Like California, Florida administers elections in a large State with a substantial immigrant population. But just last year in Florida, state and federal authorities, often working together, brought five noncitizen-voting prosecutions involving six individuals described in Florida's records: *State v. Wightman*, No. 2025-CF-1433 (Fla. Cir. Ct. 2025); *United States v. Louis*, No. 1:25-cr-20237 (S.D. Fla. 2025); *United States v. Wallace*, No. 5:25-cr-00020 (N.D. Fla. 2025); *United States v. Rigby*, No. 9:25-cr-80095 (S.D. Fla. 2025); and *United States v. Demydenko*, No. 9:25-cr-80068 (S.D. Fla. 2025). Those cases illustrate that noncitizen voting is a persistent problem even in states that take the problem seriously.

With access to better information, states can more easily prosecute these cases. Federal citizenship information assisted Florida investigations that led to charges

against 16 noncitizens who falsely claimed citizenship to register and then voted. Florida's current enforcement information also identifies 41 active criminal investigations. The practical lesson is direct—improved access to citizenship information enables officials to identify and investigate cases that otherwise could escape detection. But a statutory prohibition is not self-executing; it requires officials willing and able to enforce it.

Florida fought for that access through its multistate SAVE litigation. After Florida sued in 2024, Florida, Ohio, Indiana, and Iowa secured a 2025 agreement requiring federal capabilities for citizenship searches using full or partial Social Security numbers and bulk verification requests. *See Florida v. U.S. Dep't of Homeland Sec.*, No. 3:24-cv-00509 (N.D. Fla.). Congress likewise requires federal responses to state and local inquiries about citizenship and immigration status. 8 U.S.C. § 1373(c). These complementary state and federal efforts have made the citizenship requirement enforceable in practice. And, of course, in addition to criminal enforcement, access to better information was critical to Florida's removal of approximately 4,800 noncitizens from Florida's voter rolls in the last year.

There's every reason to think California is facing the same issue, but California has taken a different tack. Its former Secretary of State, now Senator Alex Padilla, dismissed proposed citizenship verification as resting on "the fiction of noncitizen voting."[6] But try as it might, California can't make the problem disappear by pretending it doesn't exist. Other States' experiences echo Florida's. Reports identify approximately 6,600 noncitizen registrations in New Jersey[7] and 6,303 removals from

---

[6] Letter from Alex Padilla, U.S. Sen., to Lieutenant Governors, Secretaries of State & Chief Election Officials (Apr. 7, 2025), https://perma.cc/ZU9A-7GKZ.

[7] Joey Fox & Daniel Han, *Thousands of Non-Citizens Registered to Vote in NJ Due to Software Error, Governor Says*, Politico (July 21, 2026, 12:50 PM), https://perma.cc/A7ZR-LQW2.

Virginia's voter rolls[8] on citizenship grounds between January 2022 and July 2024. This all suggests that the problem is widespread. And unless states act, widespread noncitizen voting is virtually guaranteed.

Citizens face heightened danger here because an unlawful ballot doesn't need to be one of thousands to matter. Federal elections can turn on small margins. More fundamentally, every unlawful ballot dilutes the votes that citizens were entitled to cast. *Anderson*, 417 U.S. at 226–27.

But a State shouldn't wait until a fraudulent vote is cast. Rather, it should "respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986); *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194–96 (2008) ("The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history," but "[w]hile the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) ("Even if there were no evidence of voter fraud in Florida, our precedents would not require it before a bill like S.B. 90 could be adopted."). Active enforcement therefore protects both the result and the weight of each lawful vote. A state has no reason to wait for an election to be decided by unlawful voting before taking the problem seriously.

And when a state refuses to act, the federal government has a legitimate role in enforcing the federal prohibition against noncitizen voting. What's worse, once an unlawful ballot is counted, prosecution can't undo the harm. Prosecution can punish the offender, but it can't repair a past federal election from the distortions of noncitizen participation.

---

[8] Shawn Fleetwood, *If Democrats Want Proof Foreigners Are Registering to Vote, Virginia Just Found 6,303 Examples*, Federalist (Aug. 8, 2024), https://perma.cc/E3FB-696F.

Logan's own description of the counting process confirms the problem. After verification, "the ballot is removed from its identification envelope and, to anonymize the vote, commingled with other ballots for tabulation." ECF 32-1 at 18. He further acknowledges that "[n]o order can reach ballots already separated from their envelopes and commingled, which cannot lawfully be identified." *Id.* at 34. Separating the identified ballots before tabulation prevents an injury that no later order can undo. That fact, combined with the scope of the problem as outlined above, shows the importance of the United States' request here.

## II. The United States seeks lawful, familiar, and ordinary safeguards against noncitizen voting.

Florida, California, and other States already preserve provisional ballots while resolving eligibility. The United States asks California to use comparable procedures for the identified ballots. Those procedures protect eligible voters' ballots while preventing unlawful votes from entering the count. The United States is thus entitled to the relief it seeks.

### A. Provisional ballots are an ordinary election tool.

Florida's experience with provisional ballots provides a useful comparison. Florida combines eligibility enforcement with a process that preserves ballots for later determination. Under Florida's existing notice procedures for potentially ineligible registered voters, a person whose eligibility remains unresolved may cast a provisional ballot. A vote-by-mail ballot is treated provisionally as well, and counting awaits a final eligibility determination. § 98.075(7)(a)1.h., 2.g., Fla. Stat. (2026). The statutory notice explains how the voter may present evidence of eligibility. *Id.* Florida thus has an established mechanism for receiving a ballot while withholding it from the count until eligibility is resolved.

The same approach appears in Florida's registration-verification procedures. When an applicant's identifying number cannot be verified, Florida provides notice and an opportunity to supply the necessary evidence. § 97.053(6), Fla. Stat. (2026).

An applicant whose verification remains unresolved may vote provisionally, and that vote may later be tabulated if the voter completes the statutory verification process. *Id.* Separating receipt from tabulation gives officials time to resolve the question without losing the ballot.

Florida reinforced that framework through HB 991. Its enacted amendments expressly address records indicating that an applicant is a noncitizen or has not supplied acceptable citizenship documentation. They provide for verification through governmental sources, notice, and a provisional-ballot process allowing the required evidence to be supplied.[9] The enacted framework builds citizenship verification into the same familiar method of preserving ballots until eligibility is established.

Congress also uses provisional ballots to reconcile access and eligibility. The Help America Vote Act requires provisional voting in specified circumstances and provides for counting after an eligibility determination under state law. 52 U.S.C. § 21082(a). California administers provisional ballots under its own Election Code. Cal. Elec. Code § 14310 (2025). The tools are familiar ones: retain the ballot separately, resolve the eligibility question, and count the ballot when the voter is eligible.

The United States seeks that basic sequence here. Its requested order would require California to set aside the identified vote-by-mail ballots and verify citizenship independently or with federal assistance before tabulating them. ECF 62-1 at 28–29. A ballot held for verification remains available to be counted. That provides concrete protection for eligible voters and for citizens whose votes would otherwise be diluted by an unlawful ballot.

The NVRA doesn't prohibit this relief. Its quiet-period provision addresses a different operation: a State "program" whose "purpose . . . is to systematically to remove the names of ineligible voters from the official lists of eligible voters." 52

[9] Act of Apr. 1, 2026, ch. 2026-26, §§ 4, 34 (Fla.), https://perma.cc/WAR3-SCZL.

U.S.C. § 20507(c)(2)(A). The United States isn't asking to cancel anyone's registrations. ECF 62-1 at 24–26. Preserving ballots while conducting the requested verification gives effect to the distinction Congress drew between maintaining registration lists and deciding which ballots may be lawfully counted.

The Supreme Court's recent SAVE decision confirms the continuing role of individualized verification during the quiet period. It recognized that individualized inquiries remain permissible and that preventing federal assistance with those inquiries impedes proper election administration. *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, slip op. at 6 (U.S. Sept. 25, 2026) (per curiam). Thus, provisional balloting systems, like Florida's, remain lawful and demonstrate such ordinary election tools to ensure election integrity are possible here.

**B. The United States is entitled to a preliminary injunction.**

A party seeking preliminary relief must clearly show likely success on the merits, likely irreparable harm, a favorable balance of equities, and consistency with the public interest. *Starbucks*, 602 U.S. at 346. The United States alleges that California's proposed tabulation conflicts with Congress's prohibition on noncitizen voting. ECF 1 at 12–14. Its requested interim relief directly addresses that conflict by separating and verifying the disputed ballot before election officials count the vote. ECF 62-1 at 28–29. The federal prohibition and the preemption principle support the United States' likely success on the merits. Again, Florida's and other states' experience with noncitizen voting underscores the necessity and feasibility of the requested relief.

Congress prohibited noncitizens from voting in elections for federal office. 18 U.S.C. § 611(a). The United States challenges California officials' continued processing and tabulation of ballots despite specific federal information identifying the voters as likely noncitizens. ECF 1 at 12–14; ECF 62-1 at 17–23. Tabulation gives those ballots their effect: it includes them in the count that determines the election's

outcome. California can't rely on its ballot-processing procedures to justify counting votes that federal law prohibits.

As the United States explains, state law can't authorize conduct that federal law forbids. DE62-1 at 18–19 (citing *Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 478 (1984)). Nor may a State encourage private parties to accomplish what it is constitutionally forbidden to accomplish itself. *Id.* at 18 (citing *Norwood v. Harrison*, 413 U.S. 455, 465 (1973)). Those principles apply equally when state officials act through administrative procedures. *Id.* at 19 (citing *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 n.5 (1986)). California can't use its ballot-processing procedures to facilitate the noncitizen voting Congress prohibited.

California officials received specific investigative information and an offer of federal assistance to verify citizenship. Continuing to give likely unlawful ballots effect despite that information would advance the very conduct § 611 forbids. The requested hold allows California, with federal assistance, to determine citizenship before the votes are counted.

But counting unlawful ballots would cause irreparable harm. The harm occurs when an unlawful ballot is counted alongside lawful ballots. Citizens' votes are subsequently diluted, and the election proceeds on a tally that includes votes Congress prohibited. *Anderson*, 417 U.S. at 226–27. A later prosecution punishes the offender, but it does not restore the original weight of each citizen's vote. Separating the ballot before tabulation protects an interest that after-the-fact enforcement cannot reliably repair. And election officials can still later count the vote.

The requested relief also protects the United States' interest in administering federal election law. In the SAVE litigation, the Supreme Court recognized the federal government's interest "in the proper administration of the midterm elections." *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, slip op. at 6 (U.S. Sept. 25, 2026) (per curiam). The United States' obligation to ensure only eligible citizens

are voting does not go away if California intermingles illicit votes with legitimate ones. It can enforce that obligation more easily by verifying a voter's citizenship before an election rather than attempting to resolve the issue in the short period of time after the election and before the next Congress begins.

The equities and public interest also favor the United States. The scope of the requested relief is narrow: separate and preserve the identified ballots and verify the voter's citizenship before counting them. ECF 62-1 at 28–29. California already administers provisional ballots, and the United States has offered its assistance with citizenship verification. Cal. Elec. Code § 14310; ECF 62-1 at 28. Florida's procedures confirm that separating a disputed ballot from the count is a workable election-administration tool.

The United States seeks an order that preserves eligible citizens' ballots, protects lawful votes against dilution, and supports confidence in the result. Confidence in government is an interest of the highest importance. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788–89 (1978). Those interests favor separating and verifying the affected ballots while ensuring that only lawful votes enter the count. The irreversible harm of counting unlawful votes outweighs any administrative cost of separating and preserving ballots. Because all the relevant equitable factors favor the United States, it is entitled to the requested relief.

## CONCLUSION

The Court should grant the United States' application and require the identified vote-by-mail ballots to be preserved separately pending verification of citizenship before tabulation.

Dated: October 27, 2026

JAMES UTHMEIER
*Attorney General*

DAVID M.S. DEWHIRST* (FBN 1076928)
*Solicitor General*
HUNTER R. PRATT* (FBN 1018395)
*Deputy Solicitor General*
JOHN SCOGGIN* (FBN 1058864)
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK

By /s/ Bradley A. Benbrook
BRADLEY A. BENBROOK
*Counsel for Proposed Amicus Curiae State of Florida*

* *Pro Hac Vice forthcoming*

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

**CERTIFICATE OF COMPLIANCE**

1. Undersigned counsel hereby certifies for *amici* states of Florida, Alabama, Arkansas, Iowa, Kansas, Montana, Nebraska, South Carolina, South Dakota, Texas, and West Virginia that this Motion contains 3,429 words, which complies with the word limit of L.R. 11-6.1.

2. This brief also complies with the 25-page limit in Section 6 of Judge Carter's published procedures, excluding the caption, signature, tables, and attorney information.

/s/ Bradley A. Benbrook
BRADLEY A. BENBROOK
*Counsel for Proposed Amicus Curiae State of Florida*

**CERTIFICATE OF SERVICE**

I certify that on October 27, 2026, I served a copy of the foregoing motion for leave to file together with the accompanying amicus curiae brief on all parties and counsel of record via the Court's CM/ECF electronic filing system.

/s/ Bradley A. Benbrook
BRADLEY A. BENBROOK
*Counsel for Proposed Amicus Curiae State of Florida*