Stephen M. Duvernay (CA Bar No. 250957)
steve@benbrooklawgroup.com
BENBROOK LAW GROUP, PC
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
(916) 447-4900

Christopher Mills (SC Bar No. 101050)*
cmills@spero.law
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640

Attorneys for Proposed *Amicus Curiae* National Republican Congressional Committee

**Pro hac vice* application forthcoming

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF CALIFORNIA, *et al.*,

Defendants.

**Case No. 2:26-cv-12025-DOC-ADS**

**[PROPOSED] BRIEF OF *AMICUS CURIAE* NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE (ECF NO. 62)**

Hearing Date: Oct. 27, 2026
Time: 1:00 PM
Courtroom: 1
Judge: Hon. David O. Carter
Action Filed: October 15, 2026

# TABLE OF CONTENTS

Page


Table of Authorities ........ iii

Interest of Amicus Curiae ........ 1

Argument ........ 2

I. Noncitizen Ballots Irreparably Dilute Proper Votes. ........ 2

II. Separating the Ballots of Voters Credibly Identified as Noncitizens Is a Longstanding Election Practice That California Law Already Uses. ........ 5

A. American Election Law Has Long Set Aside Doubtful Ballots Pending a Determination of the Voter's Eligibility. ........ 5

1. Federal law long authorized officials to challenge doubtful votes in federal elections. ........ 5

2. Federal law now requires provisional ballots that are set aside until eligibility is confirmed. ........ 6

3. States and courts routinely separate questioned mail ballots pending resolution. ........ 7

B. California's Own Law Sets Aside Questioned Ballots—Including Ballots Questioned on Citizenship Grounds. ........ 8

1. California authorizes challenges to mail ballots on citizenship grounds. ........ 8

2. California sets aside provisional ballots until the voter's eligibility is confirmed. ........ 10

3. California holds signature-questioned mail ballots for weeks after Election Day while it verifies the voter. ........ 10

4. California's same-day registration and recount procedures work the same way. ........ 11

C. Because Ballot Separation Is Ordinary Election Administration, It Neither "Removes" Voters Nor "Refuses" to Count Qualified Votes ........ 12

Conclusion ........ 13

# TABLE OF AUTHORITIES


**Page(s)**

**CASES**

*Ambach v. Norwick*, 441 U.S. 68 (1979) ....................4

*Anderson v. United States*, 417 U.S. 211 (1974) ....................3

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd mem.*, 565 U.S. 1104 (2012) ....................4

*Burson v. Freeman*, 504 U.S. 191 (1992) ....................3

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) ....................4

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ....................3, 6, 7

*Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072 (9th Cir. 2024) ......11

*Ex parte Siebold*, 100 U.S. 371 (1879) ....................5, 6

*Foley v. Connelie*, 435 U.S. 291 (1978) ....................4

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770 (6th Cir. 2024) ....................4

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ....................2, 4, 7

*Republican Party of Pa. v. Boockvar*, No. 20A84, 2020 WL 6536912 (U.S. Nov. 6, 2020) ....................7

*Reynolds v. Sims*, 377 U.S. 533 (1964) ....................2

*Sugarman v. Dougall*, 413 U.S. 634 (1973) ....................4

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. II, § 2(a) ....................8

**STATUTES**

25 Pa. Stat. § 3146.8 ....................7

Ariz. Rev. Stat. § 16-552 ....................7

Cal. Elec. Code § 2101 ....................8, 12

Cal. Elec. Code § 2111 ....................8

Cal. Elec. Code § 2170 ....................11

Cal. Elec. Code § 2201 ....................8

Cal. Elec. Code § 2300 ....................8, 12

Cal. Elec. Code § 3019 ....................2, 8, 10, 11
Cal. Elec. Code § 14240 ....................8, 9
Cal. Elec. Code § 14310 ....................10
Cal. Elec. Code § 15105 ....................8, 9
Cal. Elec. Code § 15106 ....................9
Cal. Elec. Code § 15108 ....................9
Cal. Elec. Code § 15307 ....................11, 13
Cal. Elec. Code § 15372 ....................12, 13
Cal. Elec. Code § 18560 ....................8
Cal. Elec. Code § 18561 ....................8
N.C. Gen. Stat. § 163-89....................7
26 Rev. Stat. § 2017....................6
18 U.S.C. § 611....................12
52 U.S.C. § 10307....................12, 13
52 U.S.C. § 20507....................12
52 U.S.C. § 21082....................6, 12
52 U.S.C. § 21083....................6, 12

**REGULATIONS**

Cal. Code Regs. tit. 2, § 20282 ....................11
Cal. Code Regs. tit. 2, § 20363 ....................11
Cal. Code Regs. tit. 2, § 20879 ....................9
Cal. Code Regs. tit. 2, § 20990 ....................10
Cal. Code Regs. tit. 2, § 20993 ....................10

**OTHER AUTHORITIES**

P. Hancock, *Here's How Illinois Election Authorities Guard Against Noncitizen Voting*, Rockford News First (July 24, 2026), https://bit.ly/4ceFFBR ....................3
K. Thomas & L. Radnofsky, *New Jersey Removes Thousands of Noncitizens From Voter Rolls*, Wall St. J. (July 21, 2026), https://bit.ly/3ROpFQg ....................3

D. VanderHart, *Updated Findings Show Nearly 1,260 Possible Noncitizens Were Registered to Vote in Oregon Since 2021*, Or. Pub. Broad. (Sept. 23, 2024), https://bit.ly/4bZH67a ....................................................................................3

## INTEREST OF AMICUS CURIAE

The National Republican Congressional Committee (NRCC) is a national political party committee registered with the Federal Election Commission. Its mission is to support the election of Republican candidates to the United States House of Representatives, including by advocating for the reelection of Republican Members of the House.

The NRCC supports Republican candidates in House races across the country, including in California. Those races will be decided in part by mail ballots processed under the procedures at issue here. The NRCC therefore has a direct interest in ensuring that only the ballots of eligible voters are counted, so that no lawful vote is diluted by an unlawful one. It also has an interest in procedures for handling questioned ballots that are clear and applied evenhandedly. The NRCC and its candidates also share the public's interest in confidence that federal elections are decided by qualified voters.

The NRCC regularly participates as *amicus curiae* in federal election-law cases. It submits this brief to emphasize the consequences of noncitizens voting and explain that the relief the United States seeks follows longstanding election practice and California's own law.

## ARGUMENT

Voting by noncitizens undermines our representative government by canceling out the choices of proper voters. This severe harm far outweighs any hypothetical inconvenience of verifying an uncertain vote. The United States merely asks California to set aside the vote-by-mail ballots of persons whom federal immigration authorities have identified as likely noncitizens while California verifies those persons' citizenship. ECF No. 62-1 at 24, 38–39.[1] California calls this relief "unprecedented." ECF No. 65-1 at 27; ECF No. 62-5 at 8. But this modest, commonsense step is a fixture of American election administration. Indeed, California sets aside questioned ballots in every election. The only novelty here is California's refusal to apply those ordinary tools to an undisputed disqualification under both federal and state law: noncitizenship. The Court should grant the requested relief.

### I. Noncitizen Ballots Irreparably Dilute Proper Votes.

Each noncitizen vote inflicts irreparable harm on lawful voters. An illegal vote cancels out a proper one—and could even provide the margin of victory for a candidate who would not otherwise have been elected. And the illegal vote generally cannot be remedied once it is cast and tabulated, *see* Cal. Elec. Code § 3019(h), so proper voters have no recourse for the unlawful dilution of their votes. The severe harm caused by noncitizen votes counsels in favor of the relief sought by the United States.

As the Supreme Court has said, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). "To the extent that a citizen's right to vote is debased, he is that much less a citizen." *Reynolds*, 377 U.S. at 567. A voter "has a right under the Constitution to have his vote fairly counted,

[1] All docket citations refer to the ECF page numbering.

without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion) (noting "a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the election process").

Voting by noncitizens is not a hypothetical problem. Recently, New Jersey discovered that at least "6,600 noncitizens were erroneously registered to vote" in 2023–2024—and that hundreds had cast ballots. K. Thomas & L. Radnofsky, *New Jersey Removes Thousands of Noncitizens From Voter Rolls*, Wall St. J. (July 21, 2026), https://bit.ly/3ROpFQg. Illinois estimated that "545 noncitizens were mistakenly entered as registered voters" in 2019. P. Hancock, *Here's How Illinois Election Authorities Guard Against Noncitizen Voting*, Rockford News First (July 24, 2026), https://bit.ly/4ceFFBR. And over a thousand noncitizens were apparently registered to vote in Oregon. D. VanderHart, *Updated Findings Show Nearly 1,260 Possible Noncitizens Were Registered to Vote in Oregon Since 2021*, Or. Pub. Broad. (Sept. 23, 2024), https://bit.ly/4bZH67a.

The harms from noncitizens voting far outweigh any hypothetical harms from the requested relief here. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197–98 (2008) (opinion of Stevens, J.) (noting that "the availability of the right to cast a provisional ballot provides an adequate remedy"). So on the one hand, an eligible citizen faces at most a short delay before the ballot is counted, and on the other, the rest of the citizenry suffers grave harm if *any* noncitizen's ballot is tabulated. As between two different "error costs," those that arise from the risk of noncitizens voting easily swamp those that could hypothetically arise from the requested relief.

Refusing an injunction would also harm public confidence in the election, further discouraging lawful voters at a time when confidence in our elections has ebbed precipitously. California's refusal to act on federal evidence that thousands of registered voters are likely noncitizens would do just that. "Voters who fear their legitimate votes

will be outweighed by fraudulent ones will feel disenfranchised," "driv[ing] honest citizens out of the democratic process and breed[ing] distrust of our government." *Purcell*, 549 U.S. at 4. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," *id.*, so a court order that promotes confidence in those processes also promotes democratic functioning.

Last and relatedly, noncitizen voting is not some technical violation. Excluding noncitizens "from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982). "States can prevent non-citizens from serving as probation officers, or teaching in public schools." *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 777 (6th Cir. 2024) (citations omitted). "Why? Because the 'distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State.'" *Id.* (quoting *Ambach v. Norwick*, 441 U.S. 68, 75 (1979)).

"Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed," and noncitizens "are by definition those outside of this community." *Cabell*, 454 U.S. at 439–40. Citizens "belong[] to the polity and [are] entitled to participate in the processes of democratic decisionmaking," which is why the Supreme Court has repeatedly recognized "'a State's historical power to exclude aliens from participation in its democratic political institutions' as part of the sovereign's obligation 'to preserve the basic conception of a political community.'" *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978) (citation omitted) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647–48 (1973)). In short, "[i]t is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government"—most of all, voting. *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd mem.*, 565 U.S. 1104 (2012).

## II. Separating the Ballots of Voters Credibly Identified as Noncitizens Is a Longstanding Election Practice That California Law Already Uses.

Defendants and proposed Intervenors repeatedly cast aspersions on the United States's requested relief, suggesting that setting ballots aside to resolve citizenship questions is somehow the denial of the right to vote. *See, e.g.*, ECF No. 62-5 at 8 ("an unprecedented suspension—and even denial—of voting rights"); ECF No. 65-1 at 30 ("a devastating disenfranchising effect"); ECF No. 62-5 at 5 ("disenfranchise those in question without due process"); *see also* ECF No. 37-1 at 12; ECF No. 58-1 at 11. It is not. Rather, it is how American elections have long handled doubtful ballots. During the 1800s, federal law authorized federal officers to challenge doubtful votes in congressional elections, and it has required set-aside provisional ballots since 2002. California's own law sets aside questioned ballots in at least five distinct settings—including when the question is whether the voter is a citizen. Thus, the United States's requested relief applies a familiar tool of election administration to ballots whose validity is in doubt.

### A. American Election Law Has Long Set Aside Doubtful Ballots Pending a Determination of the Voter's Eligibility.

Federal law, States, and courts all use ballot-separation mechanisms to address and resolve potential balloting deficiencies, underscoring the reasonableness of the requested relief here.

#### 1. Federal law long authorized officials to challenge doubtful votes in federal elections.

Identifying and challenging doubtful votes is as old as federal election supervision itself. In the Enforcement Acts of 1870 and 1871, Congress provided for federal supervisors of election at congressional elections. *Ex parte Siebold*, 100 U.S. 371, 379–80, 382 (1879). Those federal officers were "required to attend the times and places for holding elections of representatives or delegates in Congress, and of counting the votes cast; to challenge any vote the legality of which they may doubt; to be present continually

where the ballot-boxes are kept, until every vote cast has been counted, and the proper returns made." *Id.* at 380 (setting out counsel's summary of 26 Rev. Stat. § 2017). The Supreme Court upheld those provisions, describing them as "an assertion, on the part of Congress, of a power to pass laws for regulating and superintending said elections, and for securing the purity thereof." *Id.* at 382; *see id.* at 383–88. Given "the violence, fraud, corruption, and irregularity which have frequently prevailed at such elections," the Court explained, "it may easily be conceived that the exertion of the power, if it exists, may be necessary to the stability of our frame of government." *Id.* at 382. Thus, the practice of assessing the legality of particular votes has longstanding roots in federal law.

**2. Federal law now requires provisional ballots that are set aside until eligibility is confirmed.**

Modern federal law reinforces the point. The Help America Vote Act of 2002 (HAVA) requires a provisional ballot when an individual affirms registration and eligibility but does not appear on the polling-place list, or an election official asserts ineligibility. Officials then verify eligibility and count the ballot if the individual is eligible under state law. 52 U.S.C. § 21082(a)(1)–(4). HAVA applies the same rule to certain mail ballots. A first-time voter who registered by mail and who does not submit the required identification with a mail ballot "may cast such a ballot by mail and the ballot shall be counted as a provisional ballot in accordance with section 21082(a) of this title." *Id.* § 21083(b)(2)(B)(ii). In other words, Congress directed that some mail ballots be held apart from the count until the voter's qualification is confirmed.

The Supreme Court has recognized the use of such set-aside-and-verify procedures. In upholding Indiana's photo-identification law, the lead opinion in *Crawford* emphasized that a voter who is indigent or has a religious objection to being photographed "may cast a provisional ballot that" could be counted on the execution of "an appropriate affidavit before the circuit court clerk within 10 days following the election." 553 U.S. at 186 (opinion of Stevens, J.). Any burden on voters without identification "is, of course,

mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted." *Id.* at 199. In *Purcell*, the Court likewise described Arizona's procedure under which "[a] voter who arrives at the polls on election day without identification may cast a conditional provisional ballot," counted if the voter presents identification within five business days. 549 U.S. at 2.

**3. States and courts routinely separate questioned mail ballots pending resolution.**

State election codes often apply similar practices to mail ballots. For example, Pennsylvania directs that challenged absentee and mail-in ballots be "placed unopened in a secure, safe and sealed container in the custody of the county board" until the board resolves the challenge after a hearing, and it suspends the canvass of those ballots while any appeal is pending. 25 Pa. Stat. § 3146.8(g)(5), (7). Other States have similar mechanisms. *See, e.g.*, Ariz. Rev. Stat. § 16-552(D) (requiring challenged early ballots to be set aside pending resolution); N.C. Gen. Stat. § 163-89(e) (requiring absentee-ballot challenges to be decided before the return envelopes are opened).

Courts use the same tool when the lawfulness of particular ballots is disputed. When litigation arose in 2020 over Pennsylvania mail ballots received after Election Day, Justice Alito ordered county boards to follow Pennsylvania officials' own guidance that those ballots "be segregated and kept 'in a secure, safe and sealed container separate from other voted ballots,'" and that "all such ballots, if counted, be counted separately." *Republican Party of Pa. v. Boockvar*, No. 20A84, 2020 WL 6536912, at *1 (U.S. Nov. 6, 2020) (Alito, J., in chambers). Segregation of the challenged ballots preserved every option: if the ballots proved lawful, they could be counted; if not, they could be excluded without unwinding the count. That is the kind of relief the United States seeks here.

**B. California's Own Law Sets Aside Questioned Ballots—Including Ballots Questioned on Citizenship Grounds.**

California already uses this practice, which further underscores the reasonableness of the United States's request. Its Elections Code and the Secretary of State's regulations set aside questioned ballots in a variety of settings. Each rests on the same premise as the relief requested here: when a ballot's validity is genuinely in doubt, officials hold the ballot, resolve the doubt, and then count or reject it. California law also says when that must happen. A mail ballot "shall not be removed from its identification envelope until the time for processing ballots," and "[a] ballot shall not be rejected for cause after the identification envelope has been opened." Cal. Elec. Code § 3019(h); *see id.* § 15105. Separation of unopened envelopes is therefore not a departure from California's system.

**1. California authorizes challenges to mail ballots on citizenship grounds.**

Citizenship is a constitutional qualification for voting in California. Cal. Const. art. II, § 2(a). "A person entitled to register to vote shall be a United States citizen," Cal. Elec. Code § 2101(a), and "[a]ll voters, pursuant to the California Constitution and this code, shall be citizens of the United States," *id.* § 2300(a). A person "may prove" citizenship when registering via sworn attestation. *Id.* § 2111. But California does not treat that attestation as conclusive in the face of contrary evidence. Its officials "shall cancel the registration" "[u]pon proof that the person is otherwise ineligible to vote." *Id.* § 2201(a)(8). California also criminalizes fraudulent voting by an ineligible person, *id.* § 18560(a), and knowingly assisting an unqualified person to vote, *id.* § 18561(a). California law thus presupposes that its officials will confront—and act on—evidence that a registrant is not a citizen.

California law authorizes a challenge to a voter on the ground "[t]hat the voter is not a citizen of the United States." *Id.* § 14240(a)(3). The same grounds apply to mail voters: "Challenges to a vote by mail voter may be made for the same reasons as those made against a voter voting at a polling place." *Id.* § 15105. Those challenges "shall be

made prior to the opening of the identification envelope of the challenged vote by mail voter," *id.*—that is, while the ballot is still sealed and can be set aside—and "[i]f a challenge is allowed, the board shall endorse on the face of the identification envelope the cause of the challenge and its action thereon." *Id.* § 15108; *see also* Cal. Code Regs. tit. 2, § 20879(a)(3). The State concedes that "[s]tate law permits challenges to mail ballots related to 'the voter's qualifications to vote,' including citizenship." ECF No. 65-1 at 11 (citing Cal. Elec. Code §§ 14240, 15105, 15106).

California's challenge statute even contemplates a challenge prompted by a list. When a precinct board member "receives, by mail or otherwise, any document or list concerning the residence or other voting qualifications of any person or persons, with the express or implied suggestion, request, or demand that the person or persons be challenged," the statute tells officials to evaluate the evidence. Cal. Elec. Code § 14240(c). The board member "shall first determine whether the document or list contains or is accompanied by evidence constituting probable cause to justify or substantiate a challenge," must "immediately contact the elections official," and that official "shall advise the members of the precinct board as to the sufficiency of probable cause for instituting and substantiating the challenge." *Id.*; *see* Cal. Code Regs. tit. 2, § 20879(e) (requiring evidence that "establishes, at a minimum, probable cause for the requested challenge"). California thus has a procedure for evaluating lists like the one the United States submitted. The United States's declarations describe the review underlying that list. *See* ECF No. 62-2 ¶¶ 16–22; ECF No. 62-3 ¶¶ 16–24.

The State argues that a challenger to a mail ballot bears "the burden of establishing extraordinary proof of the validity of the challenge at the time the challenge is made." Cal. Elec. Code § 15106; ECF No. 65-1 at 32–33. But that burden governs a mail-ballot challenge when it is made. It does not address whether the Court may order temporary preservation of unopened envelopes pending verification. And the United States has not asked California to reject a single ballot on the strength of the list alone. It has asked

California to hold the ballots and verify citizenship—after which, it agrees, "citizen votes must be tabulated." ECF No. 62-1 at 36.

**2. California sets aside provisional ballots until the voter's eligibility is confirmed.**

California's provisional-ballot procedure is another example of ballot separation pending verification. "Once voted, the voter's ballot shall be sealed in a provisional ballot envelope," and the ballot is excluded from the canvass unless officials confirm the voter's right to vote. Cal. Elec. Code § 14310(b), (c). A provisional vote "shall be counted" when "the voter's eligibility can be confirmed and the voter's choice is clearly marked." Cal. Code Regs. tit. 2, § 20993(b)(1). It "shall not be counted" when "the voter's ineligibility is confirmed by clear and convincing evidence based upon a review of available records." *Id.* § 20993(c)(1). The regulation gives examples of qualifying records—felony-status records, court determinations of incompetency, and death records—but the list is open-ended: the examples "include, but are not limited to," those records. *Id.* § 20993(c)(1)(A). Nothing in the regulation excludes records bearing on a qualification every California voter must have: United States citizenship.

**3. California holds signature-questioned mail ballots for weeks after Election Day while it verifies the voter.**

California also sets aside every vote-by-mail ballot whose signature is in doubt. If an official finds that a signature has "multiple, significant, and obvious differing characteristics," two more officials review it. Cal. Elec. Code § 3019(c)(1)–(2). If they agree the signatures do not compare, "the identification envelope shall not be opened and the ballot shall not be counted." *Id.* § 3019(c)(2). Ordinarily, the elections official must notify the voter by the next business day. *Id.* § 3019(d)(1)(A), (E); Cal. Code Regs. tit. 2, § 20990(d). For a regularly scheduled statewide election, the voter may cure the signature until 22 calendar days after Election Day. Cal. Elec. Code § 3019(d)(4)(A), (j)(1). Only if the voter's signature then compares does the official "deposit the ballot, still in the

identification envelope, in a ballot container." *Id.* § 3019(d)(4)(B)(i). The Ninth Circuit has described this process: when a signature is rejected, "elections officials must promptly inform the voter and provide the voter an opportunity to cure the non-conforming ballot," and if the voter does so, "the voter's VBM ballot may be processed as usual." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1080 (9th Cir. 2024).

Every election, then, California keeps signature-questioned ballots unopened for as long as three weeks after Election Day while it confirms that the person who cast the ballot is the voter of record.

**4. California's same-day registration and recount procedures work the same way.**

California's conditional voter registration—its same-day registration procedure—follows the same pattern. A person who registers in the final 14 days before an election (or on Election Day) ordinarily casts a provisional ballot, and the elections official must process and validate the registration "before counting or rejecting the corresponding ballot." Cal. Elec. Code § 2170(d)(3).

Likewise, in a recount, "[a] challenged ballot shall be set aside with a notation indicating" the reason for the challenge and the person making it, and "[r]esolution of challenged ballots shall take place in a segregated area within the recount location, separate from that being used to perform the recount, as determined by the elections official, to avoid confusion and mixing of ballots." Cal. Code Regs. tit. 2, § 20363(a)–(b). And in every count, "[a] ballot that is not marked as provided by law must be segregated and counted in the manner directed by the elections official and as required by law." *Id.* § 20282(a).

California's Elections Code schedules around these set-aside ballot processes. Officials must finish counting most ballots within 13 days of the election, but that deadline expressly excludes mail ballots awaiting signature verification, provisional ballots, and ballots cast by conditional registrants. Cal. Elec. Code § 15307(a)–(b). Those

ballots are resolved during the canvass, which must be completed and certified within 30 days of the election. *Id.* § 15372(a). Los Angeles County itself explains that "[i]n the weeks following the election and until the end of November, [county officials] will be fully engaged with ballot processing activities." ECF No. 62-5 at 4. Thus, the relief requested by the United States would merely add a category of ballots to a process California already uses.

**C. Because Ballot Separation Is Ordinary Election Administration, It Neither "Removes" Voters Nor "Refuses" to Count Qualified Votes.**

The State and proposed Intervenors recast ballot separation as a purge and a denial of the right to vote. ECF No. 65-1 at 28–29, 31–32; ECF No. 37-1 at 25–27; ECF No. 58-1 at 22–26. California's own practice refutes both characterizations, and the authorities invoked by the State and proposed Intervenors do not support them.

*The National Voter Registration Act (NVRA).* The NVRA's 90-day provision governs "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). Separating a ballot removes no one's name from any list. Every voter on the federal list remains registered and free to vote. And each ballot will be counted if the voter's citizenship is confirmed. California does not treat setting a ballot aside as removal, either: within 90 days of every federal election it routinely sets ballots aside without removing voters from official lists. What's more, the NVRA does not condemn a practice that HAVA, enacted nine years later, affirmatively requires. *See* 52 U.S.C. § 21082(a); *id.* § 21083(b)(2)(B)(ii).

*Section 11(a) of the Voting Rights Act.* Section 11(a) forbids officials to "willfully fail or refuse to tabulate, count, and report" the vote of a person "who is entitled to vote . . . or is otherwise qualified to vote." 52 U.S.C. § 10307(a). By its terms, the provision protects qualified voters, and a noncitizen is not one. *See* 18 U.S.C. § 611(a); Cal. Elec. Code §§ 2101(a), 2300(a). Holding a ballot while officials determine whether

the voter is qualified is not a willful refusal to count a qualified voter's ballot—any more than California "refuses" to count every ballot it seals or holds for weeks. California's Code treats delayed counting of those ballots as lawful and routine. *See* Cal. Elec. Code § 15307(b). Plus, the same section of the Voting Rights Act punishes anyone who "conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting." 52 U.S.C. § 10307(c). A statute that criminalizes encouraging illegal voting cannot sensibly be read to require officials to count, without checking, ballots that federal authorities have credibly identified as illegal.

*The rules of the election.* For the same reason, ballot separation does not change the rules of an ongoing election. Voters on the federal list receive the same ballot, return it the same way, and face the same deadline as everyone else. The only question is what officials do with an envelope after it arrives—a question California law already answers for provisional, challenged, and signature-questioned ballots. *See* Cal. Elec. Code §§ 15307(b), 15372(a).

## CONCLUSION

For these reasons, the Court should grant the United States's application.

Dated: October 27, 2026

Respectfully submitted,

By: /s/ *Stephen M. Duvernay*

Stephen M. Duvernay (CA Bar No. 250957)
steve@benbrooklawgroup.com
BENBROOK LAW GROUP, PC
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
(916) 447-4900

Christopher Mills (SC Bar No. 101050)*
cmills@spero.law
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640

Attorneys for Proposed *Amicus Curiae*
National Republican Congressional Committee

**Pro hac vice* application forthcoming

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for proposed *amicus curiae* the National Republican Congressional Committee, certifies that this brief contains 4,091 words, which complies with the word limit of L.R. 11-6.1.

Dated: October 27, 2026

*/s/ Stephen M. Duvernay*
Stephen M. Duvernay