UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:26-cv-12025-DOC-ADSx |
| Plaintiff, | ) | CIVIL |
| vs. | ) | Los Angeles, California |
| STATE OF CALIFORNIA, ET AL., | ) | Tuesday, October 27, 2026 |
| | ) | (1:01 p.m. to 2:10 p.m.) |
| Defendants. | ) | (2:49 p.m. to 3:57 p.m.) |
| | | (4:30 p.m. to 4:31 p.m.) |

ORDER TO SHOW CAUSE HEARING RE UNITED STATES GOVERNMENT'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER [62]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Courtroom Deputy: Karlen Dubon

Court Reporter: Recorded; CourtSmart

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Ste 1105-237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES**:

For Plaintiff: ANDREW MICHAEL DARLINGTON, ESQ.
DOJ-Enrd
950 Pennsylvania Ave. NW
Washington, DC 20530

AUSA JOHN ROBERT RENNER
AUSA JULIE ANN HAMILL
AUSA DAVID BECK
FAUSA BILAL ALI "BILL" ESSAYLI
U.S. Attorney's Office, CAC
300 N. Los Angeles
Suite 7516
Los Angeles, CA 90012

For Movant: UZOMA N. NKWONTA, ESQ.
BRANDEN D. LEWISTON, ESQ.
JULIANNA D. ASTARITA, ESQ.
Elias Law Group
250 Massachusetts Ave. N.W.
Suite 400
Washington, DC 20001

TYLER L. BISHOP, ESQ.
Elias Law Group
1700 Seventh Ave.
Suite 2100
Seattle, WA 98101

ANNA M. BALDWIN, ESQ.
Campaign Legal Center
1333 New Hampshire Ave. N.W.
Suite 300
Washington, DC 20036

DANIELLE EVELYN LEONARD, ESQ.
Altshuler Berzon
177 Post Street
Suite 300
San Francisco, CA 94108

**APPEARANCES**: (CONTINUED)

For Movant:

POOJA CHAUDHURI, ESQ.
NORMAN L. EISEN, ESQ.
Democracy Defenders Action
600 Pennsylvania Ave. S.E.
No. 15180
Washington, DC 20003

For Defendants:

ANNE P. BELLOWS, ESQ.
California Attorney General's Office
California Department of Justice
455 Golden Gate Ave.
Suite 11000
San Francisco, CA 94102

CHRISTINA MARIE MCCALL, ESQ.
MICHAEL SURREN COHEN, ESQ.
California Department of Justice
Civil Division
1300 I Street
Sacramento, CA 95814

CHRISTOPHER K. PELHAM, ESQ.
ABIGAIL URQUHART, ESQ.
ALEX JORDAN SCANDROLI, ESQ.
Norton Rose Fulbright U.S.
555 S. Flower Street
41st Floor
Los Angeles, CA 90071

SHARANYA MOHAN, ESQ.
KYRA SIKORA, ESQ.
CHRISTINE ELIZABETH BASS, ESQ.
Public Rights Project
490 43rd Street
Unit 115
Oakland, CA 94609

NICK WORLEY, ESQ.

**Los Angeles, California; Tuesday, October 27, 2026; 1:01 p.m.**

**--oOo--**

**THE COURT:** And as we begin, I know a lot of you folks are trying to check in. I promise you, we'll create a record about who's present, who's arguing, et cetera. I'm going to limit this initially to two lead counsel for each of the parties. If you need help, we'll have the time calling your associates forward, because we have limited room.

Second, a lot of you folks are appearing pro hac vice, by the time we go through the 40 plus names, we'll be here till 6 o'clock. So just assume that your pro hac vices have been approved by the Court, been resolved, and I think that'll save a lot of time.

I've received a number of amicus briefs in this matter. I've also received the requested intervenor status by the League of United American Citizens, NAACP, NAACP California, Hawaii, State of California or State Conference and NAACP of Los Angeles branch and Services Immigration Rights and Education Network, commonly referred to as SIREN and Mi Familia en Accion.

I'm going to grant the following, for those two who request intervenor status, I'm going to allow you to have limited arguments today but not party status in this matter.

I'm not going to limit your arguments today. I believe that the TRO is brought on behalf of the United States,

so if you'd like to identify yourself and all of your colleagues who are sitting at the table with you, argue first, and then we'll get the -- well, let's get the appearances now.

Mr. Essayli, on behalf of the Government.

**MR. ESSAYLI:** Good afternoon, Your Honor, Bill Essayli on behalf of the United States.

**MR. DARLINGTON:** Good afternoon, Your Honor, Andrew Darlington on behalf of the United States.

**THE COURT:** Pleasure. Nice meeting both of you. Have a seat. And who's with you today? I see folks in the back and you're more than welcome to identify yourselves.

**MS. HAMILL:** Julie Hamill for the United States.

**THE COURT:** Thank you.

**MR. RENNER:** Robert Renner for the United States.

**THE COURT:** Pleasure, sir, thank you very much.

Now, let me turn counsel to your --

**MR. BECK:** Your Honor, David Beck also for the United States.

**THE COURT:** Okay. Thank you. Counsel.

**MR. COHEN:** Good morning, Your Honor, Michael Cohen for the State defendants, the State of California and California Secretary of State.

**THE COURT:** Thank you. And by the way, either go to the lectern so we can hear you, because we have CourtSmart. I can hear you, but CourtSmart may not be able to. Or I don't

mind if you remain seated so your papers are near you, but then move the microphone closer to you, okay?

**MS. BELLOWS:** Ann Bellows for State defendants.

**THE COURT:** Pleasure.

**MR. PELHAM:** Good afternoon, Your Honor, Christopher Pelham -- I'm sorry, go ahead.

**MS. MCCALL:** Sorry, also Christina McCall for the State defendants.

**THE COURT:** Thank you.

**MR. PELHAM:** And good afternoon, Your Honor, Christopher Pelham for defendant Dean Logan. With me also is Pat Moore whose pro hac application is pending.

**THE COURT:** All right. Thank you.

**MS. URGUHART:** Good afternoon, Your Honor, Abigal Urguhart also for the County defendants, Dean Logan.

**MR. SCANDROLI:** Good afternoon, Your Honor, Alex Scandroli on behalf of defendant Dean Logan.

**THE COURT:** Okay. Thank you.

**MS. MOHAN:** Good afternoon, Your Honor, Sharanya Mohan on behalf of defendant Dean Logan.

**THE COURT:** Thank you.

**MS. SIKORA:** Good afternoon, Your Honor, Kyra Sikora on behalf of defendant Dean Logan.

**MS. BASS:** Good afternoon, Your Honor, Christine Bass on behalf of Dean Logan.

**MR. WORLEY:** Good afternoon, Your Honor, Nick Worley on behalf of Dean Logan.

**THE COURT:** All right. Thank you.

**MR. NKWONTA:** Good afternoon, Your Honor, Uzoma Nkwonta on behalf of the SIREN and Mi Familia en Accion, intervenors and I'm joined by my co-counsel, Mr. Branden Lewiston.

**THE CLERK:** You need to speak at the microphone.

**MS. NKWONTA:** Is that better?

**THE COURT:** Yes. Once again please.

**MR. NKWONTA:** Good afternoon, Your Honor, Uzoma Nkwonta on behalf of the SIREN and Mi Familia en Accion, intervenors and I'm joined by my co-counsel, Mr. Branden Lewiston whose pro hac application is still pending. I'm also joined by Mr. Tyler Bishop and Ms. Julianna Astarita.

**THE COURT:** And once again you can assume that if you're pro hac vice application is before the Court, I've signed it. There were over 40, so.

**MR. EISEN:** Good afternoon, Your Honor, Norman Eisen from the Democracy Defenders Fund and I am here for proposed intervenors, the NAACP intervenors and also LULAC. With me is Anna Baldwin from the Campaign Legal Center, on our team Danielle Leonard from Altshuler Berzon and Pooja Chaudhary from Democracy Defenders.

**THE COURT:** All right. I assume all of you have

received the opinion from the Ninth Circuit which was handed down yesterday and I assume that all of us have read that a number of times. I also, as of the last information I have received, there's been no en banc request I believe by the Government at the present time and if so but, Mr. Essayli, the floor is yours, sir.

**MR. ESSAYLI:** Thank you, Your Honor. The Government is here today to request a preliminary injunction. The Court has received substantial briefing from the parties and we're here to present witnesses and additional evidence as well as oral argument on our request for a preliminary injunction.

Your Honor, we are here on a very narrow request for an injunction, to separate ballots of those suspected to be noncitizens. And I want to be very clear about what we're seeking and what we're not seeking, because I think there's been a lot of confusion about what the Government's request is.

We have not asked to void any ballots. We have not asked to cancel any ballots. We have not asked for a systematic list maintenance in violation of NDRA. We have not asked to change a single election procedure.

What we are doing, Your Honor, is seeking to enforce federal law, specifically 18 United States Code Section 611 which makes it a crime for a noncitizen to vote in a federal election.

Your Honor, the Government -- California has

explained its processes for the attestations of voters to get on the voter rolls and how a person can attest that they're a citizen to get on the voter rolls and Congress has allowed that, that is correct.

The situation we're in, Your Honor, is where the Government has developed credible evidence and we'll get into that today what that is, where we've given them a list of specific individuals that the Government has a good faith belief are noncitizens on the voter rolls what the State's obligation is with that information. Meaning, once they come into actual knowledge, of persons who we suspect are not citizens and we're happy to provide as much information as evidence that they need to satisfy that we are correct.

They have to make a decision what they want to do. What they cannot do is do nothing and proceed to count the votes. The reason this is an emergency posture, Your Honor, is because of the way California conducts elections.

We don't really have election day anymore, it's really election month or maybe a month and a half where the ballots are out, they're being returned in real time, they're being returned now, and as they're being returned California has allowed the counties to start processing the ballots.

What that means is they start validating the envelopes and removing the ballot from the envelope. Once that ballot is removed from the envelope, it can never be undone.

It's a secret ballot. And that's by design. We want people to have an anonymous vote, a secret vote, and so the two can never be connected again.

And so what has caused our alarm, Your Honor, and the reason for all this expedited movement on the Government's part is just learning the scale of the number of ballots that have been processed to date. I believe the last count was over 500,000 ballots in LA County alone have already been processed, meaning if any of the noncitizens we identified were in that batch, their votes will now be counted and California conceded as much during the Ninth Circuit oral arguments.

They did concede that under the current practices those noncitizen votes will be counted. That's the nature of the emergency, Your Honor, that's why we're here.

You know, I'm happy to get into the theory of the federal preemption here, Your Honor. It's obstacle preemption is a theory under which we're here. We believe that this -- the California, through Secretary Weber, has made an executive decision to read federal and state law in a way that permits the acceptance and the counting and the commingling of mail in ballots cast by those identified as likely noncitizens.

And the result is California continues to accept potentially unlawful ballots, thwarting Congress' attempt to protect election integrity and the power of every legal vote, Your Honor.

And so that's the nature of our request, Your Honor. That's the nature of the emergency. We're not telling California what they have to do. We're telling them what they can't do, which is just count these ballots without doing more to ensure that they are actually citizens or not.

So the choice is up to them. We have made resources available, we're here to work collaboratively with the state to get them the information they need to validate the citizenship status of these individuals and -- but the choice is theirs how they want to proceed.

What they cannot do is count these ballots once they've been informed of the prospective noncitizens that we've made known to them.

Your Honor, I think today's hearing, if I may, should focus on the evidence that we presented in this case. I do think this case rises and falls based on the reliability and the credibility of the evidence the Government has put forward to the defendants, as well as to Your Honor.

We've provided some supplemental declarations last night trying to better explain how these lists were created. We have the witnesses here today, Your Honor. We're ready to put them on and subject them to cross. And so that way, the Court can be satisfied with the methodology, with the process, the integrity in which these lists were developed.

I do think this case rises and falls on that, Your

Honor. If the Court accepts that the Government has provided substantial evidence of noncitizens on the voter rolls, then I do think our injunction should be granted. And again, the injunction is just to keep these ballots separate so we can continue these proceedings before Your Honor. It's not to cancel them, we just want to protect the Government's interest in being able to adjudicate this, and also protect the votes of lawful citizens, Your Honor, who have a right to have their vote counted equally and not diluted by people who are not supposed to be voting in our elections.

It means something to be a United States citizen. It means something to participate in an election. And we want to make sure those interests are safeguarded. The Government has a strong interest in that and that's what we want to focus on.

I'm not going to repeat everything that's been briefed, Your Honor. I'm going to conclude my opening remarks at this time, but we're prepared to move forward with evidence for Your Honor in today's hearing.

Unless you have questions you'd like me to answer.

**THE COURT:** Just check with your colleagues and make certain that that covers -- take a few moments. Step over and make sure that that covers everything you'd like to in your opening argument.

**(Pause)**

**MR. ESSAYLI:** Your Honor, the only thing I would

conclude with is I'm sure the Court understands the exigency of our request and the papers we presented. So we would just be asking that the Court would issue a ruling at the end of today's hearing. I understand the Court may not have a written ruling, but given the exigency and the time sensitivity nature of this case, we would request that the Court issue a prompt ruling at the conclusion of today's hearing.

And with that, I'll conclude my opening remarks, Your Honor.

**THE COURT:** Thank you. Counsel, who would like to argue, the County or the State?

**MR. COHEN:** The State first, Your Honor.

**THE COURT:** State first, all right. And then once again now if you'd reintroduce yourself to the record because we're on CourtSmart.

**MR. COHEN:** Good afternoon again, Your Honor, Michael Cohen on behalf of the State defendants.

Your Honor, the facts and the law of this Court are difficult to believe and I'll get to that in just a moment. But just to set some standards here, we're going to be splitting argument if -- with Your Honor's permission. My colleague Ms. Bellows will be handling questions about standing and the equities, including <u>Purcell</u> and the unlawfulness of the relief sought. I'll be taking questions on preemption and cause of action issues. And my colleague Ms. McCall will be

speaking to the reliability of the data and other associated issues.

With an election ongoing, Your Honor, the Executive has suddenly struck upon a suggestion of unlawful voting, using data and methods known to be unreliable and that are now indemonstrably unreliable in California. And that the Executive itself recognizes does not demonstrate noncitizenship. They still won't even tell us how the list was generated.

The Executive is now bullying counties across California to work closely with federal agencies to investigate further or else suffer litigation and even prosecution. Their legal claim is simply not serious, and a majority of the Ninth Circuit panel on Sunday captured well why it fails.

They allege that a misdemeanor criminal prohibition on noncitizen voting, on individual noncitizen voting preempts amorphous set of actions implementing California's rules for election administration. Rules consistent with federal law and enacted pursuant to the state's plenary constitutional authority.

More remarkably still, they argue that the Executive is entitled to an injunction ordering California to collaborate with the federal government on law enforcement investigations. This claim distorts several legal doctrines beyond recognition. To find that the Executive has brought a cognizable claim here

would be to bless a breathtaking expansion of judiciability and preemption doctrines with no limiting principal in sight.

It's really hard to know frankly, Your Honor, where to begin in rebutting such a defective legal claim and the State would welcome the Court's questions on the many doctrinal flaws at issue here.

But if the Court has no questions, I would be glad to get straight to the heart of this case, which is preemption claim that the Executive has alleged.

Thank you, Your Honor. The Executive papers aren't a model of clarity on this point, but I take their preemption claim to be that the federal misdemeanor prohibition on noncitizen voting preempts California's refusal to collaborate with the federal Executive on law enforcement investigations.

Just to paraphrase Judge Bennett on Sunday, this isn't preemption, this is just the federal Executive deciding it doesn't like what the State is doing, but that's not a legal theory. The Executive's preemption claim fails no matter how you slice it. It either encroaches on the State's elections clause authority or it runs afoul of the Tenth Amendment, but either way it loses.

And because Judge Bennett wrote so extensively on the elections clause theory, perhaps I can touch on that for a moment and would be glad to take Your Honor's questions.

To be clear, the Executive is seeking to challenge

procedures that the Constitution expressly reserves to the states and has sought relief inconsistent with those procedures. Under these circumstances, it runs up against the State's plenary elections clause authority.

The Supreme Court has articulated just one test for preemption of state's elections clause authority. Given the Constitution's conferral of authority to states in this area, that test is designed to guard it very, very close.

Congressional enactments displace state law only so far as Congress expressly did so and no further. Section 611 has nothing to do with election administration. Nothing at all. It sets out no methods for verifying voter eligibility, it's not even an elections clause statute, Your Honor, even though the Executive bizarrely suggests that it is, it has nothing to do with the time, the place, or the manner of election administration.

If Your Honor would like a great example of how preemption works in this area, I would refer the Court to the Watson v Republican National Committee case that the Supreme Court decided just this last summer in July. That case concerned whether federal statutes setting the day for the election preempts state law allowing mail ballots to be tabulated if they were postmarked by election day but received afterward. And the Court said no, since there was no clear statement in federal law displacing state law. This is a much

easier case.

I'll say to end, Your Honor, on this point is that there's an active debate in Congress about how to authenticate citizenship for voters. That's the appropriate forum for the Executive to be raising these arguments. I think Judge Bennett had that exactly right.

And as I said at the outset, if the Executive were right here, they could sue any time they would like to modify state policy under the egis of speculation that state conduct or even inaction, as is the case here, could enable someone else to commit a crime. Fortunately that is not the law.

I would be glad to take Your Honor's questions, otherwise would invite my colleague Ms. Bellows up here to address what she would like.

**THE COURT:** Thank you.

**MS. BELLOWS:** Thank you, Your Honor, Anne Bellows on behalf of the State defendants.

I'd like to address the Purcell principle which independently forecloses the relief that the United States is requesting in their motion. The Supreme Court has reiterated time and again that as an election is close at hand, federal courts should not interfere to change the rules under which that election is held. This applies with even more force when the election is ongoing.

The relief that plaintiff requests changes a host of

state election procedures that are designed to quote allow the election to continue forward in a smooth way and to enforce the rule that both California and the United States agree on, which is that noncitizens are allowed to vote.

Those state procedures involve eligibility determinations under attestation of citizenship, attestation of citizenship according to penalty of perjury which is the federal standard, and the maintenance of an official list of registered voters as provided for in the NVRA of those who are duly registered, the tabulation of votes as soon as they are received, including the processing, to check the signature matching, you know, the choreography down to placing it in a container for opening, separating the ballot from the envelope, for accounting and reporting the votes, and challenges where there is a challenge to someone's eligibility including on the basis if they're noncitizens. California has a statutory framework for that as well.

Plaintiff requests that the Court sweep all of those procedures, which were enacted by California under its elections clause authority and consistent with federal law, sweep it off the table and replace it with a new unclear procedure in which the federal government can issue a list and require California to change the way a subset of its voter's ballots are received and whether or not they are tabulated.

And it requires California to suddenly impose a new

standard of eligibility for those citizens, not attestation of citizenship under penalty of perjury, but something else, something which plaintiff has not clearly specified but appears to be something closer to the documentary proof of citizenship standard that Congress itself has refused to impose on the states.

The stakes here are enormous. Not only is the relief the plaintiff requests incredibly instructive for the election officials who are working around the clock to implement and administer our elections. The risk of this disenfranchisement is clear.

Asking California to initiate some unclear investigation into the citizenship of tens of thousands of people without any standards that are articulated by plaintiff's request for relief nor any that make any sense that are available to the Court, and to set their ballots aside, and to do all of that within a few weeks is a recipe for disenfranchisement.

California owes a duty under its own state laws to ensure that those who vote in the manner provided for in California's elections have their votes counted. And plaintiff's demand to set all that aside in order to facilitate an investigation into their suspicions, is the exactly the sort of tinkering with federal elections that <u>Purcell</u> counsel's against at the last minute.

I'd be happy to address any questions that the Court has on the quiet period under the NVRA, or on standing, or on equities, but I think that this issue is preclusive along with the preemption argument that my colleague presented. So I won't take time unless there's a question I'm able to answer.

**THE COURT:** All right. Thank you, counsel.

**MS. BELLOWS:** May I pass it to my colleague, Christina McCall in case you'd like to address. Thank you.

**MS. MCCALL:** Just briefly, Your Honor, Christina McCall on behalf of the State defendants as well. Mr. Essayli just argued that the evidence that federal government has submitted in this case has reliability and credibility. We submit it is neither.

Just in July, the Secretary of Homeland Security sent a letter to the Secretary of State to California claiming, there may be as many as I believe the number was 190,000 noncitizens currently on California's voter rolls. Less than three months later, with no explanation of the underlying data, and no good explanation of the methodology, that number dropped to 20,000. Last week it dropped to 28, which is the total number of people charged in California in this election cycle with citizenship related election crimes.

There's been no explanation of these changing numbers. The Secretary of State has repeatedly asked the federal government from DHA and Department of Justice to show

her the evidence. Where is the evidence, person-by-person for these list of names that they have created through these mysterious database methods. They don't name the database, they don't explain their process, they don't even explain where and how and when they got the supposed voter roll for California to begin their process that they claim involves enrichment processes, that are again not clearly described and not reliable.

This would fly in the face of any Daubert test and it definitely is not the sort of evidence required to obtain a temporary restraining order that would compel the recipient of that order to take some action, not simply refrain from an action, and that is that the facts and law clearly favor relief.

These declarations that they submitted, even the ones close to midnight last night, which are late, they fall far short of providing evidence that would support either a temporary restraining order or a preliminary injunction. They're not reliable. They're vague and they lack personal knowledge.

And based upon the evidence that the movant has chosen to put forward on their own timeline, there's no basis to issue a temporary restraining order or a preliminary injunction.

**THE COURT:** Thank you, counsel.

**MR. MOORE:** Good afternoon, Your Honor, Patrick Moore on behalf of the Register Recorder, County Clerk, Dean Logan who is with us here in the courtroom today.

As the State did with Your Honor's indulgence, we intend to break up the argument on facts handled by Mr. Pelham and on the legal issues by me. And we are not at all and afraid of the facts, in fact, we look forward to talking about them in length, because everything that the County does with respect to this election is public.

Your Honor can go on the internet right now and see the ballots being processed. This is the largest election jurisdiction in the United States and its elections are well run.

The United States is here today is asking for extraordinarily -- extraordinary relief, asking for a mandatory injunction. As Your Honor knows, the United States must show that the law clearly entitles them to that extraordinary relief. They cannot make that showing for any number of reasons, but I'll highlight three at the outset.

As Ms. Bellows noted for the State of California, Purcell prohibits federal court intervention with a comprehensive administration of election when the election is underway, as it has been in California for three weeks.

Second, Section 611 does not preempt California's counting or voter challenge processes. I'll elaborate on this

in a bit in a moment, but to establish preemption, the United States must show the manifest intent of Congress and a clear statement to displace the State Election Code. It has done and can do neither, and in fact, California and federal law mirror each other in important ways and compliment each other in others.

While it is plain that the United States Government would prefer California have a different law under well settled preemption principles and under the election clause, the federal Executive's preference is immaterial to election administration unless Congress has said otherwise.

Judge Bennett emphasized these points in his concurrence, pages 12 to 13. If the federal Executive believes California should have a different process to challenge voters or to challenge ballots, the proper audience for that argument is Congress, not this Court.

And if the federal Executive believes, as it appears to, that there should be a lower quantum of proof, necessary to set aside or throw out ballots, the proper audience for that too is Congress and not this Court.

The Supreme Court of the United States so instructed just months ago in Watson v Republican National Committee as Mr. Cohen pointed out on behalf of the State a moment ago.

Just to elaborate very quickly on these three points, Purcell rests on the central tenant as described by Justice

Kavanaugh of election law that when the election is close at hand, the rules of the road must be set. That's because elections are complex, approximately 2 million voters or more will vote in LA County, there are more than 12,000 election workers putting on this election.

That takes a massive coordinated effort and Purcell exists to avoid the confusion that results from belated federal court intervention. And to the extent that there is delay here, which there is extensive delay, that delay rests only at the feet of the United States.

The United States at least before the Ninth Circuit has made some sort of argument that Purcell exists only to obviate voter confusion and that Purcell is not, in fact, concerned with the smooth administration of elections. That's false.

The Wisconsin State Legislature case so establishes, but there is also controlling precedent from the Ninth Circuit. Arizona Democratic Party v Hobbs, a Ninth Circuit case from 2020 involved a challenge to how Arizona handles ballots after they've been returned, ballots that are not signed. Was there an opportunity for voters to correct them, not under the law. The Arizona Democratic Party said that there should be and the Ninth Circuit said no.

The Arizona State government cannot be made at a late time, just weeks before, not while the election was underway as

we have here, should not be made to change its election administration in that fashion.

To address preemption. There is, of course, no express preemption here. As best we can tell, the United States Government is making an argument of implied preemption. That too requires a high threshold. The United States must show a purpose and objective of Congress and an action or a law by the State. And I will return to that attempted distinction by the United States in a moment.

But they must show an action or a law by the State that somehow poses an obstacle. This is not a free willing inquiry and Your Honor can find a bevy of cases so stating.

How do we discern the purpose of Congress? The Court instructs us that we look to the language and the structure of the statute. Here, we have a criminal prohibition with no language whatsoever contemplating any sort of civil enforcement relating to state election administration. And that tells us something. It tells us something in particular because there are many statutes that do relate to voting that do give the United States Government civil enforcement authority just to name a few, the Voting Acts Right, the NVRA, UOCAVA, the Elderly Voter Protection Act of 1984 even.

So let's look at the laws that the United States somehow conflict with one another. The United States prohibits noncitizen voting, so too does California. The United States

says we must determine whether somebody is a citizen at the time of registration by attestation, so too does California.

Are there nominally some civil mechanisms that the United States uses to prevent noncitizen voting? Sure, perhaps the NVRA's list maintenance requirements get at that, but California does much more. There is an extensive state election process meant to address any number of things, including the assurance of free and fair elections, but also it includes ways to challenge ineligible voters.

The United States could present evidence to the registrar that voters are ineligible and the registrar could cancel them. The United States could under the California Election Code go into state court and challenge registration. The United States could under the California Election Code and controlling regulations by the Secretary challenge voters, they may do so in person, they may do so to voters casting ballots by mail. That is a comprehensive system. It compliments and does not thwart in any way the federal government's interest in the criminalization of noncitizen voting.

It is clear, as I mentioned a moment ago, that the United States for whatever reason has belatedly come to take objection to how -- pardon me, to how California has adopted and implemented these procedures. It says that there is a difference here between California law, which as best I understand it and would welcome clarification from the United

States they are not arguing is preempted and California action or action by the County.

But just to read from the California Election Code, the processing of vote by mail ballot return envelopes, the reason why the United States has said we are here, the processing and counting of vote by mail ballots and the disposition of challenges of vote by mail ballots shall be according to the laws now in force pertaining to the election for which they are cast. Those are the laws that the County is following. Those are the laws that the State is following. And those are the laws that the United States without any credible legal argument is attempting to displace.

If I could note, Your Honor, there are many -- there are reasons why the Elections Clause places the power to regulate elections with legislatures, with the state legislature, with Congress. That reason is because every action in the election context involves any number of rights.

There is a right to a free and fair election, that means a qualified voter has the right to vote. There are due process rights attendant to taking that right away, as the United States in some ways is asking be done by these votes be set aside for some indefinite period of time and not counted.

There is a right to voter secrecy set forth in the California Constitution and applicable in every single state in the United Statse. There is a right to be represented by the

official of the voters choosing, which needs we need to bring elections to conclusion in some reasonable time following the election.

California has, in light of all of those values, figure it out, a complex system of state administration. The United States focusing on only one of those things, their purported interest in ensuring that every single person who casts a ballot will have whatever process that they would like to make up applied to them if the United States decides to cast some doubt on their eligibility, they say that that is in service of the free and fair election component, right, that says that votes should not be diluted.

But, of course, that's not the only component of free and fair elections. There is also the component that eligible voters have the right to have their ballot counted according to existing California law. And that's precisely what is happening here.

I would like to turn it over to my co-counsel, Mr. Pelham to address some of the facts that are before the Court today.

**THE COURT:** All right. Thank you, counsel.

**MR. PELHAM:** Your Honor, thank you, and I'll be brief. I'll open, Your Honor, by reiterating the State's position which is that Your Honor can decide the merits of this restraining order based on the discussion of legal principles

and without an evidentiary contest or a factual contest.

We would submit that at the conclusion of these arguments Your Honor can make a ruling, can render a ruling on the preliminary injunction/TRO request.

That said, Your Honor, Mr. Logan's position would be that the -- among the other problems with the injunction that the Government seeks is that the proposed remedy is vague and unworkable. The fact is that there are no state laws or regulations that permit the segregation of ballots, that permit the in absentia adjudication of voter eligibility, that is the determination of eligibility where the voter is not present, not given a chance to be heard, does not have notice, and there are no standards, evidentiary standards for burdens of proof or the involvement of a third party neutral, such as a judge.

There is no ability of the County to investigate citizenship beyond recourse to verifying the presence of a sworn attestation that my colleagues have referenced that is provided by the voter, because of course, the County does not have access to records such as social security documents or passport information or entry/exit information that would be in the possession of the federal government.

There's also no technical ability on the part of the County to accommodate the demand that the Government is making here with their request. Because of -- because we're in the middle of the voting period and because the Government's

complaint came after ballots had already been mailed to voters, it's too late for the County to make adjustments to its software program that would allow its machines that are currently receiving several thousands at least ballots a day that are being returned by LA County citizens to remove specific ballots for segregation.

So what would need to happen is that county workers would have to review ballots by hand, by eye, as they come in and not feed them into the machines. And because of the volume of the ballots that are involved in what is again the nation's largest voting jurisdiction, it's impossible. There's no way to do that before Tuesday, the end of the election period and not even by the early December certification deadline.

It's important to note that the Government also does not propose any accommodation or remedy with respect to in person voting. Their focus is on vote by mail. But the same problems would exist with respect to votes that are voting. There's no ability on the part of the County because again how late we are in the process to identify beforehand through the ePollbook system voters who should be set aside or whose ballots should be set aside because they've been flagged by the Deputy Attorney General's letter.

And even if there could be software adjustments on the part of the County, there's no time to do critical work that's important for any software implementation for government

process, such as testing or quality control.

With respect to the data as presented by the DAGS letter and as described in the complaint, as well as the declarations that the Government has filed in support, Your Honor, we would submit that just based on that written record, there's much less than enough for the County to take action, again to decide that these ballots should be segregated and there should be some sort of summary adjudication, this mass summary adjudication of voter's citizenship status.

It's important to note that all the way back to July, Secretary Mullins' letter only referenced what were likely noncitizens among a batch of several -- of over 100,000 voters. That number came down to 20,000 with DAG McCotter's letter, but again still only a reference to likely noncitizens, not an under oath or an unequivocal assertion that the folks identified on that list were, in fact, not citizens.

What's missing here, Your Honor, is the type of individualized showing that we might expect from, for example, a proceeding under 1326, 8 U.S.C. Section 1326 where an official from DHS reviews an A file, provides indicia, biometric indicia to confirm that the individual who's named in that proceeding actually matches records that the Government has in its possession, individualized showing of the information that has led the Government to conclude that a person is a noncitizen. And importantly because this is the

subject of the declaration that was just filed on a supplemental basis last night, ruling out potential derivative citizenship status, where a person derives U.S. citizenship despite not being born in the United States because of the citizenship status of a birth parent.

So we don't have that here. Instead all we have is again at best an assertion that there's a list of individuals who are likely noncitizens.

On top of that, we have from paragraph 60 of the complaint the Government's own admission that it's not practicable or feasible for the United States before the 2026 election concludes for thousands, let alone tens of thousands of individual that two federal investigative offices identified on the voter roster as being -- likely being sent DMV ballots.

Not practical or feasible for the United States to review and make conclusions about those folks before the conclusion of the voting period.

Well, if the federal government which of course possesses a broader array of resources that can be used to determine citizenship status can't make that determination how can the County?

We also don't know the provenance of the data itself on which both Secretary Mullins' letter rests or DAG McCotter's letter. And this was referenced by my colleagues with the State Attorney General's Office.

We know from their assertions that there was a list of -- there was a voter list that was acquired from the State, but we don't know who the list was sent to on the Department of Homeland Security side, we don't know when that list was sent, so importantly, Your Honor, I would assert we're not -- we don't know if the transmission of that list comports with Your Honor's order earlier this year in its earlier U.S. v Weber case.

We don't know what representations were made to the state in order to get them to provide that list to DHS. And we don't know what fields were provided by the state to DHS for each of those individual voters.

For example, did that list include social security numbers, did it include birthdays, did it include any other biographical matching indicia than what is put forth by the declarants, which would just be name, date of birth and address.

And if it was just those three fields, Your Honor, I would submit it was just name, address and DOB, then there is a strong concern on the part of the County that there are false matches. Because what the declarants suggest is that the state data was taken, matched up with Accurint, a third party software provider in order to generate social security numbers, and then that later -- data was later further validated on the field.

The issue is that we simply do not have a record that tells us what that matching process was like, the accuracy of that process, how well it was quality control tested, what the error rates were, et cetera. And the reason why that's important is again, the Government is asking the County to make a broad, mass determination, a mass adjudication of the enfranchisement of voters on the eve or in the middle of an election period on the eve of the end of the election period, again with no standards for adjudication, no involvement of a third party, no state laws or regulations that allow the County to undertake such an exercise.

Your Honor, so with that, I would submit. Again, I would -- we would offer to the Court that Your Honor has the ability now, you have the record to rule without further evidentiary discussion, but we're also prepared to go forward if the Court chooses. Thank you, Your Honor.

**MR. LEWISTON:** Good afternoon, Your Honor, Brandon Lewiston for the intervenors SIREN and Mi Familia.

We moved to intervene in this case to defend against the federal government's assault on California voters. DOJ's demand to segregate ballots from voters on its list who have never been shown to be ineligible has no basis in the law and is an affront to our constitutional structure and our democratic system of government.

I join the arguments that my friends have already

made from the State of California and from LA. I also believe that Judges Bennett and Judge Sanchez have already laid there many of the legal flaws in DOJ's theory here. And to avoid duplication and respect of the Court's time and the time of the other parties' here, I'm going to focus my presentation specifically on the woeful inadequacy of the Government's actual showing in support of their TRO.

The first point I want to make, Your Honor, is that the list that they have provided to the public, the Court, and the State of California and LA is unreliable. Even DOJ admits in their complaint that they don't know if any of the names on that list are actually noncitizens. What they say is that they might be noncitizens and there's little reason given in the declarations and other evidence before the Court to give credence to that assertion.

I think it's actually really helpful to look at not just what the declarations say but what they don't say. What they don't say is that the Government databases that they used to create this list are accurate, up to date or comprehensive.

And it's no surprise that those types of assertions are not made in these declarations, because the declarants are not people who have the technical expertise or role in the federal government necessary to even make those types of assertions.

Instead, the declarants are largely people who are,

you know, involved in using these databases but not creating, maintaining or assessing the accuracy or reliability of the databases that are used to create this list.

Instead of detailed information in these declarations to support the allegations that DOJ has made, instead what we see in these declarations are a lot of buzz words, words like enrichments or enhancements that are largely undefined and feel a lot more like corporate lingo than the type of credible and reliable testimony that the Court could rely on, particularly in light of the extraordinary relief that the federal government is asking for here.

Another issue that my friend has also pointed out is that we don't even know the providence of the data that the Government -- that the federal government took from -- you know, is using for California's voter roll. It doesn't seem like the federal government acquired that information, you know, this data directly from the State of California. It seems from their declarations like they acquired it through a third party.

They've attached an e-mail to their most recent declaration from last night, but they conspicuously redacted the name of the party that gave them this information and even the date that the e-mail was transmitted. So we don't even know when exactly they acquired this information.

And I find that really striking that the federal

government is coming here and asks the Court to rely so heavily on its representation and its extraordinary allegations when the federal government doesn't seem to be willing to, you know, show its cards and explain to the Court where it got this data from, what third party they used to acquire it, what representations were made, and even the date on which they acquired the data.

There's also some very striking admissions in the Government's declarations that have been submitted in support of their extraordinary allegations. Mr. Bartel's (phonetic) declaration admits that the data they relied on may be incomplete, outdated or mismatched. He also acknowledged that there's also a risk for human error when they're creating these lists. And that should be no surprise because as Your Honor held in the voter list case when DOJ came to Your Honor last fall and over the winter seeking California's full unredacted voter list, including social security numbers, Your Honor was the first in the country to rule against DOJ on that matter. And I think 27 or 28 other courts have subsequently followed suit.

But the implication is that the list that the federal government used to or the data or rather, the voter roll that the federal government used did not include voter's social security numbers. And that's an important problem, that's, you know, a striking problem for the federal government.

They've been telling us in litigation across the country that in order to effectively do a database matching process they have to have specific personal identifying information from the voters on the voter roll including social security numbers. But the database that they're using here doesn't seem to include those social security numbers.

So what do they do? Well their original declaration said that they went to a third party software provider to enhance the data, and that was very -- it was very vague, you know, we don't know who this third party software provider is and we don't know what that process of enhancement means.

Last night for the first time they disclose that the third party is Lexus Nexus, they apparently took this voter data that they received from origins who have not been disclosed to the Court or to us and gave that data to a program, you know, created by Lexus Nexus and enhanced it to apparently include social security numbers for some of the individuals that Lexus Nexus might have these numbers for.

What's striking, though, is that the federal government has not provided any declarations or any evidence that the Lexus Nexus database that they're relying upon to enhance their voter data is reliable. We don't have any declarations from, you know, associated with Lexus Nexus themselves, we don't have any declarations from anyone associated with technical -- from the federal government with

technical expertise in this database.

Instead, it's not even an assertion that the Government is making, it's more like an assumption that they're making that this enhancement process was viable.

The second point I want to make, Your Honor, is that the declarations and the evidence that the federal government has submitted here, almost entirely ignores all the public failures that the federal government has already encountered when they tried to create lists of noncitizens on state's voter rolls.

Nevada is the most striking example, DHS sent them a letter just this summer around the same time as the first California letter. That said there are 16,000 voters on -- there are 16,000 noncitizens on Nevada's roll. And then later the federal government corrected themselves and said, oh, wait, maybe it's not 16,000 maybe it's just 185. And when Nevada's election officials took a look at it they determined that according to their records, none of those 185 registered voters in the State of Nevada were, in fact, noncitizens.

Something similar unfolded in Utah, a manual audit that, you know, the federal government said that there was 9,000 noncitizens on Utah's rolls and when there was a manual audit conducted by Utah election officials, they found that nearly every single person on that list was actually an eligible voter.

The same thing is now unfolding in California. We started with 190,000 in July and then with no explanation, it fell to 20,000. And now, you know, when we start looking into the details of it, it looks like it's, you know, there's no reason to even give credence to that number.

And what's really striking to me about this sequence of events, Your Honor, and the omissions in the declarations that the Government has supported and the evidence they've put before the Court is that if DHS and the federal government wanted to get this process right, if what they wanted to do was actually be able to create an accurate list of noncitizens on a state's voter rolls what they would do is acknowledge their, you know, egg in the face moments, acknowledge their public failures, recognize their mistakes, and then examine them to try to learn from them, so that they, you know, could correct that mistake the next time.

But instead as far as I can tell what the federal government's approach has been is more of a head in the sand, you know, approach to these failures. They ignore them in their declarations, they have not seriously confronted them in their briefing and there's no reason to think that the reliability of the list that the federal government has given the officials here in California is any more reliable than the list that they've given officials in Nevada or Utah that prove to be inaccurate.

To close, Your Honor, I think that DOJ's theory here fails on the law many times over for reasons that have already been stated and that are explained in the concurrences, you know, by the two judges on the Ninth Circuit.

I will like to request that Your Honor make credibility determinations and factual findings regarding the credence of the federal government's allegations here and the list they've given California.

And the reason for that, Your Honor, is because we are inevitably going to be back before the Ninth Circuit, we may be before the Supreme Court in the coming days or weeks, and those courts are going to look to Your Honor as to the finder of fact to have made determinations about the credibility of the Government's allegations in this case and whether we can trust the Government's representations about this voter list.

And I think when Your Honor makes those determinations, when you looks closely at the record that has been put into evidence before Your Honor, I think it's very clear that there is no reason to give any credibility or reliability to the Government's allegations in this case. Thank you, Your Honor.

**MS. BALDWIN:** Thank you, Your Honor, and may it please the Court. Anna Baldwin for the LULAC and NAACP intervenors.

Your Honor, this is an extraordinary case in which the federal government is seeking essentially to up end the separation of powers and the election clause to come in and make a demand that I'm unaware of the federal government ever making to say, once voting is in process, you must literally not count the ballots of the voters lawfully registered under state and federal law until you satisfy some demand that we've made.

As my colleagues have made that is a demand that finds no basis in federal law, in fact, it violates multiple multiple federal voting right statutes as well as the Constitution.

I want to center my remarks on the equitable considerations and the public interest and the voices of voters. And I think both legally and factually there is no harm to the United States and there is great harm to voters, including the many thousands of members of the NAACP and LULAC who are prejudiced by the conduct of the Government in this case.

The public's interest is in fair elections, including protecting the fundamental right to vote. And that public interest weighs entirely against the Department of Justice here. The public interest strongly favors protecting the rights and permitting as many qualified voters to vote as possible.

The voter qualifications are set by state and federal law. And so on the one hand you have voters who are qualified under state and federal law, and on the other side of the ledger you have the Department of Justice running into court with this list of 20,000 names.

I agree with many of the things that my counsel has just said and I just want to point the Court in making those sort of credibility determinations to the expert evidence that the LULAC and NAACP intervenors have put before the Court in the declaration from Dr. Kascary Osky (phonetic). The Osky declarations and there are two of them, Your Honor, talk about why the process that the federal government has laid out is not entitled to credence.

And let's start with the first step of the process. Again, we've talked a lot this morning about the fact that the State starts with a voter file that they are still redacting the date on which it's sent. Why does it matter that the date is redacted? It matters because Cal Votes, the State voter database is updated on a daily basis under state law. It is a dynamic list precisely because the state cares about maintaining an accurate voter list.

So if this is a list to start from 2025 at some long period of time, it is already out of date. We further don't know that it is actually just the actual voter file that could have been publicly purchased.

So that publicly purchased voter file doesn't have social security numbers. And as Dr. Osky explains in his declaration, having a social security matters because when you're having large databases attempt to talk to one another, you want a common identifier between the databases that let you say, hey, is this person in this database, is this Maria Gomez here the same as the Maria Gomez in another database.

And without that unique identifier it is very difficult to figure out if you have the same two persons. So the McLaughlin and Bartel declarations talk about, we use multiple identifiers to do this work and it gets slightly more specific in the updated declarations, but, you know, first we know they have this information of undetermined province.

It's not even clear that the list that was given to whatever third party is given without modification to DHS. There is in some of the first declarations filed in this case there's language talking about information from the voter rolls. So we don't know if it's already been extracted and some data work done before it even comes into DHS possession.

From that point, the first step then as Dr. Osky discusses is there's this third party data analytics done, which they've now identified as the Lexus Nexus accurate database. And this is how, from what we understand, and I think, you know, as LA County was talking about earlier there's some kind of matching -- that adds the social security numbers

on to this database, but really troublingly in the new declarations that we have, we find out that it's not even using date of birth. It's using name and address to marry these social security numbers.

So it's unclear. In the public voter file there's certainly date of birth information. It's unanswered why you wouldn't use date of birth information to do that, but again, the fewer variables you have, the higher likelihood of a false positive.

And why does a false positive matter? Because at that first instance when you are using this black box third party data that is driving everything else in the process. You make an error at the outset and that is going to carry throughout if you misjoin someone on the voter file with a mismatched social security number.

So you file this black box process, and I just want to point out in the second declaration that Dr. Osky very kindly put together this morning after the United States' late night filing, you know, Accurint's own terms and conditions do not even ensure, they don't warranty the accuracy of the data. Accurint customers appear to have to acknowledge and agree that Lexus Nexus obtained its data from third party resources, which may or may not be completely thorough and accurate, and that the customer shall not rely on Lexus Nexus for the accuracy or completeness of the information obtained.

It further states, due to the nature of public record information, the public records and commercially available data sources used by Lexus Nexus may contain errors. Sometimes the sources are reported or entered inaccurately, processed poorly or incorrectly and is generally not free from defect.

So as far as we know, those are the contractual terms the United States agreed to. Dr. Osky further talks about scholarly literature that reviewed some of the problems with the accurate data that reveals that it has a higher rate of error with respect to Latino and African American persons.

So again, in terms of the impact on my clients, the impact of the fundamental right to vote, this is the process that the United States is coming in the eleventh hour as an end run around federal statutes that assign, you know, the state a responsibility and unless and until Congress comes in.

And so you have this you've added in the social security numbers and then what happens from that, well then the declarations describe, you know, going to other federal databases, various, you know enrichment checks, none of that has any kind of error rates, it doesn't say how many, you know, records went in, came out, it doesn't explain any of those steps that would allow you to say, oh, this is an accurate process.

This is essentially the federal government's coming into this court and saying just trust us when we say that you

should place in a hold which seems very likely to be the same thing as disenfranchise these citizens based on just trust us.

And everything else that we know from the public record about this information, there is no federal database of the citizenship of every resident in the United States. It doesn't exist. And so that's why, you know, looking to these different databases.

You have in other cases very recently they're pulling data from all kinds of federal databases that explains in the common cause case that Judge Soonkanan recently decided. There are findings of fact saying that the Social Security Administration very recently found that in Social Security Administration records up to 7 percent of individuals have their citizenship status incorrectly reported.

So you have this data matching where we just hope and trust that we've gotten the social security number right. We're not going to use the date of birth to associate with that. And I just want to give an example of how that could be problematic at the outset.

Let's say you have two individuals, a young adult U.S. born citizen and an elder grandparent, mixed status. The elder grandparent is a green card holder they have the same name. They are both Juan Rivera. One is a green card holder, the other is a U.S. citizen. I'm just giving that name as an example.

Under the matching protocol you don't enter the date of birth, they live together, they have the same address. It is not clear how the Government's protocol as described in these two declarations would differentiate between the grandfather who is a noncitizen and the grandson who is a citizen. This is deeply troubling.

And then at the end of this process, if you've associated the social security number correctly you still reach the point where we're just trusting that this citizenship information is accurate.

And again, these databases are not the federal databases that have citizenship information are not updated real time live. And there is no information whatsoever in the declaration that says what the process is for the Government going back and making sure that people haven't naturalized.

Of course, they may have had an alien number at some point, that doesn't mean that they are still a noncitizen. This is a deeply troubling process that is trying to use social security numbers that they've glued to the voter file to go fishing for anybody who has an alien number without any kind of clarity in how the federal government is assuring that just this fact that at one time you were a noncitizen that you are not an American citizen today. None of that detail is found in the declarations.

And to the contrary, it's discussed in our expert

declaration. It's discussed in the case law. It's discussed in the public record. This process has a well known error rate of sweeping in naturalized citizens. And the Ninth Circuit has already held that it violates the NVRA to essentially treat people as presumptively ineligible unless they can prove through documentary proof of citizenship that they are eligible to vote.

That's the Mi Familia Avoto (phonetic) case and this case is doing the exact same thing. Those are all the factual reasons, Your Honor, why there is no reason to credit what the Government has come into this court and the extraordinary relief it's seeking.

And I just want to point out, you know, legally of course we agree with what everyone else has said, that there is no cause of action, equity is not an end run around the elections clause. But even more to the point, the main injury that the United States is talking about is under a vote dilution theory.

And the Ninth Circuit has already in a case that is on all fours with this case rejected that there could possibly be even assuming all the facts were true, which they are not, this will result in the disenfranchisement of U.S. citizens.

The Ninth Circuit has already rejected the United States' theory of injury flowing from vote dilution and the EIPCA v Weber case which is at 113 F.4th 1072 from 2024 in

which the Court says -- and that case also involved supposedly ballots that were -- mail ballots that were cast by individuals who were not eligible to vote.

And the Ninth Circuit held that that doesn't even state a vote dilution claim because vote dilution is about a showing of disproportion voting power for some voters over others.

And in this instance, there is no disproportionate showing. It's the same, know when these votes are being under or overweighted relative to any other voter, the effect of counting, you know, any invalid ballots is the same on all voters regardless of voting method or geography.

So their legal theory is a dead letter. They've already been -- have no cause of action, it's barred by Purcell, it is contrary to multiple federal voting statutes that don't give the federal government to super intend the voting rolls, but even the injury that the United States says has been legally rejected and cannot be counterweighed against the real injuries to actual California voters who stand to be disfranchised.

And even, you know, we don't have to assume that members of my clients are on this list. This is having a chilling effect to have the United States coming in and threatening criminal penalties for people exercising their right to vote as they are entitled to under federal and

California law. They have attested to their citizenship under penalty of perjury and the United States has no credible evidence to undercut that.

So we would, you know, join in asking this Court to promptly deny this motion.

**THE COURT:** All right. We've had the first round. Why don't we take a recess for just a moment and we'll have rebuttal in just a moment. Would 20 minutes be acceptable for counsel? All right. We'll see you in 20 minutes. Thank you very much.

**(Recessed at 2:10 p.m.; reconvened at 2:49 p.m.)**

**THE COURT:** All right then, counsel. We're back on the record. This would be rebuttal, beginning with the Government, please. And each party has unlimited time. Okay?

**MR. ESSAYLI:** Thank you, Your Honor. Bilal Essayli on behalf of the United States.

Your Honor, I want to start with the timeline of events. There's been a lot said about what the Government did or did not do, and so I want to just make the record very clear on what exactly the Government has done in this case. This started, Your Honor, last year when the Government undertook an effort to try to find out how many potential ineligible voters are on the state voter rolls. As you know, the Government tried to do that in many ways, one of which was to try to obtain the unredacted voter rolls, which were not successful.

That's not part of this case.

The Government then shifted. They obtained the voter rolls that were redacted, meaning California makes the voter rolls available for purchase, but when you purchase it, it does not have the Social Security numbers and the other identifying markers. So that then requires the Government to undertake an enormous amount of effort and resources to try to identify exactly, positively, who each person is and make a determination on their citizenship.

Your Honor, if I may, I want to display one of the summary charts in the exhibit we -- in the declaration we filed last night.

**THE COURT:** Do you want to use the Elmo and put that up on the screen?

**MR. ESSAYLI:** Please, Your Honor.

**THE COURT:** Please, so Karlen can help you and make sure that you don't have an issue.

**MR. ESSAYLI:** I want to walk Your Honor exactly through what the Government did. The Government obtained the redacted voter rolls, which were purchased from the Secretary of State directly. They are the keepers of the voter rolls. They make it available for purchase. It was purchased and it was provided to the Department of Homeland Security. We put that in our declaration. We've explained it. We have the attachment that shows the purchase of those voter rolls.

Those rolls were then provided to USCIS, which is United States Citizenship and Immigration Services, and they are the keeper, if you will, of all the immigration records that the Government has for people who apply for naturalization or visas, et cetera. So those are mostly lawful citizens, residents in the U.S. who don't have citizenship status. So they're sort of known non-citizens is the way I would explain it.

And so the best way to think of this as a funnel, the top, the entire voter roll came in. It was then scrubbed to try to identify how many people on there the Government thinks are potentially non-citizens. In order to do that, Your Honor, the Government had to enrich or enhance or add, supplement, whatever you want to call it, information to the voter file. And so they took the information that was on there, the names, the addresses, et cetera, and they used a database that's often used by law enforcement. It's used commercially that contains people's identifying information, such as socials and other things like that. That was done preliminarily at the beginning to try to match the data. Only if there was a --

**THE COURT:** Is that the --

**MR. ESSAYLI:** Yes, Your Honor.

**THE COURT:** Is that the 197,000 initial figure or the 20,000 number?

**MR. ESSAYLI:** So that process at the top provided

that bigger, larger number. I don't know exactly --

**THE COURT:** 190,000 or 197,000 initial number.

**MR. ESSAYLI:** Yes, Your Honor. And so, again, we make California aware of that as soon as possible. If you read -- the tone of the letter, it is to sort of explain to California what we have and invite them to try to work with us on this together collaboratively. My understanding is the Government offered to have a call with the Secretary of State to have these discussions, and they refused. They bucked us. And so we moved forward with this process in trying to determine on our own who exactly is a citizen or a non-citizen. And when in doubt, they were not included. So that's why we believe strongly in this list, Your Honor. This is the list that we're most confident in.

We're never going to stand here and tell you everything's 100 percent. You have humans involved. We're not going to make that representation to the Court. So I'll walk you through the list, Your Honor.

So once the data was enriched with the identifying information, it was then combined with federal databases. So Social Security, USCIS, other Government databases, passport records, to try to positively confirm if someone's a citizen or a non-citizen. Once it went through those various databases, Your Honor, it then went to actual humans. It went to employees at the USCIS. And my understanding is it was about 8

to 900 individuals were involved in reviewing the records in this case.

And they were reviewing for two things, Your Honor. And this is step five is really the critical step. This is the human manual verification process where a human being sits there with the file, opens it up, looks at the voter data, the enriched information, they look at the records, and they ask two questions. Question one, is this the same person? And question two, are they a non-citizen? And only if both answers are correct or yes, are they then added to the list. And each of those determinations was then reviewed by a supervisor.

So there are two layers of review in that process. And again, we feel strongly in that verification process. The county took a sample of 200 people off our list. They provided us the name and the birthdays of the people they sampled. And we responded in our declaration yesterday, Your Honor. Each and every one of those people was foreign born. They were not born in the United States.

We did disclose that potentially four of them might have a claim to citizenship. We do not believe they are citizens, but they may have an articulable claim. It would have to be vetted -- derived citizenship is a very complicated issue. And so we did note in our declaration, Your Honor, that there may be four people that we would probably take off the list if we were to look at it again. But that would mean that

98 percent of the people on there was correct.

And again, the purpose of the list, Your Honor, is not to cancel anyone's vote or to disenfranchise anyone. It's to provide the information to the State and the county so that way they can undertake whatever review process they choose to confirm whether or not this person's a citizen. And we're not making them do anything. They do not have to collaborate with us. They can go out and do their own investigation. They can go ask the individuals for information. They can do a myriad of things, Your Honor. But they do have access to citizenship information through what's called the SAVE program, Your Honor. It's been in effect since the '80s. They use it in the context of Medi-Cal.

Every applicant in Medi-Cal, California, runs through that system to confirm their citizenship, and that's so they can be reimbursed by the federal Government. So California has access to that database. They could very easily in, we think, hours or days run the whole list and be satisfied themselves whether these people are citizens or not. And I think that's the point here, Your Honor.

I think we've been really surprised by just the lack of any interest whatsoever in cooperating with us or trying to make this as collaborative as possible. It's really just been very controversial, or very adversarial, and very confrontational. And the tone of the federal government has

always been, we want to work with you on this. And we understand we can't force you to take any particular step, but what they cannot do is knowingly count ballots when they have specific information that these individuals are not citizens. That they cannot do. That is a prohibition by Congress. 18 U.S.C. 611 makes that illegal. And even though they're not the ones casting the ballot under aiding and abetting theory of liability, Your Honor, 18 U.S.C. subsection 2, they would be criminally liable if they knowingly process a ballot of a non-citizen. They would have the same criminal liability as the person who voted. And that's a statute passed by Congress. That's Congress's intent.

Congress has said, we do not want non-citizens voting in our elections. And that's a very important principle in the United States, that it is citizens who determine their Government. It is citizens who get to elect their leaders and to self-govern, not non-citizens coming in here and infecting our elections, Your Honor.

And we don't have to get into how close some elections are. I mean, I would ask the State, how many illegal votes is okay for them? You know, is it five, is it ten? Well, some elections, Your Honor, are decided by a handful of votes. I mean, we had a state race decided a couple years ago, I think it was less than 20 votes. There was a congressional race in the last cycle decided, I think, by 200 votes. So

every vote matters, Your Honor, and every American citizen deserves to have their vote counted equally and not diluted.

So that's the process that was undertaken. This process, Your Honor, took a lot of time. It took a lot of man hours. Again, Mr. Bartell is here in court. He led a team, again, of about 800 individuals to go through this process. We did not have this list done until early October. So the suggestion that we could have brought this lawsuit earlier, we could have brought a lawsuit, but we would not have had a meaningful list or evidence to present the Court as a basis for an emergency request or to seek the relief that we needed. We did not have that. We did not have this review process completed prior to the time that we made the list available to the State of California and asked them to, again, just separate the ballots. Not to void them, just separate them so we can preserve the rights and interests of American citizens while we litigate this before Your Honor.

On the Purcell, Your Honor, Purcell's about not changing the rules in the middle of the game. And we have not sought to change the rules. The rules are the same. If you're an eligible voter, you have a right to vote and you have a right to have your vote counted. And the United States government is committed to ensuring that every American voter's vote gets counted. We're going to have election monitors here coming up soon to make sure no one's disenfranchised at the

voting place, Your Honor, and we're committed to that.

What we're talking about here is segregating ballots after they're received. It's not changing the rules of the game. It's really a ministerial task to preserve the interests of the government and to protect American citizens. And when you look at the balancing test, the factors clearly weigh in the Government's side here, Your Honor. As far as the merits, I mean, it cannot be that the State has a right to facilitate the counting and tabulation of non-citizen votes. There's no right to that. They do not have a right to tabulate these ballots. You do not.

The ballots that we have identified with reliable evidence of non-citizens cannot be tabulated. And there's irreparable harm. As I said, Your Honor, as we're having this argument, the county is opening envelopes and separating the ballots. That cannot be undone. The bell cannot be unwrung. The envelope cannot be restuffed. It's done. So hundreds of thousands of ballots are being processed as we speak. The harm is irreparable. I believe there's a strong public interest here, Your Honor.

Not only is there an interest in individual voters not having their ballots diluted, but there's an interest in the American public, Your Honor, having trust and confidence in their elections, and that when we get our election results, that the public will accept those results and so those leaders

can govern. And so there is a strong interest here in election integrity in this case.

As far as the equities, you know, the State has alleged that this would be catastrophic to segregate ballots. It would be unworkable. It's catastrophic. Your Honor, that's just simply not true. If you look at California's own procedures, they have procedures to have list challenges. They have procedures to segregate mismatched signatures. We submitted a declaration last night from an elected registrar voter -- voter -- I'm sorry, the elected registrar, a voter who's responsible for tabulating ballots in this county, and he said this could be easily done. All you have to do is go in the system and mark these individuals and when the machines sort the ballots, it will just spit them out to the side and they can be manually reviewed.

This list, we're happy to give it in any format they want that would make it accessible to their IT teams to then upload it in their systems and flag them electronically. We're in 2026. This can be done, I believe, electronically and digitally in a very efficient manner, Your Honor. It doesn't require a manual review.

You know, I think what's being missed here, Your Honor, is maybe it's a burden shifting scheme. California has the right to register people to vote based on attestation. You have a right to be on the voter roll. You have a right to get

a ballot. But once the federal government, or anybody for that matter, presents evidence concerning the eligibility of that voter, I do believe the burden now shifts back to the State to try to make a determination on the eligibility of that voter. And what California has said here is we're not even going to do that. We're not even going to look at their list. We're not even going to check it out. We're not going to do our own investigation. It's too late, Your Honor. It's too late. Ballots are out. We're too busy. We can't be bothered. That's essentially the argument.

And when asked about this again in the Ninth Circuit, the position of the State was that these ballots will absolutely be counted and the Government can go prosecute these people after the fact. That's essentially the remedy they've proposed.

As Your Honor knows, we are not set up to prosecute tens of thousands of people. That's just not a realistic thing. We charged 28 people last week. Primarily when we bring criminal cases, it's a form of deterrence. It is not to -- it is not to charge every single person who's ever committed that crime. We charge primarily out of deterrence. And hopefully it discourages other lawbreakers from engaging in the same conduct.

There's been some confusion about the list in Nevada, Your Honor. My understanding of that list is there was a list

of 185, again, validated names that were provided to Nevada. Nevada went through their records and they said, we have an attestation for every one of those people claiming to be a citizen. So we believe they're a citizen. So there's a big -- I think there's a lot of over speaking with each other here where we're talking about validating and they're talking about attestation. And I think the position of the State is that the attestation is good enough for them. As long as the person assigned that, they're satisfied they're a citizen and they don't have any obligations to do anything else.

And I think that's right until the point they receive actual knowledge or actual evidence regarding that person's eligibility. Then it shifts. That's why I'm suggesting it might be this burden shifting scheme that might have to be applied in these situations.

Your Honor, there was a recent -- well, I just want to state there are 34 states who are currently using the SAVE program, which again is a program that's been around since the '80s, that allows the states to check for citizenship. There's 34 states who are currently using it to confirm the citizenship status of their voters. It's being done broadly by a majority of the states. There has not been any issues. There was one court that enjoined -- issued an injunction, I believe it was Judge Sparkle in DC, who issued an injunction preventing the use of that program to confirm the eligibility of those on the

voter rolls.

The Supreme Court on September 26 -- September 25th of this year, in DHS v. League of Women Voters, docket number 26A308, they lifted that injunction. They lifted that restriction and they permitted the use of this program by states to verify citizenship. So the Supreme Court has -- it was in an emergency posture, so they haven't fully heard the case, but they have signaled at this point that the Supreme Court believes that this program is lawful. It's not violating people's constitutional rights and that there's confidence in the records that are made available to the states to confirm citizenship status.

I just want to reemphasize the timeline again real quick, Your Honor. So the original preliminary data set that we got, the 190,000, that was communicated in July of this year. There was no willingness to participate in some sort of collaborative effort to pare that down. Again, if they were to provide -- if they voluntarily were willing to provide data, we could have sorted this out very quickly, but they didn't and they didn't have to.

And once we had this list, it was early October, we delivered the list on October 13th. We asked -- sent it with a letter, asking them to work with us on this or at minimum sequester or segregate these ballots while we can litigate this. They didn't comply. On the 15th, we filed our lawsuit.

On the following Monday, we filed the TRO in less than a week. We've already been up to the 9th and back in here or so.

Things are moving as quickly as they possibly can from our perspective, Your Honor. Just one second, Your Honor. I'm just checking my notes. I'm a little outnumbered. There's a lot of argument here today.

Okay, on the supremacy clause issue, in our briefing, we discussed some applicable cases that talk about the State cannot -- the State cannot frustrate or obstruct a declared purpose of Congress, in this case ensuring that non-citizens are not voting in here. And even though they, again, are not directly participating, there is a principle, there is a concept where they may not induce, encourage, or promote private persons to accomplish what is constitutionally forbidden.

And there's a lot of cases in that space in the civil rights context, Your Honor, where the local actors, the state actors, are basically very passive. They weren't preventing the violation of people's civil rights. And the Supreme Court found that that was a violation of the supremacy clause to frustrate the Civil Rights Act, the civil rights statutes when states would put up these obstacles. And those cases, Your Honor, are Norwood v. Harrison, 413 U.S. 455, and City of Richmond v. J.A. Croson Co., 488 U.S.C. 469.

So I would just draw that -- draw the Court's

attention is that case law and that we don't need an expressed preemption. We don't need this Congress to lay out every ministerial thing that must happen to accomplish its will. The supremacy clause applies to state when there's an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and that's what the Supreme Court's held.

Your Honor, I'll just conclude with, again, we have witnesses here if the Court wants to hear from them. We stand by the reliability of this information. We take our obligations and ethics very seriously. We're being very careful in how we're representing the information to the Court and through these declarations, and we just would ask the Court to read the declarations, a lot of time put into that, and this was a very thoughtful, methodical evidence-based approach and, again, we're willing to work with the State. We're willing to show them our records.

I mean, if they want to come and see the A files, if they want to see the data, we submitted I believe in camera the database that USCIS prepared for the sample, the 200 person sample the State or the County looked at. We took their data and put it next to USCIS's data and it shows the identifying information, the A number, the country of birth. You could see the amount of work that went into creating these databases.

We're happy to, you know, whether it's in a

protective order context, you know, make information available as much as they need to satisfy their interest that this is a legitimate credible list.

So with that, Your Honor, I'll conclude my remarks unless the Court wants me to address anything in particular.

**THE COURT:** I'm going to have some questions after rebuttal.

**MR. ESSAYLI:** Thank you, Your Honor.

**THE COURT:** Thank you very much. Counsel?

**MR. COHEN:** Thank you, Your Honor. Just a few points before I pass it off to my colleagues. As a matter of housekeeping, just to ensure the SCUI (phonetic) dec, the expert report, I mean, entered by LULAC is in the record before the Court. The State will join those expert reports. That's docket number 37-2 and 131-1.

Does the Court have any questions about that?

**THE COURT:** No.

**MR. COHEN:** Great. So maybe I'll begin by just starting to set the record straight. To be clear, the secretary's office didn't provide voter rolls directly to the federal government. They won't tell us who they got the voter rolls from nor when that list was generated. That declaration entered only at 10:30, 11:00 p.m. last night is fully redacted. So we have no idea what the providence of the information actually is, nor did the secretary refuse collaboration with

the federal government. In fact, the secretary's office asked for the details about the data and underlying methodology in writing and the federal government refused to provide it.

I leave it up to Your Honor to speculate why that might be and I'll leave it to the accuracy of the data itself to the many counsel here who have ably articulated its many deficiencies, which the Government has not rebutted despite the fact that they've displayed an infographic. We don't have to guess at its inaccuracy because, fortunately, the county has demonstrated it for us.

Next, Your Honor, we heard now about a new law invented out of whole cloth before you, a burden shifting principle, where if the federal government brings to the states some sort of evidence that they allege is sufficient proof of non-citizenship, the burden shifts to the State to then prove that those folks are actually lawful voters. That law doesn't live anywhere. In fact, the State provides for many systems for challenging voter eligibility and has its own burden shifting provisions in place. There's simply no basis for a new system under which the federal government has invented a law by which they can enlist the states to prove citizenship at the mere allegation of ineligibility.

On the preemption, we've heard very little of substance from the government. Nothing about the elections clause which forecloses this claim. I think Your Honor does

not have to reach the supremacy clause at all because the Executive's claim here fails before we even get there. Judge Bennett was exactly right on that point, but because it was raised, I'll address it anyway.

It's remarkable to me that even as the Executive touts arrests for alleged violations of Section 611 across California, it claims California is impeding enforcement of the statute and as Mr. Moore explained earlier, that's a very, very high bar. The Court has rarely found obstacle preemption and has done so in only two types of cases. One, where federal law governs a uniquely federal area, and state law directly interferes with the federal program. It can't be that because the founders clearly conferred authority over elections to the states in the first instance. And that's been true since the founding. Or two, where federal law clearly sought to set a balance of interests that state law impedes. Again, nothing like that sort of claim alleged here.

So we can only make out two maybe possible characterizations of what the preemption claim is here if it's adjudicated under the supremacy clause. The first is that California is just refusing to help and we did hear that from the government today. They said California is refusing to work with the Government. That's a direct quote. But even if that were true, the Ninth Circuit has squarely foreclosed that theory of obstacle preemption. I mean, that's Con Law 101.

That's Prince. That's the earlier United States v. California in 2019.

The other theory is that California is facilitating unlawful voting by holding elections in accordance with federal standards, but by the same token the State is facilitating drunk driving by maintaining roads. Congress has told the states that attestation under penalty of perjury is sufficient to establish citizenship. The Government suggested that's the State's position. To be clear, that's Congress's position. Congress even considered and rejected requiring documentary proof of citizenship on voter registration forms when formulating the National Voter Registration Act. The idea that Congress's own judgment is somehow facilitating unlawful conduct under federal law just doesn't make any sense. And anyway, California has also criminalized non-citizen voting, as you've heard here today, and has in place mechanisms to prevent it, as Ms. Bellows has spoken to.

So there's really no colorable way to make out whatever preemption claim the Government supposes it's brought here, and on that point, the majority of the Ninth Circuit panel that's already heard this case had it exactly right.

Before I give up the mic, I do want to speak for a moment about the authorities that the Government has raised, namely Norwood v. Harrison and City of Richmond v. Croson. I want to be clear that Norwood was a challenge to a Mississippi

statutory program, providing textbooks to schools, including those engaged in racial discrimination. It concerned the 14th amendment, which is an express limitation on state conduct. It says no state shall. There's no such language in Section 611, not even close. And of course, the 14th Amendment implicates a doctrinal framework that is quite complex and idiosyncratic and, frankly, just not at issue here.

In Croson, this was a challenge to a city council adopted plan requiring racial preference in contracting bids and the Court only cited Norwood for the idea that the city could dismantle any racially discriminatory system of contractor bidding if it wanted to, lest the city accidentally funded or passively fund any discrimination with public dollars. It's not even a preemption case.

There has been an allusion to a robust body of case law in this area, but if there is, it's not in the Government's papers, and I'm not aware of it. So with that, Your Honor, I'll pass along the mic to Ms. Bellows to speak to some of the other issues raised today.

**MS. BELLOWS:** Thank you, Your Honor. I'd like to start by speaking to disenfranchisement, which is the clear risk of the relief the plaintiff requests. Opposing counsel suggests that that's not the goal. They're just asking for verification, but we also heard opposing counsel threaten elections officials with criminal prosecution if they tabulate

the ballots of those on this list.

And to be clear, this is a list that even the U.S. government describes as likely non-citizens and even the U.S. government acknowledges that confirmation of their citizenship status is required. And so what is actually happening is that the U.S. government is asking that this court take a number of people, it could be 20,000. It could be more, because they've said there are more names that could be coming, and put them in a status of ineligible to vote until proven otherwise, and that could result -- plainly would result under the current circumstances where the election is ongoing in thousands of people losing their right to vote.

The federal government has not offered any evidence that it's feasible to confirm citizenship on that timeline. They mentioned the SAVE database, a database in their possession, which apparently, they've chosen not to use. California has concerns about the SAVE database's reliability. Those concerns are shared by many other states and at least one federal court. There's no basis to force us into using something that we think opens up serious questions about the reliability of determining someone's right to vote. So just want to make sure the stakes are clear that what we're talking about is stripping voting rights from thousands of people until proven otherwise.

On the Purcell matter, Mr. Essayli mentioned that

they're not trying to change the rules in the middle of the game, but the relief they're asking for would change everything. It would change the determination of eligibility under California law, the determination that places someone on the official list of eligible voters, and essentially nullify and reverse that determination until some further step is taken. That's a procedural change. It would change the procedures for tabulating votes and for processing mail ballots. Those -- California law requires that election officials, upon receipt of a mail ballot, verify the signature, and if there's no challenge and the signature is verified, proceed to open it and count it. It would also represent a seat change in the challenge procedure, which, under California law, requires the person bringing the challenge to show extraordinary proof.

The federal government asks us to effectively end-run those procedures and place thousands of people outside of the normal voting stream without even a specific allegation that that person is a non-citizen, only that they are likely a non-citizen, and to shift the burden to the State or to the local officials, or even to the voter, to overcome that allegation.

And finally, Mr. Essayli said how many illegal votes are acceptable, and he alluded to the possibility that it could affect the outcome of an election. First of all, given the numbers we're talking about here, that is extraordinarily

unlikely. There are 23 million voters in the State of California. So let's start with that. But if there were an allegation that unlawful voting affected the outcome of the election, California law, again, provides procedures to address that in the election contest statutes, which begins at California Election Code 1600 and continues onward, laying out a whole procedure for how a contest is noticed and what happens next and the duties of the elections officials and the duties of the courts.

And so that is what the State of California has erected to deal with this problem of how do you both protect the right to vote, how do you protect the finality of the election, and how do you enforce limitations on who's eligible? And that is all well within California's power under the Elections Clause. And a late eleventh hour demand by the U.S. government to do something different is a lawless imposition on that right.

The last thing I'd like to talk about is injury and the federal government's position that it is irreparably injured by the possibility that someone will vote who is not allowed to vote. Let us be clear, their injury needs to be connected to the theory they have in the case, which is that the U.S. is somehow harmed in its enforcement of 18 U.S.C. 611, but nothing that California does has any impact on the ability of the U.S. government to investigate and prosecute cases under

that statute as it has shown in recent weeks.

Really, what we're dealing with is a policy disagreement about the best way to enforce the citizenship qualification for voting. California has a whole book of procedures in how we enforce that qualification and all the other procedures necessary to voting. This administration is coming in and saying, it's not enough, we want more. That cannot be the basis for irreparable injury. Adopting that policy -- adopting that theory of irreparable injury would have no limiting principle.

As another court in this district said in a recent case also entitled U.S. v. California, this one about egg regulations, commented, that sort of theory of injury would allow the federal government to abuse the courts for political purposes and bring suits calculated to bring state law in line with its own political agenda. Sorry, that is -- there were several -- that was a partial quote as I'm looking at my notes, to be clear. But I think it is directly on point for what is happening here. The federal government has a disagreement and is calling that disagreement injury, and those two things are not the same.

With that, I will pass it to LA County. Thank you.

**MR. MOORE:** Thank you, Your Honor. A few quick points from me before passing along to my co-counsel. The United States Government raised a number of points which were

ably addressed by the State. Just want to emphasize a few points from the perspective of the County.

First, it appears that the United States Government has never before claimed preemption arising from a criminal statute that addresses federal elections in any way that impacts state election administration. Certainly the federal government has come forward. They note a mountain of precedent and leave that assessment to Your Honor. They have come forward with not a single case where that has ever occurred and in the short time of briefing, we've all been afforded in this case, the County has not found such a case either. Of course, the federal government does have an interest under Section 611 in prosecutions. You've heard from the federal government about them bringing those prosecutions. There is nothing about the State administration or the county administration of elections that the Government has or can identify as an impediment in any way to those prosecutions. If an individual who is a non-citizen votes, there will be a record of that. The County will provide that record. The individual can be prosecuted. Nothing that the County does provides in any way an obstacle to the prosecution of non-citizen voters, and that is the only preemptive interest that the State has here.

I do want to touch, as Mr. Cohen did, on this idea of a burden-shifting test, in no small part because the United States Government represented two parties that should be a part

of that burden-shifting: the United States Government coming forward with some quantum of evidence; and the State or County government assessing that evidence.

Of course, what the United States Government is attempting to do is disqualify a voter who, too, has rights in that process. What does the burden-shifting look like? How are the voters' due process rights accommodated? Who is establishing this purpose? If it is the State or the County, of course the State or the County must follow existing State Elections Code, which I will get to in a moment, which contemplates no such thing. If what is being asked is that Your Honor do this at this time, three weeks into an election, that is plainly barred by Purcell, and is so novel as to require some sort of clear statement somewhere in the United States Code that would ever contemplate such a thing. And of course, there is none.

The United States Government asks what of a close election? And Ms. Bellows addressed this briefly as well. Of course, this is not a novel thing. Sometimes elections are close. Sometimes there is a dispute about whether the handful of votes deciding an election were cast by eligible voters. That is what an election contest is for. California has that statute, and it does allow voter eligibility to be challenged after the fact where that is material to the outcome of an election. What it does not allow is this free ranging inquiry

to the idea that somehow, somewhere, somebody may have cast one vote among 23 million that reflects the preference of an ineligible voter. If that vote were to be material ever, there is a lengthy and well-established state process to deal with it. Of course, the United States has ignored that process in their briefing.

The United States, as I mentioned before, referenced a lot of cases on obstacle preemption. One principle that is fundamental to obstacle preemption that the United States did not mention is that where Congress is aware of any number of issues and does not address them by statute, it is presumed that Congress has not sought to preempt state or local practice. So let's give an example.

Unfortunately, this country has a long history of voter eligibility requirements. They date back to the day of the very founding. The moment we had voting, we had challenge processes to allow people to determine whether or not the voter was eligible to vote. Literally dating back to the first day that this country has existed. California has such a process. It is robust. I'll return to that in a moment, and Congress has never, not once, addressed those processes, and to the extent you could interpret, for example, HAVA to address those issues, it is to make sure that a potentially disqualified voter has the chance to cast a provisional ballot so that they are not excluded from an election.

In terms of California's challenge process, California does allow a challenge after a voter has returned a mail ballot. Now, that is a unique circumstance because the voter is not there to rebut the challenge. So the state law and implementing regulations require extraordinary proof. The United States, and we saw their list, does not have extraordinary proof, which is why they are in this court rather than using established state court and state administrative processes. And that is one of many fundamental flaws in their case.

I should note, too, that there are many states, including states that have submitted materials to this court, that do not allow voters to be challenged after they have returned a mail ballot. For that very reason, the voter is not there to confront the challenge. They require a challenge before the mail ballot has even been sent out. But California actually affords a more robust process, and somehow that fault is found with that. If there is fault, of course, the remedy lies for the United States before the Congress of the United States and not before this Court.

Just to address one final point before turning it over to my co-counsel. The United States has spent the better part of the last week demonstrating by its filings in this Court and the Ninth Circuit that it either knows or pays precious -- that it knows precious little about how the County

and the State as a whole administers elections. It expressed surprise in filings before this Court that ballots were being opened and that ballots to preserve the fundamental right to voter secrecy were being detached from envelopes.

That, of course, has been plainly apparent in California law for many years, and it also could have been plainly apparent to the United States Government in an election facility on which a livestream is presently available and has been since the moment they started processing ballots. But the United States is here before you to say, actually, this is not complicated. Surely the County can impose this segregation remedy that it's seeking without problem, without interruption to the very complex endeavor of putting on an election. There are declarations before you from Buller, from Flores, and Buller paragraphs 13 through 16, Flores 39 through 49, that are unrebutted and demonstrate quite plainly that the simplicity that the United States has represented to this Court is not actually what is happening on the ground.

Let me please pass it over to my co-counsel.

**MR. PELHAM:** Your Honor, I'm just going to make six very brief points. So first, there was a discussion earlier about the County sampled about 200 voters in that list of 7,000, and in the Government's witnesses' most recent supplemental declarations, about four of those individuals, four or five of those individuals, about two percent were

determined to possibly be U.S. citizens as a virtue of derivative citizenship. Two percent of 7,000 is over 100 voters, and that's why this is so important.

Before that correction last night, if the County had been ordered to actually carry out the Government's requested remedies, potentially, if that ratio were to hold up, over 100 voters just by virtue of potential derivative citizenship, let alone the other ways in which this data may be either inaccurate or other ways in which citizenship may have been misrepresented or inaccurately reflected in the data, in any event, those voters would have been pulled out and their ballots not counted, and I would insist, Your Honor, that under the procedures that exist, either what's been requested or demanded by the Government or that practically the County can even carry out, that adjudication, the adjudication of that citizenship status may not -- probably would not have been possible, and I would say would not have been possible before certification. So those folks' votes simply would not count, and that's the risk here.

Of course, voter fraud is important, but so is the disenfranchisement of valid, eligible U.S. citizen voters, especially through the virtue of a process that does not afford them hearing, due process, notice, so that they can be part of the adjudication of their citizenship status. While the Government says that you can do your own investigation, County,

you can use access to SAVE program resources in order to carry forward the investigation that we have started onto citizenship status, Your Honor, we reemphasize the point. The State does not allow the County to participate in the SAVE program for the termination of citizenship for voting purposes. There is no access to that resource for the County. So how would that adjudication take place? Again, that question has not been addressed.

On the question of whether or not the County can modify the system, my co-counsel already addressed this issue. We cannot modify the vote tabulation system or the ballot separation system on the vote-by-mail ballots that are currently being received and processed in order to single out the folks who appear on that list of 7,000. As Mr. Moore indicated, Your Honor, there's a live feed that's available now. I can display it for the Court. The Ballot Processing Center in Norwalk is dealing with thousands of these ballots every day, so a manual check, requiring election workers to manually try to identify folks from a list of 7,000, the Court can plainly see is impossible. And if it can't be done on a software level, it can't be done.

Deterrence. So my former colleague, USA Essayli, referred to the deterrent effect of 611. That is important. And to the extent that the federal government prosecutes folks who it can show by beyond a reasonable doubt voted or, excuse

me, registered unlawfully, that is important. What I submit to the Court is that deterrence effect, the ability to do individual prosecutions and send that message throughout the community, that needs to be weighed in its effect, again, against the potential disenfranchisement of voters through this list maintenance process that the Government is proposing. And that's what this is. This is ultimately list maintenance because we're talking about large bulk numbers of voters and analysis that happens through a data analytics, an unreliable data analytics system, and plainly violative of the quiet period under the NVRA.

Finally, Your Honor, I would just urge the Court on this last point. Ms. Bellows, my co-counsel, indicated that there is a significance to the threat of arrest for county workers who process ballots attributable to one of the 7,000 folks who have been identified on these lists. As Your Honor can see from the record, those indications from folks at DOJ, including DAG McCotter, have worked their way out into the County system. There are folks who know that there is this threat hanging above them of potential prosecution.

Your Honor, we respectfully insist that the issues that you've heard today can be resolved through a 12(b) motion that both the State and the County have already filed. We respectfully submit, Your Honor, that a briefing schedule can be -- should be set by the Court to expedite a resolution of

that motion, of those motions, and to have that decided before Tuesday. I know that's a very aggressive schedule, but again, the idea on the part of both State and County workers that they could be in trouble federally for processing ballots and simply following County and State law is chilling for them. And we look to the Court to resolve that issue. Thank you, Your Honor.

**MR. LEWISTON:** Brandon Lewiston on behalf of SIREN and Mi Familia. I'll keep my presentation very short, Your Honor. I have a few remarks on the U.S. Attorney's argument. I was listening very carefully to his presentation to the Court, and one of the things that I heard him say was that the voter rolls, the California voter rolls that the federal government used to conduct their analysis were purchased from California and were acquired by the federal government. And I thought that use of passive voice was striking. It caught my attention because the federal government still has not told us who actually purchased the voter list from California, when it was purchased. And without that information, we have no ability to assess whether anything was done to the voter list in the meantime or what the project was behind the acquisition of this voter list, whether it's complied with any other court orders or anything else. And I'm just not sure why the federal government has made it such a point to keep that information from the Court and from the public, including as an exhibit,

you know, in this exhibit that they attached today, where they redacted both the name and the date on which they acquired California's purported voter list.

The second observation I have, Your Honor, is in the U.S. Attorney's presentation, he gave no explanation, no evidence, no reason to believe that the federal government databases that were used as a comparison point with California's purported voter rolls are accurate, up to date or comprehensive. If you look through the declarations, there's no evidence in any of those declarations that those voter -- that those databases are accurate, up to date and comprehensive. And without that information, the United States Government cannot have met its burden to get a TRO in this matter, particularly considering the extraordinary relief that they are seeking.

And then the third observation, Your Honor, is that the U.S. Attorney provided no explanation for why the federal government has been so wrong so many times when they've alleged that states have, you know, thousands of non-citizens on their voter rolls in Nevada, in Utah, in their first letter from July to California, which had the 190,000 number, now down to 20,000. There's no explanation from the Government for why they've been so wrong so many times. But now, this time, the Court and California election officials should trust the federal government.

The last thing I want to mention, Your Honor, is we'd like to respectfully renew our motion to intervene in this matter on behalf of SIREN and Mi Familia as parties to ensure that we're able to participate in any appeal coming from this matter. Thank you, Your Honor.

**THE COURT:** I'll reconsider that, counsel. Thank you.

**MR. PELHAM:** Thank you.

**THE COURT:** I assume that the same request is by the NAACP.

**MS. BALDWIN:** Yes, Your Honor, we would also respectfully renew our request to be considered as intervenors. I just want to make one very brief point. What the United States is doing is asking this Court essentially to open up a kind of Pandora's box. Trust us. This is good enough. You know, the U.S. Attorney talks about a burden-shifting test. There, of course, can't be a burden-shifting test without a cause of action. There can't be a burden-shifting test where there's no actual preemption. There's nothing to shift against other than the fundamental right to vote.

And I just, what the federal government is asking for is limitless. And we've been talking about this 20,000 list, but I just want to point out that that's not all the federal government is asking for. In the second Bartel Declaration, and this was also in the first one, but in the one filed last

night at Docket No. 1072 in paragraph 24, it says that USCIS continues to analyze additional potential non-citizen voting records through the above-mentioned multilevel process. And USCIS has identified a separate batch of more than 17,000 voting records potentially tied to non-citizen voters.

This process is endless, and it is endless because it is lawless. There are no standards. It is the Department of Justice saying, trust us. It's not too late. We can keep coming and doing this. And the consequence of that is chaos, it is confusion, and it is disenfranchisement. And the real interest in election integrity is by shared commitment to the rule of law, to the Constitution, and the statutes that Congress has passed that govern this process, none of which the federal government is relying on and, in fact, is acting in contravention to in its request to this court. Thank you, Your Honor.

**THE COURT:** All right. Then I've got a couple questions for you, and then a few more after the recess. Is this a case of first impression where sequestration comes before the Court for the first time? Is there any precedence for this? And if so, point me to that precedence. Give me the case, give me the state, give me the precedence. Sequestration.

**MR. MOORE:** Your Honor, Patrick Moore on behalf of the County. There's at least one case of which we are aware

that the federal government also has noted, at least in its reply brief, where sequestration was agreed to by the state party and represented to the Supreme Court of the United States and then was memorialized in an order. It was in a markedly different context, I think. I think the difference --

**THE COURT:** Just a moment. Counsel, just a moment. It's my turn for questions.

**MR. MOORE:** Oh, please.

**THE COURT:** You've had your turn at the lectern. Stay there. Did that come during the period of time that election was taking place? In other words, taking into account the Purcell factors?

**MR. MOORE:** It did, Your Honor, but it came because there -- for a number of reasons, including that there was a potential Purcell issue with the ballots that were being cast and ultimately were segregated. If I may just add a few sentences of explanation. In the lead up to the 2020 election, the Pennsylvania Supreme Court, in light of COVID and other circumstances, allowed ballots that were cast by Election Day but not received until a number of days thereafter to be counted.

Review was sought before the Supreme Court of the United States, and the State in response to that indicated that those ballots, which, of course, are easy to segregate and were segregated at the State's election.

**THE COURT:** Thank you very much. Thank you. When Nevada initially was presented with the 16,000 numbers and eventually was reduced to, I believe, 185, was the SAVE system used? That's just a yes or no. Yes or no.

**MR. ESSAYLI:** Yes, Your Honor.

**THE COURT:** All right. Thank you.

**MR. ESSAYLI:** 185.

**THE COURT:** The answer is yes. Is that correct?

**MR. ESSAYLI:** For the 185, the list of 185 non-citizens that was provided to Nevada, those were verified using the same steps we outlined today. That's never been adjudicated. There's never been a lawsuit on that. The judge has sent it --

**THE COURT:** Not my question. I've given each of you the courtesy of unending -- now I want my questions answered. I'm going to ask it once again, yes or no. Was the SAVE system used?

**MR. ESSAYLI:** Oh, SAVE system. No. I'm sorry, Your Honor. I thought you said the same system.

**THE COURT:** SAVE system.

**MR. ESSAYLI:** SAVE, not same, S-A-M-E.

**THE COURT:** Okay.

**MR. ESSAYLI:** SAVE system was not used in Nevada or here. What I said was it was the same process as these cases.

**THE COURT:** Was the same process used in Nevada as it

was in California?

**MR. ESSAYLI:** The same flowchart, yes, but not the SAVE program. The SAVE system was not used.

**THE COURT:** When it was reduced to 185, how do we have an explanation that these were valid citizens who could vote?

**MR. ESSAYLI:** I'm sorry, Your Honor, 185?

**THE COURT:** When you reduced from 16,000 in Nevada to 185, 185 turned out to be valid citizens who could vote.

**MR. ESSAYLI:** No, that's not true, Your Honor.

**THE COURT:** It's not?

**MR. ESSAYLI:** No, Your Honor. The State came back and said, we have an attestation for each of the 185, and so Nevada said, in our eyes, they're citizens. But it's never been adjudicated.

**THE COURT:** But Nevada stated they could vote.

**MR. ESSAYLI:** Nevada has, but it hasn't been challenged.

**THE COURT:** I understand it hasn't been challenged, but Nevada states control their own election process, and Nevada stated they could vote.

**MR. ESSAYLI:** Yes, Your Honor.

**THE COURT:** Okay. I think there's always been an encouragement of the people's right to vote, we the people, because when we exercise our right to vote, we exercise

equality. It doesn't matter our station in life, whether we're rich, poor. It's been a struggle sometimes in this country to make certain that those eligible voters can vote. And, of course, no one wants a non-citizen voting. Anybody taking that position is a ridiculous position. But don't -- you have the power, historically, in this balance of non-disenfranchisement of voters, indictments, and in fact you just brought 28 indictments, and don't you have what I'm going to call a cure period up to December 3rd. In other words, you may find others who have voted illegally. You have the right to bring that indictment against them, which is our traditional remedy, which has an absolute chilling effect, but you also have the ability to ferret out those people, from my understanding, and then I'm going to have you push back, because while we cast a ballot and then we want anonymity, we have an attestation, we have a ballot that comes into us showing that I voted or not.

So it's not who I voted for. That should be nobody's business. It's the fact that we can retrieve that information up to December 3rd, that's my understanding, and the very fact that this person voted, we have that ballot, not the ballot, but the envelope, gives you full carte blanche to prosecute this person, because it's not who they voted for. It's the fact that they voted, and so I don't see why, in this cure period, those people wouldn't be removed, giving us the safeguard of non-sequestration, non-disenfranchisement, but

still the traditional remedy as a good prosecutor, as you pursue 28, and maybe some more, to make sure that these people are prosecuted.

And I'd like you to respond, why, in balancing those two interests, this Court would cause disenfranchisement where voters would not be counted versus the ability to catch those few who are, as you've ably done, and I'm going to presume that they're innocent, of course, under the law, but 28 recently, you've demonstrated that. Why can't you bring those to me in two weeks?

**MR. ESSAYLI:** May I respond, Your Honor?

**THE COURT:** Yeah, in other words, get busy.

**MR. ESSAYLI:** We're very busy, Your Honor.

**THE COURT:** I'm going to get you busier. If it's this big, you've got a remedy, for goodness sakes, go out and indict, you know, and we've got the ballots. Yes, you can't match that, but you can the envelope, and a lot of these folks may be not voting at all. Some of these may be very valid voters, and that's my concern about disenfranchisement, versus the remedy that we seem to have.

**MR. ESSAYLI:** So, two responses, Your Honor. First is, we've never sought to disenfranchise anybody, and again, a request to separate, not to discount, or to cancel, and we believe there's plenty of time for Your Honor to decide what that review process would look like to ensure no one's

disenfranchised. So, again, we're here in emergency posture just to preserve the interests of legal votes not being diluted. To your second point --

THE COURT: Now, you follow Judge Bennett's reasoning up in the federal circuit, and he found, quite frankly, and was very strong in his concurring opinion, that you were late. That you had this ability to bring this much earlier, and that you, not you personally, I apologize --

**MR. ESSAYLI:** I understand, Your Honor.

**THE COURT:** -- but that the Government, the United States, has put themselves in this position during, you know, what I'm going to call the Purcell period. How do you respond to his reasoning?

**MR. ESSAYLI:** I'd point you to Judge Bumatay's dissent, Your Honor, and I would respond there. I think he laid it out pretty well in how there was an effort early on to engage the State to see if there was a willingness to provide the identifying information, and Your Honor, that would have resolved this in a matter of days, but when we have to go to the second step of the individual verification.

On the prosecutions, Your Honor, we believe the United States has an interest, not only in just prosecuting violators of that, but to prevent non-citizens from voting in the first place, and that's our interest.

**THE COURT:** Counsel, thank you. I've heard that.

Thank you. I appreciate that.

This comes to the Court as a TRO, not a preliminary injunction, but I'm happy to expedite this matter, but I would want to make certain that in doing so, that I had expertise on my part because these conclusory statements by both sides are not well taken.

In other words, what are these systems? What are the algorithms? How is this derived? And therefore, the Government, at some point, may not want this disclosed, may want this disclosed, but I would want an expert on the Court's part to make a definitive ruling, and I don't know that this is the appropriate time that in developing that kind of record, I think we've got time because I'm very concerned about the Purcell factors. This is a monumental change, and as such, it seems to me that in having this expedited hearing, let's say within the next two weeks, and I would have an expert appointed on the Court's behalf, I would invite you to present that evidence and to show these numbers again with clarity, but not certainly with last-moment filings last evening, where no party is fully prepared, and to have the Court just wing it with a ruling. And I think I could develop a good factual basis for the circuit in that regard, let alone the Supreme Court, and I still think you have the advantage and ability to prosecute those folks who have voted illegally before December 3rd. We can take those voters off the voter roll as we would anybody

else, those few, if any, and so I'm just wondering once again, why wouldn't this Court cause an expedited hearing, let's say two weeks from now, so you can line up your experts and just have that kind of factual determination made?

Now, the Government is going to claim because of the exigent circumstances. My response is we can clean that up before December 3rd. They can show us the data.

Now, on the County's part, you would have the ability to show me how you went through your process, and I would appoint a special master who actually called it in court. Mr. Gary, I'm now appointing you the special master in this matter. Thank you. Now, just hold up your hand. Okay, good. Now, you go check him out because he's now my special master. Congratulations. You both split the costs.

Okay, I'm going to take a recess for just a moment. I may have a few more questions, but I don't think too many more. Okay? I just want to check my notes for a moment, and I want to thank all of you, the amicus folks who were not mentioned or are voluminous, the intervenors, of course, the State and the County and the Government.

Would you give me about 20 minutes again? Would that be acceptable since you have no choice? But you go relax for a couple minutes. I'll see you in about 20 minutes, okay?

//

//

**(Recessed at 3:57 p.m.; reconvened at 4:30 p.m.)**

**THE COURT:** Thank you for your courtesy, folks, but sit down. That's awfully nice of you and very much appreciated, but thank you. I'm humbled by it.

I want to thank you. I've gone over all of my notes. I have no further questions that I choose to ask this evening. You will have a ruling by tomorrow.

**UNIDENTIFIED SPEAKER:** Your Honor?

**THE COURT:** Thank you very much counsel, have a seat. This Court believes it would be wise, that it would be wise that any threats to State and County-elected employees cease immediately. Good night. Good night. As I said, good night, you'll hear from me tomorrow.

**(Proceedings concluded at 4:31 p.m.)**

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Signed — October 28, 2026

Signed Dated

*TONI HUDSON, PRESIDENT*