Name Julie A. Hamill, AUSA
Address 300 N Los Angeles, Suite 7516
City, State, Zip Los Angeles, CA 90012
Phone (213)894-2464
Fax (213)894-0141
E-Mail julie.hamill@usdoj.gov
☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

United States of America

PLAINTIFF(S),

v.

California, et al.

DEFENDANT(S).

CASE NUMBER:

2:26-cv-12025-DOC-ADS

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that United States of America hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Order denying injunctive relief (ECF 149)

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on 10/28/26. Entered on the docket in this action on 10/28/26.

A copy of said judgment or order is attached hereto.

October 28, 2026
Date

/s/ Julie A. Hamill
Signature
☐ Appellant/ProSe ☒ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

UNITED STATES OF AMERICA

Plaintiff,

v.

STATE OF CALIFORNIA, SHIRLEY N. WEBER, PH.D., DEAN C. LOGAN,

Defendants,

NAACP, NAACP California-Hawaii State Conference, and League of United Latin American Citizens; Services, Immigrant Rights and Education Network and Mi Familia en Accion,

Intervenors.

**Case No. 2:26-cv-12025-DOC-ADS**

**ORDER DENYING TEMPORARY RESTRAINING ORDER [62]**

## I. INTRODUCTION

This case is about the right of every American citizen to vote in a free and fair election.

Never before in American history has the federal government, on the eve of an election, sought to coerce a state and local government to abandon their own Constitutional elections procedures and bend to the will of the Executive Branch. In bringing this lawsuit, the Executive would have this Court believe that it reigns as a sole sovereign. But California and its people are sovereign, too.

The right to vote has long been understood as integral to both citizenship and participation in our democracy. Ronald Reagan described this right as "the crown jewel of American liberties, and we will not see its luster diminished." *Remarks on Signing the Voting Rights Act Amendments of 1982* (June 19, 1982) (extending the Voting Rights Act of 1965). But access to voting has always been contested. At the inception of our country, African Americans and women of all ethnicities were denied access to the ballot. Their push to be recognized as equal citizens of this nation led to the Fifteenth Amendment in 1870 and the Nineteenth Amendment in 1920, which declared that the right to vote could not be denied due to someone's race or gender. But these amendments did not guarantee all citizens' enfranchisement in practice. Minority communities continued to fight for suffrage. Poll taxes, literacy tests, and other obstacles were further used to prevent individuals from casting their vote.

Every generation in our history has witnessed repeated clashes between those who seek to limit access to the ballot and those who fight to ensure it. In this case, the federal government seeks to segregate and exclude over 20,000 ballots. This request violates longstanding constitutional principles mandating that states have control over their elections. If Plaintiff's last-minute request for relief were granted, either party could create chaos for their own political purposes to disrupt the election process. Over 20,000 registered Californians would potentially lose the right that generations of Americans have fought to preserve.

The Government's Application for Temporary Restraining Order is **DENIED**.

## II. BACKGROUND

### A. The United States sent a list to California of those it believed were non-citizens on its voter rolls.

On July 16, 2026, the United States Department of Homeland Security ("DHS") sent a letter to Shirley Weber, California's Secretary of State. The DHS asserted that there "may be as many as 190,832 non-citizens registered to vote in California." Complaint (Compl.) *Id.* On July 23, 2026, Secretary Weber responded with "serious doubts" regarding the "data and accuracy" of DHS's claims. Compl. Ex. B. She indicated the statewide voter registration list had not been shared with any federal agency or official, including DHS. *Id.*

Accordingly, Secretary Weber requested detailed descriptions of "the methodology utilized by DHS to identify these allegedly ineligible voters" and "how DHS came into possession of the list of registered voters in California." *Id.* DHS did not comply. State Defendants' Opposition to Plaintiff's Application for Temporary Restraining order ("State Opp.") (Dkt. 31-1) at 2. Secretary Weber also explained that the National Voter Registration Act's ("NVRA") quiet period, which makes it unlawful to systematically cancel voter registrations during the 90-day period before a federal election, would go into effect on August 5, 2026. Compl. Ex. B at 1-2. The August 5, 2026 deadline came and went without further action from the Federal Government.

### B. During the NVRA's quiet period and with the federal election already underway, the Federal Government sent California and Los Angeles County a new list and demanded action.

On October 13, 2026—after Los Angeles County ("County") had mailed approximately 5.9 million vote-by-mail ("VBM") ballots and processed over 331,000 ballots—the United States Department of Justice ("DOJ") hand-delivered a letter and password-protected thumb drive to Dean Logan, the Los Angeles County Registrar-Recorder and County Clerk. County Defendants' Opposition to Plaintiff's Application for a Temporary Restraining Order ("County Opp.") (Dkt. 32-1) at 13, 31; Compl. Ex. C. The thumb drive contained the "sensitive and personal identifiable information" of over 20,000 individuals. Declaration of Christopher Pelham ("Pelham Decl.") (Dkt. 32-2) Ex. C at 2. The federal government believed this

identifying information corresponded to “likely noncitizens who were sent a vote-by-mail ballot” for the November 2026 federal election. Compl. ¶ 4. The County was instructed to “review the list within 48 hours to determine whether any citizens [were] listed.” Compl. Ex. D (“October List”). Following this review, the County was directed to (1) segregate the VBM ballots for any non-confirmed citizens, (2) withhold unsent ballots from listed individuals, and (3) not verify signatures or tabulate ballots until citizenship could be confirmed. *Id.* On the same day, Secretary Weber was emailed the same requests with a 48-hour deadline *without* an accompanying list. Compl. Ex. C.

The next day, on October 14, 2026, Mr. Logan issued a public statement, confirming receipt of the letter and explaining a review was being conducted “in coordination with the California Secretary of State and Attorney General to determine the next appropriate steps.” Pelham Decl. Ex. C. The County further provided that “any action to remove a voter from eligibility must be based on verifiable information, not assertions of unconfirmed data matching.” *Id.*

Before the 48-hour deadline expired on October 15, the County responded to the DOJ. Pelham Decl. Ex. D. From its preliminary review, the County concluded that the October List was unspecific to Los Angeles County because it contained addresses from throughout the State. *Id.* Additionally, the County found the DOJ’s instructions were “legally prohibited” because the DOJ failed to provide any informational or evidentiary basis for the list of “likely noncitizens.” *Id.* The County stated that DOJ did not provide methodology for the County to verify the citizenship of the 20,000 individuals on the List in general, let alone in 48 hours. *Id.* On the same day, Secretary Weber responded to the DOJ, rejecting the demands in the October 13th letter. Declaration of Rachel Evans (“Evans Decl.”) (Dkt. 31-2) Ex. 2.

**C. The United States sued in this Court.**

Minutes after the 48-hour deadline, the United States of America, through the DOJ, filed this action. County Opp. at 14-15. The Complaint suggested the State of California (“State”) and the County violated the Supremacy Clause by “knowingly” sending VBM ballots to “likely noncitizens” and ultimately counting these ballots—actions that are allegedly preempted by 18 U.S.C. § 611. Compl. ¶¶ 50-61. The DOJ requested that the Court issue a preliminary,

permanent injunction that would enjoin the State from tabulating VBM ballots from individuals on the October List until their citizenship statuses could be verified. *Id.* ¶¶ 62-64.

In its Complaint, the DOJ explained the process by which the October List of likely noncitizens was determined. *Id.* ¶¶ 33-49. The Government represents that first, Homeland Security Investigations ("HSI"), a component of the Department of Homeland Security ("DHS"), purchased a voter file that appeared to reflect "the actual voter rolls in California, that as of August 2025, may be used for the 2026 federal election," Declaration of Eric McLoughlin ("McLoughlin Decl.") (Dkt. 62-3) at ¶ 21. Subsequently, HSI sent the acquired voter profiles for analysis to the Fraud Detection and National Security Directorate ("FDNS"), a subset of U.S. Citizenship and Immigration Services ("USCIS"). *Id.* ¶ 14. FDNS then "enhance[d]" the voter data through a "reliable third-party data analytics" and matches the profile to an internal USCIS immigration number "that may be the same individual." Declaration of Nicolas Bartell ("Bartell Decl.") (Dkt. 62-2) ¶ 16. The matches are scored because "the resulting data may be incomplete, outdated, or mismatched." *Id.*

FDNS then compared the potential identity matches to Department of State and Social Security Administration data to screen out U.S. citizens. *Id.* ¶ 17. In the next step, a confidence level was assigned (where a high score supported a "strong identity link") and a manual review was conducted for each match to "determine which registered voters [the FDNS investigators] believe are very likely to be aliens based on USCIS' citizenship data." Bartell Decl. ¶ 19. FDNS sent its completed analysis to HSI, which undertook a "quality review" to identify issues such as "duplicate entries" and "incomplete records." McLoughlin Decl. ¶ 16. This was followed by an "enrichment process" that utilized "additional unique identifiers" to "improv[e]" the matching process. *Id.* ¶ 17. This process was used to create the list of 20,000 likely noncitizens that was delivered to Mr. Logan—and mentioned to Secretary Weber—on October 13, 2026. *Id.* ¶¶ 45-47.

The County's review of the List revealed that 7,035 out of more than 20,000 records had addresses in Los Angeles County. Declaration of Aman Bhullar ("Bhullar Decl.") (Dkt. 32-3) ¶ 25. A sample of two hundred records from the List revealed 42.4% were active, 42.9% were cancelled, and 4.6% were inactive. *Id.* ¶ 24. Furthermore, 71.2% of the List had never voted in past elections. *Id.*

**D. The DOJ's actions are indicative of a broad, ongoing pattern of attempted election interference by federal officials.**

The United States Department of Justice has filed at least thirty-one lawsuits in federal district courts across the country seeking complete voter rolls from the States.[1] Out of the twenty-six decided cases, the DOJ has prevailed in precisely *zero*.[2] This Court presided over the first of those cases. *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

In *Weber*, this Court held the DOJ's claim failed under Title III of the Civil Rights Act of 1960 ("CRA"), the National Voter Registration Act of 1993 ("NVRA"), and the Help America Vote Act of 2002 ("HAVA"). *See generally id.* The Court further held that DOJ's demands violated federal privacy laws, including the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act ("DPPA"). *Id.*

Beyond its failed attempt to seek State voter rolls, the United States has also requested that States act based on the Executive's own lists. As in the present case, DHS Secretary Mullin sent letters to Secretaries of State in New Jersey, Nevada, and Pennsylvania alleging that the States' voter rolls included non-citizens.[3]

In Nevada, Secretary Mullin stated that 15,903 non-citizens were registered to vote.[4] A manual review by DHS officials yielded a subset of 185 individuals that they argued were confirmed non-citizens.[5] Yet even within the DHS's hand-picked subset, Nevada reported that *every single individual* was a United States citizen.[6]

Sister district courts across the country have cast doubt about the United States' proffered lists. In the Northern District of California, for example, a district court recently found that USCIS's process of producing its own lists relies upon "unknown artificial intelligence tools" and "[c]ommercial databases." *Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680-AMO, 2026 WL

---

[1] Justin Lam & Sara Steele, *Here's What 34 Courts Have Said About the Trump Administration's Attempts to Take Over Elections*, Brennan Ctr. For Justice (Oct. 20, 2026), https://www.brennancenter.org/our-work/research-reports/heres-what-34-courts-have-said-about-trump-administrations-attempts-take.

[2] *Id.*

[3] *DHS Secretary Markwayne Mullin Sends Letters to Secretaries of State Warning About Non-Citizens on Voter Rolls*, Dep't of Homeland Security (July 17, 2026), https://www.dhs.gov/news/2026/07/17/dhs-secretary-markwayne-mullin-sends-letters-secretaries-state-warning-about-non

[4] Jude Joffe-Block & Miles Parks, *DHS acknowledges the noncitizen numbers it touted on voter rolls were inflated*, NPR (updated Aug. 25,2026), https://www.npr.org/2026/08/25/nx-s1-5940807/noncitizen-voters-trump-nevada-call

[5] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html

[6] *Id.*

3166149, at *2 (N.D. Cal. Oct. 21, 2026). The court explained that the United States' process for generating lists creates a "high likelihood of error in review" because United States' lists include "faulty data sources that sweep in U.S. Citizens." *Id.* at *8. Another sister district court in the District Court of the District of Columbia likewise concluded recently that a list similar to the one that the federal government utilized here was "plagued with inaccuracies." *Common Cause v. U.S. Dep't of Justice*, 2026 WL 303772, *1, *26 (D.D.C. Oct. 9, 2026).

The Government has increased pressure on state and local election workers. On October 23, 2026, the United States sent letters to every county in California requiring them to set aside the votes of alleged non-citizens. The letters stated that election officials "risk significant federal scrutiny" if they failed to comply with the Government's demands. The government reiterated its threat in open court yesterday, stating that State and County election officials who do not comply with their letter risk federal charges under 18 U.S.C. § 2, which criminalizes aiding and abetting the commission of a criminal offense. The court reiterates what it said yesterday: these threats must stop.

**E. Procedural History**

On October 15, 2026, the United States of America ("Plaintiff") filed a lawsuit against Shirley N. Weber, in her official capacity as the California Secretary of State ("State Defendant"), and Sean C. Logan, in his official capacity as the County of Los Angeles Registrar – Recorder/County Clerk ("County Defendant"). *See generally* Complaint.

On the same day, the Services, Immigrant and Education Network ("SIREN") and Mi Familia en Acción ("MFA") moved to intervene as a Defendant (Dkt. 11). The following day, the League of United Latin American Citizens ("LULAC"), the National Association for the Advancement of Colored People ("NAACP"), NAACP California – Hawaii State Conference, and NAACP Los Angeles Branch (together "NAACP") similarly moved to intervene. (Dkt. 15). The court granted both motions (Dkt. 148). The NAACP and LULAC filed an Opposition to Plaintiff's TRO ("NAACP Opp.") (Dkt. 37-1). SIREN and MFA also filed an Opposition to Plaintiff's TRO ("SIREN Opp.") (Dkt. 58-1).

On October 19, 2026, Plaintiff filed an Ex Parte Application for a temporary restraining order ("TRO") and order to show cause why a preliminary injunction should not issue ("PI").

(Dkt. 22-2). The United States asked for relief by November 3, 2026, the day of the federal election. *Id.* On October 20, 2026, State and County Defendants opposed Plaintiff's TRO application (Dkt. 31–32).

On October 21, 2026, this case was transferred to this Court (Dkt. 44). Later that day, Plaintiff refiled its TRO Application, once again requesting that this Court rule by "November 3, 2026":

> This Court should order California to set aside vote-by-mail ballots from likely noncitizens in the federal election—including any ballots cast by the individuals charged with 18 U.S.C. § 611 crimes this morning—until the voter's citizenship status can be determined. The United States respectfully requests that this Court grant this relief **by November 3, 2026**, before the end of voting in the 2026 federal election. (Dkt. 62).

Pursuant to Plaintiff's requested deadline, this Court immediately set a hearing for Tuesday, October 27, 2026 (Dkt. 64). A few minutes before 9:00 p.m. that same night, Plaintiff filed an emergency request that the Court rule on the TRO by noon the following day, October 22, 2026 (Dkt. 67). When the Court did not comply with the United States' self-imposed deadline, Plaintiff filed a Notice of Appeal to the Ninth Circuit Court of Appeals, arguing that this "…Court's silence is a constructive denial of the United States' emergency application … which has the practical effect of denying a preliminary injunction" (Dkt. 74) at 1. The Plaintiff, State, and County Defendants presented their oral arguments before the Ninth Circuit on October 25, 2026. The Circuit ruled on October 26, 2026 that it did not have jurisdiction.

This Court heard oral arguments on October 27, 2026.

## III. Legal Standard

The standards for issuing a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that

an injunction is in the public interest." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

Alternatively, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). Courts have recognized very few circumstances justifying the issuance of an *ex parte* temporary restraining order. *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).

## IV. Discussion

### A. Plaintiff has not established a likelihood of success on the merits.

#### 1. The United States likely does not have standing or a cause of action to bring a claim for the civil relief it seeks.

As the plaintiff, the United States "bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citing *Carney v. Adams*, 592 U. S. 53, 59 (2020)). To be entitled to the injunctive relief it requests, the United States "'must make a clear showing of each element of standing.'" *L.A. Alliance for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956–957 (9th Cir. 2021) (citation omitted). Those elements include injury in fact, causation, and redressability by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

The core of the United States' asserted injury is that Los Angeles County and the State of California are impeding its ability to enforce 18 U.S.C. § 611, a federal criminal statute which makes it "unlawful for any alien to vote in any [federal] election." 18 U.S.C. § 611(a). The County and the State's actions, the United States argues, amount to "an injury to [U.S.] sovereignty arising from violation of its laws." TRO at 15 (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)). The United States also asserts that it suffers collateral injuries downstream of its alleged sovereign injury as the County and

the State's actions are both "caus[ing] the United States to expend substantial resources" and "dilut[ing] lawful voting," which "unduly influences who runs the Federal Government." TRO at 16. Finally, the United States argues that, perhaps even absent standing to sue under 18 U.S.C. §611, the Court may nevertheless grant "equitable relief to stop unlawful state action." TRO at 17. Each argument appears destined to fail on the merits. The Court addresses each in turn.

Initially, the United States argues that "[i]interference with the federal government's interest in enforcing federal law is sufficient to establish" injury for standing purposes. TRO at 16 (citing *United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024)). The United States has not shown that the County and the State have "interfere[d]" with its ability to enforce 18 U.S.C. §611.

The United States, by its own admission, is actively enforcing this law. The very same day the United States filed its TRO in this Court, the Department of Justice brought charges against 28 individuals "to address noncompliance with … 18 U.S.C. 611(a)," many of whom were registered Los Angeles County voters. TRO at 1, 22 (citation omitted). The relevant question under Section 611 is whether a non-citizen voted. If fraudulent voting occurs, the United States should uphold the law and bring additional Section 611 indictments against those non-citizens it believes *actually* voted illegally in the current—or a prior—election.

Defendants do not "interfere" with the United States' ability to enforce Section 611 by administering an ongoing election in accordance with established State and Federal law, rather than assuming new obligations pursuant to a federal criminal law they are not responsible for enforcing. The United States' principal authority for its "interference" theory of standing, *United States v. Missouri*, is wholly inapposite. In that case, Missouri affirmatively "withdr[e]w from joint task forces with federal law enforcement" and terminated "information sharing" with the federal government. *Missouri*, 114 F.4th at 984–85. The United States does not allege that Defendants similarly "withdrew" from any existing agreements with federal law enforcement. Instead, the United States alleges that Defendants refused to segregate and stop counting

ballots. But "refusing to help [the federal government] is not the same as impeding it." *United States v. California*, 921 F.3d. 865, 888–89 (9th Cir. 2019).

The United States does not explain why Defendants continuing to count ballots impairs any present or future Section 611 prosecution. This raises redressability concerns. Requiring Defendants to segregate ballots, as the TRO seeks, would force Defendants to reallocate finite resources towards enabling the United States' preferred method of election administration. But enforcing such a requirement would not eliminate or prevent—that is, redress—any alleged "interference" with federal law enforcement.

Next, United States' argument that it has standing because "California has caused the United States to expend substantial resources" fares no better. "Monetary costs are of course an injury." *United States v. Texas*, 599 U.S. 670, 676 (2023). But the United States cites no case holding that states impose a "monetary cost" on the federal government when they opt not to use state resources to enforce federal laws.[7] Nor could such a case legally exist since, as the United States itself acknowledges, "a State is not required to help the Federal Government investigate and prosecute crimes." TRO at 23.

Federal law is enforced by the federal government. State participation (or lack thereof) in that enforcement does not bear on how the federal government chooses to allocate its own resources or officers. If the federal government decides to prioritize the enforcement of Section 611 by "draw[ing] federal resources from … a wide range of law enforcement areas" (TRO at 23), that choice cannot itself confer jurisdiction because it is well-established that a Plaintiff may not "spend its way into standing." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 370 (2024). The government's "'unprecedented and limitless' view" that a state's refusal to allocate resources on the federal government's behalf constitutes an injury sufficient for standing has no limiting principle and is "flatly inconsistent with Article III." *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*, 609 U.S. ___ (2026), 2026 WL 2564318, at *2 (U.S. Aug. 31, 2026) (citing *Alliance*, 602 U.S. at 391–92). Such a theory of standing has no

[7] Plaintiff cites *Missouri v. United States* but, once again, that case involved a state's "withdraw[al]" of resources from a joint federal state-project, not a state's refusal to support federal criminal enforcement. 114 F.4th at 984.

basis in law and threatens to undermine the "Framers' concept of the proper—and properly limited—role of the courts in a democratic society.'" *Alliance*, 602 U.S. at 380.

Further, the United States argues that it is injured by California "sending and tabulating vote-by-mail ballots" to persons "it knows are likely to be noncitizens," which "dilutes lawful voting." TRO at 16. This claim is too tenuous to establish standing. The Ninth Circuit has squarely rejected a similar claim of vote dilution as "insufficient to plead a plausible 'real and immediate' threat." *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023). Likewise, the federal government's claim here appears to "stretch[] the concept of imminence 'beyond its purpose.'" *Id.* (citing *Lujan*, 504 U.S. at 564 n2).

Plaintiff's vote dilution theory relies upon a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Absent further verification of its proffered list, Plaintiff's allegation that the listed individuals will "unduly influence who runs the federal government" (TRO at 16) is the quintessential "allegation[] of *possible* future injury" that cannot establish Article III standing. *Id.* at 410.

Taken together, Plaintiff's theories of Article III standing are unpersuasive. "Absent some considerable revision to … existing standing doctrine," Defendants, not Plaintiff, appear "likely to succeed on the merits." *National Park Service*, 2026 WL 2564318, at *2.

Lastly, "like any other plaintiff, the federal government must first have a cause of action" to sue in federal court. *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). Plaintiff argues that it has a cause of action in equity pursuant to the Supremacy Clause. That argument gets off to a difficult start because the Supremacy Clause "certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr.*, *Inc*, 575 U.S. 320, 324-25 (2015) (Scalia, J.); *see also* TRO at 17 (conceding "there is no implied right of action under the Supremacy Clause.") Plaintiff instead asserts that the Department of Justice has inherent authority to sue under the "equitable tradition of suits to enjoin unconstitutional actions by state actors." TRO at 17. The Ninth Circuit has held, however, that the federal government may only sue in equity without a statutory grant of authority to protect "a property interest, interference with national security or a burden on interstate commerce." *United States v. Mattson*, 600 F.2d

1295, 1298-99 (9th Cir. 1979); *see also In re Debs*, 158 U.S. 564, 599 (1895) (recognizing a cause of action to protect interstate commerce). None of those interests are at issue here. The Supreme Court also explained recently that equitable remedies must be cabined to those "traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (citation omitted). Plaintiff has not demonstrated such a historical "tradition" of federal courts sitting in equity requiring state election officials to comply with federal prosecutorial priorities. Rather, our tradition "prohibits the federal government from commandeering state and local officials to help enforce federal law." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see infra Section IV.A.II.*

**2. Plaintiff is not likely to succeed in its claim that 18 U.S.C. § 611 preempts California election law.**

Plaintiff argues that California's election laws are preempted under the Supremacy Clause of the United States Constitution because they "stand[] as an obstacle" to the United States' enforcement of Section 611. Compl. ¶ 54 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)); *see also* TRO at 15-17. Obstacle preemption is a high bar and the "Supreme Court has only found [it] in a small number of cases." *ConocoPhillips Alaska, Inc. v. Alaksa Oil & Gas Conservation Comm'n*, F.4th 964, 972 (9th Cir. 2026). Plaintiff fails to demonstrate a likelihood of meeting that bar in this preliminary posture for three primary reasons.

*First,* preemption requires a genuine conflict between state and federal law. To make out a successful preemption claim, "the mere fact that there is tension between federal and state law is not enough." *MetroPCS California LLC v. Picker*, 970 F.3d 1106, 1118. Here, there is no "tension" between California state law and Section 611 on the question of whether non-citizens may vote. Section 611 makes it "unlawful for any alien to vote in any election." 18 U.S. Code § 611. California's Constitution likewise makes clear that only citizens can vote in federal elections. *See* Cal. Const. art. II(a) ("A United States *citizen* 18 years of age and resident in this State may vote.") (emphasis added).

California enforces its constitutional mandate that only citizens may vote through a series of elections laws which, for example, require an attestation of citizenship under penalty of perjury in order to register to vote (Cal. Elec Code §§ 2101, 2102(c)); match signatures on mail-in ballots to records of those registrations (Cal. Elec Code §§ 2111, 3019); provide a process to cancel the registration of any voter upon proof that the individual was not eligible to vote (Cal. Elec. Code § 2201(a)(8), (c), 2213); and, most squarely in line with Section 611, criminalize fraudulent voting by ineligible voters (Cal. Elec. Code § 18560).

These procedures reinforce, rather than conflict with, Section 611's prohibition on non-citizen voting. State law does not obstruct federal law where, as here, it "trace[s]" it. *Chamber of Commerce of U.S. v. Whiting,* 563, U.S. 582, 602 (2011).

*Second*, the text of the Constitution's Elections Clause, U.S. Const. art. I, § 4, cl. 1, gives California the authority to set election procedures absent express preemption by the United States Congress. The text of the Elections Clause reads:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

This Clause gives States the primary role in administering federal elections. For nearly a century, the Supreme Court has consistently interpreted the Clause to mean that that State Legislatures, "must provide a complete code for congressional elections," including regulations "relat[ing] to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (Roberts, C.J.) (quoting *Smiley v. Holm*, 285 U.S. 355, 361 (1932) (Hughes, C.J.)). Indeed, the Elections Clause operates as a "default provision," vesting States in the first instance "with responsibility for the mechanics of congressional elections." *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1, 9 (2013) ("ITCA").

Yes, the federal government may "pre-empt state legislative choices" regarding "*how* federal elections are held." *Id.* at 9, 16. Section 611, however, is not a vehicle for the preemption of state election procedures because it regulates individual conduct and is not procedural in nature. If "Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). Plaintiff has failed to demonstrate that Section 611 carries Congress' "unmistakably clear … intention" to preempt California's current procedures for counting and processing ballots during a federal election.

Section 611 is a federal misdemeanor statute that sets forth criminal punishments for non-citizens who vote illegally. It includes no express preemption provision. It includes no language addressing the State administration of federal elections. And it includes no mechanism for the United States Department of Justice to intervene in an ongoing election to require a State and its officials to segregate and stop counting ballots.[8] What it *does* include, however, is an express exemption for non-citizens who are "authorized to vote … under a State constitution or statute or a local ordinance." §§ 611(a)(1)–(a)(3).

Congress, in other words, expressly incorporated state statutory and Constitutional law (and local law) within the scope of Section 611's criminal prohibition. Federal law only abrogates state election law "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 19. As the Supreme Court made clear just last term, "state [election] law is preempted by federal statutes only 'so far as the conflict extends.'" *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026). It cannot reasonably be concluded that Congress, through a federal misdemeanor provision, intended to strip California of its Constitutionally-vested responsibility for election administration and implicitly granted that power to Executive Branch's Department of Justice.[9]

---

[8] If it did, it would likely violate the Tenth Amendment. *See infra*.

[9] Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457 (2001) (Scalia, J.) (citing *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U. S. 218, 231 (1994); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)).

At the end of the day, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2010). "If Plaintiff believes requiring additional confirmation of citizenship is necessary for vote-by-mail ballots … the appropriate audience for that suggestion, in full accord with the plain language of the Elections Clause, is Congress, not the Courts." *United States v. California*, No. 26-7070 at 13 (9th Cir. 2026) (Bennett, J., concurring) (citing *Watson*, 609 U.S. at 695) ("[P]olicy arguments are properly directed to legislatures, not courts."). Congress knows how to displace state election procedures with federal law. *See National Voting Registration Act of 1993* (52 U.S.C. § 20510(a)); *Help America Vote Act of 2002 (HAVA)* (52 U.S.C. § 2111); *Voting Rights Act of 1965* (52 U.S.C. § 10307(a)); *Voting Accessibility for the Elderly and Handicapped Act of 1984 (VAEHA)* (42 U.S.C. §§ 1973ee–1973ee-6). Congress did not do so in Section 611.

*Third*, Plaintiff's preemption theory is also not likely to succeed because it raises constitutional concerns under the Tenth Amendment. The gravamen of Plaintiff's preemption theory is that "California is obstructing the United States' law enforcement efforts" by refusing to "work with" the Federal Government to prevent violations of federal criminal law. TRO at 23; Compl. ¶ ¶ 4, 47, 57-58. Plaintiff argues that they are not requesting that California or its officers *do* anything to enforce Section 611, but instead that they stop "induc[ing], encourage[ing] or promot[ing]" non-citizens to violate the statute.[10] TRO at 20. But the Tenth Amendment prohibits the federal government from commandeering States "to address particular problems" or "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935.

[10] Plaintiff locates this principle in *Norwood v. Harrison*, 413 U.S. 455, 464-65 (1973), but that case does Plaintiff no such favors. For one, it did not concern the Supremacy Clause. It held only that the State of Mississippi violated the Equal Protection Clause of the Fourteenth Amendment when it lent textbooks to private schools with racially discriminatory practices because the textbooks were "tangible aid" to the schools' discrimination. *Id.* at 464. Counting ballots cast by registered voters does not provide "tangible aid" to unconstitutional private conduct. On the contrary, counting ballots is necessary to uphold the democratic principles enshrined in the Constitution.

The Constitution is clear that California "has the right, pursuant to the anti-commandeering rule, to refrain from assisting with federal efforts." *California*, 921 F.3d at 891.

**3. The United States' requested relief would likely violate federal election law.**

**a. The United States' remedy would likely violate the National Voter Registration Act of 1993.**

In 1993, Congress passed the National Voting Registration Act ("NVRA") to establish voter registration requirements for elections for federal office. The NVRA states the following as its purposes:

(1) To establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) To make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) To protect the integrity of the electoral process; and

(4) To ensure that accurate and current voter registration rolls are maintained.

42 U.S.C. Section 1973gg(b).

The NVRA requires states to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. Section 20507 (c)(2)(A). The Ninth Circuit has recognized that the 90-day provision was designed "to balance with care" the NVRA's purposes "by acting 'cautious[ly]' with respect to systematic cancellation programs in the lead up to an election." *Mi Familia Vota v. Fontes*, 129 F.4th 691,717 (9th Cir. 2026) *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota* 146 S. Ct. 2799 (quoting *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). This is because eligible voters who are removed from voter rolls shortly before Election Day will likely not have the time to correct the State's errors in time to vote. *Id.* Thus, the 90-day provision prohibits systematic removals in the period during which "the risk of disfranchising eligible voters is the greatest." *Arcia*, 772 F.3d at 1346.

Though Plaintiff claims that its process constituted compiling "individual removals", the October List "is precisely the type of systematic cancellation program that the 90-day Provision was meant to preclude." Reply at 6; *Mi Familia Vota*, 129 F.4th at 717. In *Mi Familia Vota* , the Ninth Circuit found that using "a mass computerized data-matching process to compare the voter rolls with other state and federal databases" to check voters' citizenship status constituted a systematic removal program. *Id.* at 716. Plaintiff's own description of how it compiled the October List likewise indicates a process that involved the "matching of voters to their immigration status" by relying on information from various databases, including USCIS, Department of State, and Social Security Administration data. Bartell Decl. ¶19; McLoughlin Decl. ¶¶15, 23.

Plaintiff argues that it is not in violation of the 90-day provision because it seeks "temporary" ballot segregation, not removal. TRO at 25. However, the effect of Plaintiff's request is no different. Complying with this request would place enormous burden upon Defendants as they would need to make multiple changes to their technological systems and administrative procedures, including retraining and redirecting hundreds of staff. State Opp. at 25-26; County Opp. at 31-32. Additionally, Defendants have no way of verifying individuals' citizenship as they lack the data necessary to do so. County Opp. at 32. Thus, it is highly likely that the County would be unable to verify the citizenship of the October List individuals by December 3, the deadline to certify results to the Secretary of State, jeopardizing the Secretary's ability to meet the election certification deadline of December 11. County Opp. at 31, 33; State Opp. Declaration of Monica Flores ¶¶11, 14.

**b. The United States' remedy would likely violate the Voting Rights Act of 1970.**

The Voting Rights Act provides that, "No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." 52 U.S.C. Section 10307(a).

Plaintiff requests that the ballots of individuals on the October List be set aside solely because they "may be" noncitizens. TRO at 12. If their votes can be segregated solely because

of Plaintiff's unproven allegations (see section below on the unreliability of Plaintiff's claims), this would render the act of voter registration meaningless and diminish the significance of the Voting Rights Act itself , which Congress could not have intended. *See* SIREN Opp. at 17; *see generally* NAACP Opp.

**c. The United States' remedy would likely violate the Civil Rights Act.**

The Civil Rights Act provides that, "[N]o person acting under color of law shall in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote." 52 U.S.C. Section 10101(a)(2)(A).

Courts have repeatedly found that imposing a procedure on a subset of voters to the exclusion of others violates this section of the CRA, known as the DSPP provision. *See U.S. Student Ass'n Foundation v. Land*, 546 F.3d 373, 389 (6th Cir. 2008)(holding that Michigan needed to impose the same procedural requirements on everyone whose original ID was returned as undeliverable); *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971) (holding that the entity in charge of examining voter applications was required to ensure that a questionnaire regarding domicile applied equally to all applicants instead of being designed to target students); *Frazier v. Callicutt* 383 F. Supp. 15, 18–19 (N.D. Miss. 1974) (finding a violation where the registrar denied and referred the registration of every Black student who possessed a previous address outside the county to the board of election commissioners but approved nearly all registrations of non-student applicants with prior addresses outside the county).

In *Mi Familia Vota*, the Ninth Circuit held that an Arizona law requiring county officials to conduct citizenship tests on individuals they had "reason to believe" were not citizens violated the DSPP provision. 129 F.4th at 717. The Ninth Circuit's holding hinged on the fact that requiring the use of the SAVE program to check citizenship status violated the CRA because running a citizenship check on SAVE required an immigration number, which U.S.-

born citizens lacked. Because the Arizona law failed to verify citizenship status via a method "that could be applied to both naturalized and U.S.-born citizens", the law was deemed to apply "different standards, practices, or procedures" to naturalized citizens compared to U.S.-born citizens. *Id.* at 724.

On its face, Plaintiff's request clearly imposes a citizenship verification process with respect to only individuals on the October List and not the entire composition of registered voters in California. TRO at Second, Plaintiff compiled the October List after matching those voter profiles with "an internal USCIS alien number that may be the same individual." Bartell 3. Like the citizenship verification process that the Ninth Circuit held violated the CRA in *Mi Familia Vota*, Plaintiff's request does not apply a method "that could be applied to both naturalized and U.S.-born citizens." 129 F.4th at 723. Lastly, because it is impossible to segregate unreturned ballots and ballots that have already been processed, Plaintiff's request would only apply to a subset of individuals on the October List itself. Flores Decl. ¶¶ 36–38. Because Plaintiff's proposed method would impose "different standards, practices, or procedures" on a fraction of California voters, it violates the CRA. *See Mi Familia Vota*, 129 F.4th at 724.

**B. Plaintiff will not likely suffer irreparable harm absent immediate injunctive relief.**

"In this District, ex parte applications are solely for extraordinary relief and are rarely justified." *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 873 (C.D. Cal. 2025). "A party filing an ex parte application must support its request for emergency relief with 'evidence . . . that the moving party's case will be irreparably prejudiced if the underlying motion is heard according to regularly noticed motion procedures,' and a showing 'that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect.'" *Id.* (quoting *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995)). In short, "Ex Parte applications are not intended to save the day for parties who have failed to present requests when they should have." *Noem*, 790 F. Supp. 3d at 874 (quoting *Mission Power Eng'g Co*, 883 F. Supp. at 493).

Plaintiff's theoretical risk of imminent harm is solely due to its own neglect. Plaintiff submitted that it purchased a copy of the California Voter rolls from HSI for review on May 8, 2026. Bartell ¶ 21. Upon receiving this roster, Plaintiff deemed it "credible enough to initiate our investigative processes in accordance with our standard operating procedures." McLoughlin ¶ 20. Plaintiff subsequently notified Secretary Weber that "there may be as many as 190,832 non-citizens registered to vote in California" on July 16, 2026. Yet, Plaintiff chose to file suit on October 15, 2026, mere weeks before election day, and months into the NVRA's 90-day quiet period. Plaintiff's unexplained delay of multiple months refutes its eleventh-hour claim of irreparable harm. [11]

Where the federal government has developed substantial evidence of non-citizens voting in the current election, it should bring Section 611 indictments. Los Angeles County has indicated it would cooperate with these indictments.

**C. The balance of the equities favors Defendants.**

**a. Plaintiff's allegations are not credible.**

It is well-documented that matching voter registration records with data from other administrative databases presents "presents numerous challenges." NAACP Opp., Declaration of Kassra Oskooii ¶16. Multiple factors, such as differences in when and how information across databases is captured and common identifying information, can render it difficult to accurately match identities, let alone verify citizenship. Oskooii Decl. at 5-7. These difficulties can lead to errors, even when matching procedures are "carefully implemented." Oskooii Decl. ¶18. In the case of verifying citizenship, this can lead to false positives, such as a citizen incorrectly being identified as a noncitizen. Oskooii Decl. ¶ 16.

Plaintiff's protocol raises significant concerns. For example, Plaintiff failed to disclose "the specific matching rules, the specific criteria for its confidence thresholds, [or] any detailed information about the third-party platform and their procedures." Oskooii Decl. ¶ 14. Plaintiff waited until the night before the hearing to reveal that the third-party platform it relied on was Lexis Nexis. Supplement to Plaintiff's Application for TRO, Declaration #2 of Nicholas Bartell

[11] Plaintiff's theories of injury in fact and law are also unavailing. *See Section IV.A.1.*

¶ 15. It remains unknown how Lexis Nexis performed its analysis, such as how it "linked names to Social Security numbers not available on the California public voter file." Oskooii Decl. ¶ 14. Plaintiff likewise did not explain what its "enrichment process" entailed or how it occured. McLoughlin Decl. ¶¶ 17, 18. Plaintiff also provided "no error rates" or "validation against a reliable benchmark" that would enable a determination of the accuracy of its findings. Oskooii Decl. ¶ 26. Omissions of this critical information prevent an evaluation of Plaintiff's procedure, including how Plaintiff reduced its initial claim of nearly 200,000 alleged noncitizens to 20,000 individuals.

Plaintiff's disproven allegations with respect to noncitizen voting in other states raise further questions of credibility. In Nevada, DHS initially identified up to 15,903 registered voters as noncitizens based on "high-confidence" matches, but later reduced that number to 6,218, and then to 185 after conducting its manual review. NAACP Opp. at 20. Nevada officials later confirmed that all 185 individuals were citizens. *Id.* Plaintiff likewise initially claimed that nearly 200,000 registered California voters were noncitizens and later reduced its allegation to 20,000 individuals without sufficient explanation.

Given the vagueness of Plaintiff's descriptions of its procedures and the unreliability of its similar claims in other states, the Court cannot conclude that Plaintiff's process is credible. This calls into question its allegation that the individuals on the October List are "highly likely to be noncitizen[s]." TRO at 1. Given that Plaintiff's entire claim for relief rests on the sincerity of this allegation, Plaintiff's lack of credibility weighs against a finding in their favor.

**b. Plaintiff's requested relief would create a significant administrative burden for Defendants, leading to chaos and upending the election.**

With Election Day less than a week away, election staff throughout California are working diligently to ensure that the election proceeds smoothly and Californians can exercise their right to vote. This work becomes "more significant and urgent" in the days leading up and after the election. State Opp., Declaration of Jana Lean ¶ 14. During this period, staff in the Elections Divisions section of the Secretary of State's office are engaged in numerous tasks, including but not limited to, responding to voter inquiries and election complaints, testing

election night reporting technology, finalizing emergency preparedness protocols, conducting voter education and outreach events, and updating the website to communicate important election information. *Id.* Los Angeles County election staff are likewise occupied. The County opened 123 vote centers on October 24 and is gearing to open 523 more on October 31. County Opp., Declaration of Monica Flores ¶ 25. From October 24 to Election Day, the County is focused on preparing for the opening and managing of these centers, which includes training and assigning election workers to the vote centers, setting up call centers and the necessary technological supports, and ensuring the transportation and set up of voting equipment and supplies at the vote centers. *Id.* County staff also continue processing vote by mail ballots and anticipate receiving “much higher volumes” as Election Day nears. County Opp. at 11.

Plaintiff’s request for election officials to identify and segregate ballots belonging to individuals on the October List would force Defendants to create wholly new procedures while the election is already underway. Because the county Registrar’s current system “ha[s] no function for setting aside the ballots of designated voters”, complying with Plaintiff’s request would require “changes to systems and procedures that have already been tested and finalized for this election, the development and documentation of a new process, and the training of staff on it.” Flores Decl. ¶43. This would also require updates to “multiple, separate software programs and hardware devices.” County Opp., Declaration of Aman Bhullar ¶ 11. Initiating such processes during the election period would have “downstream effects on other election functions”, such as the tabulation of ballots and would thus “impede the administration of the election for all voters.” Bhullar Decl. ¶15. The scale of the required technological change is so significant such that it “cannot be completed safely and uniformly before Election Day.” *Id.*

Additionally, complying with Plaintiff’s request would require the diversion of resources from the areas outlined above. Neither the County nor the State possesses the resources to attend to Plaintiff’s request and complete the election administration responsibilities their staff are currently engaged in. County Opp. at 31; State Opp. at 26. The diversion of key staff to ballot segregation would likely interfere with counting the election results and certifying the election, threatening both the County and State’s abilities to meet statutory deadlines. Flores

Decl. ¶38; Lean Decl. ¶14. This would jeopardize the finalization of the election and the ability of newly elected officials to assume their responsibilities. Flores Decl. ¶ 50.

**c. Plaintiff's requested relief would likely lead to voter disenfranchisement.**

Granting the TRO would risk disenfranchising an untold number of voters. Plaintiff argues that the individuals on the October List are "highly likely to be noncitizen[s]." Reply at 8. However, as the Court explained earlier, Plaintiff has not provided credible evidence for its allegation. Rather, Plaintiff's own description of its methodology in creating the list was vague and raised multiple questions regarding reliability. Additionally, Plaintiff's similar allegations elsewhere have called into question its process of identifying noncitizens. SIREN Opp. at 4.

Plaintiff alleges that it merely seeks a "temporary segregati[on]" of ballots so that those individuals' citizenship can be verified. TRO at 25. However, Plaintiff has provided no process or access to information by which Defendants could verify individuals' citizenship, nor do Defendants possess the means to do so. County Opp. at 31. Furthermore, Plaintiff has admitted that it would be unable to complete the citizenship verification prior to election day. Compl. at ¶60. If the United States, with its capabilities, could not do so, there is no reason to believe that California or the County could. Thus, a ballot segregated, in effect, would be a ballot removed.

It bears mentioning that those most at risk of being disenfranchised are naturalized citizens. Individuals that the federal government recently identified as noncitizens on voter rolls in different states have repeatedly turned out to be naturalized citizens. SIREN Opp. at 4. This aligns with the disclosures made in a federal whistleblower report. The report revealed that individuals are identified as noncitizens "based solely on DHS data that is unverified, inconsistent with other information, and/or is unexplained" to the employees making the identifications. County Opp., Exh. H at 3. Furthermore, the report claimed that the government assigned employees a quota of 5 subjects to be reviewed per hour and 40 subjects per day. Further, the government gave employees "only twelve minutes to determine if a subject is a U.S. citizen." County Opp., Exh. H at 2. It is no surprise that citizens are wrongly identified as noncitizens. County Opp., Exh. H at 3.

Had Nevada officials accepted Plaintiff's allegations there as true, 185 citizens would have been deprived of their vote. This Court will not deprive Californians who have met the requirements for voter registration of their fundamental right because of Plaintiff's unfounded allegations.

**d. Plaintiff's request would violate *Purcell*.**

In *Purcell*, the Supreme Court vacated a Court of Appeals order that enjoined Arizona from requiring voters to provide proof of citizenship when registering to vote and to present identification when voting. *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006). Emphasizing "the imminence of the election," the Supreme Court held that the election should proceed without disruption to the status quo. *Id. Purcell* stands for the principle that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm. 589 U.S. 423, 424 (2020)*.

Here, "the election is not merely upcoming; it has already started." *People Not Politicians v. Onder*, 609 U.S. ____, 2026 WL 2883222, *2 (Sept. 25, 2026). That means "the *Purcell* principle applies with even greater force. *Id.* Since October 11, the County has been processing ballots and as of October 20, had already processed more than 331,000 vote by mail ballots. County Opp. at 11. It anticipates "much higher volumes" of vote by mail ballots to be received as election day nears. *Id.* . As discussed earlier, granting Plaintiff's request would provoke catastrophic change, upending the administration of the election. This would likely cause "voter confusion and consequent incentive to remain away from the polls" as individuals would wonder whether their ballots were likely to be withheld. *See Purcell* at 5.

Plaintiff argues that Purcell does not apply because the October List individuals are "likely ineligible noncitizens." Reply at 9. For the reasons discussed earlier, however, the Court does not give this allegation credence. Plaintiff further argues that its request would uphold the status quo. Reply at 1. But maintaining the status quo, as the Supreme Court did in *Purcell*, would entail ensuring that the governing laws and practices remain in place. Here, that would mean ensuring that no practice impedes registered voters, deemed eligible by California's voter

registration requirements, from voting. Plaintiff seeks to do the very opposite: disenfranchise voters.

**D. The public interest favors the protection of voting rights.**

Constitutional rights and our democracy are at stake**.** The public interest favors their protection. Individuals who have met the requirements of California's voter registration laws must not be deprived of a core right merely because of unfounded allegations stemming from a procedure rife with uncertainty and errors.

The public interest also favors the protection of election staff, who are working diligently to ensure that all citizens can cast their votes.

There is a clear remedy available. The United States can prosecute individuals according to Section 611, as it has historically and recently done. California also has established procedures to cancel the voter registrations of any individuals proven ineligible.

The Executive's requested relief, however, would wreak havoc and disrupt the election that is already underway, create a chilling effect on election workers and voters alike, and discount the votes of United States citizens. The Executive Branch cannot replace the remedy Congress carefully enacted with its own unlawful and unconstitutional solution instead.

Eroded trust in our democracy is irreparable. Once a vote is segregated, lasting harm has occurred. If the Executive can discount votes and threaten an ongoing election due to unproven allegations, then our democracy is in danger.

This Court declines to be a party to such process.

## V. Disposition

Accordingly, the Court **DENIES** the Application for a Temporary Restraining Order (Dkt. 62).

DATED: October 28, 2026

HON. DAVID O. CARTER
DISTRICT JUDGE