FILED

OCT 26 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

STATE OF CALIFORNIA; SHIRLEY WEBER, PH.D., in her official capacity as the California Secretary of State; DEAN LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

Defendants - Appellees,

No. 26-7070

D.C. No.
2:26-cv-12025-DOC-ADS
Central District of California,
Los Angeles

**ORDER**

PER CURIAM:
Concurrence by Judge BENNETT;
Concurrence by Judge SANCHEZ;
Dissent by Judge BUMATAY

In this appeal, Plaintiff, the United States, asks us to issue a mandatory injunction and order Defendants, the State of California and the County of Los Angeles (the "County")[1]: "(1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their

[1] The United States sued Dean C. Logan, in his official capacity as the County of Los Angeles – Registrar-Recorder/County Clerk.

citizenship status before tabulating their vote-by-mail ballot." But the United States failed to allow the district court adequate opportunity to consider its application for a Temporary Restraining Order ("TRO"). For that reason, we lack jurisdiction over this appeal. So we grant the County's motion to dismiss this appeal and deny as moot the United States's emergency motion for relief.

**I.**

In this case, the United States alleges that Defendants automatically mailed vote-by-mail ballots for the 2026 federal election to all registered voters in California, even after the United States informed Defendants that thousands of individuals "likely" to be noncitizens were on the voter rolls and would receive these ballots. The United States claims Defendants did not make a serious effort to work with the federal government to identify and remove "likely" noncitizens from the rolls and accuses Defendants of tabulating ballots from these individuals without verifying their citizenship. In this way, the United States claims Defendants are knowingly facilitating unlawful noncitizen voting in federal elections, in violation of federal law.

The dispute between the parties began months ago, when the U.S. Citizenship and Immigration Services ("USCIS") and Department of Homeland Security Investigations ("HSI") obtained California's voter roll in anticipation of the 2026 November midterm elections. The two agencies then curated a list of individuals

they believed with "high-confidence" were noncitizens registered to vote in California. They did so by cross-referencing the voter roster with both internal and third-party data regarding possible noncitizens.

In July, the Secretary of Homeland Security contacted Defendants' representatives and informed them that the United States was in possession of a list—developed by USCIS and HSI over the summer—of thousands of individuals registered to vote in their elections whom the agencies had labeled as "likely" noncitizens. The United States asked Defendants to coordinate with the federal government in confirming the citizenship status of those individuals on the list. Defendants responded with skepticism, seeking a more detailed description of the methodology utilized by DHS to identify these allegedly ineligible voters, among other indicia of veracity.

Hearing nothing further from the United States, and consistent with state law—which requires California to send vote-by-mail ballots to all registered voters before the election, *see* Cal. Elec. Code § 3000.5—Defendants mailed ballots to all registered voters on October 1, 2026.

On October 13, 2026, after the ballots were mailed, the United States again contacted Defendants, this time sending them a list of over 20,000 "likely" noncitizens registered to vote in California's November federal election (the "October List"). The United States asked Defendants to review the list within forty-

eight hours, confirm citizenship of the individuals, and, if Defendants were unable to independently confirm citizenship, to set aside ballots received from individuals on the October List until each individual's citizenship could be verified.

When Defendants refused to comply with that demand, the United States filed suit against Defendants on October 15, 2026. Essentially, the United States argued that Defendants were violating the Supremacy Clause, U.S. Const. art. VI, cl. 2, by knowingly facilitating the votes of noncitizens, which frustrated the federal prohibition against noncitizens voting in federal elections, *see* 18 U.S.C. § 611(a). And it asked the district court to "[i]ssue a preliminary and permanent injunction enjoining California from tabulating in federal elections vote-by-mail ballots received from individuals identified by the Federal Government as likely noncitizens until those individuals' citizenship status c[ould] be verified."

Four days later, on October 19, 2026, the United States filed an "Ex Parte Application to Exceed Page Limitation," seeking to file an overlength memorandum in support of a forthcoming application for a TRO. *See* Ex Parte Application to Exceed Page Limitation, No. 26-cv-12025 (C.D. Cal. Oct. 19, 2026), ECF No. 22.[2] The United States attached to that Motion a copy of its application for a TRO, *id.* at ECF No. 22-1, and a memorandum in support of the motion, *id.* at ECF No. 22-2.

[2] All ECF cites refer to the entries in Case No. 26-cv-12025.

In that TRO request, the United States told the district court that it was requesting a ruling on the motion by **November 3, 2026**:

> This Court should order California to set aside vote-by-mail ballots from likely noncitizens in the federal election—including any ballots cast by the individuals charged with 18 U.S.C. § 611 crimes this morning—until the voter's citizenship status can be determined. The United States respectfully requests that this Court grant this relief by **November 3, 2026,** before the end of voting in the 2026 federal election.

*See id.* at ECF No. 22-2 pp. 3–4 (emphasis in original). Two days later, on October 21, 2026, the case was reassigned to Judge David Carter.

The court, on October 21, 2026, granted the United States's request to file an overlength memorandum in support of its TRO. ECF No. 53. That same day, the United States filed its application for a TRO, which was virtually identical to the earlier version, ***including as to the request for a ruling by November 3, 2026***—*see* Emergency Ex Parte Application for TRO, ECF No. 62-1 p. 4. Judge Carter then set a hearing on the TRO motion for October 27, 2026, leaving about one week between the hearing date and the date by which the United States had requested a hearing. *See* In Chambers Order Setting Hearing, ECF No. 64.

At around 9:00 PM that night (October 21, 2026), the United States filed what it titled a "Request for Expedited Ruling on TRO." Request for Expedited Ruling on TRO, ECF No. 67. The United States emphasized that Defendants, in opposing the TRO, admitted that the County had processed more than 331,000 ballots since it

began counting them on October 5, 2026.[3] *Id.* at 1. Apparently surprised by this fact, the United States requested that the district court rule on its TRO fifteen hours (three business hours) later—"by noon on October 22, 2026." *See id.* at 2.

The district court did not rule on the motion by noon the next day, and the United States, later describing the district courts nonaction during this brief period as a "constructive denial" of the motion, appealed to this court on October 22, 2026. Despite the United States's appeal, Judge Carter continues to consider the United States's TRO; has reiterated his plans to hold a hearing on Tuesday, October 27, 2026; and has committed to "rul[ing] promptly after hearing from the Parties." *See* Order Reiterating Briefing Deadlines, ECF No. 85.

On appeal, the United States filed an emergency motion for injunctive relief, requesting that we immediately grant an injunction pending appeal that, as noted, would require Defendants "(1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot." The County soon filed an emergency motion to dismiss this appeal, contending that we lack jurisdiction to

[3] In Defendants' opposition to the TRO, a scrivener's error suggests that the County "began its VBM ballot processing operations on October 11, 2026." In fact, as clarified by the preceding sentence and the underlying declaration, the County "began its VBM ballot processing operations on October 5, 2026."

hear it. Both motions are fully briefed, and we held oral argument on October 25, 2026.[4]

## II.

We start, as we must, with jurisdiction. *See HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1238 (9th Cir. 2022) ("It is the duty of federal courts to assure themselves that their jurisdiction is not being exceeded." (quoting *In re Ryther*, 799 F.2d 1412, 1414 (9th Cir. 1986))).

### A.

Under 28 U.S.C. § 1292(a)(1), we have jurisdiction over appeals from "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1292(a)(1). Thus, in the normal course, whenever a district court denies a preliminary injunction, that denial is an appealable interlocutory order. *Id.*

But we also have jurisdiction over interlocutory appeals in which "the district court effectively denied the motion" for injunctive relief. *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1449–50 (9th Cir. 1992). This is because, since "preliminary relief must be granted promptly to be effective, simple inaction may

[4] Several entities have moved to intervene in this appeal. Dkt. Nos. 7, 27, 31. Because we dismiss for lack of jurisdiction, we deny as moot their motions to intervene.

have the practical effect of refusing an express request for a preliminary injunction." 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3924.1 (3d ed. 2008). Nevertheless, because Section 1292(a)(1) creates only a "limited exception to the final-judgment rule," we are to "narrowly" construe our interlocutory jurisdiction. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).

Recently, in *A. A. R. P. v. Trump*, 605 U.S. 91, 92 (2025) (per curiam), the Supreme Court considered appellate jurisdiction arising from a so-called "constructive denial" of injunctive relief. There, the President invoked the Alien Enemies Act ("AEA"), 50 U.S.C. § 21, to remove Venezuelan nationals whom it had deemed members of Tren de Aragua. *Id.* When several detainees were "served notices of AEA removal and told that they would be removed 'tonight or tomorrow,'" the detainees moved for an emergency TRO preventing their removal and for a ruling or a hearing on the motion by the next day. *Id.* at 92–93. After the district court delayed ruling on the motion for "14 hours and 28 minutes," the detainees appealed the "constructive denial" of their emergency motion. *Id.* at 92–94 (brackets omitted).

When the case reached the Supreme Court, the Court held that the district court practically refused an injunction to the detainees, who were "facing an imminent threat of severe, irreparable harm." *Id.* at 94. This was in part due to the "district court's inaction in the face of extreme urgency," and in part due to the "high risk of 'serious, perhaps irreparable,' consequences" faced by the detainees in

absence of a ruling. *Id.* (citations omitted). For instance, the evidence in the record showed that many of the detainees had "already been loaded on to buses, presumably headed to the airport." *Id.* at 97. And the government had "represented on the record in federal court that it reserved the right to remove detainees after midnight." *Id.* The prospect of irreparable harm was amplified by recognition that, in a prior similar case, the United States had represented that it could not secure the return of a person deported to a prison in El Salvador. *Id.* at 95. That is, once deported, the Plaintiffs would have been irretrievably and permanently outside the jurisdiction of the United States. *Id.* For this reason, the Supreme Court repeatedly stressed that it held an interest in "preserv[ing] [its] jurisdiction," an interest the threatened harm would extinguish. *Id.* at 95–97. Under these circumstances, the Court concluded that the Circuit Court (and the Supreme Court) had jurisdiction "to issue injunctive relief to prevent irreparable harm" to the detainees. *Id.* at 97.

**B.**

In the emergency motion filed with this appeal, the United States went straight to the merits, and barely addressed our jurisdiction, making a conclusory assertion that because the district court "failed to rule" on its TRO, the court constructively denied it.[5] Defendants immediately filed their own emergency motion to dismiss

---

[5] In fact, the word "jurisdiction" does not even appear in the United States's emergency motion.

this appeal for lack of jurisdiction, arguing that the United States manufactured an emergency to prematurely reach our court, even though the district court is set to hear argument on the United States's motion this Tuesday, on October 27, 2026. In response to that motion, the United States addressed our jurisdiction, arguing that California's continued counting of ballots constituted an extreme harm that the district court—in the fifteen hours (three business hours) between 8:57 PM on October 21, 2026, to 12:00 PM on October 22, 2026—failed to remedy. The United States requested that we act with exigency, purportedly invoking our jurisdiction pursuant to *A.A.R.P. v. Trump*, 605 U.S. at 92.

Because the United States invoked *A. A. R. P. v. Trump*, 605 U.S. at 92, we start there. Recall that in *A. A. R. P.*, the Court decided that the district court's inaction—for "14 hours and 28 minutes"—in the "fac[e] [of] an imminent threat of severe, irreparable harm" amounted to a constructive denial of the requested injunction. *Id.* at 94. The United States gave the district court here about 15 hours (three business hours)[6] to rule on its TRO (from 8:57 PM on October 21, 2026, to 12:00 PM on October 22, 2026). When no ruling came, the United States appealed to this court, citing *A. A. R. P.* and claiming "an imminent threat of severe, irreparable harm." *See A. A. R. P.*, 605 U.S. at 94.

[6] We note that while in *A. A. R. P.*, the government was acting to deport individuals during non-business hours, the United States has not alleged that Defendants were counting ballots between 9:00 PM and 9:00 AM.

But *A. A. R. P.* does not stand for the proposition that litigants may appeal a request for an injunction whenever the district court fails to rule within fifteen hours of filing. *See id.* at 94 ("A district court's inaction . . . *may* have the effect of refusing an injunction (emphasis added)). Rather, that case dealt with an "imminent threat of severe, irreparable harm"—detainees were in the process of being loaded on buses and taken to the airport to be irretrievably deported *beyond the United States's jurisdiction*—and the detainees twice urgently attempted to obtain a TRO during deportation proceedings. *Id.* at 92–93. As we now explain, the United States has not treated this case with anywhere near the exigency of the detainees in *A. A. R. P*. and has thus failed to establish that the district court did not act "in the face of extreme urgency." *Id.* at 93. This case is meaningfully distinct from *A.A.R.P.* for several reasons.

First, unlike in *A.A.R.P.*, any delay in the availability of judicial relief is, at least in part, the product of the United States's own decisions. Throughout these proceedings, the district court accommodated the United States's desired timetable: it took the United States at its word, set a hearing on the TRO a week before the United States's requested deadline, and notified the parties it would "rule promptly after hearing from the Parties at oral argument . . . ." That the United States had overlooked the fact that counties across California would be working diligently to

process ballots for the millions of voters residing within the State does not equal inaction by the district court or circumstances outside the United States's control.

The United States's theory is that, absent an injunction, "every minute of processing that occurs without segregating the ballots of suspected ineligible voters causes untraceable disenfranchisement and dilution of the votes of United States citizens." But the United States had the information it needed to seek relief with exigency well before October 21, 2026, when it first requested relief. The United States has taken issue with California's voter rolls since at least July 16, when it sent a letter to California's Secretary of State citing its "[p]reliminary" analysis of California's voter rolls. And neither California's law permitting the processing of ballots twenty-nine days before an election, nor its law providing for the issuance of mail-in ballots to registered voters, is new. Cal. Elec. Code. §§ 15101(a), 3003. Yet the United States's complaint, filed on October 15, 2026—ten days after counties could begin counting, and months after it initially contacted California authorities—said nothing about irreparable harm, did not request a deadline for relief, and was not filed contemporaneously with a TRO or a motion for a preliminary injunction. *See* Complaint for Declaratory and Injunctive Relief, ECF No. 1. Instead, the United States waited four days, until October 19, 2026, to file an "Ex Parte Application to Exceed Page Limitation." *See* Ex Parte Application to Exceed Page Limitation, ECF No. 22. For the first time, the United States attached to its page limit motion a

request for a TRO, *id.* at ECF No. 22-1, and its memorandum in support of such injunctive relief, *id.* at ECF No. 22-2. It took the United States four days to prepare and file a TRO (ECF No. 22-1), and all the while, California was counting votes pursuant to its longstanding state law. *See Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.").

And then, the United States doubled down on its lack of urgency. More specifically, the United States twice told the district court—first on October 19, 2026 and then again on October 21, 2026, that it was requesting a ruling "by **November 3, 2026**:"

> This Court should order California to set aside vote-by-mail ballots from likely noncitizens in the federal election—including any ballots cast by the individuals charged with 18 U.S.C. § 611 crimes this morning—until the voter's citizenship status can be determined. The United States respectfully requests that this Court grant this relief by **November 3, 2026,** before the end of voting in the 2026 federal election.

*See* Memorandum in Support of The United States's Ex Parte Application for Temporary Restraining Order, ECF No. 22-2 p. 4 (emphasis in original); *id.* at ECF No. 62-1 p. 4 (same). During this time, Defendant Logan, with California's support, requested an expedited briefing schedule to resolve the matter swiftly, and reported that the United States declined to support the motion because it did not believe there was sufficient exigency to merit it. ECF No. 57 at 7; *see generally* ECF No. 61.

Seeing the United States's request for relief by November 3, the district court immediately set a hearing on the United States's TRO for Tuesday, October 27, 2026—one week before the United States's proposed November 3 deadline—specifically stating on October 23, 2026 that the "Court will rule promptly after hearing from the Parties at oral argument on Tuesday, October 27, 2026." ECF No. 85. Only after the district court set the hearing in accordance with the United States's twice-repeated timetable did the United States change tack. At **8:57 PM** on October 21, 2026 (the very same day the district judge received this case and set the hearing), the United States filed a "Request for Expedited Ruling on Emergency Application for a TRO," stressing the urgency of its motion and asking for a ruling by **12:00 PM** the next day. After just fifteen hours—most of them in the middle of the night—the United States appealed, telling us that the district court constructively denied its motion by failing to timely rule on it during that very brief time period. Specifically, the United States argued that, although it initially "sought relief by November 3, 2026," it did not see the alleged acute urgency in this matter until it received Defendants' opposing brief on October 20, 2026, where it learned the County had processed more than 300,000 vote-by-mail ballots. We note that ***the very next day***, however, the United States filed its application for a TRO and for the second time requested a ruling by November 3, 2026.

The United States's claimed emergency, at least in part, is a self-constructed one. At least part of the delay here is attributable to the United States's own delay in filing suit, in realizing that existing California state law governs the issuance and processing of ballots, in recognizing that California has millions of registered voters and processes ballots on a schedule aligned with that scale, and in communicating to the court its desired relief. The same cannot be said of *A.A.R.P.*, a case in which the plaintiffs sought relief on a short timeline for circumstances outside their control: notification by the federal government that it sought to deport them that very night or the following morning. *A.A.R.P.*, 605 U.S. at 92–93. "[I]t is a rule of equity that an unreasonable delay in asserting rights is a bar to relief." *Martin v. Gray*, 142 U.S. 236, 239 (1891). The *A.A.R.P.* plaintiffs acted as promptly as they could; the United States, here, has not.

Second, *A.A.R.P.* takes as its template the *Carson* factors in determining what constitutes a "constructive denial" of a plaintiff's request for relief. *A.A.R.P.*, 605 U.S. at 94 (citing *Carson*, 450 U.S. at 84)). Another *Carson* factor counsels finding jurisdiction when an interlocutory order can be "effectually challenged only by immediate appeal." *Carson*, 450 U.S. at 84 (citation modified). In three separate instances, the Supreme Court stressed the relevance of this factor to the facts of *A.A.R.P.*, noting that it wished to "preserve [its] jurisdiction." *A.A.R.P.*, 605 U.S. at 95, 97. Had the *A.A.R.P.* plaintiffs been deported, they would have been removed,

permanently, from the jurisdiction of the federal judiciary. *Id.* at 93. As the United States concedes at oral argument, absent appellate court intervention here, district court proceedings will continue, and any party dissatisfied with the outcome below may seek appellate review. There is here no loss of jurisdiction.

Third, the *A.A.R.P.* decision came following another, germane Supreme Court opinion confirming that, even in the context of the AEA, our Constitution "entitles aliens to due process of law in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670 (2025) (citation modified) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). In *A.A.R.P.*, the Supreme Court called attention to this, commenting that it had already "explained—with all nine Justices agreeing—that 'AEA detainees must receive notice . . . that they are subject to removal under the Act . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief' before removal." *A.A.R.P.*, 605 U.S. at 95 (quoting *J.G.G.*, 604 U.S. at 673 (2025)). In seeking to deport the *A.A.R.P.* plaintiffs in the manner in which it proposed, the United States risked flouting the Supreme Court's clear mandate. *Id.* at 94–95. There is no analogous risk here.

### C.

The emergency the United States asserts, partly created by its own actions, bears little resemblance to the extraordinary facts of *A.A.R.P. v. Trump*. The United States's theory could confer appellate jurisdiction nearly any time a party faced some

form of "irreparable harm." But to quote the D.C. Circuit, "[w]hile a deserving litigant is always harmed if judicial relief is delayed, such harm does not automatically rise to the irreparable level." *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Inds., Inc.*, 789 F.2d 21, 24–25 (D.C. Cir. 1986). Accordingly, we grant the County's motion to dismiss this appeal for lack of jurisdiction and deny as moot the United States's emergency motion for relief.

FILED

OCT 26 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*United States v. State of California*, No. 26-7070

BENNETT, Circuit Judge, concurring:[1]

I fully concur with the per curiam order. I write separately, however, in light of the dissent. Even if I were to conclude we had jurisdiction over the appeal, and reach the merits, there are several reasons why I would deny the United States's emergency motion for injunctive relief pending appeal.

**I.**

**A.**

In this case, Plaintiff, the United States of America, alleges that Defendants, the State of California and the Los Angeles County[2], automatically mailed vote-by-mail ballots for the 2026 federal election to all registered voters in California, even after Plaintiff informed Defendants that thousands of individuals "likely" to be noncitizens were on the voter rolls and would receive these ballots. Plaintiff claims Defendants made no serious effort to work with the federal government to identify and remove "likely" noncitizens from the rolls, and accuses Defendants of tabulating

[1] Due to the time constraints in this emergency appeal, I do not address all merits issues, and focus only on several that I believe are dispositive.

[2] Plaintiff sued Dean C. Logan, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk. I refer to this defendant as "the County" for simplicity.

ballots from these individuals without verifying their citizenship, thereby knowingly facilitating unlawful noncitizen voting in federal elections in violation of federal law.

According to Plaintiff, two United States agencies work in conjunction to develop predictive lists of noncitizens who may be registered to vote in federal elections. First, the U.S. Citizenship and Immigration Services ("USCIS") obtains voter rosters, which some states—like California here—make available for purchase. *See* Cal. Elec. Code § 2188. USCIS then compares that voter roll information with its own internal immigration records, and uses third-party software to generate high, medium, or low confidence identity matches. Once complete, USCIS then creates a table of individuals who it believes are "high-confidence" matches for noncitizens with no evidence of naturalization.

The high-confidence matches are then forwarded to the Department of Homeland Security Investigations ("HSI"), which serves as the primary investigative agency enforcing America's immigration laws. Working with USCIS, HSI reviews the high-confidence referrals and attempts to further investigate and tailor the list for accuracy. According to Plaintiff, HSI's review consists of using a "customary analytical platform" to correct "information mismatches" on the high-confidence list.

**B.**

Over the summer months of 2026, USCIS and HSI obtained California's voter roll in anticipation of the 2026 November midterm elections. In accordance with the procedures outlined above, the two agencies then curated a list of "high-confidence" noncitizens who they believed were registered to vote in California.

In July, the Secretary of Homeland Security contacted Defendants and informed them that Plaintiff was in possession of a list identifying thousands of individuals who were "likely" noncitizens improperly eligible to vote in their elections. Plaintiff asked Defendants to coordinate with the federal government in confirming the citizenship status of those on the list. Defendants responded with skepticism, seeking a more detailed description of the methodology used by DHS to identify these allegedly ineligible voters, among other indicia of veracity.

Hearing nothing further from Plaintiff regarding the list, and consistent with state law—which requires California to send vote-by-mail ballots to all registered voters, *see* Cal. Elec. Code § 3000.5—Defendants mailed ballots to all registered voters on October 1, 2026.

On October 13, 2026, after the ballots were mailed, Plaintiff again contacted Defendants, this time sending them a list of over 20,000 "likely" noncitizens who may vote in California's November federal election ("October List"). Plaintiff asked Defendants to review the list, confirm citizenship of the individuals, and, if

Defendants were unable to independently confirm citizenship, to set aside ballots received from individuals on the October List until each individual's citizenship could be verified.

When Defendants refused to comply with that demand, Plaintiff brought suit against Defendants on October 15, 2026. Essentially, Plaintiff argued that Defendants were violating the Supremacy Clause, U.S. Const. art. VI, cl. 2, because by knowingly facilitating the votes of noncitizens, Defendants were frustrating the federal prohibition against noncitizens voting in federal elections. *See* 18 U.S.C. § 611(a). And it asked the district court to "[i]ssue a preliminary and permanent injunction enjoining California from tabulating in federal elections vote-by-mail ballots received from individuals identified by the Federal Government as likely noncitizens until those individuals' citizenship status c[ould] be verified."

Plaintiff sought injunctive relief in the district court, as discussed in the per curiam order. When the district court failed to rule by Plaintiff's requested deadline,[3] Plaintiff treated the court's nonaction as a constructive denial of the motion and appealed.

On appeal, Plaintiff filed an emergency motion for injunctive relief, requesting that we immediately grant an injunction pending appeal that requires Defendants to (1) set aside vote-by-mail ballots from persons identified by the

---

[3] As the per curiam order notes, Plaintiff's "deadline" materially changed over time.

Federal Government likely to be noncitizens and (2) independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot. The County soon filed an emergency motion to dismiss this appeal, contending that we lack jurisdiction to hear it. We held oral argument on October 25, 2026.

**II.**

To obtain preliminary injunctive relief, a plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff argues that it needs an injunction to maintain the status quo, and that its proposed injunction does no more than maintain the status quo. I disagree. Because Plaintiff urges this court to require Defendants to take "affirmative action"—to segregate California's ballots that the State would not otherwise segregate and to affirmatively verify certain voters' citizenship status before tabulating their vote-by-mail ballot—Plaintiff requests a mandatory injunction. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

"The standard for issuing a mandatory preliminary injunction is high." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in

doubtful cases . . . .'" *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The movant "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia*, 786 F.3d at 740. And in deciding to grant equitable relief, the remedy must be workable. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (quotation marks omitted) (quoting *New York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977)). In my view, Plaintiff fails to meet these heightened standards.

**A.**

First, I consider Plaintiff's likelihood of success on the merits of its claim—"the most important" of the *Winter* factors—and whether the "law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia*, 786 F.3d at 740. Plaintiff asks this court—in an expedited and preliminary posture—to order Defendants to segregate the ballots of alleged noncitizens because, it argues, 18 U.S.C. § 611 preempts California's declination and preempts California from following the statutory scheme adopted by the California Legislature. Yet Plaintiff has not made the required showing that such extraordinary relief, in the days leading up to an election, is clearly required by law.

As an initial matter, there is no dispute that it is unlawful under both federal and California law for noncitizens to vote. *Compare* 18 U.S.C. § 611, *with* Cal. Const. art. II, § 2(a) ("A United States citizen 18 years of age and resident in this

State may vote."). Rather, this dispute is about the *procedures* used to enforce that prohibition, which plainly implicates the Elections Clause of the U.S. Constitution. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9 (2013) ("*ITCA*"). The Elections Clause, U.S. Const. art. I, § 4, cl. 1, reads:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

This clause expressly dictates which sovereign has the authority to prescribe the manner by which Congressional elections are conducted. The question therefore is whether Congress has spoken clearly—that is, whether California's *procedures* in enforcing the election requirements, such as citizenship or ballot challenges based on citizenship, have been preempted. Nothing in § 611—a statute that criminalizes voting by a noncitizen—preempts California's comprehensive statutory scheme that has been duly enacted under the Elections Clause.

While Plaintiff argues that the Supremacy Clause requires California to segregate several thousand ballots because failing to do so would at a minimum "induce, encourage or promote" the violation of § 611, this court has recognized that "the Elections Clause operates quite differently from the Supremacy Clause." *Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013). "In practice, the [Elections] Clause functions as 'a default provision; it invests the States with

responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *ITCA*, 570 U.S. at 9 (quoting *Foster v. Love,* 522 U.S. 67, 69 (1997)). These state responsibilities on the "times, places, and manner" can include:

> notices, registration, supervision of voting, *protection of voters, prevention of fraud and corrupt practices*, *counting of votes, duties of inspectors* and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to *procedure and safeguards* which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932) (emphasis added).

Congress, however, "may supplement these state regulations or may substitute its own" because "[i]t has a general supervisory power over the whole subject." *Id.* at 366–67 (citation modified); *see also Gonzalez*, 677 F.3d at 391 ("[A] state's role in the creation and implementation of federal election procedures under the Elections Clause is to administer the elections through its own procedures until Congress deems otherwise; if and when Congress does so, the states are obligated to conform to and carry out whatever procedures Congress requires."). But federal law only displaces state election law in "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880), *abrogated on other grounds by Glasgow v. Moyer*, 225 U.S. 420 (1912)). Further, the Elections Clause confers broad authority only on Congress and the States, not the Executive. Indeed, to prevent the centralization of election management in the Executive, the Elections

Clause "empowers" only Congress and the "state governments to enact laws governing the mechanics of federal elections." *See Gonzalez*, 677 F.3d at 391.

I have, at the very least, serious doubts that Plaintiff's preemption claim is likely to succeed on the merits because Plaintiff has not shown that the law clearly favors its position. First, § 611 does what each party has determined is unlawful—it makes it a crime for a noncitizen to vote. Second, there is nothing in the text of § 611 that preempts the states' primary authority in election administration; California can still (and in fact, it must) craft its own *procedures* governing Congressional elections and ballot challenges in those elections.

**1.**

Plaintiff's sole ground for asserting preemption rests on § 611's misdemeanor criminal prohibition on noncitizen voting. To be sure, "when Congress acts under th[e] [Elections Clause] provision," Congress is empowered "to 'make or alter' state election regulations." *ITCA*, 570 U.S. at 14. But if Congress intends to preempt, "state law is preempted by the federal election[] statutes only so far as the conflict extends." *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026) (citation modified); *see also Siebold*, 100 U.S. at 392 (noting Congress's power to regulate elections "supersede[s]" state law "so far as it is exercised, and no farther").

Section 611 provides that "[i]t shall be unlawful for any alien to vote in any" federal elections, except in certain circumstances, and that "[a]ny person who

violates this section shall be fined under this title, imprisoned not more than one year, or both." 18 U.S.C. § 611(a)–(b). Notably absent from the statute is any express preemption provision; language setting forth standards for election administration that might, explicitly or implicitly, prohibit a state from mailing and tabulating ballots; or text regulating how a state deals with challenges to ballots. A review of § 611 also reveals no hidden provision authorizing the Department of Justice ("DOJ") to superintend or intervene in a state's election administration. In fact, the statute's terms seemingly approve of state voter qualification laws. Depending on the type of election, the statute explicitly exempts "aliens [who] are authorized to vote . . . under a *State constitution or statute or a local ordinance*." 18 U.S.C. § 611(a)(1)–(a)(3) (emphasis added). Thus, far from providing a blanket preemption over a state's actions of mailing and tabulating ballots, the statute expressly incorporates state constitutions and laws when defining its scope.

On its face, the statute's plain text governs only an individual's conduct—it simply does not prescribe the processes a state must (or must not) use when handling ballots from allegedly unqualified voters. *See* 18 U.S.C. § 611(a)–(b) ("It shall be unlawful for *any alien* to vote in any [federal] election . . . . *Any person* who violates this section . . . ." (emphases added)). Again, federal election law only preempts "so far as the conflict extends." *Watson*, 609 U.S. at 697. A misdemeanor statute regulating individual conduct neither conflicts with nor preemptively extends to

Defendants' actions of sending vote-by-mail ballots, tabulating them on their return, or dealing with challenges to particular ballots.

The Elections Clause gives States the default "responsibility for the mechanics of congressional elections," *ITCA*, 570 U.S. at 9, and Congress's enactment of a criminal statute against individual aliens who unlawfully vote is not a grant of authority for the Executive to restructure state election administration. Regardless of whether the DOJ believes Defendants' "actions pose an obstacle to the United States' ability to implement Congress's purposes and objectives by enforcing 18 U.S.C. § 611(a)," "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *See Kansas v. Garcia*, 589 U.S. 191, 212 (2020). In other words, nothing in § 611 *requires* Defendants to follow Plaintiff's demand to segregate ballots, as § 611 regulates individual voters' conduct, not the states' administration of elections. *See* 18 U.S.C. § 611(a). Because § 611 says nothing about federal referrals, ballot segregation, or citizenship clearance, relabeling Defendants' noncooperation as "induc[ing], encourage[ing] or promot[ing]" aliens to violate § 611 cannot rewrite the statute to provide Plaintiff's requested relief. Thus, the law does not "*clearly favor*" Plaintiff's preemption argument. *See Garcia*, 786 F.3d at 740.

Furthermore, Congress has extensively exercised its power to regulate federal elections. Through various election statutes, Congress established a clear policy on voter eligibility, delegating responsibility for voter roll maintenance, ballot mailing, and vote processing to the states. For example, the National Voter Registration Act of 1993 ("NVRA") requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists" for the death and changes in residence of the registrant; specifies limitations on how and when states may remove registrants from voter rolls; and mandates that each state shall designate an election official responsible for these tasks. 52 U.S.C. §§ 20507(a)(4), 20507(c)–(d), 20509. The NVRA also requires States to "accept and use the mail voter registration application form," which includes a citizenship attestation and signature under penalty of perjury. *Id.* §§ 20505(a)(1), 20508(b)(2). Similarly, the Help America Vote Act ("HAVA") requires a citizenship question on the mail registration form and assigns responsibility for a statewide voter registration list to state officials. *Id.* § 21083(a)(1), (b)(4)(A)(i).

Congress did not delegate any of these roles to the Executive Department; instead, Congress only authorized the Attorney General to sue to enforce the NVRA and HAVA. *Id.* §§ 20510(a), 21111. Plaintiff's complaint, however, never alleges a violation of these election statutes and never invokes the two provisions as its basis for preempting Defendants' actions. Because Congress limited the Executive's role

in enforcing these federal election statutes, allowing Plaintiff to use § 611 (a misdemeanor criminal provision) to prescribe how Defendants must process ballots once received would contravene the Elections Clause. *See Smiley*, 285 U.S. at 366 (recognizing the breadth of power given to the states under the Elections Clause concerning "registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, [and] counting of votes"). If Plaintiff believes requiring additional confirmation of citizenship is necessary for vote-by-mail ballots, I believe the appropriate audience for that suggestion, in full accord with the plain language of the Elections Clause, is Congress, not the courts. *See Watson*, 609 U.S. at 695 ("[P]olicy arguments are properly directed to legislatures, not courts.").

**2.**

Congress has not exercised the specific power granted to it under the Elections Clause to override the decisions of the California Legislature on how to remove ineligible voters from California's voter rolls. Thus, under the Elections Clause, the legislature's statutory scheme remains as the only method to do so. And the Legislature has "exercise[d] [its] wide discretion in the formulation of a system for the choice by the people of representati[on] in Congress," *see United States v. Classic*, 313 U.S. 299, 311 (1941), by prescribing a detailed statutory and regulatory scheme, *cf. Moore v. Harper*, 600 U.S. 1, 29 (2023) ("[State] Legislatures must 'provide a complete code for congressional elections,' including regulations

'relati[ng] to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" (second alteration in original) (quoting *Smiley*, 285 U.S. at 366)).

California details the exact manner in which a citizenship challenge to a voter needs to be brought, not only in the days leading up to the election, but all the way through election day and the counting of the votes. Plaintiff's request to challenge vote-by-mail ballots, by asking Defendants to segregate ballots alleged to be cast by noncitizens, contravenes the State's procedures for handling such a challenge.

First, California law requires each voter to "prove he or she is a citizen by his or her certification under penalty of perjury on the affidavit of registration." Cal. Elec. Code § 2111; *accord* 52 U.S.C. § 20508(b)(2) (requiring that a mail voter registration form "include a statement that—(A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury"). And should "the county elections official" receive "proof that [a person registered to vote] is . . . ineligible to vote" the official "shall cancel the registration." Cal. Elec. Code § 2201(a)(8). To put it succinctly, California law

provides a mechanism for challenging the registration of a person—such as a noncitizen—who is ineligible from voting in federal elections.

This is not the only mechanism California provides to challenge a noncitizen who attempts to vote in a federal election. At the polls, California permits a challenge to the voter if that "voter is not a citizen of the United States." *Id.* § 14240(a)(3). While the challenge must be made by a member of the precinct board, the statute contemplates the ability for other individuals to express their challenge by sending "any document or list concerning the residence or other voting qualifications of any person or persons, with the express or implied suggestion, request, or demand that the person or persons be challenged." *Id.* § 14240(a), (c). In such a case, the precinct board member "shall first determine whether the document or list contains or is accompanied by evidence constituting probable cause to justify or substantiate a challenge." *Id.* § 14240(c).

As for vote-by-mail ballots, California provides election observers with the right to challenge a vote-by-mail voter, *id.* § 15104(b), and such challenges "may be made for the same reasons as those made against a voter voting at a polling place," *id.* § 15105. And because in this context "the voter is not present, the challenger shall have the burden of establishing extraordinary proof of the validity of the challenge at the time the challenge is made." *Id.* § 15106.

The regulations further explicate the level of specificity and reliability of evidence that a challenger to a vote-by-mail voter must present to meet their burden of proof:

> An example of such proof would be if a challenger alleges that a vote-by-mail ballot was cast by a voter who was deceased before vote-by-mail ballots were issued by the elections official, and the challenger provided a copy of that voter's death certificate to the elections official showing that the voter was deceased prior to the time vote-by-mail ballots were issued.

Cal. Code Regs. tit. 2, § 20879(b). And ultimately "[a]ny doubt in the interpretation of the Elections Code applicable to the challenge shall be resolved in favor of the challenged voter." *Id.*

Despite these various mechanisms to challenge the eligibility of a voter, Plaintiff prefers that this court require a different procedure to effectuate a challenge to over 20,000 voters solely because, in a different context, the California Legislature permits the segregation of ballots. *See* Cal. Code Regs. tit. 2, § 20363 (providing for the segregation of ballots in a recount). But Plaintiff's preference does not carry with it the force of law.

**3.**

Plaintiff also asserts that § 611 demands the State cull noncitizens from voting during an ongoing election, without considering that, in doing so, the State would potentially violate *another* federal law. The NVRA requires states to "complete, not later than 90 days prior to the date of a primary or general election for federal office,

any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). We have held that "[b]ased on the ordinary meaning of 'any,' 'program' should be construed to have an expansive meaning." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 715 (9th Cir. 2025) (citing 52 U.S.C. § 20501(b)(2)), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026). And while "states [may] continue any non-systematic cancellation of registrations within the 90-day window," *id.* at 716, such a program must "rel[y] on 'individualized information or investigation' to determine removal of ineligible voters from voting rolls rather than cancelling batches of registrations based on a set procedure such as 'us[ing] a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices.'" *Id.* (alteration in original) (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014)).

Here, Plaintiff effectively seeks to cancel "batches of registered voters based on a set procedure [which is] systemic as opposed to individualized." *See id.* This independent reason also calls into serious doubt whether Plaintiff can prevail on its preemption claim, particularly when the very relief it seeks potentially conflicts with another federal statute. Plaintiff's position, that § 611 preempts California's

inaction, gives short shrift to harmonizing its position with the clear command of the NVRA.

**B.**

Plaintiff argues that it will likely suffer irreparable harm because "irreparable harm necessarily results from the enforcement of a preempted state law." But as discussed above, whether Plaintiff will succeed on its preemption argument is at best unclear, and therefore it follows that it is also uncertain whether any harm will result based on preemption alone. Plaintiff also argues that it will suffer irreparable harm because once the ballots are opened and separated from their envelopes, there is no "way for officials to track or trace ballots cast by individuals later determined to be ineligible to vote" in violation of § 611. This alleged irreparable harm, however, is tempered by California's established process for ensuring voter eligibility (discussed above). Moreover, at this preliminary stage—given the conflicting evidence about whether the October List accurately identifies noncitizens[4] *and with no factual findings by the district court*—we cannot determine that Plaintiff will *likely* suffer irreparable harm.

On the other hand, as to the balance of hardships and the public interest, granting Plaintiff's requested relief might result in immense hardship to Defendants

---

[4] For example, Defendants' sample of 200 records from the October List showed that "among the records for which birthplace information was meaningfully reported, 38.9% indicated that they were born in the United States."

and harm the public by risking the disenfranchisement of eligible voters and putting the entire tabulation process in jeopardy. And as the declaration of the County's Assistant Registrar of the Information Technology Bureau states: "[B]ased on my technical expertise, I have grave concerns about the potential catastrophic impact of implementing the DOJ's request to 'set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens' based on a list of approximately 20,000 individuals . . . ."

Defendants assert, with supporting declarations, that requiring them to segregate over 20,000 voters "would be a logistical and administrative nightmare: plaintiff's list does not contain the information necessary to identify voters; the Registrar has no established system for segregating ballots; and trying to create one now risks shutting down the system the Registrar needs to run the entire election." Indeed, the County's Assistant Registrar of the Information Technology Bureau declared that segregating ballots would require substantial changes to the Registrar's election systems, including the development and testing of new code and system updates to multiple, separate software programs and hardware devices. He further declared that the necessary changes could not be "completed safely and uniformly before Election Day," and even if they could, the effect of the changes is unknown and could result in a failure of the County's central election management system, "jeopardiz[ing] the Registrar's ability to meet federal and state [election] deadlines."

Beyond the infeasibility of and risks associated with segregating tens of thousands of ballots, Defendants also lack the ability to verify voters' citizenship status before December 4, 2026—the deadline for counties to certify their election results to the Secretary of State. *See* Cal. Elec. Code § 15372. As stated in the County's supporting declarations, "[t]he Registrar is not equipped to . . . verify voter citizenship because it does not independently house citizenship-related information beyond the voter attestation as identified in federal and state law . . . and certainly is not equipped to do so within the election period." Moreover, any verification process would have to allow for a reasonable time for notice and an opportunity to respond. *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." (quoting *Baldwin v. Hale*, 68 U.S. 223, 233 (1863))). On the current record, there is a material risk that Defendants would be unable to complete the verification process for all voters on the October List by December 3. Thus, there is a real risk that granting Plaintiff its requested relief would result in disenfranchisement, and worse, could jeopardize the County's entire election.

Plaintiff argues that "California is well-equipped to provide a remedy, because it has laws on its books that facilitate the very relief sought here," citing Cal. Code Regs. tit. 2, § 20363. But as Defendants point out, that regulation is inapplicable because it applies only to challenges during a formal recount. *See* Cal. Regs. tit. 2

§ 20350 (explaining that the regulations in chapter 4.8, which includes § 20363, "establish standards and procedures for conducting *recounts* of votes cast or all elections in the State of California requested pursuant to Chapter 9 of Division 15 of the California Elections Code" (emphasis added)). Moreover, it says nothing about verifying a voter's citizenship status. Other than citing the inapplicable regulation, Plaintiff offers nothing to rebut Defendants' evidence that granting the requested relief here would result in substantial hardship to Defendants. I recognize that there are countervailing public interests at stake, as permitting ineligible voters to vote would dilute the votes of lawful voters. But, as discussed, the risk that noncitizen voters will vote is tempered by California's established processes for ensuring voter eligibility and is uncertain based on the current record.

Further, in deciding to grant equitable relief, we must consider "what is necessary, what is fair, and what is workable." *North Carolina*, 581 U.S. at 488 (quotation marks omitted) (quoting *New York*, 434 U.S. at 129). And "[e]very order granting an injunction . . . must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B).

Plaintiff seeks equitable relief, asking us to order Defendants to set aside vote-by-mail ballots from over 20,000 individuals whom Plaintiff believes are likely noncitizens. But Plaintiff offers no workable plan as to how this could be

accomplished, let alone how it could be accomplished without burdening Defendants more than necessary. Instead, Plaintiff simply claims that California has an existing regulation, Cal. Code Regs. tit. 2, § 20363, which provides for ballot segregation. But as discussed, that regulation is inapplicable. The regulation also provides no guidance on *how* elections officials would be able to segregate or "flag" the potentially over 20,000 vote-by-mail ballots. The declaration from the County's Assistant Registrar of the Information Technology Bureau states that the County would have to create, develop, and test a new "flag[ging]" process within its central election management system. And even if that change could be made safely during an ongoing election, the consequences are unknown and, as noted, "potential[ly] catastrophic," as it could result in the failure of California's central election management system. There is no reason in the record to discount this evidence.[5]

On balance, given the record and because Plaintiff has offered no workable plan of any kind as to how the remedy it seeks could be accomplished in practice without potential catastrophic consequences to California's ongoing election, the equities between the parties and the public's interest do not weigh in favor of granting the requested relief.

---

[5] Had Plaintiff filed its suit earlier, and had there been time for a preliminary injunction hearing, we might have facts found by the district court which would have assisted us in balancing the hardships and determining the public interest. But again, that is not the way Plaintiff chose to proceed.

**C.**

One final note on the *Purcell*[6] principle, which becomes relevant when considering "granting an injunction pending appeal in an election case." *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). This principle dictates "that lower federal courts should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). I believe this principle is another reason showing that the law does not clearly favor Plaintiff's position. California's election has already begun, and Defendants have rules in place to process vote-by-mail ballots. Plaintiff's requested remedy would alter those rules during the election by requiring Defendants to segregate vote-by-mail ballots for voters on the October List and to then use some procedures that comport with due process to determine whether those voters are ineligible based on their citizenship status.

The requested remedy implicates several factors supporting application of *Purcell*. Most importantly, the "*Purcell* principle applies with even greater force here" when "[t]he election is not merely upcoming; it has already started." *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026) (per curiam). California's election process has already begun and disturbing

[6] *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

the established rules could have unintended consequences.[7] *See Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (citing *Purcell* in support of its decision to stay an injunction given "the imminent nature of the election" and "important[ce] [of] not . . . disturb[ing] long-established expectations that might have unintended consequences"); *see also Democratic Nat'l Comm. v. Wisconsin State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay) ("Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences."). The remedy would also affect the State of California's election processes by changing the conduct of election officials. *See Feldman*, 843 F.3d at 368 (considering under *Purcell* whether "the injunction . . . [would] affect the state's election processes or machinery" by "chang[ing] at all . . . the actual election process"). It would also not preserve the status quo. *See id.* 368–69 (considering under *Purcell* whether "the injunction [would] preserve the *status quo*").

These considerations suggest that the relief Plaintiff seeks may violate *Purcell*'s "basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm.*, 592 U.S. at 1043

[7] For example, Defendants' as-yet unrebutted evidence shows that setting up a segregation process would require modifications to their central registration database and that the consequences of such changes are unknown and could result in the failure of the entire database.

(Kavanaugh, J., concurring in denial of application to vacate stay). Thus, *Purcell* suggests that "[t]he equities dictate that we" deny Plaintiff's motion, especially since it is far from clear whether Plaintiff will succeed in prevailing on its claim for injunctive relief. *See Onder*, 2026 WL 2883222, at *2.

**III.**

For the reasons above, if I were to reach the merits, I would deny Plaintiff's emergency motion for mandatory injunctive relief pending appeal.

FILED

OCT 26 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*United States v. State of California*, No. 26-7070
SANCHEZ, J., concurring:

With only fifteen days until the November 3, 2026 election and mail-in ballot voting well underway in California, the United States sought a federal court order to set aside vote-by-mail ballots of more than 20,000 registered voters whom the United States has identified in a list as potential noncitizens. The proposed order would also require state and local elections officials to verify their citizenship status before their ballots can be processed and tabulated. Defendants State of California and the County of Los Angeles have expressed serious doubts about the accuracy and reliability of the United States' data and methodology used to generate this list and contend that this extraordinary request threatens to disenfranchise thousands of California voters. Before the district court had issued any order on the United States' request for relief, the United States filed a notice of appeal and sought an injunction from this Court. Because we do not have jurisdiction to hear this appeal, I join the per curiam order in full.

I write separately to emphasize a distinct issue. The United States seeks to have a federal court dictate to California the manner in which it must administer its own electoral process by segregating mail-in ballots and undertaking a citizenship-verification process the State has never done before. The proposed injunction would transform California's election rules for an election that is already underway

and would cause widespread confusion among voters and election officials, divert election administration resources, and "usher in electoral chaos." *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026). Therefore, even if we had jurisdiction to hear this appeal, the *Purcell* principle bars us from granting the injunction the United States seeks. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam).

I

I begin with some factual context. That these proceedings encroach on the cusp of an election is a delay entirely of the United States' own making. While the federal litigation preceding this appeal has unfolded within a week, the Department of Homeland Security ("DHS") has harbored concerns about California's voter roll for months but did nothing about it until now. On July 16, 2026, Department of Homeland Security Secretary Markwayne Mullin wrote to California Secretary of State Dr. Shirley Weber, alerting her of the Department's "concern" that "as many as 190,832 non-citizens" may be registered to vote in California. Seven days later, Dr. Weber responded and expressed doubt about the reliability of DHS's data and its methodology, particularly because state law prohibits the sharing of unredacted voter rolls which contain voters' social security information. Dr. Weber requested that DHS identify the source of its data and provide a detailed explanation of its methodology, including the matching criteria used by the federal government.

Nothing more was heard from DHS.

Then on October 13, the Department of Justice ("DOJ") presented the County of Los Angeles with a list of 20,000 individuals it alleged were noncitizens registered to vote. DOJ followed this list with a letter outlining extraordinary requests. DOJ demanded that within forty-eight hours, the County of Los Angeles was to verify the citizenship of the thousands of individuals identified, withhold ballots from those on the list for whom citizenship was not verified, and instruct elections officials to segregate ballots received by that population—contrary to established procedures outlined in California election law for challenges to voter eligibility. DOJ directed the same requests to the Secretary of State. DOJ offered no guidance for how the County of Los Angeles or California could carry out such a task within forty-eight hours.

On October 15, counsel for the County of Los Angeles wrote to DOJ, advising it was legally, as well as practically, prohibited from fulfilling DHS's demands. The County of Los Angeles noted that DHS lacks any apparent authority to regulate a county's elections administration. And, regardless, the County of Los Angeles concluded it could not lawfully comply with the requests: voter registration on the basis of attestation of eligibility under penalty of perjury is permitted by both federal and state law. Moreover, in the County's view, DOJ's requests would violate not only the National Voter Registration Act's prescribed

ninety-day "quiet period," within which voters may not be systematically removed from rolls, *see* 52 U.S.C. § 20507(c)(2), but also the mandate under the Voting Rights Act to "permit any person to vote who is entitled to vote," 52 U.S.C. § 10307(a).

In addition to these legal barriers, the County of Los Angeles stressed the logistical infeasibility of complying with DOJ's requests. The County noted that election officials were fully occupied with ballot processing procedures and were required, by California law, to complete their count of most ballots by the thirteenth day following an election. *See* Cal. Elec. Code § 15307(a). Dr. Weber also responded to DOJ's demand, reiterating that the data on which the federal government based its list was unreliable and echoing the County's concerns about the legality of DOJ's requests. In California's view, DOJ's requests would jeopardize the constitutional right to vote and risk violation of the Voting Rights Act, the National Voter Registration Act, the California Constitution, and California state laws affording eligible voters the right to access a mail-in ballot and cast a vote. Once more, Dr. Weber invited the United States to share its data and methodology so that she and her office could "take the appropriate steps in compliance with federal and state law."

The United States instead filed the instant lawsuit. On October 15, the United States filed suit in the Central District of California seeking to have the

court declare California's actions preempted by a federal criminal statute and order California to segregate ballots received from those whom the DOJ alleges are likely noncitizens, pending the verification of each voter's citizenship. By then, the United States was well aware that California had already started sending out mail-in ballots to voters on October 1 and processing returned ballots on October 5—the United States stated as much in its complaint. At oral argument before this Court on Sunday, October 25, counsel for the United States conceded that the federal government has known as well that California election law authorizes the processing of mail-in ballots as soon as they are received by elections officials. *See* Cal. Elec. Code § 15101(a). Still, in its complaint, the United States specified no particular timing for its requested relief.

On October 19, the United States filed an ex parte application for a temporary restraining order ("TRO"), declaring a "heightened" urgency because California law permits the counting of ballots twenty days before an election. Notwithstanding this observation, the United States requested relief by *election day, November 3, 2026*. On October 21, the United States renewed its request for a TRO, once again citing November 3rd as its desired deadline for relief. That very night, the United States abruptly changed its position. No longer satisfied with the prospect of relief by November 3rd, the United States then sought to have the district court issue relief by noon the next day. In doing so, the United States gave

the district court mere hours to address and weigh complex technical claims about the provenance and processing of the data the United States offers, alongside looming legal questions. When the district court did not meet the United States' proposed deadline, the United States appealed to this Court.

In the midst of an ongoing election, the United States asks the federal court to dictate to a state legislature a matter squarely within the state's traditional domain, upending the state's policies in this regard and inviting disorder and confusion for voters and election officials alike. The *Purcell* principle does not allow it.

II

"[L]ate-breaking, court-ordered rule changes" such as those the United States requests, "can 'result in voter confusion and consequent incentive to remain away from the polls,' and thus undermine the '[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy.'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 72 (2026) (quoting *Purcell,* 549 U.S. at 4–5). *Purcell* prevents that.

Under the *Purcell* principle, "federal courts should not 'alter the election rules on the eve of an election.'" *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (per curiam) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm*, 589 U.S. 423, 424 (2020) (per curiam) ("*R.N.C.*")). The Supreme Court "has repeatedly

emphasized" this command, *R.N.C.*, 589 U.S. at 424, and once again did so just days ago, *see Scanlan v. Coalition for Open Democracy*, No. 26A512, 2026 WL 3167846, at *1 (U.S. Oct. 22, 2026). The *Purcell* principle serves two key goals. First, courts enforce the principle "to avoid . . . judicially created confusion." *RNC*, 589 U.S. at 425. Second, *Purcell* prevents judicially created changes that "would usher in electoral chaos" and "disorder." *Onder*, 2026 WL 2883222, at *2.

*Onder*, decided last month, demonstrates these twin interests. There, the Supreme Court stayed federal court orders that required the State of Missouri to use a 2025 redistricting map that the Missouri Supreme Court had held was ineffective until voters approved the changes. *See Onder*, 2026 WL 2883222, at *1. "As a matter of state law," *Onder* explained, the 2022 redistricting map was to be used in the 2026 congressional election. *Id.* But on September 21, the Court of Appeals for the Eighth Circuit ordered the district court to enter a permanent injunction requiring the use of the 2025 redistricting map instead of the 2022 map. *Id.*

The Supreme Court stayed the district court and Eighth Circuit's orders under *Purcell*, stating "this Court has repeatedly cautioned that 'lower federal courts should not alter the election rules of a state on the eve of an election.'" *Id.* at *2 (quoting *Allen*, 608 U.S. at 514). The Court emphasized that "[t]he *Purcell* principle applies with even greater force" when "[t]he election is not merely

upcoming . . . [but] has already started." *Id.* at *2. "Ballots using the 2022 map ha[d] been printed and mailed. Absentee voting ha[d] already begun, as ha[d] military and overseas voting." *Id.* Election officials declared that "[a]t this point, it is practically impossible to revert to the 2025 map." *Id.* (internal quotations omitted). "At this late date," the Supreme Court found, "ordering reversion to the 2025 map in the midst of an ongoing election would usher in electoral chaos." *Id.*

As *Onder* demonstrates, it is not only voter confusion that matters in the *Purcell* analysis but election administration and broader electoral disorder stemming from late federal court-ordered changes to election rules. *See also Democratic Nat'l Comm. v. Wis. State Legislature*, 592 U.S. 1039, 1043–44 (2020) ("*D.N.C.*") (Kavanaugh, J., concurring) ("That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens . . . confidence in the fairness of the election."). After an election has begun, the problems *Purcell* seeks to prevent are greatly magnified. When voters have already received ballots and begun voting, late-breaking federal court intervention risks not only voter confusion but also resource strain and chaos in the administration of elections. *See id* at 1044–45 (Kavanaugh, J., concurring) ("If a court alters election laws near an election, election administrators must first understand the court's injunction, then devise plans to

implement the late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes.”).

Applying the *Purcell* doctrine to the circumstances here, the injunction requested by the United States at this late stage would be barred even if we had jurisdiction to hear the appeal. To begin, the current electoral regime under state law is clear. California—like all states—comprehensively regulates the administration of its elections, and its officials are not free to diverge from the procedures directed by the state legislature. To register to vote in California, an individual must certify, under penalty of perjury, that he is a United States citizen. Cal. Elec. Code §§ 2101, 2102, 2111, 2112, 2150. And, under California law, mail-in ballots are available to all registered voters. *Id.* § 3003. Upon receipt of completed mail-in ballots, state officials process each ballot by “verifying the voter’s signature on the . . . envelope.” *Id.* §§ 15101(b)(1), 3019.

In the event of challenge to a voter’s eligibility, California law prescribes a set procedure for the challenge. *Id.* §§ 14240(a), 15105, 15106. For example, challenges to a mail-in ballot may be raised upon a showing of “extraordinary proof of the validity of the challenge.” *Id.* § 15106. But, there is no provision of California election law that contemplates a large-scale mechanism for challenge to, and database-centered verification of, the citizenship of tens of thousands of voters.

And, while California has a process for ballot sequestration, it undertakes that process during recounts, not standard election procedures. *See* Cal. Code Regs. tit. 2, § 20363.

The United States' requested injunctive relief would greatly alter California's election rules and procedures. First, the contemplated federal court order would require California to sequester up to 20,000 ballots submitted by individuals that the United States alleges, based on unverified and uncertain information, may be noncitizens—despite there being no formal statutory mechanism to do so. California would then be required to complete some undefined citizenship verification process for each of those ballots that goes beyond what either state or federal law requires. Regardless of the United States' characterizations, these are not minor changes.

According to the County of Los Angeles, the technological hurdles for complying with such an order would be profoundly disruptive. *See* Declaration of Aman Bhullar In Support of Defendant Dean C. Logan's Opposition to Plaintiff's Request For Temporary Restraining Order ¶ 3, No. 26-cv-12025 (C.D. Cal. Oct. 19, 2026), ECF No. 32.3.[1] Los Angeles information technology officials have declared "grave concerns about the potential catastrophic impact" of the requests, characterizing the potential consequences as "severe," and noting they could

[1] The ECF cite refers to the entry in Case No. 26-cv-12025.

include complete cessation of in-person voting or interference with vote-counting. *Id.*

To execute the requested ballot sequestration, the County's programmers would have to develop new code for the registration database and election management software, test it in an isolated computing environment, subject it to peer review, and designate a "fail period," in which computer error would be expected. *Id.* ¶ 4. This software manages voting operations and tracks voter registration information for close to 5.9 million voters in the County. *Id.* ¶ 12. But because technological changes closer to an election can prove disruptive, the County has a "Freeze Policy," under which major changes are barred from October 14, 2026 through November 6, 2026. *Id.* ¶ 10. According to Los Angeles officials, implementation of the DOJ's requests would violate this election safeguard. *Id.*.

While the United States wishes to frame its requested relief as the mere setting aside of ballots, the County of Los Angeles explains that it is an infeasible request of far greater magnitude. Indeed, the United States acknowledged in its complaint that "it is not practicable or feasible for the United States to investigate before the 2026 election concludes thousands, let alone tens of thousands, of individuals that two federal investigative offices identified on the California voter roster as likely being sent vote-by-mail ballots." In other words, at the eleventh

hour, the United States seeks to shift the burdens of its priorities onto California and co-opt the State into carrying out the Executive Branch's policies on a massive scale.

Even worse, the supposed emergency and last-minute attempted intrusion into a state's election process is entirely of the United States' own making. Despite claiming to know for months about the alleged noncitizens on California's voter rolls, the United States waited until voting had already commenced in California and vote-by-mail ballots were being processed for two weeks.

The results of the requested relief are predictable—and strike at the heart of the *Purcell* principle. Voters will likely be confused by a federal injunction mere days from the 2026 election. Some may interpret it as an endorsement of the United States' currently unsubstantiated allegation that roughly 20,000 noncitizens are on California's voter rolls. Voters may be dissuaded from voting because they could be wrongly labeled as voting illegally and would have to engage in any subsequent investigation. Other eligible voters may have their votes denied altogether. And without question, election administrators will be drawn away from their important and time-sensitive tasks to devise and implement an entirely new sequestration and voter-citizenship verification process of uncertain duration. And the number of votes that could remain uncounted after election day and require

potentially substantial investigation could be greater than the margin of victory in races, leaving election results unclear for a significant period.

Our dissenting colleague's view that *Purcell* is merely focused on preventing prospective voter confusion is not supported by Supreme Court precedent. In *Onder*, the Supreme Court made clear that *Purcell* also "protects against . . . disorder" and "electoral chaos." 2026 WL 2883222, at *2. That chaos included absentee voting that "ha[d] already begun," as well as ongoing "military and overseas voting." *Id.* Similarly, in *Bost*, the Supreme Court relied on the *Purcell* principle to explain that "[t]he democratic consequences [of late-stage judicial intervention] can be even more dire if courts intervene only after votes have been counted." 607 U.S. at 80. In other words, the *Purcell* principle applies beyond prospective voter confusion and contemplates broader disruptions to an election already underway. Neither of the two cases the dissent cites, *R.N.C.* and *D.N.C.*, expressly limit the *Purcell* doctrine to prospective voter confusion. *See R.N.C.*, 589 U.S. at 423–426; *D.N.C.*, 592 U.S. at 1043–44 (Kavanaugh, J., concurring) (discussing burdens on election administration). Moreover, as I've explained, the Government's requested relief would in fact spark significant prospective voter confusion about an unprecedented sequestration and citizenship-verification process.

An injunction from this Court will undoubtedly "interfere with

administration of an election and cause unanticipated consequences." *D.N.C.*, 592 U.S. at 1043 (Kavanaugh, J., concurring). The *Purcell* principle exists to handle cases like this. Aside from any other legal issue presented, *Purcell* would require us to reject the United States' request that will inject extraordinary disruption into California's electoral process.

FILED

OCT 26 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*United States v. California et al.*, No. 26-7070
BUMATAY, Circuit Judge, dissenting:

"Preserving the integrity of the electoral process" is an "interest[] of the highest importance." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788–89 (1978). According to the federal government, thousands of noncitizens are registered to vote in California. And those noncitizens received mail ballots to vote in this November's election. Those questionable ballots are now rolling in. Once those ballots are processed, it would be impossible to identify them, and they must be counted in the election. The federal government raised its concerns to California and asked the State to set aside those ballots. California's chief election official, its Secretary of State, told the federal government that California could not do so because of her reading of state and federal law.

The question—does the federal government have the power to stop this potential attack on the integrity of our elections? Under both federal law and the Constitution, the answer must be "yes." Simply, the federal government has a sovereign interest in safeguarding federal elections and ensuring that the votes of noncitizens do not undermine our electoral results.

Start with the Supremacy Clause. At all times, the Constitution and federal law trump state actions that contradict them. U.S. Const. art. VI, cl. 2. Next, the Elections Clause grants States the authority to set the rules for the "Times, Places

and Manner" of elections. *Id.* art. I, § 4, cl. 1. But the Elections Clause also lets Congress make or alter those rules. It did so with 18 U.S.C. § 611(a). Congress made it a crime for an alien to vote in any election for federal office. Thus, California's actions frustrate the federal prohibition on noncitizens voting, and federal law preempts what California has done. We should've enjoined it from accepting and processing ballots likely cast by aliens until their citizenship could be verified.

In this emergency posture, I only briefly highlight the reasons the federal government is entitled to relief.

First, we have appellate jurisdiction over the matter. After the federal government filed its initial complaint and asked for injunctive relief, it learned that mail-in ballots are being received and counted at a massive scale. 331,000 mail-in ballots in Los Angeles County alone. That meant that a potentially large number of noncitizens' ballots would be commingled with legal voters—harming the integrity of the election. To the federal government, delay was no longer an option. On October 21, 2026, it told the district court that it needed a ruling by October 22. The district court did not act. With the election only 14 days away and with every passing day bringing the possibility of more illegal votes, the federal government appealed to us. Under Supreme Court precedent, this is enough to confer appellate jurisdiction.

Second, the federal government may sue California. History and precedent support that it has both standing and an equitable cause of action to protect federal elections.

Third, the federal government is likely to prevail on the merits. California officials' interpretation of state and federal law—that the State must continue to commingle likely illegal and legal ballots after learning that aliens are receiving mail-in ballots—unacceptably frustrates Congress's prohibition on aliens voting in federal elections. So California's actions must be preempted.

Finally, none of California's counterarguments prevent the federal government from stepping in and seeking to stop California from burying its head in the sand while aliens may be voting in federal elections.

We should've granted the federal government relief—federal law precludes California from commingling ballots likely cast by aliens with legitimate ballots, because it encourages and induces illegal voting. Stopping that practice for those identified as likely noncitizens is the bare minimum. I respectfully dissent.

## I.

## BACKGROUND

In the past year, the federal government has increased its efforts to prevent instances of voting by noncitizens. In California alone, the Department of Justice has sent over 300 federal grand jury subpoenas for individual voter records to the

Secretary of State's office. And in early October, the Department announced that it arrested several foreign nationals who fraudulently voted in California elections. Press Release, U.S. Att'y's Off., Cent. Dist. of California, 11 Foreign Nationals Arrested in California on Federal Charges Alleging They Illegally Registered and Voted in U.S. Elections (Oct. 19, 2026).[1]

As part of those efforts, U.S. Secretary of Homeland Security Markwayne Mullin sent a letter to California Secretary of State Shirley N. Weber on July 16, 2026, alleging that over 190,000 noncitizens might be registered to vote in California. The letter asked California to "work collaboratively" with the Department of Homeland Security to verify the identity of these voters and "ensure that only U.S. citizens participate in our federal elections." In response, Secretary Weber sent a letter on July 23 that did not offer to verify the identity of these voters but instead emphasized California's commitment to complying with federal and state "voter list maintenance obligations." Homeland Security officials asked to schedule a call with Secretary Weber's office, but she declined to address the issue in a meeting.

On October 13, the Department of Justice gave Los Angeles County a revised list of over 20,000 people who the federal government believes are noncitizens registered to vote in California, and who received a ballot for the 2026 election. The

[1] https://perma.cc/53E8-BZZ8.

Department also sent a letter to Secretary Weber and asked that she review the list within 48 hours to determine whether any citizens were listed. The Department also requested that Secretary Weber "immediately instruct the appropriate elections official to segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined." The Department finally asked that Secretary Weber "take all immediate and reasonable steps to not provide a ballot . . . until we confirm their citizenship status."

On October 15, Secretary Weber responded by letter and rejected the federal government's requests.[2] Secretary Weber first observed that ballots had been sent to voters and that voting was well underway. She questioned the accuracy of the list and further argued that the federal government's requested measures were "contrary to both federal and state law." To Secretary Weber, "refrain[ing] from tabulating ballots already issued"—even ballots returned by noncitizens—would violate the California Constitution and California Election Code §§ 2300(a)(1)(A), 2000(a), 3303, 3005.(a), and 15109. She also claimed the request violated the federal Constitution; the Voting Rights Act of 1965, 52 U.S.C. § 10307(a); and the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(c)(2).

On the same day the federal government received Secretary Weber's letter, the United States filed suit in the district court against the State of California,

[2] https://perma.cc/LNG2-HMEC.

Secretary Weber, and Los Angeles County Registrar-Recorder/County Clerk Dean Logan. On October 19, the United States moved for a temporary restraining order and order to show cause why a preliminary injunction should not issue. It asked for relief by November 3, 2026—the day before the election. The federal government sought to "enjoin[] California from tabulating in federal elections vote-by-mail ballots received from individuals identified by the Federal Government as likely noncitizens until those individuals' citizenship status can be verified." In response, the district court scheduled a hearing for October 27.

On October 21, the United States moved again for a TRO, requesting relief by November 3. At some point, however, the United States received California's opposition to the TRO. The federal government says it learned from California that it was receiving mail-in ballots at a massive scale—331,000 in Los Angeles alone. Based on that, the United States requested an expedited ruling—asking the district court to rule by noon the next day, October 22. The federal government asserted that the harm to the "integrity of our elections" was immediate and irreversible without relief. The district court did not rule on October 22, and the United States filed a notice of appeal on the same day.

**II.**

**Appellate Jurisdiction**

We have jurisdiction to hear this appeal.

Under 28 U.S.C. §1292(a)(1), we only have jurisdiction over the district court's denial of injunctions. But that jurisdiction extends to district court inaction "that ha[s] the practical effect of refusing an injunction." *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (simplified). "A district court's inaction in the face of extreme urgency and a high risk of serious, perhaps irreparable, consequences may have the effect of refusing an injunction." *Id.* (simplified). In *A.A.R.P.*, the Supreme Court ruled that a delay of 14 hours and 28 minutes was enough to constitute a "practical" refusal of an injunction when a party "fac[ed] an imminent threat of severe, irreparable harm." *Id.*

Preliminary relief is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (simplified). We grant relief "merely to preserve the relative positions of the parties' pending further proceedings." *A.A.R.P.*, 605 U.S. at 96 (simplified). And certainty isn't necessary. Even with a "limited" record, the Supreme Court has found jurisdiction when harm was "likely imminent." *Id.* In *A.A.R.P.*, an attorney's relaying a detainee's report of what immigration officers told the detainee was enough evidence to support jurisdiction. *Id.* Same with a nonprofit director's description of conversations with detainees' family members, together with video of detainees holding notices of removal. *Id.*

At this stage, the record supports that the district court's inaction created a "high risk of serious, perhaps irreparable, consequences." *Id.* at 94 (simplified). First, there are obvious irreparable consequences to the district court's refusal to decide the federal government's motion on an expedited basis. No one contests that, once a ballot is separated from its envelope, it's impossible to identify who cast it. So if an alien has voted by mail and California election officials process that ballot, the illegal vote of the alien is *forever* mixed with legitimate ballots and is counted in the final election. There is no way to remove that ballot before it's counted. So once California officials open the vote-by-mail envelope—even if it's sent by a noncitizen—that vote will count.

Yes, the federal government asked the district court to act quickly. It wanted the district court to rule within 15 hours and 2 minutes. *United States v. California*, No. 2:26-cv-12025, Dkt. 67 (C.D. Cal. Oct. 21, 2026). And the federal government ended up filing its appeal 19 hours and 33 minutes after it filed its motion for expedited relief. *Id.* at Dkt. 74. That was a quick turnaround. But that's similar to the timeline in *A.A.R.P*. After all, every hour that the district court failed to act, the more untraceable ballots would be added to the November election's tally.

Second, the risk of this harm was "high." *A.A.R.P.*, 605 U.S. at 94. In *A.A.R.P.*, it was enough that the government had "taken steps" toward removing detainees to create a high risk of irreparable consequences. *Id.* at 93. Here,

California has gone beyond taking steps. Despite being told by the federal government that as many as 20,000 aliens are registered to vote, California counties continue to count those ballots. California contests the accuracy of the federal government's lists. But the government counters that they prepared the list with a multistage verification process involving multiple federal agencies, and that the list contains *likely* noncitizen registered voters. These dueling allegations can and should be investigated. But the goal of interim relief is to "preserve the relative positions of the parties pending further proceedings." *Id*. at 96 (simplified). That means acting now. Inaction means that suspected noncitizens' votes are forever commingled and the federal government loses out on any possible redress.

Third, contrary to California's view, the federal government certainly is harmed by federal elections mired in illegal votes. California believes that the federal government's interest under 18 U.S.C. § 611(a) is in *prosecuting* noncitizens who vote in federal elections. California appears correct that the federal government can still prosecute noncitizens for voting after the fact because the State preserves the records of who voted (even if the State allows the noncitizen vote to count). But the federal government's interest in federal elections is broader. It also has an interest in stopping the illegal voting in the first place. After all, "every government ought to contain in itself the means of its own preservation," and "an exclusive power of regulating elections for the national government, in the hands of the State

legislatures, would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it by neglecting to provide for the choice of persons to administer its affairs." The Federalist No. 59, at 362–63 (A. Hamilton) (C. Rossiter ed., 1961) (simplified). And this is especially true when noncitizens vote. "[T]he United States has a compelling interest . . . in limiting the participation of foreign citizens in activities of American democratic self-government." *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012) (mem.).

Fourth, the appellate jurisdiction analysis does not change because the federal government originally requested relief by November 3. The federal government states that it only learned of the volume of untraceable ballots after California filed its TRO opposition on October 20. To the federal government, that California had processed 331,000 mail-in ballots was a change in facts that meant they needed more urgent relief. The federal government then sought an expedited ruling the very next day. So the fact that the original filing requested relief by November 3 doesn't mean that *this* appeal is not urgent.

Fifth, the appellate jurisdiction analysis doesn't change because the federal government filed the original complaint on October 15 and the request for a TRO on October 19. At the filing of the complaint, the federal government represented that it thought relief by November 3 would be sufficient. Again, the federal government

didn't realize the immediacy of the emergency until California filed its opposition on October 20. And taking four days to write a request for a TRO that demands relief by November 3 isn't unreasonable—it doesn't mean there was no emergency. And two of those days were not business days—Saturday and Sunday. And the federal government filed the request first thing in the morning on October 19. So the federal government essentially filed for a TRO after just one business day—Friday, October 16. That's not proof that there was no urgency to the federal government's actions.

Finally, we shouldn't credit California's claims that the federal government manufactured the emergency by waiting until October 15 to file this suit. According to the federal government, it's unsuccessfully tried to "collaborate with California to prevent unlawful voting" for months. At the same time, the federal government has been reviewing California's voter rolls to produce its list of 20,000 noncitizens. And it represents that it delivered the refined list to California as soon as it was finalized. While the federal government agrees it could have filed its suit earlier, it felt it needed to wait for the refined list to strengthen its case. We shouldn't presume gamesmanship that would preclude our jurisdiction on these facts.

## III.

## Article III Standing

To invoke federal power, the federal government "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The federal government easily clears this bar. It has standing to prevent current and future violations of federal law. Our law has long recognized "the injury to [the United States'] sovereignty arising from violation of its laws." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *see, e.g.*, *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024), *cert. denied*, 146 S. Ct. 90 (2025) ("The United States has a legally protected interest in enforcing federal law."); *In re Debs*, 158 U.S. 564, 584 (1895) ("The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court."). In particular, "[t]he due and fair election of [congressional] representatives is of vital importance to the United States." *Ex parte Siebold*, 100 U.S. 371, 388 (1879). So the government's sovereign interests are especially strong when States frustrate federal election law.

California's actions inflict three injuries on the government—each of which suffices for standing.

The first injury: The federal government is harmed when States facilitate alien voting in federal elections. As a direct consequence of California's actions, the government says, thousands of noncitizens have registered to vote and received ballots throughout the State. That injures the government in two ways.

One, California's practice of commingling ballots makes it more likely aliens will successfully vote in the upcoming federal election. This "undermine[s] the integrity of the electoral process"—"a process of the most fundamental [constitutional] significance." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77–78 (2026) (simplified). Just like the political candidates in *Bost*, the federal government "suffer[s] when the process departs from the law." 607 U.S. at 77. "[F]ederal officeholders and candidates" alike "owe their existence and functions to the united voice of the whole, not of a portion, of the people." *Trump v. Anderson*, 601 U.S. 100, 111 (2024) (simplified). By making illegal voting easier, California threatens the election's legitimacy. After all, "the counting of unlawful votes . . . erodes public confidence that the election results reflect the people's will." *Bost*, 607 U.S. at 78. "[T]hat loss of legitimacy—or its diminution—is a concrete harm" to our government, just as it is to candidates. *Id.*

Two, it's not conjecture or speculation that aliens may end up voting in the federal election. Just recently, the federal government arrested and charged 28 noncitizens for illegal voting in the State. The government warned California of these suspect voters. Mail-in ballots are pouring in and being processed. And because California's commingling legal with illegal ballots, that's cause for the government's alarm. The government suffers an ongoing harm to its sovereignty when illegal voters participate in elections for federal office. *Vt. Agency*, 529 U.S. at 771.

The second injury: "Interference with the federal government's interest in enforcing federal law" confers standing. *Missouri*, 114 F.4th at 985. California's actions prevent the federal government from properly enforcing § 611(a). As the federal government notes, "it is not practicable or feasible for the United States to investigate before the 2026 election concludes." Taking these allegations as true, California's refusal to act prevents the government from learning whether aliens vote in congressional elections—in direct violation of § 611(a). That interference creates another cognizable sovereign injury. *See, e.g.*, *Island Airlines, Inc. v. C.A.B.*, 352 F.2d 735, 744 (9th Cir. 1965) ("The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies." (simplified)); *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) (per curiam) ("The United States has

standing to seek relief from actual or threatened interference with the performance of its proper governmental functions.").

And the third injury: California's frustration of federal law enforcement forces the federal government to spend resources to prevent and prosecute § 611(a) offenses. That implicates the government's pecuniary interests, which are textbook injuries in fact for sovereign plaintiffs just as they are for private plaintiffs. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 676 (2023) ("Monetary costs are of course an injury."); *id.* at 718 (Alito, J., dissenting) (concluding the same); *Biden v. Nebraska*, 600 U.S. 477, 490 (2023) ("This financial harm is an injury in fact . . . ."). In sum, the federal government's jeopardized elections, frustrated law enforcement efforts, and increased expenditures are all cognizable injuries.

The federal government's injuries are also "fairly traceable" to California's actions and "likely to be redressed" by a favorable decision in federal court. *Spokeo*, 578 U.S. at 338. California's ballot commingling directly causes the sovereign and pecuniary injuries the government faces. This court could prohibit California from frustrating federal law enforcement and forcing it to spend more money on doing what California could have done in the first place. So the federal government has standing to bring this suit.

## IV.

## Cause of Action

California "and [its] officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design." *Alden v. Maine*, 527 U.S. 706, 755 (1999). California's actions collide with the federal government's efforts to prevent unlawful voting in federal elections. 18 U.S.C. § 611(a). California insists the Executive branch has no cause of action—that the federal government is powerless as California erects obstacles to the "supreme Law of the Land." U.S. Const. art. 6, cl. 2. But "there is no such impotency in the national government," *In re Debs*, 158 U.S. at 582, and the federal government may sue California and its election officials.

Courts have long accepted that the United States may invoke equitable jurisdiction to vindicate the supremacy of federal law. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 393–94 (2012); *see also United States v. Missouri*, 114 F.4th at 986 (collecting cases). This power does not arise under some implied right of action in the Supremacy Clause itself. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015). Rather, it follows from the general principle that "the United States may sue to protect its interests." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967); *see, e.g.*, *Sanitary Dist. v. United States*, 266 U.S. 405 (1925).

This equitable jurisdiction is longstanding. Courts of "[e]quity offered a mechanism for the Crown to secure justice where it would not be secured by the ordinary and existing processes of law." *Trump v. CASA, Inc.*, 606 U.S. 831, 842 (2025) (simplified). It is no surprise then that "[e]quity's roots in sovereign power have inflected the federal courts' development of equity since the Founding." Mila Sohoni, *Equity and the Sovereign*, 97 Notre Dame L. Rev. 2019, 2027 (2022). And with respect to *suits* in equity, "[t]he sovereign's special treatment in equity starts with its ability to bring a suit in equity in the first place." *Id.*; *cf. United States v. Texas*, 143 U.S. 621, 641 (1892) ("It would be a perfect novelty in the history of national jurisprudence, as well as of public law, that a sovereign had no authority to sue in his own courts." (simplified)).

The Executive's "most important constitutional duty" is to "take Care that the Laws be faithfully executed." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (quoting U.S. Const. art. II, § 3). That California is a separate sovereign "does not confer upon [it] a concomitant right to disregard the Constitution or valid federal law." *Alden*, 527 U.S. at 754–55. With federal law on the line, "[t]his is not a controversy between equals." *Sanitary Dist.*, 266 U.S. at 425.

The federal government may sue to vindicate the Supremacy Clause here.

## V.

## Federal Law Likely Preempts California's Actions

The federal government needn't helplessly stand by when States act to frustrate federal elections. Here, common sense matches the law. California's actions—accepting potentially illegal ballots and mixing them with lawful ones—is likely preempted by federal law.

"The Supremacy Clause provides that 'the Laws of the United States' . . . 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015) (quoting U.S. Const. art. VI, cl. 2). The Supreme Court has long read the Clause to mean "Congress may implicitly pre-empt a state law, rule, or other state action." *Id.* (citing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002)). So "[a]lthough preemption often applies to state statutes, preemption can also invalidate actions of state executive branch officials . . . that conflict with federal law." *Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (first citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992); and then citing *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 357 (1988)).

That's the federal government's claim here. The California Secretary of State interpreted election law to let California's election officials accept potentially illegal ballots and mix them with legal ones. The federal government asserts that this

"stands as an obstacle to the accomplishment and execution of" Congress's safeguarding federal elections by curbing illegal voting. *See ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 968–69 (9th Cir. 2026) (simplified).

On these facts, California's ballot commingling is very likely preempted. *See Oneok*, 575 U.S. at 376–77. And we should've cleared away the obstacle California placed on the prohibition against aliens voting in federal elections.

**A.**

**Preemption Applies to State Actions**

To begin, the federal government brought this case as a preemption claim. That's fine under our precedent. After all, we've held that federal law preempts "state action," *Oneok*, 575 U.S. at 376, closely resembling what the California Secretary of State did here.

Take *Duke Energy Trading & Marketing, L.L.C. v. Davis*, 267 F.3d 1042 (9th Cir. 2001). There, we said federal energy law obstacle-preempted "orders issued by the Governor of California" under state authority to "seize options to buy very inexpensive power." *Id.* at 1045–47. The governor's "orders" interpreted state regulations in a way that made them frustrate federal authority. *Id.* at 1056–57. That made the "orders"—and his efforts to seize (electric and political) power under

them—"void under the Supremacy Clause" to the extent they "conflict[ed] with" federal law. *Id.* at 1058–59.

Likewise, in *Arizona Dream Act Coalition v. Brewer*, we said the Immigration and Nationality Act preempted the Arizona Department of Transportation's "policy classif[ying] noncitizens," which interpreted that Act. 855 F.3d 957, 963 (9th Cir. 2017). The "policy" was rooted in an order by the governor that prompted his subordinates in the state executive branch, as well as local authorities, to take action. *See id.* at 964–65.

Supreme Court caselaw also underscores that federal law preempts state executive action. Consider *Morales*. There, the Court said federal aviation law preempted state enforcement of guidelines written by state attorneys general. 504 U.S. at 383–84. The guidelines looked advisory; they seemed only to "explain in detail how existing state laws appl[ied]." *Id.* at 379 (simplified). But Justice Scalia's majority found they were explicitly used to justify lawsuits, which made the guidelines as well as the resulting "enforcement actions" valid targets for preemption claims. *Id.* at 384.

Finally, our sister circuits allow preemption challenges to state executive acts. *See Marinelli*, 987 F.3d at 198–99 (applying preemption to state assistant attorney general's actions); *E.T. v. Paxton*, 19 F.4th 760, 768–69 (5th Cir. 2021) (considering obstacle preemption of Texas governor's COVID-19 orders).

In short, federal law may preempt state executive "action" or "policy" when it obstructs federal law—just as it may preempt more formal state laws or rules. *Oneok*, 575 U.S. at 377; *Ariz. Dream*, 855 F.3d at 963.

**B.**

**Secretary Weber's Actions Frustrate Federal Law**

"Pre-emption . . . is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp. v. Holliday*, 498 U.S. 52, 56–57 (1990). In 18 U.S.C. § 611(a), Congress made clear: "It shall be unlawful for any alien to vote in any [federal] election." So state actions that permit aliens to do so thwart "the accomplishment and execution" of federal law. *ConocoPhillips*, 177 F.4th at 968–69 (simplified).

When California Secretary of State Weber issued her letter interpreting federal and state election law to preclude separating illegal voters' ballots from legal ones, she directed state action subject to preemption. As California's chief elections officer, she's "responsible for executing and enforcing all state and federal law relating to elections within the State." On election law, her word counts for a lot. She has extensive power to investigate ballot procedures throughout the State. Cal. Gov't Code § 12172.5(b)–(c). She may "adopt regulations to ensure the uniform application and administration of state election laws." *Id.* § 12172.5(d). And she must provide "guidance on election laws and procedures," "training," "technical

information, advice, and assistance" to election officials. "In sum, [she] wielded potent authority"—just like the California governor in *Duke* who issued orders interpreting his executive power, the Arizona governor in *Arizona Dream* who issued orders interpreting immigration law, or the state attorneys general in *Morales* who published legal guidelines. *See Murthy v. Missouri*, 603 U.S. 43, 108 (2024) (Alito, J., dissenting). Thus, Secretary Weber's actions may be subject to preemption—and that's exactly what we should have held.

First, Secretary Weber's interpretation of state law frustrates § 611(a). She concluded that she could not "refrain from tabulating ballots already issued"—even ballots likely returned by noncitizens—because it would violate the California Constitution and California Election Code §§ 2300(a)(1)(A), 2000(a), 3303, 3005.(a), and 15109. For these reasons, Secretary Weber refused to "order any county elections official" to stop commingling lawful with unlawful ballots.

Second, Secretary Weber's interpretation of federal law frustrates § 611(a). *Cf. Ariz. Dream,* 855 F.3d at 963. Secretary Weber rejected the federal government's request to sequester ballots cast by suspected noncitizens because she claimed separating them would violate the federal Constitution, the Voting Rights Act of 1965, and 52 U.S.C. § 20507(c)(2). Instead, she cast aside the government's concerns merely because "California administers its elections in full compliance

with federal election law." In other words, she concluded that California could not frustrate § 611(a) because she believed the State was following other federal law.

Secretary Weber's directives cleared the Los Angeles County Recorder, and other election officials in the State, to keep commingling likely noncitizen ballots with legitimate ones. As counsel for the Recorder admitted at oral argument, the Recorder both agreed with Secretary Weber's reading of state and federal law and, as far as he knew, was bound to follow it. And the Secretary, working with the Recorder, concluded the federal government's list "lack[ed] both the detail and function to be of any investigative use," decided not to investigate further, and planned on commingling ballots in the upcoming election.

This situation is no different from *Duke*, *Arizona Dream*, and *Morales*. Executive action based on state officials' interpretations of law is fair game for preemption.

### C.

### Section 611(a) Preempts California's Ballot Commingling

When California election officials mix ballots cast by likely noncitizens with legal ballots, they frustrate § 611(a), which makes it "unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for [federal] office." That obstruction cannot stand.

Obstacle preemption applies to state action that "stands as an obstacle to the accomplishment and execution of" federal law. *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1159 (9th Cir. 2017), *amended sub nom. City of Los Angeles ex rel. Dep't of Airports v. AECOM Servs., Inc.*, 864 F.3d 1010 (9th Cir. 2017) (simplified). We apply this doctrine with caution—it must not devolve into "freewheeling speculation about congressional purpose that roams well beyond statutory text." *Arizona v. United States*, 567 U.S. at 440 (Thomas, J., concurring in part and dissenting in part). And there must be more than a "perceived conflict[]" between state law and vague congressional purposes "that are not embodied within the text of federal law." *Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring in the judgment). "[S]tate law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). This case counsels the rare occasion when obstacle preemption is appropriate.

First, Congress made clear in § 611(a) that it's unlawful for aliens to vote. This protects "the choice, and right, of the people to be governed by their citizen peers." *Foley v. Connelie*, 435 U.S. 291, 296 (1978). "[T]his is not intended to denigrate the valuable contribution[s] of aliens." *Id.* Instead, it recognizes that "becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony," and "[t]he individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking." *Id.* at 295. So

criminalizing noncitizen voting respects the rights conferred by citizenship and protects the democratic process.

When aliens vote contrary to Congress's will, two related harms follow—the unlawful votes undermine confidence in the integrity of elections and dilute the impact of ballots cast by legal voters. To the first point, the Supreme Court has recognized that "the electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194 (2008) (simplified). After all, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

That leads into the second harm: dilution. Dilution is a serious burden on the right to vote. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). When improper ballots are cast, not only do "fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight," but it "can affect the outcome of a close election." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021).

After learning of suspected noncitizens receiving mail-in ballots, California cannot commingle those ballots and act consistently with § 611(a). Turning a blind eye to aliens voting in federal elections necessarily frustrates Congress's criminalization of noncitizen voting. The conflict between state action and federal law is obvious. Secretary Weber made an executive decision to read federal and state law in a way that permits the acceptance and counting of mail-in ballots cast by those identified as likely noncitizens. The result is that California continues to accept potentially unlawful ballots, thwarting Congress's attempt to protect election integrity and the power of every legal vote.

Second, as fleshed out below, the Elections Clause authorizes Congress to enact § 611(a). And as Justice Scalia has said, the "presumption against preemption" principle doesn't apply with equal force in Elections Clause cases. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13–15 (2013). That's because "[t]he assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to 'make or alter' state election regulations." *Id.* at 14 (quoting U.S. Const. art. I, § 4, cl. 1). "When Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Id.* Plus, "the federalism concerns underlying the presumption in the Supremacy Clause context are somewhat weaker" in Elections

Clause cases. *Id.* "Unlike the States' historic police powers, the States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it terminates according to federal law." *Id.* (simplified). So under binding authority, there's no traditional presumption against preemption here.

Congress—not California's Secretary of State—decided that noncitizen voting is unlawful. When faced with evidence that aliens likely received mail-in ballots, California can't ignore that and act inconsistently with Congress's will.

**D.**

**Enjoining California from Commingling Illegal Ballots**

Secretary Weber's actions simply can't be countenanced. By commingling ballots, California obstructs the federal design to prevent noncitizens from unlawfully voting in federal elections. The solution is an injunction stopping California from commingling these ballots. *See Ariz. Dream.*, 855 F.3d at 978. That remedy provides the government with complete relief, which is well within this court's equitable powers to grant. *See Morales*, 504 U.S. at 382; *see also CASA*, 606 U.S. at 862 (Thomas, J., concurring) ("[T]he complete-relief principle operates as a ceiling: In no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries."). California will continue to commingle ballots unless we intervene. Thus, I would have ordered the district court to enter a limited injunction

preventing California election officials from mixing the ballots of those identified as suspected aliens on the federal government's list with the rest of the ballots.

## VI.

## Irreparable Injury

An irreparable injury, as the name suggests, is one that cannot be repaired by a trial court after a full merits proceeding. *See Ariz. Dream,* 757 F.3d at 1068. California admits that there is no way to trace a ballot after it is processed. So there is no way for the district court to repair the government's injury—noncitizens voting in a federal election. And the injury grows every day we wait to enjoin California, as hundreds of thousands of ballots are counted. Thus, the most important factors support a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (describing likelihood of success on the merits and irreparable injury as "the most critical").

## VII.

## California's Counterarguments Fail

### A.

### Anti-Commandeering Does Not Apply

California argues that relief would violate the Tenth Amendment under the anti-commandeering doctrine. But anti-commandeering doesn't even apply to this case. The Elections Clause authorized Congress to criminalize noncitizen voting in congressional elections by enacting § 611(a). *See* U.S. Const. § 4, cl. 1 ("Congress

may at any time by Law make or alter [State] Regulations . . . ."). And "Congress may not always choose to exercise this power, [but] when exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) (simplified), *aff'd sub nom. Inter Tribal Council*, 570 U.S. 1. Under *Voting Rights Coalition v. Wilson*, anti-commandeering is irrelevant in Elections Clause cases. 60 F.3d 1411, 1415 (9th Cir. 1995) (holding that, in the Elections Clause context, "Congress may conscript state agencies"); *see also Ex parte Siebold*, 100 U.S. at 382–97.

"Times, Places, and Manner . . . are comprehensive words which embrace authority to provide a complete code for congressional elections." *Inter Tribal Council*, 570 U.S. at 8–9 (simplified). This "complete code" can cover a broad range of subjects:

> not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932). Indeed, as an original matter, "'Manner' included a broad range of election regulations." *Mi Familia Vota v. Fontes*, 129 F.4th

691, 737 (9th Cir. 2025) (Bumatay, J., dissenting), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).

When Congress enacted § 611(a), it was implementing a "safeguard[] . . . necessary in order to enforce the fundamental right involved." *Voting Rts. Coal*, 60 F.3d at 1414 (simplified). The manner it chose was to prosecute noncitizens who vote. 18 U.S.C. § 611(a). And Congress even recognized that § 611(a) is about elections—it put § 611 into Chapter 29 of Title 18 which is titled "Elections and Political Activities." An Act Making Omnibus Consolidated Appropriations for the Fiscal Year Ending September 30, 1997, and For Other Purposes, Pub. L. No. 104-208, § 216, 110 Stat. 3009, 3009–573 (1996).

At oral argument, California failed to provide a single authority that § 611(a) is anything but a "Manner" of holding congressional elections. That's unsurprising. Section 611(a) is not, as California argued, a voter qualification statute. To be sure, the Elections Clause vests States with power over voter qualifications. *See Mi Familia Vota*, 129 F.4th at 738 n.3 (Bumatay, J., dissenting). But § 611(a) doesn't itself impose voter qualifications. Instead, everyone agrees on what the voter qualifications are. California law independently disqualifies noncitizens from voting. Cal. Const. art. II, § 2(a); *see* Cal. Elec. Code §§ 2100, 2101, 2102(c), 2111, 2150(a)(1), 2264(a)(3), (b), 3019, 18560. Federal law also requires that States ask mail-in registrants to verify their eligibility. 52 U.S.C. §§ 20508(b)(2)(A),

21083(b)(4)(A)(i). As explained above, § 611(a) serves a different purpose altogether. *See* Lori A. Ringhand, Symposium, *The Regulation of Presidential Elections*, 2025 Wis. L. Rev. 509, 512 ("How registrants prove their citizenship is this type of regulation—it is about *how* a qualification is proven, not what the qualification is—which gives Congress authority to make rules regarding it."). Its deterrent effect is to prevent noncitizen votes from being cast at all, which is consistent with the preexisting qualifications already set by the states. As a result, § 611(a) helps protect the integrity of congressional elections. That's well within Congress's "Manner" power in "relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes," and more. *Smiley*, 285 U.S. at 366. So as we have noted before, "[t]he flaw in the State of California's argument is that it ignores Article I, section 4, which . . . empowers Congress to impose on the states precisely the burden at issue." *Voting Rts. Coal.*, 60 F.3d at 1415.[3]

Because California's actions frustrate § 611(a), the equitable remedy the government requests would adhere to Congress's command. Any action that California would have to take to not commingle ballots is a natural consequence of Congress's Elections Clause power. *See Inter Tribal Council*, 570 U.S. at 14–15.

[3] In any event, no party challenges § 611(a)'s constitutionality.

Because § 611(a) is an Elections Clause provision, the anti-commandeering doctrine simply does not apply.

**B.**

**No *Purcell* Voter Confusion**

The *Purcell* principle is a well-known safeguard against "[l]ate judicial tinkering with election laws." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). But the "principle . . . is not absolute." *Id.* It's prudential, and courts may consider the merits of the plaintiff's claim, whether the plaintiff will suffer irreparable harm without an injunction, whether the plaintiff "unduly delayed" in bringing the complaint, and whether the proposed changes "are at least feasible." *Id.*

So the doctrine does not immediately apply to all election-related cases. Instead, it stems from the commonsense observation that "[c]ourt orders affecting elections, especially conflicting orders, can . . . result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. Voters need to know "the rules of the road": "how, when, and where" to vote. *Democratic Nat'l Comm. v. Wis. State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring).

But here, whether state officials commingle ballots that have already been submitted can't possibly cause voter confusion about how, when, or where to vote—

the only ballots affected will already have been cast. Nor does avoiding commingling affect whether votes are counted. If California—using the list provided by the federal government—found that a particular ballot came from a lawful voter, then not commingling preserves that vote. Not mixing ballots now just gives election officials a chance to determine whether ballots are legal.

So this case is far removed from *Republican National Committee v. Democratic National Committee*, in which the Court struck down a preliminary injunction requiring a State to accept absentee ballots postmarked on or before election day for up to six days more. 589 U.S. 423 (2020) (per curiam). That injunction affected "the rules of the road," specifically "when" to vote. *See Wis. State*, 592 U.S. at 1043 (Kavanaugh, J., concurring). If the injunction had stood, maybe a procrastinating would-be voter could've rushed to the mailbox and gotten their vote in after all, since they had more time than they thought. *That* would have been a big change—one that "fundamentally alter[s] the nature of the election by allowing voting for six additional days." *Republican Nat'l*, 589 U.S. at 426. A similar analysis explains *Democratic National Committee v. Wisconsin State Legislature* and other cases about ballot-collection deadlines. *See, e.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020); *Common Cause Ind. v. Lawson*, 977 F.3d 663, 665 (7th Cir. 2020).

So too in *Scanlan v. Coalition for Open Democracy*, No. 26A512, slip op. (U.S. Oct. 22, 2026) (mem.), decided just last week. There, the district court struck down a state law that said student ID cards could not be used for voter identification, but the Court reinstated it under the *Purcell* principle. That makes sense. Voter ID is a part of "how" to vote: what documents do I need? If all I have is a student ID, am I eligible to vote? Changing the answers to those questions shortly before an election is likely to confuse prospective voters and could deter some from voting at all. Changing the electoral map at the start of mail-in voting also causes voter confusion—it would be unclear which candidates voters could even choose from. *See People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222 (U.S. Sept. 25, 2026). That's a massive change which undermines one of the most fundamental "rules of the road."

But in California, no one is changing the terms. Citizens can vote. Non-citizens can't. That's always been true. An injunction here isn't changing the rules but applying them.

### C.

### The National Voter Registration Act Does Not Bar Relief

California lastly asserts that the NVRA prevents it from cooperating with the federal government. The NVRA implements a 90-day "quiet period" before an election, during which a State cannot carry out a "program" of removing ineligible

voters from voter rolls. 52 U.S.C. § 20507(c)(2)(A). But the government is not asking the State to carry out a voter roll program. If injunctive relief were granted, no one would be removed from the voter rolls, and no one would be prevented from casting their ballot. A related argument is that the NVRA, Help America Vote Act ("HAVA"), and similar statutes are Congress's exclusive dictates about elections. That argument also fails. As explained above, § 611(a)—like those statutes—is a congressional mandate rooted in the Elections Clause, making congressional power "paramount." *Inter Tribal Council*, 570 U.S. at 9. The fact that Congress has passed other laws about elections does not negate that Congress has criminalized alien voting.

## VIII.

## CONCLUSION

The federal government came to us for help as it sought to enforce Congress's law against illegal voting by aliens. It did so because California would not help. Instead, California interpreted state and federal law to *stop* it from doing so, while *empowering* it to mix legal and likely illegal ballots together. Because the State frustrates federal law by relying on that interpretation to commingle ballots, its actions are preempted. We should've stopped it from doing so and effectuated Congress's will. I respectfully dissent.