DAWYN R. HARRISON, COUNTY COUNSEL
PETER BOLLINGER, ASST. COUNTY COUNSEL (SBN 241752)
EVA CHU, SNR. DEP. COUNTY COUNSEL (SBN 235356)
ADAM BAUMGARTEN, SNR. DEP. COUNTY COUNSEL (SBN 292095)
648 KENNETH HAHN HALL OF ADMINISTRATION
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-0809
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM (SBN 241068)
ABIGAIL URQUHART (SBN 310547)
ALEX SCANDROLI (SBN 345278)
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

Attorneys for Defendant
County of Los Angeles Registrar-Recorder/County Clerk

*Additional Counsel Listed on Following Page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

Defendants.

Case No. 2:26-cv-12025

**DEFENDANT DEAN C. LOGAN, IN HIS OFFICIAL CAPACITY AS THE COUNTY OF LOS ANGELES REGISTRAR-RECORDER/COUNTY CLERK'S NOTICE OF AMENDED MOTION AND AMENDED MOTION TO DISMISS PLAINTIFF UNITED STATES OF AMERICA'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**


DOCUMENT PREPARED ON RECYCLED PAPER

NAACP, NAACP CALIFORNIA-HAWAII STATE CONFERENCE, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK, and MI FAMILIA EN ACCIÓN,

Intervenors.

*Filed concurrently with (Proposed) Order*

Date Action Filed: October 15, 2026
Hearing Date: November 13, 2026
Time: 10:00 a.m.
Courtroom: 10A
Judge: Hon. David O. Carter

**PUBLIC RIGHTS PROJECT**
Joshua Karsh (*pro hac vice*)*
Toby R. Merrill (*pro hac vice*)**
Kyra Sikora
Sharanya Mohan
Christine E. Bass
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
joshua.karsh@publicrightsproject.org
toby.merrill@publicrightsproject.org
kyra.sikora@publicrightsproject.org
sai.mohan@publicrightsproject.org
christine.bass@publicrightsproject.org

** Licensed in Illinois and Washington, D.C. Not licensed to practice law in California. **Licensed in Massachusetts and New York. Not licensed to practice law in California.*

WILMER CUTLER PICKERING HALE AND DORR LLP
Seth P. Waxman (*pro hac vice*)
Daniel S. Volchok (*pro hac vice*)
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Tel.: 202.663.6000
Fax: 202.663.6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com

WILMER CUTLER PICKERING HALE AND DORR LLP
M. Pat Moore, Jr. (*pro hac vice*)
60 State Street
Boston, Massachusetts 02109
Tel.: 617.526.6000
Fax: 617.526.5000
pat.moore@wilmerhale.com

WILMER CUTLER PICKERING HALE AND DORR LLP
Nicholas R. Werle (*pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Tel.: 212.230.8800
Fax: 212.230.8888
nick.werle@wilmerhale.com

Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 13, 2026, at 10:00 A.M., or as soon thereafter as the matter may be heard, in Courtroom 10A of the United States District Court for the Central District of California, located at Ronald Reagan Federal Building and United States Courthouse, 411 West 4th Street, Santa Ana, California 92701, Defendant Dean C. Logan, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk (the "County"), will and hereby does renew his motion for an order dismissing the Complaint for Declaratory and Injunctive Relief (ECF No. 1) (the "Complaint") filed by Plaintiff United States of America (the "Executive") as against the County.

This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(1), on the ground that the Executive lacks Article III standing, and pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that the Executive has no cause of action and that the Complaint's sole claim—that the County's compliance with California's election laws, and its refusal to follow the Executive's unlawful demands, are "preempted" by 18 U.S.C. § 611—fails to state a claim against the County. Because these defects cannot be cured by amendment, the case should be dismissed.

This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the County's Opposition to Plaintiff's Ex Parte Application for Temporary Restraining Order (ECF No. 32-1) and supporting Declarations (ECF Nos. 32-2, 32-3, 32-4); the pleadings and papers on file in this action; and such further evidence and argument as may be presented at or before the hearing.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 21, 2026. (ECF No. 68.) The parties remain at an impasse.[1]

---

[1] The County previously filed an Unopposed *Ex Parte* Application for Leave to File Oversized Briefing for Motion to Dismiss Plaintiff's Complaint Under Fed. R. Civ. Proc. 12(b), which extends to this Amended Motion because it replaces the County's original motion. (ECF No. 69.)

Dated: November 2, 2026

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI

By: *\/s/ Abigail G. Urquhart*
ABIGAIL G. URQUHART
Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

Dated: November 2, 2026

**PUBLIC RIGHTS PROJECT**
JOSHUA KARSH (*pro hac vice*)
TOBY R. MERRILL (*pro hac vice*)
KYRA SIKORA
SHARANYA MOHAN
CHRISTINE BASS

By: */s/ Joshua Karsh*
JOSHUA KARSH
Attorneys For Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

Dated: November 2, 2026

**WILMER CUTLER PICKERING HALE AND DORR LLP**
SETH P. WAXMAN (*pro hac vice*)
DANIEL S. VOLCHOK (*pro hac vice*)
M. PAT MOORE, JR. (*pro hac vice*)
NICHOLAS R. WERLE (*pro hac vice*)

By: */s/ Seth P. Waxman*
SETH P. WAXMAN
Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

**Table of Contents**

**Page**

I. INTRODUCTION ..... 16

II. BACKGROUND ..... 18

A. The County Administers Elections Under State and Federal Law ..... 18

B. The Executive's July 2026 Letter and October List ..... 19

C. How the List Was Generated, and What the Record Shows About Its Reliability ..... 21

D. Proceedings Since the County's Original Motion ..... 22

E. The Complaint ..... 23

III. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF JURISDICTION BECAUSE THE EXECUTIVE DOES NOT HAVE STANDING HERE ..... 24

A. The Complaint Alleges No Cognizable Injury ..... 24

1. States and Localities That Decline to Assist Federal Investigators Do Not Inflict a Sovereign Injury ..... 24

2. The Executive Cannot Spend Its Way into Standing ..... 26

3. The Complaint's Theory of Vote Dilution Is Speculative, and Vote Dilution, in Any Event, Is Not the Executive's Injury ..... 27

B. Even If There Were Injury, It Is Not Fairly Traceable to the County ..... 28

C. The Requested Relief Would Not Redress the Alleged Injury ..... 29

D. The Declaratory Judgment Act and 28 U.S.C. § 1345 Do Not Cure These Defects ..... 29

IV. THE COMPLAINT SHOULD ALTERNATIVELY BE DISMISSED FOR FAILURE TO STATE A PLAUSIBLE CLAIM ..... 30

A. The Executive Has No Cause of Action ..... 30

B. The Complaint Fails To State a Preemption Claim ..... 31

1. Section 611 Does Not Preempt California's Election Procedures ..... 32

*a. Implied preemption is a demanding standard ..... 32*



DOCUMENT PREPARED ON RECYCLED PAPER

*b. The Elections Clause raises the bar higher, and Section 611 does not clear it ..... 32*

2. Under Any Framework, There Is No Conflict Between California Law and Section 611 ..... 35

3. The Executive Seeks to Bypass California's Challenge Procedures, Not To Enforce Federal Law ..... 36

4. Ordering A Novel Segregation Procedure To Aid Federal Prosecutors Would Commandeer County Officers in Violation of the Tenth Amendment ..... 37

5. The Executive's "Knowing Facilitation" Theory Supplies No Basis for Preemption, Particularly as to the County ..... 38

C. Far from Vindicating Federal Law, the Preemption Claim Would Require County Officials to Violate It ..... 39

D. Mr. Logan's Jurisdiction Is Limited to Los Angeles County, But Most Voters on the Executive's List Have Addresses Elsewhere ..... 42

V. LEAVE TO AMEND SHOULD BE DENIED ..... 43

VI. CONCLUSION ..... 43


Document Prepared on Recycled Paper

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ........ 40

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) ........ 36

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ........ 28, 33

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........ 24, 30

*Baten v. McMaster*,
967 F.3d 345 (4th Cir. 2020) ........ 27

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) ........ 42

*Cal. Nurses Ass'n v. Mullin*,
2026 WL 3166149 (N.D. Cal. Oct. 21, 2026) ........ 22

*California v. Sierra Club*,
451 U.S. 287 (1981) ........ 31

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ........ 33, 39

*Chamber of Commerce of U.S. v. Whiting*,
563 U.S. 582 (2011) ........ 35

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 26, 27, 28

*Common Cause v. U.S. Dep't of Just.*,
2026 WL 3033772 (D.D.C. Oct. 9, 2026) ........ 22

*ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*,
177 F.4th 964 (9th Cir. 2026) ........ 32

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......................................................................... 24

*Democracy N.C. v. N.C. State Bd. of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) .......................................................................... 41

*Duke Energy Trading & Mktg., L.L.C. v. Davis*,
267 F.3d 1042 (9th Cir. 2001) .......................................................................... 36

*Election Integrity Project California, Inc. v. Weber*,
113 F.4th 1072 (9th Cir. 2024) .......................................................................... 27, 28

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......................................................................... 26

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......................................................................... 24

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......................................................................... 33

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) .......................................................................... 30

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......................................................................... 32, 35

*Lockyer v. City & Cnty. of San Francisco*,
33 Cal. 4th 1055 (2004) .......................................................................... 36

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................................... 24, 28

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......................................................................... 41

*MetroPCS Cal., LLC v. Picker*,
970 F.3d 1106 (9th Cir. 2020) .......................................................................... 32

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) .......................................................................... 40

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981) .......................................................................... 31

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 32

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 36

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 24

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*,
2026 WL 2564318 (U.S. Aug. 31, 2026) .......... 26

*New York v. United States*,
505 U.S. 144 (1992) .......... 37

*Norwood v. Harrison*,
413 U.S. 455 (1973). (Compl. .) .......... 38

*People Not Politicians v. Onder*,
2026 WL 2883222 (U.S. Sept. 25, 2026) .......... 42

*Printz v. United States*,
521 U.S. 898 (1997) .......... 30, 37

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) (per curiam) .......... 16, 17, 42

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
762 F. Supp. 1354 (D. Ariz. 1990) .......... 41

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
589 U.S. 423 (2020) (per curiam) .......... 42

*Republican Nat'l Comm. v. Mi Familia Vota*,
146 S. Ct. 2799 (2026) .......... 40, 42

*Rosemond v. United States*,
572 U.S. 65 (2014) .......... 39

*Ex parte Siebold*,
100 U.S. 371 (1880) .......... 33

*Silvers v. Sony Pictures Ent., Inc.*,
402 F.3d 881 (9th Cir. 2005) (en banc) .......... 31



DOCUMENT PREPARED ON RECYCLED PAPER

*Skelly Oil Co. v. Phillips Petroleum Co.*,
339 U.S. 667 (1950) .......... 29

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 32

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
444 U.S. 11 (1979) .......... 31

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 30

*United States v. Boston*,
833 F. Supp. 3d 30 (D. Mass 2026) .......... 25

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018) .......... 35

*United States v. California*,
655 F.2d 914 (9th Cir. 1980) .......... 30

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 26, 35, 38

*United States v. California*,
No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026) .......... *passim*

*United States v. California*,
No. 26-7070, ECF No. 67.1 (9th Cir. Oct. 26, 2026) (per curiam) .......... *passim*

*United States v. California*,
No. 26-7231, ECF No. 46.1 (9th Cir. Oct. 26, 2026) (per curiam) .......... *passim*

*United States v. Cox*,
No. 25-cr-60249, 2026 WL 2948729 (S.D. Fla. Oct. 1, 2026) .......... 34

*United States v. Jalas*,
409 F.2d 358 (7th Cir. 1969) .......... 31

*United States v. Mattson*,
600 F.2d 1295 (9th Cir. 1979) .......... 30

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) .......... 25, 30



DOCUMENT PREPARED ON RECYCLED PAPER

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026)....................33

*Voting Rights Coal. v. Wilson*,
60 F.3d 1411 (9th Cir. 1995)....................38

*Watison v. Carter*,
668 F.3d 1108 (9th Cir. 2012)....................43

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)....................33

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021)....................42

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)....................41

**Rules and Statutes**

8 U.S.C. § 1227(a)(6)(A)–(B)....................31

18 U.S.C. § 2....................23, 39

18 U.S.C. § 611....................*passim*

18 U.S.C. § 611(a)....................28

18 U.S.C. § 611(a)(1)–(3)....................34

18 U.S.C. § 611(b)....................31

28 U.S.C. § 1345....................29

28 U.S.C. § 2201....................29

28 U.S.C. § 2202....................29

52 U.S.C. § 10307(a)....................29, 40, 41

52 U.S.C. § 10308(d)....................31

52 U.S.C. § 20505(a)(1)....................34

52 U.S.C. § 20505(a)(1)-(2)....................28

52 U.S.C. § 20507 .......... 34
52 U.S.C. § 20507(b)(1) .......... 41
52 U.S.C. § 20507(c)(2)(A) .......... 20, 40
52 U.S.C. § 20508(b)(2) .......... 18, 28, 34
52 U.S.C. §§ 20901–21145 .......... 31, 34
52 U.S.C. § 21083(a) .......... 34
52 U.S.C. § 21083(b)(4)(A)(i) .......... 34
52 U.S.C. § 21085 .......... 34
Cal. Code Regs. tit. 2, § 20879(b) .......... 19
Cal. Elec. Code § 2101 .......... 35
Cal. Elec. Code § 2102(c) .......... 35
Cal. Elec. Code § 2111 .......... 18, 28, 35
Cal. Elec. Code § 2201(a)(8) .......... 19, 35
Cal. Elec. Code § 2213 .......... 19, 35
Cal. Elec. Code § 3000.5 .......... 36
Cal. Elec. Code § 3000.5(a) .......... 18, 28
Cal. Elec. Code § 3000.5(c) .......... 18, 28
Cal. Elec. Code § 3001 .......... 18, 28
Cal. Elec. Code § 3017(a)(3) .......... 42
Cal. Elec. Code § 3019 .......... 28, 35, 36, 37
Cal. Elec. Code § 14240(c) .......... 37
Cal. Elec. Code § 15101 .......... 36, 37
Cal. Elec. Code § 15101(b) .......... 28
Cal. Elec. Code § 15109 .......... 37

DOCUMENT PREPARED ON RECYCLED PAPER

Fed. R. Civ. Proc. 12 .......... 18

Fed. R. Civ. Proc. 12(b) .......... 5

Fed. R. Civ. Proc. 12(b)(1) .......... 5

Fed. R. Civ. Proc. 12(b)(6) .......... 5

**Other Authorities**

Tenth Amendment .......... 17, 37, 43

Cal. Const. art. II, § 2(a) .......... 35

Cal. Const. art. II, § 2.5 .......... 36, 37

U.S. Const. art. I, § 4, cl. 1 .......... 32

11A Wright & Miller, Federal Practice & Procedure § 2942 (3d ed.) .......... 31

Document Prepared on Recycled Paper

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Los Angeles County Registrar-Recorder (the "County") is administering the November 3, 2026, General Election the same way it administers every election: by following applicable laws, regulations, and practices. The County did not write California's election code, and it has no power to depart from it. The County began mailing vote-by-mail ballots on schedule, as state law requires. Twelve days later, on October 13, the Executive first asked it to do all of the things the Complaint now faults it for not doing. Yet the Complaint asks this Court to declare that the County's compliance with both federal and state law is preempted, by 18 U.S.C. § 611, a federal misdemeanor statute that punishes individual noncitizens who vote, and to order the County to set aside ballots based on a list the Executive has never shown to be reliable. The County's first motion to dismiss explained why the law permits no such relief. Since then, the Executive has sought emergency relief both in this Court, twice in the Ninth Circuit, and once in the Supreme Court, without success.

On October 26, 2026, the Ninth Circuit dismissed the Executive's attempt to leapfrog this Court, holding that the "emergency" the Executive invoked was, "at least in part, . . . a self-constructed one." (*United States v. California*, No. 26-7070, ECF No. 67.1, at 15 (9th Cir. Oct. 26, 2026) (per curiam) ("*California I*").) Two of the three panel members wrote separately to explain why, even if the court had jurisdiction, they would deny relief on the merits. Judge Bennett explained that "[n]othing in § 611 . . . preempts California's comprehensive statutory scheme"; and he added that if the Executive "believes requiring additional confirmation of citizenship is necessary for vote-by-mail ballots, . . . the appropriate audience for that suggestion . . . is Congress, not the courts." (*California I*, Bennett, J., concurring, at 7, 13 ("Bennett Concurrence").) Judge Sanchez explained that *Purcell v. Gonzalez*,



DOCUMENT PREPARED ON RECYCLED PAPER

549 U.S. 1 (2006) (per curiam), independently bars the relief sought. (*California I*, Sanchez, J., concurring, at 2, 14 ("Sanchez Concurrence").)

Two days later, this Court denied the Executive's application for a temporary restraining order ("TRO"). (*United States v. California*, No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026) ("*California II*").) The Court concluded that the Executive "likely does not have standing or a cause of action to bring a claim for the civil relief it seeks" and that its preemption theory "raises constitutional concerns under the Tenth Amendment." (*Id.* at *5, *9.) Section 611 "is not a vehicle for the preemption of state election procedures because it regulates individual conduct and is not procedural in nature." (*Id.* at *8.)

On October 30, the Ninth Circuit rejected the Executive's second emergency-injunction request, this one in its appeal of the TRO denial. (*United States v. California*, No. 26-7231, ECF No. 46.1 (9th Cir. Oct. 26, 2026) (per curiam) ("*California III*").) The court held that nothing in Section 611 "preempts California's comprehensive statutory scheme that has been duly enacted under the Elections Clause." (*Id.* at 10.) Reprising Judge Bennett's conclusion in the prior appeal, the court stated that the right forum for the Executive's grievance was "Congress, not the courts." (*Id.* at 14.) The court also explained that the Executive failed to demonstrate that it will likely suffer irreparable harm, while "the United States's requested relief might result in immense hardship to Defendants and harm the public interest by risking the disenfranchisement of eligible voters and putting the entire tabulation process in jeopardy." (*Id.* at 17.) *Purcell* further counseled against these last-minute changes. (*Id.* at 18.)

Although reached under the preliminary-injunction standard, these conclusions rest on questions of law: whether a State's refusal to help the federal government investigate crimes injures the United States; whether a criminal statute aimed at individuals gives the United States a civil cause of action against election officials as aiders and abettors for following state and federal voting law; and whether

that statute "makes or alters" state election procedures. The answers do not change between a TRO hearing and a Rule 12 motion. And because the answers turn on statutory text and constitutional structure, no amendment can cure their defects. The Complaint should be dismissed with prejudice.

## II. <u>BACKGROUND</u>

### A. The County Administers Elections Under State and Federal Law

The County's administration of the November 3, 2026, General Election is the largest local election operation in the nation, serving approximately 5.9 million registered voters across 88 cities, 55 general and special districts, and 140 unincorporated areas, in 19 languages. (Declaration of Monica Flores in Support of the County's Opposition, ECF No. 32-4 ¶ 5.)

To register to vote in California, a person "may prove he or she is a citizen by his or her certification under penalty of perjury on the affidavit of registration." Cal. Elec. Code § 2111; *see also* 52 U.S.C. § 20508(b)(2) (federal mail voter registration form must include "an attestation that the applicant meets each such requirement," including citizenship, and "require[] the signature of the applicant, under penalty of perjury"). Consistent with California and federal law for registration, the County accepts attestation under penalty of perjury and processes registrations through the statewide voter-registration database administered by the Secretary of State; the cited provisions do not require documentary evidence of citizenship. (ECF No. 32-4 ¶ 8.)

California law requires the County to send a vote-by-mail ("VBM") ballot to every active registered voter no later than 29 days before the election—here, by October 5, 2026. (Cal. Elec. Code §§ 3000.5(a), (c), 3001; *see also id.* § 4005(a)(8)(A).) All VBM ballots require signature verification before the vote can be counted. (ECF No. 32-4 ¶ 21.) This process includes a comparison of signatures on envelopes to the signatures on the voter-registration file. (*Id.*) If a signature is missing or does not compare to the signature on file, state law requires county

DOCUMENT PREPARED ON RECYCLED PAPER

officials to reach out to voters to confirm that they sent in the associated ballot and if they did, to verify their signatures to ensure that their ballots can be counted. (*Id.*)

California also prescribes how a registered voter's eligibility may be challenged. Election officials must cancel a registration "[u]pon proof" that the person is ineligible to vote. Cal. Elec. Code §§ 2201(a)(8), 2213. Separately, a voter's eligibility may be challenged by a member of the precinct board at a polling place on the ground that the voter "is not a citizen of the United States." *Id.* § 14240(a)(3). A VBM voter's eligibility may be challenged on the same grounds before the identification envelope is opened. *Id.* § 15105. Because a challenged VBM voter is not present, the challenger bears "the burden of establishing extraordinary proof of the validity of the challenge." *Id.* § 15106; *see* Cal. Code Regs. tit. 2, § 20879(b) (any doubt in interpreting the Elections Code provisions governing a challenge "shall be resolved in favor of the challenged voter"). One example in another context that the regulations give of extraordinary proof is a death certificate showing that the voter died before VBM ballots were issued. Cal. Code Regs. tit. 2, § 20879(b).

The County has never attempted a "temporary ballot segregation" of the kind the Executive demands, as it is not provided for by federal or state law. (ECF No. 32-4 ¶¶ 36, 45.) A third party's unsupported assertion that an alleged registered voter may not be a citizen does not, standing alone, authorize the County to withhold the ballot or cancel any registration–and does not meet the extraordinary proof standard. (*Id.* ¶¶ 3, 15.)

### B. The Executive's July 2026 Letter and October List

On July 16, 2026, Department of Homeland Security ("DHS") Secretary Markwayne Mullin wrote to Secretary of State Shirley N. Weber asserting that "there may be as many as 190,832 non-citizens registered to vote in California." (Compl. Ex. A.) The letter was addressed to the Secretary of State and was never sent to the County. Secretary Weber responded that she had "serious doubts about the reliability of [DHS's] data" and asked for the methodology. DHS never provided it. (Compl.

Ex. B; *California II* at *1.) The National Voter Registration Act ("NVRA") mandates a 90-day "quiet period," 52 U.S.C. § 20507(c)(2)(A), which bars systematic programs to remove ineligible voters from the rolls within 90 days of a federal election. For the November 3, 2026 general election, the quiet period began on August 5, 2026. (*See id.*)

The County mailed its VBM ballots beginning October 1, 2026. (Compl. ¶ 44.) By October 13, it had mailed approximately 5.9 million, and no ballots remained to be mailed other than replacement ballots. (ECF No. 32-4 ¶ 23.) That day, the U.S. Department of Justice ("DOJ") hand-delivered to the County a password-protected thumb drive listing more than 20,000 people it said are "likely noncitizens," and demanded that within 48 hours the County segregate their ballots, withhold unsent ballots, and decline to verify signatures or tabulate until "citizenship can be determined." (Compl. Exs. C–D; *California II* at *2.) The next day, Mr. Logan publicly confirmed receipt and stated that the County was reviewing the materials "in coordination with the California Secretary of State and Attorney General."[2] (Declaration of Christopher Pelham in Support of the County's Opposition, ECF No. 32-2 ¶ 4, Ex. C.) The list itself only included names, dates of birth, and addresses, and no other information was provided. (ECF No. 32-4 ¶ 47.) The County then responded in writing before the 48-hour deadline, explaining that the list was not specific to Los Angeles County and that most of the people on the list were linked with addresses outside of the County, that the Executive had provided no methodology or evidentiary basis, and that the demands were legally prohibited. (ECF No. 32-2 ¶ 5, Ex. D.) Minutes after the deadline, the Executive filed this suit. (*California II* at *2.)

On October 16, 2026, the day after filing suit, the Executive wrote again, asserting that it had provided "credible federal evidence" of noncitizens being on the

[2] The County did not review the contents of the thumb drive because its technology safety procedures do not permit connecting a thumb drive to its networks. The next day, the DOJ provided what it has represented was on the thumb drive via email.

rolls and warning that officials who "knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens" risk becoming "aiders and abettors to a federal crime." (ECF No. 32-2 ¶ 6, Ex. E.) The letter was addressed to the County's counsel. (*Id.*) It provided no methodology, no individualized evidence, and no process by which the County could verify anyone's citizenship. (*Id.*)

### C. How the List Was Generated, and What the Record Shows About Its Reliability

The Executive's declarations describe the list's provenance only in general terms. DHS' Homeland Security Investigations ("HSI") received, on May 8, 2026, a file reflecting California's voter rolls "as of August 2025." (*California II* at 2.) Although the public voter file contains no Social Security numbers, the Executive says it obtained such numbers from other sources and matched them to the file but without explaining how. (ECF No. 37-1 at 4 n.1, 18.) A component of DHS (U.S. Citizenship and Immigration Services) "enhance[d]" the data through a "third-party" platform—disclosed as LexisNexis only the night before the TRO hearing—and paired voters with alien numbers "that may be the same individual," while admitting that "the resulting data may be incomplete, outdated, or mismatched." (*California II* at 2 (quoting ECF No. 62-2 ¶ 16).) The Executive has never disclosed its matching rules, confidence criteria, "error rates," or any "validation against a reliable benchmark" (*id.* at 12 (quoting ECF No. 37-1, Ex. A ¶¶ 14, 26)); nor has it explained how "as many as 190,832" noncitizens in July became roughly 20,000 in October (*id.* at 12).

The record that has developed casts further doubt on the list. Only 7,035 of the more than 20,000 records bear Los Angeles County addresses. (ECF No. 32-3 ¶ 25.) And a sample of 200 of those records showed that 42.9% are canceled registrations, 14.6% are inactive, 71.2% have never voted, and 38.9% indicated they were born in the United States. (*Id.* ¶ 24; Bennett Concurrence at 18 n.4.) This effectively demonstrates that more than half of the records associated with addresses in Los

Angeles County were never mailed a ballot for the current election. A DOJ official has publicly acknowledged that "[t]here may be some names on there who it turns out ultimately are citizens." (ECF No. 99-1 at 18; ECF No. 37-1 at 15 n.5.) A federal whistleblower report describes DHS reviewers identifying noncitizens "based solely on DHS data that is unverified, inconsistent with other information, and/or is unexplained." (*California II* at 14 (quoting ECF No. 32-1, Ex. H at 2–3).) As the TRO Order recounts, DHS initially identified 15,903 alleged noncitizens in Nevada, later narrowed its allegations to 185 individuals, and that "Nevada reported that every single individual was a United States citizen." (*Id.* at 3.) And other federal courts have found that the Executive's citizenship-matching processes rely on "unknown artificial intelligence tools" and "[c]ommercial databases" that "sweep in U.S. Citizens," *Cal. Nurses Ass'n v. Mullin*, 2026 WL 3166149, at *2, *8 (N.D. Cal. Oct. 21, 2026), and are "plagued with inaccuracies," *Common Cause v. U.S. Dep't of Just.*, 2026 WL 3033772, at *1, *26 (D.D.C. Oct. 9, 2026). On this record, this Court found that it "cannot conclude that Plaintiff's process is credible." (*California II* at 13); *see California III* at 16-17 (credibility findings weaken claim of irreparable harm).

Meanwhile, the Executive has continued to enforce Section 611 through criminal process. On October 19, 2026, it announced charges against 28 individuals it says appear on the statewide list. (ECF No. 31-4, Ex. G; *California II* at 4.) It has also served more than 300 federal grand jury subpoenas for individual voter records on the Secretary of State's office. (*California I*, Bumatay, J., dissenting, at 3–4 ("Bumatay First Dissent").)

**D. Proceedings Since the County's Original Motion**

*The Executive's own timetable*. The Executive filed its Complaint without simultaneously seeking interim relief, then first submitted its TRO application four days later and twice asked for a ruling "by November 3, 2026." (*California I* at 13–14.) When the County, with the State's support, sought an expedited schedule to

resolve this motion before the election, the Executive declined to support it on the ground that there was insufficient exigency. (*Id.* at 13 (citing ECF Nos. 57, 61).)

*The Ninth Circuit's orders*. After this Court set the TRO hearing consistent with the Executive's requested ruling date, the Executive demanded a ruling within fifteen hours and, when none issued, appealed. (*Id.* at 5–6.) On the County's motion, the Ninth Circuit dismissed, holding that "any delay in the availability of judicial relief is, at least in part, the product of the United States's own decisions." (*Id.* at 11.) This Court denied the TRO two days later. (ECF No. 149.) The Executive appealed and again sought an injunction pending appeal, which the Ninth Circuit denied on October 30. (ECF No. 46.1.)

*The Executive's escalation*. On October 23, the Executive attempted to send letters to every county in California demanding that they set aside the votes of alleged noncitizens and warning that officials "risk significant federal scrutiny" if they did not comply. (*California II* at *4.) At the October 27 hearing, the Executive reiterated that officials who do not comply risk charges under 18 U.S.C. § 2. (*Id.*) In response to this and other efforts by the Executive to intimidate election officials for doing their job, the Court admonished: "these threats must stop." (*Id.*)

**E. The Complaint**

The Complaint asserts a single claim: that California's "actions" of "sending vote-by-mail ballots and ultimately counting the ballots" of listed individuals are preempted by 18 U.S.C. § 611. (Compl. ¶¶ 50–62.) Its allegations of notice and knowledge are directed at the State: that "[t]he Federal Government notified *California* months ago," that "the *State* made no serious attempt to work with the Federal Government," and that "[t]he *State* knows that noncitizens might be registered." (*Id.* ¶¶ 57, 59 (emphasis added).) It concedes that "it is not practicable or feasible" for the United States to investigate the persons on its list "before the 2026 election concludes." (*Id.* ¶ 60.)

## III. THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF JURISDICTION BECAUSE THE EXECUTIVE DOES NOT HAVE STANDING HERE

The Executive, like any other plaintiff, must establish Article III standing by identifying a concrete and particularized injury, actual or imminent, fairly traceable to the County's conduct and likely to be redressed by the requested relief, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992), for "each form of relief" it seeks, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).)

Here, the Court has already observed that each of the Executive's arguments for standing, and its fallback claim to equitable relief, "appear[] destined to fail on the merits." (*California II* at *5.) Rightly so. The Complaint's theory of standing rests on a federal interest in enforcing a federal criminal prohibition against noncitizen voting. (Compl. ¶ 9.) But while no one disputes that noncitizens may not vote in federal elections—both federal and California law prohibit it—an interest in enforcing the law is not an injury, and a federal prohibition does not dispense with Article III. The Complaint should therefore be dismissed because the Executive lacks standing to pursue its claim.

### A. The Complaint Alleges No Cognizable Injury

#### 1. States and Localities That Decline to Assist Federal Investigators Do Not Inflict a Sovereign Injury

The Complaint's standing theory rests almost entirely on a single assertion: that the Executive has "standing to vindicate its sovereign interests, including its legally protected interest in enforcing federal law, such as 18 U.S.C. § 611." (Compl. ¶ 9.) But alleging that California's procedures "are preempted and thus violate the Supremacy Clause" (*id.* ¶ 62) does not establish a concrete injury. The Supremacy Clause "provides 'a rule of decision'"; it is not a source of federal rights. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (quoting *Armstrong v.*

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015)). And court have rejected the notion that "the mere existence of an allegedly preempted law creates a sovereign harm to the federal government." *United States v. Boston*, 833 F. Supp. 3d 30, 45 (D. Mass 2026). The Complaint also fails to plead any harm based on any state action that impedes the Executive's operations or functions. As this Court explained, "[t]he United States, by its own admission, is actively enforcing this law," having charged 28 individuals across the state from its list the same day it sought a TRO. (*California II* at *5.)[3] Even the Ninth Circuit dissent acknowledged that "the federal government can still prosecute noncitizens for voting after the fact because the State preserves the records of who voted." (Bumatay First Dissent at 9.)

The Executive's principal authority for its "impeding" or "interference" theory of standing, *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024), is "wholly inapposite." (*California II* at *6.) In that case, a Missouri statute declared certain federal firearms laws "invalid to this state" and authorized private suits for $50,000 penalties against state and local law enforcement agencies that employed officers who helped enforce them. *Missouri*, 114 F.4th at 983–84. To comply, state officials "withdrew resources and manpower that further the enforcement of federal law," and the United States offered "uncontroverted evidence" that its enforcement efforts suffered as a result. *Id.* at 984. The injury there was a concrete impairment of ongoing federal enforcement, caused by a state law designed to nullify federal law. *See id*. at 984, 987.

Nothing comparable is alleged here. California's procedures do not purport to invalidate § 611, and California has not withdrawn from any federal enforcement effort. The Complaint alleges at most that Defendants "refused to segregate and stop

---

[3] By the Executive's own account, at least five of the 28 foreign nationals it charged on October 19 are not alleged to have voted at all. They are alleged only to have *registered* to vote at some point between 2002 and 2016 and to have later lied on naturalization paperwork—none of which violates § 611. *See* Press Release, U.S. Dep't of Just., *Justice Department Charges 28 Foreign Nationals in California for Election Crimes* (Oct. 19, 2026), https://www.justice.gov/opa/pr/justice-department-charges-28-foreign-nationals-california-election-crimes.

counting ballots." (*California II* at *6.) In other words, the allegation is that California declined a new federal demand to change how it administers its own elections. Declining to take on a new task (much less one that would violate both federal and state law) is not the same as withdrawing support that federal enforcement depends on: "[R]efusing to help [the federal government] is not the same as impeding it." (*Id.*) (quoting *United States v. California*, 921 F.3d 865, 888–89 (9th Cir. 2019).) Nor has that refusal impaired the Executive's ability to enforce Section 611.

**2. The Executive Cannot Spend Its Way into Standing**

The Executive next asserts "a substantial drain on federal resources." (Compl. ¶ 10.) This Court has already explained why that fails: the Executive "cites no case holding that states impose a 'monetary cost' on the federal government when they opt not to use state resources to enforce federal laws," and "[n]or could such a case legally exist since, as the United States itself acknowledges, 'a State is not required to help the Federal Government investigate and prosecute crimes.'" (*California II* at *6.) "Federal law is enforced by the federal government," and a plaintiff may not "spend its way into standing." (*Id.*) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).) The Executive's "'unprecedented and limitless' view" that a State's refusal to allocate resources on its behalf is an injury "has no limiting principle and is 'flatly inconsistent with Article III.'" (*Id.*) (quoting *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, 2026 WL 2564318, at *2 (U.S. Aug. 31, 2026).)

The Executive's asserted last-minute investigative urgency is also the result of its own timing. The Executive compiled its list over months, waited until ballots had been mailed and were being processed, and then delivered it with a 48-hour deadline. The Ninth Circuit accurately described the resulting emergency as "self-constructed." (*California I* at 15.) And this Court likewise rightly found that the Executive's "theoretical risk of imminent harm is solely due to its own neglect," (*California II* at *12.) A party "cannot manufacture standing merely by inflicting harm on [itself]." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

### 3. The Complaint's Theory of Vote Dilution Is Speculative, and Vote Dilution, in Any Event, Is Not the Executive's Injury

The Complaint's remaining theory of injury—that unlawful votes "dilute the votes of citizens" and "undermine[] public faith in federal elections" (Compl. ¶ 10)—is "too tenuous to establish standing." (*California II* at *6.) As asserted by the Executive, this theory is unprecedented *and* boundless. It claims a cognizable injury any time an ineligible voter casts a ballot in any federal race. The Ninth Circuit has rejected that theory. *Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072, 1087 and n.10 (9th Cir. 2024) (declining to recognize this "limitless" theory of "vote dilution" for "which [the Court] f[ou]nd no binding or persuasive support"). To be sure, the analysis might differ if "a disproportionate number of invalid ballots counted in favor of one particular candidate, issue, party or protected class." *Id.* at 1087. But the Executive has not made any such allegations. Indeed, such a theory would depend on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410: that listed people are currently registered in California, that those registrants are noncitizens, that they will vote in the midterms, that resulting ballots will be counted, and that enough ineligible votes will have been counted to disproportionately favor a "particular candidate, issue, party, or protected class" in at least one federal election. *Weber*, 113 F.4th at 1087. Even on DOJ's theory of standing, there cannot possibly be a cognizable injury to the United States unless all those suppositions are true. That causal chain is "the quintessential 'allegation[] of possible future injury' that cannot establish Article III standing." (*California II* at *7 (quoting *Clapper*, 568 U.S. at 410).) In addition, as the Ninth Circuit has explained, "the inadvertent counting of some invalid ballots, without more, does not limit, prevent, or otherwise burden the ability of any voter to cast a lawful ballot consistent with their voting preference, or to have their ballot 'counted equally in determining the final tally.'" *Weber*, 113 F.4th at 1089 (quoting *Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020) (as amended).) Indeed, "every court to have considered a 'vote dilution' claim

analogous to the one raised by [the plaintiff] in th[at] case has rejected the claim." (*Id.* at 1089 n.13.)

### B. Even If There Were Injury, It Is Not Fairly Traceable to the County

Traceability requires a causal connection between the injury and "the challenged action of the defendant," not "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations omitted). It is absent where the causal chain rests on "speculation about the decisions of independent actors," or on harm the plaintiff inflicted on itself. *Clapper*, 568 U.S. at 414–16. The Executive's standing here fails both those tests.

First, the County mailed VBM ballots to all registered voters in the County as required under state law before it received the list (ECF No. 32-4 ¶ 23), which precludes any claim that it knowingly facilitated unlawful voting through those mailings. An unlawful vote would also require the independent act of a noncitizen casting a ballot in violation of federal criminal law. *See* 18 U.S.C. § 611(a). More fundamentally, the Complaint must plausibly connect the County's challenged conduct to a cognizable federal injury, and it does not. *Lujan*, 504 U.S. at 560–61. Every act the Complaint attributes to the County (mailing ballots to active registrants, relying on sworn attestations of citizenship, verifying signatures, and tabulating ballots) is required or authorized by state law and permitted by federal law. Cal. Elec. Code §§ 2111, 3000.5 (a), (c), 3001, 3019, 15101(b); 52 U.S.C. §§ 20505(a)(1)–(2), 20508(b)(2); *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9, 15–20 (2013) ("*ITCA*"). The Complaint identifies no federal investigative function that those procedures prevent the United States from performing.

Second, any inability on the Executive's part to finish its own investigation before Election Day (Compl. ¶ 60) is "the product of the [Executive's] own decisions," not the County's. (*California I* at 11.)

DOCUMENT PREPARED ON RECYCLED PAPER

### C. The Requested Relief Would Not Redress the Alleged Injury

The Court has already identified the redressability problem: "Requiring Defendants to segregate ballots . . . would force Defendants to reallocate finite resources towards enabling the United States' preferred method of election administration. But enforcing such a requirement would not eliminate or prevent—that is, redress—any alleged 'interference' with federal law enforcement." (*California II* at *6.) That is exactly right: segregating mail ballots would not itself establish anyone's citizenship or remove a legal barrier to federal investigation or prosecution. It would instead shift the burden of resolving the Executive's suspicions about the listed people onto the County. And because the Executive has conceded that it cannot investigate the listed individuals before the election concludes (Compl. ¶ 60), a hold on their ballots as the Executive demands would likely mean those ballots go uncounted. "[A] ballot segregated, in effect, would be a ballot removed." (*California II* at *14.) And withholding the ballots of qualified voters would violate federal law. *See* 52 U.S.C. § 10307(a); (*California II* at *11). Relief that a court cannot lawfully order cannot establish redressability. *See infra* § IV.C. Finally, the requested statewide relief against Mr. Logan exceeds his legal authority, which ends at the Los Angeles County line. *See infra* § IV.D.

### D. The Declaratory Judgment Act and 28 U.S.C. § 1345 Do Not Cure These Defects

Nor do the Complaint's cited jurisdictional statutes help. (Compl. ¶¶ 7–8, citing 28 U.S.C. §§ 1345, 2201, and 2202.) Section 1345 confers *statutory* jurisdiction over suits by the United States; it does not eliminate Article III's case-or-controversy requirement. 28 U.S.C. § 1345; *see King County*, 122 F.4th at 750–54 (separately analyzing Article III standing and § 1345 jurisdiction). And the Declaratory Judgment Act is procedural only; it neither expands federal jurisdiction nor supplies a cause of action. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950).

## IV. THE COMPLAINT SHOULD ALTERNATIVELY BE DISMISSED FOR FAILURE TO STATE A PLAUSIBLE CLAIM

### A. The Executive Has No Cause of Action

"[L]ike any other plaintiff, the federal government must first have a cause of action." (*California II* at *7 (quoting *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980)).) The Executive has none.

First, the Supremacy Clause "certainly does not create a cause of action." (*Id.* (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015)).)

Second, the Executive's invocation of an "equitable tradition of suits to enjoin unconstitutional actions by state actors" fails under binding circuit law. (ECF No. 22-2 at 17 (citing *Missouri*, 114 F.4th at 986) (emphasis omitted).) As this Court correctly recognized, *United States v. Mattson*, 600 F.2d 1295, 1298–99 (9th Cir. 1979) limits non-statutory equitable suits by the United States to the protection of property interests, national security, or interstate commerce—none of which is implicated here. (*California II* at *7.) At a minimum, *Mattson* forecloses any general federal entitlement to sue whenever the United States claims to vindicate others' constitutional rights. The Executive must identify both a recognized basis for equitable intervention, and a historically grounded equitable remedy. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (addressing remedies "'traditionally accorded by courts of equity' at our country's inception") (quoting *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 319 (1999)). It has done neither. It "has not demonstrated such a historical 'tradition' of federal courts sitting in equity requiring state election officials to comply with federal prosecutorial priorities." (*California II* at *7.) To the contrary, "our tradition 'prohibits the federal government from commandeering state and local officials to help enforce federal law.'" *Id.* (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)).

Third, Congress's choices foreclose an implied civil remedy here. When Congress wanted to authorize the Attorney General to sue civilly over elections, it

said so. *See* 52 U.S.C. §§ 10308(d) (Voting Rights Act ("VRA")), 10504 (VRA Amendments), 20307(a) (UOCAVA), 20510(a) (NVRA), 21111 (Help America Vote Act ("HAVA")). Section 611 grants no such authority; its only remedy is a criminal penalty against the individual who votes. 18 U.S.C. § 611(b). Congress has separately prescribed immigration consequences for unlawful voting, subject to statutory exceptions. 8 U.S.C. § 1227(a)(6)(A)–(B). That choice controls: "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979). Courts will not "engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra Club*, 451 U.S. 287, 297 (1981); *see Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981); *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (statutory "omissions should be understood as exclusions" (citation omitted)). And courts are "reluctant to issue injunctions against the commission of a crime" where, as here, the criminal remedy is available and in use. 11A Wright & Miller, Federal Practice & Procedure § 2942 (3d ed.); *see United States v. Jalas*, 409 F.2d 358, 360 (7th Cir. 1969).

### B. The Complaint Fails To State a Preemption Claim

The Complaint pleads a single claim: that the County's "actions" of mailing and counting ballots are preempted by Section 611 as applied to the voters on the Executive's list. (Compl. ¶¶ 50–61.) That claim could succeed only if Section 611 displaced some state-law requirement that the *County* is applying. It does not, for five independent reasons. First, the Complaint challenges the rules by which California administers a federal election, so the Elections Clause supplies the test for preemption—and Section 611 fails. *Infra* § IV.B.1. Second, ordinary Supremacy Clause principles yield the same result. *Infra* §IV.B.2. Third, California's own procedures for challenging a voter's eligibility confirm that the Executive seeks to replace state law, not enforce federal law. *Infra* § IV.B.3. Fourth, the Executive's

reading of Section 611 would commandeer county officers in violation of the Tenth Amendment. *Infra* § IV.B.4. Fifth, its fallback "knowing facilitation" theory supplies no preemption rule and, in any event, rests on no plausible allegation of knowledge. *Infra* § IV.B.5. This Court reached the same conclusions in denying the TRO. (*California II* at 7-9.)

**1. Section 611 Does Not Preempt California's Election Procedures**

The rules the Complaint challenges—for mailing, verifying, and counting ballots (Compl. ¶¶ 5, 59, 61–63)—govern the "Manner of holding Elections," U.S. Const. art. I, § 4, cl. 1. The States prescribe that manner through "a complete code for congressional elections," including rules for "registration, . . . prevention of fraud and corrupt practices, [and] counting of votes," *Moore v. Harper*, 600 U.S. 1, 29 (2023) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). The Complaint contends that Section 611 preempts those rules. (Compl. ¶ 62). As this Court's TRO denial indicates, that claim fails as a matter of law for several independent reasons. (*California II* at 7-9).

***a. Implied preemption is a demanding standard***

"[T]here is no federal preemption *in vacuo*." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Obstacle preemption is a "high bar" that the Supreme Court "'has only found … in a small number of cases.'" (*California II* at 7 (quoting *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 972 (9th Cir. 2026)).) Even where "there is tension between federal and state law[, that] is not enough." (*Id.* (quoting *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1118 (9th Cir. 2020))). And here, there is no tension between California and federal law. *See infra* Section IV.B.2.

***b. The Elections Clause raises the bar higher, and Section 611 does not clear it***

The bar is higher still under the Elections Clause, for five independent reasons.

*First,* the Elections Clause assigns *States* the primary power over the manner of conducting elections, and the only federal actor that may displace their choices is Congress, "not the Executive." (Bennett Concurrence at 8); *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1175 (C.D. Cal. 2026). State election rules therefore do not intrude into a federal domain; they are the default the Constitution establishes, and only an Act of Congress can displace them.

*Second*, federal election law displaces state law only so far as Congress has exercised that power, "and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). And "the reasonable assumption is that that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id*. at 14. So even if Section 611 were a "Manner" regulation (First Bumatay Dissent at 29–31), it would displace only state laws that authorize noncitizens to vote in federal elections. California has no such law. And Section 611 says nothing about mailing, verifying, challenging, or counting ballots.

*Third*, administering elections is a core state responsibility, which Section 611 does not displace. If Congress intends to alter "the usual constitutional balance between the States and the Federal Government," it must make that intention "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (citations omitted). Section 611 contains no such statement. As the Ninth Circuit explained, "[n]oticeably absent from the statute is an express preemption provision or any language setting forth regulations for how a state deals with citizenship challenges to vote-by-mail ballots. Nor is there any provision authorizing the Department of Justice to take charge of or intervene in a state's administration of an ongoing election." (*California III* at 11; *see California II* at 8.) Such language should not be implied by courts because Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).



DOCUMENT PREPARED ON RECYCLED PAPER

*Fourth*, far from displacing state law, Section 611 "expressly incorporates state constitutions and laws when defining its scope." (*California I* at 10.) Section 611 accordingly exempts from its penalty any noncitizen voting in separately conducted nonfederal contests when state or local law authorizes it and the statute's other requirements are met. (*California III* at 11 (citing 18 U.S.C. § 611(a)(1)–(3)); *California II* at 8.) "It cannot reasonably be concluded that Congress, through a federal misdemeanor provision, intended to strip California of its constitutionally vested responsibility for election administration and implicitly granted that power to Executive Branch's Department of Justice." (*California II* at 9; *see California III* at 12); *see also United States v. Cox*, No. 25-cr-60249, 2026 WL 2948729, at ***1, *10-12** (S.D. Fla. Oct. 1, 2026) (dismissing § 611 prosecution on the ground that Section 611 regulates who may vote, a qualification the Constitution leaves to the States).

*Fifth*, other federal election statutes show that "Congress knows how to displace state election procedures with federal law" (*California II* at 9), giving additional meaning to section 611's silence. The NVRA, for example, requires States to accept the federal form with its sworn citizenship attestation, prescribes when and how registrants may be removed, and forbids systematic removals within 90 days of a federal election. 52 U.S.C. §§ 20505(a)(1), 20507, 20508(b)(2). Similarly, HAVA requires a statewide registration list maintained by state officials and provides that "[t]he specific choices on the methods of complying . . . shall be left to the discretion of the State." *Id.* §§ 21083(a), (b)(4)(A)(i), 21085. And when Congress wanted federal officials to send voter-specific eligibility information to the States, it built that channel expressly, with a correction mechanism. *Id.* § 20507(g) (Conviction in Federal Court). There is no comparable channel for federal citizenship assessments, and the Complaint invokes neither the NVRA nor HAVA. (Bennett Concurrence at 12.) "Congress's enactment of a criminal statute against individual aliens who unlawfully vote is not a grant of authority for the Executive to restructure state election administration." *Id.* at 11.

**2. Under Any Framework, There Is No Conflict Between California Law and Section 611**

It is also undeniable that the substance of California and federal law on noncitizen voting is complementary, not in tension. California's Constitution limits the franchise to citizens. Cal. Const. art. II, § 2(a). California's Elections Code enforces that limit by requiring a sworn citizenship attestation, Cal. Elec. Code §§ 2101, 2102(c), 2111; by verifying signatures, *id*. § 3019; by cancelling registrations upon proof of ineligibility, *id*. §§ 2201(a)(8), 2213; and by criminalizing fraudulent voting, *id*. §§ 18100, 18560. "These procedures reinforce, rather than conflict with, Section 611's prohibition on non-citizen voting," and state law "does not obstruct federal law where, as here, it 'trace[s]' it." *California II* at 8 (quoting *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 602 (2011)); *see also California III* 11-12. The hypothetical state law authorizing noncitizen voting the Complaint posits (Compl. ¶ 55) is not California's law—and the fact that the Executive is forced to resort to hypotheticals is itself telling.

What the Executive actually alleges is that it cannot finish investigating its list before the election ends. (Compl. ¶¶ 58–60.) That explains (at least in part) why the Executive would like to see ballot processing suspended, but it does not show that ballot processing frustrates Section 611. In any event, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption," and "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Garcia*, 589 U.S. at 212; (*California II* at 9; Bennett Concurrence at 11). Section 611 supplies no affirmative duty requiring the County to adopt the additional investigative procedures the Executive demands. The Ninth Circuit has already rejected the theory that state laws limiting assistance to federal enforcement are obstacle-preempted because they decline to make the federal task easier: "refusing to help is not the same as impeding." *California*, 921 F.3d at 888, *quoting United States*

*v. California*, 314 F. Supp. 3d 1077, 1104 (E.D. Cal. 2018). Moreover, complying with the Executive's demand would violate both state and federal law. *See infra* at 26, 30-33. Carrying on one's own lawful functions is not interference.

Nor can the Executive avoid this conclusion by recasting the County's compliance with state law as preemptible "action." The Elections Code and the California Constitution require the County to mail ballots, verify them, and count valid votes; they do not authorize the wholesale suspension the Executive demands. Cal. Elec. Code §§ 3000.5, 3019, 15101; Cal. Const. art. II, § 2.5. And California generally requires local officials to perform ministerial duties notwithstanding their own constitutional objections. *Lockyer v. City & Cnty. of San Francisco*, 33 Cal. 4th 1055, 1068–69 (2004). That rule does not insulate state conduct from a valid federal preemption claim, but the Executive must still identify a conflict with federal law. Section 611 supplies none. The Ninth Circuit dissent concluded that the Secretary of State's letter directed state action subject to preemption, (Bumatay First Dissent at 18–23), and relied on cases in which policymaking officials exercised discretion that itself conflicted with a federal scheme. *Duke Energy Trading & Mktg., L.L.C. v. Davis,* 267 F.3d 1042 (9th Cir. 2001); *Ariz. Dream Act Coal. v. Brewer,* 855 F.3d 957 (9th Cir. 2017); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). The County exercised no such discretion. It issued no directive and adopted no interpretation; as the dissent recognized, the County "was bound to follow" the governing reading of state law. (Bumatay First Dissent at 23.)

**3. The Executive Seeks to Bypass California's Challenge Procedures, Not To Enforce Federal Law**

California already provides procedures for challenging a registered voter's eligibility, which include safeguards to ensure due process. *See supra* § II.A. As Judge Bennett explained, "California details the exact manner in which a citizenship challenge to a voter needs to be brought, not only in the days leading up to the election, but all the way through election day and the counting of the votes." (Bennett

Concurrence at 14). When a challenger submits "any document or list" suggesting that voters be challenged at a vote center, the precinct board must first determine whether it is accompanied by "evidence constituting probable cause," Cal. Elec. Code § 14240(c); a challenge to a VBM voter requires "extraordinary proof," *id.* § 15106; and knowingly groundless challenges and certain mass challenges intended solely to prevent or delay voting are criminalized, *id.* § 18543. Ballots satisfying the applicable eligibility, receipt, signature and other legal requirements must be counted. Cal. Const. art. II, § 2.5; Cal. Elec. Code §§ 3019, 15101, 15109.

California's challenge procedures reflect a deliberate legislative judgment about the evidence required before a registered voter's ballot may be withheld. "[T]here is no provision of California election law that contemplates a large-scale mechanism for challenge to, and database-centered verification of, the citizenship of tens of thousands of voters." (Sanchez Concurrence at 9). The Executive's "preference" for a different procedure "does not carry with it the force of law," (*id.* at 16), and, in any event, the County has no authority to adopt one at the Executive's request, *see supra* § IV.B.2.

**4. Ordering A Novel Segregation Procedure To Aid Federal Prosecutors Would Commandeer County Officers in Violation of the Tenth Amendment**

The Executive's preemption theory also fails because it would require County officials to administer a federal enforcement program, which California has declined to do. The "gravamen" of the Executive's claim is that California is "obstructing" federal law enforcement by refusing to "work with" the Executive to prevent crimes. (*California II* at 9 (quoting TRO Appl. at 23; Compl. ¶¶ 4, 47, 57–58)). But the Tenth Amendment prohibits the federal government from commandeering States "to address particular problems" or "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935 (emphasis added); *see New York v. United States*, 505 U.S. 144, 188

(1992); *California*, 921 F.3d at 891. The relief sought—segregate ballots and verify citizenship "beyond relying on unverified statements of citizenship necessary to registering" (Compl. ¶ 6)—is precisely such a command to County officers, backed by letters warning them personally of prosecution. (ECF No. 32-2 ¶ 6, Ex. E; *California II* at 4.) As Judge Sanchez observed, the Executive "seeks to shift the burdens of its priorities onto California and co-opt the State into carrying out the Executive Branch's policies on a massive scale." (Sanchez Concurrence at 11–12.)

Judge Bumatay's response—that anti-commandeering principles do not apply under the Elections Clause—misses the point. (*See* Bumatay First Dissent at 28–32.) The case he cited held that Congress, by statute, may "conscript state agencies to carry out voter registration," as it did in the NVRA. *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). That principle depends on an Act of Congress directing state officials to act. Section 611 directs state officials to do nothing. An Executive demand letter is not an Act of Congress, and the Elections Clause gives the Executive no power to conscript anyone. (Bennett Concurrence at 8.)

**5. The Executive's "Knowing Facilitation" Theory Supplies No Basis for Preemption, Particularly as to the County**

Unable to identify a conflict between federal and state law, the Complaint recasts the County's ordinary procedures as "knowingly facilitat[ing] unlawful voting," relying on *Norwood v. Harrison*, 413 U.S. 455 (1973). (Compl. ¶¶ 5, 56, 59.) The theory fails for three reasons.

First, *Norwood* supplies no preemption rule. It was an equal-protection case holding that Mississippi's textbook loans to racially discriminatory private schools were "tangible aid" to discrimination the State itself could not practice. 413 U.S. at 463–68. Its principle depends on a constitutional prohibition binding the State. Section 611 binds no State. As this Court explained, *Norwood* "did not concern the Supremacy Clause," and "[c]ounting ballots cast by registered voters does not provide 'tangible aid' to unconstitutional private conduct. On the contrary, counting

ballots is necessary to uphold the democratic principles enshrined in the Constitution." *California II* at 15 n.10. *Accord*, Bennett Concurrence at 10-11.

Second, the Complaint does not plausibly allege that the County knowingly facilitated unlawful voting. Its caption charges Defendants with "[k]nowingly [s]ending" VBM ballots to likely noncitizens (Compl. at 12). But the Executive describes its October List as containing "*likely* noncitizens" and as the starting point for "further investigation." (Compl. ¶¶ 38–43.) Its own hedges undermine any basis for the list to supply knowledge of ineligibility of any voter on the list. The Court's "significant concerns" about the Executive's matching protocol, calling into question the Executive's claims that individuals on the October List are likely noncitizens, make any inference of knowledge from those claims implausible. (*California II* at 12.) And even if receiving the list of 20,000 names was a form of notice—which it was not—the County had finished mailing all ballots (aside from replacement ballots) well before it ever received the list on October 13. (Compl. ¶ 44; ECF No. 32-4 ¶ 23.)

Third, the Complaint's passing reference to aiding and abetting (Compl. ¶ 19) does not help. Section 2 of Title 18 of the U.S. Code creates no civil cause of action, and there is no general presumption that civil liability extends to aiders and abettors. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A*., 511 U.S. 164, 182 (1994). Accomplice liability requires an affirmative act furthering the offense and intent to facilitate its commission. *Rosemond v. United States,* 572 U.S. 65, 71, 76–77 (2014). Applying neutral election procedures to every registered voter is neither. And the Executive's threats of Section 2 prosecution—which the Court has said must stop, (*California II* at 4)—cannot substitute for a legal theory.

### C. Far from Vindicating Federal Law, the Preemption Claim Would Require County Officials to Violate It

The Executive invokes the supremacy of federal law, but the relief it seeks would require County officials to violate it. In particular, the requested relief raises four substantial conflicts with federal statutory and constitutional protections.

First, the NVRA, requires States to complete "any program the purpose of which is to systematically remove the names of ineligible voters" no later than 90 days before a federal election. 52 U.S.C. § 20507(c)(2)(A). That window closed on August 5, 2026. The Ninth Circuit has applied the bar to systematic programs targeting  noncitizens, holding that "a mass computerized data-matching process to compare the voter rolls with other state and federal databases, followed by the mailing of notices," is a systematic program, not an individualized one. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 716–17 (9th Cir. 2025) (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014)), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026). This Court rightly held that the Executive's list "is precisely the type of systematic cancellation program that the 90-day Provision was meant to preclude," and that the "temporary" label changes nothing because "the effect of Plaintiff's request is no different." (*California II* at 10; *see California III* at 14-16.) The Executive's proposed program is systematic by *design*: a bulk list, generated by database matching, applied wholesale on the eve of the election. It would not formally strike names from the rolls. Indeed, setting aside registered voters' ballots until an open-ended federal review ends accomplishes the very same exclusion the 90-day bar forbids. Congress drew that line to keep error-prone, last-minute purges from disenfranchising eligible voters. A ballot hold that achieves the same result under a different name does not escape it.

Second, the VRA forbids any person acting under color of law to "willfully fail or refuse to tabulate, count, and report" the vote of any person "entitled to vote" or "otherwise qualified to vote." 52 U.S.C. § 10307(a). The Executive does not claim that all 20,000 people on its list are noncitizens. It describes them only as "likely" noncitizens. (ECF 1 ¶¶ 4, 45, 38, 58.) That uncertainty creates a substantial risk (if not a near certainty) that a blanket hold would withhold ballots cast by qualified and registered citizens. Willfully refusing to count the votes of such persons would

violate Section 10307(a). As the Court has already concluded (*California II* at 11), it may not order officials to do what Section 10307(a) prohibits.

Third, the order would deny eligible voters the right to have their ballots counted without the process the Constitution requires. Due process calls for weighing the private interest at stake, the risk of erroneous deprivation, the value of additional safeguards, and the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Every factor cuts against the Executive. The private interest could not be weightier: the right to vote is among the most important of all rights, because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). And the risk of error is substantial, because the list contains disputed matches. Yet the requested relief specifies no notice to affected voters, no meaningful opportunity to respond, and no adequate standards or timetable for resolving disputed eligibility. Once the canvass closes, a mistaken exclusion may be impossible to undo.

Courts have required a meaningful opportunity to cure before an eligible voter's ballot is rejected. *See Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). Any verification process "would have to allow for a reasonable time for notice and an opportunity to respond." (Bennett Concurrence at 20). The Executive's claimed interest does not justify dispensing with those safeguards: the interest in punishing noncitizen voting remains fully protected without the order, because the County preserves the records needed to prosecute "after the fact." (Bumatay First Dissent at 9). The only interest that notice and an opportunity to respond would burden is the Executive's interest in speed, and that urgency is of its own making. This Court should not enter a decree that dispenses with the process the Constitution guarantees.

Fourth, federal law requires that voter-list maintenance be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). It also bars officials who are assessing a voter's qualifications from applying standards, practices, or procedures different



Document Prepared on Recycled Paper

from those applied to other voters in the same county already found qualified to vote. *Id.* § 10101(a)(2)(A). The Executive's proposed hold would transgress both proscriptions, singling out voters in only one jurisdiction based on immigration-related records that may show only that a person was once a noncitizen, or that current citizenship could not be confirmed. It is likely that naturalized citizens would bear scrutiny that native-born citizens do not, solely because of their immigration history, even though both have the same right to vote. *Mi Familia Vota* held that the particular citizenship-investigation requirements before it violated the NVRA's uniformity and nondiscrimination requirements. 129 F.4th at 714–15. The same statutory protections weigh against using outdated immigration history as a basis for selectively withholding ballots here.

*Purcell* also independently counsels against the requested last-minute relief, as this Court and the Ninth Circuit concluded. (*California II* at 14-15; *California III* at 19.) Federal courts "should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam), and the principle "applies with even greater force" once "[t]he election . . . has already started," *People Not Politicians v. Onder*, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026).

### D. Mr. Logan's Jurisdiction Is Limited to Los Angeles County, But Most Voters on the Executive's List Have Addresses Elsewhere

Mr. Logan's authority ends at the county line. He administers elections in Los Angeles County (Compl. ¶ 16) and has no authority to direct other counties' mailing, segregation, or tabulation of their ballots. *See* Cal. Elec. Code § 3017(a)(3) (requiring a county election official to forward to the issuing county any ballot dropped off or voted in another county). Courts enjoin officials, not laws, and an injunction runs only to the conduct of the official before the court. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). An official-capacity defendant can therefore be ordered to do only what his office empowers him to do. *See Baughcum v. Jackson*,





DOCUMENT PREPARED ON RECYCLED PAPER

92 F.4th 1024, 1033 (11th Cir. 2024) (claims not redressable where the defendant official "[was] not responsible for issuing licenses nor could he issue them to the plaintiffs if ordered"). Mr. Logan therefore cannot be compelled, as the Executive appears to seek, by injunction to act on the ballots of the approximately 13,000 individuals on the October list who may be registered outside Los Angeles County. (ECF No. 32-3 ¶ 25.)

## V. LEAVE TO AMEND SHOULD BE DENIED

Dismissal should be with prejudice because amendment would be futile. *See Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012). Additional allegations cannot supply statutory text authorizing the ballot-segregation mandate the Executive seeks. The Complaint's defects are legal, not factual: the absence of a cause of action, the text of Section 611, the allocation of authority under the Elections Clause, and the Tenth Amendment do not depend on (and cannot be changed by) any additional facts the Executive might plead. Put simply, no amendment could convert a criminal prohibition on individual voting into a federal mandate governing how California mails, verifies, and counts ballots. In any event, the Executive has *already* supplemented its pleading with three declarations and a supplemental declaration, and on that fuller record this Court still found that it was unlikely to establish standing, a cause of action, or preemption. (*California II* at 5–9.) As Judge Bennett observed, the Executive chose the timing and manner in which it proceeded. (Bennett Concurrence at 22 n.5.) It should be held to the consequence of that choice.

## VI. CONCLUSION

Election integrity is measured by making sure every lawful vote counts, guided by established law and untainted by intimidation and threats. The Executive's Complaint erodes that integrity by sowing doubt across the electorate and seeking to disrupt the core civic functions of County election workers. This Court is the essential check against this overreach, and with ballots already being cast, an order dismissing the Executive's preemption claim as unlawful will

confirm that election officials can complete their work and eligible voters are not dissuaded. For these reasons, the County respectfully requests the Court dismiss the Complaint as against the County—and dismiss it with prejudice, for no amendment can cure the defects.

Dated: November 2, 2026

**NORTON ROSE FULBRIGHT US LLP**
CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI

By: *\/s/ Abigail G. Urquhart*
ABIGAIL G. URQUHART
Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

Dated: November 2, 2026

**PUBLIC RIGHTS PROJECT**
JOSHUA KARSH (*pro hac vice*)
TOBY R. MERRILL (*pro hac vice*)
KYRA SIKORA
SHARANYA MOHAN
CHRISTINE BASS

By: */s/ Joshua Karsh*
JOSHUA KARSH
Attorneys For Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

Dated: November 2, 2026

**WILMER CUTLER PICKERING HALE AND DORR LLP**
SETH P. WAXMAN (*pro hac vice*)
DANIEL S. VOLCHOK (*pro hac vice*)
M. PAT MOORE, JR. (*pro hac vice*)
NICHOLAS R. WERLE (*pro hac vice*)

By: */s/ Seth P. Waxman*
SETH P. WAXMAN
Attorneys for Defendant DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk

DOCUMENT PREPARED ON RECYCLED PAPER

**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

The undersigned, counsel of record for Defendant Dean C. Logan, certifies that this brief contains 9,460 words, which complies the Court's order permitting up to 10,500 words.

*/s/ Abigail G. Urquhart*
ABIGAIL G. URQUHART
November 2, 2026