Andrew G. Pappas (SBN 266409)
apappas@omlaw.com
**OSBORN MALEDON, P.A.**
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
602-640-9000

*Attorney for Amicus Curiae*
*Bipartisan American Election Project*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, SHIRLEY N. WEBER, in her official capacity as the California Secretary of State, and DEAN C. LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,<br><br>Defendants. | Case No. 2:26-cv-12025-DOC-ADS<br><br>**BRIEF OF AMICUS CURIAE THE BIPARTISAN AMERICAN ELECTION PROJECT IN SUPPORT OF MOTIONS TO DISMISS**<br><br>Hearing Date: Friday, Nov. 13, 2026<br>Time: 10:00 a.m.<br>Courtroom: 1<br>Judge: Hon. David O. Carter |

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS .......... ii

INTRODUCTION .......... 1

INTEREST OF AMICUS CURIAE .......... 2

LEGAL BACKGROUND .......... 4

I. State Exercises of Authority Under the Electorate Clauses .......... 5

II. Congressional Exercises of Authority Under the Elections Clause .......... 6

III. Section 611(a) .......... 9

ARGUMENT .......... 9

I. Under Supreme Court Precedents, the Federal Statutes That Regulate State Election Procedures Foreclose Recognition of the Non-Statutory Cause of Action the Department Asserts. .......... 11

A. There Is a Strong Presumption That the Regulations and Remedies Provided in Laws Enacted Under Congress's Elections Clause Powers Cannot Be Supplemented by Other Laws .......... 11

B. The Carefully Targeted and Circumscribed Regulations Congress Has Adopted Under the Elections Clause Preclude Use of an *Ex parte Young* Action to Supplement Those Regulations. .......... 13

C. The Department Cannot Escape Application of the Foregoing Principles by Claiming That § 611(a) Is an Exercise of Congress's Elections Clause Powers .......... 16

II. The Anti-Commandeering Principle Bars This Suit and the Relief the Department Seeks. .......... 17

III. Principles Reflected in Congressional Election Laws and Supreme Court Jurisprudence Bar the Injunctive Relief the Department Seeks. .......... 19

A. The Injunctive Relief the Department Seeks Should Be Denied Under the *Purcell* Principle. ....................................19

B. The Injunctive Relief the Department Seeks Is Inconsistent With Congress's Judgment About What Actions Promote, or Undermine, Public Confidence in Elections. ...........................................................................21

CONCLUSION.....................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 5, 6, 17

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) .......... 19

*Demore v. Kim*,
538 U.S. 510 (2003) .......... 17

*Foster v. Love*,
522 U.S. 67 (1997) .......... 6

*New York v. United States*,
505 U.S. 144 (1992) .......... 17

*Newsom v. Trump*,
No. 25-3727, 2026 WL 3180273 (9th Cir. Oct. 23, 2026) .......... 18

*Oregon v. Mitchell*,
400 U.S. 112 (1970) .......... 5

*People Not Politicians v. Onder*,
No. 26A388, 2026 WL 2883222 (U.S. Sep. 25, 2026) .......... 19

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945) .......... 21

*Printz v. United States*,
521 U.S. 898 (1997) .......... 17, 18

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 19, 20

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
589 U.S. 423 (2020) .......... 19

*Ex parte Siebold*,
100 U.S. 371 (1880) .......... 6, 7, 11, 12, 13, 16

*United States v. California*,
No. 26-7070, 2026 WL 3212945 (9th Cir. Oct. 26, 2026) .................. 16, 20, 21

*United States v. Cnty. of Washtenaw*,
No. 26-11166, 2026 WL 2453724 (E.D. Mich. Aug. 26, 2026) ...................... 18

*United States v. Gradwell*,
243 U.S. 476 (1917) ........................................................................ 1, 11, 12

*West Virginia v. EPA*,
597 U.S. 697 (2022) ............................................................................... 12

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................... 1, 9, 13, 16, 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ............................................................................... 18

**Constitutional Provisions**

U.S. Const. amend. XVII ........................................................................... 5

U.S. Const. art. I ................................................................................... 4, 5

**Statutes & Rules**

18 U.S.C. § 2 ........................................................................................ 19

18 U.S.C. § 611 ........................................................... 1, 4, 9, 10, 16, 17, 18

18 U.S.C. § 3282 .................................................................................... 10

52 U.S.C. § 20302 ........................................................................... 8, 15, 16

52 U.S.C. § 20501 ..................................................................................... 7

52 U.S.C. § 20503 ................................................................................... 16

52 U.S.C. § 20505 ................................................................................... 16

52 U.S.C. § 20507 ....................................................................... 7, 8, 14, 16

52 U.S.C. § 20508 ................................................................................... 15

52 U.S.C. § 20510 ..................................................................................... 8

52 U.S.C. § 20921 ....................................................................................... 21

52 U.S.C. § 20923 ....................................................................................... 21

52 U.S.C. § 20928 ....................................................................................... 21

52 U.S.C. § 21081 ....................................................................................... 16

52 U.S.C. § 21083 ..................................................................................... 8, 14

52 U.S.C. § 21085 ..................................................................................... 8, 15

52 U.S.C. § 21101 ....................................................................................... 21

Civil Rights Repeal Act of 1894, ch. 25, 28 Stat. 36 .......................................... 7

Fed. R. Civ. P. 12 ......................................................................................... 1

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 ................................................ 9

Second Enforcement Act of 1871, ch. 99, 16 Stat. 433 ............................ 7, 21, 22

**Other Authorities**

*A Brief History of Civil Rights in the United States: Reconstruction and Jim Crow Eras*, Howard University School of Law, https://library.law.howard.edu/civilrightshistory/blackrights/jimcrow (last updated Oct. 28, 2026) ........................................................... 21

The Federalist No. 60 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ........................................................................................................ 5

Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391 (1993) ........................................................... 6, 9, 14

Kevin Rector & Brittny Mejia, *Feds Arrest Alleged Noncitizen Voters in California Amid Broader Election Fight with State*, Los Angeles Times (Oct. 19, 2026), https://www.latimes.com/california/story/2026-10-19/feds-arrest-alleged-noncitizen-voters-los-angeles-california-election ................................ 10

Petition for Writ of Certiorari, *Republican Nat'l Comm. v. Mi Familia Vota*, No. 25-1017 (U.S. Feb. 19, 2026) ........................................... 14

Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18 Minn. J.L. & Ineq. 271 (2000) .......... 5

## INTRODUCTION

The Court should dismiss the Complaint because the United States has not stated a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The non-statutory claim for judicial review that the Department asserts, and the relief it seeks, are foreclosed or impermissible for at least three reasons.

***First***, the carefully targeted and circumscribed requirements that Congress has imposed on state election procedures under the Elections Clause foreclose an *Ex parte Young* action compelling California to assist in federal enforcement of 18 U.S.C. § 611(a). Under the Supreme Court's precedents, federal election statutes are presumed to reflect the full extent to which Congress intends to override state election procedures. Only "positive and clear" language in another statute can justify additional federal interference with those state procedures. *United States v. Gradwell*, 243 U.S. 476, 485 (1917). Absent such language, courts cannot supplement or alter the precise ways that Congress has chosen to regulate state administration of congressional elections.

Here, Congress has enacted statutes governing every aspect of state election procedure at issue in this suit—maintenance of accurate registered voter rolls, use of mail-in ballots, and voter eligibility verification. None of these statutes, however, requires the actions that the Department seeks to compel. Nor do any authorize it to sue California for not taking those actions. The Department cannot use an *Ex parte Young* action to circumvent Congress's judgments and supplement the regulations it has chosen to enact.

The Department cannot escape these interpretive principles by claiming that 18 U.S.C. § 611(a) is, itself, an exercise of Congress's power under the Elections Clause. By its plain terms, and under the constitutional provisions governing federal congressional elections, § 611(a) can only be an exercise of Congress's

power over immigration and the conduct of aliens within U.S. borders, not a regulation of federal elections.

***Second***, this suit is barred by the Tenth Amendment's anti-commandeering principle. Even Congress, in the exercise of its plenary powers, cannot compel States to enact or enforce federally prescribed regulations. That principle applies *a fortiori* here, where the Department (not Congress) seeks to compel California to take various actions to enforce a federal criminal law that Congress authorized the federal government (not States) to investigate and prosecute.

***Third***, the Court should decline to grant the injunctive relief the Department seeks because (1) it frustrates the important principle—repeatedly recognized by the Supreme Court—that the rules governing congressional elections should be fixed and stable in the weeks leading up to such an election, and (2) it is inconsistent with Congress's recognition that federal intervention in such elections undermines public confidence in election outcomes unless that intervention is bipartisan in nature, which the Department's current efforts plainly are not.

## INTEREST OF AMICUS CURIAE

Lawyers affiliated with both the Democratic and Republican parties have formed *amicus curiae* The Bipartisan American Election Project ("BAEP").[1] BAEP is led by Bob Bauer and Ben Ginsberg, veteran election lawyers and the former co-chairs of the bipartisan Presidential Commission on Election Administration. BAEP is committed to reinforcing principled constitutional positions, defending democratic norms, and countering efforts to obstruct the lawful casting and tallying of votes or to undermine public confidence in election outcomes. BAEP's efforts and goals are supported by attorneys from both major

---

[1] No counsel for any party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than BAEP, its members, or its counsel made such a monetary contribution.

parties, including Dana Remus, who served as White House Counsel in the Biden Administration; Peter Keisler, who served as Assistant Attorney General for the Civil Division and as Acting Attorney General during the George W. Bush Administration; Donald Verrilli, former Solicitor General of the United States in the Obama Administration and a senior litigation adviser to the Obama–Biden and Harris–Walz presidential campaigns; Michael Carvin, who has represented conservative and Republican Party organizations in election-law litigation, including voting rights, recount, and redistricting matters; John Devaney, who has tried election-law cases on behalf of Democratic presidential campaigns and the Democratic National Committee; Daniel Troy, whose background includes appellate litigation in private practice and service as Chief Counsel to the Food and Drug Administration in the George W. Bush Administration; and Joseph Guerra, who served as a Deputy Assistant Attorney General, Office of Legal Counsel, during the Clinton Administration and as Principal Deputy Associate Attorney General during the Obama Administration. Mr. Verrilli, Mr. Devaney, and Ms. Remus are also members of the BAEP Board of Directors.

Our country is experiencing extraordinary conflict over the administration of elections and the acceptance of election outcomes. The foundational principles on which free and fair elections have been based are now the subject of a flood of litigation in federal and state courts, intense regulatory battles, and polarizing rhetoric about the reliability of elections. The major political parties have long held sharply differing perspectives on how best to administer a fair electoral process. But the intensity of the current partisan conflict threatens to undermine the lawful conduct of elections and weaken public trust in our voting systems.

The line between legitimate disagreements over the best ways to ensure fair elections and anti-democratic challenges to longstanding constitutional principles and norms has too often been lost in these conflicts. To assist courts in drawing and

upholding that line, BAEP focuses exclusively on frontal challenges to constitutional protections and democratic norms. This case involves just such a challenge.

Indeed, this lawsuit is an unprecedented, and wholly unjustified, effort by the Department of Justice to interfere with state administration of a federal election. The Department alleges no breach of any federal statutory duty by any state or local election official and cites no federal statute authorizing its suit. In fact, statutes governing state administration of federal elections foreclose recognition of the non-statutory cause of action the Department invokes. Moreover, the equitable relief it seeks is inconsistent with longstanding principles of judicial restraint and would, if granted, violate the anti-commandeering principle of the Tenth Amendment. The Court should not bless this extraordinary interference; it should reject the Department's request.

## LEGAL BACKGROUND

The Department justifies its efforts to interfere with California's administration of the upcoming congressional election based on a single statute—18 U.S.C. § 611(a). *See* Compl. ¶¶ 1, 5, 9, 17, 19–20, 40, 55–56, 59–60. That statute makes it a crime for an alien to vote in federal congressional elections. *See* 18 U.S.C. § 611(a). In light of the Department's singular focus, it is necessary to understand § 611(a)'s place in the larger context of federal election laws.

The Constitution allocates power over the administration of federal congressional elections between the States and Congress. Article I, Section 2 provides that the persons in each State who are eligible to vote for members of the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. The Seventeenth Amendment uses this same language for the election of U.S.

Senators. *See* U.S. Const. amend. XVII. In contrast to these "Electorate Clauses," the Elections Clause provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

*Id.* art. I, § 4, cl. 1.

## I. State Exercises of Authority Under the Electorate Clauses

The "Qualifications requisite for Electors of the most numerous Branch of the State Legislature" are, of course, established by the States. *See id.* art. I, § 2, cl. 1; *id.* amend. XVII. Thus, under the Electorate Clauses, States have exclusive authority to establish who can vote in elections for members of Congress. Prescribing voter qualifications "forms no part of the power to be conferred upon the national government" by the Elections Clause, which is "expressly restricted to the regulation of the *times*, the *places*, and the *manner* of elections." The Federalist No. 60, at 371 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013) (*ITCA*) ("[N]othing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress." (quoting *Oregon v. Mitchell*, 400 U.S. 112, 210 (1970) (Harlan, J., concurring in part and dissenting in part))).

In exercising their authority under the Electorate Clauses, many States once allowed aliens to vote in federal congressional elections. "[A]liens voted under the early Constitutions of Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, Rhode Island, Vermont and Virginia, all of which granted the right to vote using the more general 'freemen' terminology." Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18 Minn. J.L. & Ineq. 271, 273–74 (2000). Although many of these

States withdrew that right after the War of 1812, noncitizen voting saw a resurgence later that century. *See* Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1403–04 (1993). Before the Civil War, Wisconsin granted the right to vote to aliens who declared an intent to become citizens, and other States followed suit. *Id.* at 1404–09. After the Civil War, at least 13 new States allowed such voting. *Id.* at 1414. In the wake of World War I, however, States once again began to withdraw this right, and, by 1926, all States prohibited noncitizens from voting. *Id.* at 1397.

## II. Congressional Exercises of Authority Under the Elections Clause

The Elections Clause "invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted). Thus, while the Electorate Clauses give States primacy over *who* votes in congressional elections, the Elections Clause gives Congress primacy over *how* congressional elections are conducted. *See ITCA*, 570 U.S. at 16. As an historical matter, however, Congress has exercised this power sparingly.

Following the Civil War, Congress authorized significant federal oversight of congressional elections to ensure that newly freed slaves were not denied their right to vote. The Enforcement Act of May 1870 authorized the appointment of supervisors to attend the places fixed for voter registration and "to challenge such as they deem proper; to cause such names to be registered as they may think proper to be so marked; [and] to inspect and scrutinize such register of voters." *Ex parte Siebold*, 100 U.S. 371, 379–80 (1880). These supervisors were also required to monitor voting and the counting of votes and were authorized "to challenge any vote the legality of which they may doubt; to be present continually where the ballot-boxes are kept, until every vote cast has been counted, . . . and to personally

inspect and scrutinize . . . the manner in which the poll-books, registry lists, and tallies are kept." *Id.* at 380.

The Second Enforcement Act of 1871 included many similar provisions. Supervisors appointed by courts under the Act were to provide a "list of the persons who may register and vote," verify and decide who may be on such lists, and "scrutinize, count, and canvass each and every ballot." Second Enforcement Act of 1871, ch. 99, 16 Stat. 433, 435, 438. They were also required to "inspect and scrutinize" the voter registration lists compiled by local officials and authorized "to prevent fraudulent registration." *Id.* at 434, 436.

Congress repealed both of these laws, however, in 1894. *See* Civil Rights Repeal Act of 1894, ch. 25, 28 Stat. 36. For decades thereafter, it did not override state laws governing federal elections.

More recently, Congress has exercised its Elections Clause power to prescribe requirements for state maintenance of voter rolls, the identification of ineligible voters, and the use of mail-in ballots. Congress enacted the National Voter Registration Act of 1993 ("NVRA") to, among other things, "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "protect the integrity of the electoral process," and ensure maintenance of "accurate and correct voter registration rolls." 52 U.S.C. § 20501(b). The NVRA permits States to remove a voter from the voter rolls for three reasons: (1) "at the request of the registrant"; (2) "as provided by State law, by reason of criminal conviction or mental incapacity"; or (3) pursuant to "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . death . . . or . . . a change in the residence of the registrant." *Id.* § 20507(a)(3)–(4). Any state "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal

office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." *Id.* § 20507(b)(1). Any such program must also be completed "not later than 90 days prior to the date of a primary or general election for Federal office." *Id.* § 20507(c)(2)(A).[2] "The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter." *Id.* § 20510(a).

The Help America Vote Act of 2002 ("HAVA") also includes provisions addressing state voter rolls. It requires States to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." *Id.* § 21083(a)(1)(A). But HAVA expressly leaves "specific choices on the methods of complying" with its requirements "to the discretion of the State." *Id.* § 21085.

Finally, Congress has regulated mail-in ballots in one narrow area—by service members and citizens living abroad. The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") provides that, if States require an oath or affirmation in connection with any document relating to absentee voting, they must use a federally prescribed "standard oath." *Id.* § 20302(a)(5). UOCAVA further provides that States cannot refuse to accept "any otherwise valid voter registration application or absentee ballot application . . . or marked absentee ballot submitted in any manner by an absent uniformed services voter or overseas voter solely on the basis of" state "[n]otarization requirements." *Id.* § 20302(i)(1).

---

[2] This 90-day "quiet period" does not bar the removal of names from official voter lists based on a registrant's request, death, disqualifying criminal conviction, or mental incapacity under state law. 52 U.S.C. § 20507(c)(2)(B).

In short, Congress has generally left the administration of congressional elections to the States, subject to a number of targeted and carefully circumscribed requirements.

## III. Section 611(a)

Unlike the foregoing provisions, 18 U.S.C. § 611(a) is not part of Title 52 of the U.S. Code, which regulates "Voting and Elections." Section 611(a) is instead part of the federal criminal code. It provides, in relevant part, that it "shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of . . . the Senate . . . [or] the House of Representatives." 18 U.S.C. § 611(a). This provision, enacted 70 years after all States had prohibited voting by noncitizens, *see Raskin*, 141 U. Pa. L. Rev. at 1397, was part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 216, Pub. L. No. 104-208, 110 Stat. 3009–572 (codified as amended at 18 U.S.C. § 611). As its name reflects, this legislation was an exercise of Congress's power over immigration, naturalization, and the conduct of noncitizens within U.S. borders. It buttressed longstanding state prohibitions on noncitizen voting in congressional elections by adding a federal penalty for such conduct. *See* 18 U.S.C. § 611(a).

## ARGUMENT

In its Complaint, the Department does not claim that Defendants have violated any federal statute governing the administration of congressional elections. Nor does it claim that any of these laws—or any other federal statute—authorizes this suit. Instead, relying on *Ex parte Young*, 209 U.S. 123 (1908), the Department alleges that, by refusing to cooperate with its efforts to block mail-in voting by over 20,000 registered voters that the Department "believes" are noncitizens, Compl. ¶¶ 4, 45–46, Defendants have "made it nearly impossible for

the United States to investigate and enforce federal law," *id.* ¶ 10. Thus, the Complaint alleges, "California's actions are preempted by 18 U.S.C. § 611(a) insofar as they frustrate the very purpose and effect of the federal prohibition against noncitizens voting in federal elections." *Id.* ¶ 59; *see also id.* ¶ 60 ("California is thus knowingly imposing an obstacle on the United States' ability to enforce 18 U.S.C. § 611 . . . .").

The Department's claim that Defendants have "made it nearly impossible for the United States to investigate and enforce federal law," *id.* ¶ 10, is plainly untrue. Just four days after it filed this suit, the Department brought criminal charges against 20 individuals alleging that they had illegally registered to vote or previously voted illegally in California.[3] More fundamentally, the statute of limitations for bringing charges under § 611(a) is five years,[4] which affords the Department ample time to investigate and prosecute aliens who vote in the upcoming congressional election.

What the Department is really claiming, then, is (1) that it has the right not just to enforce § 611(a), but to *prevent* violations of this provision, *and* (2) that it has the right to an injunction that compels States to assist with such pre-election crime-prevention efforts. *See* Compl. ¶ 60 (emphasizing that "it is not practicable or feasible for the United States to investigate *before the 2026 election concludes* thousands, let alone tens of thousands, of individuals that" the Department believes are noncitizens (emphasis added)). Because the claim the Department asserts and

---

[3] *See* Kevin Rector & Brittny Mejia, *Feds Arrest Alleged Noncitizen Voters in California Amid Broader Election Fight with State*, Los Angeles Times (Oct. 19, 2026), https://www.latimes.com/california/story/2026-10-19/feds-arrest-alleged-noncitizen-voters-los-angeles-california-election.

[4] Because § 611(a) has no limitations period, it is governed by the general default provision of 18 U.S.C. § 3282(a), which sets a five-year period.

the relief it seeks are foreclosed or impermissible for at least three distinct reasons, this Court should grant Defendants' motions to dismiss.

**I. Under Supreme Court Precedents, the Federal Statutes That Regulate State Election Procedures Foreclose Recognition of the Non-Statutory Cause of Action the Department Asserts.**

As discussed above, under the Elections Clause, Congress has enacted several laws that regulate state administration of congressional elections in carefully targeted and circumscribed ways. Under Supreme Court precedents, these laws foreclose recognition of the additional, extra-statutory enforcement the Department seeks to employ here.

**A. There Is a Strong Presumption That the Regulations and Remedies Provided in Laws Enacted Under Congress's Elections Clause Powers Cannot Be Supplemented by Other Laws.**

The Supreme Court long ago explained that, when Congress acts under the Elections Clause, courts "are bound to presume that Congress has done so in a judicious manner . . . [and] that it has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations." *Siebold*, 100 U.S. at 393; *see also id.* at 392 (explaining that Congress's authority under the Elections Clause "is paramount, . . . and so far as it is exercised, *and no farther*, the regulations effected supersede those of the State which are inconsistent therewith" (emphasis added)). This presumption has generated a corollary rule: courts should not interpret other laws to supplement or alter the precise ways in which Congress has chosen to regulate state administration of congressional elections, absent clear evidence that Congress intended such a result.

In *United States v. Gradwell*, 243 U.S. 476 (1917), the government sought to prosecute individuals for voter fraud under a federal law that made it a crime to "defraud the United States in any manner for any purpose." *Id.* at 479–80 (quoting former § 37 of the U.S. Criminal Code). Despite the breadth of this statutory

language, the Court concluded that, in light of the enactment and later repeal of 1870 and 1871 laws specifically addressing voter fraud, the government could not apply a general fraud statute to such conduct. *See id.* at 485. After describing the requirements of those Acts, the Court explained that because

> the policy of Congress for so great a part of our constitutional life has been, and now is, to leave the conduct of the election of its members to state laws, administered by state officers, and that whenever it has assumed to regulate such elections it has done so by positive and clear statutes, such as were enacted in 1870, it would be a strained and unreasonable construction to apply to such elections this § 37, originally a law for the protection of the revenue, and for now fifty years confined in its application to "Offenses against the Operations of the government," as distinguished from the processes by which men are selected to conduct such operations.

*Id.* In so ruling, *Gradwell* effectively anticipated the logic of the Major Questions Doctrine. *See West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022) (holding that courts must "hesitate before concluding that Congress" intended to grant an "'unheralded power' representing a 'transformative expansion in [an agency's] regulatory authority.'" (citations omitted)). But *Gradwell* represents a unique and particularly powerful version of this concept. It reasoned that Congress's sparing and explicit use of its constitutional power to override state election procedures reflected a recognition by Congress itself that exercises of this power are a significant and dramatic intrusion on the States' primary responsibility to administer congressional elections.

Accordingly, under both *Siebold* and *Gradwell*, laws that directly regulate state administration of federal elections should not be read expansively, and laws that do not directly regulate state election procedures should not be read to intrude on such matters, absent "positive and clear" language that Congress intended such a result. *Gradwell*, 243 U.S. at 485. These interpretive rules are fatal to the Department's claims.

### B. The Carefully Targeted and Circumscribed Regulations Congress Has Adopted Under the Elections Clause Preclude Use of an *Ex parte Young* Action to Supplement Those Regulations.

Because courts must presume that Congress has exercised its Elections Clause powers "in a judicious manner . . . [and] has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations," *Siebold*, 100 U.S. at 393, the Department cannot use an *Ex parte Young* action to supplement the regulations and remedies Congress created in the NVRA, HAVA, and UOCAVA. Yet that is precisely what the Department seeks to do here.

The central thrust of the Complaint is that the Department "believes" that thousands of noncitizens are "registered to vote in California." Compl. ¶¶ 3–4, 45–49. It also faults the State because its signature verification requirement mandates only that a voter "affirm that she or he is a registered voter and is a resident of the precinct in which they voted," but "omits affirmation of a voter's U.S. citizenship." *Id.* ¶ 29. The Department therefore seeks the supposedly "commonplace" relief of an injunction compelling "California (1) to set aside vote-by-mail ballots from [these voters] and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status (beyond relying on unverified statements of citizenship necessary to registering) before tabulating their vote-by-mail ballot." *Id.* ¶¶ 6, 63.

The Department, in short, attempts to supplement Congress's election regulations by compelling California to set aside certain mail ballots and perform additional, extra-statutory voter verification before tabulating those ballots. The Department lacks authority for these actions. The NVRA, HAVA, and UOCAVA expressly address state maintenance of voter registration rolls, as well as the evidence States can rely on in determining a voter's citizenship. None, however, requires the actions the Department seeks to compel, or authorizes it to bring an action against a State to obtain such relief.

As noted earlier, the NVRA states that "each State shall . . . provide that the name of a registrant may not be removed from the official list of eligible voters except" (1) "at the request of the registrant"; (2) "as provided by State law, by reason of criminal conviction or mental incapacity"; or (3) pursuant to "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . death . . . or . . . a change in the residence of the registrant." 52 U.S.C. § 20507(a)(3)–(4). These provisions thus *permit*—but do not *require*—States to remove a voter from the list of eligible voters for three specified reasons. And, under the plain language of the NVRA, those reasons do not include the fact that a registered voter is not a citizen.[5]

HAVA requires States to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." *Id.* § 21083(a)(1)(A). And it requires state and local election officials to "perform list maintenance . . . on a regular basis." *Id.* § 21083(a)(2)(A). Because, under the law of every State, noncitizens cannot be legally registered, *see* Raskin, 141 U. Pa. L. Rev. at 1397, this provision arguably requires States to confirm the citizenship status of registered voters and to remove noncitizens.[6] But HAVA

---

[5] The Supreme Court has agreed to review the Ninth Circuit's conclusion that the NVRA prohibits States from removing noncitizen voters from their voter rolls during the 90-day "quiet period." *See* Petition for Writ of Certiorari at i, *Republican Nat'l Comm. v. Mi Familia Vota*, No. 25-1017 (U.S. Feb. 19, 2026) (second question presented), *cert. granted*, 146 S. Ct. 2799 (June 29, 2026). But even if the Court concludes that the NVRA *permits* the removal of noncitizens during this period, it does not *mandate* their removal during this period, or at any other time.

[6] This reading is arguable, rather than clearly compelled, because HAVA goes on to provide that, "[i]f an individual is to be removed from the computerized list, such individual shall be removed in accordance with" certain provisions of the

leaves "specific choices on the methods of complying" with this requirement "to the discretion of the State." *Id.* § 21085. And the "methods" of complying plainly include decisions about how often and how close to an election list maintenance should be performed, as well as what data should be used in performing that maintenance.[7] Indeed, the State's broad discretion over such matters undoubtedly explains why the Complaint does not allege that the State's refusal to accede to the Department's election-eve demands violates HAVA or the NVRA.

Finally, the UOCAVA provides that States cannot refuse to accept "any otherwise valid . . . marked absentee ballot submitted . . . by an absent uniformed services voter or overseas voter solely on the basis of" state "[n]otarization requirements." *Id.* § 20302(i)(1). The NVRA requires an "attestation" signed "under penalty of perjury" that individuals meet all state requirements for voting. *Id.* § 20508(b)(2)(B)–(C). This requirement, however, applies to those registering to vote by mail, *see id.*, not to use of mail-in ballots. Thus, neither the NVRA nor UOCAVA requires voters to provide the information that California allegedly "omits" from its verification statement for mail-in ballots—*i.e.*, "affirmation of [the] voter's U.S. citizenship." Compl. ¶ 29.

In sum, Congress has used its powers under the Elections Clause to prescribe precise requirements with respect to the very aspects of California's election procedures that give rise to this suit—*i.e.*, maintenance of accurate registered voter rolls, and the removal of voters from those rolls; use of mail-in ballots; and voter eligibility verifications. None of these provisions requires the actions that the Department seeks to compel, nor does any provision authorize it to sue California

---

NVRA, 52 U.S.C. § 21083(a)(2)(A)(i), which, as noted, do not include the fact that a voter is not a U.S. citizen.

[7] In fact, Defendants have raised significant questions about the source and accuracy of the data underlying the federal government's "belief" that 20,000 noncitizens are registered to vote in California. *See*, *e.g.*, Compl. Ex. B at 1.

for refusing to take those actions. Because Congress went "no farther," presumably to "guard as far as possible against any unnecessary interference with State laws and regulations," *Siebold*, 100 U.S. at 392–93, the Court should reject the Department's attempt to use *Ex parte Young* to circumvent Congress's judgments and supplement the regulations and requirements it chose to enact.

**C. The Department Cannot Escape Application of the Foregoing Principles by Claiming That § 611(a) Is an Exercise of Congress's Elections Clause Powers.**

The Department seeks to avoid application of these principles by characterizing § 611(a) as itself an exercise of Congress's power under the Elections Clause. *See* Compl. ¶ 1; *see also United States v. California*, No. 26-7070, 2026 WL 3212945, at *21 (9th Cir. Oct. 26, 2026) (Bumatay, J., dissenting) (same). This is plainly incorrect.

To begin with, § 611(a) is not part of Title 52 of the U.S. Code, which is entitled "Voting and Elections" and sets forth all of the various election-related requirements Congress has imposed on the States. Indeed, § 611(a) does not refer to the States at all. This stands in stark contrast to the provisions of the NVRA, HAVA, and UOCAVA, all of which directly regulate States, not voters.[8]

[8] *See*, *e.g.*, **the NVRA**, 52 U.S.C. § 20503(a) ("[E]ach State shall establish procedures to register to vote in elections for Federal office . . . ."); *id.* § 20505(a)(1) ("Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission . . . ."); *id.* § 20507(a) ("In the administration of voter registration for elections for Federal office, each State shall . . . ."); *id.* § 20507(b)(1) ("Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 . . . ."); **HAVA**, *id.* § 21081(d) ("Each State and jurisdiction shall be required to comply with the requirements of [HAVA] on and after January 1, 2006."); **UOCAVA**, *id.* § 20302(a)(1) ("Each State shall . . . permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office . . . .").

More fundamentally, § 611(a) *cannot* be an exercise of Congress's Elections Clause powers. By its plain terms, § 611(a) is a prohibition on voting by particular individuals. *See* 18 U.S.C. § 611(a) ("It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the [Senate or House of Representatives]."). But, as the Supreme Court has held, the power to decide who can (or cannot) vote in congressional elections is excluded from the scope of the Elections Clause and is instead governed by the Electorate Clauses. *See ITCA*, 570 U.S. at 16 (explaining that "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them," because it cannot be read "as treating implicitly what [the Electorate Clauses] regulate explicitly"). Section 611(a) is therefore necessarily—and exclusively—an exercise of Congress's power to control immigration, naturalization, and the conduct of aliens within U.S. borders. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 522 (2003). And, because this provision does not regulate state administration of congressional elections, the Department's authority to enforce this criminal prohibition cannot empower it to dictate or alter how California processes mail-in ballots.

## II. The Anti-Commandeering Principle Bars This Suit and the Relief the Department Seeks.

This lawsuit, and the relief the Department seeks, are barred for yet another reason. Even in areas where it has plenary authority, Congress cannot "commandeer[] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *New York v. United States*, 505 U.S. 144, 176 (1992) (citation omitted). This prohibition also applies to federal efforts to commandeer a State's executive officials. *See Printz v. United States*, 521 U.S. 898, 925 (1997) ("[O]pinions of ours have made clear that the Federal Government may not compel the States to implement, by legislation *or executive*

*action*, federal regulatory programs." (emphasis added)). No asserted federal interests can justify a federal law that seeks "to direct the functioning of the state executive" because "[i]t is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect." *Id.* at 932.

Here, of course, the Department does not claim that Congress enacted any law that forces States to assist with prosecutions under § 611(a), which is why its Complaint cites no statute authorizing the injunctive relief it seeks. It follows from the anti-commandeering principle that the Executive Branch—which has no independent law-making power, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952)—cannot compel States to assist with the enforcement of federal criminal laws that Congress has authorized the federal government (not States) to investigate and prosecute.[9]

Yet the relief sought in this suit is predicated on the assumption that the federal government *can* commandeer state assistance. The Department claims that, because California has refused to comply with its demand for assistance in enforcing § 611(a), the Court should provide a coercive "remedy" for that refusal—*i.e.*, an injunction barring the State from tabulating any votes by persons the federal government "believes" are noncitizens. *See* Compl. ¶¶ 4, 63. But the Department cites no federal law requiring California to provide the assistance it demands, and the anti-commandeering principle would render such a law unconstitutional in any

---

[9] *See Newsom v. Trump*, No. 25-3727, 2026 WL 3180273, at *29 (9th Cir. Oct. 23, 2026) (holding that, where the president lacked the authority to federalize the California National Guard, "the Guard members remained state personnel, and Defendants violated the Tenth Amendment by commandeering those state personnel to administer federal immigration laws"); *United States v. Cnty. of Washtenaw*, No. 26-11166, 2026 WL 2453724, at *17 (E.D. Mich. Aug. 26, 2026) (describing the federal government's request that States "detain and assume custody of a noncitizen at ICE's demand until ICE assumes custody" as causing "a severe commandeering problem").

event.[10] The federal government thus has no right to relief for California's decision not to provide that assistance.

## III. Principles Reflected in Congressional Election Laws and Supreme Court Jurisprudence Bar the Injunctive Relief the Department Seeks.

Even if the Department's attempt to sue under *Ex parte Young* was not barred by both the anti-commandeering principle and the *Siebold/Gradwell* presumption, the injunctive relief it seeks should be denied because it would frustrate important election principles recognized by Congress and the Supreme Court. The Department seeks to alter state election procedures too close in time to the election. And its judgment that its intervention will promote "public faith in federal elections," Compl. ¶ 10, is contradicted by judgments Congress has made about the best ways to promote that faith.

### A. The Injunctive Relief the Department Seeks Should Be Denied Under the *Purcell* Principle.

Under the so-called *Purcell* principle,[11] "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). This principle "applies with even greater force" when, as here, "[t]he election is not merely upcoming; it has already started." *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sep. 25, 2026) (per curiam); *see also Bost v. Ill. State Bd. of Elections,* 607 U.S. 71, 80 (2026) ("The democratic consequences [of

---

[10] The Department attempts to characterize the federal criminal aiding and abetting statute, 18 U.S.C. § 2, as a law that effectively requires state officials to assist with its investigation. *See* Compl. ¶¶ 19, 56; *see also id.* ¶ 59 (suggesting that, by counting ballots cast by individuals on the federal government's thumb drive, state officials are "*knowingly* facilitat[ing] unlawful voting" (emphasis added)). But interpreting 18 U.S.C. § 2 in this way would render it unconstitutional, as applied, under the anti-commandeering principle.

[11] *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

late-stage judicial intervention] can be even more dire if courts intervene only after votes have been counted.”).

This lawsuit was not filed until October 15, less than three weeks before the upcoming election on November 3 and two weeks after California had sent out mail-in ballots. *See United States v. California*, 2026 WL 3212945, at *2. Even then, the Department did not immediately file its motion for a temporary restraining order; instead, it waited another four days to do so. *Id.* It is difficult to imagine a more egregious violation of the *Purcell* principle.

In an effort to shift the blame for its last-minute litigation efforts, the Department attached to its Complaint a copy of a letter dated July 16, 2026, in which Markwayne Mullin, the Secretary of Homeland Security, alerted California’s Secretary of State, Shirley Weber, of the federal government’s concerns about noncitizen voters. *See* Compl. Ex. A. But Weber responded one week later, stating that she had “serious doubts about the reliability of [the] data and accuracy of [the] claims,” and that Secretary Mullin’s letter provided “no detail[s] whatsoever that [her] office [could] use to evaluate the veracity of [the] allegations.” Compl. Ex. B at 1. Noting that the NVRA’s “quiet period” would commence on August 5, Weber requested additional information before that date. *Id.* at 1–2. She apparently received no response for nearly three full months, until the Department sent a brief letter that did not address the specific questions she raised but instead provided a “thumb drive with a list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot.” Compl. Ex. C at 1.

Thus, the Department’s own submissions demonstrate that the federal government waited until the last possible minute to file a suit that would significantly disrupt California’s administration of the upcoming federal election. Under *Purcell*—as well as the “unclean hands” doctrine that governs equitable

relief in federal courts, *see Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 819 (1945)—the Department's untimely and highly disruptive request to enjoin the tabulation of over 20,000 ballots on the eve of an election should be rejected.

### B. The Injunctive Relief the Department Seeks Is Inconsistent With Congress's Judgment About What Actions Promote, or Undermine, Public Confidence in Elections.

Finally, the Department claims that the injunctive relief it seeks is necessary to promote "public faith in federal elections." Compl. ¶ 10; *see also United States v. California*, 2026 WL 3212945, at *25 (Bumatay, J., dissenting) ("By making illegal voting easier, California threatens the election's legitimacy."). But Congress's various enactments demonstrate that it has long had a different—and more sophisticated—understanding of the kinds of actions that threaten public confidence in our elections. Specifically, it has recognized that interference in congressional elections by the federal government undermines the public's faith in election outcomes, unless that interference is bipartisan in nature.

This understanding is reflected in several of HAVA's requirements. HAVA created a new independent agency, the Election Assistance Commission ("EAC"), 52 U.S.C. § 20921, which, among other things, is tasked with providing "voluntary guidance" to "assist States" in complying with HAVA's requirements. *Id.* § 21101(a). Even though its guidance is voluntary, the EAC must be bipartisan in composition, *id.* § 20923(b)(2), (3)(A), and "[a]ny action" it takes must have "the approval of at least three of its members," *id.* § 20928. Similarly, during Reconstruction, when state resistance to the voting rights of newly freed slaves was principally driven by the Democratic Party in the South,[12] the Second Enforcement

---

[12] *See A Brief History of Civil Rights in the United States: Reconstruction and Jim Crow Eras*, Howard University School of Law,

Act of 1871 authorized the appointment of two election district supervisors, who had to be "of different political parties." 16 Stat. at 434. Thus, Congress has consistently recognized that *partisan* federal intervention in the administration of federal elections can itself undermine public confidence in elections.

The Departments of Justice and Homeland Security are always under the control of a President from one party. Particularly in the absence of any express statutory authorization, efforts by these agencies to influence how States administer elections raise the very kind of threat to public confidence in federal elections that Congress has repeatedly sought to avoid. This fact further underscores why the last-minute injunctive relief the Department requests should be denied.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

RESPECTFULLY SUBMITTED this 3rd day of November, 2026.

OSBORN MALEDON, P.A.

By /s/ Andrew G. Pappas
Andrew G. Pappas
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012

*Attorney for Amicus Curiae Bipartisan American Election Project*

---

https://library.law.howard.edu/civilrightshistory/blackrights/jimcrow (last updated Oct. 28, 2026).

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Bipartisan American Election Project's Amicus Curiae Brief in Support of Defendants' Motions to Dismiss, certifies that this brief contains 6,915 words, which:

_x_ complies with the word limit of L.R. 11-6.1.

_x_ complies with the page limit for motions set by Section 4 of this Court's Standing Order (Doc. 70).

RESPECTFULLY SUBMITTED this 3rd day of November, 2026.

OSBORN MALEDON, P.A.

/s/ Andrew G. Pappas

Andrew G. Pappas
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012

*Attorney for Amicus Curiae Bipartisan American Election Project*