**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellant*,

v.

STATE OF CALIFORNIA; SHIRLEY WEBER, PH.D., in her official capacity as the California Secretary of State; DEAN LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

*Defendants – Appellees*,

SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK; MI FAMILIA EN ACCION; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CALIFORNIA-HAWAII STATE CONFERENCE OF THE

No. 26-7231

D.C. No. 2:26-cv-12025-DOC-ADSCentral District of California, Los Angeles

**ORDER**

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

*Intervenors – Appellees.*

Filed October 30, 2026

Before: Mark J. Bennett, Patrick J. Bumatay, and Gabriel P. Sanchez, Circuit Judges

Order;
Dissent by Judge Bumatay

**SUMMARY***

**Injunction Pending Appeal / Elections**

The panel denied the United States's emergency motion for an injunction pending appeal in its action against the State of California and the County of Los Angeles (collectively, "Defendants") alleging that the Supremacy Clause prohibits Defendants from knowingly sending vote-by-mail ballots to individuals the federal government has identified as "likely" noncitizens and counting those ballots in violation of 18 U.S.C. § 611.

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

In a prior appeal, the United States asked the court for emergency relief in the form of a mandatory injunction ordering Defendants (1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot. The panel held that it lacked jurisdiction, granted the County's motion to dismiss the appeal, and denied as moot the United States's emergency motion for relief.

The district court then held a hearing on the United States's application for a temporary restraining order ("TRO") on October 27, 2026. The next day, the district court issued an order denying the TRO. The United States immediately appealed and filed an emergency motion for an injunction pending appeal, asking the court to order California to sequester the relevant ballots and establish a process to verify the citizenship status of those voters before counting them.

The panel first held that it had jurisdiction over this appeal. The district court conducted a two-hour "adversary hearing" at which it heard arguments from all parties on the merits of the United States's requested TRO. Both the United States and Defendants were afforded notice and an opportunity to respond, and both were able to submit briefing and additional evidence" to the district court. Additionally, the district court's order denying the United States's motion for a TRO effectively foreclosed the United States from pursuing further interlocutory relief. Because the transcript of the hearing and the court's written order denying the application for a TRO make it clear that the order was tantamount to a denial of a preliminary

injunction, the panel held it had appellate jurisdiction and could proceed to the merits.

The panel next held that the United States fails to meet the requirements for a mandatory preliminary injunction. First, the United States has not made the required showing that such extraordinary relief, during an ongoing election, is clearly required by law. Nothing in 18 U.S.C. § 611, a statute that criminalizes voting by a noncitizen, preempts California's statutory scheme that has been duly enacted under the Elections Clause. Furthermore, the potential violation of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2), provides an independent reason to conclude that the United States has not shown a clear likelihood of success. Second, the United States fails to demonstrate that it will likely, let alone clearly, suffer irreparable harm. Because the United States's preemption argument is likely unavailing, it follows that any resulting harm is also unlikely. Third, the balance of hardships and the public interest weigh in Defendants' favor where there is a material risk that granting the United States its requested relief would result in disenfranchisement and could jeopardize the County's entire election. Finally, the panel wrote that the principle in *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006), that the court must not alter the election rules on the eve of an election, counsels that the panel should not intervene at this late hour.

Accordingly, the panel held the district court did not abuse its discretion in denying the United States's application for a temporary restraining order, and denied the United States's emergency motion for injunctive relief.

Dissenting, Judge Bumatay wrote, as he also wrote in his first dissent, that the federal government satisfies the

requirements for injunctive relief where (1) the federal government has shown a likelihood of success on the merits because California's actions encourage and induce the violation of federal law; (2) the federal government has shown irreparable harm—failing to act now means that suspected noncitizens will vote in the upcoming election and potentially dilute the vote of everyday citizens; and (3) the balance of interests supports relief because the due and fair election of congressional representatives is of vital importance to the United States.

Judge Bumatay added three points to his initial dissent. First, because the Elections Clause authorized Congress to enact § 611(a), the panel should have been more willing to order injunctive relief over the administration of California's ballot counting. Second, criminal statutes—like § 611(a)—often preempt contrary state laws and actions. And third, given that California's actions would likely frustrate federal law, the panel should have invoked its longstanding and commonly used equitable authority to safeguard voting rights in the State. Because the Elections Clause vests Congress with power to protect the integrity of federal elections, Judge Bumatay would hold that California's actions are preempted under § 611(a) and enjoin California from commingling its ballots further.

## COUNSEL

Matthew Donnelly, Attorney; Julie A. Hamill and J. Robert Renner, Assistant United States Attorney; Bilal A. Essayli, First Assistant United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; Andrew M. Darlington, Counsel to the Assistant Attorney General; John K. Adams, Associate Deputy Attorney General; R. Trent McCotter, Acting Deputy Attorney General; Todd Blanche, Attorney General; United States Department of Justice, Washington, D.C.; for Plaintiffs-Appellants.

Tyler Bishop, Elias Law Group LLP, Seattle, Washington; Branden D. Lewiston, Julianna D. Astarita, Robert Golan-Vilella, and Uzoma N. Nkwonta, Elias Law Group LLP, Washington, D.C.; Norman L. Eisen and Pooja Chaudhuri, Democracy Defenders Fund, Washington, D.C.; Anna M. Baldwin, Aseem Mulji, David Kronig, Danielle M. Lang, Daniel S. Lenz, and Sejal Jhaveri, Campaign Legal Center, Washington, D.C.; Olivia N. Sedwick and Kristen M. Clarke, National Association for the Advancement of Colored People, Baltimore, Maryland; Stacey Leyton, Jonah J. Lalas, and Danielle Leonard, Altshuler Berzon LLP, San Francisco, California; for Intervenors-Appellees.

Mariah E. Mastrodimos, Associate Deputy Solicitor General; Anne P. Bellows, Michael S. Cohen, Lisa C. Ehrlich, Andrew E. Kushner, and Christina M. McCall, Deputy Attorneys General; Seth E. Goldstein, Supervising Deputy Attorney General; Samuel P. Siegel, Supervising Deputy Solicitor General; Helen H. Hong, Principal Deputy Solicitor General; Samuel T. Harbourt, Solicitor General; Rob Bonta, California Attorney General; Office of the California Attorney General Los Angeles, California; Joshua

Karsh, Kyra E. Sikora, Toby R. Merrill, Christine E. Bass, and Sharanya Mohan, Public Rights Project, Oakland, California; Adam Baumgarten and Eva Chu, Senior Deputy County Counsel; Peter Bollinger, Assistant County Counsel; Dawyn R. Harrison, County Counsel; Los Angeles County, Los Angeles, California; Alex Scandroli, Christopher K. Pelham, and Abigail G. Urquhart, Norton Rose Fulbright US LLP, Los Angeles, California; Michael J. Mongan and John He, Wilmer Cutler Pickering Hale and Dorr LLP, San Francisco, California; Seth P. Waxman and Daniel S. Volchok, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Nicholas R. Werle, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; M. Patrick Moore Jr., Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; for Defendants-Appellees.

Justin G. Reden, Reden & Riddell, San Diego, California, for Amicus Curiae America First Policy Institute.

Carey R. Dunne, Mónica Folch, Stephen Cha-Kim, Zack Goldberg, and Martha Reiser, Free & Fair Litigation Group, New York, New York; Andrew J. Rising, Carlos Guevara, and Candice Cho, Governors Safeguarding Democracy, Washington, D.C.; Julia Spiegel, Emily Kirby, Charanya Krishnaswami, and Megan Flynn, Governors Action Alliance, Washington, D.C.; for Amici Curiae Bipartisan Former Governors.

Ariel T. Ashtamker, Assistant Attorney General; Jona J. Maukonen, Senior Assistant Attorney General; Paul L. Smith, Solicitor General; Dan Rayfield, Oregon Attorney General; Office of the Oregon Attorney General, Salem, Oregon; Anagha Sundararajan, Assistant Solicitor General; Judith N. Vale, Deputy Attorney General; Barbara D. Underwood, Solicitor General; Letitia James, New York

Attorney General; Office of the New York Attorney General, New York, New York; Kathleen Jennings, Delaware Attorney General; Office of the Delaware Attorney General, Wilmington, Delaware; Kristin K. Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Anne E. Lopez, Hawai'i Attorney General, Office of the Hawai'i Attorney General, Honolulu, Hawai'i; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Raúl Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Jay Jones, Virginia Attorney General, Office of Virginia Attorney General, Richmond, Virginia; Nicholas W. Brown,

Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; Jennifer Davenport, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; for Amici Curiae Oregon, New York, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Hawai‘i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Vermont, Virginia, and Washington.

Brian A. Sutherland, Complex Appellate Litigation Group LLP, San Francisco, California; Christine Berger and Maura E. O'Connor, Brennan Center for Justice, New York University School of Law, Washington, D.C.; Wendy R. Weiser, Sean Morales-Doyle, and Andrew B. Garber, New York University School of Law, New York, New York; for Amici Curiae Former Attorneys for the Department of Justice.

## ORDER

PER CURIAM:

The United States sued the State of California and the County of Los Angeles (the "County")[1] (collectively, "Defendants"), alleging that the Supremacy Clause prohibits Defendants from knowingly sending vote-by-mail ballots to individuals the federal government has identified as "likely" noncitizens and counting those ballots in violation of 18 U.S.C. § 611. The district court denied the United States's application for a temporary restraining order ("TRO"), and the United States appeals. Presently before us is the United States's emergency motion for an injunction pending appeal.[2] We deny the United States's motion because the United States has failed to meet its burden in showing that an injunction pending appeal is warranted.

### I.

Over the summer months of 2026, the U.S. Citizenship and Immigration Services and the Department of Homeland Security Investigations obtained California's voter roll and curated a list of "high-confidence" noncitizens who they believed were registered to vote in California. On October 12, 2026, the United States provided the list ("October List") to Defendants and asked them to sequester the ballots of every name on the list so that the voters' citizenships could be verified before the votes were separated from their

[1] The United States sued Shirley N. Weber, in her official capacity as the California Secretary of State, and Dean C. Logan, in his official capacity as the County of Los Angeles – Registrar-Recorder/County Clerk.

[2] The United States has asked us to expedite ruling and to rule by October 30, 2026. We do so.

envelopes and counted in the November 3, 2026, election. Defendants refused, expressing doubt about the veracity and reliability of the list. The United States sued Defendants on October 15, 2026, approximately two weeks before the 2026 midterm election, alleging that the Supremacy Clause prohibits Defendants from knowingly sending vote-by-mail ballots to likely noncitizens and counting those ballots. The United States claimed that these acts would violate 18 U.S.C. § 611. The United States moved for a TRO and appealed when the district court failed to rule on the TRO by a deadline the United States set for the court to rule.

On appeal, the United States asked us for emergency relief in the form of a mandatory injunction ordering Defendants to "(1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot." *United States v. California*, No. 26-7070, 2026 WL 3212945, at *1 (9th Cir. Oct. 26, 2026) ("*California I*") (per curiam). We held that we lacked jurisdiction over the appeal, granted the County's motion to dismiss the appeal, and denied as moot the United States's emergency motion for relief. *Id.*

The district court then held a hearing on the TRO application on October 27, 2026. The next day, the district court issued an order denying the TRO. The United States immediately appealed and filed the instant emergency motion for an injunction pending appeal on October 29, 2026. The emergency motion seeks substantially the same relief, asking us to order California to sequester the relevant ballots and establish a process to verify the citizenship status of those voters before counting them.

## II.

At the outset, and given the emergency posture of this case, we assume without deciding that the United States possesses both standing and a cause of action to sue Defendants. Under 28 U.S.C. § 1292(a)(1), we have appellate jurisdiction over appeals from interlocutory orders denying injunctive relief. "Ordinarily, we lack jurisdiction over the appeal of a TRO." *Newsom v. Trump*, 141 F.4th 1032, 1043 (9th Cir. 2025) (per curiam). But a "denial of a TRO may be appealed if the circumstances render the denial tantamount to the denial of a preliminary injunction." *Babaria v. Blinken*, 87 F.4th 963, 976 (9th Cir. 2023) (citation modified) (quoting *Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989)). To decide that question, we have primarily considered two factors: (1) whether there was a "full adversary hearing" in the district court; and (2) whether "in the absence of review, the appellants would be effectively foreclosed from pursuing further interlocutory relief." *Scott*, 869 F.2d at 1308 (quoting *Env't Def. Fund, Inc. v. Andrus*, 625 F.2d 861, 862 (9th Cir. 1980)). We have also considered whether "'the denial of the TRO effectively decided the merits of the case' and rendered plaintiff['s] claims moot." *Blinken*, 87 F.4th at 976 (quoting *Graham v. Teledyne-Cont'l Motors*, 805 F.2d 1386, 1388 (9th Cir. 1986)).

We have jurisdiction over this appeal. First, the district court conducted a two-hour "adversary hearing" at which it heard arguments from all parties on the merits of the United States's requested TRO. *See Andrus*, 625 F.2d at 862. Both the United States and Defendants were afforded "notice [and] an opportunity to respond," and both were able to submit briefing and "additional evidence" to the district court. *Blinken*, 87 F.4th at 976; *see also Washington v.*

*Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017) (per curiam) (finding appellate jurisdiction where both parties "vigorously contested the legal basis for the TRO in written briefs and oral arguments before the district court"); *Newsom*, 141 F.4th at 1043–44 (noting a TRO that was "strongly challenged" in the district court is more likely to be "best construed as an appealable preliminary injunction" (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018)).

In addition, the district court's order denying the United States's motion for a TRO "effectively foreclosed" the United States "from pursuing further interlocutory relief." *Scott*, 869 F.2d at 1308 (quoting *Andrus*, 625 F.2d at 862). In the United States's Complaint, it asked the district court to enjoin California from tabulating ballots from voters it had classified as "likely noncitizens in the upcoming federal election." Compl. at 3, No. 26-cv-12025 (C.D. Cal. Oct. 15, 2026), ECF No. 1.[3] But at the adversarial hearing, the district court stated that it did not have the "appropriate time" to develop a full record on the relevant "systems" and "algorithms" surrounding the veracity of the United States's list of "likely" noncitizens. TRO Hearing Transcript at 93, ECF No. 150. It thus appointed a special master to review the United States's voter roll data and suggested convening another hearing in two weeks—well after Election Day on November 3, 2026—to further develop a record on the issue. *Id.* at 93–94. And it noted that the purpose of the future hearing would be to determine the veracity of the October List, in the event the United States adds additional individuals to the list and wishes to bring "indictment[s] against them." *Id.* at 90. In doing so, the district court in

[3] All ECF cites refer to the entries in Case No. 26-cv-12025.

large part rendered the United States's claim—which is ostensibly based on sequestering ballots in the instant election rather than prosecuting noncitizens afterward—"moot," or at least moot in substantial part because the election is days away. *See Blinken*, 87 F.4th at 976.

The "transcript of the hearing and the court's written order denying the application [for a TRO] make it unmistakably clear that the order was tantamount to a denial of a preliminary injunction." *Scott*, 869 F.2d at 1308. Thus, we have appellate jurisdiction and may proceed to the merits. *See Newsom*, 141 F.4th at 1044.

**III.**

"The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). The United States "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As to the first factor, which is the most important, *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020), the question is usually whether the movant is likely to succeed in arguing on appeal that the district court abused its discretion in denying the preliminary injunction, *see Brown ex rel. K.M.K. v. Wash. Interscholastic Activities Ass'n*, No. 26-5488, 2026 WL 2891827, at *2 (9th Cir. Sept. 25, 2026). "A district court abuses its discretion if it bases its decision on an erroneous legal standard or on clearly erroneous factual findings." *Id.* (quoting *Baird v. Bonta*, 81 F.4th 1036,

1040 (9th Cir. 2023)). And here, the United States's burden is "doubly demanding," because it seeks a mandatory injunction requiring Defendants to segregate ballots that they would not otherwise segregate and to affirmatively verify certain voters' citizenship status before tabulating their vote-by-mail ballot. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The United States therefore "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Id.*

**IV.**

**A.**

We begin with the United States's likelihood of success on the merits—"the most important" of the *Winter* factors—and whether the "law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia*, 786 F.3d at 740. The United States once again requests that we order Defendants to segregate the ballots of alleged noncitizens because, it claims, 18 U.S.C. § 611 preempts California's constitutionally permitted statutory scheme adopted by the California legislature. But the United States has not made the required showing that such extraordinary relief, during an ongoing election, is clearly required by law.

Because this dispute focuses on California's *procedures* for administering its elections, the Elections Clause of the U.S. Constitution is directly implicated. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9 (2013) ("*ITCA*"). The Elections Clause reads:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at

> any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. This clause expressly dictates which sovereign has the authority to prescribe the manner by which congressional elections are conducted. Thus, the question remains whether California's *procedures* for enforcing election requirements, such as the State's statutory scheme for citizenship-based ballot challenges, have been preempted by Congress.

"[T]he [Elections] Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *ITCA*, 570 U.S. at 9 (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)). This "broad authority," *Smiley v. Holm*, 285 U.S. 355, 367 (1932), conferred on states includes the authority over "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, [and] duties of inspectors . . . in short, to enact the numerous requirements as to procedure and safeguards which . . . are necessary in order to enforce the fundamental right involved," *id.* at 366.

Congress, of course, "may supplement these state regulations or may substitute its own" because "[i]t has a general supervisory power over the whole subject." *Id.* at 366–67 (citation modified); *ITCA*, 570 U.S. at 14 (noting "[t]he assumption that Congress is reluctant to pre-empt does not hold when Congress acts under" the Elections Clause). But Congress's exercise of its Elections Clause preemption power only goes "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371,

392 (1880), *abrogated on other grounds by Glasgow v. Moyer*, 225 U.S. 420 (1912)). Indeed, when Congress "exercise[s] th[is] power, . . . we are bound to presume that Congress has done so in a judicious manner [and] that it has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations." *Siebold*, 100 U.S. at 393.

Nothing in § 611, a statute that criminalizes voting by a noncitizen, preempts California's comprehensive statutory scheme that has been duly enacted under the Elections Clause. Section 611 provides that:

> (a) It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless–
>
> > (1) the election is held partly for some other purpose;
> >
> > (2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and
> >
> > (3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote

> for a candidate for any one or more of such Federal offices.
>
> (b) Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.

18 U.S.C. § 611(a)–(b). Noticeably absent from the statute is an express preemption provision or any language setting forth regulations for how a state deals with citizenship challenges to vote-by-mail ballots. Nor is there any provision authorizing the Department of Justice to take charge of or intervene in a state's administration of an ongoing election.[4]

Exercising the power endowed to it by the Constitution, California comprehensively administers its elections, including by regulating voter eligibility. California law, like federal law, plainly prohibits voting by noncitizens. *Compare* 18 U.S.C. § 611, *with* Cal. Const. art. II, § 2(a) ("A United States citizen 18 years of age and resident in this State may vote."). To that end, California has established a comprehensive statutory scheme to ensure the integrity of its elections, including by requiring voter applicants to attest to citizenship under penalty of perjury, requiring election officials to match signatures on vote-by-mail ballots to voter registration records, and establishing processes for challenging ballots and canceling registration upon sufficient showing of voter ineligibility. *See California I*,

---

[4] We do not hold that § 611 could never preempt any state actions or law under the Elections Clause, as that broad question is not before us. Instead, we hold only that—in this case and under these particular facts—the United States's attempted use of § 611's preemptive force to obtain the relief it seeks does not align with § 611's text or what § 611 either permits or forbids.

2026 WL 3212945, at *11–12, 19 (Bennett, J., concurring) (detailing California's statutory scheme on citizenship challenges to a voter and vote-by-mail ballots).

If Congress intends to preempt, "state law is preempted by the federal election-day statutes only so far as the conflict extends." *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026) (internal quotations omitted); *see also Siebold*, 100 U.S. at 392–93 (noting Congress's power to regulate elections "supersede[s]" inconsistent state law "so far as it is exercised, and no farther" and presuming "that Congress . . . has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations"). But it is unclear (at best) whether Congress intended § 611 to have any preemptive effect, much less a preemptive effect that forces states to set aside their own state election laws and procedures (which, in California's case, are both detailed and comprehensive) and segregate vote-by-mail ballots in a manner inconsistent with those laws and procedures based on the Department of Justice's unsubstantiated allegations that noncitizens may be voting. Nothing on the face of § 611 prescribes a process California must follow when handling challenged ballots or preempts Defendants' actions of mailing, counting, and resolving ballot challenges in accordance with California's duly enacted procedures. *See* 18 U.S.C. § 611(a)–(b).

Because Congress has not exercised the specific power granted to it under the Elections Clause to override California's established laws for challenging ballots or removing ineligible voters, the State Legislature's statutory scheme remains the only method to do so. California, and all states, "are given, and in fact, exercise a wide discretion in the formulation of a system for the choice by the people of representatives in Congress," *see United States v. Classic*,

313 U.S. 299, 311 (1941), by prescribing a detailed statutory and regulatory scheme, *see Moore v. Harper*, 600 U.S. 1, 29 (2023) ("[State l]egislatures must 'provide a complete code for congressional elections,' including regulations 'relati[ng] to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" (second alteration in original) (quoting *Smiley*, 285 U.S. at 366)). Allowing the United States to misuse § 611 to prescribe how Defendants must process ballots would "override the plain and manifest dictates of the Constitution itself." *See Siebold*, 100 U.S. at 392.[5]

We decline the United States's invitation to contravene the Elections Clause by undermining the Constitution's plain text. *See Smiley*, 285 U.S. at 365–66 (recognizing the

[5] The United States asserts that it is "absur[d] to say that an officer who receives or has custody of the ballots given for a representative owes no duty to the national government which Congress can enforce." *Siebold*, 100 U.S. at 388. But *Siebold* dealt with whether Congress had the power to regulate election integrity by punishing state election officials who commit fraud, not a misdemeanor statute that forbids noncitizens voting in federal elections. *See id.* at 372, 387–88. As explained by the Supreme Court, "[the government of the United States] is directly interested in the faithful performance, by the officers of election, of their respective duties. Those duties are owed as well to the United States as to the State. . . . A violation of duty is an offence against the United States, for which the offender is justly amenable to that government." *Id.* at 388. Because election officials owe a duty to both sovereigns, the Court concluded that it would be "almost absur[d] to say that an officer who receives or has custody of the ballots . . . owes no duty to the national government which Congress can enforce; or that an officer who stuffs the ballot-box cannot be made amenable to the United States." *Id.* This case is not about state election officials convicted of fraud, nor are there allegations that California's election officials were stuffing ballot boxes.

responsibilities given to states under the Elections Clause); *cf. Dooley v. United States*, 183 U.S. 151, 173 (1901) ("The plain language of the Constitution should not be made 'blank paper by construction,' and its specific mandate ought to be obeyed."). If the United States believes different procedures are necessary for vote-by-mail ballots, we believe it should take that suggestion to Congress, not the courts. *See Watson*, 609 U.S. at 695 ("As we have said time and again . . . policy arguments are properly directed to legislatures, not courts."). Therefore, we hold the law does not "*clearly favor*" the United States's preemption argument. *See Garcia*, 786 F.3d at 740.

Further, the potential violation of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(c)(2), provides an independent reason to conclude that the United States has not shown a clear likelihood of success. The NVRA requires states to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). The United States argues that the NVRA, which governs voter registration, does not govern the requested ballot segregation. But this focus potentially fails to grasp the broader mechanics of California's election code. The United States effectively seeks to cancel (or potentially cancel) "batches of registered voters based on a set procedure [which] is systematic as opposed to individualized." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 716 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026). Assuming that the October List provides or generates sufficient proof of voter ineligibility, under California law, when the "county

elections official" receives "proof that [a registered voter] is otherwise ineligible to vote," the official "*shall* cancel the registration." Cal. Elec. Code § 2201(a)(8) (emphasis added). So the consequence of the United States's request is not merely ballot segregation, but ultimately both the cancellation of the ballot *and* the removal of voters from the voting rolls.

To be sure, as we have recognized, "the plain language of the 90-day Provision lets states continue any non-systematic cancellation of registrations within the 90-day window." *Mi Familia Vota*, 129 F.4th at 716. Indeed, Congress permitted such individualized cancellations but prohibited systematic ones "because such programs can cause inaccurate removal and '[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote.'" *Id.* (alteration in original) (citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014)).

Such "rigorous individualized inquiry[] lead[s] to a smaller chance for mistakes." *Id.* But the United States seeks to challenge an entire batch of 20,000 ballots. In the district court's view, "Plaintiff's protocol raises significant concerns." For example, the district court determined that the United States "provided 'no error rates' or 'validation against a reliable benchmark' that would enable a determination of the accuracy of its findings." The district court also found that the United States did not provide any information on how the data enhancement was conducted—"It remains unknown how Lexis Nexis performed its analysis, such as how it 'linked names to Social Security numbers not available on the California public voter file.'" The suspect reliability of these lists found by the district court reflects the concern Congress sought to mitigate with

the 90-day quiet period. This adds to our reasons for finding that overall, the district court did not abuse its discretion in refusing to grant the United States's proposed injunction, as the United States did not clearly show the NVRA permits its desired relief.

**B.**

The United States also fails to demonstrate that it will likely, let alone clearly, suffer irreparable harm. *See Garcia*, 786 F.3d at 740. Because the United States's preemption argument is likely unavailing, it follows that any resulting harm is also unlikely. *Cf. Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986) ("Absent a First Amendment claim, the appellants have failed to establish that irreparable harm will flow from a failure to preliminarily enjoin defendants' actions."). The district court also found that the United States's process in creating the October List was not credible, and thus the United States's assertion that individuals on the October List are "highly likely to be noncitizens" is also not credible.[6] That finding, along with California's established procedures for ensuring voter eligibility, substantially weaken the United States's claim that it is likely to suffer irreparable harm from ballots being cast by noncitizens.

The balance of hardships and the public interest also do not weigh in the United States's favor. Major concerns remain that granting the United States's requested relief might result in immense hardship to Defendants and harm the public interest by risking the disenfranchisement of

[6] The United States challenges the district court's findings. But it fails to show any clear error given the conflicting evidence in the record. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

eligible voters and putting the entire tabulation process in jeopardy. The district court found that the United States's "request for election officials to identify and segregate ballots belonging to individuals on the October List would force Defendants to create wholly new procedures while the election is already underway." Crediting the declaration of the County's Assistant Registrar of the Information Technology Bureau, the district court stated that the scale of the required technological changes to California's voter system "cannot be completed safely and uniformly before Election Day," and could result in a failure of the County's central election management system, "jeopardizing the Secretary's ability to meet the election certification deadline of December 11." As a result, the district court found that "granting [the United States]'s request would provoke catastrophic change, upending the administration of the election. This would likely cause 'voter confusion and consequent incentive to remain away from the polls' as individuals would wonder whether their ballots were likely to be withheld." (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)).[7]

To be sure, there are countervailing public interests at stake. There is a public interest in maintaining the integrity of elections. But as discussed, the district court found that the risks that noncitizens are voting are, at best, uncertain,

[7] There were conflicting declarations on the potential burden that would result from granting the United States's requested relief. But the district court reasonably credited the declaration of the County's Assistant Registrar of the Information Technology Bureau, who is presumably informed about the inner workings of the County's electronic voter system, over the declaration from an elected Registrar from a different county. The district court certainly did not abuse its discretion in this regard.

and also tempered by California's established voter-eligibility procedures. In contrast, there is a material risk that granting the United States its requested relief would result in disenfranchisement and could jeopardize the County's entire election. Thus, the balance of hardships and the public interest weigh in Defendants' favor.

Finally, *Purcell* counsels that we should not intervene at this late hour. The *Purcell* principle reflects the wisdom that we must not "alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). "The *Purcell* principle applies with even greater force" when, as here, an election is already underway. *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026) (per curiam); *see California I*, 2026 WL 3212945, at *18 (Sanchez, J., concurring) (explaining that "it is not only voter confusion that matters in the *Purcell* analysis but election administration and broader electoral disorder stemming from late federal court-ordered changes to election rules"). Just this year, the Supreme Court emphasized that "late-breaking, court-ordered rule changes," such as those the United States requests, "can 'result in voter confusion and consequent incentive to remain away from the polls,' and thus undermine the '[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy.'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 80 (2026) (quoting *Purcell*, 549 U.S. at 4–5)).

Defendants, pursuant to their constitutional authority, established rules and procedures to challenge a voter's ineligibility in the months directly preceding an election. And the United States's requested relief is simple only in the abstract. As the district court found—and we discern no

clear error—there is no feasible way to identify and segregate the ballots of specific individuals without potentially catastrophic effects on the entire system.[8]

The United States contends there is no *Purcell* problem, relying in part on *Republican Party of Pennsylvania v. Boockvar*, No. 20A84, 2020 WL 6536912, at *1 (Mem) (U.S. Nov. 6, 2020). The comparison is inapt. In *Boockvar*, Pennsylvania's Secretary of the Commonwealth had ordered county boards of elections to segregate ballots received by mail within three days of election night. *Id.* Justice Alito issued an interim order merely commanding electoral officials "to comply with the [Secretary's] . . . guidance." *Id.* The segregation process, therefore, followed existing state guidance and was markedly simpler than the injunction requested by the United States. As the district court found, "[b]ecause the county Registrar's current system 'ha[s] no function for setting aside the ballots of designated voters,' complying with [the United States's] request would require 'changes to systems and procedures that have already been tested and finalized for this election, the development and documentation of a new process, and the training of staff on it.'"

## V.

For these reasons, the district court did not abuse its discretion in denying the United States's application for a

---

[8] Indeed, the declaration of the County's Assistant Registrar of the Information Technology Bureau states: "[B]ased on my technical expertise, I have grave concerns about the potential catastrophic impact of implementing the DOJ's request to 'set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens' based on a list of approximately 20,000 individuals . . . ."

temporary restraining order, and so we **DENY** the United States's emergency motion for injunctive relief.

---

BUMATAY, Circuit Judge, dissenting:

"A sovereign without the means of enforcing civil rights, or compelling the performance, either civilly or criminally, of public duties on the part of the citizens, would be a most extraordinary anomaly." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1668 (1833).

In this case, the federal government believes that 20,000 noncitizens are registered to vote in California. Both state and federal law prohibit aliens from voting in our elections. Yet according to the federal government, those aliens received mail-in ballots for the upcoming election. If California receives these suspect ballots, mixes them with legitimate ballots, and then processes them, the potentially illegal votes will be counted toward the election of our representatives—threatening to dilute the vote of eligible citizens. The federal government proposes a modest remedy—stopping California from mixing the ballots of citizens and suspected noncitizens. This solution would not cancel any vote but would allow time to verify the eligibility of suspected noncitizens. The district court, and now our court, denies this reasonable request.

But the equitable remedy the federal government seeks has a long legal and historical pedigree. Throughout history, federal courts have acted to protect the voting and civil rights of our citizens by enjoining state action that violates the law. And common sense also tells us that the federal government shouldn't have to sit on its hands while a State allows the

violation of federal law, especially when the integrity of federal elections is at stake. As the Founders recognized, "an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it." The Federalist No. 59, at 362–63 (A. Hamilton) (C. Rossiter ed., 1961) (simplified). So legal tradition, history, and common sense all support granting this limited injunctive relief.

This is all the more true given California's lax system for verifying citizenship. During oral argument, Los Angeles County, California's most populous county, could give no evidence that it independently verifies the citizenship of its voters. Instead, it apparently relies only on applicants' attestation of their citizenship. Further, the County claimed that nearly 40% of a sample of suspected noncitizens from the federal government's list had been born in the United States. But when the federal government ran the same sample through its systems, it confirmed that none were born here. And the County doesn't rebut the federal government beyond the say-so of the potential voters themselves. Now California says it can do nothing to prevent illegal voting. That undermines the federal government's interest in promoting election integrity and preventing the dilution of lawful votes.

The district court's order denying injunctive relief hamstrings the federal government's efforts to ensure only citizens vote in our elections. First, it criticized the federal government's actions to protect election integrity *in other States*—even though those actions were not before the court. It then attempted to tie the federal government's hands. It said that all the government could do under 18 U.S.C. § 611(a) was prosecute those who voted illegally. But in the

next breath, it turned around and warned the federal government not to "threaten" criminal prosecutions under the law. Of course, the district court has no authority to order that. The federal government—not a judge—is tasked with preventing and prosecuting federal crimes. On the district court's view, § 611 could have no preemptive effect—rejecting obstacle preemption—and thus could not support any injunctive relief.

As I wrote in my first dissent, the federal government has satisfied the requirements for injunctive relief. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). First, the federal government has shown a likelihood of success on the merits because California's actions encourage and induce the violation of federal law. Second, the federal government has shown irreparable harm—failing to act now means that suspected noncitizens will vote in our upcoming election and potentially dilute the vote of everyday citizens. *Cf. Hall v. D.C. Bd. of Elections*, 141 F.4th 200, 206 (D.C. Cir. 2025) ("Logically and mathematically, . . . granting the franchise to noncitizens will expand the D.C. electorate and reduce the voting power of each U.S. citizen voter in local elections."). And third, the balance of interests supports relief: "The due and fair election of [congressional] representatives is of vital importance to the United States." *Ex parte Siebold*, 100 U.S. 371, 388 (1879). We should have granted relief on the federal government's initial emergency motion. More so now, when there is no question of our appellate jurisdiction. We should have ordered California to stop commingling suspected illegal ballots with legitimate ones to the extent feasible.

To my initial dissent, I add three points. First, because the Elections Clause authorized Congress to enact § 611(a), we should have been more willing to order injunctive relief

over the administration of California's ballot counting. Second, criminal statutes—like § 611(a)—often preempt contrary state laws and actions. And third, given that California's actions would likely frustrate federal law, we should have invoked our longstanding and commonly used equitable authority to safeguard voting rights in the State.

## I.

## Section 611(a) Is an Elections Clause Statute

Congress "may at any time . . . make or alter" state regulations dealing with the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. "What is the plain meaning of these words? . . . [W]e should not have any difficulty in understanding them." *Ex parte Siebold*, 100 U.S. at 383. In fact, the meaning is obvious: While States set the initial rules in federal elections, Congress gets the final word.

The Elections Clause empowers Congress to safeguard federal elections. Congress can exercise that authority "not only as to times and places, but [also] in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Thus, its power extends to innumerable "requirements as to procedure and safeguards" necessary to protect the integrity of federal elections. *Id.*

That power may also take the form of criminal sanctions. In 1870, Congress passed a criminal statute providing federal penalties for the violation of state election law. *See* Enforcement Act of 1870, ch. 114, 16 Stat. 140. Soon after, in *Ex parte Siebold*, five Maryland officials challenged the

constitutionality of the Act, which supplemented Maryland's criminal election laws. 100 U.S. at 374, 380. The officials violated state law in many ways, including by stuffing the ballot box and refusing to let federal officials observe vote counting. *Id.* at 378–79. The Supreme Court held that the Enforcement Act was a valid exercise of the Elections Clause. *Id.* at 383–84; *see also United States v. Classic*, 313 U.S. 299, 321–23 (1941) (recognizing that Congress may criminalize interference with the right to vote once a State has conferred the right). Even though the state officials violated state law, federal law could impose criminal liability for that same conduct.

The Enforcement Act also made it a felony to cast a ballot "without having a lawful right to vote" in federal elections. Enforcement Act of 1870, ch. 114, § 19, 16 Stat. 140, 144. While States decided which persons had the right to vote, Congress reinforced these preferences with criminal sanctions. *See Ex parte Siebold*, 100 U.S. at 388 ("[Congress] has only created additional sanctions for their performance, and provided means of supervision in order more effectually to secure such performance."). The fact that Congress's "Times, Places and Manner" authority supplemented state law made no difference because "no repugnance in the system of regulations can arise thence; for the power of Congress over the subject is paramount." *Id.* at 383–84; *see also Ex parte Coy*, 127 U.S. 731, 761 (1888) (Field, J., dissenting) (observing that "Congress had the power under the constitution to adopt the laws of the states respecting [congressional] election[s] . . . and that it could impose a punishment for a violation of such laws"). That follows from the plain meaning of the Clause—Congress can protect the "Manner" of federal elections in any way it sees fit.

In that vein, Congress passed § 611(a) against the backdrop of longstanding bans against alien voting. While suffrage is critically important, States regulate who may vote in elections. *Cf. Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 178 (1874). Some States conferred the right to vote on noncitizens in narrow situations. Take Wisconsin's original Constitution. It granted the right to vote to certain "citizens of the United States" and Native Americans, along with certain "persons of foreign birth who shall have declared their intention to become citizens conformably to the laws of the United States on the subject of naturalization." Wis. Const. art. III, § 1 (1848). Other States, however, made no distinction between aliens and citizens when they conferred the right to vote. *See, e.g.*, N.J. Const. art. IV (1776) ("[A]ll Inhabitants of this Colony of full age, who are worth Fifty Pounds proclamation money, clear estate in the same, and have resided within the county in which they claim a vote for twelve months immediately preceding the election, shall be entitled to vote . . . ." (simplified)).

By 1926, all States banned noncitizens from voting. Ron Hayduk, *Democracy for All* 19–20 tbl. 2.1 (2006). Public sentiment against noncitizen voting escalated as waves of immigrants landed on the Nation's shores. *Id.* at 18–26. In the biggest waves between 1880 and 1910, "12.5 million people streamed into the country." *Id.* at 26. State legislatures decided to end the practice of giving these noncitizens the vote. Arkansas became the last state to end this "political anomaly[,] . . . doubtless never to return." Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Pol. Sci. Rev. 114, 114 (1931).

So when Congress passed § 611(a) in 1996, alien voting was long gone. Congress did not displace what States had already universally set forth—it only reinforced it. Any

debate over whether aliens should be permitted to vote had been resolved 70 years earlier. In other words, Congress did not swoop in and make the States' decisions for them. History shows that Congress worked in concert with the States to protect election integrity. In fact, California has *never* allowed aliens to vote. Hayduk, *supra*, at 19 tbl. 2.1. Section 611(a) disenfranchises no one. California defined its federal electorate. Congress enforced it.

Nor does the "unless" clause in § 611(a) change that it prescribes only the "Manner" of elections.[1] The best reading of the "unless" clause is that it recognizes that States may choose to allow noncitizens to vote in state elections. If that were the case, then the "unless" clause means that they could continue to do so without criminal sanction. So § 611(a) reinforces States' pre-existing, universal ban on alien voting in federal elections by criminalizing that same behavior everywhere in the nation.

To be sure, Congress can pass laws under more than one power. *See, e.g.*, *United States v. Marigold*, 50 U.S. (9 How.) 560, 566–68 (1850) (upholding a criminal statute under the Foreign Commerce Clause and Coinage Clause); *Woods v.*

---

[1] Section 611(a) applies "unless":

> (1) the election is held partly for some other purpose;
> (2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and
> (3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

18 U.S.C. § 611(a).

*Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."). History, however, confirms that § 611(a) is at minimum an exercise of Congress's Elections Clause authority. So it doesn't matter that Congress passed § 611(a) as part of an immigration bill, an area over which it also has "plenary authority." *See INS v. Chadha*, 462 U.S. 919, 940 (1983).

Because § 611(a) is an Elections Clause provision, the usual concerns we have over interference with state machinery are diminished. The Constitution has already decided that Congress can "make or alter" state election procedures. Anything California must do to stop its preempted actions is thus a natural consequence of the constitutional order.

## II.

## Section 611(a) Preempts California's Actions

Nor should it surprise anyone that § 611(a), a criminal law, preempts California's ballot mixing. Simply, "federal criminal prohibitions preempt conflicting state law." *Absolute Healthcare v. NLRB*, 103 F.4th 61, 72 (D.C. Cir. 2024) (Walker, J., concurring) (citing U.S. Const. art. VI, cl. 2). That's true whether they impose felony or—as here—misdemeanor punishment. And it's true whether they preempt state criminal statutes or civil laws, rules, actions, and policies, like California's ballot commingling. *See United States v. California*, --- F.4th ----, 2026 WL 3212945, at *27–28 (9th Cir. Oct. 26, 2026) (Bumatay, J., dissenting).

In fact, federal misdemeanor laws like § 611(a) *routinely* preempt state civil laws—including through obstacle

preemption. Take the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359. IRCA "makes it illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers." *Arizona v. United States*, 567 U.S. 387, 404 (2012). The law is "enforced through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions." *Id.* These criminal penalties top out at misdemeanor punishment: a fine of $3000 per illegal alien wrongfully employed, six months in prison, or both. *See* 8 U.S.C. § 1324a(f)(1).

Lawsuits often argue that IRCA preempts state civil law. Here's how it works. IRCA has an express preemption provision for "any State or local law imposing civil or criminal sanctions" on employers. *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (simplified). That's helpful for employers who'd like to get out from under state laws and regulations. But there's a snag: IRCA has a "saving clause" that preserves state "licensing and similar laws" from *express* preemption. *Id.* (simplified). That saving clause stymies some preemption claims. *See, e.g.*, *id.* at 591–600 (holding that Arizona's employment law was a licensing law, and so was *not* expressly preempted).

But when express preemption doesn't work, employers have brought *implied* preemption claims—including under obstacle preemption, just like in our case. And they've succeeded. *See, e.g.*, *Club Madonna, Inc. v. City of Miami Beach*, 42 F.4th 1231, 1252–57 (11th Cir. 2022) (obstacle-preempting a licensing ordinance); *Lozano v. City of Hazleton*, 724 F.3d 297, 313, 321 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 1491 (2014) (obstacle-preempting housing and employment ordinances); *Chamber of Com. of*

*the U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010) (obstacle-preempting state employment law).

What's more, the federal government uses IRCA to bring implied preemption challenges too. *See United States v. California*, 921 F.3d at 882, 885–88 (finding no obstacle preemption on the merits for two challenged state immigration statutes and declining to find obstacle preemption on the third because of commandeering concerns—concerns that don't apply to Elections Clause statutes, like § 611(a)).

Need another example of criminal laws preempting state civil law? Look at federal criminal forfeiture statutes. Forfeiture under these laws is "a criminal sanction," *Libretti v. United States*, 516 U.S. 29, 40 (1995) (simplified), and "a form of monetary punishment subject to the Eight Amendment's Excessive Fines Clause," *United States v. Bajakajian*, 84 F.3d 334, 336 (9th Cir. 1996), *aff'd*, 524 U.S. 321 (1998). Even so, circuit courts have repeatedly said criminal forfeiture laws preempt "various provisions of state [civil] law." *United States v. Stevenson*, 834 F.3d 80, 87 (2d Cir. 2016) (preempting New York pension law); *see also United States v. Fleet*, 498 F.3d 1225, 1232 (11th Cir. 2007) (preempting "Florida's homestead exemption and tenancy by the entireties laws"); *United States v. Bollin*, 264 F.3d 391, 422–24 (4th Cir. 2001) (preempting Georgia pension statute), *overruled on other grounds by United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017); *United States v. Curtis*, 965 F.2d 610, 616 (8th Cir. 1992) (preempting Iowa's homestead exemption law).

The throughline of this background—courts commonly recognize that federal criminal laws preempt state laws or actions. So we shouldn't be surprised that a federal

misdemeanor statute like § 611(a) can preempt California's action to commingle illegal ballots. "[T]he power to define [federal] criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress." *Whalen v. United States*, 445 U.S. 684, 689 (1980). And once Congress defines and prescribes them, they—just like other federal laws—are supreme over state law.

## III.

## We Should Have Granted an Injunction to Protect Voters

Once we understand that federal law preempts state action, the remedy typically involves enjoining that state action. And as a matter of history, federal intervention in the state administration of elections is commonplace. So ordering California to stop commingling illegal ballots is a straightforward application of our equitable powers.

To begin, federal courts have regularly enjoined the implementation of state action or policy preempted by federal law. *See, e.g.*, *United States v. Alaska*, No. 22-cv-00054, 2024 WL 1348632, at *12 (D. Alaska Mar. 29, 2024), *aff'd*, 151 F.4th 1124 (9th Cir. 2025) (enjoining Alaska policies that conflicted with federal protections for subsistence fishing); *United States v. Arizona*, No. 10–cv–01413, 2012 WL 4076192, at *1 (D. Ariz. Sept. 18, 2012) (enjoining Arizona's immigration regulations for conflict with the federal immigration scheme); *United States v. Missouri*, 114 F.4th 980, 987 (8th Cir. 2024) (enjoining Missouri officials from enforcing a law ordering them not to comply with federal gun laws); *United States v. Alabama*, No. 11–cv–2746, 2013 WL 10799535, at *1 (N.D. Ala. Nov. 25, 2013) (enjoining Alabama from enforcing immigration

regulations that intruded on the field occupied by federal law); *cf. United States v. Sup. Ct.*, 839 F.3d 888, 929 (10th Cir. 2016) (prohibiting enforcement of certain state ethics rules against federal prosecutors).

In particular, we've seen the extension of equitable remedial power when state elections run afoul of federal law. *See, e.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960) (holding that federal courts can review state redistricting plans "when state power is used as an instrument for circumventing a federally protected right"); *Smiley*, 285 U.S. at 368, 375 (ordering a district court to enjoin Minnesota's Secretary of State from implementing an unlawful congressional redistricting scheme).

It's even more common when the challenged state conduct leads to vote dilution. *See, e.g.*, *Broom v. Wood*, 1 F. Supp. 134, 136 (S.D. Miss.), *rev'd on other grounds*, 287 U.S. 1 (1932) (ordering an injunction to remedy vote dilution); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (holding that "once a State's legislative apportionment scheme has been found to be unconstitutional," a court is usually justified in "taking appropriate action to insure that no further elections are conducted under the invalid plan"); *id.* at 586 (affirming the district court's injunction "ordering into effect a reapportionment of both houses of the Alabama Legislature"); *White v. Regester*, 412 U.S. 755, 765 (1973) (affirming an injunction to stop congressional maps being used "invidiously to cancel out or minimize" minority "voting strength"); *Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 581, 583 (11th Cir. 1995) (per curiam) (allowing an injunction where "failing to exclude the contested absentee ballots . . . would dilute the [legitimate] votes"). So ordering an injunction to enforce § 611(a), which protects against the dilution of citizens' votes, is nothing new.

To be sure, we should be skeptical of the overbroad use of federal courts' equitable remedial power. *See, e.g.*, *Brown v. Plata*, 563 U.S. 493, 555 (2011) (Scalia, J., dissenting) ("Structural injunctions depart from . . . historical practice, turning judges into long-term administrators of complex social institutions such as schools, prisons, and police departments."); *Missouri v. Jenkins*, 515 U.S. 70, 124 (1995) (Thomas, J., concurring) ("As with any inherent judicial power, . . . we ought to be reluctant to approve its aggressive or extravagant use, and instead we should exercise it in a manner consistent with our history and traditions." (simplified)).

But on this emergency posture, we should have at least granted the federal government temporary, narrow relief tailored to safeguarding the election. A limited injunction directing California to stop commingling suspected illegal ballots with legal ones is no extraordinary encroachment on state authority. *Cf. Roe*, 43 F.3d at 583 (ordering Alabama Secretary of State to sequester contested absentee ballots). Indeed, it is nothing like the structural injunctions regularly employed by federal courts in the past. In fact, Justice Alito recently ordered similar temporary relief in a state election—requiring that "all ballots received by mail . . . be segregated and kept in a secure, safe and sealed container separate from other voted ballots," and that "all such ballots, if counted, be counted separately." *Republican Party v. Boockvar*, No. 20A84, 2020 WL 6536912, at *1 (U.S. Nov. 6, 2020) (Alito, J., in chambers) (simplified). When, as here, a "question has national importance, and there is a strong likelihood that the [state action] violates the Federal Constitution," an injunction is appropriate. *Boockvar*, 592 U.S. 1068, 1070 (2020) (statement of Alito, J., joined by

Thomas and Gorsuch, JJ.). The government's request for "modest relief" should be granted. *Id.*

The point is simple: We as lower courts cannot ignore the federal government's historic interventions in election cases when the harm is as grave and as irreparable as the federal government asserts. "[I]njunctive relief has long been recognized as the proper means for preventing entities from acting [unlawfully]." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). This is especially true when the remedial relief would protect against voter dilution, which is at the heart of § 611(a).

California claims that such an injunction would be difficult to implement. I don't doubt it would be a challenge. But difficulty is no reason for courts to throw our hands in the air and give up—not when the threat is illegal votes undermining our elections. And there seems to be a factual dispute on the feasibility of enacting an injunction in short order. One county registrar attests that "locating and segregating challenged ballots is entirely possible and not catastrophic." Curtis Decl. ¶ 3, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 26, 2026), Dkt. 107-4. According to the declaration, "[e]very registrar of voters in the State of California uses an electronic information management system" that can flag potentially problematic ballots. *Id.* ¶ 4. The declaration states that "sorting machines will [be able to] flag [challenged] ballots before processing and automatically separating them into containers designed to capture segregated ballots." *Id.* And the declaration also asserts that counties could use a manual process to help accomplish the same task. *Id.* ¶ 5. The district court didn't even address the registrar's declaration. So California's asserted administrative burden is no reason

to deny relief by itself. We can order relief to the extent it is technologically feasible.

Contrary to the district court's view, such a remedy would not violate other federal laws. The remedy doesn't require Secretary Weber to carry out a "program" to remove otherwise eligible voters from voter rolls, in contravention of the National Voter Registration Act of 1993, 52 U.S.C. § 20507(c)(2)(A). And neither the Voting Rights Act of 1970, 52 U.S.C. § 10307(a), nor the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A), prevents California from investigating whether a particular mail-in ballot is cast by a qualified American citizen. After all, "[t]he right to vote is one of the badges of citizenship. The dignity and very concept of citizenship are diluted if noncitizens are allowed to vote . . . ." *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998) (Posner, C.J.).

This problem calls for a straightforward remedy: a simple command to stop commingling ballots. This narrow remedy avoids the "concerns associated with judges' running social institutions," *Plata*, 563 U.S. at 559 (Scalia, J., dissenting), and we should grant it.

## IV.

## CONCLUSION

Federal courts have a "virtually unflagging" duty to uphold the law. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (simplified). The federal government seeks limited relief before California election officials permanently separate likely noncitizen ballots from their mail-in envelopes. That harm cannot be undone. Because the Elections Clause vests Congress with power to protect the integrity of federal

elections, I would hold that California's actions are preempted under § 611(a) and enjoin California from commingling its ballots further.

The federal government and the States can work together. California decided long ago that aliens can't vote in its elections. Today, the federal government merely seeks to safeguard that decision. We should have let them try.

I respectfully dissent.